**DEPARTMENT OF THE TREASURY**
**WASHINGTON, D.C. 20220**



Case IDs: UKRAINE2-3792, UKRAINE-EO13661-13363, UKRAINE-EO13661-13367, UKRAINE-EO13661-13389, UKRAINE-EO13661-13382, UKRAINE-EO13661-13434, UKRAINE-EO13661-13384, UKRAINE-EO13661-13385, UKRAINE-EO13661-13334, UKRAINE-EO13661-13370, UKRAINE-EO13661-13321, UKRAINE-EO13661-13417, UKRAINE-EO13661-13372

OFFICE OF FOREIGN ASSETS CONTROL

## SPECIAL DESIGNATION AND BLOCKING MEMORANDUM

Pursuant to Executive Order 13661 of March 16, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine" (the Order), 31 C.F.R. § 589.802, and section 203 of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, I hereby determine, in consultation with the Department of State, that the persons listed below, and further addressed in the evidentiary memoranda listed at the top of this page and attached to this memorandum meet one or more of the criteria for designation set forth in the Order. Therefore, the persons listed below are designated pursuant to the Order and will now appear on the Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List.

### Individuals:

1. AKIMOV, Andrey Igorevich, Russia; DOB 1953; POB Leningrad, Russia; Gender Male; Chairman of the Management Board of Gazprombank (individual) [UKRAINE-EO13661].

2. DERIPASKA, Oleg Vladimirovich, Moscow, Russia; 64 Severnaya Street, Oktyabrsky, Khutor, Ust-Labinsky District, Krasnodar Territory 352332, Russia; 5, Belgrave Square, Belgravia, London SW1X 8PH, United Kingdom; DOB 02 Jan 1968; POB Dzerzhinsk, Nizhny Novgorod Region, Russia; citizen Russia; alt. citizen Cyprus; Gender Male (individual) [UKRAINE-EO13661] [UKRAINE-EO13662].

3. DYUMIN, Alexey Gennadyevich (a.k.a. DYUMIN, Alexei), Russia; DOB 28 Aug 1972; POB Kursk, Russian Federation; Gender Male (individual) [UKRAINE-EO13661].

4. FRADKOV, Mikhail Efimovich (Cyrillic: ФРАДКОВ, Михаил Ефимович), Russia; DOB 01 Sep 1950; POB Kurumoch, Kuibyshev Region, Russia; Gender Male; Director of the Russian Institute for Strategic Studies (individual) [UKRAINE-EO13661].

5. FURSENKO, Sergei (a.k.a. FURSENKO, Sergey; a.k.a. FURSENKO, Sergey Aleksandrovich); DOB 11 Mar 1954; POB Saint-Petersburg (F.K.A. Leningrad), Russian Federation; citizen Russia; Gender Male (individual) [UKRAINE-EO13661].

UKRAINE-EO13661-13321: 0001

6. GOVORUN, Oleg, Russia; DOB 15 Jan 1969; POB Bratsk, Irkutsk Region, Russia; Gender Male; Head of the Presidential Directorate for Social and Economic Cooperation with the Commonwealth of Independent States Member Countries, the Republic of Abkhazia, and the Republic of South Ossetia (individual) [UKRAINE-EO13661].

7. KERIMOV, Suleiman Abusaidovich (Cyrillic: КЕРИМОВ, Сулейман Абусаидович) (a.k.a. KERIMOV, Suleyman), Moscow, Russia; Antibes, France; DOB 12 Mar 1966; POB Derbent, Republic of Dagestan, Russia; citizen Russia; Gender Male (individual) [UKRAINE-EO13661].

8. KOLOKOLTSEV, Vladimir Alexandrovich, Russia; DOB 11 May 1961; POB Nizhny Lomov, Penza Region, Russia; Gender Male; Minister of Internal Affairs of the Russian Federation, General of the Police of the Russian Federation (individual) [UKRAINE-EO13661].

9. KOSACHEV, Konstantin, Russia; DOB 17 Sep 1962; POB Moscow, Russia; nationality Russia; Gender Male; Chairperson of the Council of the Federation Committee on Foreign Affairs (individual) [UKRAINE-EO13661].

10. KOSTIN, Andrey Leonidovich, Moscow, Russia; DOB 21 Sep 1956; POB Moscow, Russian Federation; Gender Male (individual) [UKRAINE-EO13661].

11. MILLER, Alexey Borisovich, Moscow, Russia; DOB 31 Jan 1962; POB Saint-Petersburg, Russian Federation; Gender Male (individual) [UKRAINE-EO13661].

12. REZNIK, Vladislav Matusovich, Moscow, Russia; DOB 17 May 1954; Gender Male (individual) [UKRAINE-EO13661].

13. PATRUSHEV, Nikolai Platonovich, Russia; DOB 11 Jul 1951; POB Leningrad, Russian Federation; nationality Russia; Gender Male; Secretary of the Russian Federation Security Council (individual) [UKRAINE-EO13661].

14. SHKOLOV, Evgeniy Mikhailovich, Russia; DOB 31 Aug 1955; POB Dresden, Germany; nationality Russia; Gender Male; Aide to the President of the Russian Federation (individual) [UKRAINE-EO13661].

15. SKOCH, Andrei Vladimirovich (a.k.a. SKOCH, Andrey), Russia; DOB 30 Jan 1966; POB Nikolsky (Moscow), Russia; Gender Male; Deputy of State Duma (individual) [UKRAINE-EO13661].

16. TORSHIN, Alexander Porfiryevich, Moscow, Russia; DOB 27 Nov 1953; POB Mitoga village, Ust-Bolsheretsky district, Kamchatka region, Russian Federation; Gender Male (individual) [UKRAINE-EO13661].

17. USTINOV, Vladimir Vasilyevich, Russia; DOB 25 Feb 1953; POB Nikolayevsk-on-Amur, Russian Federation; Gender Male (individual) [UKRAINE-EO13661].

UKRAINE-EO13661-13321: 0002

18. VALIULIN, Timur Samirovich, Russia; DOB 20 Dec 1962; POB Krasnozavodsk, Zagorsk District, Moscow Region, Russia; Gender Male; Chief of the General Administration for Combating Extremism of the Ministry of Internal Affairs of the Russian Federation (individual) [UKRAINE-EO13661].

19. ZHAROV, Alexander Alexandrovich (a.k.a. ZHAROV, Aleksandr), Russia; DOB 11 Aug 1964; POB Chelyabinsk, Russia; Gender Male; Head of the Federal Service for Supervision of Communications, Information Technology, and Mass Media (individual) [UKRAINE-EO13661].

20. ZOLOTOV, Viktor Vasiliyevich, Russia; DOB 27 Jan 1954; POB Ryazanskaya oblast, Russia; nationality Russia; Gender Male; Director of the Federal Service of National Guard Troops and Commander of the National Guard Troops of the Russian Federation (individual) [UKRAINE-EO13661].

**Entities:**

1. AGROHOLDING KUBAN (a.k.a. KUBAN AGRO; a.k.a. KUBAN AGROHOLDING), 77 Mira St., Ust-Labinsk, Krasnodar Territory 352330, Russia; 1 Montazhnaya St., Ust-Labinsk, Krasnodar Territory, Russia; 116 Mira St., Ust-Labinsk, Krasnodar Territory, Russia; 1 G. Konshinykh St., Krasnodar Territory, Russia; 2 Rabochaya St., Ust-Labinsk, Krasnodar Territory, Russia [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: BASIC ELEMENT LIMITED).

2. BASIC ELEMENT LIMITED (a.k.a. BAZOVY ELEMENT), Esplanade 44, Saint Helier JE4 9WG, Jersey; 30 Rochdelskaya Street, Moscow 123022, Russia; Registration ID 84039 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

3. B-FINANCE LTD, Vanterpool Plaza, 2nd Floor, Wickhams Cay, Road Town, Tortola, Virgin Islands, British [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

4. EN+ GROUP PLC, Esplanade 44, Saint Helier JE4 9WG, Jersey; 8 Cleveland Row, London SW1A 1DH, United Kingdom; 1 Vasilisy Kozhinoy St., Moscow 121096, Russia; Registration ID 91061 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

5. GAZ GROUP, 88 Lenin Avenue, Nizhny Novgorod 603950, Russia; 15/1 Rochdelskaya Str., Moscow 123022, Russia [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: RUSSIAN MACHINES).

6. JSC EUROSIBENERGO, 165 Chkalova Street, Divnogorsk, Krasnoyarsk Krai 663091, Russia; 1 Vasilisy Kozhinoy Street, Moscow 121096, Russia; Registration ID 5087746073817; Tax ID No. 7706697347; Identification Number 88303955 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: EN+ GROUP PLC).

UKRAINE-EO13661-13321: 0003

7. RUSSIAN MACHINES (a.k.a. RUSSKIE MASHINY), Ul. Rochdelskaya 15, 8, Moscow 123022, Russia; Registration ID 1112373000596; Tax ID No. 2373000582; Identification Number 37100386 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: BASIC ELEMENT LIMITED).

8. UNITED COMPANY RUSAL PLC, 44 Esplanade, St. Helier JE4 9WG, Jersey; 1 Vasilisy Kozhinoy Str., Moscow 121096, Russia; 11/F Central Twr., 28 Queen's Rd. C, Central District, Hong Kong; Registration ID 94939; Company Number F-17314 (Hong Kong); Business Number 51566843 (Hong Kong) [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: EN+ GROUP PLC).

Accordingly, except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, (1) all real, personal, and any other property and interests in property of the persons listed above that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any U.S. person are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in, and (2) any transaction or dealing by a U.S. person or within the United States in property or interests in property of the persons named above is prohibited, including the making or receiving of any contribution or provision of funds, goods, or services by, to, for the benefit of, or from these persons.

Additionally, except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, the following are prohibited: (1) any transaction by a U.S. person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions contained in the Order; and (2) any conspiracy formed to violate any of the prohibitions in the Order.

The President determined in section 7 of the Order that, because of the ability to transfer funds or other assets instantaneously, prior notice to persons determined to be subject to the Order who might have a constitutional presence in the United States would render ineffectual the blocking and other measures authorized by the Order. Therefore, the President determined that there need be no prior notice of such a determination. In making these determinations pursuant to the Order, I also find that no prior notice should be afforded to the persons named above because to do so would provide an opportunity to evade the measures authorized in the Order and, consequently, would render those measures ineffectual.

April 6, 2018
Date

Andrea M. Gacki
Acting Director
Office of Foreign Assets Control

UKRAINE-EO13661-13321: 0004



## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

Case IDs: UKRAINE-EO13662-13412, UKRAINE-EO13662-13226, UKRAINE-EO13662-13414, UKRAINE-EO13661-13434, UKRAINE-EO13661-13321, UKRAINE-EO13662-13323, UKRAINE-EO13662-13366

### OFFICE OF FOREIGN ASSETS CONTROL

### SPECIAL DESIGNATION AND BLOCKING MEMORANDUM

Pursuant to Executive Order 13662 of March 20, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine" (the Order), 31 C.F.R. §589.802, and section 203 of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, and following the Secretary of the Treasury's determination pursuant to section 1(a)(i) of the Order with respect to the energy sector of the Russian Federation economy, I hereby determine, in consultation with the Department of State, that the persons listed below, and further addressed in the evidentiary memoranda listed at the top of this page and attached to this memorandum meet one or more of the criteria for designation set forth in the Order. Therefore, the persons listed below are designated pursuant to the Order and will now appear on the Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List.

### Individuals:

1. BOGDANOV, Vladimir Leonidovich, Russia; DOB 28 May 1951; POB Suyerka, Uporovsky District, Tyumen Region, Russian Federation; Gender Male (individual) [UKRAINE-EO13662].

2. DERIPASKA, Oleg Vladimirovich, Moscow, Russia; 64 Severnaya Street, Oktyabrsky, Khutor, Ust-Labinsky District, Krasnodar Territory 352332, Russia; 5, Belgrave Square, Belgravia, London SW1X 8PH, United Kingdom; DOB 02 Jan 1968; POB Dzerzhinsk, Nizhny Novgorod Region, Russia; citizen Russia; alt. citizen Cyprus; Gender Male (individual) [UKRAINE-EO13661] [UKRAINE-EO13662].

3. ROTENBERG, Igor Arkadyevich (a.k.a. ROTENBERG, Igor Arkadevich); DOB 09 May 1973; POB Leningrad, Russia; Gender Male (individual) [UKRAINE-EO13662].

4. SHAMALOV, Kirill Nikolaevich; DOB 22 Mar 1982; POB Leningrad, Russia; Gender Male (individual) [UKRAINE-EO13662].

5. VEKSELBERG, Viktor Feliksovich, Russia; DOB 14 Apr 1957; POB Drogobych, Lviv region, Ukraine; Gender Male (individual) [UKRAINE-EO13662].

UKRAINE-EO13661-13321: 0005

### Entities:

1. AGROHOLDING KUBAN (a.k.a. KUBAN AGRO; a.k.a. KUBAN AGROHOLDING), 77 Mira St., Ust-Labinsk, Krasnodar Territory 352330, Russia; 1 Montazhnaya St., Ust-Labinsk, Krasnodar Territory, Russia; 116 Mira St., Ust-Labinsk, Krasnodar Territory, Russia; 1 G. Konshinykh St., Krasnodar Territory, Russia; 2 Rabochaya St., Ust-Labinsk, Krasnodar Territory, Russia [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: BASIC ELEMENT LIMITED).

2. BASIC ELEMENT LIMITED (a.k.a. BAZOVY ELEMENT), Esplanade 44, Saint Helier JE4 9WG, Jersey; 30 Rochdelskaya Street, Moscow 123022, Russia; Registration ID 84039 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

3. B-FINANCE LTD, Vanterpool Plaza, 2nd Floor, Wickhams Cay, Road Town, Tortola, Virgin Islands, British [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

4. EN+ GROUP PLC, Esplanade 44, Saint Helier JE4 9WG, Jersey; 8 Cleveland Row, London SW1A 1DH, United Kingdom; 1 Vasilisy Kozhinoy St., Moscow 121096, Russia; Registration ID 91061 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

5. GAZ GROUP, 88 Lenin Avenue, Nizhny Novgorod 603950, Russia; 15/1 Rochdelskaya Str., Moscow 123022, Russia [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: RUSSIAN MACHINES).

6. GAZPROM BURENIE, OOO (f.k.a. BUROVAYA KOMPANIYA OAO GAZPROM, DOCHERNEE OBSHCHESTVO S OGRANICHENNOI OTVETSTVENNOSTYU; a.k.a. GAZPROM BURENIYE LLC; a.k.a. GAZPROM DRILLING; a.k.a. LIMITED LIABILITY COMPANY GAZPROM BURENIYE; a.k.a. OBSHCHESTVO S OGRANICHENNOI OTVETSTVENNOSTYU GAZPROM BURENIE), 12A, ul. Nametkina, Moscow 117420, Russia; Website www.burgaz.ru; Email Address mail@burgaz.gazprom.ru; Registration ID 1028900620319; Tax ID No. 5003026493; Government Gazette Number 00156251 [UKRAINE-EO13662] (Linked To: ROTENBERG, Igor Arkadyevich).

7. JSC EUROSIBENERGO, 165 Chkalova Street, Divnogorsk, Krasnoyarsk Krai 663091, Russia; 1 Vasilisy Kozhinoy Street, Moscow 121096, Russia; Registration ID 5087746073817; Tax ID No. 7706697347; Identification Number 88303955 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: EN+ GROUP PLC).

8. LADOGA MENEDZHMENT, OOO (a.k.a. OBSHCHESTVO S OGRANICHENNOI OTVETSTVENNOSTYU LADOGA MENEDZHMENT; a.k.a. OOO LADOGA MANAGEMENT), 10, naberezhnaya Presnenskaya, Moscow 123317, Russia; Registration ID 1147748143971; Tax ID No. 7729442761; Government Gazette Number 29437172 [UKRAINE-EO13662] (Linked To: SHAMALOV, Kirill Nikolaevich).

UKRAINE-EO13661-13321: 0006

9. NPV ENGINEERING OPEN JOINT STOCK COMPANY (a.k.a. AKTSIONERNOE OBSHCHESTVO ENPIVI INZHINIRING; a.k.a. AO ENPIVI INZHINIRING; a.k.a. ENPIVI INZHINIRING, AO; a.k.a. NPV ENGINEERING JOINT STOCK COMPANY; a.k.a. OJSC NPV ENGINEERING), 5, per. Strochenovski B., Moscow 115054, Russia; PER. Strochenovskii B D.5, Moscow 115054, Russia; Website www.npve.narod.ru; Email Address npw@npv.su; Registration ID 106774653683; Tax ID No. 7707587805; Government Gazette Number 95533058 [UKRAINE-EO13662] (Linked To: ROTENBERG, Igor Arkadyevich).

10. RENOVA GROUP (a.k.a. JOINT-STOCK COMPANY RENOVA GROUP OF COMPANIES; a.k.a. JSC RENOVA GROUP OF COMPANIES), V, 28 Balaklavskiy Prospekt, Moscow 117452, Russia; 40, Malaya Ordynka, Moscow 115184, Russia; Registration ID 1047796880548; Tax ID No. 7727526670; Government Gazette Number 772701001 [UKRAINE-EO13662] (Linked To: VEKSELBERG, Viktor Feliksovich).

11. RUSSIAN MACHINES (a.k.a. RUSSKIE MASHINY), Ul. Rochdelskaya 15, 8, Moscow 123022, Russia; Registration ID 1112373000596; Tax ID No. 2373000582; Identification Number 37100386 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: BASIC ELEMENT LIMITED).

12. UNITED COMPANY RUSAL PLC, 44 Esplanade, St. Helier JE4 9WG, Jersey; 1 Vasilisy Kozhinoy Str., Moscow 121096, Russia; 11/F Central Twr., 28 Queen's Rd. C, Central District, Hong Kong; Registration ID 94939; Company Number F-17314 (Hong Kong); Business Number 51566843 (Hong Kong) [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: EN+ GROUP PLC).

Accordingly, except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, (1) all real, personal, and any other property and interests in property of the persons listed above that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any U.S. person are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in, and (2) any transaction or dealing by a U.S. person or within the United States in property or interests in property of the persons named above is prohibited, including the making or receiving of any contribution or provision of funds, goods, or services by, to, for the benefit of, or from these persons.

Additionally, except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, the following are prohibited: (1) any transaction by a U.S. person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions contained in the Order; and (2) any conspiracy formed to violate any of the prohibitions in the Order.

The President determined in section 7 of the Order that, because of the ability to transfer funds or other assets instantaneously, prior notice to persons determined to be subject to the Order who might have a constitutional presence in the United States would render ineffectual the blocking and other measures authorized by the Order. Therefore, the President determined that there need

UKRAINE-EO13661-13321: 0007

be no prior notice of such a determination. In making these determinations pursuant to the Order, I also find that no prior notice should be afforded to the persons named above because to do so would provide an opportunity to evade the measures authorized in the Order and, consequently, would render those measures ineffectual.

April 6, 2018
Date

Andrea M. Gacki
Acting Director
Office of Foreign Assets Control

UKRAINE-EO13661-13321: 0008



# CLEARANCE SHEET

Case ID: UKRAINE-EO13661-13321                    Date: April 3, 2018

**SUBJECT:** <u>Oleg Deripaska: Designation Pursuant to E.O. 13661 of March 16, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine," and E.O. 13662 of March 20, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine."</u>

Designation Date (if applicable): <u>4/5/2018</u>

## MEMORANDUM FOR:
X❑ DIRECTOR
❑ DEPUTY DIRECTOR
❑ Associate Director, Office of Sanctions Support and Operations
X❑ Associate Director, Office of Global Targeting
❑ Associate Director, Office of Sanctions Policy and Implementation
❑ Associate Director, Office of Compliance and Enforcement
❑ Chief Counsel, Office of Chief Counsel

## REVIEW OFFICES:

| | | |
|---|---|---|
| ❑ OSSO/TSLIT | ❑ OGT/GCN | ❑ OCE/ENF |
| ❑ OSSO/MPD | ❑ OGT/AST | ❑ OSPI/LIC |
| ❑ OSSO/SSD | X❑ OGT/MME | ❑ OSPI/POL |
| ❑ OSSO/IDS | ❑ OGT/CHC | ❑ OSPI/RA |
| X❑ OCC | ❑ OCE/SC&E | ❑ Advisor: _____ |

REFERRALS:  ❑ State  ❑ Other: _____

| NAME | INITIALS/ E-SIGN | DATE | DIVISION | PHONE NO. |
|---|---|---|---|---|
| **DRAFTER/INITIATOR(S)** ▮ | | | | |
| **REVIEWER/CLEARER(S)** ▮ | eSign | 3/22/2018 | GLOBAL WMD, MID-EAST, EURASIA (GME) | ▮ |
| ▮ | eSign | 3/23/2018 | Chief Counsels Office | ▮ |



**THE DEPUTY SECRETARY OF THE TREASURY**
WASHINGTON

**Case No. UKRAINE-EO13661-13321**

## EVIDENTIARY MEMORANDUM

(U) MEMORANDUM FOR: JOHN E. SMITH ███████ *for* TCS 4·5·2018
DIRECTOR
OFFICE OF FOREIGN ASSETS CONTROL

(U) THROUGH: GREGORY T. GATJANIS ██████ *GG*
ASSOCIATE DIRECTOR
OFFICE OF GLOBAL TARGETING

TODD C. CONKLIN ████████
DEPUTY ASSOCIATE DIRECTOR
OFFICE OF GLOBAL TARGETING

LEILA M. BAHERI
ASSISTANT DIRECTOR
GLOBAL WMD, MID-EAST EURASIA DIVISION

████████████
ACTING SECTION CHIEF
GLOBAL WMD, MID-EAST EURASIA DIVISION
RUSSIA-UKRAINE/SYRIA SECTION

(U) FROM: ████████████
GLOBAL WMD, MID-EAST EURASIA DIVISION
RUSSIA-UKRAINE/SYRIA SECTION

(U) SUBJECT: **OLEG VLADIMIROVICH DERIPASKA:** Designation
Pursuant to Executive Order 13661 of March 16, 2014, "Blocking
Property of Additional Persons Contributing to the Situation in
Ukraine" and Executive Order 13662 of March 20, 2014,
"Blocking Property of Additional Persons Contributing to the
Situation in Ukraine"

## (U) I. INTRODUCTION

(U) On March 16, 2014, the President issued Executive Order 13661, "Blocking Property of
Additional Persons Contributing to the Situation in Ukraine," ("E.O. 13661"). [Exhibit 1]

1

(U) E.O. 13661 blocks the property and interests in property of any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, to meet one or more of the criteria in E.O. 13661. [Exhibit 1]

(U) On March 20, 2014, the President issued Executive Order 13662, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine," ("E.O. 13662").

(U) E.O. 13662 blocks the property and interests in property of any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, to meet one or more of the criteria in E.O. 13662. [Exhibit 2, p. 1]

(U//FOUO) On July 16, 2014, the Secretary of the Treasury, in consultation with the Secretary of State, determined that section 1(a)(i) of E.O. 13662 shall apply to the energy sector of the Russian Federation economy. [Exhibit 3, p. 1]

(U) Information presented in this memorandum and accompanying exhibits provides reason to believe that **OLEG VLADIMIROVICH DERIPASKA**, has acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation, [Exhibit 1, p. 1] and operates in the energy sector of the Russian Federation economy [Exhibit 2, p. 1] and therefore should be added to the list of Specially Designated Nationals and Blocked Persons.[1]

## (U) II. IDENTIFYING INFORMATION

- (U) **OLEG VLADIMIROVICH DERIPASKA** [Exhibit 4, p. 5]
- (U) D.O.B.: January 2, 1968 [Exhibit 4, p. 4]
- (U) P.O.B.: Dzerzhinsk, Nizhny Novgorod Region, Russia [Exhibit 5, p. 1]
- (U) Address: Moscow, Russia [Exhibit 6, p. 1]
- (U) alt. Address: 64 Severnaya Street, Oktyabrsky, Khutor, Ust-Labinsky District, Krasnodar Territory, Russia 352332 [Exhibit 29, p. 1]
- (U) alt. Address: 5, Belgrave Square, Belgravia, London, SW1X 8PH, United Kingdom [Exhibit 7, p. 2] [Exhibit 8, p. 1]
- (U) Gender: Male [Exhibit 6, p. 1]
- (U) Citizenship: Russia [Exhibit 6, p. 1]
- (U) alt. Citizenship: Cyprus [Exhibit 12, pp. 1 and 2]

---

[1] (U) The name of the proposed target will appear in BOLD CAPITAL letters. Throughout this memorandum, an asterisk (*) following a name in ALL CAPS denotes an individual or entity whose property and interests in property have been blocked.

UKRAINE-EO13661-13321: 0010

## (U) III. BASIS FOR DETERMINATION

### (U) OLEG VLADIMIROVICH DERIPASKA (DERIPASKA)

*(U) DERIPASKA has acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation*[2]

(S//NF) DERIPASKA Has Acted in Support of Russian President Vladimir Putin's Projects

(S/

[Exhibit 14, p. 2]

(S//NF

[Exhibit 15, pp. 2 and 3]

(S

[Exhibit 16, p. 2]

(U) *The Nation* reported on October 1, 2008, that DERIPASKA told one of his closest associates that he bought an aluminum plant in Montenegro in 2005 "because Putin encouraged him to do it. ...the Kremlin wanted an area of influence in the Mediterranean." [Exhibit 22, p. 5]

---

[2] (S//NF) Investigator Comment: The Endeavor Group, which provided legal advice to DERIPASKA on issues regarding his U.S. visa, asserted in its May 2009 Foreign Agents Registration Act ("FARA") filing of lobbying on his behalf that DERIPASKA was not supervised, owned, directed, controlled, financed, or subsidized by a foreign government, foreign political party or other foreign principal. [Exhibit 13, pp. 1-3] However, OFAC assesses that DERIPASKA has acted on behalf of senior Russian officials, such as President Vladimir Putin, as demonstrated by the information in this evidentiary memorandum.

[3] (S

(U) [Exhibit 14, p. 1]

(S//NF) [Exhibit 15, p. 2]

[Exhibit 15, pp. 2-3]

(S [Exhibit 16, p. 1]

UKRAINE-EO13661-13321: 0011



[Exhibit 23, pp. 1-2]

[Exhibit 18, p. 2]

[Exhibit 19, p. 2]

[Exhibit 20, p. 3]

*(U) DERIPASKA Operates in the Energy Sector of the Russian Federation Economy*

(U) According to **DERIPASKA's** web site, accessed on March 22, 2018, **DERIPASKA** is involved in several World Economic Forum projects including ones on "New Energy Architecture" and the "Interaction between the Power Industry and Society." As part of his work

---

[7] (U) ████████████████████████████████████
[Exhibit 18, p. 2]
[8] (S//NF) Investigator Comment: Gaz is actually a **DERIPASKA** business that manufactures commercial vehicles. [Exhibit 25, p. 2]
[9] (U) ████████████████████████████████████
[Exhibit 19, p. 2]
[10] (U) ████████████████████████████
[Exhibit 20, p. 2]
[11] (U) On July 29, 2014, pursuant to E.O. 13662, OFAC imposed sanctions against VTB BANK*, prohibiting U.S. persons from providing new financing and limiting their access to U.S. capital markets. [Exhibit 21, p. 1]

4

UKRAINE-EO13661-13321: 0012

on the APEC Business Advisory Council, DERIPASKA focuses on multiple issues including energy efficiency and energy security. At a February 2012 meeting of the Council, DERIPASKA's representative presented the North East Asian Region Electrical System Ties Initiative (NEAREST), whose goal is to improve ties between the power grids of Eastern Siberia, Northern and North Eastern China, Japan, and South Korea through the creation of a transnational power grid in Northeast Asia. [Exhibit 24, pp. 1 and 3]

(U) According to DERIPASKA's web site, as of January 31, 2018, DERIPASKA's key companies operate in multiple sectors of the economy, to include the energy sector. EuroSibEnergo is the largest private power company in Russia, and produces around 9 percent of Russia's total electricity generation. [Exhibit 25, pp. 1 and 5]

(U) According to a November 3, 2017 prospectus of an offering, En+ Group[12] was initially established to hold certain aluminum and alumina assets acquired by DERIPASKA. It · eventually evolved to become "a leading international vertically integrated aluminum and power producer" with core assets located in Russia. All power assets owned by companies related to DERIPASKA were combined under EuroSibEnergo plc, a Cypriot intermediary holding subsidiary of EN+ Group. As of the date of the prospectus, EN+ Group[13] owned 100 percent of EuroSibEnergo plc which in turn owned 100 percent of JSC EuroSibEnergo in Russia. [Exhibit 26, pp. 7, 9, 20, and 25] According to EuroSibEnergo's web site, as of February 12, 2018, EuroSibEnergo, a part of EN+ Group, is the largest independent power company in Russia, operating power plants across Russia, and one of the largest hydropower generation companies in the world. EuroSibEnergo produces around 9 percent of Russia's total electricity volume and is Siberia's largest power producer. [Exhibit 27, pp. 1 and 2]

(U) Additional Information

(S//NF) Pursuant to Section 241 of the Countering America's Adversaries Through Sanctions Act of 2017 (CAATSA), the U.S. Department of the Treasury submitted a report to Congress, dated January 29, 2018, that identifies senior foreign political figures and oligarchs in the Russian Federation. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[Exhibit 28, pp. 1, 2, and 6]

---

[12] (U) The prospectus states that after the offering is completed and an option in it is fully exercised, DERIPASKA's holding in EN+ Group would be 65.2% upon admission to the London Stock Exchange. [Exhibit 26, p. 4]

[13] (U) Investigator Comment: Although identified on page 9 of Exhibit 26 as EN+ Group Limited, OFAC assesses this to be EN+ Group plc based on its consistent usage throughout the exhibit while EN+ Group Limited is only used the single time.

UKRAINE-EO13661-13321: 0013

(U) In a declaration filed with the Supreme Court of the State of New York County of New York on June 9, 2016, DERIPASKA stated that, "I have a diplomatic passport from Russia, and on occasion I have represented the Russian government in countries outside Russia." [Exhibit 17, p. 4]

(U) On October 28, 2008, the *Financial Times* reported that DERIPASKA had previously told the newspaper that he would give up his company RUSAL if the Russian government asked him to, noting, "I don't separate myself from the state. I have no other interests." [Exhibit 11, p. 5]

(U) On July 10, 2012, *The Telegraph* reported that an Uzbek businessman, Djalol Khaidarov, told U.S., Israeli, and Russian prosecutors that DERIPASKA was involved in bribing a governor in Siberia to secure the takeover of an aluminum plant. Khaidarov also claimed that DERIPASKA was a member of an organized crime group and ordered the murder of a businessman in 1995. [Exhibit 9, p. 1] The previous day, July 9, *The Times* reported that in testimony to a German court, Khaidarov[14], claimed DERIPASKA had links to a Russian organized crime group, stating that, "one could certainly say he [DERIPASKA] knew about the murders and operating methods [of the Russian mafia]." The judge in the case said that even though he implicated himself in criminality Khaidarov's testimony was credible, adding that "there were no indications of ostentatious grudge-settling." [Exhibit 10, pp. 1 and 2]

(U) *The Nation* reported on October 1, 2008 that DERIPASKA has been investigated for money-laundering in Germany as well as accused of threatening the lives of two rivals in the aluminum industry in the United States and illegally wiretapping an Israeli official. These along with other accusations of involvement in extortion and racketeering resulted in DERIPASKA being denied a visa to enter the United States, with only a brief lapse, since 1998. [Exhibit 22, pp. 6, 7, and 9]

---

[14] (U) Investigator Comment: Although spelled in this exhibit as "Dschalol Hajdarov," "Djalol Khaidarov" will be used throughout this memorandum for consistency.

UKRAINE-EO13661-13321: 0014

## (U) LIST OF EXHIBITS

(U) Exhibit 1: Executive Order 13661 of March 16, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine," 79 Fed. Reg. 15535 (March 19, 2014). (U)

(U) Exhibit 2: Executive Order 13662 of March 20, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine," 79 Fed. Reg. 16169 (March 24, 2014). (U)

(U) Exhibit 3: U.S. Department of the Treasury, "Determination Pursuant to Section 1(a)(i) of Executive Order 13662," July 16, 2014. (U//FOUO)

(U) Exhibit 4: *Bloomberg*, "Bloomberg Billionaires Index #179 Oleg Deripaska," available at www.bloomberg.com/billionaires/profiles/oleg-deripaska/, accessed January 31, 2018. (U)

(U) Exhibit 5: Web site of Oleg Deripaska, Family, available at www.deripaska.com/about/biography/, accessed January 31, 2018. (U)

(U) Exhibit 6: *Forbes*, Oleg Deripaska, available at www.forbes.com/profile/oleg-deripaska/, accessed January 31, 2018. (U)

(U) Exhibit 7: *The Guardian*, "Mega-Rich Homes Tour Puts Spotlight on London's Oligarchs," Luke Harding, February 4, 2016, available at www.the guardian.com/uk-news/2016/feb/04/mega-rich-homes-tour-london-oligarchs-russia-alexei-navalny-putin. (U)

(U) Exhibit 8: Google.com, 5 Belgrave Square London, available at www.google.com/maps/, accessed February 28, 2018. (U)

(U) Exhibit 9: *The Telegraph*, "Oligarch Linked to Politicians 'Ordered Murder of Banker,'" Sam Marsden, July 10, 2012, available at www.telegraph.co.uk/finance/financial-crime/9387913/Oligarch-linked-to-politicians-ordered-murder-of-banker.html. (U)

(U) Exhibit 10: *The Times*, "Billionaire 'With Mafia Links Spied on Rivals,'" Roger Boyes and Alex Spence, July 9, 2012, available at www.thetimes.co.uk/article/billionaire-with-mafia-links-spied-on-rivals-5bgt5k5brb6. (U)

(U) Exhibit 11: *Financial Times*, "Close to the Wind: Russia's Oligarchs," Catherine Belton, October 24, 2008, available at www.ft.com/content/d96aa8ac-a1f9-11dd-a32f-000077b07658. (U)

(U) Exhibit 12: OCCRP, "Russian Billionaire Linked to Trump, Manafort Has New Cyprus Passport," Sara Farolfi and Stelios Orphanides, March 5, 2018,

7

UKRAINE-EO13661-13321: 0015

available at: www.occrp.org/en/goldforvisas/russian-billionaire-linked-to-trump-manafort-has-new-cyprus-passport. (U)

(U) Exhibit 13: U.S. Department of Justice, Foreign Agents Registration Act Filing – Endeavor Group, May 8, 2009. (U)

(U) Exhibit 14:

(U) Exhibit 15: (S//NF)

(U) Exhibit 16:

(U) Exhibit 17: Declaration of Oleg Deripaska in Opposition to Gliklad's Motion for Summary Judgement and in Support of Deripaska's Cross Motion, Alexander Gliklad v. Oleg Deripaska, 652641/2015 (Supreme Court of the State of New York County of New York), filed on June 9, 2016. (U)

(U) Exhibit 18: (S//NF)

(U) Exhibit 19: (S//NF)

(U) Exhibit 20: (S//NF)

(U) Exhibit 21: U.S. Department of the Treasury web site, Press Release, "Announcement of Additional Treasury Sanctions on Russian Financial Institutions and on a Defense Technology Entity," July 29, 2014, available at www.treasury.gov/press-center/press-releases/Pages/jl2590.aspx. (U)

(U) Exhibit 22: The Nation, "McCain's Kremlin Ties," Mark Ames and Ari Berman, October 1, 2008, available at www.thenation.com/artticle/mccains-kremlin-ties/. (U)

(U) Exhibit 23:

(U) Exhibit 24: Web site of Oleg Deripaska, Initiatives, available at www.deripaska.com/business/, accessed March 22, 2018. (U)

(U) Exhibit 25: Web site of Oleg Deripaska, Business, available at www.deripaska.com/business/, accessed January 31, 2018. (U)

(U) Exhibit 26: EN+ Group, "Prospectus," November 3, 2017, available at www.enplus.ru/content/dam/enplus/corporate/investors/regulatory-news/enplus-group-prospectus.pdf. (U)

(U) Exhibit 27: Web site of EuroSibEnergo, www.eurosib.ru/en/, accessed February 12,

8

UKRAINE-EO13661-13321: 0016

2018. (U)

(U) Exhibit 28:

████████████████████████████████
████████████████████████████████
████████████████████████████████
(S//NF)

(U) Exhibit 29:   Complaint - Oleg V. Deripaska v. The Associated Press, 1:17-cv-00913,
May 5, 2017 (DC). (U)

UKRAINE-EO13661-13321: 0017

Exhibit 1

**Federal Register**

Vol. 79, No. 53

Wednesday, March 19, 2014

# Presidential Documents

Title 3—

The President

Executive Order 13661 of March 16, 2014

## Blocking Property of Additional Persons Contributing to the Situation in Ukraine

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 212(f) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(f)), and section 301 of title 3, United States Code,

I, BARACK OBAMA, President of the United States of America, hereby expand the scope of the national emergency declared in Executive Order 13660 of March 6, 2014, finding that the actions and policies of the Government of the Russian Federation with respect to Ukraine—including the recent deployment of Russian Federation military forces in the Crimea region of Ukraine—undermine democratic processes and institutions in Ukraine; threaten its peace, security, stability, sovereignty, and territorial integrity; and contribute to the misappropriation of its assets, and thereby constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. Accordingly, I hereby order:

Section 1. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person (including any foreign branch) of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in:

(i) the persons listed in the Annex to this order; and

(ii) persons determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(A) to be an official of the Government of the Russian Federation;

(B) to operate in the arms or related materiel sector in the Russian Federation;

(C) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly:

(1) a senior official of the Government of the Russian Federation; or
(2) a person whose property and interests in property are blocked pursuant to this order; or

(D) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of:

(1) a senior official of the Government of the Russian Federation; or
(2) a person whose property and interests in property are blocked pursuant to this order.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order.

Sec. 2. I hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of aliens determined to meet one or more of the criteria in section 1(a) of this order would be detrimental to the interests of the United States, and I hereby suspend entry into the United

1

States, as immigrants or nonimmigrants, of such persons. Such persons shall be treated as persons covered by section 1 of Proclamation 8693 of July 24, 2011 (Suspension of Entry of Aliens Subject to United Nations Security Council Travel Bans and International Emergency Economic Powers Act Sanctions).

Sec. 3. I hereby determine that the making of donations of the type of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order would seriously impair my ability to deal with the national emergency declared in Executive Order 13660, and I hereby prohibit such donations as provided by section 1 of this order.

Sec. 4. The prohibitions in section 1 of this order include but are not limited to:

(a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and

(b) the receipt of any contribution or provision of funds, goods, or services from any such person.

Sec. 5. (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 6. For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States; and

(d) the term the "Government of the Russian Federation" means the Government of the Russian Federation, any political subdivision, agency, or instrumentality thereof, including the Central Bank of the Government of the Russian Federation, and any person owned or controlled by, or acting for or on behalf of, the Government of the Russian Federation.

Sec. 7. For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in Executive Order 13660, there need be no prior notice of a listing or determination made pursuant to section 1 of this order.

Sec. 8. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA, as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government consistent with applicable law. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

Sec. 9. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to determine that circumstances no longer warrant the blocking of the property and interests in property of a person

2

# Exhibit 1

listed in the Annex to this order, and to take necessary action to give effect to that determination.

Sec. 10. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Sec. 11. This order is effective at 12:01 a.m. eastern daylight time on March 17, 2014.

THE WHITE HOUSE,
*March 16, 2014.*

Billing code 3295–F4–P

UKRAINE-EO13661-13321: 0020

Exhibit 2

Federal Register

Vol. 79, No. 56

Monday, March 24, 2014

# Presidential Documents

Title 3—

The President

**Executive Order 13662 of March 20, 2014**

**Blocking Property of Additional Persons Contributing to the Situation in Ukraine**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 212(f) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(f)), and section 301 of title 3, United States Code,

I, BARACK OBAMA, President of the United States of America, hereby expand the scope of the national emergency declared in Executive Order 13660 of March 6, 2014, and expanded by Executive Order 13661 of March 16, 2014, finding that the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine, continue to undermine democratic processes and institutions in Ukraine; threaten its peace, security, stability, sovereignty, and territorial integrity; and contribute to the misappropriation of its assets, and thereby constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. Accordingly, I hereby order:

**Section 1.** (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person (including any foreign branch) of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in: any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(i) to operate in such sectors of the Russian Federation economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State, such as financial services, energy, metals and mining, engineering, and defense and related materiel;

(ii) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any person whose property and interests in property are blocked pursuant to this order; or

(iii) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order.

**Sec. 2.** I hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of aliens determined to meet one or more of the criteria in section 1(a) of this order would be detrimental to the interests of the United States, and I hereby suspend entry into the United States, as immigrants or nonimmigrants, of such persons. Such persons shall be treated as persons covered by section 1 of Proclamation 8693 of July 24, 2011 (Suspension of Entry of Aliens Subject to United Nations Security Council Travel Bans and International Emergency Economic Powers Act Sanctions).

1

Sec. 3. I hereby determine that the making of donations of the type of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order would seriously impair my ability to deal with the national emergency declared in Executive Order 13660, and expanded in Executive Order 13661 and this order, and I hereby prohibit such donations as provided by section 1 of this order.

Sec. 4. The prohibitions in section 1 of this order include but are not limited to:

(a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and

(b) the receipt of any contribution or provision of funds, goods, or services from any such person.

Sec. 5. (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 6. For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States; and

(d) the term the "Government of the Russian Federation" means the Government of the Russian Federation, any political subdivision, agency, or instrumentality thereof, including the Central Bank of the Russian Federation, and any person owned or controlled by, or acting for or on behalf of, the Government of the Russian Federation.

Sec. 7. For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in Executive Order 13660, and expanded in Executive Order 13661 and this order, there need be no prior notice of a listing or determination made pursuant to section 1 of this order.

Sec. 8. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA, as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government consistent with applicable law. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

2

UKRAINE-EO13661-13321: 0022

Exhibit 2

**Sec. 9.** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 20, 2014.*

[FR Doc. 2014-06612
Filed 3-21-14; 11:15 am]
Billing code 3295-F4

3

Exhibit 3



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

SECRETARY OF THE TREASURY

Determination Pursuant to Section 1(a)(i) of Executive Order 13662

Section 1(a) of Executive Order 13662 of March 20, 2014 ("Blocking
Property of Additional Persons Contributing to the Situation in
Ukraine") ("E.O. 13662") imposes economic sanctions on any person
determined by the Secretary of the Treasury, in consultation with the
Secretary of State, to operate in such sectors of the Russian
Federation economy as may be determined, pursuant to section 1(a)(i)
of the order, by the Secretary of the Treasury, in consultation with
the Secretary of State.

To further address the extraordinary threat to the national security
and foreign policy of the United States described in E.O. 13662, and
in consultation with the Secretary of State, I hereby determine that
section 1(a)(i) shall apply to the financial services and energy
sectors of the Russian Federation economy. Any person I or my
designee subsequently determine, in consultation with the Secretary of
State, operates in such sectors shall be subject to sanctions pursuant
to section 1(a)(i).

Jacob J. Lew

Date: July 16, 2014

UNCLASSIFIED//FOUO

1



⟨ #178 Dan Gilbert    |    #180 Joseph Lau ⟩

# #179 | **Oleg Deripaska** | $8.87B

**Random fact: Became CEO of the Sayanogorsk Aluminium Smelter at age 26.**

### Overview

Deripaska is the majority shareholder of En+ Group, the operator of Siberia's biggest network of power plants. The Moscow-based company also owns about half of Rusal, Russia's largest aluminium producer. His other investments include an 83 percent stake in GAZ Group, the biggest manufacturer of buses in Russia.

As of Jan. 31, 2018:

01/31/2018 11:43 PM

1

UKRAINE-EO13661-13321: 0025

| | | | |
|---|---|---|---|
| **Last change** | -$53.0M (-0.6%) | **Citizenship** | Russian Federation |
| **YTD change** | +$203M (+2.3%) | **Age** | 49 |
| **Industry** | Commodities | **Wealth** | Self-made |
| **Biggest asset** | ENPL LI Equity | View net worth over: | Max  **1 year**  1 |

quarter   1 month   1 week



01/31/17



UKRAINE-EO13661-13321: 0026

## Net Worth Summary

Cash     Private asset     Public asset     Misc. liabilities

Confidence rating: ★★★☆☆

The majority of Deripaska's fortune is derived from his majority stake in En+ Group, a Moscow-based power and commodities company. Deripaska with his family owns 76.8 percent of the company's shares, according to its IPO prospectus. En+ Group began trading publicly in London on Nov. 3, 2017.

En+ Group has the biggest network of power plants in Russia, according to its website. It also owns 48 percent of Rusal, Russia's largest aluminium producer. Prior to the November 2017 IPO, Deripaska's stake in Rusal and five other companies associated with the En+ Group were listed separately in this analysis. A re-calculation of Derpiaska's fortune following the IPO led to a $1.2 billion fall in the net wealth calculation on Nov. 16, 2017.

Deripaska also owns a 26 percent stake in Strabag, a Vienna-based construction company, according to its website. Through Russian Machines he also owns 83 percent of GAZ Group, Russia's largest manufacturer of buses.

Other investments include a 10 percent stake in Moscow-based Bank Soyuz. It's valued using the average price-to-earnings and price-to-book value multiples of one publicly traded peer company: Vozrozhdenie Bank. He owns 10 percent of the bank, according to its disclosure documents. Deripaska owns at least 10 percent of insurance company Ingosstrakh, according to its website, and is the controlling shareholder of Basel Aero, which controls Russia's Krasnodar International, Sochi International, Anapa and Gelendzhik airports.

The billionaire was one of the biggest private investors in finance development projects for the 2014 Sochi Olympics, including through RogSibAl, which built a

3

UKRAINE-EO13661-13321: 0027

3,000-room Olympic village, and Port Sochi Imeretinsky. RogSibAl is valued based on his investment in the project, which was reported in 2013 disclosure documents of state-controlled VEB bank.

## Biography

**Birthdate:** 1/2/1968
**Family:** Married, 2 children
**Education:** 1996, Master's Degree, Economics, GV Plekhanov Rissian Economic Academy 1993, Graduated, Physics, Moscow State University

Oleg Deripaska was born in 1968 in Dzerzhinsk, a small town in Russia's Volga region. He served two years in the Russian army, and studied physics at Moscow State University, graduating with honors in 1993. Three years later, he earned a degree from the Plekhanov Russian Academy of Economics.

In the early 1990s, he opened an aluminum trading business, and soon began acquiring stakes in Russian smelting companies, in part by buying shares from factory employees. He was buying at the start of Russia's so-called aluminum wars, the details of which are included in a lawsuit filed by exiled Russian businessman Michael Cherney in London's High Court.

In the case, Deripaska cites a number of events that led him to hire a private security guard and pay protection money, or "krysha," to Cherney, including threats, public beatings, attacks on executives and an April 1995 shareholder meeting described as "a very threatening situation." Four days before that meeting, a senior executive, his bodyguard and driver were assassinated in a daylight attack in Moscow. Cherney claims he was a partner in the business and is owed a share of Deripaska's fortune. Deripaska claims Cherney is a member of organized crime. The case was settled in September 2012 for an undisclosed amount.

Deripaska combined his aluminum assets to create Siberian Aluminum (Sibal) in 1997, eventually merging them with the aluminum businesses of billionaire Roman Abramovich to create Russian Aluminum (Rusal). He created Basic

UKRAINE-EO13661-13321: 0028

Element in 2001, a holding company that now has investments in Russia's insurance, steel, auto, energy, coal and finance industries. That year he also married the daughter of Valentin Yumashev, once the head of former Russian President Boris Yeltsin's administration. He later became an indirect member of the Yeltsin family when Yumashev married Yeltsin's daughter, Tatyana.

Abramovich began unraveling the investments he had with Deripaska in 2003, including Rusal and car maker RusPromAvto. In 2006 and 2007, he formed United Co. Rusal by merging his aluminum assets with those owned by two other Russian billionaires, Viktor Vekselberg and Len Blavatnik, and a pair of companies owned by Glencore. Today, United Co. Rusal is Russia's largest aluminum producer.

During the global financial crisis of 2008, Deripaska's companies faced a margin call on about $20 billion of debt lent to them by cash-strapped banks. He was forced to sell his stakes in a number of assets, including less than 20 percent of Canadian auto-parts maker Magna, 10 percent of German construction company Hochtief and 25 percent of Austrian construction company Strabag. He began rebuilding in 2010, buying back a stake Strabag and striking alliances between Gaz and international automakers.

He stepped down as CEO of Basic Element in July 2012, appointing longtime executive Gulzhan Moldazhanova as CEO. He remains the chairman of the supervisory board.

### Milestones

| | |
|---|---|
| 1968 | Oleg Vladimirovich Deripaska born in Dzerzhinsk, Russia. |
| 1988 | Completes national service in the Russian Army. |
| 1993 | Earns physics degree from Moscow State University with honors. |
| 1996 | Graduates from Plekhanov Russian Academy of Economics. |
| 2000 | Creates Rusal in merger with Roman Abramovich's aluminum assets. |
| 2001 | Marries Polina Yumasheva, daughter of Yeltsin's son-in-law. |
| 2007 | Forms world's largest aluminum company, United Co. Rusal. |
| 2010 | Hong Kong initial public offering for Rusal raises $2.2 billion. |

5

UKRAINE-EO13661-13321: 0029

2014   Becomes Rusal president, steps down as CEO.



**Source:** Bloomberg reporting

**Methodology:** The Bloomberg Billionaires Index is a daily ranking of the world's richest people. In calculating net worth, Bloomberg News strives to provide the most transparent calculations available, and each individual billionaire profile contains a detailed analysis of how that person's fortune is tallied.

The index is a dynamic measure of personal wealth based on changes in markets, the economy and Bloomberg reporting. Each net worth figure is updated every business day after the close of trading in New York. Stakes in publicly traded companies are valued using the share's most recent closing price. Valuations are converted to U.S. dollars at current exchange rates... Read our complete methodology →

**Design & development:** Christopher Cannon, Dean Halford and Brittany Harris

## Bloomberg Billionaires Index

Top 500 Richest | Profiles | Biggest movers | Compare fortunes | Track returns | Methodology

Terms of Service  Trademarks  Privacy Policy
©2018 Bloomberg L.P. All Rights Reserved
Careers  Made in NYC  Advertise  Ad Choices ▷  Website  Feedback  Help

01/31/2018 11:43 PM

6

UKRAINE-EO13661-13321: 0030

Exhibit 5

# Oleg**Deripaska**



Home  About Oleg Deripaska  **Business**  **Charity**  Initiatives

About Oleg Deripaska  Autobiography  Values  Achievements  Photo gallery  Video gallery



"I was eleven when I received my first pay check working at a reduction plant. I was an electrician's apprentice, in other words, I was a real worker and even had my own locker."

## Family

Family

Early childhood

My first job at the plant

School

University and military service

Exchange

Sayanogorsk aluminium smelter

Expanding activities in the aluminium industry

The creation of RUSAL

The development of Basic Element

RUSAL's merger with SUAL and Glencore

The story with Norilsk Nickel

Crisis

New time – new challenges

Fighting the spread of the Ebola virus

>> I was born in Dzerzhinsk in the Nizhny Novgorod region. My mother joined the R&D Centre in the region following her graduation, but originally my ancestors came from the Krasnodar region.

>> My grandfather was the commander of a tank company. He was killed in Austria at the end of WWII, having fought from the beginning of the war. He was buried in an unmarked mass grave in Austria. My other grandfather fought from the beginning of WWII too and returned to his farm after the war.

Vision

Interview

01/31/2018 11:01 PM

1

UKRAINE-EO13661-13321: 0031

# Oleg**Deripaska**



Home   About Oleg Deripaska   **Business**   **Charity**   **Initiatives**

About Oleg Deripaska   Autobiography   Values   Achievements   Photo gallery   Video gallery



**"I was eleven when I received my first pay check working at a reduction plant. I was an electrician's apprentice, in other words, I was a real worker and even had my own locker."**

Family

Early childhood

My first job at the plant

School

University and military service



Sayanogorsk aluminium smelter

Expanding activities in the aluminium industry

The creation of RUSAL

The development of Basic Element

RUSAL's merger with SUAL and Glencore

The story with Norilsk Nickel

Crisis

New time – new challenges

Fighting the spread of the Ebola virus

## Exchange

》 I was once reading a magazine and came across an article about securities written by the Deputy Chair of the Central Bank. The people running the Central Bank were already thinking about a securities market even though at the time securities such as bonds, promissory notes, money and goods equivalents did not exist in the USSR. I continued to read the article, made some calculations and realised that was where I needed to be. Shortly after that the first commodity exchanges opened in Russia. When I graduated from the Moscow State University in 1993 I was 25.

》 I bought a seat on the Moscow commodity exchange with the aim of approaching trading in a systematic manner, similar to physics. The idea was to compartmentalise my life and my work in just the right way, ensuring that specific agreements were reached and communications channels were established in each compartment. My partners and I traded sugar, ferrous metals, copper and aluminium. In two years our company's sales significantly increased (it was called the Military Investment and Trading Company) and one of its divisions was Rosaluminproduct, which traded aluminium.

Vision

Interview

UKRAINE-EO13661-13321: 0032

# Oleg**Deripaska**



Home   About Oleg Deripaska   Business   Charity   Initiatives

About Oleg Deripaska   Autobiography   Values   Achievements   Photo gallery   Video gallery



"I was eleven when I received my first pay check working at a reduction plant. I was an electrician's apprentice, in other words, I was a real worker and even had my own locker."

Family

Early childhood

My first job at the plant

School

University and military service

Exchange

Sayanogorsk aluminium smelter

Expanding activities in the aluminium industry

The creation of RUSAL

The development of Basic Element

RUSAL's merger with SUAL and Glencore

The story with Norilsk Nickel

Crisis

New time – new challenges

Fighting the spread of the Ebola virus

## Sayanogorsk aluminium smelter

》》 When I became the Managing Director of the smelter it was in a shambles. The majority of the reduction cells were offline, two of the eight potrooms were effectively shut down, alumina was in short supply and the anode production processes were not being properly adhered to so poor quality anodes would end up in the reduction cells resulting in emergency drops in current strength and burnt metal. Furthermore, aluminium which had not been shipped off was left outside and workers were not paid wages for months on end leading to a strike committee forming. The smelter's management was scared and depressed.

》》 Eventually we sorted out the entire supply and production chain, optimising the delivery of raw materials and sales of finished goods. We then began modernising the production equipment. In 1996 the federal law on FOREX regulation was introduced, which simplified import and export transactions. We could now import better quality alumina from foreign suppliers instead of having to buy poor quality raw materials from primarily CIS based suppliers. The next logical step was entering into long term contracts to sell aluminium to customers in other countries and to offer it on the London Metal Exchange.

》》 ... The smelter was put into operation in 1985. Its design capacity is about 300,000 tonnes of aluminium per year. Depending on the market situation, the Sayanogorsk smelter now produces three times as much aluminium as originally envisioned back in the USSR.

Vision

Interview

UKRAINE-EO13661-13321: 0033

Exhibit 5

# Oleg**Deripaska**



Home    About Oleg Deripaska    **Business**    **Charity**    **Initiatives**

About Oleg Deripaska    Autobiography    Values    Achievements    Photo gallery    Video gallery



"I was eleven when I received my first pay check working at a reduction plant. I was an electrician's apprentice, in other words, I was a real worker and even had my own locker."

Family

Early childhood

My first job at the plant

School

University and military service

Exchange

Sayanogorsk aluminium smelter



The creation of RUSAL

The development of Basic Element

RUSAL's merger with SUAL and Glencore

The story with Norilsk Nickel

Crisis

New time – new challenges

Fighting the spread of the Ebola virus

## Expanding activities in the aluminium industry

>> Aluminium is a common metal, and one that offers tremendous possibilities. It's 100% recyclable, and recycling it uses half the amount of energy needed to recycle steel. It's light and very flexible. So it's a material that I believe creates great opportunities for the next stage of technological development.

>> Russia has almost limitless hydropower resources, many of which are located in remote areas. I like to think that a good way to visualize the potential of aluminium is to see it as a kind of energy in solid form that can be of great benefit to developing countries. We decided to work towards maximising this potential.

>> By 2000, the assets held by Sibirsky Aluminium included the Sayanogorsk aluminium smelter, SAYNAL, the aluminium beverage can plant ROSTAR, the Dmitrov aluminium can plant, the Samara metallurgical lant, and the Nikolaev alumina refinery. By that stage, we not only had powerful production facilities, we also had our own distribution network.

Vision

Interview

01/31/2018 11:03 PM

4

UKRAINE-EO13661-13321: 0034

Exhibit 5

# Oleg**Deripaska**



Home    About Oleg Deripaska    Business    Charity    Initiatives

About Oleg Deripaska    Autobiography    Values    Achievements    Photo gallery    Video gallery



"I was eleven when I received my first pay check working at a reduction plant. I was an electrician's apprentice, in other words, I was a real worker and even had my own locker."

Family

Early childhood

My first job at the plant

School

University and military service

Exchange

Sayanogorsk aluminium smelter

Expanding activities in the aluminium industry

**The creation of RUSAL**

The development of Basic Element

RUSAL's merger with SUAL and Glencore

The story with Norilsk Nickel

Crisis

New time – new challenges

Fighting the spread of the Ebola virus

## The creation of RUSAL

» I have always wanted Russia to have a powerful aluminium industry, and understood that this was only possible by consolidating plants. In 2000, the assets of Sibirsky Aluminium and the assets of Millhouse Capital, controlled by Roman Abramovich, were merged to form a new company, RUSAL. RUSAL had a 75% share of Russia's aluminium production, and became the world's third largest aluminium producer after Alcoa and Alcan.

Vision

Interview

01/31/2018 11:04 PM

5

UKRAINE-EO13661-13321: 0035

# Oleg**Deripaska**





"I was eleven when I received my first pay check working at a reduction plant. I was an electrician's apprentice, in other words, I was a real worker and even had my own locker."

Family

Early childhood

My first job at the plant

School

University and military service

Exchange

Sayanogorsk aluminium smelter

Expanding activities in the aluminium industry

The creation of RUSAL


The development of Basic Element

RUSAL's merger with SUAL and Glencore

The story with Norilsk Nickel

Crisis

New time – new challenges

Fighting the spread of the Ebola virus

## The development of Basic Element

》》 It gradually became clear that we should build a diversified holding company with access to its own supplies of raw materials and energy. We started buying coal mines, bauxite mines, alumina refineries, and energy companies.

》》 In 2000 we acquired a controlling stake in the Gorky Automobile Plant and the Pavlovo Bus Plant. By 2005 we had created the GAZ Group, which brought together and integrated 18 plants across 10 regions of Russia. I have always been convinced that Russia needs its own strong manufacturing industry, one which is competitive on a global scale. A country's automotive sector serves as an indicator of its economic maturity – only the most advanced economies are able to create their own automotive sector. I personally believe that GAZ is Basic Element's ultimate success story. An outdated, loss-making producer was transformed into the unrivalled leader in the Russian commercial vehicle sector, and an enterprise integrated into the world's carmaking industry. I now believe that GAZ is no less important to Basic Element than RUSAL.

Vision

Interview

UKRAINE-EO13661-13321: 0036

Exhibit 5

# Oleg**Deripaska**



Home   About Oleg Deripaska   **Business**   Charity   Initiatives

About Oleg Deripaska   Autobiography   Values   Achievements   Photo gallery   Video gallery



*"I was eleven when I received my first pay check working at a reduction plant. I was an electrician's apprentice, in other words, I was a real worker and even had my own locker."*

Family

Early childhood

My first job at the plant

School

University and military service

Exchange

Sayanogorsk aluminium smelter

Expanding activities in the aluminium industry

The creation of RUSAL

The development of Basic Element



The story with Norilsk Nickel

Crisis

New time – new challenges

Fighting the spread of the Ebola virus

## RUSAL's merger with SUAL and Glencore

≫ In March 2007, RUSAL completed a merger with Russia's SUAL and the alumina assets of the Swiss company Glencore. United Company RUSAL, the enterprise formed through this merger, became the world's largest aluminium producer. The management team of RUSAL spent two and a half years preparing for the merger. I believe that this was a necessary step for the company. It needs to forge ahead and evolve. Today RUSAL produces aluminium for almost the entire Russian automotive sector, as well as for packaging, construction, and insulation materials.

≫ We consolidated the industry and secured access to bauxites we don't have in Russia. We established a company that has become a leader in its industry in less than twelve years. And in so doing, we unlocked more possibilities for development in Russia.

Vision

Interview

01/31/2018 11:04 PM

7

UKRAINE-EO13661-13321: 0037

# Oleg**Deripaska**



Home   About Oleg Deripaska   Business   Charity   Initiatives

About Oleg Deripaska   Autobiography   Values   Achievements   Photo gallery   Video gallery



"I was eleven when I received my first pay check working at a reduction plant. I was an electrician's apprentice, in other words, I was a real worker and even had my own locker."

Family

Early childhood

My first job at the plant

School

University and military service

Exchange

Sayanogorsk aluminium smelter

Expanding activities in the aluminium industry

The creation of RUSAL

The development of Basic Element

RUSAL's merger with SUAL and Glencore

The story with Norilsk Nickel

Crisis

New time – new challenges

Fighting the spread of the Ebola virus

## The story with Norilsk Nickel

》 In March 2007 we officially merged with SUAL and the aluminium and alumina assets of Glencore, which became an important milestone in the history of our company. We became the largest aluminium producer in the world. Naturally we started asking ourselves where else we could grow. The issue is that you cannot just stop growing; as soon as you do you start to stagnate. One option was to keep expanding in the aluminium industry by buying more alumina refineries, power plants and aluminium smelters. Yet another option was to diversify the business by buying other types of metal assets. Diversification is the path favoured by all major international metals companies. First of all diversification allows you to hedge risks. Secondly, a large diversified company can afford more easily to invest in production and infrastructure. After all, extraction and production of metals is not just about mines and production sites. This sort of business includes construction of ports and railways to transport raw materials and finished goods.

》 Prokhorov let it be known that he was seeking to sell his stake in Norilsk Nickel; we let it be known that we were interested. After long negotiations we closed the deal and acquired a 25% stake in Norilsk Nickel.

Vision

Interview

UKRAINE-EO13661-13321: 0038

# Oleg**Deripaska**



Home   About Oleg Deripaska   **Business**   **Charity**   **Initiatives**

About Oleg Deripaska   Autobiography   Values   Achievements   Photo gallery   Video gallery



"I was eleven when I received my first pay check working at a reduction plant. I was an electrician's apprentice, in other words, I was a real worker and even had my own locker."

Family

Early childhood

My first job at the plant

School

University and military service

Exchange

Sayanogorsk aluminium smelter

Expanding activities in the aluminium industry

The creation of RUSAL

The development of Basic Element

RUSAL's merger with SUAL and Glencore

The story with Norilsk Nickel



New time – new challenges

Fighting the spread of the Ebola virus

## Crisis

≫ On October 31st 2008 (based on the financial documents we had signed) our ability to meet our financial obligations was to be put to the test: in total we were expected to pay out USD 4.5 billion.

≫ I can recall the night of October 29th very clearly. RUSAL's board of directors met in the Vneshekonombank building and signed the documents that approved taking out a loan of USD 4.5 billion.

≫ However, we could not bet the entire company on just one possible scenario. Therefore plan B was put into effect and we asked our lenders to allow us to delay payments for one month. We needed all our lenders to sign the documents, which we had several dozens of. We managed to convince them. All our lenders signed a document that granted us a one-month grace period and the next morning they received the payment from us in full. One of our top managers still has a copy of the VEB payment order for USD 4.5 billion.

Vision

Interview

UKRAINE-EO13661-13321: 0039

# Oleg**Deripaska**



Home    About Oleg Deripaska    **Business**    **Charity**    **Initiatives**

About Oleg Deripaska    Autobiography    Values    Achievements    Photo gallery    Video gallery



**"I was eleven when I received my first pay check working at a reduction plant. I was an electrician's apprentice, in other words, I was a real worker and even had my own locker."**

Family

Early childhood

My first job at the plant

School

University and military service

Exchange

Sayanogorsk aluminium smelter

Expanding activities in the aluminium industry

The creation of RUSAL

The development of Basic Element

RUSAL's merger with SUAL and Glencore

The story with Norilsk Nickel

Crisis

New time – new challenges

Fighting the spread of the Ebola virus

Vision

Interview

## New time – new challenges

>> We need to think of ways to capitalise on the continuing demand for resources not just in China but also in Korea, Japan and South East Asia, to develop our own resource potential. One major problem is a lack of infrastructure and human resources; on one hand we do not have adequate roads and railways and on the other hand we do not have enough skilled workers and qualified engineers and technicians. The fact that there is not a programme for the development of Siberia and the Far East is a major hindrance.

>> Opportunities can only be taken advantage of by people who want to seize them. We all know that the horse will go where you point its head. So if our head points to Europe, incentives or expectations will not move us any closer to Asia. No real development is possible in Asia unless we have a paradigm shift and assess the real opportunities available if we integrate with Asia.

>> Today's mechanism, whereby investments are paid for from increased rates so that consumers end up paying for the investment programmes of monopolies will not work in Siberia. Siberian consumers will not be able to pay for the sort of investments that are needed there. Therefore loans should be taken from external sources and the federal budget should be structured according to the opportunities that exist in the region. Alternatively, money from the Pension fund could be used to buy long term securities. Major investment programmes cannot be financed from operating revenue. So we need to implement a programme for accelerated development of the infrastructure in the region.

>> Unless clearly-defined procedures and incentives are put in place to stimulate major investments, our plans will be worthless. 15 years from now all these economies will have moved on to the next stage with a completely different level of resource consumption, while we will have lost several million more human resources in the region and many opportunities.

10

UKRAINE-EO13661-13321: 0040

Exhibit 6

## Oleg Deripaska

REAL TIME NET WORTH — as of 1/31/18
$6.9 B

Russian aluminum billionaire Deripaska employed Paul Manafort, Donald Trump's former campaign head, to help further Russia's President Vladimir Putin's interests, according to an Associated Press report. Deripaska had been one of the key moguls awarded contracts in Sochi in the lead up to the 2014 Olympics. He also married into former President Boris Yeltsin's family. A former metals trader, he assumed control of Russian Aluminum in 2000 at age 31. He was the nation's richest person and 9th richest in world in 2008 before nearly losing it all due to crashing markets and heavy debts. He personally negotiated with the Russian government, banks and other creditors to restructure his loan obligations. Today, through his Basic Element, he owns stakes in UC Rusal, a leading aluminum producer; EuroSibEnergo, one of the largest hydroelectric power producers in the world; GAZ Group, a leading automotive company; Ingosstrakh, an insurance company, and AgroHolding Kuban, a large agricultural company in Russia.

## STATS

- AGE

  **50**

- SOURCE OF WEALTH

  **aluminum, utilities, Self Made**

- RESIDENCE

  **Moscow, Russia**

- CITIZENSHIP

  **Russia**

- MARITAL STATUS

  **Married**

- CHILDREN

  **2**

- EDUCATION

  **Bachelor of Arts / Science, Moscow State University**

UKRAINE-EO13661-13321: 0041

Exhibit 6

https://www.forbes.com/profile/oleg-deripaska/

2

Exhibit 7

# Mega-rich homes tour puts spotlight on London's oligarchs

Campaigners connected to Russian opposition leader Alexei Navalny offer tour of billionaires' exclusive homes, including those of Vladimir Putin's friends

Luke Harding

Thu 4 Feb 2016 20.53 GMT

It is London's biggest non-royal private home, a palace in Highgate with 28 bedrooms, a 40,000-sq-ft basement and designer orangery. On Thursday the huge mansion, Witanhurst, was on the list of several destinations for what was billed by political campaigners as London's first ever "kleptocracy" tour.

Campaigners connected to Russia's opposition leader Alexei Navalny – a lawyer and critic of corruption – hired a bus and gave a guided tour of houses and flats in London's most exclusive districts, properties owned by Russian government ministers and wealthy friends of Russia's president, Vladimir Putin.

"It's a refuge, a showroom and deposit box," Roman Borisovich said of Witanhurst, standing near its massive red-brick wall. The palace was purchased in 2008 for £50m, but the owner was for some time a mystery. Last year the New Yorker magazine revealed that the mansion belonged to Andrei Guriev, a Russian tycoon and fertiliser baron who until recently had served in Putin's senate.

Borisovich is an anti-corruption activist who appeared in the Channel 4 documentary From Russia With Cash. Posing as a Russian official who had stolen his country's health budget, he exposed the antics of unscrupulous estate agents. He said his latest idea aims to draw attention to how dirty money from countries such as Russia, Ukraine and Kazakhstan, continues to pour into the west.

Borisovich said he also wanted to highlight how a group of "enablers", such as lawyers, accountants, and bankers, were helping oligarchs launder their "ill-gotten gains" by investing the cash in prime London mansions.

In central London offshore companies owned one in 10 of the houses, he said, and shell companies owned £122bn worth of property.

As well as Witanhurst, the tour members visited Eden House, a pleasant villa in Highgate. A silver Mercedes was parked in the driveway, near a tasteful statue of a boy. The house, they were told, belonged to Andrei Yakunin.

1

Exhibit 7

Yakunin's father, Vladimir, was reportedly close to Putin and until 2015 had run the company Russian Railways. A former KGB officer, Yakunin Sr had sponsored anti-western Russian thinktanks.

Yakunin's neighbour, Andrew, popped out and said he had invited the Russian and his wife round for drinks when they moved in a couple of years ago. "Funnily enough, they didn't invite us back," he said.

He said the Yakunins had installed hi-tech security cameras. They bought the house for £4.5m in 2007 via a Panamanian company. "One day I was clipping the hedge next to their property. Suddenly I heard a voice from the security camera telling me 'Keep clear! Leave the premises!'"

Were Russian millions a bad thing for London? "Well, I made my money as an engineer and a lawyer," he said.

Thursday's London tour had begun just down the road from the Houses of Parliament, on Victoria embankment. Borisovich posed with a lifesize cardboard cut-out of Russia's deputy prime minister, Igor Shuvalov. As well as being one of the top figures in the Russian government Shuvalov and his wife, Olga, owned two luxury apartments worth £11.4m overlooking the Thames. The homes cost 100 times Shuvalov's official salary.

"It's in Britain's interests to stop this flow of corrupt money," said Vladmir Ashurkov, a Russian opposition politician, who has received political asylum in the UK. Ashurkov said he rejected the argument that foreign money helped the economy. Rather, he said, it raised house prices to unaffordable levels and turned London into a global centre for money laundering.

The tour bus trundled past Belgrave Square, in Kensington, known jokingly as Red Square because of its association with other high-profile Russians.

The metals tycoon Oleg Deripaska owned No 5; the former oligarch Boris Berezovsky, who died in 2013, had several flats at No 26. Roman Abramovich's home, two adjacent townhouses in Chester Square, was a short stroll away.

The smallest house on the tour belonged to Roman Rotenberg; situated in Cadogan Lane, Belgravia, it cost a mere £3.3m. Rotenberg's father and uncle, Arkady and Boris Rotenberg, were said to be Putin's oldest friends and former judo partners. Since Putin became president in 2000, the pair had become billionaires, supplying pipelines to the state-controlled energy corporation Gazprom. In 2014 the EU and US sanctioned both of the Rotenbergs in connection with the Crimea crisis.

Roman Rotenberg is a British citizen, and now the formal owner of many of his father's companies. On Thursday he did not seem to be at home. There were no signs of life outside his mansion, with its handsome Dutch wooden shutters. "The US has sanctioned the Rotenbergs," Borisovich said, standing in the cobbled road outside. He added: "Why doesn't Britain do something?"

UKRAINE-EO13661-13321: 0044

Exhibit 7

https://www.theguardian.com/uk-news/2016/feb/04/mega-rich-homes-tour-london-oligarchs-russia-alexei-navalny-putin

3

Exhibit 8



UKRAINE-EO13661-13321: 0046

Exhibit 9

# Oligarch linked to politicians 'ordered murder of banker'

## A Russian oligarch linked to George Osborne and Lord Mandelson has been accused of ordering the murder of a banker, belonging to a mafia group and bribing a governor over a business deal, the High Court heard.

By Sam Marsden

7:00AM BST 10 Jul 2012

Oleg Deripaska, 44, a billionaire business associate of Roman Abramovich, the owner of Chelsea FC, faced allegations that he was involved in serious crime as he built his fortune in Russia's metals industry after the collapse of the Soviet Union. The claims were made at the start of a hearing in the High Court in London brought by Michael Cherney, who is demanding $1 billion (£650 million) from Mr Deripaska over the sale of a stake in Rusal, the world's biggest aluminium producer.

Mr Deripaska alleged in court documents that Mr Cherney was a criminal who used threats to impose an extortion racket on him. Lawyers for Mr Cherney, a Ukrainian-born billionaire living in exile in Israel, denied the claims and referred to serious allegations made against the Russian oligarch. In written submissions to the court, it was said that Djalol Khaidarov, an Uzbek businessman, had told prosecutors in the US, Israel and Russia that Mr Deripaska was involved in bribing a governor in Siberia to secure the takeover of an aluminium plant.

The statement also alleges that he was a member of an organised crime group and ordered the murder of Vadim Yafyasov, a businessman, in 1995. The court documents also quoted Mr Khaidarov as telling Israeli police in 2001 that people such as Mr Deripaska employ former agents of Russia's security service and "constantly receive information from the security authorities".

Mark Howard QC, for Mr Cherney, said in the written submissions: "Much of the highly selective material relied upon by Mr Deripaska (whether admissible or inadmissible) implicates Mr Deripaska himself in serious criminality, at least as much as Mr Cherney."

Mr Deripaska tried to place restrictions on the disclosure of evidence during the current hearings, it was claimed. Mr Howard said the Russian had accused Mr Cherney of running an "old-fashioned extortion racket".

"Mr Deripaska is one of the richest and most influential men in Russia, with close ties to President Putin," he said. "He has no difficulty finding witnesses who are prepared to assist him.

1

UKRAINE-EO13661-13321: 0047

Exhibit 9

Those who continue to have business interests in Russia have much to lose if they do not support Mr Deripaska if asked to do so.

"On the other hand, those who had prior business relationships with Mr Cherney are likely to find those relationships embarrassing and inconvenient now that Mr Cherney is no longer on good terms with Mr Deripaska and is persona non grata in Russia."

Mr Deripaska met Lord Mandelson, who was an EU trade commissioner, and Mr Osborne, then the shadow chancellor, when he was holidaying on his yacht off Corfu in 2008.

A spokesman for Mr Deripaska, who did not attend court yesterday, said the oligarch "vehemently denies" the allegations. "Mr Deripaska has stated that Mr Cherney is a criminal with whom he was forced to enter into a krysha relationship [protection] in post-Soviet Russia. He was never business partners with Mr Cherney and he rejects the entirety of the claim brought against him. He looks forward to demonstrating in court that Mr Cherney's allegations are untrue."

Mr Cherney, who will give evidence to the hearing via videolink because of an outstanding arrest warrant relating to a money-laundering investigation in Spain, denies any criminal involvement and claims that his relationship with Mr Deripaska was purely a business one.

Lawyers for the two billionaires will finish outlining their cases this week. The hearing will then be adjourned until September, when witnesses, due to include Mr Abramovich, will be called.

https://www.telegraph.co.uk/finance/financial-crime/9387913/Oligarch-linked-to-politicians-ordered-murder-of-banker.html

UKRAINE-EO13661-13321: 0048

Exhibit 10

# Billionaire 'with mafia links spied on rivals'

Roger Boyes, Alex Spence
July 9 2012, 1:01am, The Times

One of the world's richest businessmen, with ties to Britain's political elite, had links with a brutal mafia clan and used contacts in the Russian intelligence services to spy on rivals, according to court testimony obtained by *The Times*.

The allegations were levelled against the aluminium tycoon Oleg Deripaska by a former business associate in a money-laundering trial in Germany. Documents from the case have been made available to this newspaper prior to a clash between Mr Deripaska and a rival oligarch beginning in the High Court in London today.

Dschalol Hajdarov, an Uzbek businessman, told the German court that Mr Deripaska had links to the Ismailovskaya, one of the most powerful organised crime groups to emerge after the fall of the Soviet Union. "One can certainly say he knew about the murders and operating methods [of the Russian mafia]," Mr Hajdarov testified.

The allegations are likely to embarrass Mr Deripaska as he prepares to fight a £730 million claim by Ukrainian-born Michael Cherney, who says that he was cheated out of a 13 per cent stake in Rusal, the world's largest aluminium company.

Today's case is one of the biggest to come before the English courts and the latest in a string of extraordinary battles between Eastern Europeans. It is expected to feature allegations including extortion, bribery and attempted murder and to reveal how Mr Deripaska emerged from the bloody "aluminium wars" of the 1990s as an extremely wealthy man.

He is at 44 one of the best connected oligarchs, with ties to the Kremlin and the top of British political life, including to Lord Mandelson. In 2008, he famously welcomed the Labour peer and George Osborne, then the shadow chancellor, on to his 72m (236ft) yacht in Corfu. In 2005 he hosted Lord Mandelson and the financier Nat Rothschild on a trip to Siberia. They visited a smelter and had a sauna together.

Mr Deripaska is based in Moscow but owns more than 20 homes globally, including an £80 million mansion in Belgrave Square, Central London. His fortune, once estimated at $28 billion, has been depleted by the financial crisis, but he is still a multi-billionaire.

In his defence in today's case, he asserts that he was never Mr Cherney's business partner but the victim of a protection racket operated by Mr Cherney and Anton Malevsky, the feared former leader of the Ismailovskaya.

A spokesman for Mr Deripaska said: "[He] was never a partner of either Mr Cherney or Mr Malevsky. As Mr Deripaska's evidence will show, during the 1990s Mr Cherney and Mr Malevsky imposed a krysha, meaning an extortion racket, on Mr Deripaska. Criminal gangs were

1

UKRAINE-EO13661-13321: 0049

Exhibit 10

operating very widely in post-Soviet Russia. Mr Deripaska was subjected to a krysha by Mr Cherney and Mr Malevsky and the organised crime gangs they represented, which included Ismailovskaya, one of the most fearsome and feared of such gangs."

Mr Deripaska's defence echoes that of Roman Abramovich, the billionaire owner of Chelsea Football Club, against a $6 billion claim by Boris Berezovsky last year. Judgment in that case has yet to be given. Mr Abramovich is expected to appear as a witness for Mr Deripaska.

Among the evidence the tycoon will rely on to support his defence is the judgment in the German case, which finished three years ago and provided a rare exposé of the methods employed by the Ismailovskaya.

Parties not involved in the English litigation gave *The Times* access to a cache of thousands of documents from the Stuttgart trial, in which four Russian emigrés were convicted of laundering money for the gangsters. The 30-month trial drew on hundreds of hours of telephone intercepts as well as reports from the FBI, the German BND intelligence service and the Israeli police.

The documents painted a murky picture of a society in turmoil after the collapse of the Soviet Union. Politicians and police were frequently bribed, opponents threatened or murdered and corrupt journalists used to blacken the names of business rivals.

According to Mr Hadjarov's testimony, Mr Deripaska "was one of the partners of Cherney and Malevsky". He helped to run and expand the group's aluminium interests, including using contacts in the Russian FSB, successor to the KGB, to help gather information on rivals.

Summing up in the case, Judge Uta Baisch said that Mr Hajdarov's testimony was credible, even though he had been implicated in criminality himself. "There were no indications of ostentatious grudge-settling," she added.

The judge said of the Ismailovskaya: "As a violent and armed wing of Michael Cherney's consortium, its activities included threatening businessmen and their families, lodging false accusations with the police — a favourite method because of the Ismailovskaya's tight links with the judiciary and the police — to the armed occupation of factories and the liquidation of rivals."

Neither Mr Deripaska nor Mr Cherney gave evidence at the Stuttgart trial.

The tycoon's spokesman said: "Mr Deripaska voluntarily filed extensive materials and his statement with the German court. It would be inappropriate to comment further as these matters will be discussed in [the English] court."

Mr Cherney declined to comment but told *The Times* that he expected them all to be examined by the High Court. In court documents, he has dismissed as "scandalous" Mr Deripaska's allegations about him having mafia links.

Opening statements in the case are expected to last until Friday. The trial will then be adjourn until late in September when Mr Cherney will begin giving evidence by video link from Israel.

2

UKRAINE-EO13661-13321: 0050

Exhibit 10

He refuses to travel to London because he fears being extradited to Spain, where he is suspected of money laundering.

https://www.thetimes.co.uk/article/billionaire-with-mafia-links-spied-on-rivals-5bgt5k5brb6

3

UKRAINE-EO13661-13321: 0051

**UK banks**

## Close to the wind: Russia's oligarchs



Catherine Belton in Moscow OCTOBER 24, 2008

Oleg Deripaska had reason to be in ebullient form as the late August sun washed the grey steel hull and white aluminium superstructure of his yacht (above), the 72-metre Queen K, as it sat moored off the coast of Corfu. Russia's richest man, who had made his money in metals, was in the middle of a nickel take-over battle but was taking time to throw a party on board for Britain's political and business elite.

As has now become the stuff of furious UK debate, guests at that glittering Ionian occasion – aboard what is ranked as one of the 50 biggest yachts to ply the seas – included Peter Mandelson, then a European Union commissioner, and George Osborne, chief finance spokesman for the UK's opposition Conservative party. As part of his tussle for control of Norilsk Nickel, the world's biggest nickel miner, Mr Deripaska was considering floating his UC Rusal aluminium producer in London. Drinks with friends in high places could surely do no harm.

But that was the calm before the storm. In just two months, the tens of billions of dollars Mr Deripaska was playing for have been obliterated in Russia's stock market rout. Norilsk Nickel is worth less than one-quarter of its $40bn (£26bn, €32bn) summer valuation and Mr Deripaska faces the possible forced divestment of his stake.

UKRAINE-EO13661-13321: 0052

With Mr Osborne this week having to deny allegations of soliciting a party donation from the tycoon, and Lord Mandelson – newly appointed as business secretary in the Labour government – rejecting suggestions of a conflict of interest with his own role at the time as EU trade commissioner, the Russian's meetings with British political figures have meanwhile become as toxic as the debts Mr Deripaska appears to hold.

The 40-year-old oligarch is scrambling to find refinancing for a $4.5bn loan from western banks, including Royal Bank of Scotland, that paid for part of his 25 per cent Norilsk stake, after a plunge in the value of the shares he pledged as collateral. If he fails to gain an extension from the western banks of a waiver on repayments or a bail-out from the Russian state by the end of next week, he could have to hand over the shareholding to creditors. Rusal says it is optimistic it will win refinancing from the government, adding that it is in the meantime "conducting negotiations with the banks" on a extension of the waiver.

But what had been Russia's biggest industrial empire "is starting to look like a house of cards", says one person close to Rusal. "[Mr Deripaska's] people think they have a lot of options. But they are starting to run out . . . Every billion counts. It is going to be very close run."

Mr Deripaska is not alone. The global credit crisis has wiped an estimated $230bn off the peak $300bn total value of stocks held by Russia's oligarchs. Others who have lost paper fortunes in the market's slide include Roman Abramovich and Alisher Usmanov, the respective backers of London's Chelsea and Arsenal soccer clubs.

But those who, like Mr Deripaska, raised tens of billions of dollars by pledging shares as collateral are in the most precarious position. In a reverse of the 1990s privatisations, when oligarchs dictated terms of the sell-off to a weak state, now the cash-rich government is in a position to decide the fates of the country's most highly leveraged businessmen. Setting the stage for the biggest redistribution of property since the 1990s, the Kremlin has set aside $50bn to refinance the foreign loans of strategic enterprises such as Mr Deripaska's Rusal.

If Mr Deripaska fails to land an extension of the waiver or a state bail-out by the October 31 deadline set by the banks, he could face defaults on another nearly $10bn in loans Rusal owes to foreign banks. People with knowledge of the situation say the banks would prefer to extend the waiver to give time for VEB, the state-owned development bank, to

UKRAINE-EO13661-13321: 0053

provide refinancing, which may not come before November. But with 100 per cent approval required from creditors, there are still risks.

Mr Deripaska has already been forced to divest stakes in two foreign holdings to meet demands by foreign banks. Other debts are stacking up. Rusal says it has persuaded the billionaire, Mikhail Prokhorov, to allow it to defer a $700m tranche it owes him for buying his 25 per cent stake in Norilsk.

Basic Element, Mr Deripaska's holding company, does not disclose the total level of its debts. But by at least one account, Mr Deripaska borrowed to the hilt. "We bought this and then we bought that," says a former business partner. "If he bought something he would immediately pledge it as collateral and borrow money for something else. This is how he built up turnover." Alexander Temerko, former vice-president of Yukos, the defunct energy group, says: "Everything is fine when the market is growing. But this system of loans generating more loans is very dangerous when the market falls."

Basic Element denies it has any problems with liquidity, saying it does not intend to hand over any more shares to creditors. It managed to raise €500m in refinancing from co-shareholders in order to keep its 25 per cent stake in Strabag, the Austrian construction company, following a call by banks for more collateral.

But the leverage that went into building Mr Deripaska's empire, via which he controls 90 per cent of the country's aluminium output, is symptomatic of a borrowing boom by Russia's richest men. The hundreds of billions of dollars raised on Russian collateral helped make Moscow one of the world's most expensive cities, in a country where the average wage is still only about $700 a month. "This was part of the expanding wealth gap," says Chris Weafer from the Moscow-based Uralsib investment bank. "The growth of high-end restaurants and clubs and the purchasing of west end apartments in London is a reflection of that."

But when the market started to fall after the war in Georgia in August, cutting the value of collateral, the leveraging sparked a vicious circle of forced selling, helping send the Russian stock market down more than 70 per cent since its peak in May.

The practice of pledging shares in Russian blue chips to raise billions of dollars in loans became widespread as the stock market climbed for nearly five years in a row. Russian banks and western ones led by Credit Suisse and Deutsche Bank headed the trade, say

UKRAINE-EO13661-13321: 0054

market participants. Estimates on how much money was raised by pledging Russian blue chips vary as widely as $40bn to $120bn. As a result, "no one knows" how much Russia's actual debt is on top of the $527bn the central bank reports Russian companies and banks have borrowed from foreign banks, says Andrei Illarionov, a former presidential economic adviser.

Mr Weafer agrees: "One of the reasons Russia's market has gone down so much further is because investors fear there is a bigger debt problem than the official statistics show." Among those worst affected, he adds, are a second tier of so-called minigarchs. "A lot of their fortunes were predicated on the growth of asset values. But now they are the most exposed."

Of the oligarchs, however, Mr Deripaska stands out. He had cultivated close ties to Vladimir Putin, the former president and current prime minister, by promising to help rebuild Russia. Basic Element took the lead on the construction programme for the 2014 Sochi winter Olympics and Mr Deripaska pledged to invest up to $3bn a year in rebuilding Russia's roads, airports and other infrastructure – a commitment that added to his debt.

One market participant says Mr Deripaska "flew too close to the sun both on a political and economic level", adding: "He is the public face of Sochi's problems with rising costs."

Mr Deripaska is thought likely to win refinancing from the state before the foreign creditors call in the $4.5bn loan. Russia will not want a big stake in the strategically important Norilsk to fall into the hands of foreign banks, analysts say. Igor Shuvalov, first deputy prime minister, said this week that he believed the foreign banks would extend the waiver to give time for a state bail-out to be disbursed. "What do the banks want? They want their loan back. If it's a question of three weeks, then there should be no problem, because getting money from VEB is no problem but selling 25 per cent of Norilsk – that is a problem," he said.

But the state bail-out could come at a high price. The opportunity to control 25 per cent of Norilsk could prove too tempting an opportunity for some in the government who for years have been wanting a state-controlled national champion in the metals and mining sector, says Mr Weafer.

UKRAINE-EO13661-13321: 0055

A battle is still being waged in the government over what to do with the shares VEB will take as collateral in return for bail-out loans. But even with refinancing from the state, Rusal could face problems paying off government loans when they fall due. A London High Court case brought by Michael Cherney, a controversial figure in Russia's 1990s aluminium industry, involving a 20 per cent stake in Rusal also threatens the oligarch's reputation.

Mr Deripaska once told the FT he would surrender Rusal if the state asked him to. "If the state says we need to give it up, we'll give it up," he said. "I don't separate myself from the state. I have no other interests."

He now says that line was a joke. Soon it might not be.

Copyright The Financial Times Limited 2018. All rights reserved.

Comments have not been enabled for this article.

UKRAINE-EO13661-13321: 0056

Exhibit 12

# Russian Billionaire linked to Trump, Manafort Has New Cyprus Passport

**by Sara Farolfi, IRPI and Stelios Orphanides**
05 March 2018

Aluminum magnate Oleg Deripaska — a one-time business partner and employer of Paul Manafort, the embattled former campaign chairman for US President Donald Trump — was one of hundreds of wealthy individuals who have applied for Cypriot nationality. His application was approved last year.

The island also offered citizenship to Viktor Vekselberg, another Russian billionaire and a major shareholder in the largest bank on Cyprus, the documents show. Vekselberg appears to have turned down the offer, with his spokesman insisting Thursday that he holds only Russian citizenship.

Documents obtained by OCCRP and The Guardian include several hundred people who have taken advantage of programs that allow high-net-worth individuals to acquire Cypriot citizenship and, with it, the right to freely travel, work, and settle in the European Union.

Originating more than 30 years ago in the Caribbean, such schemes — known in the industry as "Golden Visas" — have spiked in popularity in the past decade and are now offered in more than 20 countries. They have been criticized for allowing wealthy people, including those who have obtained their wealth illegally in countries with weak legal systems, special access to life in developed countries that is not available to others.

As reported by The Guardian last September, the Cyprus version of the program requires investment of €2 million in property, or €2.5 million in companies or government bonds, in exchange for citizenship.

According to figures provided to the Cypriot parliament on Monday, since 2008, Cyprus has awarded citizenship to 1,685 foreign investors — many from the former Soviet Union, as well as from China, Iran and Saudi Arabia — and 1,651 of their family members. The investment inflow from the scheme is estimated at more than €4.5 billion.

A trove of more than 400 names obtained by The Guardian and OCCRP confirms the extent to which Cyprus's citizen-by-investment program has become an avenue for wealthy Russians to obtain EU passports. About one-third of the names on the list appeared to be Russian.

It also raises serious questions about the background checks carried out on applicants by Cypriot authorities.

Deripaska and Vekselberg — two of the most prominent names on the Cyprus list — were both included on a Jan. 29 list of 210 Russian officials and wealthy businessmen believed by the US Treasury Department to be close to Putin. While not a sanctions list, the names were assembled as part of a sanctions package signed into law the previous August.

UKRAINE-EO13661-13321: 0057

Exhibit 12

Russian officials have derided the list as simply a "telephone directory" of rich Russians intended to damage their reputations and sow doubts about doing business with them, while Trump's political opponents have blasted the list as falling well short of serious sanctions.

## *A History of Visa Problems*

Deripaska, whose net worth has been estimated at $6.6 billion by Forbes, has global business interests ranging from agriculture to aviation to automobiles. He has had previous difficulties in obtaining visas due to alleged ties to organized crime, which he strenuously denies.

For example, The Guardian reported in 2008 that the billionaire had failed to obtain a US business visa in 1998, although he was subsequently allowed to visit the country in 2000 after employing former US Sen. Bob Dole to lobby on his behalf. The FBI interviewed him during that visit, however, and reinstated the ban on US visits.

According to the New York Times, Deripaska nevertheless managed to make eight visits to the US between 2011 and 2014, traveling as a Russian diplomat with Moscow's permission.

Deripaska also has a previous history in Cyprus. In 2016, he had applied for a Cypriot passport through the island's collective investment scheme, which allowed a group of individual investors to band together, contributing a minimum of €2.5 million each, for a minimum total investment of €12.5 million. His application was denied.

Documents seen by OCCRP and The Guardian indicate why Deripaska's first attempt to become a Cypriot citizen was unsuccessful. He was asked to resubmit his bid amid allegations from Belgium that he had been involved there in money-laundering. Deripaska denies the claims.

At that time, those who applied as individuals were required to acquire Cypriot assets worth at least €5 million, which could include companies, real estate, securities, government bonds, or even bank deposits with a three-year maturity.

On Sept. 13, 2016, the country's Council of Ministers revised the visa process by cancelling the collective scheme and reducing the eligibility threshold for investors to €2 million.

As the Cypriot government was weighing Deripaska's initial application, officials were notified by European authorities that he had been investigated in 2015 by Belgian officials in a money-laundering case involving art and property worth "tens of millions."

Deripaska responded by presenting a letter from the Bureau of the Royal Commissioner of Brussels on July 27, 2016, saying that "the case was archived and because of lack of evidence it was not further pursued."

That October, the Cypriot Council of Ministers decided to further investigate the allegations and to re-submit his application for a final decision at a later stage. Deripaska's new application was filed on March 24, 2017 and ultimately approved.

But, though Deripaska's new Cypriot passport enables him to travel freely around the European Union, it will not necessarily get him into the US. Cyprus is currently awaiting approval for inclusion in the US Visa Waiver Program, which allows citizens of 38 countries to travel to the US without a visa.

UKRAINE-EO13661-13321: 0058

Exhibit 12

## *An easier route to the EU: banking*

A second and even richer Russian billionaire, Viktor Vekselberg, appeared to have an easier time getting at least the offer of a Cypriot passport. According to a request filed by the country's Minister of Interior to the Council of Ministers on March 27, 2017, he was granted Cypriot citizenship via an "honorary naturalization."

Under Cypriot law, the Council of Ministers can grant such naturalizations in very exceptional cases of high-level services offered to the country, or for reasons of public interest. This was the case with three Greek athletes and a Romanian trainer who competed for Cyprus in various venues from 2008 to 2010.

In Vekselberg's case, it appears to be his considerable investment into the Bank of Cyprus that won him the offer.

Vekselberg is the owner and president of the Renova Group, a large Russian conglomerate active both in the country and abroad.

The Lamesa Group, which a spokesperson said "is affiliated with" Renova, is also owned by Vekselberg. In August 2014, Lamesa contributed to the Bank of Cyprus's €1 billion capital increase.

That was the year now-US Commerce Secretary Wilbur Ross was elected vice chairman of the bank, together with Vladimir Strzhalkovskiy, a former KGB official and Putin ally. In 2015, upon resigning as board member, Strzhalkovskiy sold part of his stake to Vekselberg. Ross resigned from the bank after he was confirmed in the Commerce post in 2017.

As of Jan. 19, 2017, Lamesa was directly or indirectly the owner of 9.3 percent of the bank's shares, making it the largest single shareholder.

"[The Lamesa] investment took place during a difficult period for the economy of Cyprus, when foreign investment was [the only hope] for recovery and investors could hardly demonstrate confidence in the Cypriot economy," reads the interior ministry document.

Furthermore, "as an indication of his commitment to the Cypriot economy, Vekselberg indicated interest in further increasing Lamesa Group's shareholding in the Bank of Cyprus and the request is under review by the authorities in charge."

Despite his investments, Vekselberg's spokesman Andrey Shtorkh was adamant in a written statement Thursday. "Mr. Vekselberg has only one citizenship — of [the] Russian Federation and was never granted any other citizenship, including Cypriot."

According to the interior ministry document, Vekselberg is also a citizen of both Russia and Ukraine. He owns the world's biggest collection of Fabergé eggs and his personal wealth is estimated by Forbes to be $14.9 billion.

He was among the attendees of a December 2015 dinner in Moscow for the Kremlin TV channel RT, where Trump's future national security adviser Michael Flynn was photographed seated next to Putin. Vekselberg was also in Washington during Trump's inauguration ceremony 13 months ago, according to the Washington Post.

*With additional reporting by Tanja Milevska.*

UKRAINE-EO13661-13321: 0059

Exhibit 12

*This story was produced as part of the Global Anti-Corruption Consortium, a partnership between OCCRP and Transparency International.*

https://www.occrp.org/en/goldforvisas/russian-billionaire-linked-to-trump-manafort-has-new-cyprus-passport

4

UKRAINE-EO13661-13321: 0060

Exhibit 13

**U.S. Department of Justice**
Washington, DC 20530

**Exhibit A**
To Registration Statement
Pursuant to the Foreign Agents Registration Act of 1938, as amended

OMB NO. 1124-0006

Privacy Act Statement. The filing of this document is required by the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 et seq., for the purposes of registration under the Act and public disclosure. Provision of the information requested is mandatory, and failure to provide this information is subject to the penalty and enforcement provisions established in Section 8 of the Act. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, DC. Statements are also available online at the Registration Unit's webpage: http://www.fara.gov/. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the Administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public in print and online at: http://www.fara.gov/.

Public Reporting Burden. Public reporting burden for this collection of information is estimated to average .49 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Counterespionage Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

*Furnish this exhibit for EACH foreign principal listed in an initial statement
and for EACH additional foreign principal acquired subsequently.*

| 1. Name and address of registrant | | 2. Registration No. |
|---|---|---|
| Endeavor Group<br>2001 K Street, NW<br>Suite 206<br>Washington, D.C. 20006 | | 5934 |

| 3. Name of foreign principal | 4. Principal address of foreign principal |
|---|---|
| Oleg Deripaska | c/o Basic Element<br>30 Rochdelskaya Street<br>Moscow 123022 Russia |

*(stamp: CRM/ISS/REGISTRATION UNIT 2009 MAY -8 PM 2: 09)*

5. Indicate whether your foreign principal is one of the following:

☐ Foreign government

☐ Foreign political party

☐ Foreign or domestic organization: If either, check one of the following:

    ☐ Partnership          ☐ Committee

    ☐ Corporation        ☐ Voluntary group

    ☐ Association         ☐ Other (specify): _____

  ☒ Individual-State nationality   **Russian Federation**

6. If the foreign principal is a foreign government, state:

  a) Branch or agency represented by the registrant
    N/A

  b) Name and title of official with whom registrant deals
    N/A

7. If the foreign principal is a foreign political party, state:

  a) Principal address
    N/A

  b) Name and title of official with whom registrant deals
    N/A

  c) Principal aim
    N/A

**Formerly CRM-157**

FORM NSD-3
DECEMBER 2007

1

Exhibit 13

8. If the foreign principal is not a foreign government or a foreign political party,

    a) State the nature of the business or activity of this foreign principal.
Chairman, Basic Element, a diversified global investment company

    b) Is this foreign principal

| | | |
|---|---|---|
| Supervised by a foreign government, foreign political party, or other foreign principal | Yes ☐ | No ☒ |
| Owned by a foreign government, foreign political party, or other foreign principal | Yes ☐ | No ☒ |
| Directed by a foreign government, foreign political party, or other foreign principal | Yes ☐ | No ☒ |
| Controlled by a foreign government, foreign political party, or other foreign principal | Yes ☐ | No ☒ |
| Financed by a foreign government, foreign political party, or other foreign principal | Yes ☐ | No ☒ |
| Subsidized in part by a foreign government, foreign political party, or other foreign principal | Yes ☐ | No ☒ |

9. Explain fully all items answered "Yes" in Item 8(b).    *(If additional space is needed, a full insert page must be used.)*
N/A

CRM/ISS/REGISTRATION UNIT
2009 MAY -8 PM 2:09

10. If the foreign principal is an organization and is not owned or controlled by a foreign government, foreign political party or other foreign principal, state who owns and controls it.

N/A

| Date of Exhibit A | Name and Title | Signature |
|---|---|---|
| 5/6/09 | Adam R. Waldman<br>President<br>Endeavor Group | *A R Wald[signature]* |

2

Exhibit 13

OMB NO. 1124-0004

**U.S. Department of Justice**
Washington, DC 20530

**Exhibit B**
To Registration Statement
Pursuant to the Foreign Agents Registration Act of 1938, as amended

INSTRUCTIONS: A registrant must furnish as an Exhibit B copies of each written agreement and the terms and conditions of each oral agreement with his foreign principal, including all modifications of such agreements, or, where no contract exists, a full statement of all the circumstances by reason of which the registrant is acting as an agent of a foreign principal. One original and two legible photocopies of this form shall be filed for each foreign principal named in the registration statement and must be signed by or on behalf of the registrant.

Privacy Act Statement. The filing of this document is required by the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 et seq., for the purposes of registration under the Act and public disclosure. Provision of the information requested is mandatory, and failure to provide this information is subject to the penalty and enforcement provisions established in Section 8 of the Act. Every registration statement, short form registration statement, supplemental statement, exhibit, amendment, copy of informational materials or other document or information filed with the Attorney General under this Act is a public record open to public examination, inspection and copying during the posted business hours of the Registration Unit in Washington, DC. Statements are also available online at the Registration Unit's webpage: http://www.fara.gov/. One copy of every such document, other than informational materials, is automatically provided to the Secretary of State pursuant to Section 6(b) of the Act, and copies of any and all documents are routinely made available to other agencies, departments and Congress pursuant to Section 6(c) of the Act. The Attorney General also transmits a semi-annual report to Congress on the Administration of the Act which lists the names of all agents registered under the Act and the foreign principals they represent. This report is available to the public in print and online at: http://www.fara.gov/.

Public Reporting Burden. Public reporting burden for this collection of information is estimated to average .33 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Chief, Registration Unit, Counterespionage Section, National Security Division, U.S. Department of Justice, Washington, DC 20530; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

| 1. Name of Registrant | 2. Registration No. |
|---|---|
| Endeavor Group | 5934 |

| 3. Name of Foreign Principal |
|---|
| Oleg V. Deripaska |

CRM/ISS/REGISTRATION UNIT 2009 MAY -8 PH 2: 0

#### Check Appropriate Boxes:

4. ☐ The agreement between the registrant and the above-named foreign principal is a formal written contract. If this box is checked, attach a copy of the contract to this exhibit.

5. ☐ There is no formal written contract between the registrant and the foreign principal. The agreement with the above-named foreign principal has resulted from an exchange of correspondence. If this box is checked, attach a copy of all pertinent correspondence, including a copy of any initial proposal which has been adopted by reference in such correspondence.

6. ☒ The agreement or understanding between the registrant and the foreign principal is the result of neither a formal written contract nor an exchange of correspondence between the parties. If this box is checked, give a complete description below of the terms and conditions of the oral agreement or understanding, its duration, the fees and expenses, if any, to be received.

Endeavor Group is engaged at will by Mr. Deripaska to provide general legal advice on issues involving his U.S. visa as well as commercial transactions. Mr. Deripaska pays Endeavor Group a monthly retainer of $40,000 plus actual expenses incurred.

7. Describe fully the nature and method of performance of the above indicated agreement or understanding.
Endeavor Group provides legal and advisory services to the principal Mr. Deripaska around U.S. visa issues and commercial transactions.

FORM NSD-4
SEPTEMBER 2007

3

UKRAINE-EO13661-13321: 0063

Exhibit 13

8. Describe fully the activities the registrant engages in or proposes to engage in on behalf of the above foreign principal.

Endeavor Group assists the principal Mr.Deripaska in the preparation of a U.S. visa application and advocates for U.S. approval of such application. Endeavor Group also advises on and assists in the execution of commercial transactions. Additionally, Endeavor Group provides legal advice and assistance to Mr. Deripaska with respect to global aluminum issues.

9. Will the activities on behalf of the above foreign principal include political activities as defined in Section 1(o) of the Act and in the footnote below?    Yes ☒    No ☐

If yes, describe all such political activities indicating, among other things, the relations, interests or policies to be influenced together with the means to be employed to achieve this purpose.

Endeavor Group expects to engage with the U.S. government regarding the status of the foreign principal's visa application; interact with the United States Trade Representative Office to encourage U.S. participation in the intra-governmental global aluminum discussions; and engage with the Department of Treasury's Auto Task Force regarding the prospective acquisition of General Motor's European operations.

| Date of Exhibit B | Name and Title<br>Adam Waldman<br>President<br>Endeavor Group | Signature |
|---|---|---|
| | | arWald |

Footnote: Political activity as defined in Section 1(o) of the Act means any activity which the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party.

4

UKRAINE-EO13661-13321: 0064

Exhibit 14,

Bates Pages 0065 – 0067,

Withheld in Full

Exhibit 15,

Bates Pages 0068 – 0071,

Withheld in Full

Exhibit 16,

Bates Pages 0072 – 0075,

Withheld in Full

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

ALEXANDER GLIKLAD,

               Petitioner,

v.

OLEG DERIPASKA,

               Respondent.

-----------------------------------------------------------------x

Index No.: 652641/2015
(Singh, J.)

DECLARATION OF OLEG
DERIPASKA IN OPPOSITION
TO GLIKLAD'S MOTION FOR
SUMMARY JUDGMENT AND
IN SUPPORT OF DERIPASKA'S
CROSS MOTION

      **OLEG DERIPASKA**, declares under penalty of perjury, that the following is true and correct:

      1.    I am the respondent in this special proceeding (the "Special Proceeding"). I make this declaration in opposition to the motion for summary judgment filed by petitioner Alexander Gliklad ("Gliklad") and in support of my cross-motion. Except where otherwise indicated, I make this declaration based upon my personal knowledge.

      2.    In this Special Proceeding, Gliklad seeks to garnish ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *See* Affirmation of Thomas J.

Quigley, dated April 15, 2016 ("Quigley Aff."), Ex. 5. ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

      3.    From the very beginning of this Special Proceeding, my attorneys, at my direction, have taken the position that this Court lacks personal jurisdiction over me, because

1

UKRAINE-EO13661-13321: 0076

Exhibit 17

(i) I am a Russian citizen and my home is Russia, and (ii) I have not purposefully availed myself of the privilege of conducting any activities in New York and seeking the benefits and protections of its laws with respect ████████████████████████████████████

████████████████

    4.    The purpose of this declaration is to present evidence that demonstrates the facts underlying my legal position that this Court lacks personal jurisdiction over me. Thus, this declaration will show the following: (1) my permanent home is, and always has been, in Russia; (2) ████████████████████████████████████████, and I have never made New York my residence; (3) ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

████████████████████████ (6) I have never been a party plaintiff in the courts in New York, and I was not in the *Veleron* lawsuits; (7) ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

2

UKRAINE-EO13661-13321: 0077

Exhibit 17

## MY PERMANENT HOME IS, AND ALWAYS HAS BEEN, IN RUSSIA

5. I was born in Russia on January 2, 1968, and I have always regarded Russia as my permanent home. To this day, I intend for Russia to remain my permanent home. My intention is reflected in numerous facts about my past and present circumstances. Specifically:

(a) I am a Russian citizen, and I have never been a citizen of any other country;

(b) ███████████████████████████████████████
███████████████████████████████████████

(c) I currently reside in Russia at ████████████████████
████████████ My primary residence has been in ████████
prior to which my primary residence was in █████████████

(d) ███████████████████████████████████████
███████████████████████████████████████

(e) ███████████████████████████████████████
███████████████████████████████████

(f) ███████████████████████████████████████
████████

(g) ███████████████████████████████████████
███████████████████████████████████████
████████████

(h) ███████████████████████████████████████
███████████████████████

(i) I have been a public representative of Russia in certain diplomatic and trade organizations, such as the Asia-Pacific Economic Cooperation Business Summit, the Asia Pacific Economic Cooperation Business Advisory Council, the G8 Summit, and the G20 Summit;

UKRAINE-EO13661-13321: 0078

Exhibit 17

(j)     I have a diplomatic passport from Russia, and on occasion I have represented the Russian government in countries outside Russia; and

(k)     I have never taken any action to change my permanent home from Russia.

6.     In short, I have always acted on the intention and belief that Russia is, and has been, my permanent home.  As described in paragraphs 7-19, below, I have never taken up residence in New York State, and I have never intended to make it my permanent home.

## I DO NOT OWN REAL PROPERTY IN NEW YORK STATE, AND I DO NOT RESIDE, AND HAVE NOT RESIDED, IN NEW YORK STATE

7.     In seeking summary judgment in this Special Proceeding, Gliklad's lawyers have filed several documents in which they assert, with great confidence, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* Legal Memorandum in support of Motion for Summary Judgment against Respondent Oleg Deripaska, dated April 15, 2016 ("Gliklad Br."), at 4, 7 – 10; Affidavit of W. Gordon Dobie, sworn to on April 15, 2016 ("Dobie Aff."), para. 27.  Those assertions are false and unsupported.  Despite the arguments and unfounded accusations of Gliklad's lawyers to the contrary,[1] ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮

8.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4

UKRAINE-EO13661-13321: 0079

Exhibits 18 – 20

Bates Pages 0080 - 0090

Withheld in Full

Exhibit 21

## Announcement of Additional Treasury Sanctions on Russian Financial Institutions and on a Defense Technology Entity

7/29/2014

*Actions Target Three Russian State-Owned Banks, and one Russian State-Owned Defense Technology Entity*

**WASHINGTON** – In response to Russia's continued efforts to destabilize eastern Ukraine, the U.S. Department of the Treasury today imposed prohibitions on additional entities operating within the financial services sector of the Russian economy pursuant to Executive Order (E.O.) 13662. Specifically, Treasury imposed sanctions that prohibit U.S. persons from providing new financing to three major Russian financial institutions, limiting their access to U.S. capital markets. Treasury today has also designated one Russian state-owned defense technology firm pursuant to Executive Order (E.O.) 13661. These measures coincide with actions taken to suspend U.S. export credit and development finance to Russia.

"In light of Russia's continuing support for separatists in Ukraine, we took additional steps today to further increase financial pressure on the Russian government," said Under Secretary for Terrorism and Financial Intelligence David S. Cohen. "These actions, along with actions announced today by the European Union, significantly increase the costs to Russia for its efforts to undermine Ukraine's sovereignty. We are prepared to continue to expand these sanctions if Russia refuses to change course."

*Prohibition of Certain Types of Activities with Three Russian State-Owned Financial Institutions Pursuant to E.O. 13662*

Treasury today imposed measures prohibiting U.S. persons and persons within the United States from transacting in, providing financing for, or otherwise dealing in new debt of longer than 90 days maturity or new equity for Bank of Moscow, Russian Agricultural Bank, and VTB Bank OAO, their property, or their interests in property. As a practical matter, this step will severely limit these banks' access to medium- and long-term U.S. dollar financing, and will impose additional significant costs on the Russian Government for its continued activities in Ukraine.

We have not blocked the property or interests in property of these banks, nor prohibited transactions with them beyond these specific restrictions. However, the scope of prohibited activities and the number of sanctioned financial institutions may be expanded under the authority of E.O. 13662 if we decide to do so.

**Bank of Moscow** is a Russian state-owned financial institution—through its parent bank, VTB Bank OAO—with 148 sub-offices located in all administrative districts of Moscow.

**Russian Agricultural Bank (A.K.A. Rosselkhozbank)** is a state-owned bank, which acts as a Russian government agent offering a full range of financial services to clients. With a network of 78 regional branches and more than 1,500 additional offices covering Russia, it has the second-largest regional branch network in the Russia.

**VTB Bank OAO** is a state-owned bank, and, together with its subsidiaries ("the VTB Group"), is Russia's second-largest banking group. The VTB Group has more than 1,600 offices in Russia, and operates more than 30 banks in 23 countries across Europe, Asia, and Africa. The VTB Group offers financial services including retail, corporate and investment banking; brokering and other stock-market services; insurance; asset management for pension and unit funds; and leasing. VTB Bank's shares are traded on the Moscow Exchange and on the London Stock Exchange.

*Imposition of Sanctions on One Russian State-Owned Firm Pursuant to E.O. 13661 for Operating in the Arms or Related Materiel Sector in Russia*

1

Exhibit 21

Treasury today has also designated and blocked the assets of United Shipbuilding Corporation, pursuant to E.O. 13661, for operating in the arms or related materiel sector in Russia.

United Shipbuilding Corporation, which was established pursuant to a March 21, 2007 presidential order, is a Russian state-owned company that manufactures, among other things, ordnance and accessories, and is engaged in shipbuilding, repair, and maintenance. United Shipbuilding Corporation designs and constructs ships for the Russian Navy and is the largest shipbuilding company in Russia. This addition expands upon the list of eight defense technology firms designated on July 16.

As a result of today's action under E.O. 13661, any assets of the entity designated that are within U.S. jurisdiction must be frozen. In addition, transactions by U.S. persons or within the United States involving the entity designated today under E.O. 13661 are generally prohibited.

For identifying information on the entities named in this release, please click *here*.

###

https://www.treasury.gov/press-center/press-releases/Pages/jl2590.aspx

2

# N

RUSSIA   OCTOBER 20, 2008 ISSUE

# McCain's Kremlin Ties

*He may talk tough about Russia, but John McCain's political advisors have advanced Putin's imperial ambitions.*

*By Mark Ames and Ari Berman*

OCTOBER 1, 2008



Vladimir Putin listens to aluminum tycoon Oleg Deripaska during their meeting in Putin's Novo-Ogaryovo residence outside Moscow, Wednesday, August 2, 2006. *(AP Photo / ITAR-TASS / Presidential Press Service, Dmitry Astakhov)*

UKRAINE-EO13661-13321: 0093

EDITOR'S NOTE: *Research support was provided by the Puffin Foundation Investigative Fund at The Nation Institute.*

O ver the course of the presidential campaign, John McCain has repeatedly emphasized his willingness to stand up to Russian Prime Minister Vladimir Putin as proof that only he possesses the fortitude and judgment to become the next leader of the free world. In his acceptance speech at the Republican convention, McCain lashed out at Putin and the Russian oligarchs, who, "rich with oil wealth and corrupt with power...[are] reassembling the old Russian Empire." McCain rushed to publicly support the Georgian republic during its recent conflict with Russia and amplified his threat to expel Moscow from the G-8 club of major powers. His running mate, Sarah Palin, suggested in her first major interview that the United States might have to go to war with Russia one day in order to protect Georgia—the kind of apocalyptic scenario the United States avoided during the cold war.

Yet despite McCain's tough talk, behind the scenes his top advisers have cultivated deep ties with Russia's oligarchy—indeed, they have promoted the Kremlin's geopolitical and economic interests, as well as some of its most unsavory business figures, through greedy cynicism and geopolitical stupor. The most notable example is the tale of how McCain and his campaign

UKRAINE-EO13661-13321: 0094

manager, Rick Davis, advanced what became a key victory for the Kremlin: gaining control over the small but strategically important country of Montenegro.

According to two former senior US diplomats who served in the Balkans, Davis and his lobbying firm, Davis Manafort, received several million dollars to help run Montenegro's independence referendum campaign of 2006. The terms of the agreement were never disclosed to the public, but top Montenegrin officials told the US diplomats that Davis's work was underwritten by powerful Russian business interests connected to the Kremlin and operating in Montenegro. Neither Davis nor the McCain campaign responded to repeated requests for comment. (Davis's extensive lobbying work, especially on behalf of collapsed mortgage giants Fannie Mae and Freddie Mac, has already attracted critical media scrutiny.)

At the time, Putin wanted to establish a Russian outpost in the Mediterranean, and Montenegro–a coastal republic across the Adriatic from Italy—was seen as his best hope. McCain also lobbied for Montenegro's independence from Serbia, calling it "the greatest European democracy project since the end of the cold war." For McCain, the simplistic notion of "independence" from a country America had gone to war with in the late 1990s was all that mattered. What Montenegro looked like after independence seemed not to interest him. This suited

UKRAINE-EO13661-13321: 0095

Putin just fine. Russia had generally sided with Serbia
against the West during the Balkan wars of the 1990s,
but for the Kremlin, cutting Montenegro free from
Serbia meant dealing with a Montenegro that could be
more easily controlled. Indeed, today, after its
"independence," Montenegro is nicknamed "Moscow
by the Mediterranean." Russian oligarchs control huge
chunks of the country's industry and prized
coastline—and Russians exert a powerful influence
over the country's political culture. "Montenegro is
almost a new Russian colony, as rubles flow in to buy
property and business in the tiny state," Denis
MacShane, Tony Blair's former Europe minister,
wrote in *Newsweek* in June. The takeover of
Montenegro has been a Russian geostrategic victory
—quietly accomplished, paradoxically enough, with the
help of McCain and his top aides.

In mid-September *The Nation*'s website published a
photo of McCain celebrating his seventieth birthday in
Montenegro in August 2006 at a yacht party hosted by
convicted Italian felon Raffaello Follieri and his
movie-star girlfriend Anne Hathaway. On the same
day one of the largest mega-yachts in the world, the
Queen K, was moored in the same bay of Kotor. This
was where the real party was. The owner of the Queen
K was known as "Putin's oligarch": Oleg Deripaska,
controlling shareholder of the Russian aluminum giant
RusAl, currently listed as the ninth-richest man in the
world, with a rap sheet as abundant as his wealth. By

UKRAINE-EO13661-13321: 0096

mid-2005 Deripaska had already virtually taken control of Montenegro's economy by snapping up its aluminum plant, KAP—which accounts for up to 40 percent of the country's GDP and some 80 percent of its export earnings—in a nontransparent privatization tender strongly criticized by NGO watchdogs, Montenegrin politicians and journalists. *The Nation* has learned that Deripaska told one of his closest associates that he bought the plant "because Putin encouraged him to do it." The reason: "the Kremlin wanted an area of influence in the Mediterranean."

In mid-2005 Ambassador Richard Sklar, the former lead US official in the Balkans, ceased advising the Montenegrin government (he'd worked as a pro bono adviser after leaving the US diplomatic service) when it became clear the plant was being handed to Deripaska under heavy Russian pressure. "I quit because it was a bad deal, not for any political reasons. The Russians scared all the other buyers off. They offered far too little money and got themselves a sweetheart deal."

Russia's virtual takeover of Montenegro was well under way by January 2006, when Rick Davis introduced Deripaska to McCain at a villa in Davos, Switzerland. They met again seven months later, at a reception in Montenegro celebrating McCain's birthday, as reported in *The Washington Post*.

UKRAINE-EO13661-13321: 0097

The story of how Oleg Deripaska, 40, rose from a
Cossack village to become a Putin-blessed aluminum
tycoon with an estimated $40 billion fortune does not
begin with a lemonade stand and old-fashioned elbow
grease. Like most post-Soviet success stories,
Deripaska's rise began abruptly and violently, during
the chaotic reign of Boris Yeltsin. Among all the
battles for control of valuable state assets in the 1990s,
none were as bloody as the "aluminum wars," in
which organized-crime gangs hired by competing
interests assassinated dozens of executives,
shareholders and bankers. During a visit to the United
States in 1995, Deripaska threatened the lives of two
aluminum rivals, Yuri and Mikhail Zhivilo, according
to a RICO lawsuit filed against Deripaska in New
York district court in 2000. The RICO case is just one
of many lawsuits, including one filed in Israel by a
former business partner claiming that Deripaska
illegally wiretapped an Israeli cabinet minister. In
addition, German prosecutors have begun a criminal
money-laundering investigation in Stuttgart.
(Deripaska did not respond to requests for comment.)

Deripaska understands that success in Russia today
comes from a mixture of brute force, political
influence and personal connections. In 2001, about a
year after Putin signed a decree granting legal
immunity to Yeltsin's family, Deripaska married
Yeltsin's granddaughter, thereby cementing his own
immunity and power. Throughout Putin's reign,

UKRAINE-EO13661-13321: 0098

Deripaska has adhered to an unwritten understanding between Putin and the oligarchs: as long as they support the Kremlin, they can operate with impunity. Deripaska has thus taken on numerous projects dear to Putin, such as building a new airport in Sochi for the 2014 Olympics and buying out Tajikistan's aluminum plant to help Putin reassert control over that key ex-Soviet republic. Deripaska openly admits that his RusAl holdings are subservient to the Kremlin's wishes, telling the *Financial Times* last year, "If the state says we need to give it up, we'll give it up."

Yet Deripaska faced a serious obstacle to his business ambitions, hampering his duties as a Putin surrogate. Because of numerous accusations of involvement in death threats, extortion, racketeering and money laundering, he had been barred from entering America since 1998. Putin has lobbied for Deripaska's US visa. In an interview with *Le Monde* earlier this year, Putin complained, "I have asked my American colleagues why. If you have reasons for not delivering him a visa, if you have documents on illegal activities, give us them…. They give us nothing, explain to us nothing, and forbid him from entry."

The visa ban was costing Deripaska billions: for years he and fellow RusAl shareholders had sought to cash in their wealth by launching an IPO in London, which could have netted up to $10 billion for RusAl's owners. However, finding institutional buyers would

UKRAINE-EO13661-13321: 0099

be difficult if not impossible as long as RusAl's
primary owner was barred from entering the United
States.

Despite rampant Russophobia among Republicans,
Deripaska turned to powerful GOP figures to solve his
problem—especially to Republicans connected with
McCain. In 2003 Deripaska hired former presidential
candidate Bob Dole, who had nearly picked McCain as
his running mate, and Dole's lobbying partner Bruce
Jackson (also a McCain aide) to lobby the State
Department to overturn the visa ban, according to
Glenn Simpson and Mary Jacoby of *The Wall Street
Journal*. Over the next few years Dole's firm, Alston
& Bird, was paid more than $500,000 to push for
Deripaska's visa.

Deripaska also reached out to a Washington-based
intelligence firm, Diligence, chaired by GOP foreign
policy hand Richard Burt, McCain's top foreign policy
adviser in 2000 and an adviser in '08 (Burt left
Diligence in 2007 to join Henry Kissinger's consulting
firm). Deripaska's business partner in London,
Nathaniel Rothschild, an heir to the English Rothschild
fortune, bought a stake in Diligence, according to the
*New York Times* and confirmed by a Rothschild
spokesman. The firm offered Deripaska many useful
services: corporate intelligence gathering, visa
lobbying through considerable GOP connections and,
crucially, help in obtaining a $150 million World

UKRAINE-EO13661-13321: 0100

Bank/European Bank for Reconstruction and
Development loan for a Deripaska subsidiary, the
Komi Aluminum Project. Getting the loan was useful
in providing a layer of comfort to Western investors
skittish about RusAl. So Diligence, now partly owned
by Rothschild, provided a "due diligence" report to the
World Bank, which the Bank then used to approve its
loan to Deripaska.

Not surprisingly, the lobbying worked: in December
2005 Deripaska was issued a multientry US visa,
according to the State Department. During his brief
stay he signed his World Bank loan, spoke at a
Carnegie Endowment meeting and attended a dinner
for Harvard University's Belfer Center, where, thanks
to a generous donation, he became a member of its
international council.

However, Deripaska's trip did not end well. Under the
visa's terms, he was forced to endure lengthy FBI
questioning. According to the mining-industry
newsletter *Mineweb*, the list of his enemies had grown
from jilted former business partners to the heads of
powerful US metals companies and government
officials unhappy with RusAl's control of key Third
World bauxite mines, which threatened beleaguered
US aluminum giants. The interview went
badly—according to people who know him, Deripaska
had little patience for prying bureaucrats. When he left
the country, the visa ban was reinstated. Once again

UKRAINE-EO13661-13321: 0101

Deripaska turned to powerful Republicans—this time, to McCain and campaign manager Davis, who arranged the January 2006 Davos introduction. The McCain campaign later claimed that "any contact between Mr. Deripaska and the senator was social and incidental," but afterward Deripaska thanked Davis for arranging "such an intimate setting." *The Washington Post* reported that Davis was "seeking to do business with the billionaire." Indeed, Deripaska's subsequent thank-you letter mentioned his possible investment in a metals company Davis represented through a hedge-fund client.

If you're wondering how Deripaska came to know Davis & Co., the answer lies in Russia's next-door neighbor Ukraine.

In December 2004 Ukrainians poured into the streets of Kiev and other cities in the peaceful "Orange Revolution," which overthrew a Putin-backed corrupt leader, Viktor Yanukovich, who had tried to steal the country's presidential election that year (during which the pro-Western opposition candidate, Viktor Yushchenko, was poisoned and almost died). It was a serious blow to Russia's geopolitical standing.

Putin's Ukrainian proxies were also in trouble. Shortly after the Orange Revolution, a murder investigation was launched against the country's richest oligarch, Rinat Akhmetov, Yanukovich's main backer. Akhmetov fled the country. In exile in Monaco, he

UKRAINE-EO13661-13321: 0102

turned to Davis's business partner, Paul Manafort–the second name in the lobbying firm Davis Manafort. An old GOP hand, Manafort, like Davis, had played a key role in Dole's failed 1996 presidential run and had worked for dictators like Ferdinand Marcos of the Philippines and Mobutu Sese Seko of Zaire. Akhmetov initially hired Manafort to improve the image of his beleaguered conglomerate, SCM, but soon Manafort's role shifted to helping Yanukovich.

Manafort assembled a skilled team of political operatives in Ukraine and set about raising the popularity of Yanukovich's pro-Russian Party of Regions, which Akhmetov financed. It was a very lucrative deal for Davis Manafort—and successful (according to Ukrainian investigative journalist Mustafa Nayem, Akhmetov paid Manafort upward of $3 million). Yanukovich's disgraced party won a resounding victory in the March 2006 elections—and Akhmetov returned as the top Ukrainian oligarch. Thanks in part to the work of Davis Manafort, the Orange Revolution was essentially undone, putting Putin back in the chess match over Ukraine's future.

Publicly McCain and his campaign chief's lobbying firm were on opposite sides. In 2005 McCain had nominated Orange Revolution hero Yushchenko for the Nobel Prize, and that spring he'd honored Yushchenko in the headquarters of the International Republican Institute, whose board McCain has chaired

UKRAINE-EO13661-13321: 0103

since 1993. But behind the scenes the former head of IRI's Moscow office, Philip Griffin, was recruited by Manafort to work on Yanukovich's campaign against Yushchenko. Davis Manafort's work was considered so detrimental to US interests that a National Security Council official called McCain's office to complain, according to the *New York Times*. The McCain campaign denies receiving the NSC complaint.

But the firm's work was only just beginning. The same month Davis Manafort helped deliver this victory to Putin's proxies, it started work on another key Kremlin success story: an independent and Russia-dominated Montenegro.

First, a little history. Montenegro was the smallest of the former Yugoslavia's six republics. When Slobodan Milosevic was overthrown in October 2000, Montenegro's longtime strongman, Milo Djukanovic, figured the West would reward him by supporting his push for independence. But the European Union and the United States opposed Montenegro's secession, which they feared would undermine the new, pro-Western leaders in Serbia and bring more war. So under heavy pressure from the EU, an agreement was struck in 2002 putting off an independence referendum for at least three years.

Djukanovic then looked beyond the West for support. That same year his closest ally and mentor, Milan Rocen, was dispatched to Moscow as ambassador of

UKRAINE-EO13661-13321: 0104

the Serbia-Montenegro confederation. Rocen nurtured
ties to Putin's Russia, and by 2005 the biggest
Montenegrin industrial asset, the KAP aluminum
plant, was snatched up by Deripaska at Putin's request.
After that, Russia surprised everyone by dropping its
objections to Montenegrin independence, which
Russia's historic ally Serbia vigorously opposed.
"There seemed to be a belief that Deripaska and the
Russians wanted to gain control of the aluminum plant
as part of a Russian move for greater influence
throughout Montenegro," says former ambassador
Sklar.

Meanwhile, Rick Davis was also eager for a piece of
Montenegro's independence, lobbying hard for Davis
Manafort to run the referendum campaign. Bob Dole,
who has been paid $1.38 million by the Montenegrin
government since 2001 to lobby for it in Washington,
urged his Montenegrin friends to hire Davis. Whether
it was because of Dole or, as some speculate, the
Russians, Davis got his deal.

Though Davis has claimed no connection to his partner
Manafort's controversial activities in Ukraine, he
nevertheless hired at least three specialists
recommended by Manafort, from the same team
Manafort used for Yanukovich's victory, to work on
Montenegro's independence referendum. They
included Russian political operative Andrei Ryabchuk,
an elections specialist who had previously worked on

UKRAINE-EO13661-13321: 0105

pro-Putin campaigns in Russia. Ryabchuk told *The Nation* that he was "recruited by Manafort's people" out of Moscow to the Ukraine operation and then on to Montenegro.

Davis's team was vetted by Montenegro's Russian ambassador Rocen, who was returning from Moscow to oversee the independence campaign. Why was Davis hired? The top McCain aide was as much a political symbol as a campaign consultant. "I think the Montenegrins hired Rick to have political cover–it was important to show they had support from the United States," said an American democracy expert who's worked in Montenegro. Though disclosure is required by Montenegrin law, Davis Manafort's contract with the ruling Montenegrin party was never publicly released. In addition, Djukanovic's party never listed payments to Davis Manafort on its election filings, lending credence to private claims by top Montenegrin officials that Russian business interests paid for Davis's work through hired third parties, an oft-used though illegal tactic in Eastern Europe to disguise money trails.

At key points in the campaign, Davis reached out to Deripaska's allies for help. With the referendum too close to call, the Serbs tried to sway public opinion by threatening to revoke scholarships and other education privileges of Montenegrin students if the country should secede. This caused a panic–so to counter the

UKRAINE-EO13661-13321: 0106

Serbs, Davis turned to Deripaska emissary Nathaniel
Rothschild (Rothschild has reportedly become the
richest of all the Rothschilds, thanks to his privileged
role as a Deripaska adviser).

Three weeks before the independence referendum,
Davis asked Rothschild to come to Montenegro. After
arriving in his private Gulfstream jet, Rothschild was
trotted out before the cameras with the Montenegrin
prime minister, where he pledged $1 million to support
students who might be hurt by Serbia's scholarship
threat. Another Deripaska ally brought in to secure the
student vote was Canadian billionaire Peter Munk,
CEO of Barrick Gold, the world's largest gold-mining
corporation (it was Munk who had hosted the Davos
meeting between McCain and Deripaska a few months
earlier). Munk, who serves on the advisory board of
RusAl, delivered pledges of support from Canadian
universities.

At the same time Deripaska's allies were employed by
Davis, Dole was lobbying McCain to promote
Montenegro's independence. Dole's aides held a
teleconference with McCain's Senate office when
Montenegro's foreign minister visited Washington;
shortly thereafter, the referendum passed by a razor-
thin 0.5 percent. In April 2006 McCain announced that
Montenegro's independence was the "greatest
European democracy project since the end of the cold
war." Despite opposition cries of vote rigging, the

UKRAINE-EO13661-13321: 0107

United States and other major powers accepted the results—and Putin's Russia recognized newly independent Montenegro before the EU did.

A few months after the vote, McCain and a contingent of GOP senators visited Montenegro. The day before they arrived, Djukanovic had flown to Putin's dacha on the Black Sea. "Your government made it possible for large-scale Russian investments," Putin told the Montenegrin leader. Djukanovic then returned to Montenegro and warmly received McCain, who also met with the Montenegrin president, speaker of Parliament and opposition leader Predrag Bulatovic. Bulatovic told McCain about how Russian capital was taking over the country and of his concern that "this investment can have a negative impact on the democratic process." McCain listened but kept criticism of Russia to himself. Meanwhile, Davis was still in the country, helping Djukanovic's Russia-allied party win the upcoming parliamentary elections. (At the time, Djukanovic was under investigation by Italian prosecutors for cigarette smuggling and "Mafia-type activities.")

Soon after the referendum, the powerful figures behind Montenegro's independence were carving up the country. That summer Rothschild started discussions with top Montenegrin officials about gaining control of the valuable shoreline, including the half-billion-dollar Porto Montenegro project, which aims to

UKRAINE-EO13661-13321: 0108

become the world's top mega-yacht marina, complete
with luxury hotels, shopping and the country's first
eighteen-hole golf course. The property was handed to
the Munk-Rothschild-fronted offshore consortium for
a pittance, according to MANS, the local NGO partner
of Transparency International, in yet another backroom
deal. Eventually, Deripaska's role in Porto
Montenegro, which was initially secret, was formally
acknowledged, although the full list of owners is still a
mystery. Deripaska is also developing an 8 billion-
euro resort in southern Montenegro and seeking
control of a coal mine and a thermal power plant.

Roughly two years later, in March of this year,
Rothschild hosted a high-dollar fundraiser for McCain
at London's posh eighteenth-century Spencer House,
which Rothschild donated for the occasion. Given the
close relationship between Rothschild and Deripaska,
some speculated that Deripaska was the hidden hand
behind the event. The conservative watchdog group
Judicial Watch filed a complaint with the Federal
Election Commission, alleging that the fundraiser
amounted to an illegal contribution by foreign
nationals to McCain's campaign.

Aside from a little campaign dough, what has McCain
gotten out of all this? It's hard to tell—either he was
utterly clueless while his top advisers and political
allies ran around the former Soviet domain promoting
the Kremlin's interests for cash, or he was aware of it

UKRAINE-EO13661-13321: 0109

and didn't care. McCain was reportedly so angry about Davis Manafort's role in stifling Ukraine's Orange Revolution that he almost removed Davis as campaign manager. But in the case of Montenegro, he should have known what Davis & Co. were up to. After all, McCain lent a helping hand. And by the time he visited the country, the Russian takeover was plain to see.

The story of how McCain's closest aides and employees have been undermining his vociferously expressed opposition to Putin and Russia's oligarchs offers a highly disturbing preview of what a McCain administration might look like. When McCain's campaign proclaims "country first," one has to wonder, Which country? The one with the highest bidder?

---

**MARK AMES** Mark Ames is the founding editor of the *eXile* and author of *Going Postal: Rage, Murder and Rebellion: From Reagan's Workplaces to Clinton's Columbine*. He is an editor at *The eXiled Online* and a regular guest on MSNBC's *The Dylan Ratigan Show*.

**ARI BERMAN** Ari Berman is a former senior contributing writer for *The Nation*.

To submit a correction for our consideration, click *here*.
For Reprints and Permissions, click *here*.

---

UKRAINE-EO13661-13321: 0110

Exhibit 23

Bates Pages 0111 - 0114

Withheld in Full

# Oleg**Deripaska**



Home   About Oleg Deripaska   Business   Charity   Initiatives

Hot topic   Fighting Ebola



"Without a significant change of thinking and a better understanding of the opportunities that integration with Asia can bring to Russia, development will be limited."

## World Economic Forum

APEC Business Advisory Council

Developing Eastern Siberia and the Far East

Russian Union of Industrialists and Entrepreneurs

Supporting Russian Education and Science

Climate change regulation initiatives

Fighting the spread of the Ebola virus

Public–private partnership with Rusal: Ebola response initiative in the Republic of Guinea

Oleg Deripaska and Rusal's public–private partnership Ebola response

Rusal and Russia develop Ebola vaccine

Rusal's Guinea Ebola response

Rusal's Ebola response in Guinea: building the CEMRT

Rusal's public–private partnership in Guinea: stopping Ebola in its tracks

Public health in Guinea: the

Oleg Deripaska has regularly participated in the annual meetings of the World Economic Forum in Davos since the late 1990s. These meetings have become the main event of the Forum which brings together around 1,000 companies and organisations from all over the world. Basic Element is a strategic partner of the forum - the highest level of cooperation with the World Economic Forum that a business organisation can have. Oleg Deripaska's key companies actively participate in the WEF's industry groups and are involved in a number of WEF initiatives. UC RUSAL, the world's leading aluminium company, participates in the work of the Mining and Metals Group.

As part of his work in the Group, Oleg Deripaska discusses current industry situations with other key players in the market, helping to develop a strategy for the industry, defining procedures for cross-industry interaction and developing standard approaches to tackle global problems. In 2010 Oleg Deripaska was elected to the Management Council of the Group.

En+ Group, a leading Russian diversified power and metals group of companies, participates in the work of the Energy, Utilities and Technology group . As part of the work in the group Oleg Deripaska is involved in several projects, such as the New Energy Architecture and the Interaction between the Power Industry and Society.

In his work in the WEF, Oleg Deripaska devotes special attention to climate change. He is one of the 16 business leaders who developed the CEO Climate Policy Recommendations to G8 Leaders, a document that summed up proposals and recommendations on how to counter global warming. This document was developed as part of the Gleneagles Dialogue group and was signed by the CEOs of the 100 largest companies of the world. These recommendations were presented to G8 leaders at the G8 summit in Japan in July 2008.

Oleg Deripaska was also part of the WEF's Task Force on Low Carbon Prosperity, which brought together representatives of business and science. The task force interacted with the governments of leading nations of the world to prepare climate change discussions in Copenhagen in December 2009.

Oleg Deripaska also supported the global Partnering Against Corruption Initiative  (PACI). This initiative was proposed by the CEOs of companies

Vision.

Interview

UKRAINE-EO13661-13321: 0115

Exhibit 24

Ebola crisis and Rusal's
public—private partnership

Rusal boosts Guinea's
sustainable development

Foreign direct investment (FDI)
in Guinea

Public—private partnerships
(PPPs) help Guinea grow

Rusal corporate social
responsibility (CSR)

How Rusal is using public—
private partnerships around the
world

Fighting Ebola: part of Rusal's
commitment to sustainability

How Rusal helps Guinea use
bauxite mining to push forward
with development

How sustainable mining is
helping Guinea build a
sustainable future

Public—private partnerships:
Driving force of the developing
world

Racing against time on Ebola
vaccine research

Guinea and Rindia reap benefits
of mining

Rusal takes the lead in Ebola
research

Rusal's social projects support
development in Guinea

operating in all industries with the aim of consolidating the business
community's efforts to counter corruption.

2

UKRAINE-EO13661-13321: 0116

# Oleg**Deripaska**

Home    About Oleg Deripaska    Business    Charity    Initiatives

Hot topic    Fighting Ebola



"Without a significant change of thinking and a better understanding of the opportunities that integration with Asia can bring to Russia, development will be limited."

World Economic Forum



Developing Eastern Siberia and the Far East

Russian Union of Industrialists and Entrepreneurs

Supporting Russian Education and Science

Climate change regulation initiatives

Fighting the spread of the Ebola virus

Public–private partnership with Rusal: Ebola response initiative in the Republic of Guinea

Oleg Deripaska and Rusal's public–private partnership Ebola response

Rusal and Russia develop Ebola vaccine

Rusal's Guinea Ebola response

Rusal's Ebola response in Guinea: building the CEMRT

Rusal's public–private partnership in Guinea: stopping Ebola in its tracks

Public health in Guinea: the

## APEC Business Advisory Council

The APEC Business Advisory Council was set up in November 1995. The Council was supposed to prepare recommendations on how to carry out the Osaka action plan and achieve APEC's other tasks. The Business Advisory Council is a key organisation through which the Forum interacts with the business community. Every year the Business Advisory Council offers recommendations to APEC summits on how to implement its programmes. Members of the Business Advisory Council are appointed by the leaders of their countries.

In 2004 Oleg Deripaska was appointed to represent Russia in the Council for the first time. His status was confirmed twice in 2007 and in 2010. In 2007 Oleg Deripaska became chair of the Russian section of the Council.

As part of his work on the Council, Oleg Deripaska focuses primarily on energy efficiency and energy security, international trade, refinement of financial instruments and regulations, food availability and sustainable development. In 2005 Oleg Deripaska supported an anti-corruption initiative proposed by the US section of the APEC Business Advisory Council.

At this year's first meeting of the Business Advisory Council in Hong Kong in February 2012, Oleg Deripaska's representative presented the North East Asian Region Electrical System Ties Initiative (NEAREST). The goal of this initiative is to improve ties between the power grids of Eastern Siberia, Northern and North Eastern China, Japan, the Republic of Korea and other countries in the region. The name was suggested by a consortium of Russian, Korean and Japanese R&D Institutes in 2008. In practice NEAREST proposes creating a transnational power grid in North Eastern Asia with a total capacity of up to 200 GW by building connecting power transmission lines and laying underwater cables. Modern technology makes it possible to exchange electricity between grids and compensate daily and seasonal imbalances in the production and consumption of electric power.

Due to differences in time zones and climates the peak loads in neighbouring grids occur at different times, so it would make sense to connect them up into a single mega-grid. Once this is done, it will be possible to produce cheaper, safer and more environmentally friendly electricity for all the economies in North Eastern Asia. In addition, NEAREST

Vision

Interview

3

UKRAINE-EO13661-13321: 0117

Exhibit 24

Ebola crisis and Rusal's public–private partnership

Rusal boosts Guinea's sustainable development

Foreign direct investment (FDI) in Guinea

Public–private partnerships (PPPs) help Guinea grow

Rusal corporate social responsibility (CSR)

How Rusal is using public–private partnerships around the world

Fighting Ebola: part of Rusal's commitment to sustainability

How Rusal helps Guinea use bauxite mining to push forward with development

How sustainable mining is helping Guinea build a sustainable future

Public–private partnerships: Driving force of the developing world

Racing against time on Ebola vaccine research

Guinea and Kindia reap benefits of mining

Rusal takes the lead in Ebola research

Rusal's social projects support development in Guinea

will allow participating countries to help each other out in emergencies.

A pilot project to test out NEAREST concepts is a 400 km long 500 KW set of power transmission lines with a total output of 1GW, connecting Eastern Siberia and North Eastern China.

The best examples of similar systems elsewhere in the world include the Super-grid in Europe, the power link between Canada and the US. This demonstrates that there is currently a worldwide trend toward connecting national grids into larger transnational super grids and to increase the use of renewable energy.

The Russian section of the Business Advisory Council recommended that the NEAREST project be included as part of the APEC agenda, as well as the Business Advisory Council 2012 agenda. Representatives of business, science and finance from APEC nations and international organisations were invited to participate in NEAREST. In addition, a proposal was put forward to develop a feasibility study for use in bilateral and multilateral cooperation projects.

UKRAINE-EO13661-13321: 0118

# Oleg**Deripaska**

Home    About Oleg Deripaska    Business    Charity    Initiatives

Hot topic   Fighting Ebola



"Without a significant change of thinking and a better understanding of the opportunities that integration with Asia can bring to Russia, development will be limited."

World Economic Forum

APEC Business Advisory Council

Developing Eastern Siberia and the Far East

Russian Union of Industrialists and Entrepreneurs

Supporting Russian Education and Science

Climate change regulation initiatives

Fighting the spread of the Ebola virus

Public-private partnership with Rusal: Ebola response initiative in the Republic of Guinea

Oleg Deripaska and Rusal's public-private partnership Ebola response

Rusal and Russia develop Ebola vaccine

Rusal's Guinea Ebola response

Rusal's Ebola response in Guinea: building the CEMRT

Rusal's public-private partnership in Guinea: stopping Ebola in its tracks

Public health in Guinea: the

## Climate change regulation initiatives

Oleg Deripaska is one of the staunchest advocates for introduction of a global carbon tax (carbon levy), a universal mechanism for financing international climate programs that would reduce demand for high-carbon emission fuels and discourage businesses from emitting greenhouse gases.

He also speaks out for a creation of an international carbon fund refilled via the revenues generated from the tax and used to support innovative renewable projects. At its essence the idea would be that all countries agree to a minimum carbon tax and apply it to their carbon emitting producers, with each country administering the tax nationally.

Oleg Deripaska is among a few world's business leaders who openly voice concerns about a global threat of deforestation. He calls for the mechanism of economic stimulus for forests' maintenance and reproduction. Each hectare of forest, depending on its absorbing capacities, should be subsidized. Subsidies from the international carbon fund will be the source of finance for national subsidies what will eventually help to create a clear mechanism to stimulate the implantation of new forests.

Deripaska's RUSAL is taking active measures to address global warming. Since 1990, RUSAL has reduced its greenhouse gas emissions by 54% making 90% of its aluminum production sourced by hydro energy.

Among RUSAL's latest steps to mitigate the global warming effects was a creation of a 'Climate partnership of Russia', an initiative that consolidates efforts of Sberbank, RusNano, RusHydro and Ingosstrakh that will work closely with in Russia and abroad to seek optimum solutions which will enable the companies prevent the damaging effects of global climate change.

Vision

Interview

UKRAINE-EO13661-13321: 0119



# Oleg**Deripaska**

Home   About Oleg Deripaska   Business   Charity   Initiatives

Key businesses

**Key businesses**

- ⚙ Manufacturing
- ⚡ Energy
- ⛏ Metals and mining
- 🧱 Construction
- 💲 Financial services
- ✈ Airports business
- 🌱 Agribusiness

## 200 000

➤➤ Over 200 000 employees

## Business

Basic Element, which was founded and is now owned by Oleg Deripaska, manages assets in all the key sectors of industry such as manufacturing, energy, metals and mining, construction, financial services, aviation, agricultural business and a number of others.

A number of Basic Element's companies are leaders in their market sector. They use cutting edge industrial technology, innovative techniques and work to high standards to improve energy efficiency, corporate governance, social and environmental responsibility. They also closely cooperate with the leaders of international business.

Oleg Deripaska's key companies operate in the following sectors of the economy:

> Manufacturing

> Energy

> Metals and mining

> Construction

> Financial services

> Aviation

UKRAINE-EO13661-13321: 0120

Exhibit 25

> Agribusiness

01/31/2018 10:54 PM

2

UKRAINE-EO13661-13321: 0121

# Oleg**Deripaska**

Home    About Oleg Deripaska    Business    Charity    Initiatives

Key businesses



Key businesses
- Manufacturing
- Energy
- Metals and mining
- Construction
- Financial services
- Airports business
- Agribusiness

## Manufacturing

### Russian Machines

> Comprises industrial and engineering assets in the following industries: automotive OEM (GAZ Group), automotive components (RM-Systems), rail industry (RM Rail), aircraft OEM (Aviacor), road construction (RM-Terex) and agricultural machinery (AGCO-RM).

> 27 industrial and mechanical engineering assets in 12 regions of Russia

> Employs about 57,000 people

> http://eng.rm.ru/

#### GAZ Group

> 13 plants producing vehicles and automotive components, and a number of service and sales offices.

> Leading positions on the Russian commercial vehicles market. It occupies 50% of the light commercial vehicles segment and nearly 75% of the buses segment

> The largest Russian manufacturer of gas-engine buses and commercial vehicles

> Active implementation of Euro-4 and Euro-5 environmental standards

**61 369**

>> commercial vehicles sold during 2015

UKRAINE-EO13661-13321: 0122

Exhibit 25
http://www.deripaska.com/business/?SECTION_ID=49

> Successful developing of partnerships with the leading international car manufacturers: VOLKSWAGEN and Daimler

> Production of Gazelle NEXT panel van, Ural NEXT and new bus Vector NEXT launched in 2015

> Shares of OAO GAZ are listed on RTS stock exchange (Ticker : GAZA)

> http://eng.gazgroup.ru/

01/31/2018 10:55 PM

4

UKRAINE-EO13661-13321: 0123

Exhibit 25
http://www.deripaska.com/business/?SECTION_ID=48

# Oleg**Deripaska**

Home  About Oleg Deripaska  Business  Charity  Initiatives

Key businesses



Key businesses

- Manufacturing
- Energy
- Metals and mining
- Construction
- Financial services
- Airports business
- Agribusiness

## Energy

**77,3**

>> billion kilowatt/hours of electricity produced in 2013

**En+ manages assets for energy, metals and mining sector**

> http://enplus.ru/en/

### EuroSibEnergo

> EuroSibEnergo is the largest private power company in Russia that has the world's largest capacity for privately held hydroelectric power generation. The company produces around 9% of Russia's total electricity generation.

> The design capacity of the company's 18 power plants is 19.5 GWt, of which 15 GWt are hydroelectric power plants. The company's supplies of coal exceed 1.2 billion tones.

> EuroSibEnergo is investing in a joint venture with China's largest hydroelectric power generation company China Yangtze Power Co to build new power plants, primarily hydroelectric ones, in Siberia, with a total capacity of up to 10 GWt.

> The company employs over 27,000 people.

> http://www.eurosib.ru/en/

01/31/2018 10:55 PM

5

UKRAINE-EO13661-13321: 0124

# Oleg**Deripaska**

Home   About Oleg Deripaska   Business   Charity   Initiatives

Key businesses



Key businesses

- Manufacturing
- Energy
- Metals and mining
- Construction
- Financial services
- Airports business
- Agribusiness

## Metals and mining

**7%**

of the global aluminum production

### En+ manages assets for energy, metals and mining sector

> http://enplus.ru/en/

### UC RUSAL

> UC RUSAL is the world's largest aluminum producer and one of the largest alumina producers, accounting for 7% of the global aluminum market and 7% of the world's alumina market.

> The company operates 47 production sites in 13 countries on 5 continents.

> UC RUSAL owns a 25% + two shares stake in Norilsk Nickel, the world's largest producer of nickel and palladium and one of the largest producers of platinum and copper. The company also has a parity stake in a joint venture with the Kazakhstan-based holding Samruk, which owns the CIS's largest coal deposit.

> The company is among the top 10% of the world's most efficient aluminum producers with bauxites supplies enough for 120 years of operation.

> The company employs the world's most energy efficient electrolysis technology RA-300, RA-400 and develops new RA-500 process while improving Green Soederberg technology.

UKRAINE-EO13661-13321: 0125

Exhibit 25
http://www.deripaska.com/business/?SECTION_ID=47

> About 80% of the company's products are made using
  environmentally friendly hydroelectric power produced with zero
  emissions. The company is developing an inert anode production
  process that will completely eliminate hazardous emissions and
  polyaromatic carbohydrates during aluminum production.

> The company is implementing projects to build the Boguchansky
  Energy and Metals Complex (BEMO) and the Taishet aluminum smelter
  that will allow UC RUSAL to increase its annual aluminum capacity by
  1.3 million tons.

> UC RUSAL is Russia's first company to float on the Hong Kong Stock
  Exchange in January 2010 (IPO).

> The company employs over 61,000 people.

> Oleg Deripaska is the President and member of the Board of Directors
  of UC RUSAL

> http://www.rusal.ru/en/

01/31/2018 10:56 PM

7

UKRAINE-EO13661-13321: 0126

# Oleg**Deripaska**

Home   About Oleg Deripaska   Business   Charity   Initiatives

Key businesses



Key businesses

- 🌐 Manufacturing
- ⚡ Energy
- ⛰ Metals and mining
- 🏗 Construction
- ⬤ Financial services
- ✈ Airports business
- ⬤ Agribusiness



# 100 000

»» square meters of residential and
non-residential housing
commissioned annually

## Construction

### Glavstroy Development

› Glavstroy Development is one of the leading real estate investment and development holdings in Russia. The company focuses on the complex development of large territories, urban transformation and creation of the residential areas

› The company currently has 22 projects underway in Moscow, Moscow region, Yaroslavl, Irkutsk and Krasnodar region

› Glavstroy Development builds low-income and comfort-class housing as well as upscale real estate with a focus on urban development and construction of residential complexes with social infrastructure

› The company has a 219-hectare land bank. A total area of residential real estate planned for construction is about 4 mln sq. m

### Glavstroy SPb

› Glavstroy-SPb is one of the largest developers in Saint Petersburg. It focuses on the complex development of the urban territories and acts as a project owner, a developer, a general contractor and an investor

› The company has a 700-hectare land bank. A total area of residential real estate planned for construction is about 5 mln sq. m

› Over 250 bln rubles will be invested to the planned projects including

UKRAINE-EO13661-13321: 0127

Exhibit 25
http://www.deripaska.com/business/?SECTION_ID=46

Severnaya Dolina, Yuntolovo and Panorama 360 residential complexes

01/31/2018 10:56 PM

9

UKRAINE-EO13661-13321: 0128



# Oleg**Deripaska**

Home    About Oleg Deripaska    Business    Charity    Initiatives

Key businesses

**Key businesses**

⚙ Manufacturing

⚡ Energy

🔺 Metals and mining

🏭 Construction

◎ Financial services

✈ Airports business

🌾 Agribusiness

## $ Financial services

> Business interests of Oleg Deripaska, a key stakeholder of industrial diversified group Basic Element, include minority stakes in Russia's leading financial companies. Mr Deripaska's investment portfolio (direct or indirect) consists of the top financial organizations whose reliability has been recognised by Russian and international ratings and regulatory agencies.

### Ingosstrakh

> Ingosstrakh is one of Russia's oldest and largest insurance companies. Oleg Deripaska personally holds 10% of Ingosstrakh's ordinary shares.

> The company is a leading insurer of complex risks such as insurance of the liability of ship owners, ship hull insurance, insurance against aviation and space related risks, insurance of transportation companies

> The company has 83 branches all around Russia in 149 Russian cities and towns

> Ingosstrakh was ranked the 4th in direct insurance rates (without compulsory health insurance), the 1st water transport insurance, the 2nd in MOD insurance, corporate property insurance and compulsory insurance of the carrier civil liability in 2015

> The company's total premiums were equal to RUR 79.5 billion in 2015

> Expert RA: Rating of reliability A++. "The exceptionally high level of

10

UKRAINE-EO13661-13321: 0129

Exhibit 25
http://www.deripaska.com/business/?SECTION_ID=45

reliability", rating outlook "stable"

> Rating Standard & Poor's: on the international scale - BB+, on Russia national scale - ruAA+

> Ingosstrakh's employees: approx. 5,500 people

> http://www.ingos.ru/en/ ⌐

## Bank SOYUZ

> Bank Soyuz is a universal commercial bank. The bank is a financial wing of Ingosstrakh insurance company, Soyuz's main shareholder. The bank provides a wide range of services to individuals and legal entities including deposits, credit cards, foreign exchange transactions. Bank offers loans to purchase real estate corporate and mortgage loans to individuals.

> Bank's share capital amounted to RUR 5.216 bln, assets - to RUR 122 bln and equity - to RUR 14.1 bln as of January 1st, 2017

> Standard & Poor's long-term foreign and local currency issuer ratings "B", its long-term national-scale rating "ruA-", outlook 'stable'

> Bank employees: over 1,200 people

> http://www.banksoyuz.ru/en/ ⌐

## NPF Socium

> Socium, one of Russia's twenty largest private pension funds in terms of volume of pension savings. Socium has over 20 years' experience in pension insurance and coverage

> Pension reserves totaled RUR 426.8 mln, pension savings – RUR 14.7 bln as of January 1, 2016

> More than 140,000 people participate in the private pension program, more than 240,000 people have entrusted to Socium the formation of investment part of state pensions

> 9th largest fund in Russia on number of participants receiving non-state pension, 19th fund of number of insured persons, 18st place in terms of the pension savings

> Expert RA's rating of financial strength: "A+", outlook "stable"

> Fund employs over 100 people

## Ingosstrakh–Investments

> "Ingosstrakh-Investment Management Co." (OJSC) was established in 1997. The company is under the brand of Ingosstrakh, one of the leading insurance companies in Russia

> Ingosstrakh Investments offers a broad range of products, which opens opportunities for investment in domestic and international markets

> Ratings by Expert RA, Russia's independent rating agency: A++ (Absolutely high (the highest) level of reliability)

> Ingosstrakh Investments has over 50 people

01/31/2018 10:57 PM

11

UKRAINE-EO13661-13321: 0130



# Oleg**Deripaska**

Home   About Oleg Deripaska   Business   Charity   Initiatives

Key businesses

Key businesses
- Manufacturing
- Energy
- Metals and mining
- Construction
- Financial services
- Airports business
- Agribusiness

## Airports business

### Basel Aero

**8 670 889**

» passengers in 2015

› Includes airports in Southern Russian cities of Sochi, Krasnodar, Gelendzhik and Anapa

› Basel Aero is a joint venture of Basic Element, Sberbank of Russia and Changi Airports International

› Basel Aero's airports served over 5% of the passenger traffic and 2% of the cargo traffic in Russia

› Basel Aero's airports serviced 8,7 mln passengers, 40.8 thousands flights and 12 thousand tons of cargo in 2015

› Sochi International Airport is the gateway of the Winter Olympic Games 2014

› Airports in Krasnodar, Sochi and Anapa won the 2nd National Award "Air gateway of Russia" in 2015

› Basel Aero's employees: over 3000 people

› http://www.basel.aero/en/

01/31/2018 10:57 PM

12

UKRAINE-EO13661-13321: 0131



# Oleg**Deripaska**

Home   About Oleg Deripaska   Business   Charity   Initiatives

Key businesses

**Key Businesses**

⚙ Manufacturing

⚡ Energy

▲ Metals and mining

▦ Construction

● Financial services

✈ Airports business

◆ Agribusiness

## Agribusiness

### Kuban Agroholding

> One of the largest agribusinesses in the South of Russia. The company integrates two modern dairy mega farms, a 16,000 pig capacity breeding complex, three elevators with nonrecurrent grain storage capacity more than 270,000 tonnes, three modern seed plants, a sugar factory and one of Russia's best horse breeding farms, the Sunrise, specialising in the breeding of English thoroughbred horses

> Enters top-20 of the largest agricompanies and top-5 of the most efficient land users in Russia

> Operates according to the Japanese production system known as 'Kaisen'

> Employs over 4,800 people

**86 000**
▶▶ hectares of tillable land

01/31/2018 10:58 PM

13

UKRAINE-EO13661-13321: 0132

Exhibit 26



# En+ Group plc
## Offering of up to 112,142,858 Global Depositary Receipts
## Offer Price: U.S. $14 per GDR

This is an offering (the "Offering") by En+ Group plc (the "Company") and by Basic Element Limited, a shareholder of the Company (the "Selling Shareholder"), companies organised and existing under the laws of Jersey of 112,142,858 global depositary receipts (the "GDRs") representing ordinary shares of the Company (the "Ordinary Shares"). Each GDR represents an interest in one Ordinary Share. The Selling Shareholder has granted to Citigroup Global Markets Limited, Credit Suisse Securities (Europe) Limited, J.P. Morgan Securities plc, Merrill Lynch International, SIB (Cyprus) Limited and VTB Capital plc (together, the "Joint Global Coordinators and Joint Bookrunners"), Bank GPB International S.A., BMO Capital Markets Limited, Société Générale and UBS Limited (together, the "Joint Bookrunners") and ATON LLC (the "MOEX Bookrunner" and, together with the Joint Global Coordinators and Joint Bookrunners, the "Managers") an option (the "Over-Allotment Option") to acquire up to 5,000,000 additional GDRs representing Ordinary Shares at the offer price (the "Offer Price") for the purposes of meeting over-allotments in connection with the Offering.

This document (the "Prospectus") has been approved by the United Kingdom Financial Conduct Authority (the "FCA") in accordance with the Prospectus Rules (the "Prospectus Rules") of the FCA made under section 73A of the Financial Services and Markets Act 2000 ("FSMA") in relation to the admission to listing and to trading of the GDRs. This document is a prospectus relating to the Company prepared in accordance with the Prospectus Rules. Applications have been made: (i) to the FCA, in its capacity as competent authority under the FSMA for a listing of up to 571,428,572 GDRs, consisting of: (A) 107,142,858 GDRs to be issued on or about 8 November 2017 (the "Closing Date"); (B) up to 5,000,000 additional GDRs to be sold in connection with the Over-Allotment Option; and (C) up to an additional 459,285,714 GDRs to be issued from time to time against the deposit of Ordinary Shares (to the extent permitted by law) with Citibank Hong Kong as custodian (the "Custodian") acting on behalf of Citibank N.A. as depositary (the "Depositary"), to be admitted to the official list of the FCA (the "Official List"); and (ii) to the London Stock Exchange plc (the "London Stock Exchange") for such GDRs to be admitted to trading under the symbol ENPL (in the case of Regulation S GDRs (as defined below)) and the symbol ENPL (in the case of Rule 144A GDRs (as defined below)) on the London Stock Exchange's regulated market for listed securities, which is regulated under the Markets in Financial Instruments Directive 2004/39/EC, through its international order book (the "IOB"). Conditional trading in the GDRs on the London Stock Exchange through its IOB is expected to commence on an if-and-when issued basis on or about 3 November 2017. Admission to the Official List and to trading on the regulated market (the "London Admission") is expected to take place on or about 8 November 2017. All dealings in the GDRs prior to the commencement of unconditional dealings will be of no effect if the London Admission does not take place and will be at the sole risk of the parties concerned.

A copy of this document has been delivered to the registrar of companies in accordance with Article 5 of the Companies (General Provisions) (Jersey) Order 2002, which the registrar has given, and has not withdrawn, its consent to this document's circulation. The Jersey Financial Services Commission has given, and has not withdrawn, its consent under Article 2 and Article 4 of the Control of Borrowing (Jersey) Order 1958 to the issue of securities in the Company. It must be distinctly understood that, in giving such consents, neither the registrar of companies nor the Jersey Financial Services Commission takes any responsibility for the financial soundness of the Company or for the correctness of any statements made, or opinions expressed, with regard to it. If you are in any doubt about the contents of this document you should consult your stockbroker, bank manager, solicitor, accountant or other financial adviser.

The Company is seeking the approval of Public Joint-Stock Company "Moscow Exchange MICEX-RTS" ("MOEX"), a part of the Moscow Exchange Group, in accordance with: Federal Law No. 39-FZ "On Securities Market" dated 22 April 1996, as amended (the "Russian Securities Market Law"); Regulation of the Central Bank of Russia ("CBR") No. 437-P "On Conducting Organised Trading Activity" dated 17 October 2014, as amended; Regulation of the CBR No. 454-P "On the Disclosure of Information by Issuers of Issue Securities" dated 30 December 2014, as amended; Regulation of the CBR No. 534-P "On the Admission of Securities to Organised Trading" dated 24 February 2016, as amended; and the listing rules of MOEX dated 26 June 2017 in relation to: (i) the public circulation in the Russian Federation of the Regulation S GDRs to be issued from time to time; and (ii) the admission of the Regulation S GDRs to be issued from time to time to trading on MOEX under the symbol ENPL (together, the "MOEX Admission"). Rule 144A GDRs will not be admitted to trading on MOEX. The MOEX Admission may not take place earlier than the London Admission. Dealings in the GDRs on MOEX prior to the MOEX Admission are not permitted. Although the Company expects that the MOEX Admission may take place on or about 8 November 2017, no assurance can be given that MOEX will approve the MOEX Admission and that, if such approval takes place, thereafter the GDRs will continue to be admitted to trading on MOEX.

The Offering comprises an offering of GDRs: (i) within the United States to qualified institutional buyers ("QIBs"), as defined in, and in reliance on, Rule 144A ("Rule 144A") under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or another exemption from, the registration requirements of the Securities Act; and (ii) outside the United States to institutional investors in "offshore transactions" as defined in, and in reliance on, Regulation S under the Securities Act ("Regulation S"). Prior to the Offering, there has been no public market for the Ordinary Shares or the GDRs. The Ordinary Shares will not be and are not expected to be listed on any exchange.

**INVESTMENT IN THE GDRS INVOLVES A HIGH DEGREE OF RISK. PROSPECTIVE INVESTORS SHOULD READ THE ENTIRE PROSPECTUS, PARTICULARLY, THE SECTION HEADED "RISK FACTORS", WHEN CONSIDERING AN INVESTMENT IN THE COMPANY (SEE "RISK FACTORS").**

The Offering does not constitute an offer to sell, or solicitation of an offer to buy, securities in any jurisdiction in which such offer or solicitation would be unlawful. The GDRs and the Ordinary Shares represented by them (together, the "Securities") have not been and will not be registered under the Securities Act and may not be offered or sold within the United States, except to QIBs by certain U.S. selling agents of the Managers in reliance on the exemption from the registration requirements of the Securities Act provided by Rule 144A, or outside the United States to certain persons in offshore transactions in reliance on Regulation S. Prospective purchasers are hereby notified that sellers of the GDRs may be relying on the exemption from the provision of Section 5 of the Securities Act provided by Rule 144A. The GDRs are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under applicable securities laws and regulations. Investors should be aware that they may be required to bear the financial risks of this investment for an indefinite period of time. For a discussion of these and certain further restrictions on transfers of the GDRs, see "Plan of Distribution", "Selling and Transfer Restrictions" and "Settlement and Delivery".

The GDRs are offered by the Managers when, as and if delivered to and accepted by them and subject to their right to reject orders in whole or in part. The GDRs being offered and sold within the United States (the "Rule 144A GDRs") will be evidenced by a Rule 144A Master Global Depositary Receipt (the "Rule 144A Master GDR") registered in the name of Cede & Co., as nominee for The Depository Trust Company (the "U.S. Clearing Agent") in New York. The GDRs being offered and sold outside the United States (the "Regulation S GDRs") will be evidenced by a Regulation S Master Global Depositary Receipt (the "Regulation S Master GDR") registered in the name of Citivic Nominees Limited, as nominee for Citibank Europe plc, as common depositary for Euroclear S.A./N.V. ("Euroclear") and Clearstream Banking, société anonyme ("Clearstream, Luxembourg"). Except as described herein, beneficial interests in the Rule 144A Master GDR and the Regulation S Master GDR (together, the "Master GDRs") will be shown on, and transfers thereof will be effected only through, records maintained by the U.S. Clearing Agent, Euroclear and Clearstream, Luxembourg and their direct and indirect participants, including the Russian National Settlement Depository ("NSD"). It is expected that delivery of the GDRs will be made against payment therefor in U.S. Dollars in same day funds through the facilities of the U.S. Clearing Agent with respect to the Rule 144A GDRs, through Euroclear and Clearstream, Luxembourg with respect to the Regulation S GDRs, in each case on or about the Closing Date, and through the facilities of NSD with respect to the Regulation S GDRs offered under the MOEX Admission following the Closing Date (see "Settlement and Delivery").

### Joint Global Coordinators and Joint Bookrunners

**BofA Merrill Lynch   Citigroup   Credit Suisse   J.P. Morgan   Sberbank CIB   VTB Capital**

### Joint Bookrunners

**BMO Capital Markets   Gazprombank   Société Générale   UBS Limited**
**Corporate & Investment Banking**

### MOEX Bookrunner
### ATON

The date of this Prospectus is 3 November 2017

1

UKRAINE-EO13661-13321: 0133

Exhibit 26

| | |
|---|---|
| **B.3** *A description of, and key factors relating to, the nature of the company's current operations and its principal activities, stating the main categories of products sold and/or services performed and identification of the principal markets in which the company competes.* | The Company and its consolidated subsidiaries (together, the "**Group**") is a leading international vertically integrated aluminium and power producer with core assets located in Russia. The Group is the world's largest privately-held hydro power generator and the largest aluminium producer outside of China. Based on its long-term average hydro power production, the Group covers almost all needs of its Siberian aluminium smelters by its own hydro power. |

The Group operates through two major business segments: En+ Power and RUSAL. For the purposes of IFRS, the Group reports on the basis of five operating segments: the Metals Segment, the Power Segment, the Coal Segment, the Logistics Segment and the Other Segment. RUSAL, which also includes an equity investment in Norilsk Nickel, is equivalent to the Metals Segment. En+ Power predominantly consists of the Power Segment, and also includes both the Coal Segment and the Logistics Segment, both of which support the operations of the Power Segment, and the Other Segment. The Other Segment comprises insignificant businesses in the context of the Group as a whole, and the Company may consider disposing of these non-core assets.

The Company operationally manages the assets in En+ Power, the operating activities of which primarily include: (i) power and heat generation; (ii) power trading and supply and engineering services; as well as (iii) power transmission and distribution. The Group also strategically controls RUSAL through a 48.13% shareholding and contractual rights contained in a shareholders' agreement with the non-controlling shareholders of RUSAL (including the right to propose for nomination for appointment the CEO of RUSAL, at least 50% of the board of directors and two independent directors), while the Company does not exercise day-to-day management of RUSAL's operations.

The Group is the largest private power producer in Russia in terms of installed capacity, according to SEEPX Energy Ltd ("**SEEPX**"). According to SEEPX, the Group is ranked as the largest private hydro power generation company globally, with 15.1 GW of total installed hydro power capacity in 2016. The Group operates generating assets with 19.7 GW of installed electricity capacity and with 17.0 kGcal/h of installed heat capacity (as of 2016). The Group held an 8.0% share of the total installed electricity capacity in Russia and a 37.6% share of the total installed electricity capacity of the Siberian Integrated Power System ("**Siberian IPS**") as at 31 December 2016, according to SEEPX. In 2016, 76.6% of the Group's installed electricity capacity was represented by hydro power plants ("**HPPs**"), with the remaining 23.4% represented by combined heat and power plants ("**CHPs**") (which are predominantly coal-fired) and a solar plant. The Group operates five HPPs, including three of the five largest HPPs in Russia and of the twenty largest HPPs globally, in each case in terms of installed electricity capacity. In 2016, the Group produced 69.5 TWh of electricity, which represented 6.6% of Russia's and 34.0% of the Siberian IPS's total electricity production according to SEEPX, and 27.4 million Gcal/h of heat.

The Group's power operations are predominantly located in Siberia, Russia, benefiting from the abundant water resources of the Angara and Yenisei river cascades. In addition, certain assets are situated in the European region of Russia, including the Nizhny Novgorod and Karelia Regions.

3

Exhibit 26

RUSAL is a low-cost, vertically integrated aluminium producer with core smelting operations located in Siberia, Russia. According to CRU International Limited ("CRU"), RUSAL is the world's largest producer of primary aluminium outside China and the second largest aluminium group globally. In 2016, RUSAL produced 3,685 thousand tonnes of aluminium, accounting for approximately 6.2% of global aluminium output. RUSAL's core aluminium smelters are major consumers of the power produced by En+ Power. Currently, RUSAL operates 10 aluminium smelters, 7 alumina refineries (including QAL), a strategic investment in Norilsk Nickel and a 50% interest in the Boguchansk Energy and Metals Complex (the "BEMO Project").

**B.4a** *A description of the most significant recent trends affecting the company and the industries in which it operates.*

The Group's operations have recently been influenced by the following significant recent trends, which are expected to affect its business and results of operations in the future:

- In October 2016, En+ Power entered into new long-term power supply agreements with RUSAL effective from 1 November 2016 and 1 January 2017, replacing previous arrangements that had been in place since November and December 2009. The parties renegotiated these long-term power supply contracts to reflect the price for electricity with reference to the wholesale market in Siberia. The renegotiated long-term contracts provide for the supply of electricity to RUSAL's aluminium smelters located in Bratsk, Irkutsk and Krasnoyarsk, generally at a rate 3.5% below market price (on a day-ahead market basis). The agreements also contain certain provisions relating to the volumes of electricity to be supplied each year. For example, in 2017, the Company's power subsidiaries are contracted to supply to RUSAL up to 37.6 TWh of electricity, which is equivalent to 54.4% of En+ Power's power production and 66.8% of En+ Power's hydro power production in Siberia in 2016.

- The prices of aluminium, which are set by the international markets as quoted on the London Metal Exchange (the "LME"), are one of the primary determiners of the Group's revenue. As a result of the recent growing global demand, which has primarily been driven by demand from the U.S. and E.U., continued supply moderation in China and significant production cost inflation, the average LME aluminium price has increased by 21.8% from U.S.$1,543 per tonne in the first half of 2016 to U.S.$1,880 per tonne in the first half of 2017.

**B.4b** *A description of any known trends affecting the company and the industries in which it operates.*

The Group's operations have historically been influenced by the following key factors, which the Company's management believes will continue to affect business and results of operations in the future. General factors and trends affecting the Group's business include: (i) interdependence of En+ Power and RUSAL; (ii) macroeconomic conditions; (iii) currency fluctuations; and (iv) cost of sales. Factors and trends affecting the business of En+ Power include: (i) demand for and prices of electricity, heat and capacity; (ii) tariffs; (iii) weather and environmental conditions; and (iv) regulatory environment. Factors and trends affecting the business of RUSAL include: (i) demand for and price of aluminium; and (ii) investment in Norilsk Nickel.

**B.5** *If the company is part of a group, a description of the group and the company's position within the group.*

The Company is the parent company of the Group, which comprises the Company and its consolidated subsidiaries. The Group's business is conducted solely through the Company and its subsidiaries.

Exhibit 26

| **B.6** | *In so far as is known to the company, the name of any person who, directly or indirectly, has an interest in the company's capital or voting rights which is notifiable under the company's national law, together with the amount of each such person's interest. Whether the company's major shareholders have different voting rights if any. To the extent known to the company, state whether the company is directly or indirectly owned or controlled and by whom and describe the nature of such control.* | Jersey law does not impose any notification obligations on shareholders, or the Jersey company itself, in respect of shareholdings in a Jersey company, and the concept of a "notifiable interest" is therefore not a feature of Jersey law.

No holder of Ordinary Shares has voting rights that differ from those of any other holder of Ordinary Shares.

Prior to the Offering, the holders of the Company's issued and outstanding Ordinary Shares are as follows: (i) 82.65% is held in total by B-Finance Limited and the Selling Shareholder, which are beneficially controlled by Mr. Oleg Deripaska (the "**Majority Shareholder**"); (ii) 4.35% is held by VTB Bank (PJSC) ("**VTB**"); and (iii) 13.0% is held by companies that are beneficially owned by the family of the Majority Shareholder or directly by members of his family (the "**Other Shareholders**"). Upon London Admission, assuming that the Over-Allotment Option is exercised in full, the holders of the Company's issued and outstanding Ordinary Shares are expected to be as follows: (i) 65.2% will be held in total by B-Finance Limited and the Selling Shareholder, which are beneficially controlled by the Majority Shareholder; (ii) 3.8% will be held by VTB; (iii) 11.4% will be held by the Other Shareholders; (iv) 6.2% will be held by the ANAN GROUP (SINGAPORE) PTE (the "**Cornerstone Investor**"); and (v) 13.4% will be held by the Depositary on behalf of the persons registered as the holder of any GDR on the books of the Depositary maintained for such purpose ("**Holders**"). |

5

Exhibit 26

*The Group may fail to effectively manage the growth of its business and operations*

Some of the Group's businesses and operations have experienced, and may experience in the future, rapid growth, which has placed, and may continue to place, significant demands on the Group's managerial, operational and financial infrastructure. If the Group does not effectively manage such growth, the quality of its companies' products and services could suffer, which could negatively affect the Group's operating results. To sustain or manage this growth effectively, the Group will need to continue to improve its operational, financial and managerial controls, and the reporting systems and procedures of some of its subsidiaries. Effective management of the Group's growth will require, among other things: (i) the continued development and implementation in newly acquired businesses of financial and managerial controls and information technology systems; (ii) the ability to adapt to changes in the markets and industries in which the Group operates; (iii) the ability to manage risks associated with potential expansion into other emerging markets; and (iv) the hiring and training of new personnel. Any inability of the Group to successfully manage this growth could have a material adverse effect on its business, results of operations, financial condition and prospects.

*The Group is dependent on attracting and retaining qualified senior management personnel at a reasonable cost*

The Group's ability to maintain its competitive position and to implement its business strategy is dependent, to a certain degree, on the skills and abilities of its senior management team. The Group's business has benefited in the past from the contributions of a number of the Group's key senior managers, including the strategic guidance of the Mr. Oleg Deripaska (the "**Majority Shareholder**"), the controlling shareholder of the Group. Competition in Russia for personnel with relevant expertise is relatively intense, due to the limited quantity of qualified individuals, and this situation affects the Group's ability to retain its existing senior management and attract additional qualified senior management personnel. The loss of or diminution in the services of members of the Group's senior management team, or an inability to attract, retain and maintain additional senior management personnel, could have a material adverse effect on the Group's business, financial condition and results of operations.

### Risks relating to Corporate Structure

*The Majority Shareholder will continue to control the Group and the Majority Shareholder's interests may differ from the interests of other shareholders*

Immediately prior to the Offering, the Majority Shareholder was the Group's controlling shareholder with 82.65% of the Company's share capital. Following the completion of the Offering, the Majority Shareholder will control 77.4% of the Company's share capital (and 76.6% assuming full exercise of the Over-Allotment Option). As the controlling shareholder, the Majority Shareholder has significant influence over the Group's business strategy (including decisions on acquisitions and disposals of businesses), corporate affairs, management and policies. The Group believes that such influence has been, and will continue to be, important in the development, pursuit and implementation of the Group's strategy. However, there can be no assurance that the Majority Shareholder's interests, views or strategy in relation to the development of the Group's business will coincide with those of other shareholders. The Majority Shareholder possesses and is expected to continue to possess sufficient votes to pass most shareholder resolutions without regard to the votes of other shareholders. Potential conflicts may arise if the Majority Shareholder chooses not to approve matters which would otherwise be in the interests of the remaining shareholders. In addition, the Majority Shareholder may act in concert with other significant shareholders that may have similar interests and/or views on matters submitted to a vote of shareholders or to the Board of Directors for deliberation. Taken together, such shareholders acting in concert would be able to control the outcome of virtually all such shareholder votes and deliberations of the Board of Directors.

*Adverse media speculation, claims and other public statements could adversely affect the value of the GDRs*

The media and others have speculated publicly from time to time about a wide variety of matters relating to the Group's beneficial owners. For example, there has been negative coverage in the media recently relating to the rejection by U.S. authorities of Mr. Deripaska's application for a visa to enter the United States, the most recent of which occurred in 2015. Mr. Deripaska has repeatedly and consistently challenged these denials as being unwarranted and unsupported, and since 2015 has continued to enter the United States with his Russian diplomatic passport.

Exhibit 26

under IFRS. These business units are managed separately and the results of their operations are reviewed regularly by the Company's management in order to make decisions on the resources to be allocated to each segment and to assess their performance.

In the Financial Statements and other reportings, in addition to operating segments, the Company reports on the basis of two major business segments: the En+ Segment (referenced in this Prospectus as the "En+ Power") and RUSAL (each defined below). For the purposes of this Prospectus, the En+ Segment is referred to as the "En+ Power". En+ Power predominantly consists of the Power Segment, and also includes the Coal Segment and the Logistics Segment, both of which support the operations of the Power Segment, and the Other Segment. The Other Segment includes Krasnoyarsk Metallurgical Plant LLC ("KRAMZ") (an aluminium processing plant) and Strikeforce Mining and Resources PLC and its consolidated subsidiaries ("SMR") (a molybdenum and ferromolybdenum producer). The Group's other (unallocated) operations that are not reportable separately due to their immateriality are included into En+ Power. RUSAL which also includes an equity investment in Norilsk Nickel, is equivalent to the Metals Segment.

The Company's management believes that the division of the results of the Group's operations into En+ Power and RUSAL enables investors and analysts to assess the part the Group's business (primarily power operations supported by coal and logistics businesses) that is under the Company's direct day-to-day operational management. The Company maintains strategic control in RUSAL through a 48.13% interest and contractual rights contained in the shareholders' agreement with non-controlling shareholders of RUSAL (including the right to propose for nomination for appointment the CEO of RUSAL, at least 50% of the board of directors and two independent directors) without having day-to-day control over its operations.

Throughout this Prospectus (unless stated otherwise), the following definitions are used:

- "Group" means the Company and its consolidated subsidiaries;

- "En+ Segment" means the Group's business segment, which comprises the Power Segment, the Coal Segment, the Logistics Segment, the Other Segment and unallocated assets, but excludes RUSAL, as described in Note 4 to each of the Interim Financial Information and the Annual Financial Statements. En+ Segment is referenced in this Prospectus as the "En+ Power";

- "En+ Power" means, for the purposes of this Prospectus, the En+ Segment;

- "Power Segment" means the Group's power assets and operations that do not include those of RUSAL;

- "Coal Segment" means the Group's operations in the mining and sale of coal that do not include those of RUSAL;

- "Logistics Segment" means the Group's operations engaged in transportation services that do not include those of RUSAL;

- "Other Segment" means the operations of KRAMZ and SMR;

- "Metals Segment" means the Group's operations that are conducted by RUSAL; and

- "RUSAL" means United Company RUSAL Plc ("UC RUSAL") and its consolidated subsidiaries.

### Non-IFRS Measures

This Prospectus includes certain financial measures that are not measures of performance specifically defined by IFRS. These include Adjusted EBITDA, Adjusted EBITDA Margin, Adjusted Net Profit, Covenant Net Debt/EBITDA, Free Cash Flow, Gross Profit Margin, Net Debt, Net Debt/Adjusted EBITDA, Net Profit Margin, Net Working Capital, Operating Profit Margin, Recurring Net Profit and Recurring Net Profit Margin.

Throughout this Prospectus (unless stated otherwise), the following definitions are used:

- "Adjusted EBITDA" means, for any period, the results from operating activities adjusted for amortisation and depreciation, impairment of non-current assets and gain/loss on disposal of property, plant and equipment for the relevant period, in each case attributable to the Group, En+ Power or RUSAL, as the case may be;

Exhibit 26

En+ Power enable En+ Power to benefit from stable cash flow under its long-term supply agreements with RUSAL, which is the principal consumer of electricity in the region in which En+ Power principally operates. This synergy also allows the core smelters of RUSAL to receive guaranteed access to low-carbon and low cost hydro generated electricity.

In 2016, the Group's revenues and Adjusted EBITDA were U.S.$9,776 million and U.S.$2,311 million, respectively. In 2016, En+ Power accounted for 23.7% of the business segments' revenue (before intersegmental eliminations) and had an Adjusted EBITDA of U.S.$822 million. For 2016, RUSAL accounted for 76.3% of the Group's revenues (before intersegmental eliminations) and had an Adjusted EBITDA of U.S.$1,489 million.

## History and Development

En+ Group plc was established in 2002, initially to hold certain aluminium and alumina assets acquired by the Majority Shareholder. Since then, through strategic acquisitions, gradual asset consolidations, as well as organic growth, the Company has developed into a leading international vertically integrated aluminium and power producer. Below is a general description of the Group's historical development.

In 2003, following the corporate restructuring of aluminium and alumina assets controlled by the Majority Shareholder and the establishment of Rusal Holding Limited (which later formed the group of companies that now comprises RUSAL), the Majority Shareholder received 75% of shares in Rusal Holding Limited. In 2004, the consolidation of Rusal Holding Limited was completed with the acquisition by the Majority Shareholder of the remaining 25% of shares in Rusal Holding Limited from third party shareholders. The Majority Shareholder transferred 100% of shares in Rusal Holding Limited to the Company.

Between 2001 and 2007, the Group and certain other companies related to the Majority Shareholder gradually acquired 50.2% of the shares in Irkutskenergo, a power company that owns several large HPPs and CHPs, with an aggregate generation capacity of 12.8 GW. The shares were purchased from third party shareholders who had acquired shares in Irkutskenergo during its privatisation process or on the secondary market through subsequent transactions. In 2016, the Group acquired 40.3% of shares in Irkutskenergo from Inter RAO, increasing its shareholding to 90.8% (including treasury shares).

In 2003, the Group acquired 64.0% of shares in Krasnoyarsk HPP, currently the tenth largest HPP globally in terms of installed capacity. Between 2003 and 2007, the Group acquired a further 4.3% interest in Krasnoyarsk HPP through a series of acquisitions from third parties. In 2014, the Group purchased 3.4% of shares in RusHydro and exchanged this shareholding in RusHydro for 25.0% of shares in Krasnoyarsk HPP, which were at that time owned by RusHydro. Pursuant to a mandatory tender offer and the buyout process undertaken in 2016, the Group increased its shareholding to 100% of shares in Krasnoyarsk HPP.

In 2006, RUSAL and RusHydro entered into a cooperation agreement to jointly implement the BEMO Project, which contemplated the construction of the 3.0 GW Boguchansk HPP on the Angara river and the Boguchansk aluminium smelter (with a designed production capacity of approximately 588,000 tonnes of aluminium per annum) in the Krasnoyarsk Region. Boguchansk HPP's power generation operations were launched in 2014 under the operational management of RusHydro, a 50% joint venture partner in the BEMO Project. Under the operation management of RUSAL, the first half of the first stage of Boguchansk aluminium smelter launched its operations in 2016 with the production capacity of 149 thousand tonnes.

In 2007, EuroSibEnergo plc was established to consolidate and manage the Group's power assets and operations. All power assets that were owned by companies related to the Majority Shareholder were combined under EuroSibEnergo plc, a Cypriot intermediary holding subsidiary of the Company, by 2009.

In 2007, as a result of the acquisition by the Group of SUAL, which at the time was one of the ten largest aluminium producers globally, and certain of the aluminium and alumina businesses of Glencore, the current RUSAL was formed under UC RUSAL, a parent company for the newly formed group, which was comprised of the aluminium producing assets and subsidiaries of the Group. Due to the shareholders' objective at that time, which was to form a global producer of aluminium focused on its upstream aluminium business, KRAMZ was not included in RUSAL as part of the acquisition arrangements, as the former focuses on the downstream market for aluminium products, and as such did not fit RUSAL's strategic profile.

In 2008, RUSAL completed the acquisition of a 25% plus one share interest in Norilsk Nickel, the world's second largest producer of nickel, top-1 producer of palladium in 2016 and one of the world's leading

Exhibit 26

producers of platinum and copper. Norilsk Nickel is the lowest nickel cash cost producer globally, firmly positioned on the first quartile of the global cost curve. In 2016, Norilsk Nickel produced 236 thousand tonnes of nickel.

In 2008, with a view to increasing vertical integration within En+ Power, the Group acquired companies operating coal mining assets located primarily in the Irkutsk and Krasnoyarsk Regions. The Group's CHPs, which are predominantly coal-fired, source almost all of their coal consumption from its own coal operations, which are included in the Coal Segment.

In 2010, RUSAL conducted an IPO and listed its shares and global depositary receipts on the Hong Kong Stock Exchange and NYSE Euronext in Paris. Later in 2010, RUSAL listed its Russian depositary receipts on Russia's stock exchanges. In 2015, the shares of RUSAL were admitted to listing on MOEX.

In 2010, the Group acquired SMR, which owned and operated two mining and processing plants, as well as two ferromolybdenum plants, all of which are located in the Khakassia and Zabaikalsk Regions. The Group purchased SMR from the company under common control.

In 2011, the Group formed a logistics business in order to provide comprehensive logistics services predominantly to the power companies of En+ Power. The logistics assets include railway lines with a total length of 95 km and a number of railcars and locomotives in the Khakassia Region.

In 2016, the Group purchased dams in the Angara river cascade in the Irkutsk Region from RusHydro. The dams, which are a part of the Group's cascade comprising the Irkutsk, Bratsk and Ust-Ilimsk HPPs located on the Angara river, were previously leased by Irkutskenergo from RusHydro.

## Competitive Strengths

The Group's management believes that the Group has a number of competitive strengths that have enabled it to expand significantly over the last several years, and that these strengths will continue to provide it with competitive advantages in the future. The Group's key competitive strengths are summarised below.

### *Global leader in hydro power generation and aluminium production*

The Group benefits from its unique base of closely located and integrated assets in order to establish its global leadership in both power and aluminium production.

With 15.1 GW installed hydro power capacity in 2016, the Group is the largest privately held hydro generator in the world. It also operates three of the twenty largest HPPs globally and three of the top five HPPs in Russia (Krasnoyarsk HPP Bratsk HPP and Ust-Ilimsk HPP). The Group has the highest installed power generation capacity in the Siberian IPS and was the fifth largest electricity producer in Russia in 2016.

RUSAL is the world's largest aluminium producer outside of China and the second largest aluminium group globally according to CRU, with annual production of 3,685 thousand tonnes of aluminium in 2016.

In Russia, the Group is among the largest industrial groups, one of the largest employers and a major contributor to the federal and regional budgets.

With an established presence in 19 countries and a strong operational hub in Siberia, combining assets of both En+ Power and RUSAL, the Group is able to capture opportunities arising from its world class platform and scale. The Group's aluminium segment has a well-diversified sales platform which allows it to efficiently access and operate in all key aluminium markets, such as the United States, Western Europe, Japan and South East Asia. The Group has a world class market research and analytics platform which provides valuable input to the Group's long-term operational and financial planning. At the same time, En+ Power operates the largest and the most cost-efficient network of power plants in the Siberian region, which allows it to efficiently and reliably cater to its core clients in Siberia, including the largest smelters operated by RUSAL.

The Group's scale also provides a number of distinct operational advantages including greater bargaining power with key raw materials suppliers, service providers and regulators, both in Russia and globally. The Group's scale allows it to actively manage the flow of aluminium products, alumina and other raw materials within the Group and proactively plan the Group's energy generation and consumption targets in order to optimise capacity utilisation and maximise efficiency at the Group's smelters, refineries and power plants.

Exhibit 26

**Corporate Organisation**

All production, sales, marketing and other operations of the Group are conducted through the Group's subsidiaries. The following chart sets forth the Group's simplified organisational structure as at the date of the Prospectus:



*Internal reorganisation*

In 2018, the Group intends to implement an internal reorganisation whereby EuroSibEnergo plc, a Cypriot intermediary holding subsidiary of the Company, is expected to be merged into the Company. Following this merger, LLC En+ Management, a Russian company that currently manages the operating subsidiaries of En+ Power, is expected to become a Russian holding company that will legally own and control most of the operating subsidiaries of En+ Power. It is planned that LLC En+ Management will own 100% of shares in JSC EuroSibEnergo. It is anticipated that the completion of the reorganisation will optimise the

Exhibit 26

management structure and the Group's internal business processes, in order to better facilitate the rapid implementation of decisions.

### Redomiciliation

Following the Offering, the Company intends to become a tax resident of Cyprus by the end of 2017 and to redomicile from Jersey to Cyprus in 2018. Based on advice from the Company's external legal counsels on Jersey and Cypriot law, below is a general description of steps required to be made by the Company in order to implement the redomiciliation.

Under Jersey laws, the Company is required to adopt a shareholders' resolution in the form of a special resolution, which must be passed by a two-thirds majority of those shareholders entitled to attend and vote at a general meeting. Unless the vote in favour of the special resolution is unanimous, the Company must wait for 21 days following the passing of the special resolution to allow minority shareholders to object.

Unless all of the known creditors of the Company agree in writing, notice must also be given to all of the known creditors of the Company at least 21 days before making any application to continue overseas. Each creditor under Jersey law has the power to apply to court within 21 days after the date of such notice for an order restraining the application of the Company to redomicile. If the court is satisfied that the interests of the creditor would be unfairly prejudiced by the proposed continuance it may make an order restraining the application. The Company intends to obtain the written consent of all of its known creditors prior to making any application to the Jersey Financial Services Commission (the "JFSC"), a local regulator.

Following the passing of the special resolution, the grant of consent by all the known creditors of the Company and the expiration of a 21-day period, the Company will apply to the JFSC to issue a certificate of discontinuance, which is issued only after the temporary certificate of registration in Cyprus is granted.

Following the completion of steps under the Jersey laws, the Company will file applications for transfer of its registered office in Cyprus with the registrar of companies in Cyprus which shall be accompanied by certain documents (including the respective corporate shareholders' resolution adopted under the Jersey laws).

If the registrar is satisfied that the Company has complied with the provisions of the Cypriot corporate laws, it should provisionally register the Company as a company continuing in Cyprus and issue a temporary certificate. The date of the temporary certificate is deemed to be the date of the Company's registration in Cyprus. The Company will then be considered as a legal entity established under the Cypriot laws. Prior to the issuance of a temporary certificate, the Company will still be considered as a legal entity registered under the Jersey laws.

Within six months from the date of the temporary certificate, the Company is required to file with the Cypriot registrar a form accompanied by the certificate issued by the Jersey registrar confirming that the Company ceased to be registered in Jersey. The Cypriot registrar will then issue the permanent certificate confirming that the Company has been registered as a company continuing in Cyprus from the date of the temporary certificate.

Once the temporary certificate is issued by the Cypriot registrar, the shareholders who are recorded in the register of members (including the Depositary) at the time of redomiciliation will continue to be registered in the register of members following the issuance of a temporary certificate. The share certificates will be issued in their name as soon as possible following the issue of the temporary certificate.

See also "Risk Factors—Risks Relating to the Securities and the Trading Market—The contemplated redomiciliation of the Company may entail certain risks".

Exhibit 26

*Location of principal assets*

The following map shows the location of the Group's principal assets in Siberia:



## Business Operations

The Group's operations, businesses and financial reports are presented based on the following segments:

- *En+ Power:* En+ Power includes the Group's power generation, transmission and distribution operations, which are supported by the Group's coal and logistics operations, and other immaterial assets. Operationally, En+ Power is divided into four segments:

    - *Power:* The Power Segment includes the Group's operations that provide for the generation of green, cost-effective hydro energy and heat, and the subsequent transmission and distribution and sales of such hydro energy and heat in the east Siberia and Volga regions of the Russian Federation.

    - *Coal:* The Coal Segment is engaged in the mining and sale of coal in the east Siberia region of the Russian Federation. Brown and fossil coals are the products of this segment. The Coal Segment provides sufficient coal to enable the Power Segment's operations to be self-sufficient in coal, and is also involved in coal sales to third parties in Russia and abroad.

    - *Logistics:* The Logistics Segment is engaged in providing transportation services to the other segments of the Group and to third parties.

    - *Other:* The Other Segment includes the production and processing of molybdenum and ferromolybdenum at SMR plants located in certain cities of eastern Russia, and the aluminium processing operations of KRAMZ. These products are mainly sold to customers in the military, aircraft, transportation, ship building, packaging and construction industries in Russia and

Exhibit 26

abroad. This segment also holds a number of greenfield and brownfield project licences for ferrous and non-ferrous metals.

- *RUSAL:* This segment includes the Group's shareholding in RUSAL, whose operations include the mining and refinement of bauxite into alumina, along with the production and sale of primary aluminium, alumina and other related products. In addition to its other assets, RUSAL also owns a 27.82% stake in Norilsk Nickel, the world's largest producer of nickel and palladium.

The operations of the Group's segments are managed separately and the results of their operations are reviewed by the Group's management on a regular basis.

#### En+ Power

The Group's En+ Power, which includes its assets and operations involved in the production and supply of electricity and heat, as well as its supporting operations engaged in the supply of coal reserves, as well as logistics services to the Group, is operationally managed as three distinctive operating segments. For reporting purposes, En+ Power also includes the non-core operations of SMR and KRAMZ.

#### Power Segment

##### Overview

The Group's Power Segment includes energy operations in the east Siberia and Volga regions and is engaged in all of the major areas of the power industry in Russia, with assets and activities in: electricity and heat generation; electricity, capacity and heat sales; heat distribution; retail energy trading and supply; engineering services; and electricity distribution and transmission.

The Group operates five HPPs, including three of the five largest HPPs in Russia and of the twenty largest HPPs globally, in each case in terms of installed electricity capacity. As at 31 December 2016, the total installed electricity capacity of the Power Segment's assets amounted to 19.7 GW, while their total installed heat capacity amounted to 17.0 Gcal/h. The Power Segment produced 69.5 TWh of electricity output in 2016, which represented 6.6% of Russia's total electricity generation and 34% of the Siberian IPS's total electricity generation for the period, according to SEEPX.

Hydro power generation is a key area of the Group's Power Segment's business. Russia has the second largest potential in the world for economically efficient hydro power generation. This is namely due to Russian rivers, which are recoverable energy sources that in total are able to provide more than 800 billion kWh of low-carbon electricity per annum, according to SEEPX. As at 31 December 2016, 76.6% of the Power Segment's installed electricity capacity was represented by HPPs, with the remaining 23.4% represented by CHPs (which are predominantly coal-fired) and one solar plant. The Group's management believes that its HPPs operate in accordance with high environmental protection standards and provide a low-carbon power source for Russian manufacturing facilities. In 2016, the Power Segment's HPPs produced 81.5% of the total electricity generated by the Power Segment. The Group is a member of International Hydropower Association (the "IHA") and will adhere to IHA Sustainability Assessment Protocol in order to mitigate and prevent the negative environmental impact of its hydro power plants on Lake Baikal. As electricity output of the HPPs is subject to fluctuations in water flows, the Group's CHPs complement the Group's generation assets portfolio by enabling the Power Segment to balance its electricity production loads (see—"*Risk Factors—Risks Relating to the Group's Business and Industries of Operation—Risks Relating to Power Operations—The electricity output of the Group's hydro power generation facilities is subject to fluctuations in water flows*").

The assets and activities attributable to the Power Segment are predominantly located in the Siberian federal district of Russia. In addition, the Group has certain assets in the European part of Russia. The Group's power operations are located in close proximity to numerous Russian companies that produce goods and extract natural resources found in Siberia. A large proportion of the natural resources extracted and produced in Siberia are sold to consumers in nearby Asian markets, in particular China, Japan and South Korea. Consequently, the Group is well positioned to benefit as a supplier of sustainable green hydro power to companies involved in energy intensive extraction and production of natural resources to be sold on the Asian markets.

The total revenue attributable to the Power Segment amounted to U.S.$2,077 million, U.S.$2,075 million and U.S.$2,856 million for the years ended 31 December 2016, 2015 and 2014, respectively. In the first half of 2017, the Power Segment's revenues amounted to U.S.$1,371 million compared to U.S.$976 million in

Exhibit 26

the first half of 2016. For 2016, the Power Segment's Adjusted EBITDA and Adjusted EBITDA margin were U.S.$794 million and 38.2%, respectively.

*Operations*

The following table sets forth the Power Segment's key operating data for the periods indicated:

| | | Six months ended 30 June | | Year ended 31 December | | |
|---|---|---|---|---|---|---|
| | | 2017 | 2016 | 2016 | 2015 | 2014 |
| **Production volumes** | | | | | | |
| Electricity[1] . . . . . . . . . . . . . . | *GWh* | 33,917 | 32,169 | 69,498 | 65,507 | 75,369 |
| HPPs . . . . . . . . . . . . . . . . . . | *GWh* | 27,347 | 25,175 | 56,714 | 52,421 | 62,891 |
| CPPs . . . . . . . . . . . . . . . . . . | *GWh* | 6,570 | 6,994 | 12,784 | 13,086 | 12,478 |
| Heat . . . . . . . . . . . . . . . . . . | *Gcal* | 14,611,560 | 14,959,702 | 27,362,622 | 26,409,464 | 27,710,179 |
| **Transmission and** **distribution[2]** | | | | | | |
| Power transmission and distribution . . . . . . . . . . . . | *GWh* | 23,366 | 22,184 | 43,905 | 45,595 | 45,708 |
| **Purchase volumes** | | | | | | |
| Electricity . . . . . . . . . . . . . . | *GWh* | 11,132 | 9,990 | 20,732 | 22,112 | 22,589 |
| Capacity. . . . . . . . . . . . . . . . | *MWh/year* | 10,476 | 8,465 | 15,308 | 14,643 | 19,703 |
| **Sales volumes** | | | | | | |
| Electricity . . . . . . . . . . . . . . | *GWh* | 42,203 | 39,121 | 84,361 | 80,862 | 85,354 |
| Capacity. . . . . . . . . . . . . . . . | *MW/year* | 85,910 | 84,882 | 171,395 | 169,965 | 165,413 |
| Heat . . . . . . . . . . . . . . . . . . | *Gcal* | 12,809,967 | 13,075,906 | 23,928,657 | 23,326,265 | 24,579,039 |
| Power transmission . . . . . . . . | *GWh* | 15,436 | 15,158 | 30,578 | 30,937 | 30,588 |
| **Revenues** | | | | | | |
| Electricity . . . . . . . . . . . . . . | *U.S.$ million* | 985 | 679 | 1,449 | 1,447 | 1,872 |
| Heat . . . . . . . . . . . . . . . . . . | *U.S.$ million* | 222 | 180 | 352 | 350 | 550 |
| Other . . . . . . . . . . . . . . . . . | *U.S.$ million* | 164 | 117 | 276 | 278 | 434 |
| **Total** . . . . . . . . . . . . . . . . . | *U.S.$ million* | **1,371** | **976** | **2,077** | **2,075** | **2,856** |

Notes:

(1) Including generation of Ondskaya HPP in amount of 297, 396, 178 and 191 GWh for 2015, 2016, 1H2016 and 1H2017, respectively (Ondskaya HPP was acquired in October 2014 and leased by RUSAL). Including Bratsk HPP production (6.2 TWh), which was supplied directly to RUSAL.

(2) Presents 100% results for the Group's consolidated subsidiaries, including not wholly-owned by the Group.

For information on regulated tariffs and unregulated prices for the Company's power operations during the first half of 2017 and the years 2016, 2015 and 2014, see "*Operating and Financial Review—Key Factors Affecting the Results of Operations—Factors affecting the results of operations of En+ Power—Tariffs*".

*Generation*

The principal business of the Power Segment of the Group involves the production and supply of electricity to the wholesale market and the production and supply of heat to end consumers. The majority of the Group's assets are located in the Siberian Federal District, along the Yenisei and Angara rivers. The vast water reserves of the Yenisei and Angara rivers create a natural environment for the development of hydro generation, which in turn facilitate the development of power intensive industry plants, such as aluminium smelters. CHPs are designed to operate in both the condensing cycle for the production of electricity only and the combined cycle for the production of electricity and heat. The Group's CHPs are primarily operated in the combined cycle, which is more efficient. In the years ended 31 December 2016, 2015 and 2014, the Power Segment produced 69,498 GWh, 65,507 GWh and 75,369 GWh of electricity, respectively, and 27,362,622 Gcal, 26,409,464 Gcal and 27,710,179 Gcal of heat, respectively.

The Group's principal generation assets include Irkutskenergo's HPPs and CHPs, Krasnoyarsk HPP and Avtozavodskaya CHP.

Exhibit 26

The table below sets forth, for each of the Group's principal plants, the installed capacity for electricity generation as at 31 December 2016, as well as their production results and utilisation levels for 2016, 2015 and 2014.

| | Installed capacity | | 2016 | | 2015 | | 2014 | |
|---|---|---|---|---|---|---|---|---|
| | 2016 | % of total | Generated | Utilisation | Generated | Utilisation | Generated | Utilisation |
| | (MW) | (%) | (GWh) | (%) | (GWh) | (%) | (GWh) | (%) |
| **Siberia** | | | | | | | | |
| *HPPs* | | | | | | | | |
| Krasnoyarsk HPP ........ | 6,000 | 30 | 19,283 | 37 | 16,532 | 31 | 19,678 | 37 |
| Bratsk HPP ........... | 4,500 | 23 | 17,626 | 45 | 16,611 | 42 | 20,485 | 52 |
| Ust-Ilimsk HPP .......... | 3,840 | 20 | 16,550 | 49 | 16,132 | 48 | 19,156 | 57 |
| Irkutsk HPP ........... | 662 | 3 | 2,859 | 49 | 2,849 | 49 | 3,573 | 62 |
| *CHPs* | | | | | | | | |
| CHP-10 ............. | 1,110 | 6 | 2,487 | 26 | 2,733 | 28 | 2,282 | 23 |
| CHP-9 .............. | 540 | 3 | 1,771 | 37 | 1,611 | 34 | 1,605 | 34 |
| Novo-Irkutsk CHP ....... | 708 | 4 | 2,767 | 45 | 2,723 | 44 | 2,662 | 43 |
| Ust-Ilimsk CHP ......... | 515 | 3 | 971 | 22 | 1,055 | 23 | 977 | 22 |
| CHP-11 ............. | 350 | 2 | 799 | 26 | 785 | 26 | 691 | 23 |
| CHP-6 .............. | 270 | 1 | 803 | 34 | 809 | 34 | 889 | 38 |
| Novo-Ziminskaya CHP .... | 260 | 1 | 930 | 41 | 956 | 42 | 972 | 43 |
| **European part** | | | | | | | | |
| Ondskaya HPP .......... | 80 | 0 | 396 | 56 | 297 | 42 | | |
| Avtozavodskaya CHP ..... | 580 | 3 | 1,569 | 31 | 1,655 | 33 | 1,666 | 33 |
| Other power plants ....... | 271 | 1 | 686 | 29 | 761 | 32 | 735 | 31 |
| **Total power generation** .... | **19,687** | **100** | **69,498** | | **65,507** | | **75,369** | |
| Power consumption losses for the period ......... | | | 537.9 | | 523.4 | | 498.8 | |

Out of total electricity generated in 2016, 2015 and 2014, the Group's generation assets' total consumption amounted to 2.9%, 3.4% and 3.2%, respectively.

The Power Segment's generation facilities include 5 HPPs, which produce cost-efficient and low-carbon hydro power, and 17 electricity generating CHPs, which are mainly coal-fired. The Group controls and operates three of the five largest HPPs in Russia in terms of installed electricity capacity. According to SEEPX, the Group is a leading private hydro power producer globally with approximately 15 GW of total installed hydro power capacity under its control. Hydro power generation has a number of important advantages as compared to other generation technologies, including, but not limited to: (i) cost-effectiveness (due to the absence of costs associated with the use of fossil fuels); (ii) load flexibility (allowing increased output in a short timeframe to support peak loads); and (iii) the generation of green and renewable energy (utilising the considerable water reserves in Siberia). As at 30 June 2017, 76.6% of the Power Segment's installed electricity capacity was represented by HPPs, with only 23.4% represented by CHPs. Therefore, the Group has a cost advantage over many of its competitors in Siberia, who rely on thermal electricity generation capacity to a more significant extent. The Group's hydro power generation results are affected mainly by fluctuations in water flows. For example, lower water inflows in 2014-2015 resulted in a decrease in electricity production at the Group's HPPs (see—"*Risk Factors—Risks Relating to Power Segment—Electricity output of the Group's generation facilities is subject to fluctuations in water flows and the capacity utilisation factor of its facilities*").

The power generating assets of the Group supply some of the Group's produced electricity and capacity to its customers through the wholesale market. Electricity and capacity are treated as separate economic products in the Russian electricity market. A sale of capacity represents the obligation to maintain sufficient generation capability to satisfy a target level of potential demand, while a sale of electricity represents an actual delivery of electricity to its purchaser. The Group's principal customers on the wholesale market are industrial consumers, and include RUSAL's aluminium smelters, certain electricity supply companies, including retail supply companies of the Group, and certain grid companies, including Irkutsk GridCo.

14
UKRAINE-EO13661-13321: 0146

## Exhibit 26

### PRINCIPAL AND SELLING SHAREHOLDER

**General**

The following table sets forth the ownership of the Ordinary Shares of the Company immediately prior to the Offering, immediately following the Offering and immediately following the exercise of the Over-Allotment Option in full.

| Shareholder | Immediately prior to the Offering | | Immediately following the Offering | | Immediately following the Over-Allotment Option | |
|---|---|---|---|---|---|---|
| | Number of Ordinary Shares | Percentage | Number of Ordinary Shares | Percentage | Number of Ordinary Shares | Percentage |
| B-Finance Limited[1] . . . . . | 307,750,000 | 61.55% | 307,750,000 | 53.9% | 307,750,000 | 53.9% |
| Basic Element Limited[2] . . | 105,500,000 | 21.10% | 69,785,714 | 12.2% | 64,785,714 | 11.3% |
| VTB Bank (PJSC)[3] . . . . . | 21,750,000 | 4.35% | 21,750,000 | 3.8% | 21,750,000 | 3.8% |
| Other[4] . . . . . . . . . . . . . . | 65,000,000 | 13.00% | 65,000,000 | 11.4% | 65,000,000 | 11.4% |
| Citibank N.A.[5] . . . . . . . . | — | — | 107,142,858 | 18.8% | 112,142,858 | 19.6% |
| Total . . . . . . . . . . . . . . . | 500,000,000 | 100.00% | 571,428,572 | 100.00% | 571,428,572 | 100.00% |

Notes:

(1) B-Finance Limited is a company organised and existing under the laws of the British Virgin Islands with its registered office and principal place of business at Vanterpool Plaza, 2 Floor, Wickham's Cay, Road Town, Tortola, the British Virgin Islands. Prior to the Offering, 61.55% of the Company's issued and outstanding Ordinary Shares were held by B-Finance Limited, which is beneficially controlled by Mr. Oleg Deripaska.

(2) Basic Element Limited is a company organised and existing under the laws of Jersey with its registered office and principal place of business at 44 Esplanade, St. Helier, Jersey, Channel Islands, JE4 9WG. Prior to the Offering, 21.10% of the Company's issued and outstanding Ordinary Shares were held by Basic Element Limited, which is beneficially controlled by Mr. Oleg Deripaska.

(3) VTB Bank (PJSC) is a company organised and existing under the laws of the Russian Federation with its registered office and principal place of business at Ul. Bolshaya Morskaya 29, St. Petersburg, 190000, the Russian Federation. Prior to the Offering, 4.35% of the Company's issued and outstanding Ordinary Shares were held by VTB Bank (PJSC). As of the date of the Prospectus, in aggregate 32.55% of Ordinary Shares are pledged in favour of VTB under the arrangements described beow (see "—*Arrangements between the Principal Shareholders and VTB*").

(4) Prior to the Offering, 13.00% of the Company's issued and outstanding Ordinary Shares were held by the companies, which are beneficially owned by the family of Mr. Oleg Deripaska, or directly by members of his family. In October 2017, 6.9% of the Company's issued and outstanding Ordinary Shares have been transferred to Ms. Polina Deripaska. The transfer is subject to a call option whereby Mr. Oleg Deripaska may, directly or indirectly, buy the transferred Ordinary Shares (in full or in part). The transferred shareholding is subject to a lock-up arrangement (see "*Plan of Distribution—Lock-up Arrangements—Lock-up of the Company, the Selling Shareholder, B-Finance Limited and Other Shareholders*").

(5) Such Ordinary Shares will be held by Citibank N.A. as Depositary on behalf of the Holders. Both immediately following the Offering and immediately following the Over-Allotment Option the Cornerstone Investor will hold 6.2% thereof.

### Arrangements between the Principal Shareholders and VTB

In July 2011, the Company, Basic Element Limited, B-Finance Limited and VTB entered into a shareholders' agreement regarding, *inter alia*, the corporate governance of the Company. This shareholders' agreement was amended and replaced by a new shareholders' agreement in December 2013 (the "**Shareholders' Agreement with VTB**") as a result of certain arrangements among the same parties and Eastern Carriers Trading Limited (a company controlled by the Majority Shareholder) made under the Forward Sale Agreement (as defined below) in relation to the Ordinary Shares. The Shareholders' Agreement with VTB provides, *inter alia*, for Basic Element Limited and B-Finance Limited to coordinate with VTB in connection with corporate governance matters, as well as dividend payments. Under the Shareholders' Agreement with VTB, VTB is entitled to nominate for appointment and require the removal of one Director. The Shareholders' Agreement with VTB will be terminated upon completion of the Offering (see "*Management and Corporate Governance—Directors—Riccardo Orcel*").

In December 2013, Eastern Carriers Trading Limited, Basic Element Limited, B-Finance Limited and VTB entered into a forward sale agreement in relation to the Ordinary Shares (the "**Forward Sale Agreement**"). Under the Forward Sale Agreement, VTB as seller shall deliver an exercise notice to Eastern Carriers Trading Limited to sell all Ordinary Shares owned by VTB five business days prior to 13 December 2018. Prior to 13 December 2018, VTB only in a limited number of circumstances such as

15
UKRAINE-EO13661-13321: 0147

Exhibit 26

illegality, change of control or event of default, may (but shall not be obligated to) provide an early exercise notice to Eastern Carriers Trading Limited to sell all Ordinary Shares owned by VTB. At any time prior to 13 December 2018, Eastern Carriers Trading Limited as buyer is entitled to deliver an early exercise notice to VTB as seller to purchase all Ordinary Shares from the seller. It is intended that the Selling Shareholder will apply a portion of proceeds from the sale of GDRs to reduce the outstanding strike price under the Forward Sale Agreement and/or to repay a portion of the debt owed to VTB as lender under certain lending arrangements.

Under the share pledge agreements made in connection with the Forward Sale Agreement, B-Finance Limited and Basic Element Limited pledged in aggregate 7.7% of Ordinary Shares in favour of VTB to secure obligations of Eastern Carriers Trading Limited as buyer and B-Finance Limited and Basic Element Limited as guarantors under the Forward Sale Agreement. Separately, under the share pledge agreements made in connection with certain lending exposure by VTB as lender and the related guarantee, B-Finance Limited and Basic Element Limited, which are guarantors under this lending exposure, pledged in aggregate 24.85% of Ordinary Shares in favour of VTB to secure obligations of the respective obligors under the lending arrangement. Thus, in aggregate, 32.55% of Ordinary Shares are pledged in favour of VTB under the arrangements described above (see also *"Description of Share Capital and Applicable Jersey Legislation—Jersey Legislation—Mandatory bid"*).

### Conversion of Shareholding in RUSAL into the GDRs

On 18 October 2017, the Company and Amokenga Holdings Limited ("AHL") signed a non-binding term sheet setting out the terms and conditions of a transaction whereby AHL will subscribe for the GDRs representing newly issued Ordinary Shares pursuant to a subscription agreement between AHL and the Company in consideration for which AHL will transfer to the Company its shareholding in UC RUSAL (the "**Conversion Transaction**"). As at the date of this Prospectus, AHL owns 8.75% of shares in UC RUSAL and is ultimately controlled by Glencore. Upon completion of the Conversion Transaction, which, subject to certain conditions, is expected to occur following the Offering, the Company's shareholding in RUSAL will increase from 48.13% to 56.88%.

The conversion price is calculated with reference to a formula taking into account the Offer Price, the number of shares that AHL owns in UC RUSAL and the volume weighted average U.S.$ price of shares of UC RUSAL over the 60-day period immediately preceding the Offering.

The definitive transaction documents necessary to consummate the Conversion Transaction will be conditional upon (a) receipt of all necessary governmental, regulatory and shareholders' consents, approvals and waivers (if any) required for completion of the Conversion Transaction; (b) the execution of a shareholders agreement between: (i) AHL and (ii) Basic Element Limited and B-Finance Limited (and/or such other affiliated entities that hold shares in the Company at the time); and (c) receipt of a clearance from the Hong Kong regulator that no mandatory takeover offer is required to be made in relation to UC RUSAL as a result of the Conversion Transaction.

Under the shareholders agreement described above, AHL will be entitled to appoint CEO of Glencore as a director to the Board of Directors (the "**AHL Director**"). The quorum for a meeting of the Board of Directors will include the AHL Director, save that the quorum requirement will not apply to a reconvened meeting of the Board of Directors originally adjourned as a result of the failure of the AHL's director to attend. It is expected that under the shareholders' agreement, AHL shall be provided rights equivalent to the rights created under the Shareholders' Agreement between the RUSAL Major Shareholders and shall have the same investor governance rights as the Cornerstone Investor under the Cornerstone Investment Agreement (see also *"Plan of Distribution—Cornerstone Investor and Cornerstone Investment Agreement"*).

### Other

As far as the Company is aware, as at the date of this Prospectus, there are no arrangements the operation of which may at a later date result in a change of control of the Company.

As far as the Company is aware, other than the shareholders and their beneficial owners, no person, directly or indirectly, has an interest in the Company's capital or voting rights.

Save in respect of the Majority Shareholder, the Company is not aware of any person who, either as at the date of this Prospectus or immediately following the London Admission, exercises, or could exercise, directly or indirectly, control over the Company.

## Exhibit 26

In spite of Russia's wholesale power market liberalisation, until 2014, HPPs in Siberia were obliged to sell capacity at regulated prices. Naturally, the effect placed considerable downward pressure on Siberian capacity price growth. However, since 2014 HPPs were gradually liberalised: 65% of their capacity was sold at liberalised (KOM) capacity prices in 2014-2015, and 80% until May 2016, and 100% since May 2016, excluding volumes related to sales to residential customers.

See the "*Regulation of the Power Industry*" section for the details on the power market structure and trading segments following power market reform.

### Generation

The majority of Russian thermal generating assets were privatised during the power sector reform either through large capital raisings or through direct sale of RAO UESR's stakes in generation companies (or through a combination of both methods). Some strategic investors acquired controlling stakes in two or more generation companies (including Gazprom Group, IES Holding and SUEK).

Following the power market reform, from an ownership perspective, the key players in the generation segment can be divided into the following three groups: (i) state-controlled companies, including Gazprom Group, RusHydro, and Rosenergoatom; (ii) companies controlled by Russian strategic investors, including Russian EuroSibEnergo, T Plus (previously IES Holding) and SUEK; and (iii) companies controlled by foreign strategic investors, including Unipro (previously E.On), Enel and Fortum.

The top three largest players control approximately 45% of the total installed electricity capacity in Russia, while the top five players control approximately 63%. The table below illustrates the top 10 largest players in the Russian power generation sector by installed electricity capacity under their respective control.

| Rank | Investor | Ownership | Key assets | Installed capacity under control | % of Russia's capacity |
|------|----------|-----------|------------|---------------------------------|------------------------|
| | | | | (GW) | |
| 1 | Gazprom .... | State | Mosenergo, TGK-1, OGK-2, OGK-6 | 39.0 | 17% |
| 2 | RusHydro .... | State | 62 HPPs, RAO Energy System of the East[1] | 38.9 | 16% |
| 3 | Rosatom . . . . . | State | 10 Nuclear Power Plants (Rosenergoatom) | 27.9 | 12% |
| 4 | Inter RAO . . . | State | Inter RAO EG, BGK, TGK-11 | 23.7 | 10% |
| 5 | EuroSibEnergo | Russian | 15.1 GW hydropower, Irkutskenergo | 19.7 | 8% |
| 6 | T Plus Group . | Russian | Volzhskaya TGK, TGK-5,6,9, Orenburg TGK | 15.1 | 6% |
| 7 | Unipro . . . . . . | Foreign | 5 Thermal power plants (formerly OGK-4) | 11.1 | 5% |
| 8 | Enel Russia . . | Foreign | 4 Thermal power plants (formerly OGK-5) | 9.5 | 4% |
| 9 | SGK . . . . . . . | Russian | Kuzbassenergo (TGK-12), TGK-13 | 7.8 | 3% |
| 10 | Fortum . . . . . . | Foreign | 8 Thermal power plants (TGK-10), 25% in TGK-1 | 4.2 | 2% |

*Source: Companies' annual reports, The System Operator.*

(1) Including Boguchansk HPP (2,997 MW), which is owned 50% by RusHydro and 50% by RUSAL, and operated by RusHydro.

In the Siberian IPS, the top three largest players control approximately 73% of the total installed electricity capacity, while the top six players control approximately 90%. Foreign strategic investors have a limited presence in the Siberian power market; the only power plant controlled by a foreign investor is Unipro's Berezovskaya power plant (2,400MW, including unit 3 currently under maintenance).

17
UKRAINE-EO13661-13321: 0149

Exhibit 26

The table below presents the largest players in the generation sector of the Siberian IPS.

| Rank | Investor | Ownership | Key assets | Installed capacity under control (GW) | % of Siberian IPS capacity |
|------|----------|-----------|-----------|------|------|
| 1 | EuroSibEnergo .. | Russian | 15.1 GW hydropower, Irkutskenergo | 19.1[1] | 37% |
| 2 | SGK . . . . . . . . . . | Russian | Kuzbassenergo (TGK-12), TGK-13 | 7.8 | 15% |
| 3 | RusHydro . . . . . . | State | 3 HPPs (excluding Boguchansk HPP) | 7.5 | 14% |
| 4 | Inter RAO . . . . . . | State | Inter RAO EG, BGK, TGK-11 | 4.1 | 8% |
| 5 | RusHydro/RUSAL | Russian | Boguchansk HPP[2] | 3.0 | 6% |
| 6 | Sibeco . . . . . . . . | Russian | Novosibirsk CHPs | 2.5 | 5% |
| 7 | Unipro . . . . . . . . | Foreign | Berezovskaya GRES | 2.4 | 5% |
| 8 | Other . . . . . . . . . | — | — | 5.5 | 11% |

*Source: Companies' annual reports, The System Operator.*

(1) Excluding EuroSibEnergo assets operating outside of Siberia.

(2) Boguchansk HPP is owned by a 50%/50% joint venture established by RusHydro and RUSAL, and operated by RusHydro.

### Transmission, distribution and infrastructure

Russian Grids (known in Russian as "Rosseti") is the operator of Russia's energy grid and one of the largest power network companies in the world. It maintains 2.3 million km of power transmission lines, 490,000 substations with transformer capacity of more than 761 GWA (gigawatt amperes). In 2015, the net power output to consumers amounted to 720.5 billion kWh, an increase by 5.2 billion kWh when compared to 2014. In 2015, the overall transmission losses within Russian Grids declined by 0.14 points and reached 9.2%.

The asset portfolio of Russian Grids includes 37 subsidiaries and affiliates, inclusive of 14 interregional distribution companies ("MRSKs") and the transmission company (Federal Grid Company ("FGC")). The state owns 87.9% of the Russian Grids' share capital. The FGC and MRSKs are part of UES' technological infrastructure, the dispatch and operation of which is executed by the System Operator.

Today, MRSKs own and operate approximately 70% of all Russia's power distribution assets. Approximately 30% of Russia's other electricity distribution assets are owned and operated by grid companies of the formerly independent AO-Energos, as well as by numerous smaller regional and municipal companies.

The national interregional and regional power network companies provide power transmission and distribution services, as well as technological connections of consumers and generators' equipment to the power grid. The activity of network companies falls under the state regulation of natural monopolies with regards to the price formation for the provided services, and for non-discriminative access of consumers to the electric power grid network.

See "*Electricity Industry Structure*" section for details on industry infrastructure participants, including the System Operator, Market Council and Commercial Operator.

### Supply

Russian retail customers currently purchase electricity from energy supply companies, which have been either spun-off from the AO-Energos and subsequently sold by RAO UESR in public auctions, or were formed as independent energy supply companies (including RusEnergoSbyt, TNS Energo, and MAREM+). Most former AO-Energo sales companies were granted the status of "guaranteeing suppliers" (i.e., the energy supply companies of last resort) in their respective geographical regions, and therefore are obligated to enter into contracts with any retail consumer on demand.

The energy supply companies that do not have the status of guaranteed supplier tend to be independent and are free to choose their consumers without obligation. By the end of 2016, the number of these companies was reduced from around 3,000 to approximately 1,900.

# Exhibit 26

## DESCRIPTION OF SHARE CAPITAL AND APPLICABLE JERSEY LEGISLATION

*Set forth below is a description of the Company's share capital, the material provisions of the Company's M&A in effect on the date of this Prospectus and certain requirements of Jersey legislation. Holders of the GDRs will be able to exercise their rights with respect to the Ordinary Shares underlying the GDRs only in accordance with the provisions of the Deposit Agreements and the Deed Poll and the relevant requirements of Jersey law (see "Terms and Conditions of the Global Depositary Receipts").*

### Description of the Company

The Company was incorporated as a private limited liability company limited by shares and was registered in British Virgin Islands on 30 April 2002 under the name Baufinanz Limited. On 18 March 2004 the Company registered a change of its legal name to Eagle Capital Group Limited. On 25 August 2005, the Company changed its domicile to Jersey and was renamed to En+ Group Limited. On 1 June 2017, the Company re-registered as a public company in Jersey and was renamed to En+ Group plc and has conducted business since that date. The principal legislation under which the Company operates, and under which the Ordinary Shares are created, is the Companies Law. The Company's registered office is 44 Esplanade, St Helier, Jersey, JE4 9WG (Telephone: 01534 504 000).

### Purpose

The Company's purpose includes, among other things, to undertake business of a commercial nature. The Company has an unrestricted corporate capacity.

### Share Capital

The Company's authorised share capital on its incorporation was U.S.$1,000 divided into 1,000 ordinary shares of U.S.$1.00 each, fully subscribed for by B-Finance Limited.

Prior to the date of this Prospectus, the Company's shareholders resolved on 1 June 2017 to subdivide the authorised share capital of the Company from U.S.$50,000 divided into 50,000 Ordinary Shares of U.S.$1.00 each to U.S.$50,000 divided into 12,500,000,000 Ordinary Shares of U.S.$0.000004 each, such that each share in the capital of the Company with a par value of U.S.$1.00 was subdivided into 250,000 shares with a par value of U.S.$0.000004.

To meet certain legal requirements for redomiciling as a public Company to Cyprus, the Company's shareholders further resolved on 9 October 2017 to increase the issued share capital of the Company to US$35,000 such that 8,250,000,000 additional Ordinary Shares of US$0.000004 each were issued to the shareholders on a *pro rata* basis. The shareholders then immediately resolved to consolidate the authorized share capital of the Company such that every 17.5 Ordinary Shares of US$0.000004 each were consolidated into 1 Ordinary Share of US$0.00007 so that the current authorized share capital of the Company is US$50,000 divided into 714,285,714.286 Ordinary Shares of US$0.00007 each.

As a result, as of the date of this Prospectus, the Company's issued share capital is U.S.$35,000 divided into 500,000,000 Ordinary Shares, each with a par value of U.S.$0.00007, all of which are fully paid, free from any liens and any restrictions on the right to transfer. As of the date of this Prospectus, the Company's authorised share capital is U.S.$50,000 divided into 714,285,714.286 Ordinary Shares of U.S.$0.00007. The Company's authorised and issued fully paid share capital immediately following the Offering will be 571,428,572 Ordinary Shares. The Company does not have in issue any listed or unlisted securities not representing its share capital.

As at the date of this Prospectus, the Company's major shareholders were B-Finance Limited (BVI) with a 61.55% ownership interest and Basic Element Limited (Jersey) with a 21.10% ownership interest.

Neither the Company nor any of its subsidiaries (nor any party on its behalf) holds any of the Company's Ordinary Shares.

Neither the Company nor any of its subsidiaries has any outstanding convertible securities, exchangeable securities or securities with warrants or any relevant acquisition rights or obligations over the Company's or either of the subsidiaries' authorised but unissued capital or undertakings to increase its issued share capital.

276

# Exhibit 26

13. The following table sets forth certain information regarding the Group's significant subsidiaries as at the date of this Prospectus:

| Name | Country of Incorporation | Beneficial ownership/ voting rights | Registered Office |
|---|---|---|---|
| United Company RUSAL Plc . . . . . | Jersey | 48.13% | 44 Esplanade, St Helier, JE4 9WG, Jersey |
| LLC Irkutskaya Energosbytovaya Kompaniya . . . . . . . . . . . . . . . . | Russia | 92.5% | 257 Lermontova Street, 664033, Irkutsk, Russia |
| JSC Krasnoyarsk Hydro Power Plant | Russia | 100.0% | 663090, Divnogorsk, Krasnoyarsk Region, Russia |
| PJSC Irkutskenergo . . . . . . . . . . . | Russia | 92.5% | 3 Sukhe-Batora Street, 664011, Irkutsk, Russia |
| OJSC Irkutsk Electric Grid Company . . . . . . . . . . . . . . . . . | Russia | 52.3% | 257 Lermontova Street, 664033, Irkutsk, Russia |
| JSC EuroSibEnergo . . . . . . . . . . . | Russia | 100.0% | 663090, Divnogorsk, Krasnoyarsk Region, Russia |

356

Exhibit 26

| | |
|---|---|
| "Companies Act" .............. | the Companies Act 2006 of the U.K. |
| "Companies Law".............. | the Companies (Jersey) Law 1991, as amended from time to time |
| "Company" .................. | En+ Group plc |
| "Company Secretary" .......... | Intertrust Corporate Services (Jersey) Limited |
| "Competition Law" ............ | Federal Law of the Russian Federation No. 135-FZ *"On Protection of Competition"* of 26 July 2006, as amended |
| "Conditions" ................ | the terms and conditions of the GDRs included in the section entitled *"Terms and Conditions of the Global Depositary Receipts"* of this Prospectus |
| "Cornerstone Investment Agreement" | the agreement between the Cornestone Investor in connection with the Offering dated 7 September 2017 |
| "Cornerstone Investor" .......... | the ANAN GROUP (SINGAPORE) PTE. with whom the Company has entered into the Cornerstone Investment Agreement |
| "Cornerstone Investor GDRs" ...... | the GDRs purchased by the Cornerstone Investor pursuant to the Cornerstone Investment Agreement |
| "Cornerstone Offering" .......... | a placement of 35,714,285 GDRs to the Cornerstone Investor under the Cornerstone Investment Agreement. |
| "Corporations Act" ............ | the Corporations Act 2001 (Cwth) of Australia |
| "Covenant Net Debt / EBITDA" .... | a non-IFRS measure, calculated for any period as covenant net debt divided by covenant EBITDA, in each case as reported, in accordance with the terms of credit facility agreements |
| "CRU"...................... | CRU International Limited |
| "CRU Industry Report" .......... | the industry report dated 12 April 2017 prepared by CRU at the request of the Company |
| "Custodian".................. | Citibank Hong Kong |
| "Cyprus" .................... | the Republic of Cyprus |
| "Cyprus Takeover Law" .......... | Section 13 of the Public Take Over Bids Law, law no. 41(I)/2007 |
| "CySEC" .................... | the Cyprus Securities and Exchange Commission |
| "day-ahead market" ............ | the Russian wholesale market for electric energy deliverable 24 hours in advance of a given time in any day |
| "Defence Tax" ................ | the Special Contribution for the Defence Fund of the Republic Law |
| "Deposit Agreements"............ | the agreements entered into on or about the date of this Prospectus between the Company and the Depositary |
| "Depositary" ................. | Citibank N.A. |
| "Deposited Property" ............ | the rights, interests and other securities, property and cash attributable to the Deposited Shares |
| "Deposited Shares" ............ | the shares deposited with the Custodian pursuant to the Deposit Agreements |
| "Director(s)" ................. | the director(s) of the Company |
| "Disclosure and Transparency Rules" | the UK Listing Authority disclosure and transparency rules |
| "Disclosure Guidance and Transparency Rules" ........... | the disclosure guidance and transparency rules made by the FCA under Part VI of FSMA |

359

Exhibit 26

| | |
|---|---|
| "Free Cash Flow" . . . . . . . . . . . . . . | a non-IFRS measure, calculated for any period as the cash flows generated from operating activities before capital expenditures and interest less interest paid and less capital expenditures adjusted for restructuring fees, payments from settlement of derivative instruments, one-off acquisitions plus dividends from associates and joint ventures, in each case attributable to the Group, the En+ Segment or RUSAL, as the case may be |
| "FSC" . . . . . . . . . . . . . . . . . . . . . . | Joint-Stock Company *"Financial Settling Centre"*, a company incorporated in the Russian Federation on 29 September 2004, which is engaged in rendering services related to financial settlements between participants of the wholesale electricity market, and which is owned by the Market Council and ATS |
| "FSFM" . . . . . . . . . . . . . . . . . . . . . | the Federal Service for Financial Markets of the Russian Federation |
| "FSMA" . . . . . . . . . . . . . . . . . . . . | the Financial Services and Markets Act 2000 of the U.K. |
| "FTS" . . . . . . . . . . . . . . . . . . . . . . | the Federal Tariffs Service of the Russian Federation |
| "GDRs" . . . . . . . . . . . . . . . . . . . . . | global depositary receipts representing interests in Ordinary Shares |
| "GDP" . . . . . . . . . . . . . . . . . . . . . . | gross domestic product |
| "geological research licences" . . . . . . | licences for the geological research of a subsoil plot |
| "Glencore" . . . . . . . . . . . . . . . . . . . | Glencore plc, a company, incorporated in Jersey, which is a leading integrated commodity producer and marketer |
| "Glencore Businesses" . . . . . . . . . . . | certain of the alumina and aluminium businesses of Glencore acquired by RUSAL |
| "Gross Profit Margin" . . . . . . . . . . . | a non-IFRS measure, for any period calculated as gross profit or loss divided by revenues and expressed as a percentage |
| "Group" . . . . . . . . . . . . . . . . . . . . . | the Company and its consolidated subsidiaries |
| "GRP" . . . . . . . . . . . . . . . . . . . . . . | gross regional product |
| "Guarantee" . . . . . . . . . . . . . . . . . . | the corporate guarantee provided by the Company in favour of VTB securing the obligations of GrandStroy LLC under the VTB Facility of August 2015 |
| "guaranteeing supplier" . . . . . . . . . . | a company under an obligation to enter into a contract for the sale and purchase of electricity at the request of any customer within a Guaranteeing Supplier's area of operation |
| "Heat Market Roadmap" . . . . . . . . . | a roadmap entitled "On Implementation of the Target Model of the Heat Market" approved by the Russian Government in 2014 |
| "Heat Supply Law" . . . . . . . . . . . . . | Federal Law of the Russian Federation No. 190-FZ "On Heat Supply" of 27 July 2010 |
| "Holder" . . . . . . . . . . . . . . . . . . . . . | in relation to any GDR, the person registered as the holder of that GDR on the Register |
| "HPP" . . . . . . . . . . . . . . . . . . . . . . | a hydro power plant |
| "hryvnia" . . . . . . . . . . . . . . . . . . . . | the lawful currency for the time being of the Ukraine |
| "HSE" . . . . . . . . . . . . . . . . . . . . . . | health, safety and environmental laws and regulations |
| "Hydraulic Constructions Safety Law" . . . . . . . . . . . . . . . . . . . . . | Federal Law of the Russian Federation No. 117-FZ "On Safety of Hydraulic Constructions" of 23 June 1997 |
| "IAS 34" . . . . . . . . . . . . . . . . . . . . | International Accounting Standard 34, Interim Financial Reporting |

Exhibit 26

| | |
|---|---|
| "KPMG" . . . . . . . . . . . . . . . . . . . . . | JSC KPMG |
| "KRAMZ" . . . . . . . . . . . . . . . . . . | Krasnoyarsk Metallurgical Plant LLC, a company incorporated in the Russian Federation on 9 Junauary 1997, whose principal business is the manufacturing of semi-finished products from primary aluminium, and in which the Group owns a 100% shareholding. |
| "Krasnoyarsk aluminium smelter" . . | JSC RUSAL Krasnoyarsk, a company incorporated under the laws of the Russian Federation on 16 November 1992, and which is a wholly owned subsidiary of RUSAL |
| "Krasnoyarsk HPP" . . . . . . . . . . . . | JSC Krasnoyarsk Hydro-Power Station, a company incorporated in the Russian Federation on 7 October 1993, whose principal business is electricity generation, and which is the wholly owned indirect subsidiary of the Company |
| "Land Code" . . . . . . . . . . . . . . . . . | the Land Code of the Russian Federation No. 136-FZ of 25 October 2001 |
| "Law No. 122 FZ" . . . . . . . . . . . . . | Federal Law "On State Registration of Rights to Immovable Property and Transactions Therewith" No. 122 FZ dated 21 July 1997, as amended |
| "Law No. 218 FZ" . . . . . . . . . . . . . | Federal Law "On State Registration of Immovable Property" No. 218 FZ dated 13 July 2015, as amended |
| "LCIA" . . . . . . . . . . . . . . . . . . . . . . | the London Court of International Arbitration |
| "Licensing Law" . . . . . . . . . . . . . . . | the Federal Law on Licensing of Certain Types of Activities No. 99-FZ dated 4 May 2011, as amended |
| "Licensing Regulation" . . . . . . . . . . | the Resolution of the Supreme Soviet of the Russian Federation on 15 July 1992, as amended |
| "Listing Rules" . . . . . . . . . . . . . . . . | the Listing Rules of the U.K. Listing Authority |
| "LME" . . . . . . . . . . . . . . . . . . . . . . | the London Metal Exchange |
| "Lock-up Agreements" . . . . . . . . . . | an undertaking of the Company, the Selling Shareholder, B-Finance Limited, the Other Shareholders, VTB and the Cornerstone Investor, establishing that, subject to certain exceptions, until the expiry of a period of 180 days after the London Admission, neither they nor any of their subsidiaries or their affiliates nor any person acting on their behalf will, without the prior written consent of the Joint Global Coordinators, on behalf of the Managers, or the Company (as the case may be) sell, pledge or encumber the Ordinary Shares or the GDRs or, in the case of the Company, issue new Ordinary Shares |
| "Logistics Segment" . . . . . . . . . . . . | the Group's operations in transportation services (excluding those of RUSAL) |
| "London Admission" . . . . . . . . . . . | admission to the Official List and to trading on the regulated market |
| "London Stock Exchange" . . . . . . . . | the London Stock Exchange plc |
| "LTIFR" . . . . . . . . . . . . . . . . . . . . . | the Lost Time Injury Frequency Rate |
| "M&A" . . . . . . . . . . . . . . . . . . . . . | the Company's memorandum and articles of association to be in force on the date of the London Admission |
| "Majority Shareholder" . . . . . . . . . | Mr. Oleg Deripaska |
| "Managers" . . . . . . . . . . . . . . . . . . | the MOEX Bookrunner, the Joint Global Coordinators and the Joint Bookrunners |

23
UKRAINE-EO13661-13321: 0155

Exhibit 26

| | |
|---|---|
| "Norilsk Nickel" . . . . . . . . . . . . . . . | PJSC Mining and Metallurgical Company "NORILSK NICKEL", a company incorporated in the Russian Federation on 4 July 1997, whose principal business is nonferrous metal production, and in which RUSAL holds a 27.82% stake |
| "NSD" . . . . . . . . . . . . . . . . . . . . . . | the Russian National Settlement Depositary |
| "OECD" . . . . . . . . . . . . . . . . . . . . . | the Organisation for Economic Co-operation and Development |
| "OFAC" . . . . . . . . . . . . . . . . . . . . . | the U.S. Office of Foreign Assets Control |
| "Offer Price" . . . . . . . . . . . . . . . . . | the final dollar price per GDR at which the GDRs are to be acquired pursuant to the Offering |
| "Offering" . . . . . . . . . . . . . . . . . . . | the offering of the GDRs by the Company and the Selling Shareholder |
| "offer within the EEA of the GDRs" . | in relation to any GDRs in any EEA Relevant Member State, the communication in any form and by any means of sufficient information on the terms of the offer and any GDRs to be offered so as to enable an investor to decide to purchase or subscribe for the GDRs |
| "Official List" . . . . . . . . . . . . . . . . | the official list of the FCA |
| "OGK" . . . . . . . . . . . . . . . . . . . . . . | thermal generation companies (specifically "optovaya generiruiushchaya kompaniya", wholesale generating company) |
| "Operating Profit Margin" . . . . . . . . | a non-IFRS measure, calculated for any period as results from operating activities divided by revenues and expressed as a percentage |
| "Order" . . . . . . . . . . . . . . . . . . . . . | the Financial Services and Market Act (Financial Promotion) Order 2005, as amended, of the U.K. |
| "Other Shareholders" . . . . . . . . . . . | companies that are beneficially owned by the family of the Majority Shareholder or directly by members of his family, which hold 13.0% of the Company's Ordinary Shares |
| "Ordinary Shares" . . . . . . . . . . . . . | ordinary shares, each with a nominal value of U.S.$0.00007, in the share capital of the Company |
| "Other Segment" . . . . . . . . . . . . . . | the operations of KRAMZ and SMR |
| "Over-Allotment Option" . . . . . . . . | the option granted by the Selling Shareholder to the Managers to procure purchasers for, or failing which to purchase, up to 5,000,000 additional GDRs at the Offer Price for the purposes of meeting over-allotments in connection with the Offering |
| "PFIC" . . . . . . . . . . . . . . . . . . . . . . | Passive Foreign Investment Company |
| "Power Segment" . . . . . . . . . . . . . . | the Group's power assets and operations (excluding those of RUSAL) |
| "2010 PD Amending Directive" . . . . . | Directive 2010/73/EU, as amended |
| "Prospectus" . . . . . . . . . . . . . . . . . | this prospectus dated 3 November 2017 |
| "Prospectus Directive" . . . . . . . . . . | Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the EEA Relevant Member State), including any relevant implementing measure in each EEA Relevant Member State |
| "Pre-Release" . . . . . . . . . . . . . . . . . | the execution and delivery of GDRs or issuance of interests in a Master GDR by the Depositary prior to the receipt of Shares by the Custodian or the Depositary, as the case may be |
| "Pre-Releasee" . . . . . . . . . . . . . . . . | the person to whom GDRs or Deposited Property are to be delivered in the event of a Pre-Release |

Exhibit 26

| | |
|---|---|
| "**Russian EuroSibEnergo**" ......... | JSC EuroSibEnergo, a company incorporated in the Russian Federation on 8 September 2008, which is the management company for the Group's power assets and in which the Group owns 100% of its share capital |
| "**Russian Securities Market Law**" ... | Federal Law of the Russian Federation No. 39-FZ "*On the Securities Market*" of 22 April 1996, as amended |
| "**Russian Tax Code**" ............. | the Tax Code of the Russian Federation |
| "**Russian Qualified Investors**" ...... | "qualified investors" (as defined under the Russian Securities Market Law) in Russia |
| "**Safety Law**" .................. | Federal Law of the Russian Federation No. 116-FZ "*On Industrial Safety of Dangerous Industrial Facilities*" of 21 July 1997 |
| "**Sayano-Shushenskaya HPP**" ...... | a HPP operating in Siberia, which is a branch of RusHydro |
| "**Sberbank**" ................... | Sberbank of Russia |
| "**SC 1**" and "**SC 2**"............. | supply contracts between Bratsk aluminium smelter and Irkutskenergo providing for Irkutskenergo to supply electricity to Bratsk aluminium smelter from 1 January 2017 to 31 December 2026 |
| "**SC 3**"....................... | contract between RUSAL Energo and Russian EuroSibEnergo, providing for Russian EuroSibEnergo to supply RUSAL Energo with electricity from 1 November 2016 to 31 December 2025 |
| "**SEC**" ....................... | the United States Securities and Exchange Commission |
| "**Securities**" ................... | the GDRs and the Ordinary Shares represented by them |
| "**Securities Act**" ................ | the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder |
| "**SEEPX**" ..................... | SEEPX Energy Ltd |
| "**SEEPX Industry Report**" ........ | the industry report dated 27 April 2017 prepared by SEEPX at the request of the Company |
| "**Selling Shareholder**" ........... | Basic Element Limited |
| "**Senior Management**" ........... | the senior management of the Group as at the date of this Prospectus |
| "**Shareholder(s)**" .............. | means, unless specified otherwise, holder(s) of Share(s) |
| "**Shareholders' Agreement between RUSAL Major Shareholders**"..... | the shareholders' agreement concluded in January 2010 in respect of RUSAL between the RUSAL Major Shareholders |
| "**Shareholders' Agreement with RUSAL**" ................... | the shareholders' agreement concluded in January 2010 in respect of RUSAL between RUSAL and the RUSAL Major Shareholders |
| "**Shareholders' Agreement with VTB**" | the shareholders' agreement entered into by the Company, Basic Element Limited, B-Finance Limited and VTB in July 2011 regarding, *inter alia*, the corporate governance of the Company |
| "**Siberian IPS**" ................ | Siberian integrated power system |
| "**SMR**" ...................... | Strikeforce Mining and Resources PLC and its consolidated subsidiaries, whose principal activity is the production of molybdenum and ferromolybdenum. |
| "**Stabilisation Period**" ............ | a period of 30 days after the announcement of the Offer Price |

Exhibit 26

## 27. Significant subsidiaries

The significant entities of the Group, included in these consolidated financial statements, are as follows:

| Name | Place of incorporation and operation | Principal activities | Ownership and equity interest 31 December | | |
|------|------|------|------|------|------|
| | | | 2016 | 2015 | 2014 |
| **UC RUSAL** | | | | | |
| United Company RUSAL Plc | Jersey | Holding company | 48.1% | 48.1% | 48.1% |
| Compagnie Des Bauxites De Kindia S.A. | Guinea | Bauxite mining | 100.0% | 100.0% | 100.0% |
| Friguia | Guinea | Alumina | 100.0% | 100.0% | 100.0% |
| JSC RUSAL Achinsk | Russian Federation | Alumina | 100.0% | 100.0% | 100.0% |
| RUSAL Mykolaev Ltd | Ukraine | Alumina | 100.0% | 100.0% | 100.0% |
| JSC RUSAL Boxitogorsk Alumina | Russian Federation | Alumina | 100.0% | 100.0% | 100.0% |
| Eurallumina SpA | Italy | Alumina | 100.0% | 100.0% | 100.0% |
| OJSC RUSAL Bratsk | Russian Federation | Smelting | 100.0% | 100.0% | 100.0% |
| JSC RUSAL Krasnoyarsk | Russian Federation | Smelting | 100.0% | 100.0% | 100.0% |
| JSC RUSAL Novokuznetsk | Russian Federation | Smelting | 100.0% | 100.0% | 100.0% |
| JSC RUSAL Sayanogorsk | Russian Federation | Smelting | 100.0% | 100.0% | 100.0% |
| CJSC Khakas Aluminium Smelter | Russian Federation | Smelting | - | - | 100.0% |
| RUSAL Resal LLC | Russian Federation | Processing | 100.0% | 100.0% | 100.0% |
| JSC RUSAL SAYANAL | Russian Federation | Foil | 100.0% | 100.0% | 100.0% |
| CJSC RUSAL ARMENAL | Armenia | Foil | 100.0% | 100.0% | 100.0% |
| RUS-Engineering LLC | Russian Federation | Repairs and maintenance | 100.0% | 100.0% | 100.0% |
| JSC Russian Aluminium | Russian Federation | Holding company | 100.0% | 100.0% | 100.0% |
| Rusal Global Management B.V. | Netherlands | Management company | 100.0% | 100.0% | 100.0% |
| JSC United Company RUSAL Trading House | Russian Federation | Trading | 100.0% | 100.0% | 100.0% |
| Rusal America Corp. | USA | Trading | 100.0% | 100.0% | 100.0% |
| RS International GmbH | Switzerland | Trading | 100.0% | 100.0% | 100.0% |
| Rusal Marketing GmbH | Switzerland | Trading | 100.0% | 100.0% | 100.0% |
| RTI Limited | Jersey | Trading | 100.0% | 100.0% | 100.0% |
| Alumina & Bauxite Company Limited | British Virgin Islands | Trading | 100.0% | 100.0% | 100.0% |
| JSC Komi Aluminii | Russian Federation | Alumina | 100.0% | 100.0% | 100.0% |
| JSC Bauxite-Timana | Russian Federation | Bauxite mining | 100.0% | 100.0% | 80.0% |
| JSC Severo-Uralsky Bauxite Mine | Russian Federation | Bauxite mining | 100.0% | 100.0% | 100.0% |
| JSC SUAL | Russian Federation | Primary aluminium and alumina production | 100.0% | 100.0% | 100.0% |
| OJSC Zaporozhye Aluminium Combine | Ukraine | Primary aluminium and alumina production | - | - | 98.0% |
| SUAL-PM LLC | Russian Federation | Aluminium powders production | 100.0% | 100.0% | 100.0% |
| CJSC Kremniy | Russian Federation | Silicon production | 100.0% | 100.0% | 100.0% |
| SUAL-Kremniy-Ural LLC | Russian Federation | Silicon production | 100.0% | 100.0% | 100.0% |
| UC RUSAL Alumina Jamaica Limited (a) | Jamaica | Alumina | - | 100.0% | 100.0% |
| UC RUSAL Alumina Jamaica II Limited | Jamaica | Alumina | 100.0% | 100.0% | 100.0% |
| Kubikenborg Aluminium AB | Sweden | Smelting | 100.0% | 100.0% | 100.0% |
| RFCL Sarl | Luxembourg | Finance services | 100.0% | 100.0% | 100.0% |

# Exhibit 26

| Name | Place of incorporation and operation | Principal activities | Ownership and equity interest 31 December | | |
|---|---|---|---|---|---|
| | | | 2016 | 2015 | 2014 |
| Aktivium B.V. | Netherlands | Holding and investment company | 100.0% | 100.0% | 100.0% |
| Aughinish Alumina Ltd | Ireland | Alumina | 100.0% | 100.0% | 100.0% |
| EN+ | | | | | |
| Eurosibenergo Plc | Cyprus | Holding company Management | 100.0% | 100.0% | 100.0% |
| JSC Eurosibenergo | Russian Federation | company | 100.0% | 100.0% | 100.0% |
| PJSC Krasnoyarsk Hydro-Power Plant (b) | Russian Federation | Energy generation | 100.0% | 92.6% | 89.6% |
| CJSC MAREM + | Russian Federation | Energy trading | 99.9% | 99.9% | 99.9% |
| PJSC Irkutskenergo | Russian Federation | Energy generation | 90.8% | 52.8% | 52.8% |
| OJSC Irkutsk Electric Grid Company | Russian Federation | Power transmission and distribution | 51.9% | 44.4% | 44.4% |
| LLC Telmamskaya HPP | Russian Federation | Investing company | 100.0% | 100.0% | 100.0% |
| CJSC Volgaenergosbyt | Russian Federation | Energy trading | 96.2% | 80.5% | 80.5% |
| LLC Avtozavodskaya TEC | Russian Federation | Energy generation | 95.3% | 75.9% | 75.9% |
| LLC Zavodskie seti | Russian Federation | Energy transmission | 100.0% | 100.0% | 100.0% |
| LLC Eurosibenergo-engineering | Russian Federation | Engineering services | 100.0% | 100.0% | 100.0% |
| LLC Kompaniya VostSibUgol | Russian Federation | Coal production | 90.8% | 52.8% | 52.8% |
| OJSC Razrez Tulunsky | Russian Federation | Coal production | 87.8% | 52.6% | 52.8% |
| LLC KRAMZ | Russian Federation | Manufacturing of semi-finished products from primary aluminium | 91.7% | 57.6% | 57.3% |
| LLC Tyvinskaya Gornorudnaya Company | Russian Federation | Coal production | 93.0% | 39.5% | 39.5% |
| LLC Sorsk Mining and Metallurgical Complex | Russian Federation | Ore mining | 100.0% | 100.0% | 100.0% |
| LLC Sorsk Ferromolybdenum Plant | Russian Federation | Ore processing, ferromolybdenum production | 100.0% | 100.0% | 100.0% |

(a) Entity was disposed of in 2016 for a consideration of USD 299 million, please see note 2(h) for details.

(b) As at 31 December 2016 excluding squeeze out procedures Krasnoyarsk HPP nominal ownership is 98.6% (note 17(a)).

The nominal ownerships indicated in the table above are the effective holdings, except for UC RUSAL shareholdings where 48.1% is held by the Parent Company.

Trading entities are engaged in the sale of products to and from the production entities.

# Exhibit 26

| COMPANY | SELLING SHAREHOLDER |
|---|---|
| **En+ Group plc**<br>44 Esplanade, St. Helier<br>Jersey, Channel Islands<br>JE4 9WG | **Basic Element Limited**<br>44 Esplanade, St. Helier<br>Jersey, Channel Islands<br>JE4 9WG |

## JOINT GLOBAL COORDINATORS

| **Citigroup Global Markets Limited**<br>Citigroup Centre<br>Canada Square<br>London E14 5LB<br>United Kingdom | **Credit Suisse Securities (Europe)**<br>**Limited**<br>One Cabot Square<br>London E14 4QJ<br>United Kingdom | **J.P. Morgan Securities plc**<br>25 Bank Street<br>London E14 5JP<br>United Kingdom |
|---|---|---|
| **Merrill Lynch International**<br>2 King Edward Street<br>London EC1A 1HQ<br>United Kingdom | **SIB (Cyprus) Limited**<br>Alpha Business Centre<br>1 Floor Block B, 27 Pindarou<br>Street<br>CY-1060 Nicosia, Cyprus | **VTB Capital plc**<br>14 Cornhill<br>London EC3V 3ND<br>United Kingdom |

## JOINT BOOKRUNNERS

| **BANK GPB INTERNATIONAL S.A.**<br>Luxembourg<br>Le Dome<br>15, rue Bender<br>Luxembourg<br>L-1229 | **BMO Capital Markets Limited**<br>95 Queen Victoria Street<br>London EC4V 4HG<br>United Kingdom | **Société Générale**<br>29 boulevard Haussmann<br>75009 Paris<br>France |
|---|---|---|

**UBS Limited**
5 Broadgate
London EC2M 2QS
United Kingdom

## MOEX BOOKRUNNER

**ATON LLC**
20 Ovchinnikovskaya emb., bld. 1
Moscow 115035
Russia

## LEGAL ADVISERS TO THE COMPANY

| *As to English and U.S. law* | *As to Russian law* | *As to Jersey law* |
|---|---|---|
| **White & Case LLP**<br>5 Old Broad Street<br>London EC2N 1DW<br>United Kingdom | **White & Case LLC**<br>4 Romanov Pereulok<br>125009 Moscow<br>Russia | **Ogier**<br>44 Esplanade, St. Helier<br>Jersey, Channel Islands<br>JE4 9WG |

## LEGAL ADVISERS TO THE JOINT GLOBAL COORDINATORS

| *As to English and U.S. law* | *As to Russian law* |
|---|---|
| **Linklaters LLP**<br>One Silk Street<br>London EC2Y 8HQ<br>United Kingdom | **Linklaters CIS**<br>Paveletskaya Square 2/2<br>Moscow, 115054<br>Russian Federation |

## INDEPENDENT AUDITORS TO THE COMPANY

**JSC KPMG**
10, Presnenskaya Naberezhnaya
123112 Moscow
Russia

## DEPOSITARY

**Citibank N.A.**
388 Greenwich Street
New York, New York 10013
United States of America

Exhibit 27

EuroSibEnergo at a glance

- EUROSIBENERGO IS THE LARGEST INDEPENDENT POWER COMPANY IN RUSSIA AND RANKS AS **one of the largest hydropower generation companies in the world**



- EUROSIBENERGO PRODUCES AROUND **9% of Russia's total electricity volume**

- **Siberia's** LARGEST POWER PRODUCER



- EUROSIBENERGO WAS FORMED IN 2007 IN ORDER TO CONSOLIDATE POWER GENERATION ASSETS, WHICH PREVIOUSLY WERE SEPARATELY MANAGED BY LLC EUROSIBENERGO, AND TO **develop power generation operations**

- EUROSIBENERGO IS A **vertically integrated power group** ENGAGING IN ALL OF THE MAJOR AREAS OF THE POWER INDUSTRY IN RUSSIA – FROM COAL PRODUCTION FOR OUR CHPS AND GENERATION OF ELECTRIC AND HEAT POWER TO SALES TO END USERS – AS WELL AS HAVING AN ENGINEERING UNIT WITH EPC / EPCM COMPETENCES



- THE COMPANY HAS 18 POWER GENERATION PLANTS, **including 4 hydro power plants**

- EUROSIBENERGO'S INSTALLED ELECTRICITY CAPACITY AMOUNTS TO **19 460 MW,** INCLUDING 15 002 MW CAPACITY OF HYDRO POWER PLANTS REPRESENTING 9.2% OF INSTALLED ELECTRICITY CAPACITY IN RUSSIA



- THE TOTAL INSTALLED HEAT CAPACITY OF OUR HEAT POWER GENERATING ASSETS AMOUNTS TO **17485 Gcal/h.**

- EUROSIBENERGO'S OWN COAL RESERVES AMOUNT TO **1.26 billion tonnes**



- OUR PERSONNEL NUMBERS EXCEED **27 000 persons**

- IN 2009 EUROSIBENERGO PRODUCED **82.8TWh** OF ELECTRICITY



UKRAINE-EO13661-13321: 0161

Exhibit 27

About us



EUROSIBENERGO (ESE), A PART OF EN+ GROUP, IS THE LARGEST INDEPENDENT POWER COMPANY IN RUSSIA AND THE LARGEST PRIVATE HYDROPOWER PRODUCER GLOBALLY. ESE WAS ESTABLISHED IN 2001 AS A POWER PLANTS HOLDING COMPANY. SINCE THEN WE HAVE COMPLETED VARIOUS ACQUISITIONS AND UNDERWENT SIGNIFICANT ORGANIC GROWTH TO BECOME AN ENERGY SECTOR CHAMPION IN RUSSIA.

We operate power plants across Russia with a total installed capacity of 19.7 GW, providing approximately 8% of Russia's electricity.

Over 15 GW of our generation portfolio comes from hydroelectric power plants located on Siberian rivers – the Angara and the Yenisei. Three of our hydropower plants are among 20 world's largest: Krasnoyarsk HPP (6,000 MW), Bratsk HPP (4,500 MW) and Ust-Ilimsk HPP (3,840 MW).

Hydro power generation has a number of important advantages compared to other forms of power generation:

- low and stable cost base, due to the absence of fossil fuel costs;
- load flexibility, allowing increased output in a short time frame to support peak loads;
- lack of CO2 emissions

**TOTAL INSTALLED CAPACITY OF POWER PLANTS**
**19.7 GW**

**INSTALLED CAPACITY OF HYDROPOWER PLANTS**
**15.1 GW**

**Vertically integrated power GROUP**

In December 2015 we diversified our clean energy mix by launching a pilot solar PV power project – Abakan SPP – with core equipment produced in-house. The launch of Abakan SPP reinforced ESE leading position in green energy generation in Russia.

Most of our power assets are located in the Siberian region of Russia; a region considered to be part of North Asia and home to many of the world's natural resources. We supply electricity to major oil & gas production facilities, mining enterprise, pulp and paper mills, machinery works, airline plants and over 1 million households. Our major consumer is UC RUSAL, a part of En+ Group: it's aluminium smelters consume more than a half of our electricity.



ESE engages in all of the power industry's key areas, including electric power generation, its transmission and distribution, power trading and supply. Our fossil fuel power plants are fully sourced with our own coal production. ESE has an in-house engineering unit – ESE-Engineering – with in-depth industry knowledge that provides repair/maintenance/EPCM services to the company, as well as to the global market, including Africa, Asia and South America.

Our strategy is focused on the development of clean energy, promoting energy efficiency, and the reduction of our carbon footprint. We are investing in R&D in the energy sector: this includes development of a new generation 100MW compact nuclear reactor, new types of porevskite-based solar panels, energy storage systems, and a research on cross-border grid interconnections potential in North-East Asia.

ESE is a member of the Global Sustainable Electricity Partnership, a non-profit organization whose members are the world's leading electricity companies, supplying energy to over 1.2 billion customers.

We aim to become a global player in renewable energy fuelling the world's growth and prosperity with the



UKRAINE-EO13661-13321: 0162

power of nature.



UKRAINE-EO13661-13321: 0163

## Exhibit 27



History

January 2010 – Completed the transfer of all EuroSibEnergo power generation plants to the wholesale electricity market
December 2009 - LLC EuroSibEnergo-Engineering completed its first project outside Russia: the Company constructed a mini-CHP with a 2 MW capacity and centralized heat supply system in the Avan residential district of Yerevan, the Republic of Armenia

2007 through 2009 – All En+ Group power generation assets were gradually consolidated on the basis of EuroSibEnergo, specifically controlling shares of OJSC Irkutskenergo, OJSC Krasnoyarskaya HPP, LLC Avtozavodskaya CHP, CJSC MAREM+, LLC EuroSibEnergo-Engineering

2008 – VostSibUgol Company was acquired, meeting 80% of EuroSibEnergo's CHPs demand for coal

2008 - OJSC Irkutsk Electronetwork Company ("Irkutsk GridCo") was spun-off from OJSC Irkutskenergo in accordance with the requirements of the legislation of the Russian Federation

2007 - EuroSibEnergo was established to consolidate and manage the electricity generation assets within the En+ Group, which were previously managed by LLC EuroSibEnergo, and to develop power generation operations

2007 –En+ Group increased its stake in OJSC Irkutskenergo to a controlling stake

2007 –En+ Group increased its stake in OJSC Krasnoyarskaya HPP to a controlling stake

2004 - LLC Avtozavodskaya CHP was acquired by En+ Group companies

2004 - CJSC MAREM+ (one of the oldest electricity trading company in Russia having been established in 1998) was acquired by En+ Group companies

2003 - En+ Group started to acquire shares of OJSC Krasnoyarskaya HPP

2002 - LLC EuroSibEnergo-Engineering was established in order to provide repair, maintenance and modernization services for OJSC Irkutskenergo HPPs and Krasnoyarskaya HPP

2001 - En+ Group started to acquire shares of OJSC Irkutskenergo

2001 - LLC EuroSibEnergo was established in order to manage electric power projects

02/12/2018 06:22 PM

4

UKRAINE-EO13661-13321: 0164

Corporate Structure



OAO Irkutskenergo

OAO Irkutskenergo is a coal and power generating company, located in the Irkutsk Oblast and Krasnoyarsk Krai. The company's key assets include three large HPPs on the Angara River - Irkutsk, Bratsk and Ust-Ilimsk HPPs, with a total capacity of over 9 GW, as well as thirteen coal-fired CHPs located in large cities of Irkutsk Oblast, six open-pit coal mines to meet the power plants' demand for coal, two loading and transportation units, and a coal dressing plant.

The total installed capacity of the company's power plants amounts to 12.9 GW, including over 9 GW of HPPs capacity, 14,800 GCal/h of heat energy capacity, and 1.29 billion tons of coal reserves. OAO Irkutskenergo is capable of generating over 70 billion KWh of electric power and up to 48 million Gcal of heat energy each year, and producing over 14.9 million tons of coal. The company's structure also includes heating networks with a total length of 900 km.

The company has over 13.7 thousand employees.



BRATSKAYA HPP
**4500 MW**



UST-ILIMSKAYA CHP
**525 MW**



UST-ILIMSKAYA HPP
**3840 MW**



IRKUTSKAYA HPP
**662 MW**

EuroSibEnergo holds a controlling stake (50.19%) of OAO Irkutskenergo shares, while 40% of the company's shares are owned by the Russian Federation.

⌃ back

OAO Krasnoyarsk HPP

UKRAINE-EO13661-13321: 0165

OAO Krasnoyarsk HPP owns and controls Krasnoyarsk HPP on the Yenisei River with the installed capacity of 6 GW. Krasnoyarsk HPP ranks second among the largest Russian hydroelectric power plants, and is included in the list of top ten HPPs of the world.

Krasnoyarsk HPP is capable to produce over 23 billion KWh per year, covering more than 50% of Krasnoyarsk Krai energy demand.

In terms of modernization, Krasnoyarsk HPP is one of the leading HPPs in Russia due to the fact that 9 of 12 hydropower units have been fully reconstructed till present.

The company has over 600 employees.

EuroSibEnergo holds a controlling stake (68.29%) of OAO Krasnoyarsk shares.




KRASNOYARSKAYA HPP
**6000 MW**

← back

### Volgaenergo Group of Companies

Volgaenergo Group of companies includes assets, located in Nizhny Novgorod, such as the Avtozavodskaya TPP with installed electric capacity of 580 MW and heat capacity of 2074 Gcal/h, two boiler houses with total capacity of 605 Gcal/h, as well as heating networks and power supply company ZAO VolgaEnergoSbyt which has the status of guaranteeing supplier of Nizhny Novgorod Oblast.

The Volgaenergo GC's annual production of electric power exceeds 3 billion KWh, while the heat energy production is over 4,300 Gcal.

Taking into account the power deficit in Nizhniy Novgorod Oblast, EuroSibEnergo is considering the opportunity of constructing a new 400 MW energy generation unit at the Avtozavodskaya TPP.

The company has over 1700 employees.

EuroSibEnergo holds 100% of Volgaenergo shares.

△ back

### OAO Irkutsk Electrosetevaya Company

OAO Irkutsk Electrosetevaya Company (IESK, Irkutsk Electric Network Company) provides transmission and distribution of electric power, produced mainly by OAO Irkutskenergo power plants. The company was established on the basis of network assets of OAO Irkutskenergo in accordance with the Federal Law "On Features of the Electric Power Industry Operations during the Transitional Period".

The total length of the company's 0.4 - 500 kV network amounts to 38, 000 km. The company owns over 7, 000 substations.

The company has over 3,200 employees.

OAO Irkutskenergo holds 19.9% of IESK shares, and it participates in the company's management.

△ back

### ZAO MAREM+

ZAO MAREM+ was established in 1996, and is one of the oldest Russian energy supply companies. Today the company operates in Russia and Kazakhstan.

The company purchases electric power on wholesale market and sales it to end consumers. In 2009, ZAO MAREM+ supplied 2.3 billion kWh of electric power to end consumers.

EuroSibEnergo holds 100% of ZAO MAREM+ shares.

UKRAINE-EO13661-13321: 0166

∧ back

### OOO EuroSibEnergo-Engineering

OOO EuroSibEnergo-Engineering is an engineering unit of EuroSibEnergo with EPC / EPCM competences. The company repairs, modernizes, designs and constructs energy producing facilities for EuroSibEnergo, as well as for other companies in Russia and abroad. The company holds one of the deepest competences in the field of hydroelecvric power production in Russia, and retains susnainable relations with industry research instituses.

OOO EuroSibEnergo-Engineering has its representative offices in seven regions of Russia and in Armenia.

At the moment the company is working on implementation of the following large-scale projects:

Development of design documentation for the project "Reconstruction of the Avtozavodskaya TPP and Construction of CCGT-400";

Management of external electric power supply at the Taishet Industrial Hud;

Restoration of a centralized heat supply system in the Avan district of Erevan, the Republic of Armenia;

Reconstruction of hydroelectric power units at Krasnoyarsk HPP;

Reconstruction and construction of power supply units in terminals of the international airport of Sochi and the airport of Gelendzhik.

The company has over 2,100 employees.

EuroSibEnergo holds 100% of EuroSibEnergo-Engineering shares.

∧ back

UKRAINE-EO13661-13321: 0167

Exhibit 27

Contacts

EuroSibEnergo

www.eurosib.ru
E-mail: info@eurosib.ru

165, Chkalova street, Divnogorsk, Krasnoyarsk Krai, 663091, Russian Federation

EuroSibEnergo (Moscow office)

1 Vasiliay Kozhinoy Street, Moscow, 121096, Russia
Tel: +7 (495) 720-50-85
Fax: +7 (495) 720-50-86



UKRAINE-EO13661-13321: 0168

Exhibit 28

Bates Pages 0169 - 0174

Withheld in Full

Exhibit 29
Case 1:17-cv-00913   Document 1   Filed 05/15/17   Page 1 of 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OLEG V. DERIPASKA,<br>64 Severnaya Street, Oktyabrsky,<br>Khutor, Ust-Labinsky District,<br>Krasnodar Territory, Russia, 352332,<br><br>                Plaintiff,<br><br>      v.<br><br>THE ASSOCIATED PRESS,<br>200 Liberty Street,<br>New York, NY 10281,<br><br>              Defendant. | Civil Action No. _____<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Oleg V. Deripaska brings this action under the laws of the District of Columbia. Plaintiff's allegations are made with knowledge of his own acts and acts taking place in his presence, and upon information and belief as to all other matters.

### NATURE OF THE CASE

1.     This is an action for defamation by direct statements and by implication.

2.     Mr. Deripaska, a private investor and industrialist, is the CEO of United Company RUSAL, one of the world's largest aluminum companies.

3.     The Associated Press (hereinafter the "AP") is a news publishing agency with global reach. In its most recent annual report, the AP claimed that "[m]ore than half the world's population sees content from the AP every day via 15,000 news outlets worldwide."

4.     On March 22, 2017, the AP, by and through its writers Jeff Horwitz and Chad Day, published an article (hereinafter the "Article") that falsely accused Mr. Deripaska of

1

UKRAINE-EO13661-13321: 0175

Exhibit 29
Case 1:17-cv-00913   Document 1   Filed 05/15/17   Page 2 of 12

involvement in criminal acts and other improprieties. Mr. Horwitz and Mr. Day are writers at
the AP's local news bureau in Washington, DC.

5.     The AP acted with actual malice in publishing the Article because prior to
publication it knew that such statements were false, or at minimum entertained doubts about the
truth of the defamatory statements contained in the article. In addition to the Article's overtly
false and defamatory statements, the Article is structured to imply falsely that Mr. Deripaska's
commercial dealings from the period between 2005 and 2009 were somehow related to alleged
criminal conduct and improprieties related to the campaign of then-presidential candidate Donald
J. Trump and the 2016 U.S. Presidential election (hereinafter the "Trump Campaign
Controversy").

6.     The AP admitted, through an online video featuring one of the Article's authors,
that the Article's central representations regarding Mr. Deripaska were misleading (hereinafter
the "Horwitz Video"). In the Horwitz Video, the AP admitted, *inter alia*, that "the relationship
[Mr. Manafort had] with Deripaska would've been over by the time the [Trump] campaign
began, long since then." The AP also admitted: "There isn't any sort of question at the moment
as to whether Oleg Deripaska was involved in some way in the Trump Campaign."

7.     Although the Horwitz Video contradicts some of the Article's central, defamatory
themes, it did not accompany the Article's initial distribution. Readers of the Article and of its
numerous republications by news outlets around the world have been left with the impression
that Mr. Deripaska's private, commercial dealings were—and still may be—deeply intertwined
with the Trump Campaign Controversy.

8.     On March 31, 2017, Mr. Deripaska, through his attorneys, asked that the AP issue
a public correction and retraction. The requested retraction would have clarified that the AP is

2

2

UKRAINE-EO13661-13321: 0176

Exhibit 29

Case 1:17-cv-00913   Document 1   Filed 05/15/17   Page 3 of 12

aware of no evidence, of any kind, to suggest that Mr. Deripaska and Mr. Manafort had a contractual relationship to advance the interests of the Russian government or Mr. Putin, and that the relationship between Mr. Deripaska and Mr. Manafort predated all of the alleged contacts between the Russian government and the Trump Campaign by many years.

9. The AP refused Mr. Deripaska's request for a public correction and retraction.

10. Since its publication, the Article has been republished or cited by numerous news outlets worldwide, including but not limited to both print and televised publications by The Independent (UK), Bloomberg News, CNN, and MSNBC.

## PARTIES

11. Plaintiff Oleg V. Deripaska is a citizen of the Russian Federation ("Russia"), with business interests in several countries.

12. Defendant The Associated Press is an unincorporated cooperative association organized under the laws of the statue of New York, with its principal place of business in New York, NY.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(a)(2). For purposes of that statute, Mr. Deripaska is a citizen of Russia, and the AP is a citizen of New York. Accordingly, the citizenship of the parties is diverse. The amount in controversy exceeds $75,000.

14. This Court has personal jurisdiction over Defendant, and venue is proper in this judicial district, under 28 U.S.C. § 1391 and the District of Columbia's long-arm statute, D.C. Code §§ 13-423(a)(1) and (a)(3). The AP regularly transacts business in this district. The AP,

3

3

UKRAINE-EO13661-13321: 0177

Exhibit 29
Case 1:17-cv-00913   Document 1   Filed 05/15/17   Page 4 of 12

through its agents, has caused harm in this district. A substantial part of the events giving rise to Mr. Deripaska's claim occurred in this district.

**FACTUAL ALLEGATIONS**

**Statement #1**

15.     In its opening line, the Article asserts: "Before signing up with Donald Trump, former campaign manager Paul Manafort secretly worked for a Russian billionaire with a plan to 'greatly benefit the Putin Government,' The Associated Press has learned." The Article continues: "Manafort pitched the plans to aluminum magnate Oleg Deripaska, a close Putin ally with whom Manafort eventually signed a $10 million annual contract beginning in 2006." According to the Article, these "plans" were set forth in a memo written by Mr. Manafort in 2005 (hereinafter the "2005 Manafort Memo").

16.     The Article links the purported plans set forth in the 2005 Manafort Memo to the "$10 million annual contract" purportedly entered into between Mr. Deripaska and Mr. Manafort. The Article then quotes the 2005 Manafort Memo: "'We are now of the belief that this model can greatly benefit the Putin Government if employed at the correct levels with the appropriate commitment to success.' Manafort wrote in the 2005 memo to Deripaska."

17.     The Article expresses certainty about the connection between the plans set forth in the 2005 Manafort Memo and funds paid by Mr. Deripaska to Mr. Manafort: "Manafort's plans were laid out in detailed documents obtained by the AP that included strategy memoranda and records showing international wire transfers for millions of dollars."

18.     Taken together, these assertions constitute a false and defamatory statement (hereinafter "Statement #1").

4

4

Exhibit 29
Case 1:17-cv-00913  Document 1  Filed 05/15/17  Page 5 of 12

19.     Statement #1 is verifiably false in that it asserts in substance that Mr. Deripaska paid Mr. Manafort to execute the plans set forth in the 2005 Manafort Memo, in particular to "greatly benefit the Putin Government."

20.     Contrary to Statement #1, Mr. Deripaska never had any arrangement, whether contractual or otherwise, with Mr. Manafort to advance the interests of the Russian government or to implement the purported proposal in the 2005 Manafort Memo.

21.     On information and belief, the 2005 Manafort Memo constituted a pitch by Mr. Manafort's firm for services unrelated to the contractual arrangements between Mr. Deripaska and Mr. Manafort.

22.     The AP knew that Statement #1 was false when it published the Article. There is no contract pursuant to which Mr. Deripaska paid Mr. Manafort for work designed to "greatly benefit the Putin government." The AP knew that to be the case when it published the Article, because it claimed to be in possession of a contact between Mr. Deripaska and Mr. Manafort, yet it did not quote, paraphrase, or otherwise summarize its terms. On information and belief, the purported contract in the AP's possession relates to ordinarily commercial dealings and in no way supports any assertion that Mr. Manafort was engaged by Mr. Deripaska to perform work to "greatly benefit the Putin government."

23.     In the alternative, but for the same reasons stated above, the AP published Statement #1 with reckless disregard as to whether it was false. The AP had the terms of the purported 2006 contract in its possession, and could have examined those terms and reported on them. The AP, however, did not report on the terms in the purported 2006 contract because doing so would have contradicted the AP's assertion that Mr. Deripaska's dealings with Mr. Manafort were somehow related to subject of the 2005 Manafort Memo.

5

UKRAINE-EO13661-13321: 0179

Exhibit 29
Case 1:17-cv-00913   Document 1   Filed 05/15/17   Page 6 of 12

24.    Statement #1 is defamatory. As the Article notes, "Under the Foreign Agents Registration Act, people who lobby in the U.S. on behalf of foreign political leaders or political parties must provide detailed reports about their actions to the department" and "[w]illfully failing to register is a felony." By asserting in substance that Mr. Deripaska paid Mr. Manafort to act as an unregistered foreign agent, Statement #1 injured plaintiff in his trade, profession, and community standing by making him appear to have been engaged in criminal conduct.

25.    Statement #1 is actionable as a matter of law, irrespective of special harm, because it asserts that Mr. Deripaska was involved in, or aided, criminal conduct by Mr. Manafort.

26.    Statement #1 has caused Mr. Deripaska special harm, because his business interests have suffered a loss of good will value and other pecuniary loss.

**Statement #2**

27.    In an effort to lend authority to its dubious chimera of accusations, the Article quotes Senator Lindsey Graham of South Carolina: "Clearly if [Mr. Manafort]'s getting millions of dollars from [Mr. Deripaska,] a billionaire close to Putin, to basically undermine democratic movements, that's something I'd want to know about."

28.    The quotation attributed to Senator Graham (the "Graham Quotation") uses the present participle form, thereby asserting that Mr. Manafort is *currently* "getting millions of dollars" from Mr. Deripaska. In addition, the Graham Quotation's reference to "basically undermin[ing] democratic movements" furthers the Article's false and defamatory themes and effectively confirms that the 2005 Manafort Memo's plans are nefarious in and of themselves.

29.    The Article does not clarify that the hypothetical payment of "millions of dollars" described in the Graham Quotation would have taken place many years ago, if it had happened at

6

UKRAINE-EO13661-13321: 0180

Exhibit 29
Case 1:17-cv-00913    Document 1    Filed 05/15/17    Page 7 of 12

all. Nor does the Article correct or clarify the Graham Quotation's suggestion that Mr.
Deripaska's contracts with Mr. Manafort were intended "to basically undermine democratic
movements."

30.     The AP had (and has) no basis for reporting that any contract between Mr.
Deripaska and Mr. Manafort provided for the undermining of democratic movements.

31.     The next paragraph of the Article reads: "Democrats on the House Intelligence
committee said the new revelations will feature in their investigations."

32.     Taken together, these assertions constitute a false and defamatory statement
(hereinafter "Statement #2").

33.     The AP intended for Statement #2 to have a false and defamatory inference
beyond the reporting of true facts. Even if true, the statement regarding the House Democrats'
investigation—when paired with the Graham Quotation—strongly and falsely conveys that Mr.
Deripaska's contracts with Mr. Manafort had criminal implications and merit a congressional
investigation. Again, Mr. Deripaska did not make any payments to Mr. Manafort to undermine
democratic movements, and the Article cites no proof to substantiate that accusation.

34.     The AP knew that Statement #2 was false when it published the Article.
Specifically, the AP knew that Mr. Deripaska severed relations with Mr. Manafort many years
ago. In the Horwitz Video, the Associate Press admitted, *inter alia*, that "the relationship [Mr.
Manafort had] with Deripaska would've been over by the time the [Trump] campaign began,
long since then."

35.     Alternatively, by not placing the Graham Quotation in its proper temporal
context, the AP acted with reckless disregard for whether or not Statement #2 conveyed a false
inference.

7

UKRAINE-EO13661-13321: 0181

Exhibit 29
Case 1:17-cv-00913 Document 1 Filed 05/15/17 Page 8 of 12

36. Statement #2 is defamatory. By conveying that Mr. Deripaska paid Mr. Manafort to undermine democratic movements, and that Mr. Deripaska merited being the subject of a congressional investigation, Statement #2 injured plaintiff in his trade, profession, and community standing by making him appear infamous or odious.

37. Statement #2 is actionable as a matter of law, irrespective of special harm, because it conveys that Mr. Deripaska was involved in, or aided, criminal conduct by Mr. Manafort—including conduct in violation of the Foreign Agents Registration Act, and that he merited being the subject of a congressional investigation.

38. Statement #2 has caused Mr. Deripaska special harm, because his business interests have suffered a loss of good will value and other pecuniary loss.

**Statement #3**

39. The Article claims: "Deripaska became one of Russia's wealthiest men under Putin, buying assets abroad in ways widely perceived to benefit the Kremlin's interests."

40. The next paragraph returns to a discussion of the Trump Campaign Controversy. In that paragraph, the Article repeats that Mr. Manafort had worked as President Trump's campaign chairman during the 2016 Presidential election—a fact already set forth in the very first paragraph.

41. In the next paragraph, the Article claims: "The newly obtained business records link Manafort more directly to Putin's interest in the region. According to those records and people with direct knowledge of Manafort's work for Deripaska, Manafort made plans to open an office in Moscow, and at least some of his work in Ukraine was directed by Deripaska, not local political interests there."

8

8

Exhibit 29

Case 1:17-cv-00913   Document 1   Filed 05/15/17   Page 9 of 12

42.     In the next paragraph, the Article claims: "Meanwhile, federal criminal prosecutors became interested in Manafort's activities years ago as part of a broad investigation to recover stolen Ukraine assets after the ouster of pro-Russian President Viktor Yanukovych there in early 2014."

43.     Taken together, these assertions constitute a false and defamatory statement (hereinafter "Statement #3").

44.     The AP intended for Statement #3 to have a defamatory inference beyond the mere reporting of true facts. Even if each element of Statement #3 were true or a matter of opinion, the Article's juxtaposition of these assertions reasonably conveys that Mr. Deripaska stole Ukrainian assets in 2014, and that he is implicated in federal prosecutors' investigation of that theft. Moreover, the strange insertion of a paragraph regarding the Trump Campaign Controversy in the middle of Statement #3 conveys that the alleged theft of assets from Ukraine is somehow tied to the Trump Campaign Controversy.

45.     Statement #3 is verifiably false. Mr. Deripaska has never stolen assets from Ukraine or elsewhere, and did not aid Mr. Manafort in doing so. Moreover, Mr. Deripaska has never had any involvement in the Trump Campaign Controversy.

46.     The AP knew that what Statement #3 implied was false when it published the Article. The AP knew that by 2014 Mr. Deripaska had not worked with Mr. Manafort for several years. Indeed, the AP knew that by 2014, Mr. Deripaska and Mr. Manafort were already engaged in litigation over their prior contracts.

47.     Alternatively, the AP published Statement #3 with reckless disregard as to whether or not it conveyed a false implication. At a minimum, a review of the public litigation between Mr. Deripaska and Mr. Manafort would have revealed the striking improbability that

9

9

Exhibit 29
Case 1:17-cv-00913   Document 1   Filed 05/15/17   Page 10 of 12

they would have engaged in any work together in 2014, let alone that they embarked on a criminal conspiracy to steal assets from Ukraine.

48.     Statement #3 is defamatory. By conveying that Mr. Deripaska was involved in the theft of assets from Ukraine and that he might be the subject of a federal criminal investigation, Statement #3 injured plaintiff in his trade, profession, and community standing by making him appear odious or infamous.

49.     Statement #3 is actionable as a matter of law, irrespective of special harm, because it reasonably conveys that Mr. Deripaska was involved in, or aided, criminal conduct, and that he might be the subject of a federal criminal investigation.

50.     Statement #3 has caused Mr. Deripaska special harm, because his business interests have suffered a loss of good will value and other pecuniary loss.

## COUNT I:
## DEFAMATION — LIBEL

51.     Plaintiff incorporates and adopts by reference the allegations contained in each and every preceding and subsequent paragraph of this Complaint.

52.     The AP published the Article without authorization or privileged and it was subsequently viewed by third parties throughout the world.

53.     Statements #1, 2, and 3 are each false.

54.     The Article as a whole creates a false overall implication.

55.     The AP published Statements #1, 2, and 3 with knowledge that each was false.

56.     Alternatively, the AP published Statements #1, 2, and 3 with reckless disregard as to whether they were false.

57.     The AP published the Article as a whole with knowledge that its overall implication was false.

10

10

UKRAINE-EO13661-13321: 0184

Exhibit 29
Case 1:17-cv-00913   Document 1   Filed 05/15/17   Page 11 of 12

58.     Alternatively, the AP published the Article as a whole with reckless disregard as to whether its overall implication was false.

59.     Statements #1, 2, and 3 are defamatory in that each one injured Mr. Deripaska in his trade, profession, and community standing, and made him appear odious and infamous.

60.     The Article as a whole is defamatory in that it injured Mr. Deripaska in his trade, profession, and community standing, and made him appear odious and infamous.

61.     Statements #1, 2, and 3 are each actionable as a matter of law without regard to special harm because each one implies that Mr. Deripaska engaged in criminal conduct or that he aided criminal conduct by Mr. Manafort.

62.     The Article as a whole is actionable as a matter of law without regard to special harm because it implies that Mr. Deripaska engaged in criminal conduct or that he aided criminal conduct by Mr. Manafort.

63.     Statements #1, 2, and 3 have caused Mr. Deripaska special harm, because his business interests have suffered a loss of good will value and other pecuniary loss.

64.     The Article as a whole has caused Mr. Deripaska special harm, because his business interests have suffered a loss of good will value and other pecuniary loss.

## REQUEST FOR RELIEF

65.     Plaintiff incorporates and adopts by reference the allegations contained in each and every preceding and subsequent paragraph of this Complaint.

66.     Mr. Deripaska request that this Court render the following relief:

    a.      Award him an appropriate amount in monetary damages as determined at trial, including pre- and post-judgment interest;

    b.      Award exemplary damages against Defendant in an appropriate amount to

11

UKRAINE-EO13661-13321: 0185

Exhibit 29
Case 1:17-cv-00913 Document 1 Filed 05/15/17 Page 12 of 12

be determined at trial; and

c.      Grant him such other relief as is just and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all claims

asserted in this Complaint so triable.

Respectfully submitted,

Dated: May 15, 2017                     **BOIES SCHILLER FLEXNER LLP**

_/s/ Jonathan D. Schiller_
Jonathan D. Schiller (DC Bar No. 185496)
jschiller@bsfllp.com
575 Lexington Ave., 7th Fl.
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

Jonathan Sherman (DC Bar No. 468539)
jsherman@bsfllp.com
1401 New York Ave., NW
Washington, DC 20005
Telephone:     (202) 237-2727
Facsimile:     (202) 237-6131

_Attorneys for Plaintiff_

12

12

UKRAINE-EO13661-13321: 0186