**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| OLEG DERIPASKA,<br><br>    Plaintiff,<br><br>  v.<br><br>STEVEN T. MNUCHIN, Secretary of the<br>UNITED STATES DEPARTMENT OF<br>THE TREASURY, ANDREA M. GACKI,<br>DIRECTOR OF THE OFFICE OF<br>FOREIGN ASSETS CONTROL,<br><br>    Defendants. | Civil Action No. 19-cv-00727 (APM) |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

BACKGROUND ............................................................................................................................2

I.    Statutory and Regulatory Background................................................................................2

      A.    Historical Overview ...............................................................................................2

      B.    International Emergency Economic Powers Act ("IEEPA") ...................................3

      C.    Executive Orders 13661 and 13662 ......................................................................4

      D.    Countering America's Adversaries Through Sanctions Act ("CAATSA")....................6

II.    Factual Background ............................................................................................................8

      A.    Deripaska's Inclusion in Treasury's CAATSA Report...........................................8

      B.    Deripaska's Designations Under EO 13661 and EO 13662........................................8

      C.    Deripaska's Complaint and Amended Complaint...................................................9

LEGAL STANDARDS OF REVIEW ........................................................................................12

ARGUMENT ...............................................................................................................................14

I.    OFAC's Designation of Deripaska Was Not Arbitrary and Capricious..................................14

      A.    OFAC's Decision Is Entitled to Substantial Deference.................................................14

      B.    OFAC's Well-Reasoned Decision Easily Satisfies the APA's Standard......................15

II.    Deripaska's Constitutional Claims Should be Dismissed, or in the Alternative, the Court
      Should Grant Summary Judgment to the Government Because OFAC's Designation of
      Deripaska Accords with the Constitution .........................................................................19

III.    Deripaska Was Provided with Sufficient Notice Under the APA .........................................24

IV.    The Sufficiency of the CAATSA Report Submitted to Congress Is Not Justiciable,
      but in Any Event Deripaska's CAATSA-Related Challenges Fail on the Merits .................25

      A.    The Adequacy of the CAATSA Report Is Not Subject to Judicial Review....................26

      B.    Plaintiff Lacks Standing to Challenge the CAATSA Report .........................................27

C.     Treasury's Report Does Not Constitute Final Agency Action for Purposes
       of the APA ............................................................................................................28

D.     CAATSA Does Not Require Treasury to Identify Oligarchs Based on
       Their Proximity to the Russian Regime .........................................................30

E.     Defendant's Demand for Further Notice and an Opportunity to Challenge
       His Inclusion in the CAATSA Report Is Not Justiciable and Fails on the Merits..........32

       1.    Deripaska's APA Claim That Treasury Must Provide Additional Notice
             Why He Was Identified As An Oligarch Fails.......................................32

       2.    Deripaska's Due Process Challenge to the CAATSA Report Also Fails ...............33

CONCLUSION .................................................................................................................34

# TABLE OF AUTHORITIES

## CASES

*Am. Forest Res. Council v. Hall,*
  533 F. Supp. 2d 84 (D.D.C. 2008) ............................................................28

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................13

*Bd. of Regents of State Colls. v. Roth,*
  408 U.S. 564 (1972) ............................................................33

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................13

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................29

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156 (1962) ............................................................15

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ............................................................14

*Coll. Sports Council v. Gov't Accountability Office,*
  421 F. Supp. 2d 59 (D.D.C. 2006) ............................................................27

*Conant v. Wells Fargo Bank, N.A.,*
  60 F. Supp. 3d 99 (D.D.C. 2014) ............................................................13

*32 County Sovereignty Committee v. Department of State,*
  292 F.3d 797 (D.C. Cir. 2002) ............................................................20

*Dames & Moore v. Regan,*
  453 U.S. 654 (1981) ............................................................3, 18

*Fares v. Smith,*
  901 F.3d 315 (D.C. Cir. 2018) ............................................................18, 22

*Fla. Gas Transmission Co. v. FERC,*
  604 F.3d 636 (D.C. Cir. 2010) ............................................................17

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) ............................................................14

*Gen. Elec. Co. v. Jackson,*
  610 F.3d 110 (D.C. Cir. 2010) ............................................................33, 34

*Gilbert v. Homar,*
    520 U.S. 924 (1997) ............................................................................................21

*Hinton v. Corr. Corp. of Am.,*
    624 F. Supp. 2d 45 (D.D.C. 2009) ......................................................................13

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ................................................................................................15

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
    219 F. Supp. 2d 57 (D.D.C. 2002) ......................................................................19

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
    333 F.3d 156 (D.C. Cir. 2003) ...............................................................16, 21, 23

*Islamic Am. Relief Agency v. Gonzales,*
    477 F.3d 728 (D.C. Cir. 2007) ............................................................................18

*Jifry v. FAA,*
    370 F.3d 1174 (D.C. Cir. 2004) ...............................................................19, 20, 24

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) ............................................................................................19

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
    341 U.S. 123 (1951) ............................................................................................34

*Joshi v. Nat'l Transp. Safety Bd.,*
    791 F.3d 8 (D.C. Cir. 2015) ................................................................................30

*Kadi v. Geithner,*
    42 F. Supp. 3d 1 (D.D.C. 2012) ..............................................................13, 17, 20

*Khadr v. United States,*
    529 F.3d 1112 (D.C. Cir. 2008) ..........................................................................12

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .....................................................................................27, 28

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ............................................................................................21

*Mosrie v. Barry,*
    718 F.2d 1151 (D.C. Cir. 1983) ..........................................................................34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,*
    463 U.S. 29 (1983) .....................................................................................14, 15, 16

*N. Air Cargo v. U.S. Postal Serv.*,
  674 F.3d 852 (D.C. Cir. 2012) ........................................................................25

*Nat. Res. Def. Council v. Lujan*,
  768 F. Supp. 870) (D.D.C. 1991) ....................................................................27

*Nat'l Ass'n of Home Builders v. Norton*,
  415 F.3d 8 (D.C. Cir. 2005) ............................................................................29

*Nat'l Council of Resistance of Iran v. Dep't of State*,
  251 F.3d 192 (D.C. Cir. 2001) ............................................................17, 20, 23

*Nat'l Resources Def. Council, Inc. v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988) ....................................................................26-27

*Nat'l Shooting Sports Found., Inc. v. Jones*,
  716 F.3d 200 (D.C. Cir. 2013) ........................................................................15

*OKKO Bus. PE v. Lew*,
  133 F. Supp. 3d 17 (D.D.C. 2015) ..................................................................18

*Orvis v. Brownell*,
  345 U.S. 183 (1953) ..........................................................................................3

*Paul v. Davis*,
  424 U.S. 693 (1976) ........................................................................................34

*People's Mojahedin Org. of Iran v. Dep't of State*,
  327 F.3d 1238 (D.C.Cir.2003) ........................................................................23

*Prisology v. Fed. Bureau of Prisons*,
  74 F. Supp. 3d 88 (D.D.C. 2014),
  *aff'd,* 852 F.3d 1114 (D.C. Cir. 2017) ...........................................................12

*Propper v. Clark*,
  337 U.S. 472 (1949) ..........................................................................................3

*Regan v. Wald*,
  468 U.S. 222 (1984) ..........................................................................................3

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
  324 F.3d 726 (D.C. Cir. 2003) ..................................................................28, 29

*Renal Physicians Ass'n v. HHS*,
  489 F.3d 1267 (D.C. Cir. 2007) ......................................................................28

*Sherley v. Sebelius*,
  776 F. Supp. 2d 1 (D.D.C. 2011) ....................................................................16

*Siegert v. Gilley*,
    500 U.S. 226 (1991) ............................................................................................34

*Small Refiner Lead Phase-Down Task Force v. U.S. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) ..........................................................................19

*Sulemane v. Mnuchin*,
    No. 16-1822, 2019 WL 77428 (D.D.C. Jan. 2, 2019) .......................................24

*Trudeau v. Fed. Trade Comm'n*,
    384 F. Supp. 2d 281 (D.D.C. 2005),
    *aff'd on other grounds,* 456 F.3d 178 (D.C. Cir. 2006) ...................................29

*United States v. McKeeve*,
    131 F.3d 1 (1st Cir. 1997) .................................................................................18

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ....................................................................................20, 21

*Williams v. Lew*,
    819 F.3d 466 (D.C. Cir. 2016) ..........................................................................20

*Zarmach Oil Servs., Inc. v. U.S. Dep't of Treasury*,
    750 F. Supp. 2d 150 (D.D.C. 2010) ..................................................................15

*Zevallos v. Obama*,
    10 F. Supp. 3d 111 (D.D.C. 2014),
    *aff'd,* 793 F.3d 106 (D.C. Cir. 2015) .........................................13, 15,16, 19, 21, 23

## **STATUTES**

5 U.S.C. § 701 *et seq.* .................................................................................1, 3, 11, 14, 19

22 U.S.C. § 9225 .................................................................................................................6

22 U.S.C. § 9403 .................................................................................................................6

22 U.S.C. § 9544 .................................................................................................................6

50 U.S.C. § 4301 *et seq* .....................................................................................................2

50 U.S.C. § 1701 .............................................................................................................1, 3

50 U.S.C. § 4305 .................................................................................................................2

Countering America's Adversaries Through Sanctions Act,
    Pub. L. No. 115-44, 131 Stat. 886 (2017) ............................................... *passim*

## LEGISLATIVE MATERIALS

Stop Corrupt Iranian Oligarchs and Entities Act ("SCIOE),
  H.R. 7182, 115th Cong. § 2 (2018) ......................................................................31, 32

## FEDERAL RULES

Fed. R. Civ. P. 12 ...................................................................................... *passim*

Fed. R. Civ. P. 56 ...................................................................................... *passim*

## ADMINISTRATIVE MATERIALS

31 C.F.R. § 501.807 ...............................................................................5, 22, 23

31 C.F.R. pt. 589 ...............................................................................................5

31 C.F.R. § 1010.605 ...................................................................................6, 31

## OTHER AUTHORITIES

Blocking Assets and Prohibiting Transactions With Significant Narcotics Traffickers,
  Exec. Order No. 12,978, 60 Fed. Reg. 54,579 (Oct. 21, 1995)..................................3, 4

Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To
  Commit, or Support Terrorism,
  Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ...................................3

Blocking Property of Additional Persons Contributing to the Situation in Ukraine,
  Executive Order No. 13,661 ("EO 13661"), 79 Fed. Reg. 15,535 (March 16, 2014) ......... *passim*

Blocking Property of Additional Persons Contributing to the Situation in Ukraine,
  Exec. Order No. 13,662 ("EO 13662"), 79 Fed. Reg. 16,169 (March 24, 2014) ............... *passim*

Notice of OFAC Sanctions Actions,
  83 Fed. Reg. 19,138 (May 1, 2018) ....................................................................9, 22

Treasury, Office of Ins. Gen. Audit Report OIG-19-033, *Audit of the Office of Terrorism and
  Financial Intelligence's Report on Section 241 of the Countering America's Adversaries
  Through Sanctions Act* (Feb. 22, 2019) ( "Audit Report"),
  https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%
  20Testimonies/OIG-19-033.pdf (last visited Aug. 2, 2019) ...................................8, 30

U.S. Dep't of the Treasury, Press Release, *Treasury Designates Russian Oligarchs, Officials, and
  Entities in Response to Worldwide Malign Activity*,
  https://home.treasury.gov/news/press-releases/sm0338 (last visited Aug. 2, 2019)........... *passim*

## **INTRODUCTION**

Pursuant to Article II of the Constitution, as well as powers conferred on him by Congress in the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, the President has the authority to impose economic sanctions on persons and entities in response to declared national emergencies.  In response to the Russian Federation's use of military force in the Ukraine and its purported annexation of Crimea, the President in 2014 declared a national emergency and issued several Executive Orders responding to this threat.  These include Executive Order No. 13661, authorizing the Office of Foreign Assets Control ("OFAC") within the United States Department of the Treasury ("Treasury") to sanction and block the assets of persons who have acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Russian Government, and Executive Order No. 13662, authorizing OFAC to sanction and block the assets of persons operating in the energy sector of the Russian economy.  Pursuant to this authority, and following a review of open source and classified reporting, on April 6, 2018, OFAC designated Plaintiff Oleg Deripaska for having acted or purported to act, directly or indirectly, for or on behalf of Russian President Vladimir Putin and for operating in the energy sector of the Russian economy.  Deripaska only brings a legal challenge to OFAC's determination with respect to Putin, which he contends violates his purported rights to due process and is arbitrary and capricious within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  In addition, Deripaska challenges his inclusion in a Treasury report provided to Congress that was mandated by Section 241 of the Countering America's Adversaries Through Sanctions Act, Pub. L. No. 115-44, 131 Stat. 886 (2017), which identified Deripaska as an oligarch in the Russian Federation based on the fact that he is an individual who, according to reliable public sources, has an estimated net worth of at least one billion dollars.  Deripaska argues that his inclusion in Treasury's report violates the APA and his rights to due process.

As seen below, this Court should dismiss Deripaska's Amended Complaint pursuant to Rule 12(b)(1) or Rule 12(b)(6), or in the alternative, enter summary judgment in favor of the government under Rule 56.  Deripaska alleges that his rights to due process were violated because he has not been informed of some of the factual bases for his designation given redactions of classified information in the administrative record.  He cannot bring this claim because, as a foreign national, he has failed to adequately allege a presence in the United States; moreover, the redacted administrative record he received provided sufficient notice of the legal and factual bases for his designation and he has a meaningful opportunity under OFAC's regulations to contest the agency's designation.  As for his claim that the agency's designation was not adequately supported by the administrative record and hence is arbitrary and capricious, the record provides ample support for OFAC's conclusion that Deripaska acted on behalf of Putin.  Finally, Deripaska's due process and APA challenges to his inclusion as an oligarch in Treasury's report to Congress are not justiciable and, in any event, fail on the merits.

Accordingly, and for the reasons discussed more fully below, the Court should dismiss Deripaska's claims or, in the alternative, grant summary judgment in favor of the government.

## **BACKGROUND**

I. **Statutory and Regulatory Background**

A. **Historical Overview**

For nearly its entire history, the United States has utilized economic sanctions as a tool in its foreign policy and national security arsenals.  During most of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917.  *See* 40 Stat. 411 (codified as amended at 50 U.S.C. § 4301 *et seq.*).  As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies.  *See* 50 U.S.C. § 4305(b)(1);

*Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981).  TWEA conveys to the Executive Branch the authority to regulate, prevent, or prohibit transactions, which has been consistently interpreted to encompass the power to block or freeze a person's property.  *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).

**B.     International Emergency Economic Powers Act ("IEEPA")**

In 1977, Congress amended TWEA and enacted IEEPA.  *See* S. Rep. No. 95-466, at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541.  IEEPA extended the President's authority to declared national emergencies, while TWEA's application was limited to periods of declared wars. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984).  Although the broad authorities granted to the President under IEEPA remain essentially the same as those under TWEA, with certain limited exceptions, *see id.* at 228, IEEPA requires the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," *see* 50 U.S.C. § 1701(a).  Once such a national emergency is declared, IEEPA authorizes the President to:

> . . . direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B).

Pursuant to this expansive authority, Presidents have designated persons under sanctions programs based on IEEPA in response to a variety of declared national emergencies.  *See, e.g.*, Exec. Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001) (blocking assets of persons determined "to have committed, or to pose a significant risk of committing, acts of terrorism that threaten" U.S. national security); Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995) (blocking assets of persons who "play a significant role in international narcotics trafficking

centered in Colombia").  In October 2001, the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 amended IEEPA. Among other things, the amendments provided that, in case of judicial review of an IEEPA-based blocking designation, an agency record containing classified information "may be submitted to the reviewing court *ex parte* and *in camera*."  *See* 50 U.S.C. § 1702(c), added by Pub. L. No. 107-56, § 106, 115 Stat. 272, 278 (2001).

### C.    Executive Orders 13661 and 13662

On March 16, 2014, pursuant to IEEPA, the President issued Executive Order No. 13661, "finding that the actions and policies of the Government of the Russian Federation with respect to Ukraine—including the recent deployment of Russian Federation military forces in the Crimea region of Ukraine— undermine democratic processes and institutions in Ukraine; threaten its peace, security, stability, sovereignty, and territorial integrity; and contribute to the misappropriation of its assets, and thereby constitute an unusual and extraordinary threat to the national security and foreign policy of the United States."  Exec. Order No. 13661 ("EO 13661"), 79 Fed. Reg. 15535 (March 19, 2014).  In order to deal with this national emergency, the President blocked all property and interests in property of persons who, as relevant here, are determined by the Secretary of the Treasury, in consultation with the Secretary of State, "to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly . . . a senior official of the Government of the Russian Federation."  *Id*. § 1(a)(ii)(C)(1).

Approximately one week later, on March 24, 2014, the President issued Executive Order No. 13662, "finding that the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine" continue to "constitute an unusual and extraordinary threat to the national security and foreign policy of the United States."  Exec. Order No. 13662 ("EO 13662"), 79 Fed. Reg. 16169 (March 24, 2014).

Pursuant to EO 13662, the President blocked all property and interests in property of persons who, *inter alia*, are determined by the Secretary of the Treasury, in consultation with the Secretary of State, "to operate in such sectors of the Russian Federation economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State, such as financial services, energy, metals and mining, engineering, and defense and related materiel."  EO 13662 § 1(a)(i).

Both EO 13661 and 13662 further authorize the Secretary of the Treasury, in consultation with the Secretary of State, to "take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order," and to re-delegate such functions as needed.  EO 13661 § 8; EO 13662 *§* 8.  Pursuant to a delegation of authority by the Secretary of the Treasury, *see* 31 C.F.R. § 589.802, OFAC has promulgated regulations to implement EO 13661 and EO 13662. *See generally* 31 C.F.R. Pt. 589 ("Ukraine Related Sanctions Regulations").

An individual or entity designated by OFAC pursuant to EO 13661 and 13662 is referred to as a "Specially Designated National" ("SDN"), and OFAC maintains a list of such individuals or entities whose assets are blocked (the "SDN List").  Once designated, an SDN may "seek administrative reconsideration" of the designation, or may "assert that the circumstances resulting in the designation no longer apply."  31 C.F.R. § 501.807.  In doing so, the SDN "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation," and may also "propose remedial steps on the person's part . . . which the person believes would negate the basis for designation."  *Id.* § 501.807(a).  Additionally, the SDN may request a meeting with OFAC.  *Id.* § 501.807(c).  After conducting a review, OFAC will "provide a written decision" to the SDN.  *Id.* § 501.807(d).  OFAC's regulations do not limit the number of times an SDN may seek to challenge its designation administratively.  *See generally id.* § 501.807.

**D.      Countering America's Adversaries Through Sanctions Act ("CAATSA")**

CAATSA imposes sanctions on the activities of three countries: Iran (Title I of the legislation), Russia (Title II), and North Korea (Title III).  It also requires the Executive Branch to submit reports to specified congressional committees on a variety of subject matters.  Topics for these reports range from the identities of individuals who materially contributed to Iran's ballistic missile program, media organizations controlled and funded by Russia, and operators of foreign ports that fail to enforce inspection regulations on cargo sent to or from North Korea, as required by applicable United Nations Security Council resolutions.  *See, e.g.*, CAATSA § 104(e) (codified as enacted at 22 U.S.C. § 9403(e)); *id*. § 255 (codified as enacted at 22 U.S.C. § 9544); *id*. § 314 (codified as enacted at 22 U.S.C. § 9225(a)).

Pertinent to this litigation, CAATSA directs the Secretary of the Treasury to provide a report to six congressional committees that identifies "the most significant senior foreign political figures and oligarchs in the Russian Federation, as determined by their closeness to the Russian regime and their net worth."  *Id*. § 241(a)(1)(A).  For the term "senior foreign political figure," CAATSA incorporates the definition set forth in 31 C.F.R. § 1010.605.  *See id*. § 241(c)(2).  Under that definition, a senior foreign political figure is, *inter alia*, a current or former senior official of a foreign government or foreign political party, or a current or former senior executive in a foreign government-owned commercial enterprise.  31 C.F.R. § 1010.605(p)(1)(i).  The definition further clarifies that senior officials and executives are limited to those who have or had substantial authority over policy, operations, or the use of government-owned resources.  *Id*. § 1010.605(p)(2).  In contrast to its incorporation of the definition of "senior foreign political figure," CAATSA neither sets forth nor incorporates any definition of the term "oligarch."

On January 29, 2018, Treasury delivered its report to Congress.  *See Report to Congress Pursuant to Section 241 of the CAATSA Regarding Senior Foreign Political Figures and*

*Oligarchs in the Russian Federation and Russian Parastatal Entities* ("CAATSA Report" or "Report"), http://prod-upp-image-read.ft.com/40911a30-057c-11e8-9650-9c0ad2d7c5b5 (last visited August 2, 2019).  In the unclassified portion of the Report, Treasury set forth a list of senior foreign political figures and oligarchs in Russia.  Both lists were created, Treasury explained, by using "objective criteria related to individuals' official position in the case of senior political figures, or a net worth of $1 billion or more for oligarchs."  *Id*. at 1.  The list of senior foreign political figures consists of "i) senior members of the Russian Presidential Administration; ii) members of the Russian Cabinet, Cabinet-rank ministers, and heads of other major executive agencies; [and] iii) other senior political leaders, including the leadership of the State Duma and Federation Council, other members of the Russian Security Council, and senior executives at state-owned enterprises."  *Id*.  As for the list of oligarchs, Treasury identified individuals with an estimated net worth of $1 billion or more according to reliable public sources.  *Id*.  As permitted by statute, Treasury also provided to Congress "a classified annex to this report" that provided "additional information required pursuant to Section 241(a)(l)."  *Id*.  That annex "may include" additional individuals who are not included in the unclassified report because they hold a position below that of the senior foreign political figures listed in the unclassified portion of the report or have a net worth below $1 billion.  *Id*.

In the report itself, Treasury made clear that the lists were prepared "exclusively in response to Section 241 of CAATSA."  *Id*. at 2.  They were not "sanctions list[s]," and thus, "the inclusion of individuals or entities in th[e] report, its appendices, or its annex does not and in no way should be interpreted to impose sanctions on those individuals or entities" or represent any "determination by any agency that any of those individuals or entities meet the criteria for designation" for sanctions.  *Id*.  To the contrary, a person's presence on the lists neither implies,

nor gives rise to, nor creates any "restrictions, prohibitions, or limitations on dealings with such persons by either U.S. or foreign persons." *Id.*

After the report's release, Treasury's Office of Inspector General conducted an audit to determine the agency's "compli[ance] with reporting requirements stipulated in CAATSA section 241." Treasury, Office of Ins. Gen. Audit Report OIG-19-033, *Audit of the Office of Terrorism and Financial Intelligence's Report on Section 241 of the Countering America's Adversaries Through Sanctions Act* (Feb. 22, 2019)*,* at 1, https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and% 20Testimonies/OIG-19-033.pdf ("Audit Report") (last visited August 2, 2019).  In its February 22, 2019 Audit Report, the Office of Inspector General concluded that the Report "complies with the requirements listed in" CAATSA § 241, and that the report's completion "represents a great undertaking among members of multiple agencies."  Audit Report at 1.

## II.    Factual Background

### A.    Deripaska's Inclusion in Treasury's CAATSA Report

On January 29, 2018, Treasury provided the unclassified report to Congress required by Section 241 of CAATSA, which identified Plaintiff as one of a number of oligarchs in the Russian Federation.  CAATSA Report, Appendix B; Am. Compl. ¶ 18, ECF No. 7.  The CAATSA Report stated that to "determine the list of oligarchs, the Department of the Treasury enumerated those individuals who, according to reliable public sources, have an estimated net worth of $1 billion or more."  CAATSA Report at 1; Am. Compl. ¶ 21.

### B.    Deripaska's Designations under EO 13661 and EO 13662

On April 6, 2018, OFAC designated Plaintiff pursuant to section 1(a)(ii)(C)(1) of EO 13661 for "having acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation," and pursuant to section 1(a)(i) of EO

13662 "for operating in the energy sector of the Russian Federation economy." *See* 83 Fed. Reg.

19138 ("Notice of OFAC Sanctions Actions"). Treasury's April 6, 2018 press release announcing

the designations explained that "Deripaska has said that he does not separate himself from the

Russian state," and that he "has also acknowledged possessing a Russian diplomatic passport, and

claims to have represented the Russian government in other countries." U.S. Dep't of the

Treasury, Press Release.[1]

C.      **Deripaska's Complaint and Amended Complaint**

On March 15, 2019, Deripaska filed this lawsuit against Defendants OFAC, Treasury,

Andrea M. Gacki, in her official capacity as Director of OFAC, and Steven T. Mnuchin, in his

official capacity as the Secretary of the Treasury (collectively, "Defendants"). Compl. ¶ 1, ECF

No. 1. Deripaska's original complaint challenged his designation as an SND (i.e., a Specially

Designated National) pursuant to EO 13661 and EO 13662 and his inclusion on OFAC's SDN List

of individuals whose assets are blocked. He also challenged his inclusion in the list of oligarchs in

Treasury's CAATSA Report provided to Congress.

On April 29, 2019, OFAC voluntarily agreed to release the administrative record

underlying Deripaska's designations, with redactions to protect classified information. In

addition, Defendants filed the administrative record, again with redactions to protect classified

information, on the public docket on May 28, 2019.[2] ECF No. 6-1.

---

[1] *Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity*, https://home.treasury.gov/news/press-releases/sm0338 (last visited August 2, 2019).

[2] As authorized by IEEPA, Defendants intend to lodge, on an *ex parte*, *in camera* basis, a copy of the unredacted record containing classified information with the Court when the parties file the joint appendix required by Local Civil Rule 7(n). *See* IEEPA, 50 U.S.C. § 1702(c) ("[I]f the determination was based on classified information. . .such information may be submitted to the reviewing court ex parte and in camera").

The one hundred sixty-one page administrative record includes the "evidentiary memorandum" setting forth OFAC's reasons for Deripaska's designation as an SDN, which relied upon twenty-nine supporting exhibits, some of which are classified.  Admin. R. 0009-17 ("AR").  OFAC's memorandum explains the factual and legal bases for its determination pursuant to EO 13661 that "Deripaska has acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation."  AR 0011.  Under the heading "Deripaska Has Acted in Support of Russian President Vladimir Putin's Projects," the memorandum includes nine supporting paragraphs, eight of which were redacted because they are classified.  *Id*. at 0011-12.  In the unredacted paragraph, the memorandum cited an article in *The Nation*, reporting that "Deripaska told one of his closest associates that he bought an aluminum plant in Montenegro in 2005 'because Putin encouraged him to do it. . . the Kremlin wanted an area of influence in the Mediterranean.'"  *Id*. (citing Exhibit 22).  *The Nation* article further reported that "Deripaska has adhered to an unwritten understanding between Putin and the oligarchs: as long as they support the Kremlin, they can operate with impunity."  AR 0099.  To demonstrate his fealty to Putin, *The Nation* reported, "Deripaska has thus taken on numerous projects dear to Putin, such as building a new airport in Sochi for the 2014 Olympics and buying out Tajikistan's aluminum plant to help Putin reassert control over that key ex-Soviet republic."  *Id*.  According to the article, "Deripaska openly admits that his RusAl holdings are subservient to the Kremlin's wishes, telling the *Financial Times* last year, 'If the state says we need to give it up, we'll give it up.'"  *Id*.

OFAC's memorandum also sets forth the grounds for Deripaska's designation under EO 13662, specifically, the agency's conclusion that Deripaska "Operates in the Energy Sector of the Russian Federation Economy."  AR 0012-13.  This portion of the memorandum is unclassified and explains in detail the basis for OFAC's determination.  *Id*.  The memorandum states that,

"[a]ccording to Deripaska's web site, as of January 31, 2018, Deripaska's key companies operate in multiple sectors of the [Russian] economy, to include the energy sector." *Id*. at 0013.  One of these companies, EuroSibEnergo, "is the largest private power company in Russia, and produces around 9 percent of Russia's total electricity generation." *Id*.

After receiving the administrative record, Deripaska filed an Amended Complaint, dropping his challenge to his designation under EO 13662 for operating in the energy sector of the Russian economy.  Am. Compl. ¶ 6, ECF No. 7.  According to his Amended Complaint, he "will petition OFAC through the administrative reconsideration process for the rescission of that designation and to develop a new record that supports that rescission." *Id*.

In his Amended Complaint, Deripaska continues to challenge his designation pursuant to EO 13661 and his inclusion in the list of oligarchs in Treasury's CAATSA Report provided to Congress.[3]  In Count I, he alleges that OFAC's "findings and conclusions in support of" his designation under EO 13661 are arbitrary and capricious.  Am. Compl. ¶ 63 (citing § 706(2)(A) of the APA).  In Count II, in light of the redactions of classified material in the administrative record, he asserts that the agency has withheld a "full statement of reasons" for his designation and that this purported lack of sufficient post-deprivation notice violates his rights to due process, *id*. ¶ 67 (Count II), and also constitutes arbitrary and capricious agency action under the APA, *id*. ¶ 70 (Count III).  In Count IV, he contends that Treasury's decision to include him as one of the oligarchs identified in the CAATSA Report violates the APA because CAATSA supposedly required Treasury to identify oligarchs not simply by their net worth but also by their "closeness to the Russian regime." *Id*. ¶¶ 73-75.  Finally, he asserts that Defendants have failed to provide sufficient notice as to why Deripaska was identified as an oligarch in the CAATSA Report, *id*. ¶

---

[3] Because Deripaska does not challenge his designation under EO 13662, even if he prevails in this suit, he would still be an SDN.

78 — notwithstanding his assertion in Count IV that he was identified as an oligarch based on his net worth — and further alleges that Defendants have failed to provide him with a process to challenge his inclusion in the CAATSA Report, in violation of his rights to due process and the APA.  *Id.* ¶ 80 (Count V; due process); *id.* ¶ 83 (Count VI; APA).

The Amended Complaint seeks a variety of declaratory and injunctive relief, including an order rescinding his designation under EO 13661 and his inclusion as an oligarch in the CAATSA Report; an order requiring Defendants to "release any and all records underlying their decision to include Deripaska's name in the Section 241 Report"; and an order requiring Defendants to "disclose the redacted portions of the evidentiary memorandum and supporting administrative record underlying Deripaska's designation under E.O. 13661 or otherwise provide alternative means by which Deripaska can be provided sufficient notice as to the reasons for his designation under E.O. 13661."  Am. Compl., Relief Requested.   He also requests an order requiring Defendants to "retract any public statements attributing conduct to Deripaska that is unrelated to the bases for his designation" and enjoining "Defendants from making such statements in the future."  *Id.*

## LEGAL STANDARDS OF REVIEW

On a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing the court's subject-matter jurisdiction.  *E.g.*, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  "Standing is a necessary predicate to any exercise of federal jurisdiction, and if it is lacking, then the dispute is not a proper case or controversy under Article III, and federal courts do not have subject matter jurisdiction to decide the case."  *Prisology v. Fed. Bureau of Prisons*, 74 F. Supp. 3d 88, 93 (D.D.C. 2014), *aff'd*, 852 F.3d 1114 (D.C. Cir. 2017).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  For purposes of a Rule 12(b)(6) motion, the "complaint" also includes matters incorporated therein.  *E.g.*, *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) ("Matters that are not 'outside' the pleadings a court may consider on a motion to dismiss include 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint,' . . . or documents 'upon which the plaintiff's complaint necessarily relies' even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.") (citations omitted)).

Rule 12(d) authorizes the court to treat a Rule 12(b)(6) motion as a motion for summary judgment under Rule 56 where the defendants rely on matters outside the pleadings, provided that all parties have a reasonable opportunity to present all material pertinent to the motion.  Fed. R. Civ. P. 12(d); *Conant v. Wells Fargo Bank, N.A.*, 60 F. Supp. 3d 99, 106-07 (D.D.C. 2014). Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Conant*, 60 F. Supp. 3d at 107.  In the context of an APA claim, "[s]ummary judgment [] serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015) (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012)); *see also* 10 F. Supp. 3d at 117 (noting the court's "limited role" "in reviewing the administrative record" and explaining that "[w]hen assessing a summary judgment motion in an APA case, 'the district judge sits as an appellate tribunal'") (citation omitted)).

## ARGUMENT

## I.     OFAC's Designation of Deripaska Was Not Arbitrary and Capricious

In his Amended Complaint, Deripaska claims that OFAC's determination that he has purported to act, or has acted, directly or indirectly, on behalf of a senior official of the Russian Federation (i.e., Vladimir Putin) is unsupported by the administrative record and is arbitrary and capricious in violation of the APA.  Am. Compl. ¶¶ 62-64.  As explained below, OFAC's decision readily withstands scrutiny under the applicable APA standards.

### A.     OFAC's Decision is Entitled to Substantial Deference

When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).  Under the APA, this Court may hold unlawful and set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law."  *See* 5 U.S.C. § 706(2).  Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park*, 401 U.S. at 416.  An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The court may not "substitute its judgment for that of the agency" *id.*, and must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Nat'l Shooting Sports Found., Inc. v. Jones*, 716

F.3d 200, 214 (D.C. Cir. 2013) (quoting *State Farm*, 463 U.S. at 43).  In short, the agency's

decision should be affirmed as long as there is a "'rational connection between the facts found and

the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. U.S.*, 371

U.S. 156, 246 (1962)).

This deference is further heightened in cases, such as this one, that involve national

security and foreign affairs.  The Supreme Court has emphasized the need for courts to grant this

heightened deference even when considering constitutional claims; such deference is required

because courts should respect the Executive's expertise in the national security and foreign policy

arenas.  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).  Cases involving

blocking orders issued under IEEPA are no exception.  *Zevallos*, 10 F. Supp. 3d at 119

(recognizing additional deference beyond that typically accorded to an agency under the APA);

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010)

(noting that "courts owe a substantial measure of deference to the political branches in matters of

foreign policy, including cases involving blocking orders") (internal quotation marks and citation

omitted).

### B.  OFAC's Well-Reasoned Decision Easily Satisfies the APA's Standard

Applying the highly deferential standard of review required by the APA and the national

security and foreign policy nature of Deripaska's SDN designation, the Court should uphold

OFAC's decision.  The unclassified portions of the administrative record alone provide a clear,

rational basis for the agency's determination that Deripaska "acted or purported to act for or on

behalf of, directly or indirectly . . . a senior official of the Government of the Russian Federation."

EO 13661 § 1(a)(ii)(C)(1).  OFAC's redacted evidentiary memorandum setting forth the legal and

factual bases for Deripaska's designation explains that he was designated for having "Acted in

Support of Russian President Vladimir Putin's Projects," and cited an article in *The Nation*

15

reporting that "Deripaska told one of his closest associates that he bought an aluminum plant in Montenegro in 2005 'because Putin encouraged him to do it . . . the Kremlin wanted an area of influence in the Mediterranean.'"  AR 0011 (citing Exhibit 22); *see Zevallos*, 793 F.3d at 112-13 (D.C. Circuit approving use of open source materials such as newspaper articles to support an OFAC designation); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) ("[I]t is clear that the government may decide to designate an entity based on a broad range of evidence, including intelligence data and hearsay declarations.").

Deripaska contends that the article does not establish that the purchase of the aluminum plant was technically "considered to be a project of Russia President Putin," Am. Compl. ¶ 41, but Putin did not need to publicly declare that the purchase of the aluminum plant was a "project" of his for OFAC to have reasonably concluded that Deripaska had purported to act on behalf of Putin within the meaning of E.O. 13661 § 1(a)(ii)(C)(1) given his statement to his close associate that he had purchased an aluminum plant in Montenegro in response to Putin's encouragement and in light of the Kremlin's reported goal of establishing an area of influence in the Mediterranean.  AR 0011; *see Sherley v. Sebelius*, 776 F. Supp. 1, 22 (D.D.C. 2011) (explaining that "an agency is presumed to have special expertise in interpreting executive orders charged to its administration, and so judicial review must afford considerable deference to agency interpretations of such orders").  The redacted portions of OFAC's memorandum demonstrate that the agency's determination was not arbitrary and capricious and provided a rational basis for its decision.  *State Farm*, 463 U.S. at 43 (under the APA, agency decision should be upheld if there is a "rational connection between the facts found and the choice made") (internal quotation marks and citation omitted); *Zevallos*, 793 F.3d at 114 (upholding OFAC designation and stating that "when we evaluate agency action, 'we do not ask whether record evidence could support the petitioner's view

of the issue, but whether it supports the [agency's] ultimate decision'') (quoting *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C.Cir.2010)).

In addition, the classified portions of the record provide ample support for OFAC's determination.  Defendants respectfully refer the Court to pages AR 0011-12 of the administrative record and the exhibits cited therein (Exhibits 14-16, 18-20, 22-23) for a description of the key information considered by OFAC that supports Deripaska's designation.  The Government regularly relies on classified and privileged information to make determinations related to its sanctions programs and when those determinations are reviewed, it is permitted to provide that information to the Court for *ex parte*, *in camera* review pursuant to IEEPA.[4]  50 U.S.C. § 1702(c); *see Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 197 (D.C. Cir. 2001) ("[T]he record can, and in our experience generally does, encompass classified information . . . as to which the alleged terrorist organization never has any access . . . .") (internal quotations marks omitted); *Fares v. Smith*, 901 F.3d 315, 324-25 (D.C. Cir. 2018) (rejecting argument that OFAC cannot rely on undisclosed classified and law enforcement privileged information to support a designation); *Kadi*, 42 F. Supp. 3d at 24 (finding that "it was wholly proper for OFAC to rely on classified material in making its determination").

Deripaska appears to argue (Am. Compl. ¶ 42) that even if OFAC's designation is adequately supported by the administrative record, his designation is still arbitrary and capricious because the administrative record does not explicitly explain how his designation promotes the foreign policy goals set forth in EO 13661.  Deripaska plainly falls within the broad scope of EO 13661, which blocks all property and interests in property of "persons determined by the Secretary

---

[4] As noted, Defendants will lodge, on an *ex parte*, *in camera* basis, a copy of the unredacted record containing classified information with the Court when the parties file the joint appendix required by Local Civil Rule 7(n).

17

of the Treasury, in consultation with the Secretary of State . . . to have acted or purported to act for

or on behalf of, directly or indirectly . . .a senior official of the Government of the Russian

Federation."  E.O. 13661 § 1(a)(ii)(C)(1).[5]  Furthermore, as recognized repeatedly by courts in this

Circuit, appropriate deference should be accorded to the foreign policy judgments of the Executive

about what steps —authorized by statute and implemented by a Presidential Executive Order and

regulations—are best suited to accomplish its foreign policy goals.  *See OKKO Bus. PE v. Lew*,

133 F. Supp. 3d 17, 28 (D.D.C. 2015) ("Whether continued blocking is an effective strategy at

fulfilling OFAC's foreign policy objectives, however, is not a question for this court.").  *Cf.*

*Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007) (rejecting argument

that "OFAC cannot block an entity's assets unless it determines that the entity itself poses an

'unusual and extraordinary threat to national security'"); *U.S. v. McKeeve*, 131 F.3d 1, 14 (1st Cir.

1997) (rejecting argument that the government must show that "the particular goods, when or if

sold, constitute an actual threat to national security").  Courts should not constrain the President's

"broad and flexible power" under IEEPA, *id.* at 10, nor interfere with what the President

determines to be an effective bargaining strategy in the realm of foreign relations, *see Dames &*

*Moore v. Regan*, 453 U.S. 654, 673 (1981) ("[Blocking] orders . . . permit the President to

maintain the foreign assets at his disposal for use in negotiating the resolution of a declared

---

[5] EO 13661 also blocks the property and interests in property of persons listed in the Annex to the order, EO 13661 § 1(a)(i), as well as persons determined by Secretary of the Treasury, in consultation with the Secretary of State, "to be an official of the Government of the Russian Federation," *id*. § 1(a)(ii)(A), "to operate in the arms or related material sector in the Russian Federation," *id*. § 1(a)(ii)(B), "to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly:. . .a person whose property and interests in property are blocked pursuant to this order," *id*. § 1(a)(ii)(C)(2), and who have "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of: (1) a senior official of the Government of the Russian Federation; or (2) a person whose property and interests in property are blocked pursuant to this order," *id*. § 1(a)(ii)(D).

national emergency," and "[t]he frozen assets serve as a 'bargaining chip' to be used by the President when dealing with a hostile country.").

As set forth above, the administrative record amply demonstrates that OFAC's designation satisfies the highly deferential APA standard that the Court must apply here. *See Zevallos*, 10 F. Supp. 3d at 123 n.9 (explaining that a court must uphold OFAC's decision if "the evidence OFAC relied upon as a whole 'adequately supports its ultimate decision'") (citation omitted); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 (D.D.C. 2002) (decision must be affirmed if it "meets the 'minimal standards of rationality'") (quoting *Small Refiner Lead Phase-Down Task Force v. U.S. EPA*, 705 F.2d 506, 521 (D.C. Cir. 1983)).  Accordingly, there is no basis to conclude that OFAC's decision was arbitrary and capricious under 5 U.S.C. § 706(2)(A). The Court should therefore grant Defendants summary judgment on Count I of the Amended Complaint.

## II.     Deripaska's Constitutional Claims Should be Dismissed, or in the Alternative, the Court Should Grant Summary Judgment to the Government Because OFAC's Designation of Deripaska Accords With the Constitution

In Count II of his Amended Complaint, Deripaska alleges that OFAC infringed upon his Fifth Amendment right to due process by failing to adequately notify him of the basis for his designation. Am. Compl. ¶¶ 65-67.  Deripaska's arguments, however, are unsupported by fact or law.  As a foreign person lacking presence in and substantial contacts with the United States, Deripaska does not have standing to assert any constitutional rights.  In any event, the notice provided by OFAC accords with any process that Deripaska may be due.

"[N]on-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections." *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *accord Johnson v. Eisentrager*, 339 U.S. 763, 770-71 (1950).  Some constitutional protections may apply when aliens "have come within the territory of the United States and developed

substantial connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).  Although the D.C. Circuit has not directly addressed what types of connections are substantial enough to satisfy that standard within the context of an OFAC sanctions case, the Circuit's discussion of the issue in Foreign Terrorist Organization ("FTO") cases is instructive. *Cf. Kadi*, 42 F. Supp. 3d at 25-26.  In *National Council of Resistance of Iran*, the D.C. Circuit concluded that two Iranian organizations could bring a due process challenge because they had an "overt presence within the National Press Building in Washington, D.C." and a "claim[] [of] an interest in a small bank account."  251 F.3d at 201.  By contrast, in *32 County Sovereignty Committee v. Department of State*, the D.C. Circuit rejected the petitioners' claim to constitutional rights where they "demonstrated neither a property interest nor a presence in this country."  292 F.3d 797, 799 (D.C. Cir. 2002).

Here, the allegations in Deripaska's Amended Complaint do not provide a basis for him to seek relief based on the Constitution.  Deripaska acknowledges that he is a Russian citizen with no apparent physical presence in the United States, Am. Compl. ¶ 13, and he does not allege that he has property in the United States, only that "he may" hold property in the U.S., *id*. ¶ 33.  While he alleges that his "property and interests in property located within U.S. jurisdiction are blocked," *id*. ¶ 33, this is merely a description of the legal consequences of his designation, 50 U.S.C. § 1702(a)(1)(B); EO 13661, § 1(a)(ii)(C)(1), and as such is insufficient to demonstrate a substantial connection between him and this country.  *See Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (explaining that "conclusory statements and legal conclusions are insufficient to state a plausible basis for standing").  In any event, mere property ownership—in the absence of both presence and a substantial connection to this country—would be insufficient under *Verdugo* and *Jifry* to support Deripaska's claim to the protections of the Constitution.  In short, Deripaska's Amended Complaint fails to adequately allege that he is entitled to Fifth Amendment protections.

See *Verdugo-Urquidez*, 494 U.S. at 270-71.  Deripaska thus has no standing to assert any rights under the Constitution, and the Court should dismiss his Fifth Amendment claim in Count II of his Amended Complaint under Rule 12(b)(1).  Am. Compl. ¶¶ 65-67.

Even if Deripaska has standing to assert a Fifth Amendment claim— and as discussed above, he does not — the Court should nevertheless hold that OFAC's well-established administrative procedures satisfy due process.  "Due process is flexible and calls for such procedural protections as the particular situation demands."  *Gilbert v. Homar*, 520 U.S. 924, 930 (1997).  "The essence of due process is the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it."  *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (internal quotation marks omitted).  In the context of OFAC's designation of an SDN—where pre-deprivation notice is not required, *Zevallos*, 793 F.3d at 116; *Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 163-64 (D.C. Cir. 2003)—due process mandates only that OFAC provide Deripaska with "a basis from which to understand his designation, and thereby offer rebuttal arguments and evidence in response."  *Zevallos*, 10 F. Supp. 3d at 131.

Here, OFAC's disclosures provided Deripaska with sufficient post-deprivation notice.  On April 6, 2018, the day he was designated, Treasury issued a press release which explained that OFAC had determined that Deripaska had purported to act, or had acted, directly or indirectly, on behalf of a senior official of the Government of the Russian Federation, EO 13661 § 1(a)(ii)C)(1), and that he operates in the energy sector of Russia, EO 13662 § 1(a)(i).  *See* U.S. Dep't of the Treasury, Press Release.[6]  The press release noted that "Deripaska has said that he does not separate himself from the Russian state," and that he has "acknowledged possessing a Russian

---

[6] https://home.treasury.gov/news/press-releases/sm0338 (last visited August 2, 2019).

diplomatic passport, and claims to have represented the Russian government in other countries."
*Id*.  The legal basis for his designation was also repeated in the Federal Register notice published
on May 1, 2018.  83 Fed. Reg. 19138.

Furthermore, while much of the factual support for OFAC's designation of Deripaska
pursuant to EO 13661 is classified, *see supra*, as noted, the unclassified portions of OFAC's
evidentiary memorandum make clear that he was designated because "Deripaska Has Acted in
Support of Russian President Vladimir Putin's Projects."  AR 0011.  In support of this
determination, the unclassified portions of the evidentiary memorandum discuss an article in *The
Nation* reporting that Deripaska told a close associate that he bought an aluminum plant in
Montenegro in 2005 "'because Putin encouraged him to do it . . . the Kremlin wanted an area of
influence in the Mediterranean.'"  AR 0011 (quoting article at Exhibit 22 of memorandum).

This information provides a clear path for Deripaska to challenge his designation given the
process afforded to him under OFAC's regulations.  Once designated, an SDN may "seek
administrative reconsideration" of the designation, or may "assert that the circumstances resulting
in the designation no longer apply."  31 C.F.R § 501.807.  In doing so, the SDN "may submit
arguments or evidence that the person believes establishes that insufficient basis exists for the
designation," and may also "propose remedial steps on the person's part . . . which the person
believes would negate the basis for designation."  *Id.* § 501.807(a).  Pursuant to these regulations,
and given the notice that has been provided to him, Deripaska could provide OFAC with evidence
disputing the charge that he purchased an aluminum plant in Montenegro, or alternatively, he
could provide evidence regarding the commercial motivation for purchasing the plant and proffer
any other evidence tending to show that the purchase was unrelated to Putin.  *See, e.g., Fares*, 901
F.3d at 321-22 (noting that SDNs challenging their designation submitted an "independent audit"
to OFAC that was "completed by a professional-services and auditing firm" in support of their

petition for "delisting").  In addition, Deripaska could respond directly to the charges reported in *The Nation* article offered in support of OFAC's designation, Ex. 22 to AR 0099-0110, that he has taken on "numerous projects dear to Putin, such as building a new airport in Sochi for the 2014 Olympics and buying out Tajikistan's aluminum plant to help Putin reassert control over that ex-Soviet republic."  AR 0099.  Alternatively, he could seek to show that, despite his past support for Putin's projects, he no longer has any connection with the Russian regime and/or could propose, as contemplated by 31 C.F.R § 501.807, "remedial steps . . . or similar steps" to demonstrate that he will not offer future support for Putin's projects.  In short, Deripaska has a clear path to challenge the agency's designation, notwithstanding that much of the factual basis underlying his designation is classified.  *See Zevallo*s, 793 F.3d at 116-17 (finding that disclosure of unclassified portions of the record and SDN's ability to challenge his designation pursuant to 31 C.F.R. § 501.807 satisfied due process requirements of adequate notice and a meaningful opportunity to contest OFAC's designation).

To the extent Deripaska argues that the agency's use of classified information to support his designation violates his purported rights to notice under the Due Process Clause, he is mistaken.  As explained, IEEPA expressly authorizes OFAC to rely upon classified information in an administrative record to support a designation.  *See* IEEPA, 50 U.S.C. § 1702(c) ("[I]f the determination was based on classified information . . . such information may be submitted to the reviewing court ex parte and in camera").  In addition, the D.C. Circuit has repeatedly held that due process only requires the agency to provide the unclassified portions of the administrative record. See *Holy Land Found*., 333 F.3d at 164 (finding that "'due process require[s] the disclosure of only the unclassified portions of the administrative record'") (quoting *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1242 (D.C.Cir.2003); *Nat'l Council of Resistance of Iran*, 251 F.3d at 208–09 (holding that under due process clause, agency "need not

disclose the classified information to be presented *in camera* and *ex parte* to the court," and that "[t]his is within the privilege and prerogative of the executive, and we do not intend to compel a breach in the security which that branch is charged to protect"); *see also Jifry*, 370 F.3d at 1183-84 (D.C. Circuit holding that government satisfied notice requirements of due process by informing pilots, all foreign nationals, that their airmen certificates had been revoked based on TSA's determination that they were a "security threat" without requiring agency to disclose the reasons for the determination, which were classified).

Thus, even if the Court were to reach the merits of Deripaska's due process claim, it should grant summary judgment to the Defendants pursuant to Rule 56.

## III.    Deripaska Was Provided With Sufficient Notice Under the APA

In Count III of his Amended Complaint, Deripaska recasts his notice-based due process argument as an APA claim.  Am. Compl. ¶¶ 68-70.  This claim fares no better under the APA. While the APA requires OFAC to provide Deripaska with the administrative record underlying his designation, *see supra*, OFAC is only required under the APA to disclose the unclassified portions of the record to him.  *See, e.g., Sulemane v. Mnuchin*, 2019 WL 77428, No. 16-1822, at *7 (D.D.C. January 2, 2019) (explaining that the APA "does not require OFAC to provide Sulemane the classified or law enforcement-privileged information supporting th[e] grounds" for his designation).  Deripaska does not explain what beyond the unclassified portions of the administrative record would be required by the APA.  In any event, as explained above in response to Deripaska's due process claim, whatever level of notice might be required by the APA was satisfied here in light of the April 6, 2018 press release, the May 1, 2018 Federal Register notice announcing his designations, and the redacted portions of the administrative record, including the redacted portions of OFAC's evidentiary memorandum, which set forth the legal and unclassified factual basis for Deripaska's designation.  *See supra*.  Accordingly, the Court should therefore

24

dismiss Count III of the Amended Complaint pursuant to Rule 12(b)(6) or, in the alternative, grant

summary judgment to Defendants under Rule 56.[7]

## IV.    The Sufficiency of the CAATSA Report Submitted to Congress is Not Justiciable, But In Any Event Deripaska's CAATSA-Related Challenges Fail On The Merits

Deripaska brings both an APA and due process challenge to his inclusion as an oligarch in

a January 2018 report that Treasury provided to Congress pursuant to Section 241 of CAATSA

("CAATSA Report" or "Report").  Treasury expressly stated in the CAATSA Report that it had

compiled the list of Russian oligarchs by including persons with a net worth of at least one billion

dollars.  CAATSA Report at 1.  In Count IV, Deripaska contends that Treasury violated the APA

because CAATSA supposedly required Treasury to consider an individual's "closeness to the

Russian regime" before determining whether the individual qualified as an oligarch.  Am. Compl.

¶ 73.  Despite his clear understanding of why he was listed as an oligarch in the Report, in Count

V, Deripaska contends that Defendants violated his rights to due process because Treasury

allegedly failed to provide him adequate notice of why he was included in the Report as well as

"an opportunity to challenge his inclusion in the Section 241 Report."  *Id.* ¶¶ 77-80.  Finally, in

Count VI, Deripaska contends that this alleged failure to provide him with notice and an

opportunity to challenge his inclusion in the Report violated the APA.  *Id.* ¶¶ 81-83.

Deripaska's CAATSA-related claims fail.  First, these claims are not justiciable, as the

adequacy of the CAATSA report is not subject to judicial review, nor does it constitute final

---

[7] In the event the Court were to find that the notice provided by OFAC was inconsistent with the APA, the proper remedy would be a remand to the agency, not an order vacating Deripaska's designation.  *See, e.g.*, *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal.");  Am. Compl., Prayer for Relief (requesting that Court vacate and rescind Deripaska's designation under EO 13661).

agency action for purposes of the APA because the report expressly states that an individual's inclusion on the oligarch list does not carry legal consequences, nor should it be viewed as evidence of improper or illegal behavior.  For the same reason, Deripaska lacks standing to challenge his inclusion in the report.  On the merits of his APA claim, Deripaska is wrong that CAATSA required Treasury to consider an individual's closeness to the Russian regime before including that person as an oligarch — that criterion is instead relevant to whether a Russian citizen should be listed as a "senior political figure" in the Report.  As to Deripaska's due process claim, for the reasons set forth above, as a foreign national who has failed to adequately allege presence in and substantial contacts with the U.S., he lacks constitutional rights.  But, in any event, this claim fails on the merits.  Finally, his claim in Count VI that the APA required Treasury to provide him with notice and opportunity to challenge his inclusion in the CAATSA Report is not justiciable.  Am. Compl. ¶¶ 81-83.

### A.     The Adequacy of the CAATSA Report Is Not Subject To Judicial Review

Because Treasury submitted the oligarch list (as well as the remainder of the unclassified report and its classified annex) to Congress in response to Congress's demand for such information, *see* CAATSA § 241(a), (b), Plaintiff's various challenges to the CAATSA Report are not reviewable here.  Courts have repeatedly held that Congressional reporting requirements are "committed to *congressional* discretion in measuring the fidelity of the Executive Branch actor to legislatively mandated requirements."  *Nat'l Resources Def. Council v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988).  In *Hodel*, an appropriations act required an agency to report to Congress "in detail" why the agency declined to accept particular leasing proposals, and plaintiff argued that the agency had not provided sufficient explanation in its statement to Congress.  *Id.* at 316.  The D.C. Circuit rejected this claim, concluding that such reporting provisions are not subject to the "general presumption of reviewability of agency action," "most importantly" because such

executive responses are "an entirely different sort of agency action" than normal agency action, *i.e.*, where the agency has exercised its delegated powers. *Id.* at 318. Under these circumstances, "the Executive Branch officer is simply reporting back to the source of its delegated power [i.e. Congress]," and thus Congress—not courts—is charged with ensuring the adequacy of that report. *Id.* at 318-19 ("In short, in the absence of a congressional directive for judicial review of claims by non-congressional parties, this issue seems to us quintessentially within the province of the political branches to resolve as part of their ongoing relationships.").

The same is true of CAATSA. Here, Congress directed Treasury to provide it certain types of information, *see* CAATSA § 241(a), and in a certain way, *i.e.*, "in an unclassified form, but may contain a classified annex," CAATSA § 241(b). Treasury provided what was requested, and the adequacy of the CAATSA Report is to be determined solely by Congress and is not justiciable. *See, e.g.*, *Coll. Sports Council v. Gov't Accountability Office*, 421 F. Supp. 2d 59, 68 (D.D.C. 2006) (rejecting APA claim alleging deficiencies and misstatements in report to Congress, explaining that "[w]here a report is 'not explicitly or implicitly intended as anything more than a vehicle to inform Congress,' it is for Congress alone to 'determine if the Report satisfies the statutory requirements it enacted.'") (quoting *Nat. Resources Defense Council v. Lujan*, 768 F. Supp. 870, 882) (D.D.C. 1991)).

## B. Plaintiff Lacks Standing to Challenge the CAATSA Report

Moreover, Deripaska has not carried his burden to show "the irreducible constitutional minimum of standing," which requires an "injury in fact," that is "fairly. . .trace[able] to the challenged action of the defendant," and "likely" to "be redressed by a favorable decision." *Lujan v. Defenders of* Wildlife, 504 U.S. 555, 560-61 (1992) (alterations in original). Here, Treasury caveated the report, stating that a person's inclusion in the list of oligarchs neither carries any legal consequences for the individual, nor should be taken as evidence that he or she has engaged in any

improper or illegal behavior.  *See* CAATSA Report at 2 (explaining that inclusion on the list is not indicative of involvement "in malign activities," "does not, in and of itself, imply, give rise to, or create any other restrictions, prohibitions, or limitations on dealings with such persons by either U.S. or foreign persons," and "does not constitute the determination by any agency that any of those individuals or entities meet the criteria for designation under any sanctions program").  Nevertheless, Plaintiff identifies alleged injuries supposedly stemming from third parties disregarding Treasury's clear statements in the CAATSA Report.  *See* Am. Compl. ¶ 28 (alleging that after his inclusion in the CAATSA Report, "several of the banks at which [Deripaska's] companies maintained accounts began to close those accounts").  But where, as here, standing "depends on the unfettered choices made by independent actors," it is "ordinarily substantially more difficult to establish," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (internal quotation marks and citations omitted), and Plaintiff has not done so.  He has not shown that a favorable ruling that removes him from the CAATSA Report—which was provided to Congress more than a year-and-half ago—would cause third parties to reevaluate and correct their purported misapprehensions.  *See Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1274 (D.C. Cir. 2007) ("[S]tanding to challenge a government policy cannot be founded merely on speculation as to what third parties will do in response to a favorable ruling.").

### C.    Treasury's Report Does not Constitute Final Agency Action for Purposes of the APA

Plaintiff's APA claim is also not justiciable because this Court's "authority to review the conduct of an administrative agency is limited to cases challenging 'final agency action.'" *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (quoting 5 U.S.C. § 704)); *see also Am. Forest Res. Council v. Hall*, 533 F. Supp. 2d 84, 90 (D.D.C. 2008).  "[T]wo conditions must be satisfied for agency action to be 'final.'" *Bennett v.*

*Spear*, 520 U.S. 154, 177 (1997).  "First, the action must mark the consummation of the agency's

decisionmaking process," and "second, the action must be one by which rights or obligations have

been determined, or from which legal consequences will flow."  *Id.* at 177-78 (internal quotation

marks omitted).  "[A]ctions that are 'purely advisory and in no way affected the legal rights of the

relevant actors,' fall outside the definition of 'final agency action.'"  *Trudeau v. Fed. Trade

Comm'n*, 384 F. Supp. 2d 281, 289 (D.D.C. 2005) (quoting *Bennett*, 520 U.S. at 178), *aff'd on

other grounds*, 456 F.3d 178 (D.C. Cir. 2006).

Because Treasury's identification of Deripaska as a Russian oligarch in the CAATSA

Report does not determine any rights or obligations, and "[n]o legal consequences flow from the

agency's conduct," *Reliable Automatic Sprinkler*, 324 F.3d at 732, the CAATSA Report does not

constitute final agency action that would be reviewable under the APA.  CAATSA does not

impose legal repercussions for those identified in Treasury's list, as Section 241 merely requires

the provision of a report, and Treasury disclaims any such effects in the report itself.  *See Nat'l

Ass'n of Home Builders v. Norton*, 415 F.3d 8, 14 (D.C. Cir. 2005) ("An agency's past

characterization of its own action, while not decisive, is entitled to respect in a finality analysis.").

Although CAATSA did not require Treasury to explain the report to the public at all, Treasury

expressly caveated the report, stating that a person's inclusion in the list of oligarchs neither

carries any legal consequences for the individual, nor should be taken as evidence that he or she

has engaged in any improper or illegal behavior: "the inclusion of individuals or entities in this

report, its appendices, or its classified annexes does not, in and of itself, imply, give rise to, or

create any other restrictions, prohibitions, or limitations on dealings with such persons by either

U.S. or foreign persons."  CAATSA Report at 2.  Moreover, the agency explained that the list of

oligarchs "is not a sanctions list . . . and in no way should be interpreted to impose sanctions on

those individuals" identified.  *Id.*  Inclusion on the list does not "constitute the determination by

any agency that any of those individuals . . . meet the criteria for designation under any sanctions program." *Id.* Indeed, Treasury emphasized that a person's presence on the list does not "indicate that the U.S. Government has information about the individual's involvement in malign activities." *Id.*

Though Deripaska alleges that after his inclusion in Treasury's Report some banks closed certain accounts belonging to his companies, *see* Am. Compl. ¶ 28, these allegations refer to the conduct of third parties and are not attributable to Defendants. Accordingly, they are "practical consequences, not legal harms that can transform the Report[] into a final agency [action]." *Joshi v. Nat'l Transp. Safety Bd.*, 791 F.3d 8, 11-12 (D.C. Cir. 2015). Accordingly, Plaintiff's APA claim should be dismissed.

### D.   CAATSA Does Not Require Treasury to Identify Oligarchs Based On their Proximity to the Russian Regime

Plaintiff's APA claim in Count IV alleging that CAATSA required Treasury to consider an individual's closeness to the Russian regime before including the individual as an oligarch in the CAATSA Report fares no better on the merits. Am. Compl. ¶¶ 73-75. Indeed, that claim is at odds with the determination from Treasury's Office of Inspector General that the agency complied with Section 241 of CAATSA. Audit Report at 7.

CAATSA contains no mandate to consider a putative Russian oligarch's closeness to the Russian regime. Instead, section 241(a)(1)(A) instructs Treasury to identify two sets of Russian individuals for purposes of its report: "the most significant senior foreign political figures" and "oligarchs." Those lists are to be compiled based on two criteria: "closeness to the Russian regime" and "net worth." CAATSA § 241(a)(1)(A). The statute does not require that *both* criteria be used to determine *both* lists of individuals, and a reasonable interpretation of the statute calls for using the first criterion to determine the first list of individuals (*i.e.,* closeness to the Russian

regime in determining the most significant senior foreign political figures) and the second criterion to determine the second list of individuals (*i.e.,* net worth in identifying oligarchs).

Further weighing against Plaintiff's interpretation, CAATSA incorporated the definition of "senior foreign political figure" found at 31 C.F.R. § 1010.605.  *See* CAATSA § 241(c)(2).  That regulation defines senior foreign political figures as individuals who possess or possessed "substantial authority over policy, operations, or the use of government-owned resources" while in (1) a foreign government's executive, legislative, administrative, military, or judicial branch; (2) a major foreign political party; or (3) a foreign government-owned commercial enterprise.  31 C.F.R. § 1010.605(p).  This definition focuses on an individual's authority and position, not one's net worth.  And because CAATSA directs Treasury to identify not just "[s]enior foreign political figures," but rather "*the most significant* senior foreign political figures," CAATSA § 241(a)(1)(A) (emphasis added), the statute is reasonably interpreted to require consideration of a senior foreign political figure's "closeness to the Russian regime" in making those determinations, as that factor sheds light on both the authority and position held by the individual in question.  In contrast, the "net worth" criterion bears no relevance to the definition of "senior foreign political figure" incorporated by CAATSA, and thus that criterion is reasonably interpreted only to have applicability for determining whether an individual should be identified as an oligarch.

Had Congress demanded that Treasury consider "closeness to the Russian regime" when identifying its list of oligarchs, it would likely have said so.  For example, the Stop Corrupt Iranian Oligarchs and Entities Act ("SCIOE") was introduced in the House of Representatives on November 28, 2018.  *See* H.R. 7182, 115th Cong. § 2 (2018).  Like CAATSA, it would require Treasury to identify in a report for Congress "the most significant senior foreign political figures and oligarchs in Iran."  *Id*. § 2(a)(1)(A).  But unlike CAATSA, the SCIOE expressly states that "the most significant senior foreign political figures and oligarchs in Iran" would be "determined

31

by the closeness to the Iranian Government of *each such figure and oligarch*, and the estimated net worth of *each such figure and oligarch*." *Id*. (emphasis added).  The different language in that bill demonstrates that Congress knows how to combine such requirements, and that CAATSA did not adopt such an approach, at a minimum, confirms the reasonableness of Treasury's interpretation.

Accordingly, Deripaska's APA claim in Count IV of his Amended Complaint should be dismissed or, alternatively, summary judgment should be granted to the Defendants.

> **E.      Defendant's Demand for Further Notice and an Opportunity to Challenge his Inclusion in the CAATSA Report is not Justiciable and Fails on the Merits**

Deripaska contends that Treasury was required to provide him with "a full statement of reasons" for including him as an oligarch in the CAATSA Report along with an opportunity to challenge Treasury's decision to include him in the Report.  Am. Compl. ¶¶ 79-80.  He contends that the failure to provide him with adequate notice and a means to challenge his inclusion in the Report violated his rights to due process, and alleges that the failure to provide adequate notice violated the APA.  *Id*. ¶¶ 76-83.  As seen below, he is mistaken.

> **1.      Deripaska's APA Claim That Treasury Must Provide Additional Notice why he was Identified as an Oligarch Fails**

For the reasons set forth at length above, Deripaska's APA claim in Count VI of his Amended Complaint is not justiciable.  Am Compl. ¶¶ 81-83.  As explained, the CAATSA Report does not constitute final agency action for purposes of the APA and its adequacy is not subject to judicial review.  *See supra*.  Deripaska also lacks standing to challenge the report under the APA because it does not have legal consequences.  *Id*.  Moreover, Deripaska knows why he was included in the report: as he acknowledges, the CAATSA Report expressly states that Russian nationals were included in the list of oligarchs if they have a net worth of at least one billion dollars.  CAATSA Report at 1; Am. Compl. ¶ 21.  To the extent Deripaska is seeking access to

information in the classified annex of the CAATSA Report, he has no entitlement to that information for the reasons set forth above.  Accordingly, Deripaska's APA claim in Count VI should be dismissed.

### 2.      *Deripaska's Due Process Challenge to the CAATSA Report Also Fails*

In Count V, Deripaska alleges that the failure to provide him with further reasons as to why he was included in the CAATSA Report and a process to challenge his inclusion in the Report also violates his rights to due process.  However, he cannot bring a claim under the Due Process Clause because he has not adequately alleged presence in and substantial contacts with the U.S. sufficient to confer due process rights upon him.  *See supra*.

While Deripaska complains about the alleged harms that supposedly resulted from his identification as an oligarch in the CAATSA Report, Am. Compl. ¶ 28 (alleging that several banks closed accounts of his companies following the issuance of the Report), these purported reactions by third parties do not establish a viable procedural due process claim, especially given Treasury's explicit statement in its Report that inclusion on the list of oligarchs neither imposes any "restrictions, prohibitions, or limitations on dealings with such persons," nor "indicate[s] that the U.S. Government has information about the individual's involvement in malign activities." CAATSA Report at 2.  "As the Supreme Court has repeatedly stated, 'the range of interests protected by procedural due process is not infinite.'"  *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 119 (D.C. Cir. 2010) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972)). Liberty and property interests cognizable under the Fifth Amendment "attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law," and thus "the procedural guarantees of the [Fifth] Amendment apply whenever the State seeks to remove or significantly alter that protected status."  *Paul v. Davis*, 424 U.S. 693, 710-11 (1976).

A person's "interest in reputation," however, "is quite different from [such] 'liberty' or 'property' [interests]." *Id*. at 711-12. "[A]ny harm or injury to that [reputational] interest, even where . . . inflicted by an officer of the State, does not result in a deprivation of any 'liberty' or 'property' recognized by state or federal law, nor [does] it work[] any change of. . . status as theretofore recognized under the State's laws." *Id*. at 712. One's interest in one's own reputation, therefore, "is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law." *Id*.

Courts have thus long held that "stigma alone is insufficient to invoke due process protections." *Gen. Elec*., 610 F.3d at 121; *see also Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (noting that Court's decision in *Paul v. Davis* "turn[ed] . . . on the lack of any constitutional protection for the interest in reputation"). This includes purported financial injuries that flow from reputational harm allegedly inflicted by the Government. Harm to "business interests . . . cannot qualify as a deprivation of liberty because it does not amount to a change in legal status." *Mosrie v. Barry*, 718 F.2d 1151, 1162 (D.C. Cir. 1983). This is because "[t]he reaction of others to unfavorable publicity about a person" constitutes not a "change in legal status imposed by the government officials who generated the publicity," but rather "'sanctions applied by public disapproval, not by law.'" *Id*. (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 184 (1951) (Jackson, J., concurring)).

Accordingly, in addition to not being justiciable, Deripaska's procedural due process challenge to the CAATSA Report fails to state a claim for relief and should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Defendants' motion to dismiss or, in the alternative, motion for summary judgment and enter judgment in favor of Defendants on all claims.

Dated August 2, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director

*/s/ Nicholas Cartier*
Nicholas Cartier
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 616-8351
Fax: (202) 616-8470
Email:  Nicholas.Cartier@usdoj.gov

35