**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| OLEG DERIPASKA,<br><br>            Plaintiff,<br><br>      v.<br><br>STEVEN T. MNUCHIN, Secretary of the<br>UNITED STATES DEPARTMENT OF<br>THE TREASURY, ANDREA M. GACKI,<br>DIRECTOR OF THE OFFICE OF<br>FOREIGN ASSETS CONTROL,<br><br>            Defendants. | Civil Action No. 19-cv-00727 (APM) |

**<u>MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT ........................................................................................................................4

I.    Deripaska's Designation Under E.O. 13661 was not Arbitrary and Capricious...................4

      A.    Deripaska's Designation Complied With IEEPA .......................................................4

      B.    OFAC Reasonably Concluded That Deripaska Acted or Purported to Act
            for or on Behalf of, Directly or Indirectly, a Senior Russian Official (Putin) ...........7

            1.    E.O. 13661 Does not Require OFAC to Establish That Deripaska
                  Acted as Putin's Agent..................................................................................8

            2.    The Administrative Record Provides a Reasonable Basis to Conclude
                  That Deripaska Acted for or on Behalf of Putin. ..........................................11

II.   Deripaska's Opposition Provides no Basis to Find That he can Raise a
      Due Process Claim, and That Claim Also Fails on the Merits.............................................14

      A.    Deripaska Lacks "Substantial Connections" to the U.S..............................................14

      B.    Deripaska's Due Process Claim Fails on the Merits...................................................17

III.  The APA Does not Require OFAC to Provide Deripaska With a Summary of
      Classified Information in the Administrative Record. ..........................................................24

IV.   Deripaska's CAATSA-Related Challenges are not Justiciable and Fail on the Merits .......25

      A.    The Adequacy of the CAATSA Report is not Subject to Judicial Review..............26

      B.    Treasury's Report Does not Constitute Final Agency Action for Purposes
            of the APA ...............................................................................................................29

      C.    Deripaska Lacks Standing to Challenge the CAATSA Report...............................31

      D.    Deripaska's Challenge to the Sufficiency of the CAATSA Report Fails
            on the Merits Because Treasury was not Required to Identify Oligarchs
            Based on Their Closeness to the Russian Regime ...................................................32

      E.    Deripaska's Request for Further Notice and an Opportunity to
            Challenge his Inclusion in the CAATSA Report is not Justiciable
            and Fails on the Merits.............................................................................................35

CONCLUSION ...................................................................................................................36

# TABLE OF AUTHORITIES

CASES

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*
  686 F.3d 965 (9th Cir. 2012)........................................................................................20, 21, 22

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................................16

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................................15

*Bennett v. Donovan,*
  4 F. Supp. 3d 5 (D.D.C. 2013) ................................................................................................9

*Bennett v. Spear,*
  520 U.S. 154 (1997) ..........................................................................................................29, 31

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156 (1962) ................................................................................................................12

*Chai v. Dep't of State,*
  466 F.3d 125 (D.C.Cir.2006) ................................................................................................20

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ................................................................................................................11

*Coll. Sports Council v. Gov't Accountability Office,*
  421 F. Supp. 2d 59 (D.D.C. 2006) ..................................................................................27, 28

*Connecticut Nat. Bank v. Germain,*
  503 U.S. 249 (1992) ................................................................................................................33

*Dalton v. Specter,*
  511 U.S. 462 (1994) ................................................................................................................30

*Dames & Moore v. Regan,*
  453 U.S. 654 (1981) ..................................................................................................................7

*Fares v. Smith,*
  901 F.3d 315 (D.C. Cir. 2018) ....................................................................................18, 22, 24

*FBME Bank Ltd. v. Lew,*
  125 F. Supp. 3d 109 (D.D.C. 2015) ..................................................................................19, 20

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA,*
  313 F.3d 852 (4th Cir. 2002)................................................................................................29

*FTC v. Standard Oil Co.*,
   449 U.S. 232 (1980) ............................................................................................30

*Gen. Elec. Co. v. Jackson*,
   610 F.3d 110 (D.C. Cir. 2010) ...........................................................................35

*Guerrero v. Clinton*,
   157 F.3d 1190 (9th Cir. 1998) ......................................................................27, 29

*Heartland Reg'l Med. Ctr. v. Sebelius*,
   566 F.3d 193 (D.C. Cir. 2009) ...........................................................................23

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003),
   *cert. denied*, 540 U.S. 1218 (2004) ....................................................13, 19, 21, 24

*Islamic Am. Relief Agency v. Gonzales*,
   477 F.3d 728 (D.C. Cir. 2007) .............................................................................6

*Jifry v. FAA*,
   370 F.3d 1174 (D.C. Cir. 2004) ................................................... 18-19, 20, 21, 24

*Jo v. Dist. of Columbia*,
   582 F. Supp. 2d 51 (D.D.C. 2008) .....................................................................16

*Johnson v. Eisentrager*,
   339 U.S. 763 (1950) ............................................................................................15

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
   341 U.S. 123 (1951) ............................................................................................36

*Kadi v. Geithner*,
   42 F. Supp. 3d 1 (D.D.C. 2012) ...............................................................15, 16, 21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................31

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ............................................................................................22

*Mosrie v. Barry*,
   718 F.2d 1151 (D.C. Cir. 1983) .........................................................................36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................................................12, 13, 22

*Nat. Res. Def. Council v. Hodel*,
   865 F.2d 288 (D.C. Cir. 1988) .............................................................26, 27, 28, 29

iii

*Nat. Res. Def. Council v. Lujan,*
   768 F. Supp. 870 (D.D.C. 1991) ............................................................27, 28

*Nat'l Council of Resistance of Iran v. Dep't of State,*
   251 F.3d 102 (D.C. Cir. 2001) ............................................... *passim*

*OKKO Bus. PE v. Lew,*
   133 F. Supp. 3d 17 (D.D.C. 2015) ............................................................6

*Paul v. Davis,*
   424 U.S. 693 (1976) ............................................................35

*People's Mojahedin Org. of Iran v. Dep't of State,*
   182 F.3d 17 (D.C. Cir. 1999) ............................................................15

*People's Mojahedin Org. of Iran v. Dep't of State,*
   327 F.3d 1238 (D.C. Cir. 2003) ............................................................19

*People's Mojahedin Org. of Iran v. Dep't of State,*
   613 F.3d 220 (D.C. Cir. 2010) ............................................................20, 23

*Potter v. United States,*
   155 U.S. 438 (1894) ............................................................9

*Renal Physicians Ass'n v. HHS,*
   489 F.3d 1267 (D.C. Cir. 2007) ............................................................32

*Schindler Elevator Corp. v. United States ex rel. Kirk,*
   563 U.S. 401 (2011) ............................................................9

*Sherley v. Sebelius,*
   776 F. Supp. 2d 1 (D.D.C. 2011) ............................................................11

*Smith v. City of Jackson,*
   544 U.S. 228 (2005) ............................................................34, 35

*United States v. Fantin,*
   130 F. Supp. 2d 385 (W.D.N.Y. 2000) ............................................................17

*United States v. Verdugo-Urquidez,*
   494 U.S. 259 (1990) ............................................................14

*United States v. White,*
   869 F.2d 822 (5th Cir. 1989) ............................................................27

*Williams v. Lew,*
   819 F.3d 466 (D.C. Cir. 2016) ............................................................15

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
  750 F. Supp. 2d 150 (D.D.C. 2010) ........................................................12

*Zevallos v. Obama*,
  10 F. Supp. 3d 111 (D.D.C. 2014),
  *aff'd*, 793 F.3d 106 (D.C. Cir. 2015) ...........................................12, 14, 18, 22

STATUTES

5 U.S.C. § 704 .............................................................................................28

50 U.S.C. § 1701 .......................................................................................4, 6

50 U.S.C. § 1702 .....................................................................................15, 20

50 U.S.C. §§ 1701-1706 ............................................................................4, 6

EXECUTIVE AND ADMINISTRATIVE MATERIALS

31 C.F.R. pt. 589 ...........................................................................................8

31 C.F.R. § 589.802 ......................................................................................8

31 C.F.R. § 597.101(a) ................................................................................10

31 C.F.R. § 597.301(a) ................................................................................10

31 C.F.R. § 1010.605 ...................................................................................33

Exec. Order 13,661, 79 Fed. Reg. 15,535 (March 16, 2014),................... *passim*

Exec. Order 13,662, 79 Fed. Reg. 16,169 (March 20, 2014) ................3, 6, 30

Exec. Order 13,582, 76 Fed. Reg. 52,209 (August 17, 2011)......................5

OTHER AUTHORITIES

Restatement (Second) of Agency § 1 (1958) .......................................7, 9, 10

Stop Corrupt Iranian Oligarchs and Entities Act,
  H.R. 7182, 115th Cong. § 2(a)(1)(A) (Nov. 28, 2018) ..........................33

*Report to Congress Pursuant to Section 241 of the CAATSA Regarding Senior*
  *Foreign Political Figures and Oligarchs in the Russian Federation and Russian*
  *Parastatal Entities*.....................................................................24, 29, 30

Treasury, Office of Ins. Gen. Audit Report OIG-19-033, *Audit of the Office of*
  *Terrorism and Financial Intelligence's Report on Section 241 of the Countering*
  *America's Adversaries Through Sanctions Act* (Feb. 22, 2019) .................33

U.S. Dep't of the Treasury, Press Release, *Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity* (April 6, 2018) ...............5, 30

The American Heritage Dictionary (Fifth ed. online 2019) ............................................. 8-9, 10, 13

Merriam-Webster Dictionary (online ed. 2019) ...............................................................................9

**INTRODUCTION**

Plaintiff Oleg Deripaska was designated by the U.S. Treasury's Office of Foreign Assets Control ("OFAC") based on two executive orders promulgated by the President in response to Russia's aggressive actions in the Ukraine. Specifically, on April 6, 2018, OFAC designated Deripaska pursuant to Executive Order 13661 ("E.O. 13661") based on the agency's determination that he acted or purported to act for or on behalf of, directly or indirectly, a senior Russian official given his support for Vladimir Putin's projects. Deripaska was also designated by OFAC under Executive Order 13662 ("E.O. 13662") for operating in the energy sector of the Russian economy, but after receiving the administrative record he dropped his challenge to this designation. *See* Am. Compl. ¶ 6, ECF No. 7.

In the government's opening brief, we explained that while the classified portion of the administrative record provides ample support for the agency's determination that Deripaska acted for or on behalf of Putin, the unclassified record by itself easily satisfies the governing standard of review provided by the Administrative Procedure Act ("APA"). Indeed, Deripaska's opposition does not meaningfully dispute that the unclassified portions of the record show that he undertook actions to support Putin's projects, but he maintains that this evidence does not establish that he acted as Putin's "agent." But the operative language of E.O. 13661—to "act for or on behalf of"—does not require that Deripaska act as the agent of or subject to a senior Russian official's control. Instead, the ordinary meaning of this language encompasses conduct in which a person acts "in the interest of" or "for the benefit of" a senior Russian official. Deripaska plainly has done so. He acted in the interest of and for the benefit of Putin when, as reported in an article from *The Nation* that is part of the unclassified record, he purchased an aluminum plant in Montenegro in response to Putin's encouragement in order to allow the Kremlin to establish a foothold in the Mediterranean. Deripaska points to nothing in the record that contradicts this

reporting nor does he offer any extra-record evidence that casts doubt on *The Nation*'s reporting. Therefore, this Court can and should find that OFAC's designation of Deripaska under E.O. 13661 was not arbitrary and capricious based *solely* on the unclassified portions of the record.

As a result, the Court does not need to reach Deripaska's argument that due process requires OFAC to summarize classified information in the administrative record given that the unclassified record provides adequate support for his designation. As an initial matter, however, Deripaska's Amended Complaint fails to allege the sort of "substantial connections" required for such a foreign national to invoke the protections of the U.S. Constitution. While his Amended Complaint alleges that he "may" hold property in the U.S., that is clearly insufficient to establish his right to bring a constitutional claim. In his opposition, Deripaska continues to refuse to identify any property interests in this country, which either confirms that he does not have property in this country or seems designed to avoid having any such property blocked. In either case, he cannot bring a claim based on constitutional protections to which he is not entitled. But in the event the Court disagrees, the Court should reject Deripaska's argument that due process required OFAC to provide summaries of the classified portions of the record. While the D.C. Circuit has permitted the use of summaries to support an OFAC designation, it has never held that due process *requires* such summaries. Indeed, the D.C. Circuit has repeatedly upheld the Executive's use of classified information to support various actions adverse to foreign nationals without requiring that the government provide insight into the classified intelligence reporting that forms the basis of the government's actions. While Deripaska recasts his due process notice argument as an APA claim, he provides no support for the proposition that the APA requires an agency to provide extra-record summaries of classified information. In any event, the unclassified record provides a sufficient statement of the reasons for his designation, fully satisfying OFAC's obligations under the APA.

Deripaska's challenge to a report submitted by Treasury to Congress pursuant to the Countering America's Adversaries Through Sanctions Act ("CAATSA") identifying him as an "oligarch" based on his net worth is not subject to judicial review because Congress alone determines the adequacy of an agency's informational report submitted in response to a Congressional reporting requirement.  Treasury expressly caveated the list of Russian oligarchs, explaining that it was not a sanctions list and had no operative legal consequences.  Deripaska therefore lacks standing to challenge the adequacy of the report and fails to show that it constitutes a final agency action for purposes of the APA.  On the merits, Treasury's interpretation of Congress's requirement to identify Russian "oligarchs" in section 241 of CAATSA was reasonable, and by including nearly one hundred oligarchs based solely on their net worth (the vast majority of whom have never been sanctioned), this interpretation reduced the risk that third parties would interpret the oligarch list as a presumptive sanctions list.  Finally, his claim that he was not provided adequate notice under the Due Process Clause or the APA of the grounds for his inclusion in the CAATSA report not only fails because he cannot bring a constitutional claim and because his challenge is not justiciable under the APA, but is belied by Deripaska's lengthy complaint that he was included in the report based solely on his net worth.  In short, Deripaska knows precisely why he was included in the report and has cited no authority to show that he has an entitlement to any particular administrative process to challenge his inclusion in an informational, advisory report to Congress.

For all these reasons, OFAC's designation of Deripaska pursuant to E.O. 13661 and his inclusion on OFAC's "Specially Designated Nationals and Blocked Persons" list ("SDN List") as well as in Treasury's CAATSA report were not arbitrary and capricious and satisfied any applicable constitutional requirements.  Accordingly, the Court should grant Defendants' motion to dismiss or in the alternative grant summary judgment to the government on all counts in

Deripaska's Amended Complaint.[1]  *See generally* Defendants' Mot. to Dismiss or, in the Alternative, Mot. for Summ. J. ("Defs.' MTD/MSJ"), ECF No.9-1.

## ARGUMENT

### I.     Deripaska's Designation Under E.O. 13661 was not Arbitrary and Capricious

#### A.     Deripaska's Designation Complied With IEEPA

Deripaska argues that OFAC's decision to designate him pursuant to E.O. 13661 under the authority of the International Emergency Economic Powers Act ("IEEPA") 50 U.S.C. §§ 1701-1706, was arbitrary and capricious because it allegedly violated IEEPA's requirement that the President declare a national emergency before imposing economic sanctions under the statute. Mem. of Points and Authorities in Supp. of Pl.'s Cross-Mot. for Summ. J. and in Opposition to Defendants' Mot. to Dismiss or, in the Alternative, Mot. for Summ. J. ("Pl.'s Opp.") at 12-13, ECF No. 11-1; *see also* 50 U.S.C. § 1701(b) (authorities granted to President in IEEPA "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared").  Deripaska erroneously contends that he was designated in response to Russia's "worldwide malign activity," but that no national emergency has been declared with respect to such activities.  *Id.*

Deripaska was designated under E.O. 13661 for having acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Russian government—namely, Vladimir Putin.  *See* AR 09-13.  And there can be no dispute that E.O. 13661 was promulgated by President Obama in response to a Presidentially-declared national emergency with respect to Russia's

---

[1] As noted, Deripaska does not challenge his designation pursuant to E.O. 13662 for operating in the energy sector of the Russian economy and has stated that he intends to file an administrative petition for reconsideration of this designation. *See* Am. Compl. ¶ 6; Blocking Property of Additional Persons Contributing to the Situation in Ukraine, Exec. Order No. 13,662, 79 Fed. Reg. 16,169 (March 20, 2014).  Since that designation remains in place, even success by Deripaska in this action does not mean that he will be delisted by OFAC.

invasion of Ukraine.  *See* Blocking Property of Additional Persons Contributing to the Situation in

Ukraine, Exec. Order No. 13,661, 79 Fed. Reg. 15,535 (March 19, 2014) (preamble).  The

preamble to that executive order stated, "I, Barack Obama, President of the United States, hereby

expand the scope of the national emergency declared in Executive Order 13660 of March 6, 2014,

finding that the actions and policies of the Government of the Russian Federation with respect to

Ukraine—including the recent deployment of Russian Federation military forces in the Crimea

region of Ukraine—undermine democratic processes and institutions in Ukraine; threaten its

peace, security, stability, sovereignty, and territorial integrity; and contribute to the

misappropriation of its assets."  *Id*.   President Obama declared that these actions "constitute an

unusual and extraordinary threat to the national security and foreign policy of the United States."

*Id*.  Thus, Deripaska was designated under an executive order based on a bona-fide Presidential

emergency.

Deripaska's claim to the contrary is founded on his misreading of Treasury's April 6, 2018

press release announcing his designation along with six other oligarchs, 12 companies owned or

controlled by these oligarchs, and various Russian government officials and state-owned entities.

*See* Pl.'s Opp. at 13; U.S. Dep't of the Treasury, Press Release (April 6, 2018).[2]  The press release

stated that the "Russian government engages in a range of malign activity around the globe," and

cited Russian aggression in the Ukraine as one prominent example.  *See id*. at 2 (listing examples

of Russia's "malign activity" to include "continuing to occupy Crimea and instigate violence in

eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own

civilians, attempting to subvert Western democracies, and malicious cyber activities").  Put

---

[2] *Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity* (April 6, 2018), https://home.treasury.gov/news/press-releases/sm0338 (last visited October 11, 2019).

simply, in the April 6, 2018 press release, Treasury announced the designation of a number of Russian individuals and entities pursuant to various authorities, all of which were examples of Russian malign activity in the world.  Press Release at 2.  But that does not mean that Deripaska was designated based on a non-Presidentially-declared national emergency.  On the contrary, the press release, consistent with the rest of the administrative record, stated that Deripaska was "designated pursuant to E.O. 13661 for having acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation, as well as pursuant to E.O. 13662 for operating in the energy sector of the Russian Federation economy."  *Id.* at 3.  Both orders were issued in response to the Presidentially-declared national emergency concerning Russia's aggression in the Ukraine.  *See* E.O. 13661 (preamble); E.O. 13662 (preamble).  Therefore, it is beyond dispute that Deripaska was designated based on a bona-fide national emergency and, as a result, his designation was fully in keeping with IEEPA.  *See* 50 U.S.C. § 1701.

Moreover, any charge by Deripaska that his designation did not further the purposes of E.O. 13661, *see* Pl.'s Opp. at 14 (suggesting designation was not "tailored to the scope of the national emergency" at issue in E.O. 13661) would be misplaced.  As courts in this Circuit routinely acknowledge, appropriate deference should be accorded to the foreign policy judgments of the Executive about what steps —authorized by statute and implemented by a Presidential executive order and regulations—are best suited to accomplish its foreign policy goals.  *See OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17, 28 (D.D.C. 2015) ("Whether continued blocking is an effective strategy at fulfilling OFAC's foreign policy objectives, however, is not a question for this court.").  *Cf. Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007) (rejecting argument that "OFAC cannot block an entity's assets unless it determines that the entity itself poses an 'unusual and extraordinary threat to national security'").  Courts should not

constrain the President's "broad and flexible power" under IEEPA, *id.* at 10, nor interfere with what the President determines to be an effective bargaining strategy in the realm of foreign relations.  See *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981) ("[Blocking] orders . . . permit the President to maintain the foreign assets at his disposal for use in negotiating the resolution of a declared national emergency," and "[t]he frozen assets serve as a 'bargaining chip' to be used by the President when dealing with a hostile country.").

In sum, OFAC's decision to designate Deripaska based on the actions he took to benefit Putin was fully in accordance with IEEPA.

## B.     OFAC Reasonably Concluded That Deripaska Acted or Purported to Act for or on Behalf of, Directly or Indirectly, a Senior Russian Official (Putin)

Deripaska contends that his designation under section 1(a)(ii)(C)(1) of E.O. 13661 for "having acted or purported to act for or on behalf, directly or indirectly. . . a senior official of the Government of the Russian Federation" based on his actions with respect to Vladimir Putin was arbitrary and capricious because this language required OFAC to establish that he acted as Putin's agent.  Pl.'s Opp. at 17-18.  Deripaska does not meaningfully dispute that the evidence in the record shows that he took actions supporting Putin's projects, *see, e.g.*, *id*. at 18, given that the unclassified portions of the record contain reporting that he purchased an aluminum plant in Montenegro in response to Putin's encouragement because the Kremlin wanted an area of influence in the Mediterranean.  AR at 11-12.  Instead, Deripaska argues that this evidence does not support the existence of an agent-principal relationship between himself and Putin.  Pl.'s Opp. at 17-18.  Although he never explains what this agency relationship would entail, under the common law an agent is the "fiduciary" of the principal and acts "subject to his control."  *See* Restatement (Second) of Agency § 1 (1958).  But the operative language of E.O. 13661 did not

require Putin to exercise control for Deripaska's actions to be encompassed within the scope of the order.

### 1. *E.O. 13661 Does not Require OFAC to Establish That Deripaska Acted as Putin's Agent.*

E.O. 13661 authorizes the Secretary of the Treasury, acting in consultation with the Secretary of State, to sanction and block the assets of foreign entities and individuals who fall into various categories set forth in the order. *See* E.O. 13661 § 1 (authorizing designation of "an official of the Government of the Russian Federation" and those who "operate in the arms or related material sector in the Russian federation," among others). As relevant here, pursuant to section 1(a)(ii)(C)(1) of E.O. 13661, the Secretary of the Treasury, who has delegated his authority to the Director of OFAC, *see* 31 C.F.R. § 589.802,[3] has the authority to sanction foreign entities and persons "owned or controlled by" or who "have acted or purported to act for or on behalf of, directly or indirectly . . . a senior official of the Government of the Russian Federation." E.O. 13661 § 1(a)(ii)(C)(1). This language sweeps broadly and includes conduct where a person has merely "purported" to act for or on behalf of a senior Russian official and also encompasses actions which have both a direct and indirect effect. *Id.*

OFAC designated Deripaska pursuant to section 1(a)(ii)(C)(1) based on the agency's reasonable assessment that Deripaska had "acted or purported to act for or on behalf of, directly or indirectly" a senior Russian official because he acted in support of Vladimir Putin's projects. AR at 11-12. While the terms "act for or on behalf of" are not defined in E.O. 13661 or OFAC's regulations, this language is reasonably interpreted to include actions carried out "in the interest of" or "for the benefit of" another. *See On/In Behalf Of,* The American Heritage Dictionary (Fifth

---

[3] Treasury has promulgated regulations to implement E.O. 13661 and E.O. 13662. *See generally* 31 C.F.R. Pt. 589 ("Ukraine Related Sanctions Regulations").

online ed. 2019), *https://www.ahdictionary.com/word/search.html?q=on+behalf+of* (defining acting "on/in behalf of" to include not only acting as "the agent of" but also "[f]or the benefit of" or "in the interest of" another) (last visited October 11, 2019); *Behalf*, Merriam-Webster Dictionary (online ed. 2019)*, https://merriam-webster.com/dictionary/behalf (treating "behalf" as synonymous with "benefit" or "interest" and explaining that acting "on behalf of" includes acting "in the interest of" another) (last visited October 11, 2019); *cf. Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011) ("Because the statute does not define 'report,' we look first to the word's ordinary meaning"). Thus, Deripaska is mistaken that this language requires OFAC to provide evidence that he acted as Putin's agent and subject to Putin's control. *See* Restatement (Second) of Agency § 1 (agent acts subject to "control" of principal).

It is also clear that OFAC was not required to establish the existence of an agent-principal relationship when section 1(a)(ii)(C)(1) is viewed in its entirety. While a person is subject to sanctions if they are under the "control" of a senior Russian government official under section 1(a)(ii)(C)(1), that section goes on to list other behavior that would qualify for sanction: namely, persons who "have acted for or purported to act for or on behalf of, directly or indirectly" a senior Russian government official. *See* E.O. 13661 § 1(a)(ii)(C)(1). Acting for or acting on behalf of a senior Russian official therefore must mean something other than acting subject to the official's control; otherwise everything that comes after the word "control" in section 1(a)(ii)(C)(1) would be surplusage. *See Bennett v. Donovan*, 4 F. Supp. 3d 5, 10 (D.D.C. 2013) (noting canon of construction that "a court must not interpret a statute so as to render any words within that statute as 'mere surplusage'") (quoting *Potter v. United States*, 155 U.S. 438, 446 (1894)).

Deripaska's contrary argument that OFAC must establish that he acted as Putin's agent thus ignores the actual language of the executive order itself, in which the term agent does not even appear, and instead relies on OFAC's definition of "agent" in an entirely different set of

regulations governing when an entity may be designated as a Foreign Terrorist Organization

("FTO"), including when an "agent" of such an organization may be sanctioned.  *See* Pl.'s Opp at

17 (citing 31 C.F.R. § 597.301(a)(2)).  OFAC's definition of the term agent under the FTO

regulations is quite broad and, importantly, does not require the control of the FTO.  *See* 31 C.F.R.

§ 597.301(a).  Agent is defined to include, but is not limited to (1) any person "owned or

controlled by a foreign terrorist organization," and (2) any person "acting or purporting to act

directly or indirectly on behalf of a foreign terrorist organization."  *Id*.  In other words, an agent

for purposes of the FTO regulations is not the formal agent of the common law, *see* Restatement

(Second) of Agency § 1 (agent acts subject to "control" of principal), but includes someone who

simply acts for or on behalf of an FTO.  *Id*.  But, critically, what it means to act for or on behalf of

an FTO is not defined or furthered elucidated in the FTO regulations.  *See* 31 C.F.R. § 597.301(a).

As a result, Deripaska's argument is entirely circular — he claims that to act for or on

behalf of a senior Russian government official under E.O. 13661 requires that the person act as the

official's agent because OFAC defines agent in another set of regulations as someone who acts for

or on behalf of another.  Pl.'s Opp. at 17.  To the extent the FTO regulations are even relevant,[4]

the definition of agent in the FTO regulations merely serves to confirm that, in E.O. 13661, to act

for or on behalf of a senior Russian official does not require that the person act under the official's

control.

In short, this case is not about whether Deripaska acted as Putin's formal agent and took

actions subject to Putin's control, but rather whether he acted or purported to act for or on behalf

of Putin, directly or indirectly, which is reasonably interpreted to include Deripaska acting in the

---

[4] *See* 31 C.F.R. § 597.101(a) (noting that "[d]iffering statutory authority and foreign policy and national security contexts may result in differing interpretation of similar language among the parts of this chapter").

"interest of" or "for the benefit of" Putin. *See supra*. It would make little sense to interpret E.O. 13661 to require OFAC to establish a formal agent-principal relationship. Leaders like Putin are commonly understood to make their wishes clear and to allow others to take actions to benefit them without always providing explicit direction or control. This allows such leaders to avoid later accountability. OFAC's interpretation captures this well-known reality and also comports with the common understanding of these terms. *See Sherley v. Sebelius,* 776 F. Supp. 2d 1, 22 (D.D.C. 2011) (explaining that "an agency is presumed to have special expertise in interpreting executive orders charged to its administration, and so judicial review must afford considerable deference to agency interpretations of such orders").

Deripaska's apparent suggestion that his support for Putin could have rendered him eligible for sanction pursuant to a separate prong of E.O. 13661—authorizing sanctions for persons that provide, *inter alia*, financial or material support or services in support of a senior Russian government official, Pl.'s Opp. at 17-18 (citing E.O. 13661 § 1(a)(D)(1))—does not mean that Deripaska is not eligible for sanction under the acting for or acting on behalf of prong for all the reasons set forth above. That Deripaska may be doubly eligible for sanction under E.O. 13661 is plainly of no aid to his argument, but simply confirms the reasonableness of the agency's designation.

### 2. The Administrative Record Provides a Reasonable Basis to Conclude That Deripaska Acted for or on Behalf of Putin.

OFAC's determination that Deripaska's actions fell within the scope of section 1(a)(ii)(C)(1) of E.O. 13661 was clearly reasonable and should be upheld under the deferential APA standard of review that governs here. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (under APA standard of review, a court presumes the validity of the agency's decision and only reviews whether agency's decision "was based on a consideration of

the relevant factors and whether there has been a clear error of judgment"); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983) (under APA, agency's decision should be affirmed as long as there is a "'rational connection between the facts found and the choice made'") (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also* Defs.' MTD/MSJ at 14-15 (summarizing case law). And because this case involves an OFAC designation implicating national security and foreign affairs, an even greater level of deference is warranted to OFAC's decision than would ordinarily apply in an APA case.  *See, e.g., Zevallos v. Obama*, 10 F. Supp. 3d 111, 119 (D.D.C. 2014) (recognizing additional deference beyond that typically accorded to an agency under the APA when reviewing an OFAC blocking action issued pursuant to IEEPA) *aff'd*, 793 F.3d 106 (D.C. Cir. 2015); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) (noting that "courts owe a substantial measure of deference to the political branches in matters of foreign policy, including cases involving blocking orders") (internal quotation marks and citation omitted).

Here, OFAC reasonably concluded that Deripaska "acted or purported to act for or on behalf of" Vladimir Putin, "directly or indirectly," E.O. 13661 § 1(a)(ii)(C)(1), based on the evidence in the administrative record providing reason to believe that "Deripaska Has Acted in Support of Russian President Vladimir Putin's Projects."  AR at 11.  While the classified portions of the administrative record provide ample support for this determination, *see id*. at 11-12, the unclassified portion of the record by itself easily satisfies the APA standard of review.  In particular, the unclassified portion of the record relies upon an article from *The Nation* reporting that Deripaska told a close associate that he purchased an aluminum plant in Montenegro in 2005 "because Putin encouraged him to do it" and that "the Kremlin wanted an area of influence in the Mediterranean."  *Id*. at 11; *see Zevallos*, 793 F.3d at 112-13 (approving use of "news media

reports to justify designation decisions"); *see also Holy Land Found. for Relief & Dev. v. Ashcroft* ("*Holy Land*"), 333 F.3d 156, 162 (D.C. Cir. 2003) ("[I]t is clear that the government may decide to designate an entity based on a broad range of evidence, including intelligence data and hearsay declarations."), *cert. denied*, 540 U.S. 1218 (2004).  Deripaska's reported conduct, which he does not meaningfully dispute, thus falls comfortably within the ordinary meaning of "to act for or on behalf of" because Deripaska plainly acted in the "interest of" or "for the benefit of" Putin by purchasing the plant in response to Putin's encouragement and to further Putin's reported goal of gaining a foothold in the Mediterranean.  *See supra* (American Heritage Dictionary defining to act "on behalf of" to include acting "in the interest of" or "for the benefit of" another); *see also* Pl.'s Opp. at 2 (asserting that the reporting in *The Nation* is "contradicted elsewhere in the record" without identifying anything in the record to support this claim).

Finally, Deripaska argues that even if the evidence in the record provides a basis to conclude that he acted in furtherance of Putin's projects, there is a distinction between Deripaska's actions to support such a project and acting on behalf of Putin.  Pl.'s Opp. at 19.  But there is no meaningful distinction between acting in the interest of a senior official's projects and acting in the interest of the senior official himself within the meaning of E.O. 13661.  By purchasing an aluminum plant in Montenegro in response to Putin's encouragement in order to expand the Kremlin's influence in the Mediterranean, Deripaska clearly acted for or on behalf of Putin within the meaning of section 1(a)(ii)(C)(1) because he acted in the interest of Putin and for his benefit. *See supra*; *Sherley,* 776 F. Supp. 1, 22 (D.D.C. 2011) (granting "considerable deference to agency interpretations" of an executive order that it is charged to administer).  Accordingly, OFAC's determination that Deripaska's actions fell within the scope of E.O. 13661 was not arbitrary and capricious and should be upheld.  *See State Farm*, 463 U.S. at 43 (under APA, agency's decision should be affirmed as long as there is a "rational connection between the facts found and the

choice made") (internal quotation marks and citation omitted); *Zevallos* 10 F. Supp. 3d at 119

(when reviewing an OFAC blocking action issued pursuant to IEEPA courts afford an even

greater level of deference than is typically accorded to an agency under the APA).

## II.     Deripaska's Opposition Provides no Basis to Find That he can Raise a Due Process Claim, and That Claim Also Fails on the Merits

Deripaska contends that his designation pursuant to E.O. 13661 violated his right to

adequate post-deprivation notice under the Fifth Amendment's Due Process Clause because the

administrative record contains redactions of classified information used to support his designation.

Pl.'s Opp. at 19-25; AR at 11-12.  But like his Amended Complaint, Deripaska's opposition fails

to identify any property or presence in the United States and thus he clearly lacks standing to

assert a claim under the Fifth Amendment.  *See infra.*  This information is presumably known to

Deripaska, and for reasons that are unclear, he has declined to identify this allegedly blocked

property.  The Court should reject this claim out of hand; there is simply no plausible basis for the

Court to conclude that due process protections apply to Deripaska, a foreign national with no

property or presence in the United States.  And, in any event, this claim also fails on the merits.

Not only has the D.C. Circuit made clear that OFAC may rely on classified information to support

a designation, the unclassified portions of the record alone provide a sufficient basis for his

designation under the governing APA standard of review.

### A.     Deripaska Lacks "Substantial Connections" to the U.S.

In Defendants' opening brief, the government explained that Deripaska's Amended

Complaint fails to allege the sort of "substantial connections" to the United States necessary for

Deripaska, as a foreign national, to be entitled to the full protections of the U.S. Constitution.  *See*

Defs.' MTD/MSJ at 19-21; *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990)

(constitutional protections may apply when foreign nationals "have come within the territory of

the United States and developed substantial connections with this country"); *Johnson v. Eisentrager*, 339 U.S. 763, 770–71 (1950) (non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections).  In response, Deripaska contends that he has included "colorable allegations" in his Amended Complaint that he has property in the United States.  Pl.'s Opp. at 25.  By "colorable," Deripaska perhaps means "conclusory" since the Amended Complaint is devoid of any plausibly alleged factual allegations on this point.  But even assuming that a foreign national with property in the U.S. can invoke the Fifth Amendment to challenge OFAC's actions concerning such property, Deripaska fails to adequately allege that he has any property or interests in property in this country.  *See People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) ("A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise.").

Instead, his Amended Complaint includes the legal conclusion that "Deripaska's property and interests in property located within U.S. jurisdiction are blocked," Am. Compl. ¶ 33, but that is simply a description of the legal effect of OFAC's blocking action, *see* 50 U.S.C. § 1702(a)(1)(B); E.O. 13661, § 1(a)(ii)(C)(1), and does not answer the question of whether Deripaska has property in the United States.  *See Williams v. Lew,* 819 F.3d 466, 472 (D.C. Cir. 2016) (explaining that "conclusory statements and legal conclusions are insufficient to state a plausible basis for standing"); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 8 (D.D.C. 2012) (stating that a "plaintiff must furnish 'more than labels and conclusions' or a formulaic recitation of the elements of a cause of action" to survive a Rule 12(b)(6) motion to dismiss) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  This is made clear in the very next sentence of the complaint, where Deripaska (for reasons known only to him) studiously avoids answering the question of whether he has property in the United States and obfuscates by stating that "Deripaska

15

is barred from travel to the United States and from accessing property that he *may* hold there." Am. Compl. ¶ 33 (emphasis added).  The allegation that he "may" hold property in the United States is clearly deficient, because even if the Court presumes the truth of the allegation, it does not allow the Court to assume that Deripaska does, in fact, have property in this country.  *See Kadi*, 42 F. Supp. 3d at 8 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).  In short, Deripaska's complaint seems drafted to keep the Court guessing as to whether he has any property interests in the United States.

In response to the government's identification of these clear deficiencies in his complaint, *see* Defs.' MTD/MSJ at 19-21, Deripaska could have sought leave to file an amended complaint to include allegations that he has property in the United States.  At a minimum, if they exist, he could have identified property interests that he has in this country in his opposition— although his Complaint would remain legally deficient under Rule 12(b)(6).  *See Kadi*, 42 F. Supp. 3d at 8; *Jo v. Dist. of Columbia*, 582 F. Supp. 2d 51, 64 (D.D.C. 2008) ("It is well-established in this district that a plaintiff cannot amend his Complaint in an opposition to a defendant's motion for summary judgment.").  Strikingly, he has refused to do either.  Instead, his opposition contains the purely conclusory statement that his designation has "rendered him incapable of traveling to the United States and [from] accessing his property there" without identifying any such property.  Pl.'s Opp. at 27; *Kadi*, 42 F. Supp. 3d at 8 (conclusory allegations not sufficient to survive a motion to dismiss).  There are only two plausible explanations for this refusal: either he does not have property in the United States and clearly is not entitled to raise a claim under the Due Process Clause; or he does have property in the United States but refuses to identify the property because he is concerned that it will be blocked by the Defendants.  In the latter scenario, his pleading deficiency would appear to be an effort to evade the lawful reach of U.S. sanctions law.  Deripaska

knows whether or not he has property in the United States, and if he does, he must include adequate supporting allegations to this effect to raise a constitutional claim.

Deripaska also argues, without any supporting authority, that he can assert constitutional claims because OFAC's blocking action "prevented him from continuing to retain U.S. legal counsel" representing him "in international legal matters."  Pl.'s Opp. at 25, 27.  But no court has suggested that the mere retention of U.S. counsel or a lobbying firm, *see id*. at 26, establishes a right to constitutional protections.  Deripaska also suggests that he may invoke the Due Process Clause because he once held a U.S. visa, which has since been revoked.  *See id*. at 26.  But the fact that he is banned from travel to the United States only underscores his *lack* of connections to this country.  *See, e.g., United States v. Fantin*, 130 F. Supp. 2d 385, 391 (W.D.N.Y. 2000) (past travel to the United States failed to satisfy substantial connections "standard set by *Verdugo-Urquidez*" because otherwise "every foreign visitor to the United States could conceivably invoke Fourth Amendment protections against searches in his own country").

In short, given that his Complaint fails to allege substantial connections to the U.S., this Court should dismiss Deripaska's due process claim.  In the event, however, the Court were to reach the merits, it should find that OFAC's designation satisfied the requirements of due process for the reasons set forth below.

### B.      Deripaska's Due Process Claim Fails on the Merits

Deripaska's opposition argues that OFAC's reliance on classified information in the administrative record to support his designation under E.O. 13661 violates his rights to adequate post-deprivation notice under the Due Process Clause, and that Defendants must either disclose this information or provide "alternative means" to satisfy due process, such as providing him an unclassified summary of the classified information in the record.  *See* Pl.'s Opp. at 19-25.  In doing so, Deripaska seeks to impose an unprecedented legal obligation upon the government

17

requiring it to summarize classified information in an administrative record used to designate a foreign national.  *See id.* at 25.  While the D.C. Circuit has *permitted* OFAC to rely on summaries to support a designation, Deripaska is mistaken that the court of appeals in *Fares* held that such summaries are *required* by the Due Process Clause.  *See* Pl.'s Opp. at 20-21 (citing *Fares v. Smith*, 901 F.3d 315, 324-25 (D.C. Cir. 2018) (acknowledging out-of-circuit precedent "countenancing the use of summaries" of classified information, without holding that due process requires the provision of such summaries).  The plaintiffs in *Fares* did not argue that due process required OFAC to summarize privileged information in the record and thus the D.C. Circuit's discussion of this issue was dicta; the *Fares* plaintiffs instead contended that OFAC was not permitted to reply upon undisclosed information in an administrative record at all — a claim which the D.C. Circuit easily rejected.  *See* 901 F.3d at 325-26.  Nor did the district court in *Zevallos*, as Deripaska suggests, hold that summaries of classified information are required under the Due Process Clause, *see* Pl.'s Opp. at 21, but merely stated, relying on the "helpful analogy" of IEEPA designations, that due process "required OFAC to promptly provide the unclassified administrative record on which it relied in taking its blocking action."  *See Zevallos*, 10 F. Supp. 3d at 129.

The D.C. Circuit has repeatedly held in cases before *Fares* that there is no due process violation when a federal agency makes a decision based on classified information not disclosed to a foreign national, and that it is perfectly proper for a court to take this classified information into account during its ex parte and in camera review of the agency's action.  *See* Defs' MTD/MSJ at 23-24 (discussing cases).  In *Jifry v. FAA*, for example, the D.C. Circuit held that the government satisfied the notice requirements of due process by informing foreign pilots that their airmen certificates had been revoked based on TSA's determination that they were a "security threat," even though the notice of that revocation "did not include the factual basis for" that determination, "which was based on classified information," and plaintiffs had argued that "without knowledge of

the specific evidence on which TSA relied, they [were] unable to defend against the charge that

they are security risks."  *See* 370 F.3d 1174, 1178, 1184 (D.C. Cir. 2004) (noting that D.C. Circuit

"rejected the same argument" that an agency is not permitted to rely on undisclosed classified

information with respect to the designations of foreign terrorist organizations in *Nat'l Council of*

*Resistance of Iran v. Dep't of State ("Nat'l Council")*, 251 F.3d 102, 208 (D.C. Cir. 2001) and

*People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1242-43 (D.C. Cir. 2003)).

And in *Holy Land*, the D.C. Circuit held that due process permitted the government, pursuant to

IEEPA, to rely on classified information submitted ex parte and in camera to support the

designation of a domestic entity as a Specially Designated Global Terrorist ("SDGT"), finding that

the argument "that due process prevents its designation based upon classified information to which

it has not had access is of no avail." 333 F.3d at 164 (D.C. Cir. 2003).

And the D.C. Circuit has repeatedly held that due process does not require the government

to provide access to the classified portions of an administrative record with respect to the

designations of foreign terrorist organizations, but must merely provide notice of the unclassified

portions of the record.  *See Holy Land*, 333 F.3d at 164 (stating that "'due process require[s] the

disclosure of only the unclassified portions of the administrative record'") (quoting *People's*

*Mojahedin Org. of Iran*, 327 F.3d at 1242; *Nat'l Council*, 251 F.3d at 208-09 (holding that under

Due Process Clause, agency "need not disclose the classified information to be presented in

camera and ex parte to the court," and that "[t]his is within the privilege and prerogative of the

executive, and we do not intend to compel a breach in the security which that branch is charged to

protect").  In short, while "courts have recognized that unclassified summaries of classified

information on which an agency relied may be helpful to litigants, they are not required." *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 119 n.2 (D.D.C. 2015).

In addition, IEEPA, which provides the statutory authority for Deripaska's designation, expressly authorizes the government to designate an SDN based on a classified record that is submitted to a district court ex parte and in camera. *See* IEEPA, 50 U.S.C. § 1702(c) ("[I]f the determination was based on classified information . . . such information may be submitted to the reviewing court ex parte and in camera."). In other words, IEEPA contemplates that the government may designate a person based on classified information that the SDN never sees. *Id.*

This authority provides ample support for this Court to uphold Deripaska's designation based in part on the classified portions of the record without requiring OFAC to summarize this information, particularly where the unclassified record by itself provides a sufficient basis to designate him under the APA. *See People's Mojahedin Org. of Iran v. Dep't of State* ("*PMOI*") 613 F.3d 220, 230-31 (D.C. Cir. 2010) (determining that providing FTO unclassified portions of record satisfies due process, "at least where the Secretary has not relied critically on classified material and the unclassified material provided to the FTO is sufficient to justify the designation"); *Chai v. Dep't of State*, 466 F.3d 125, 129 (D.C.Cir.2006) (declining to resolve due process challenge to Secretary's use of classified information because "we can uphold the designations based solely upon the unclassified portion of the administrative record"). Indeed, as noted, the D.C. Circuit has permitted the government to rely *exclusively* on classified information as the factual basis for an agency's decision where that information is submitted to the court ex parte and in camera. *See Jifry*, 370 F.3d at 1184 (finding no due process violation where government revoked pilots' airmen certificates based on determination that they were a security

threat even though pilots did not have "knowledge of the specific evidence on which TSA relied" given that it was classified).

While Deripaska is correct that the Ninth Circuit has held that the use of classified information to support the designation of a non-profit organization incorporated in Oregon violated due process in the absence of an unclassified summary based on the facts of the case, *see* Pl.'s Opp. at 21 (citing *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury* ("*Al Haramain*"), 686 F.3d 965, 986 (9th Cir. 2012)), that decision is in conflict with the aforementioned decisions in this Circuit upholding the use of classified information, where the D.C. Circuit did not suggest that due process requires the government to summarize such information.[5]  *See Jiffry*, 370 F.3d at 1183-84; *Holy Land*, 333 F.3d at 164 (D.C. Cir. 2003); *Nat'l Council*, 251 F.3d at 208–09.  Furthermore, in *Al-Haramain*, the Ninth Circuit found that the unclassified record (as is true here) "supports" OFAC's designation, 686 F.3d at 979, and stated that "[v]iewing the record as a whole, including the classified information" in the record, the procedural due process violation identified in the case was harmless error.  *Id*. at 990 (finding that even if plaintiff "had enjoyed better access to classified information and constitutionally adequate notice, we are confident that it would not have changed OFAC's ultimate designation determination").  That was so because the plaintiff was unable to satisfy its burden, *see id*. at 989, to show that "had it been provided the process it was due, it could have, and plausibly would have, taken steps to undermine OFAC's 2008 redesignation such that OFAC would not have made the redesignation or that substantial evidence would not have supported the redesignation."  *Id*. at 990; *see also Kadi*, 42 F. Supp. 3d at 29 n. 16 (noting that "Kadi relies heavily on *Al Haramain I* to

---

[5] *Al-Haramain* acknowledged that "an unclassified summary may not be possible because, in some cases, the subject matter itself may be classified and cannot be revealed without implicating national security."  *Al-Haramain*, 686 F.3d at 983.

support his due process claim.  However, this reliance is unavailing, as both the District of Oregon

and the Ninth Circuit subsequently held that any due process violation found in *Al Haramain I*

was harmless error.  Similarly, to the extent that there was any violation of Kadi's due process

rights in October 2001, it clearly was harmless in light of all the subsequent process he received")

(citations omitted)).

Therefore, the Court does not need to reach the question of whether OFAC is required to

provide unclassified summaries to Deripaska because even assuming *arguendo* that the failure to

do so violated his rights to adequate notice under the Fifth Amendment (a proposition that the

government strenuously disputes), any such error was harmless.  As explained above, the

unclassified portion of the administrative record by itself provides a sufficient basis under the

APA to conclude that Deripaska acted for or on behalf of Putin, directly or indirectly, within the

meaning of section 1(a)(ii)(C)(1) of E.O. 13661.  *See Islamic American Relief Agency v. Gonzales,*

477 F.3d 728, 734 (D.C. Cir. 2007) ("We acknowledge that the unclassified record evidence is not

overwhelming, but we reiterate that our review—in an area at the intersection of national security,

foreign policy, and administrative law—is extremely deferential."); *State Farm*, 463 U.S. at 43

(agency's decision should be affirmed under APA as long as there is a "rational connection

between the facts found and the choice made"); *Zevallos* 10 F. Supp. 3d at 119 (greater level of

deference applies to OFAC blocking action than is typically the case under the APA).  Under these

circumstances, there is no meaningful risk that Deripaska was erroneously designated by OFAC

nor any justification for ordering OFAC to provide a foreign national reportedly aligned with

Putin insight into the classified basis for his designation.  *See Fares*, 901 F.3d at 323 (noting that

to assess whether OFAC's designation provided adequate notice under Due Process Clause, courts

consider "'the risk of an erroneous deprivation'" of plaintiff's private interest "'thorough the

procedures used'" under the *Mathews* balancing test) (quoting *Mathews v. Eldridge,* 424 U.S. 319,

335 (1976)); *see also Nat'l Council*, 251 F.3d at 207 (noting the "strong interest of the government" in protecting classified information under the *Mathews* balancing test). Instead, as the Ninth Circuit held in *Al Haramain*, "[v]iewing the record as a whole, including the classified information" in the record, it is clear that the lack of an unclassified summary in this case was, at most, harmless error. *See Al Haramain*, 686 F.3d at 990.

But even if the Court were inclined to disagree with the government that it provided adequate notice to Deripaska or that if error occurred it was harmless, in no event should the Court order OFAC to provide Deripaska with a summary of classified information. Instead, consistent with establish practice with respect to APA challenges to an administrative record, instead of reaching the question of whether OFAC was required to provide summaries of classified information, the Court should remand the matter without vacating Deripaska's designation to permit OFAC to assess in the first instance whether additional unclassified information exists that would support Deripaska's designation. *See U.S. Lines, Inc. v. Federal Maritime Commission*, 584 F.2d 519, 532 (D.C. Cir. 1978) (stating if agency's "finding is not sustainable on the administrative record made," then it must be remanded "for further consideration") (internal quotation marks omitted); *PMOI*, 613 F.3d at 230 (finding due process violation and remanding for further proceedings without vacating designation given foreign policy and security concerns); *Nat'l Council*, 251 F.3d at 209 (same). In addition to reporting on Deripaska's purchase of an aluminum plant in Montenegro in response to Putin's encouragement, AR at 11, *The Nation* article included in the administrative record, AR, Ex. 22, reports that "Deripaska has adhered to an unwritten understanding between Putin and the oligarchs: as long as they support the Kremlin, they can operate with impunity." AR 99. To demonstrate his fealty to Putin, *The Nation* reported that "Deripaska has thus taken on numerous projects dear to Putin, such as building a new airport in Sochi for the 2014 Olympics and buying out Tajikistan's aluminum plant to help Putin reassert

23

control over that key ex-Soviet republic." *Id.* As the reporting in *The Nation* indicates, it should not be difficult to identify additional unclassified information that would support Deripaska's designation. *See Heartland Regional Medical Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009) (to determine whether remand without vacatur is appropriate, courts are guided by "two principal factors"— whether it is "likely" the agency will be able to justify its decision on remand and whether vacating agency's decision will have "disruptive consequences").

Accordingly, for the reasons set forth above, Deripaska lacks standing to raise a constitutional claim and his claim also fails on the merits. Therefore, the Court should grant Defendants' motion to dismiss or, in the alternative, grant summary judgment to the government with respect to Deripaska's due process challenge to his designation.

## III.   The APA Does not Require OFAC to Provide Deripaska With a Summary of Classified Information in the Administrative Record

Deripaska recasts his notice-based argument as an APA claim, *see* Pl.'s Opp. at 28-29, but he identifies no authority that finds that the APA requires OFAC to provide a summary of classified information contained in an administrative record. While he cites case law explaining that the APA requires the government to provide the reasons for its actions, *id.* at 28, that generic proposition hardly shows that OFAC must provide summaries of classified information pursuant to the APA. Such an argument would effectively require the government to provide extra-record summaries in response to a lawsuit brought under the APA. But while the compelling interest in protecting classified information and permitting the government to use such information to designate persons in support of the nation's foreign policy *permits* the use of such summaries, *see Fares*, 901 F.3d at 324, there is no basis in the APA for imposing an obligation to provide such summaries. Such a holding would conflict with repeated decisions of this Circuit finding that the government may rely on classified information in a record without any suggestion that it must

24

summarize such information.  *See Jifry*, 370 F.3d at 1183-84; *Holy Land*, 333 F.3d at 164; *Nat'l Council*, 251 F.3d at 208–09.  Moreover, as discussed above, the unclassified portion of the record provides a sufficient statement of reasons to uphold Deripaska's designation.  *See supra*; *see also* Pl.'s Opp. at 18 (acknowledging that OFAC has "concluded that Deripaska has acted in support of Russian President Vladimir Putin's projects'' without pointing to anything in the record that contradicts this conclusion).

Accordingly, the Court should grant summary judgment to the government with respect to Deripaska's notice-based APA claim as well.

**IV.     Deripaska's CAATSA-Related Challenges are not Justiciable and Fail on the Merits**

Deripaska's opposition fails to show that his challenge to Treasury's report to Congress identifying him as one of a number of Russian "oligarchs" who had a net worth of at least one billion dollars is justiciable.   *See* Pl.'s Opp. at 34-39; Am. Compl. ¶¶ 18-21; *Report to Congress Pursuant to Section 241 of the CAATSA Regarding Senior Foreign Political Figures and Oligarchs in the Russian Federation and Russian Parastatal Entities* ("CAATSA report" or "report"), http://prod-upp-image-read.ft.com/40911a30-057c-11e8-9650-9c0ad2d7c5b5 (last visited October 11, 2019).  Treasury expressly caveated the CAATSA report, stating that a person's inclusion in the list of oligarchs neither carries any legal consequences for the individual, nor should be taken as evidence that he or she has engaged in any improper or illegal behavior. *See* CAATSA report at 2 (explaining that inclusion on the list is not indicative of involvement "in malign activities," "does not, in and of itself, imply, give rise to, or create any other restrictions, prohibitions, or limitations on dealings with such persons by either U.S. or foreign persons," and "does not constitute the determination by any agency that any of those individuals or entities meet the criteria for designation under any sanctions program").  Even if his challenge to the sufficiency

of the report were justiciable, on the merits, the report satisfied the requirements of Section 241 of

CAATSA, and thus did not violate the APA.  Furthermore, in addition to lacking standing to bring

a constitutional claim, Deripaska also fails to allege the deprivation of any cognizable liberty or

property interest based on his inclusion in the report.  Accordingly, all of his CAATSA-related

arguments fail.

### A.      The Adequacy of the CAATSA Report is not Subject to Judicial Review

Deripaska's opposition offers no reason why the adequacy of Treasury's CAATSA report

should be subject to judicial review given that the D.C. Circuit has held that such informational

reports are unreviewable and are "committed to *congressional* discretion in measuring the fidelity

of the Executive Branch actor to legislatively mandated requirements."  Defs.' MTD/MSJ at 26

(citing *Nat'l Resources Def. Council v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988)).  "[I]n the

absence of a congressional directive for judicial review of claims by non-congressional parties" —

and there is no such right of review in CAATSA—the adequacy of an agency's response to a

Congressional reporting requirement is "quintessentially within the province of the political

branches to resolve as part of their ongoing relationships."  *Hodel*, 865 F.2d at 319.

Deripaska attempts to distinguish *Hodel* by arguing that the D.C. Circuit found the

reporting requirement at issue there—a demand that the Department of Interior explain "in detail"

why the agency had refused to accept certain leasing proposals—lacked judicially manageable

standards by which to assess the adequacy of the agency's response but that such standards exist

here.  Pl.'s Opp. at 34.  As an initial matter, CAATSA's requirement that Treasury submit a

"detailed report," including identifying Russian oligarchs, *see* CAATSA § 241(a), parallels the

reporting requirement in *Hodel*, 865 F.2d at 319, suggesting a similar lack of judicially

manageable standards here.  In addition, however, *Hodel* found compliance with the

Congressional reporting requirement in that case to be unreviewable "most importantly" because

26

an agency's report to Congress is "an entirely different sort of agency action" than an agency's exercise of Congressionally-delegated legislative or adjudicatory functions, in which "Congress has seen fit to provide broadly for judicial review of those actions, affecting as they do the lives and liberties of the American people." *Hodel*, 865 F.2d at 318.  In the case of a reporting requirement, in contrast, "the designated Executive Branch officer is simply reporting back to the source of its delegated power." *Id.*  Consequently, it is for Congress to determine the adequacy of an agency's response rather than for "non-congressional parties to carry on as an ersatz proxy for Congress itself." *Id.*; *see also id.* at 319 (finding that it was inappropriate to "take the remarkable step, rife with the danger of flooding an already over-burdened judicial system with failure-to-report cases" of permitting third parties to challenge the adequacy of agency reports to Congress).

Subsequent decisions in this Circuit have confirmed that the lack of judicially manageable standards was not necessary to *Hodel*'s holding.  *See Nat. Res. Def. Council v. Lujan*, 768 F. Supp. 870, 882-83 (D.D.C. 1991) (stating that "even were the Court to conclude that the statute's requirements were sufficiently discernible to judge the Report, that would not be dispositive because [*Hodel*] did not rely on the absence of such standards to find the statute unreviewable").  Instead, *Hodel* "held that because congressional reporting statutes are 'a management tool employed by Congress for its own purposes,' it was inappropriate to 'take the remarkable step' of judicial review."  *Coll. Sports Council v. Gov't Accountability Office*, 421 F. Supp. 2d 59, 67 (D.D.C. 2006) (quoting *Hodel*, 865 F.2d at 319); *see also Lujan*, 768 F. Supp. at 882 ("[T]he Report was not explicitly or implicitly intended as anything more than a vehicle to inform Congress. The subsection of the statute is labeled 'Report to Congress.' . . . It is for Congress, not the courts, to determine if the Report satisfies the statutory requirements it enacted.") (internal citation omitted); *see also Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998); *United States v. White*, 869 F.2d 822, 829 (5th Cir. 1989) (per curiam).  These cases stand for the principle that

Congress may request informational reports even when it casts some in an unflattering light, without authorizing third parties to challenge the adequacy of the agency's response. Tellingly, Deripaska does not cite a single case in which a court has permitted a challenge to a Congressional reporting requirement.

Deripaska also attempts to distinguish *Hodel* on the basis that Congress was the injured party in that case, but that Deripaska is the "victim" here. Pl.'s Opp. at 35. But there was no suggestion in *Hodel* that if third parties had been injured by the agency's report that the D.C. Circuit would have found the report to be reviewable. The reporting requirement in *Hodel* required the Department of Interior to explain "in detail" why it had rejected leasing proposals concerning California offshore drilling submitted by designated members of Congress and by the governor of California. *Hodel*, 865 F.2d at 292-93. Unsatisfied with Interior's response, the State of California, unlike the other plaintiffs in the case, challenged the adequacy of Interior's report. *Id*. at 316. But California's complaint with Interior's response to the Congressional reporting requirement did not prevent the D.C. Circuit from concluding that it was entirely for Congress to decide whether the report was adequate. *Id*. at 318. It will invariably be the case that a plaintiff requesting judicial review of an agency's response to a Congressional reporting requirement will contend that he or she is somehow injured by the agency's response —otherwise, the plaintiff presumably would not bring such a lawsuit. In *Coll. Sports Council*, for example, the plaintiff alleged that a GAO report to Congress contained material misstatements that might mislead those who read the report to plaintiff's "'detriment.'" 421 F. Supp. 2d at 70. Even so, the court found *Hodel* binding and concluded that the report was not subject to judicial review, explaining that "[t]o conclude otherwise would subject every Congressional reporting requirement to judicial review by private individuals or entities unsatisfied with a report's contents or conclusions." *Id*. at 67-68. But "where a report is 'not explicitly or implicitly intended as anything more than a

28

vehicle to inform Congress,' it is for Congress alone to 'determine if the Report satisfies the statutory requirements it enacted.'"  *Id*. at 67-68 (citing *Lujan*, 768 F. Supp. at 882).

In short, as courts have uniformly recognized, it is for Congress to determine whether the Executive Branch has adequately responded to its requests for informational reports, and for Congress, not the courts, to take appropriate action where it determines that the Executive Branch's response is inadequate.  See *Hodel*, 865 F.2d at 318 ("If the Secretary's response has indeed been deemed inadequate (in the statutory sense of 'insufficiently detailed') by its recipient [i.e., Congress], then it is most logically for the recipient of the report to make that judgment and take what it deems to be the appropriate action.  It scarcely bears more than passing mention that the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives.").

### B.       Treasury's Report Does not Constitute Final Agency Action for Purposes of the APA

Deripaska also cannot state a claim under the APA because to do so requires that he show that the CAATSA report reflects a "final agency action," 5 U.S.C. § 704, and he cannot do that because it is not an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted); Defs.' MTD/MSJ at 28-30; *see also Guerrero*, 157 F.3d at 1195 ("Because [the report] triggers no legal consequences and determines no rights or obligations, no check on the substance of the report is necessary."); *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 858-62 (4th Cir. 2002) (holding that report with "no direct regulatory effect" was not final agency action, even though its classification of environmental tobacco smoke as a human carcinogen caused "coercive pressures on third parties").

Reports that are advisory, even those that contain recommendations in favor of a particular

course of action, do not constitute final agency action where the ultimate decision-maker retains the discretion whether to accept or reject the report. *See Spear,* 520 U.S. at 178 (discussing *Dalton v. Specter*, 511 U.S. 462, 469-71 (1994), and explaining that in *Dalton*, the Secretary of Defense's submission of a list to the President of military bases that the Secretary recommended closing was not a "final agency action" because the "recommendations were in no way binding on the President, who had absolute discretion to accept or reject them"); *see also FTC v. Standard Oil Co.*, 449 U.S. 232, 241 (1980) (agency complaint finding "reason to believe" that company violated the law did not constitute "definitive" final agency action because it merely "represents a threshold determination that further inquiry is warranted") (cited at Pl.'s Opp. at 37)).  Here, the CAATSA report did not even constitute a recommendation of persons that Treasury was proposing for designation.  The report was purely an informational one, and lest there be any doubt about that, Treasury explained in the report that a person's inclusion in the list of oligarchs neither carries any legal consequences, nor should be taken as evidence that he or she has engaged in any improper or illegal behavior.  *See* CAATSA report at 2.

Nevertheless, Deripaska argues that an individual's inclusion in the list of oligarchs in the CAATSA report was tantamount to a determination that these individuals would later be designated because Treasury's April 6, 2018 press release announcing his designation along with other Russian persons and entities stated that these designations "followed" the January 2018 CAATSA report to Congress.  Pl.'s Opp. at 38.  Deripaska also notes that Secretary Mnuchin testified to Congress that sanctions would "come out of [the list]."  *Id*.  But this statement (which apparently referred to the entire CAATSA report, not to the list of oligarchs) did not suggest that inclusion as an "oligarch" in the report triggered legal consequences.  *See* Press Release at 3, Dep't of the Treasury, *Treasury Information on CAATSA Report and Russian Sanctions* (stating that Secretary Mnuchin testified "there will be sanctions that come out of this" report, while

stressing that the "report is not a sanctions list").  Out of the nearly one hundred oligarchs

identified in the CAATSA report, *see* Appendix B to CAATSA report, Am. Compl. ¶ 18,

Defendants, pursuant to separate and distinct agency processes, subsequently designated only

seven of these oligarchs, conclusively demonstrating that inclusion in the list by itself had no legal

consequences.  *See* Dep't of the Treasury, Press Release (April 6, 2018).  The reality that less than

ten percent of the persons identified as oligarchs in the CAATSA report were later designated (for

separate and distinct reasons) demonstrates that inclusion in the unclassified portion of the

CAATSA report was precisely what Treasury said it was: a list of Russian citizens with a net

worth of at least one billion dollars and nothing more.  Moreover, Deripaska was not designated

because of his net worth —the sole criterion upon which persons were identified as oligarchs in

the CAATSA report— but, rather, because of OFAC's determination that he acted for or on behalf

of Putin, pursuant to E.O. 13661, and because he operates in the energy sector of the Russian

economy, pursuant to E.O. 13662.  AR at 11-13.  In short, Deripaska's inclusion in Treasury's

report carried no "legal consequences" and therefore was not a final agency action.  *Spear*, 520

U.S. at 177-78.

### C.    Deripaska Lacks Standing to Challenge the CAATSA Report

Deripaska's opposition also fails to satisfy his burden to show "the irreducible

constitutional minimum of standing," which requires an "injury in fact," that is "fairly

. . .trace[able] to the challenged action of the defendant," and "likely" to "be redressed by a

favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations in

original).  Deripaska alleges that "several" of the banks at which his companies maintained

accounts began to close those accounts following his inclusion in the CAATSA report, *see* Pl.'s

Opp. at 36; Am. Compl. ¶ 28, but it remains purely speculative that the "several" banks that

allegedly closed his accounts did so because of the CAATSA report.  This does not satisfy his

31

burden to plausibly allege a non-speculative injury based on the actions of third parties.  *See Lujan*, 504 U.S. at 562 (noting that where standing "depends on the unfettered choices made by independent actors," it is "ordinarily substantially more difficult to establish") (internal quotation marks and citations omitted).

Even assuming, *arguendo*, that certain banks closed some of his companies' accounts because of the CAATSA report, Deripaska has failed to adequately allege that a ruling that removes him from the CAATSA report—provided to Congress more than a year-and-a-half ago— would cause third parties to reevaluate and correct any purported misunderstandings about the legal consequences of the report.  Now that Treasury has made clear that there are distinct grounds upon which to designate Deripaska given his actions in support of Putin and because he operates in the energy sector of the Russian economy, *see* AR at 11-13, it seems highly unlikely that any ruling with respect to his inclusion in the CAATSA report based solely on his net worth would have any impact on the actions of third-party banks.  *See Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1274 (D.C. Cir. 2007) ("[S]tanding to challenge a government policy cannot be founded merely on speculation as to what third parties will do in response to a favorable ruling.").  As a result, in addition to the fact that the CAATSA report is not subject to judicial review and does not constitute final agency action, Deripaska's speculative allegations of injury and redressability are insufficient to confer standing to bring an APA challenge to his inclusion in the report.

**D.    Deripaska's Challenge to the Sufficiency of the CAATSA Report Fails on the Merits Because Treasury was not Required to Identify Oligarchs Based on Their Closeness to the Russian Regime**

Deripaska contends that CAATSA required Treasury to consider an individual's closeness to the Russian regime before including the individual as an oligarch in the CAATSA report.  Pl.'s Opp. at 31.  He is mistaken.

Section 241 of CAATSA calls for Treasury to identify two sets of Russian individuals

("the most significant senior foreign political figures" and "oligarchs") based on two sets of

criteria ("closeness to the Russian regime" and "net worth").  *See* CAATSA § 241.  Deripaska

maintains that "net worth" and "closeness to the Russian regime" should both be used to

determine who is an "oligarch," citing the rule of the last antecedent.  Pl.'s Opp. at 31.  But

"canons of construction are no more than rules of thumb" and "courts must presume that a

legislature says in a statute what it means and means in a statute what it says there."  *Connecticut*

*Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  Here, the statute incorporated 31 C.F.R. §

1010.605's definition of "senior foreign political figure," CAATSA § 241(c)(2)—which focuses

on an individual's authority in positions such as a foreign government or political party—and

CAATSA directs Treasury to identify "the *most* significant senior foreign political figures,"

CAATSA § 241(a)(1)(A) (emphasis added).  Thus, the statute is reasonably read to use "closeness

to the Russian regime" in identifying "the most significant senior foreign political figures."

Deripaska also points to dictionary definitions of the word "oligarch" and a discussion of

the term by Judge Bates in a case that had nothing to do with CAATSA to argue that an oligarch is

someone with close political connections to a governmental regime.  Pl.'s Opp. at 31-32.  But here

Congress set forth specific criteria—"net worth"—to "determin[e]" whether one is an "oligarch[]"

in the Russian Federation."  CAATSA § 241(a)(1)(A).  It was reasonable for Treasury to conclude

that Congress intended the list of oligarchs in the unclassified section of the CAATSA report to be

based only on net worth, because an unclassified list that also contained an analysis of the

individuals' closeness to the Russian regime might, as an audit report later discussed, more likely

be misinterpreted as telegraphing potential targets for future sanctions and therefore trigger asset

flight.[6]  It is ironic that Deripaska would complain about an interpretation that carried far less risk

---

[6] *See* Treasury, Office of Ins. Gen. Audit Report OIG-19-033 at 5-6, *Audit of the Office of*
*Terrorism and Financial Intelligence's Report on Section 241 of the Countering America's*

that third parties would misinterpret the CAATSA report as a proposed sanctions list.

Finally, had Congress intended to require Treasury to consider "closeness to the Russian regime" when identifying the list of oligarchs in the CAATSA report, it likely would have expressly said so, as is true of the Stop Corrupt Iranian Oligarchs and Entities Act, introduced in the House of Representatives on November 28, 2018.  H.R. 7182, 115th Cong. § 2(a)(1)(A) (2018).  That Act would require Treasury to identify in a report for Congress "the most significant senior foreign political figures and oligarchs in Iran," and expressly states that "the most significant senior foreign political figures and oligarchs in Iran" are to be "determined by the closeness to the Iranian Government of *each such figure and oligarch*, and the estimated net worth of *each such figure and oligarch*."  *Id*. § 2(a)(1)(A) (emphasis added).   Although not passed into law, this Act shows that Congress knows how to require Treasury to provide a list of oligarchs based *both* on their proximity to a government and their net worth.  The failure to adopt comparable language in CAATSA therefore provides further support for Treasury's interpretation of Section 241.  *Cf. Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

For all these reasons, the Court should dismiss or alternatively grant summary judgment to the government with respect to Deripaska's challenge to the adequacy of Treasury's CAATSA report.

---

*Adversaries Through Sanctions Act* (Feb. 22, 2019) ( "Audit Report"), https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and% 20Testimonies/OIG-19-033.pdf (last visited October 11, 2019); *see also* CAATSA § 241(b) (stating that "report . . . shall be submitted in unclassified form, but may contain a classified annex").

E.   **Deripaska's Request for Further Notice and an Opportunity to Challenge his Inclusion in the CAATSA Report is not Justiciable and Fails on the Merits**

Deripaska's opposition provides no basis for this Court to conclude that he has a right to further notice of the grounds for his inclusion in the CAATSA report or a procedure to challenge his inclusion, either pursuant to the APA or the Due Process Clause.  Pl.'s Opp. at 39-45.  This claim is not reviewable under the APA because the CAATSA report does not constitute final agency action, its adequacy is not subject to judicial review, and because Deripaska has offered only speculative allegations of harm and redressability.  *See supra*.  He also cannot bring a constitutional challenge because he has not alleged "substantial connections" to the United States. *Id*.

In addition, his claim that he lacks notice of the grounds for his inclusion in the report is misplaced given his clear understanding that Treasury included him in the list of oligarchs based on his net worth.  Pl.'s Opp. at 30.  Finally, he does not meaningfully respond to the government's argument that he has failed to identify the deprivation of any cognizable property or liberty interest based on his inclusion in the CAATSA report.  *See* Defs.' MTD/MSJ at 33-34.  At most, he has alleged a reputational injury that allegedly led several banks to close his companies' accounts following his inclusion in the report — notwithstanding Treasury's explicit statement that inclusion on the list of oligarchs neither imposes any "restrictions, prohibitions, or limitations on dealings with such persons," nor "indicate[s] that the U.S. Government has information about the individual's involvement in malign activities."  CAATSA report at 2.  But one's interest in one's own reputation "is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law."  *Paul v. Davis*, 424 U.S. 693, 712 (1976).  Consequently, "stigma alone is insufficient to invoke due process protections."  *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010).  This includes purported financial injuries that flow from reputational harm

allegedly inflicted by the Government.  Harm to "business interests . . . cannot qualify as a deprivation of liberty because it does not amount to a change in legal status." *Mosrie v. Barry*, 718 F.2d 1151, 1162 (D.C. Cir. 1983).  This is because "[t]he reaction of others to unfavorable publicity about a person" constitutes not a "change in legal status imposed by the government officials who generated the publicity," but rather "'sanctions applied by public disapproval, not by law.'"  *Id.* (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 184 (1951) (Jackson, J., concurring)).  Deripaska's opposition fails to meaningfully respond to the government's argument and discussion of these cases, which demonstrate that his inclusion in the CAATSA report did not deprive him of any cognizable property or liberty interest under the Due Process Clause.

In sum, Deripaska's CAATSA-related arguments are not justiciable and in any event fail on the merits.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss or, in the alternative, their motion for summary judgment and enter judgment in favor of Defendants on all claims.

Dated October 11, 2019                    Respectfully submitted,

                                          JOSEPH H. HUNT
                                          Assistant Attorney General

                                          DIANE KELLEHER
                                          Assistant Branch Director

                                          */s/ Nicholas Cartier*
                                          Nicholas Cartier
                                          Trial Attorney
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L Street, N.W.
                                          Washington, DC 20005

Tel: (202) 616-8351
Fax: (202) 616-8470
Email:  Nicholas.Cartier@usdoj.gov