# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| OLEG DERIPASKA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 19-0727 (APM) |
| v. | ) | |
| | ) | |
| STEVEN T. MNUCHIN, Secretary of the | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE TREASURY, ANDREA M. GACKI | ) | |
| DIRECTOR OF THE OFFICE OF | ) | |
| FOREIGN ASSETS CONTROL, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 2

    I.      Statutory and Regulatory Background ....................................................... 2

    II.     Statement of Facts ..................................................................................... 6

           A.      Deripaska's Identification in the Section 241 Report .................. 6

           B.      Deripaska's Designation by OFAC ............................................. 6

           C.      OFAC's Disclosure of the Administrative Record .................... 8

           D.      Deripaska's Amended Complaint ............................................. 10

           E.      Deripaska's E.O. 13662 Delisting Request ............................... 10

           F.      OFAC's Issuance of Unclassified Summaries ........................... 12

           G.      OFAC's Denial of Deripaska's E.O. 13662 Delisting Request ............... 13

           H.      Deripaska's Second Amended Complaint ................................. 15

LEGAL STANDARDS ............................................................................................. 16

    I.      Summary Judgment Standard .................................................................. 16

    II.     Motion to Dismiss Standard .................................................................... 17

DISCUSSION .......................................................................................................... 18

    I.      Defendants Impermissibly Exercised Their Authority Under IEEPA and Acted in Excess of Statutory Jurisdiction When They Designated Deripaska Under E.O. 13661 and E.O. 13662 ....................................................................... 18

    II.     Defendants Acted Arbitrarily and Capriciously When Designating Deripaska Under E.O. 13661 ....................................................................................... 23

    III.   Defendants Acted Arbitrarily and Capriciously When They Denied Deripaska's E.O. 13662 Delisting Request ............................................................... 28

    IV.   Defendants Acted in Violation of Deripaska's Due Process Rights By Failing to Provide Deripaska with Adequate Notice of the Reasons for Their Actions ....... 32

V.      Defendants Acted in Violation of the APA's Notice Requirement By Failing to Provide Deripaska with Adequate Notice of the Reasons for Their Actions ....... 41

VI.     Defendants' Identification of Deripaska in the Section 241 Report Constitutes Arbitrary and Capricious Agency Action .............................................................. 42

        A.      Defendants' Section 241 Report Constitutes Arbitrary and Capricious Agency Action in Violation of the APA ...................................................... 43

        B.      Defendants' Identification of Deripaska as an "Oligarch" for Purposes of the Section 241 Report Constitutes Arbitrary and Capricious Agency Action in Violation of the APA .......................................................................... 46

        C.      Deripaska's Challenge to the Section 241 Report is Justiciable .............. 46

        D.      Deripaska Has Standing to Challenge the Section 241 Report ................ 48

        E.      Defendants' Publication of the Section 241 Report Constitutes Reviewable Final Agency Action ................................................................................ 49

VII.    Defendants Failed to Provide Deripaska with a Process to Challenge His Inclusion in the Section 241 Report in Violation of Constitutional Due Process ................ 51

VIII.   Defendants Failed to Provide Deripaska with Adequate Notice of the Reasons for His Inclusion in the Section 241 Report ............................................................. 53

CONCLUSION ..................................................................................................................... 55

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Aktieselskabet v. Fame Jeans*, 525 F.3d 8 (D.C. Cir. 2008) ........................................ 18

*Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23 (D.D.C. 2017) .................................... 22

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*,

      686 F.3d 965 (9th Cir. 2012) ........................................................ 33, 34, 35, 37

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ............................ 41, 54

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 17

*Barnhart v. Thomas*, 540 U.S. 20 (2003) ................................................................... 44

*Bell Atlantic Co. v. Twombly*, 550 U.S. 544 (2007) ................................................... 18

*Bowman Transp., Inc. v. Arkansas Best Freight System, Inc.*, 419 U.S. 281 (1974) ........ 24, 26, 27

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ................................................. 17

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ............................ 23

*Camp v. Pitts*, 411 U.S. 138 (1973) ........................................................................... 21

*Carter v. George Washington Univ.*, 387 F.3d 872 (D.C. Cir. 2004) .......................... 17

*Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192 (D.C. Cir. 2011) ................. 48

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) .............................. 23

*Copar Pumice Co., Inc. v. Tidwell*, 603 F.3d 780 (10th Cir. 2010) ............................. 18

*Empresa Cubana Exportadora v. U.S. Dep't of Treasury*,

      516 F. Supp. 2d 43 (D.D.C. 2007) ................................................ 23, 32, 43, 46

*Fares v. Smith*, 901 F.3d 315 (D.C. Cir. 2018) ..........................................…32, 33, 36

*Fares v. Smith*, 249 F. Supp. 3d 115 (D.D.C. 2017) ................................................... 32

*Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006) ................................................... 27

*Finley v. United States*, 490 U.S. 545 (1989) ............................................................. 46

*FTC v. Standard Oil Co.*, 449 U.S. 232 (1980) .......................................................... 49

*Fulmen Co. v. Office of Foreign Assets Control*,

No. CV 18-2949 (RJL), 2020 WL 1536341 (D.D.C. Mar. 31, 2020) .............................. 40

*Herron v. Fannie Mae*, 861 F.3d 160 (D.C. Cir. 2017) ................................................. 17

*Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) ...................... 23

*In re Subpoena Duces Tecum*, 156 F.3d 1279 (D.C. Cir. 1998) ................................................. 21

*Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004) ................................................................ 38

*Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123 (1951) ...................................... 51

*Joumaa v. Mnuchin*, 1:17-cv-02780 (D.D.C. April 10, 2019) .................................... 36

*Kadi v. Geithner*, 42 F. Supp. 3d 1 (D.D.C. 2012) ........................................... 17, 38, 40

*Kiareldeen v. Ashcroft*, 273 F.3d 542 (3d Cir. 2001) ................................................. 33

*KindHearts for Charitable Humanitarian Dev. v. Geithner*,

647 F. Supp. 2d 857 (N.D. Ohio 2010) ........................................................... 51

*King & Spalding LLP v. U.S. Dep't of Health and Human Servs.*,

330 F. Supp. 3d 477 (D.D.C. 2018) ................................................................ 17

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ................................................. 27

*Lockhart v. United States*, 136 S. Ct. 958 (2016) ....................................................... 44

*Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*,

826 F.3d 492 (D.C. Cir. 2016) .......................................................................... 17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................. 48

*Lyng v. Payne*, 476 U.S. 926 (1986) ......................................................................... 18

*Mathews v. Eldridge*, 424 U.S. 319 (1976)………………………………..……….32, 51

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................................................ 51

*Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,

463 U.S. 29 (1983)…………………………………………………………..23, 24, 29

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*,

417 F.3d 1272 (D.C. Cir. 2005) ........................................................................ 49

*Nat'l Council of Resistance of Iran v. U.S. Dep't of State,*

251 F.3d 192 (D.C. Cir. 2001) ...................................................... 32, 34, 38, 40

*Nat'l Resources Def. Council v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988) ..................................... 47

*OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005) ........................... 45

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994) ................................... 18

*Paul v. Davis*, 424 U.S. 693 (1976) ......................................................................... 52

*Rakhimov v. Gacki*, 2020 WL 1911561 (D.D.C. Apr. 20, 2020) ................................... 40

*Roelofs v. Sec. of the Air Force*, 628 F.2d 594 (D.C. Cir. 1980) ........................... 41, 54

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ................................................. 24, 25, 27

*Sierra Club v. Jewell*, 764 F.3d 1 (D.C. Cir. 2014) ....................................... 48

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006) ........................... 23

*Transohio Sav. Bank v. Director, OTS*, 967 F.2d 598 (D.C. Cir. 1992) ...................... 18

*Tourus Records v. DEA*, 259 F.3d 731 (D.C. Cir. 2001) ....................................... 41, 54

*United States v. Tajideen*, 319 F. Supp. 3d 445 (D.D.C. 2018) ........................... 19

*Williams-Jones v. LaHood*, 656 F. Supp. 2d 63 (D.D.C. 2009) ........................... 17

*Zevallos v. Obama*, 10 F. Supp. 3d 111 (D.D.C. 2014) ....................................... 17, 33

*Zevallos v. Obama*, 793 F.3d 106 (D.C. Cir. 2015) ....................................... 17, 36

**STATUTES**

5 U.S.C. § 706 ............................................................................... 18, 23, 43

22 U.S.C. § 8909 ....................................................................................... 5

22 U.S.C. § 8924 ....................................................................................... 5

22 U.S.C. § 9522 ....................................................................................... 5

50 U.S.C. § 1701 ............................................................................... 2, 18, 19

50 U.S.C. § 1702 ....................................................................................... 2

Countering America's Adversaries Through Sanctions Act,

Pub. L. No. 115-44, 131 Stat. 886 (2017)...................................................*passim*

**EXECUTIVE ORDERS**

Executive Order 13661 ...................................................................................*passim*

Executive Order 13662 ...................................................................................*passim*

**REGULATIONS**

31 C.F.R. § 501.807.......................................................................................6, 41

31 C.F.R. § 589.101...........................................................................................4

31 C.F.R. § 589.201.....................................................................................3, 4, 7

31 C.F.R. § 589.406...........................................................................................7

**RULES**

Fed. R. Civ. P. 56............................................................................................16

## INTRODUCTION

Oleg Deripaska is a renowned international businessman who has founded and led some of the world's largest companies. In 2018, however, Defendants sought to destroy everything that Deripaska spent his life building. They did so by targeting him with devasting U.S. sanctions which separated him from or otherwise destroyed his companies; caused thousands of people employed by him to be laid off; and libeled him an "oligarch" and a criminal. Since that time, Defendants have left Deripaska's future in the hands of the same federal agency—the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC")—which made those libelous allegations against him; unlawfully targeted him for sanctions; and which continuously denies him a meaningful opportunity to challenge its actions.

While Deripaska may never be made whole from Defendants' unlawful actions, this instant lawsuit seeks to at least undo those actions so that Deripaska may be relieved from the onerous consequences wrought by U.S. sanctions which continue unabated to this day. Examples of how Defendants have violated the law are plentiful and addressed below. Amongst others, these examples include Defendants' 1) capricious identification of Deripaska as an "oligarch" solely on the basis of his Russian nationality and his net worth—not on the basis of any purported connections to the Russian government; 2) failure to afford Deripaska an opportunity to address that erroneous identification; 3) imposition of sanctions on Deripaska on the basis of an undeclared national emergency; 4) conflation of supporting a third-party's projects vs. acting at that party's direction; 5) abandonment, without sufficient explanation, of their traditional definition of "energy sector"; and 6) conclusion that that the mere ownership of a company whose business is in a particular industrial sector constitutes operation in that sector.

These and Defendants' other unlawful actions have caused Deripaska to lose ownership and control of his largest companies; have caused U.S.-based properties in which Deripaska maintained an interest to be blocked; and have led him to lose billions of dollars in wealth. These harms will continue until Defendants are compelled by the Court to correct their errors, adhere to the law, or—at a minimum—provide Deripaska a meaningful opportunity to respond to their actions. Indeed, it is clear by the manner in which Defendants have carried out and defended their actions that they believe they can continue to harm and malign Deripaska with impunity. For this reason, Deripaska respectfully turns to this honorable Court for injunctive and declaratory relief.

## BACKGROUND

### I.   STATUTORY AND REGULATORY BACKGROUND

#### A.   *International Emergency Economic Powers Act*

Executive Orders ("E.O.") 13661 and 13662—as well as their implementing regulations, the Ukraine-Related Sanctions Regulations ("URSR"), 31 C.F.R. Part 589—are issued under the authority of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq*. IEEPA authorizes the President "to deal with any unusual or extraordinary threat, which has its source in whole or in substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). IEEPA provides the President the power to "regulate, . . . prevent or prohibit . . . transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B). IEEPA specifies that these powers "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . ." 50 U.S.C. § 1701(b).

### B.    Executive Order 13661

On March 16, 2014, President Obama issued E.O. 13661 in response to "the actions and policies of the Government of the Russian Federation with respect to Ukraine." Exec. Order 13661, Preamble. Those actions and policies, as enumerated in E.O. 13661, are those that purportedly "undermine democratic processes and institutions in Ukraine; threaten its peace, security, stability, sovereignty, and territorial integrity; and contribute to the misappropriation of its assets." *Id.*

To address these enumerated threats, E.O. 13661 authorizes the Secretary of the Treasury to impose sanctions on, *inter alia*, persons determined to "have acted or purported to act for or on behalf of . . . a senior official of the Government of the Russian Federation . . ." Exec. Order 13661, § 1(a)(C)(1). E.O. 13661 further authorizes, *inter alia*, the Secretary to impose sanctions on persons determined to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, a senior official of the Government of the Russian Federation. *Id.*

Persons determined to meet the criteria for designation under E.O. 13661 are subject to blocking sanctions—i.e., their property and interests in property within U.S. jurisdiction are blocked (or "frozen"), and U.S. persons are prohibited from engaging in transactions or dealings with them. Exec. Order 13661, §§ 1(a), 4, and 5. Such persons are identified on OFAC's List of Specially Designated Nationals and Blocked Persons ("SDN List"). NOTE 1 to 31 C.F.R. § 589.201.

### C.    Executive Order 13662

On March 20, 2014, President Obama issued E.O. 13662 in response to "the actions and policies of the Government of the Russian Federation," which "undermine democratic processes

and institutions in Ukraine; threaten its peace, security, stability, sovereignty, and territorial integrity; and contribute to the misappropriation of its assets." Exec. Order 13662, Preamble.

To respond to these threats, E.O. 13662 authorizes the Secretary of the Treasury to impose sanctions on persons determined to operate in those sectors of the Russian Federation economy as may be determined by the Secretary of the Treasury. Exec. Order 13662, § 1(a)(i). This includes such sectors as the financial services, energy, metals and mining, engineering, and defense and related materiel sectors. *Id*. Persons determined to meet the criteria for designation under E.O. 13662 are subject to blocking sanctions—i.e., their property and interests in property within U.S. jurisdiction are blocked, and U.S. persons are prohibited from engaging in transactions or dealings with them. Exec. Order 13662, §§ 1(a), 4, and 5. Such persons are identified on OFAC's SDN List. NOTE 1 to 31 C.F.R. § 589.201.

### D.    *Ukraine-Related Sanctions Regulations*

On May 2, 2014, OFAC issued the Ukraine-Related Sanctions Regulations ("URSR"), 31 C.F.R. Part 589, to implement E.O. 13661 and E.O. 13662. Final Rule, Office of Foreign Assets Control, 79 FED. REG. 26365 (May 8, 2014). The URSR prohibit, *inter alia*, all transactions that are prohibited by E.O. 13661 and E.O. 13662. 31 C.F.R. § 589.201. The names of persons designated under E.O. 13661 and E.O. 13662 are incorporated into OFAC's SDN List with the identifying program tag "[UKRAINE-EO13661]" and "[UKRAINE-EO13662]," respectively. NOTE 1 to 31 C.F.R. § 589.201. The URSR also incorporate the recordkeeping and reporting requirements and license application and other procedures identified in the Reporting, Procedures, and Penalties Regulations, 31 C.F.R. Part 501. 31 C.F.R. § 589.101.

E.        *Countering America's Adversaries Through Sanctions Act*

On August 2, 2017, Congress enacted the Countering America's Adversaries Through Sanctions Act ("CAATSA"), which, *inter alia*, imposed additional sanctions on, and established, reporting requirements with respect to, Russia. CAATSA also codified U.S. sanctions relating to the Russian Federation, including E.O. 13661 and E.O. 13662. 22 U.S.C. § 9522. Further, CAATSA imposed or amended certain U.S. secondary sanctions authorities relating to the Russian Federation and persons designated under E.O. 13661 or E.O. 13662. This included an amendment to the Ukraine Freedom Support Act of 2014 requiring the President to sanction foreign financial institutions determined to have knowingly facilitated a significant financial transaction on behalf of any Russian person included on OFAC's SDN List pursuant to E.O. 13661 or E.O. 13662. 22 U.S.C. § 8924(b). In addition, CAATSA amended the Support for the Sovereignty, Integrity, Democracy, and Economic Stability of Ukraine Act of 2014 to require the President to sanction foreign persons determined to knowingly facilitate significant transactions for or on behalf of any person sanctioned under legal authorities targeting the Russian Federation. 22 U.S.C. § 8909(a)(2).

Section 241 of CAATSA required the Secretary of the Treasury to submit a report to Congress that, *inter alia*, identifies the most significant senior foreign political figures and oligarchs in Russia, "as determined by their closeness to the Russian regime and their net worth . . ." Countering America's Adversaries Through Sanctions Act § 241, Pub. L. No. 115-44, 131 Stat. 886 (2017). This report was to be submitted in unclassified form, although it could "contain a classified annex." *Id*. Congress sought this report to help it assess "[t]he potential impacts of imposing secondary sanctions with respect to Russian oligarchs . . ." CAATSA, § 241(a)(5).

F.      *OFAC's Delisting Procedures*

OFAC publishes procedures governing delisting from the SDN List. 31 C.F.R. § 501.807. Under these procedures, designated persons may seek administrative reconsideration of their designation or assert that the circumstances resulting in the designation no longer are applicable and may thus seek the rescission of their designation. *Id*. To do so, designated persons can submit arguments or evidence that they believe establishes that an insufficient basis exists for the designation and may also propose remedial steps that negate the basis for designation. *Id*.

## II.   STATEMENT OF FACTS

A.      *Deripaska's Identification in the Section 241 Report*

On January 29, 2018, the United States Department of the Treasury issued the Section 241 Report of senior political figures and oligarchs in the Russian Federation consistent with its statutory obligations under CAATSA. U.S. Dep't of Treasury, REPORT TO CONGRESS PURSUANT TO SECTION 241 OF THE COUNTERING AMERICA'S ADVERSARIES THROUGH SANCTIONS ACT OF 2017 REGARDING SENIOR FOREIGN POLITICAL FIGURES AND OLIGARCHS IN THE RUSSIAN FEDERATION AND RUSSIAN PARASTATAL ENTITIES (2018). In the unclassified version, the Section 241 Report included Deripaska's name in Appendix B as an "oligarch." *Id*. According to this report, the U.S. Department of the Treasury determined the list of oligarchs based on whether an individual "ha[d] an estimated net worth of $1 billion or more." *Id*.

B.      *Deripaska's Designation by OFAC*

On April 6, 2018, OFAC designated Deripaska under E.O. 13661 and E.O. 13662 for "having acted or purported to act for or on behalf of, directly or indirectly, a senior official of the

Government of the Russian Federation" and "operating in the energy sector of the Russian Federation economy," respectively. AR 0413-0420. This action was undertaken to ensure that "Russian oligarchs and elites who profit from [Russia's] corrupt system will no longer be insulated from the consequences of their government's destabilizing activities." *Id*. This includes Russia's "malign activit[ies] around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb civilians, attempting to subvert Western democracies, and malicious cyber activities." *Id*.

In support of its action, OFAC alleged that Deripaska "has said that he does not separate himself from the Russian state" and "has also acknowledged possessing a Russian diplomatic passport." *Id*. According to OFAC, Deripaska also "claim[ed] to have represented the Russian government in other countries." *Id*. OFAC's press release further alleged that "Deripaska has been investigated for money laundering and has been accused of threatening the lives of business rivals, illegally wiretapping a government official, and taking part in extortion and racketeering." *Id*. OFAC's press release repeated allegations that "Deripaska bribed a government official, ordered the murder of a businessman, and had links to a Russian organized crime group." *Id*.

As a result of his designations, Deripaska's property and interests in property within U.S. jurisdiction are blocked. 31 C.F.R. § 589.201. Entities in which Deripaska owns a 50 percent or greater interest are similarly blocked. 31 C.F.R. § 589.406. U.S. persons are also generally prohibited from transacting or dealing with Deripaska or entities in which he owns a 50 percent or greater interest. 31 C.F.R. § 589.201. In addition, as OFAC's press release noted, non-U.S. persons may be sanctioned for knowingly facilitating transactions for or on behalf of Deripaska or companies blocked due to his ownership or control. AR 0413-0420.

C.      *OFAC's Disclosure of the Administrative Record*

On March 15, 2019, Deripaska filed a lawsuit challenging his designations under E.O. 13661 and E.O. 13662. Compl., ¶ 1, ECF No. 1. In response, Defendants provided Deripaska with an unclassified version of the administrative record compiled in support of his designation. This record comprises the evidentiary memorandum underlying his E.O. 13661 and E.O. 13662 designations, as well as the exhibits attached to it. OFAC's evidentiary memorandum provides the factual and legal bases for its designation actions. AR 0006-0014.

Section III of the evidentiary memorandum is titled "Basis for Determination." AR 0008. With respect to the E.O. 13661 designation, OFAC identifies its legal determination that Deripaska "has acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation." *Id*. In support of this determination, OFAC concludes that "DERIPASKA has acted in support of Russian President Vladimir Putin's projects." *Id*. The rest of this section provides information constituting the agency's findings for that conclusion. In the unclassified version of the record, eight of the nine paragraphs identifying OFAC's findings are entirely redacted. AR 0008-0009. The sole unredacted paragraph cites to a 2008 article in *The Nation* titled "McCain's Kremlin ties," which is more than a decade old and reports that Deripaska is alleged to have "told one of his closest associates that he bought an aluminum plant in Montenegro in 2005 'because Putin encouraged him to do it . . .'" AR 0008.

With respect to the E.O. 13662 designation, OFAC identified its legal determination that Deripaska "operates in the energy sector of the Russian Federation economy." AR 0009. In support of this legal determination, OFAC found the following:

- Deripaska is involved in several World Economic Forum projects, including ones on 'New Energy Architecture' and the 'Interaction between the Power Industry and Society.'

- Deripaska's work on the APEC Business Advisory Council requires his focus on multiple issues, including energy efficiency and energy security. At a February 2012 meeting of the Council, Deripaska's representative presented the North East Asian Region Electrical System Ties Initiative whose goal is to improve ties between the power grids of Eastern Siberia, Northern and North Eastern China, Japan, and South Korea through the creation of a transnational power grid in Northeast Asia.

- Deripaska's key companies, including En+ Group and EuroSibEnergo, operate in multiple sectors of the Russian economy, including the energy sector. EuroSibEnergo is the largest private power company in Russia, producing 9% of Russia's total electricity generation, and Deripaska exercises ownership over the company through his majority interest in En+ Group, which owns 100% of EuroSibEnergo. *Id.*

The following section of the evidentiary memorandum is titled "Additional Information." AR 0010-0011. This section includes allegations regarding Deripaska's purported statements about his Russian diplomatic passport and his closeness to the Russian state, as well as false allegations made by Deripaska's former business rivals. *Id.*

D.      *Deripaska's Amended Complaint*

Following Defendants' provision of the unclassified administrative record, Deripaska amended his complaint. Am. Compl., ¶ 1, ECF No. 7. The Amended Complaint challenged OFAC's decision to designate Deripaska under E.O. 13661, as well as OFAC's failure to provide adequate notice of the reasons for the designation. Am. Compl., ¶ 62-70. The Amended Complaint also challenged Defendants' decision to include Deripaska in the Section 241 Report, as well as Defendants' failure to provide him notice of the reasons for his inclusion in the Section 241 Report or a process by which to challenge his inclusion in the Report. Am. Compl., ¶¶ 71-83.

E.      *Deripaska's E.O. 13662 Delisting Request*

Due to the disclosures made in the unclassified administrative record, Deripaska ceased litigating his E.O. 13662 designation and pursued an administrative rescission of that designation pursuant to OFAC's delisting procedures. AR 0190-0205. Deripaska's delisting request was filed on June 27, 2019. *Id*.

Deripaska's delisting request argued that he did not meet the criteria for designation under E.O. 13662 and, alternatively, that there had been a change in circumstances negating the basis for his designation. Specifically, Deripaska's delisting petition set forth the following arguments:

- Deripaska's alleged participation in international conferences related to energy and his purported proposal for a region-wide energy initiative do not provide a reasoned basis under which to determine that Deripaska operates in the energy sector of the Russian Federation economy;

- Deripaska's purported ownership or control over ESE does not provide a reasoned basis under which to determine that Deripaska operates in the energy

> sector of the Russian Federation economy, as ESE—by OFAC's admission—is an "independent power company in Russia," and OFAC has never before interpreted the term "energy sector" to capture parties solely engaged in the production of electricity; and

- OFAC's determination that Deripaska operates in the energy sector of the Russian Federation economy is based on its finding that Deripaska owns or controls ESE. OFAC, however, separately determined that ESE is no longer owned or controlled by Deripaska or any companies over which Deripaska is alleged to exercise ownership or control and does not otherwise meet the legal criteria for designation under E.O. 13662. Accordingly, there has been a change in circumstances negating the basis for designation under E.O. 13662 as Deripaska no longer exercises ownership over, nor controls, ESE—the entity through which Deripaska is alleged to operate in the energy sector of the Russian Federation economy.

Following more than four months without a response from OFAC, Deripaska moved this Court for leave to file a supplemental complaint with respect to his E.O. 13661 designation. *See* Pl.'s Mot. for Leave to File Suppl. Pleading and Mem. in Supp. Thereof, ECF No. 16 (Nov. 5, 2019). This supplemental complaint alleged that OFAC had yet to render a decision on Deripaska's delisting request or otherwise indicate when that decision may be forthcoming and had not requested any "additional, clarifying, or corroborating information" from Deripaska.

On November 13, 2019, OFAC sent Deripaska a questionnaire in response to his delisting request. AR 0221-0222. Following issuance of this questionnaire, Defendants withdrew their opposition to Deripaska's motion seeking leave to file a supplemental complaint. Defendants

informed Deripaska that they would provide an unclassified summary of information redacted from the administrative record and issue a decision on Deripaska's delisting request within 60 days of receiving "a response to the questionnaire or…a written indication from [Deripaska] whether he does not intend to respond." Defs. Notice of Withdrawal of Opp. to Pl.'s Mot. for Leave to File Suppl. Pl. and Joint Request to File Status Report Within 75 Days In Lieu of Dec. 9, 2019 Status Conference, ECF No. 20 (Dec. 6, 2019).

### F.   OFAC's Issuance of Unclassified Summaries

On January 22, 2020, Defendants provided Deripaska with "additional non-privileged and unclassified information regarding the basis for [Deripaska's] designations." SAC, Exhibit C. These unclassified summaries relate solely to the basis for Deripaska's designation under E.O. 13661 and comprised six separate sentences as follows:

- As of late January 2012, then Prime Minister Vladimir Putin had reportedly compelled Russian oligarchs to invest in projects associated with the 2014 Sochi Olympics; this included an $800 million investment by Oleg Deripaska.

- As of late January 2018, Deripaska was reported to have financed projects upon request of Vladimir Putin and senior Russian officials.

- Deripaska had reportedly once cancelled an IPO of his company, Gaz, to hide Russian President Vladimir Putin's money laundering through the company, as recently as September 2017.

- In December 2016, Deripaska was reportedly identified as one of the individuals holding assets and laundering funds on behalf of Russian President Vladimir Putin.

- In or before July 2011, Deripaska's business activity was reportedly used, on at least one occasion, as a cover to facilitate the transfer of funds for the personal use of then Russian Prime Minister Vladimir Putin.

- In late 2004, Deripaska reportedly acted on verbal instructions from President Vladimir Putin in a high-level bilateral meeting between Russian and Kyrgyz representatives.

Upon receipt of these unclassified summaries, Deripaska requested clarification from OFAC regarding whether the summaries represented all of OFAC's findings with respect to its E.O. 13661 designation. SAC ¶ 55. Deripaska further requested OFAC to provide information regarding whether—in those instances where no geographic location is identified—the summaries can be presumed to relate to conduct in or involving Ukraine. *Id*. Defendants responded by stating that OFAC was "not in a position to provide any additional information either about the unclassified summary itself or the contents of the underlying classified information." *Id*.

### G.   OFAC's Denial of Deripaska's E.O. 13662 Delisting Request

On March 6, 2020, OFAC denied Deripaska's E.O. 13662 delisting request. OFAC stated that it "ha[d] determined that [Deripaska] ha[s] not put forth arguments or evidence establishing that an insufficient basis exists for [his designation] or that the circumstances resulting in the designation are no longer applicable." SAC, Exhibit D.

OFAC released an unclassified version of the administrative record underlying its denial decision, including the unclassified evidentiary memorandum. AR 0158-0169. In its evidentiary memorandum, OFAC stated that it had "considered" Deripaska's arguments but "[found] them unpersuasive" for the following reasons:

- OFAC has sufficient factual evidence to demonstrate that Deripaska operates in the energy sector of the Russian Federation economy, as OFAC considers Deripaska's involvement in World Economic Forum projects to "constitut[e] operation in the energy sector of the Russian Federation due to the fact that these projects related to energy and that DERIPASKA participated in these projects as part of his work in the En+ Group, which . . . operates in the Russian federation [sic] economy"; OFAC considers Deripaska's focus on energy efficiency and energy security on the APEC Business Advisory Council and his representatives' presentation on the North East Asian Regional Electrical System Ties Initiative "to be activities that constitute operation in the energy sector of the Russian Federation economy due to the fact that this activity relates to the energy sector and that Deripaska participated in these organizations as the appointee of the Russian Federation government and to represent a business sector of the Russian Federation economy." AR 0161.

- OFAC considers the term "energy sector" as used in E.O. 13662 to include power generation, as the term "energy sector" was not specifically defined within E.O. 13662 or by the Secretary of the Treasury; OFAC has never before limited its interpretation of the term "energy sector" in the Russia/Ukraine context; and each OFAC sanctions program is different so that an interpretation in one program is not determinative of an interpretation in the Russia/Ukraine context. AR 0161-0162.

- OFAC considers that—despite changes to Deripaska's level of ownership in ESE via En+ Group—Deripaska "still owns a sufficiently significant stake such

14

that circumstances have not sufficiently changed to warrant removal." According to OFAC, "Deripaska's continued ownership interest in En+ and ESE as evidence of his continued operation in the energy sector of the Russian Federation economy." AR 0163.

- Deripaska "continues to operate in the energy sector of the Russian Federation economy through his ownership stakes of ESE and En+," as Deripaska "owns a 44.95% percent of En+, votes 35 percent of En+ shares, and appoints four out of 12 board members to the En+ board of directors." AR 0163-0164. ESE and En+ are entities that operate in the energy sector of Russia's economy.

Parts of OFAC's unclassified administrative record were redacted in the version disclosed to Deripaska, including the final paragraph of OFAC's evidentiary memorandum. AR 0165-0166. OFAC did not provide alternative means by which to inform Deripaska of the information contained in the redacted portions of the administrative record.

### H.   *Deripaska's Second Amended Complaint*

On April 16, 2020, Deripaska filed a second amended complaint. Second Am. Compl. ("SAC"), ECF No. 26. The Second Amended Complaint challenges OFAC's decision to designate Deripaska under E.O. 13661, as well as OFAC's failure to provide adequate notice of the reasons for his designation. SAC ¶¶ 126-137. Specifically, the Second Amended Complaint claims that OFAC's decision to designate Deripaska under E.O. 13661 constitutes arbitrary and capricious agency action, as well as agency action in excess of statutory jurisdiction, in violation of the APA. *Id*. at ¶¶ 126-131. The Second Amended Complaint further claims that OFAC's failure to provide

Deripaska with adequate notice of the reasons for his designation violates his Fifth Amendment right to due process and the APA's notice requirement. SAC ¶¶ 132-137.

The Second Amended Complaint also challenges OFAC's decision to designate Deripaska under E.O. 13662 and its decision to deny Deripaska's delisting request and its failure to provide adequate notice of the reasons for this denial decision. SAC ¶¶ 138-152. Specifically, the Second Amended Complaint claims that OFAC's decision to designate Deripaska under E.O. 13662 constitutes arbitrary and capricious agency action, as well as agency action in excess of statutory jurisdiction, in violation of the APA. SAC ¶¶ 138-140, 144-146. The Second Amended Complaint further claims that OFAC's decision to deny Deripaska's delisting request constitutes arbitrary and capricious agency action in violation of the APA and that OFAC failed to provide adequate notice of the reasons for its denial decision in violation of his Fifth Amendment right to due process and the APA's notice requirement. SAC ¶¶ 141-143, 147-152.

The Second Amended Complaint further challenges Defendants' inclusion of Deripaska in the Section 241 Report and their failure to provide him notice of the reasons for his inclusion in that report or a process by which to challenge his inclusion in the report. SAC ¶¶ 153-165.

## LEGAL STANDARDS

### I.   LEGAL STANDARDS

#### A.   *Summary Judgment Standard*

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute is 'genuine' only if a reasonable fact-finder could find for the nonmoving party, and a fact is

'material' only if it is capable of affecting the outcome of the litigation." *King & Spalding LLP v. U.S. Dep't of Health and Human Servs.*, 330 F. Supp. 3d 477, 487 (D.D.C. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Granting summary judgment is appropriate if "when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016) (citing *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)).

When a court reviews agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, "[t]he entire case on review is a question of law, and only a question of law." *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015). Summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012).

### B.  Motion to Dismiss Standard

"A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not require a court to 'assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint.'" *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017) (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)). In resolving a Rule 12(b)(6) motion, "the court must treat the complaint's factual allegations—including mixed questions of law and facts—as true and draw all reasonable inferences therefrom in the plaintiff's favor." *Williams-Jones v. LaHood*, 656 F. Supp. 2d 63, 67 (D.D.C. 2009). To survive a motion to dismiss, the facts alleged must state a facially plausible claim for relief and the court must accept

as true all material factual allegations. *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 556 (2007). A

court "must not make any judgment about the probability of the plaintiff's success, for a complaint

may proceed even if it appears that a recovery is remote and unlikely." *Aktieselskabet v. Fame

Jeans*, 525 F.3d 8, 17 (D.C. Cir. 2008); *see generally Twombly*, 550 U.S. at 554 (2007).

## DISCUSSION

I.   **DEFENDANTS IMPERMISSIBLY EXERCISED THEIR AUTHORITY UNDER IEEPA
     AND ACTED IN EXCESS OF STATUTORY JURISDICTION WHEN THEY DESIGNATED
     DERIPASKA UNDER E.O. 13661 AND E.O. 13662**

A court reviewing agency action shall set aside and hold unlawful agency action, findings,

and conclusions found to be in excess of statutory jurisdiction, limitations, or authority. 5 U.S.C.

§ 706(2)(C). "It is 'central to the real meaning of 'rule of law,' [and] not particularly controversial'

that a federal agency does not have the power to act unless Congress, by statute, has empowered

it to do so.'" *Transohio Sav. Bank v. Director, OTS*, 967 F.2d 598, 621 (D.C. Cir. 1992) (holding

that "[a]gency actions beyond delegated authority are 'ultra vires,' and courts must invalidate

them."); *see also Lyng v. Payne*, 476 U.S. 926, 937 (1986) ("[A]n agency's power is no greater

than that delegated to it by Congress."). Accordingly, it is the court's "essential function" when

reviewing agency action to "determin[e] whether an agency acted within the scope of its authority."

*Copar Pumice Co., Inc. v. Tidwell*, 603 F.3d 780, 801 (10th Cir. 2010) (quoting *Olenhouse v.

Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994)).

In the context of IEEPA, this includes determining whether a President's exercise of his

broad authorities thereunder is "based on a new declaration of a national emergency which must

be with respect to [an unusual and extraordinary] threat." 50 U.S.C. § 1701(b). These authorities

"[are] not all-encompassing and without limitation, as IEEPA directs '[a]ny exercise of []

authorities to deal with any new threat [to] be based on a new declaration of national emergency

18

with respect to that threat." *United States v. Tajideen*, 319 F. Supp. 3d 445, 455 (D.D.C. 2018). IEEPA expressly prohibits its authorities from being "exercised for any other purpose" other than "to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . ." 50 U.S.C. § 1701(b).

As evidenced by the April 6, 2018 press release announcing Deripaska's designation, OFAC exercised IEEPA's authorities in response to an undeclared national emergency—i.e., Russia's "worldwide malign activities." AR 0413-0420. Secretary Mnuchin explained the rationale for the designation in OFAC's press release. *Id*. In doing so, he stated that the designation was in response to "[t]he Russian government engag[ing] in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities." *Id*. OFAC's designation, according to Secretary Mnuchin, was intended to send a clear signal that "Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities." *Id*.

No President has declared a national emergency with respect to Russia's "worldwide malign activities," nor one that is inclusive of all the "destabilizing activities" identified in OFAC's press release. Russia's "worldwide malign activities" are not a threat identified in E.O. 13661 or E.O. 13662 nor are most of those "destabilizing activities," including, for instance, Russia's "supplying the Assad regime with material and weaponry," Russia's "attempt[] to subvert Western democracies," and Russia's "malicious cyber activities." *See* Exec. Order 13661, Preamble; Exec. Order 13662, Preamble.

Instead, E.O. 13661 was issued in response to "the actions and policies of the Government of the Russian Federation with respect to Ukraine," which "undermine democratic processes and institutions in Ukraine; threaten its peace, security, stability, sovereignty, and territorial integrity; and contribute to the misappropriation of its assets." Exec. Order 13661, Preamble. E.O. 13662 was issued in response to similar identified threats.

OFAC's unlawful action undermines the very purposes for which IEEPA was enacted. The purpose of IEEPA was to limit the President's authority to regulate international economic transactions during wars or other national emergencies. 7 S. Rep. No. 466, 95th Cong., 1st Sess. 2, *reprinted in* 1977 U.S. CODE CONG. & AD. NEWS 4540, 4541. By enacting IEEPA, Congress sought to constrain the Executive in response to the manner in which the Executive had used the Trading With the Enemy Act of 1917 ("TWEA") and to undo TWEA's carve-outs to the National Emergencies Act of 1977 by establishing safeguards for the role of Congress in declaring and terminating national emergencies. *Id.* Accordingly, IEEPA provides that the President may only use its emergency economic powers pursuant to a declared national emergency and only to address the specific threat for which such emergency was declared. 123 CONG. REC. 22475 (1977) (statement of Rep. Bingham).

To be lawful, OFAC's designation of Deripaska under E.O. 13661 and E.O. 13662 must be tailored to the scope of the national emergency that the Executive orders were promulgated to address—i.e., Russia's "actions and policies . . . with respect to Ukraine." However, as Defendants explained at the time, their action was undertaken in response to Russia's "worldwide malign activities" and, therefore, was not tailored as a response to Russia's actions and policies with respect to Ukraine. AR 0413-0420.

The D.C. Circuit has long held that "the reasonableness of [an] agency's action is judged in accordance with its stated reasons," *In re Subpoena Duces Tecum*, 156 F.3d 1279, 1279 (D.C. Cir. 1998), a view consistent with the Supreme Court's ruling that "[t]he validity of [an] [agency's] action must . . . stand or fall on the propriety of . . . [the] contemporaneous explanation of the agency decision . . ." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). By Defendants' own admission, Deripaska's designation responded to a threat for which IEEPA-based sanctions were inapplicable. Accordingly, OFAC's designations of Deripaska are in response to a threat for which no national emergency exists, which, in turn, renders OFAC's action an unlawful exercise of its delegated authority under IEEPA. For this reason, Defendants' designation of Deripaska is in excess of statutory jurisdiction, limitations, or authorities in violation of the APA.

Notwithstanding this unlawful exercise of power, Defendants urge the Court to ignore the contemporaneous explanation offered by OFAC for its actions, contending that their "statement made in a press release and correspondence with Congress . . . are not part of the [a]dministrative [r]ecord and are thus outside the scope of this Court's review." Defs. Mem. In Supp. Of Mot. to Dismiss or, In the Alternative, for Summ. J. ("Defs. Mem.") at *26, ECF No. 27 (May 15, 2020). Defendants, however, provide no support for their argument that the Court must ignore the agency's own stated rationale for the designation action, particularly where Defendants subsequently explained the designation action in the exact same terms in correspondence with members of Congress. Letter from Andrea M. Gacki, Director, Office of Foreign Assets Control, to Sen. Mitch McConnell, Sen. Maj. Leader (Dec. 19, 2018) (stating that designation action "aggressively targeted Russian oligarchs and elites that further the Kremlin's *global malign activities*…").

The most striking error in presenting this argument is Defendants' failure to acknowledge that courts have routinely considered an agency's press release when reviewing the corresponding agency action. *See e.g.*, *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 42 (D.D.C. 2017). Also, ironically, Defendants themselves request the Court to consider this same press release to find that Deripaska was offered sufficient notice of the basis for his designation. *See* Defs. Mem. at 29-30. In taking this approach, Defendants seek to simultaneously bar the Court from considering the press release for purposes of understanding OFAC's rationale and intent in undertaking the action, while asking the Court to consider it for purposes of providing Deripaska with notice of the reasons for its actions. *Id*. at 26, 29. Defendants offer no authority or precedent for such contradiction. Plainly, Defendants cannot have it both ways.

Defendants then go on to argue that—even if the Court considers the press release—"the[ir] statements say nothing about whether OFAC had the statutory authority to designate Plaintiff in the first place." Defs. Mem. at 26. But this is merely an attempt to obscure the central issue: regardless of whether there may have been a lawful avenue to designate Deripaska under E.O. 13661 and E.O. 13662, OFAC failed to pursue that avenue. Instead, OFAC opted to use those authorities to address a threat for which no national emergency had been declared. Defendants offer no explanation why they chose to utilize their authorities in response to Russia's "worldwide malign activities," absent a declared national emergency with respect to that threat, and such an explanation is not provided in the record underlying the designations. Compounding the issue is the fact that there is no discernible connection between Ukraine or to the Russian government's actions with respect to Ukraine alleged by OFAC and the conduct for which Deripaska was designated. Simply put, OFAC's stated purpose for Deripaska's designation responds to a national emergency that does not exist, and OFAC's findings with respect to Deripaska involves purported

conduct without connection to the national emergency under which E.O. 13661 and E.O. 13662 were issued. Defendants have made unlawful use of their authorities under IEEPA, and Deripaska's designations under E.O. 13661 and E.O. 13662 should be rescinded as a result.

## II. DEFENDANTS ACTED ARBITRARILY AND CAPRICIOUSLY WHEN DESIGNATING DERIPASKA UNDER E.O. 13661

Courts shall set aside and hold unlawful agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). While courts have traditionally shown deference towards OFAC's decision-making, that deference does not immunize OFAC from judicial scrutiny. *See Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) (noting that the court must "review the agency record to determine whether the agency's decision was supported by a rational basis.").

In conducting its arbitrary and capricious review, a court must determine whether, as a matter of law, "the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). This involves determining whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). While an agency's decision is entitled to a "presumption of regularity," a court must nevertheless conduct a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971).

A reviewing court must also determine whether an agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence . . ." *Empresa*

*Cubana Exportadora v. U.S. Dep't of Treasury*, 516 F. Supp. 2d 43, 53 (D.D.C. 2007) (quoting *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43 (1983)). In conducting this review, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp., Inc. v. Arkansas Best Freight System, Inc.*, 419 U.S. 281, 286 (1974). Instead, a court is limited to judging the permissibility of an agency's action on the basis of the contemporaneous explanation offered by the agency itself. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

E.O. 13661 authorizes the Secretary of the Treasury to designate persons determined "to have acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation." Exec. Order 13661. To act for or on behalf of a person is to act as that person's agent; it is this agency relationship that is at issue when the Secretary of the Treasury makes a designation pursuant to § 1(C)(1) of E.O. 13661. This is reflected in OFAC's own regulations promulgated with respect to other sanctions programs. *See e.g.*, 31 C.F.R. § 597.301(a)(2) (defining "agent" as any person that is, or has been, acting or purporting to act, directly or indirectly, on behalf of a foreign terrorist organization).

OFAC, however, did not conclude that Deripaska acted or purported to act as Putin's agent—i.e., for or on behalf of Putin. Instead, OFAC concluded that he acted in "support of Russian President Vladimir Putin's projects." AR 0008. Thus, OFAC's determination fails to demonstrate that Deripaska has acted or purported to act as an agent of Russian President Vladimir Putin. This insufficiency is brought into stark relief when considering that E.O. 13661 includes distinct authorities for designating persons who act for or on behalf of a senior Russian government official and, separately, for designating persons who provide material support for such officials.

Because these legal criteria for designation are separate and distinct, they cannot be regarded as co-extensive. Specifically, Section 1(a)(C)(1) of E.O. 13661—the subsection under which Deripaska was designated—targets a purported agency relationship between the sanctions target and a senior official of the Russian Federation government. On the other hand, § 1(a)(D)(1) of E.O. 13661 targets the provision of material support to a senior official of the Russian Federation government. Support to a senior Russian government official (or to such an official's projects) is not the equivalent of, and does not serve as lawful grounds to designate a person for, "acting for or on behalf of" the senior official, particularly in the absence of any agency explanation as to how that "support" signifies a purported agency relationship.

Because OFAC determined that Deripaska acts or purports to act for or on behalf of Putin solely on the basis of its conclusion that Deripaska supported Putin's projects but failed to explain how that alleged "support" constitutes Deripaska acting as Putin's agent, OFAC acted arbitrarily and capriciously in violation of the APA. As this Court "is powerless to affirm [OFAC's] action by substituting what it considers to be a more adequate or proper basis," it must, at a minimum, set aside the designation and remand to the agency for further consideration. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Defendants' assertion that "OFAC's unclassified summaries of those classified materials, moreover, make clear that Plaintiff has engaged in or purported to engage in conduct for or on behalf of Putin" is simply wrong. Def. Mot. at 17. First, OFAC determined that Deripaska acts for or on behalf of a senior Russian official following its conclusion that Deripaska acted in support Putin's projects, not that Deripaska engaged in conduct for or behalf of Putin himself. Certain of OFAC's unclassified summaries are therefore irrelevant to OFAC's conclusion that Deripaska acted in support of Putin's projects. For instance, Deripaska's purported cancellation of a GAZ

IPO to hide Putin's engagement in money laundering—in addition to being false—would not be an act in support of a Putin project, but rather an act undertaken for Putin himself. Likewise, the allegation that, as of December 2016, Deripaska purportedly held assets and laundered funds on Putin's behalf is equally irrelevant insofar as it is not tied to a specific project of the Russian President. Furthermore, OFAC's allegation of Deripaska's business activity being used as a cover to facilitate the transfer of funds for Putin's personal use—which is also false, but even assuming *arguendo* its validity—cannot be in support of a Putin project, as the unclassified summary clearly indicates OFAC's finding that it was for Putin's "personal" use. Moreover, that summary does not identify any "act" or conduct by Deripaska, referring only to his business activity, whatever that means for an international business magnate with thousands of employees and interests in companies across the global and spanning numerous industries. *See Bowman Transp., Inc.*, 419 U.S. at 286 (holding that a court "may not supply a reasoned basis for the agency's action that the agency itself has not given.").

But there are problems with OFAC's unclassified summaries even beyond of the lack of connection between certain of the unclassified summaries and OFAC's conclusion that Deripaska acted in support of Putin's projects. These include the fact that certain of those summaries allege conduct that purportedly occurred and—as evidenced by OFAC's phrasing of the allegations—ceased prior to the issuance of E.O. 13661 such as to make them irrelevant, as they were not sanctionable at the time which they purportedly occurred. Thus, OFAC's allegation that Putin compelled Deripaska to provide an $800 million investment to projects associated with the 2014 Sochi Olympics as of late January 2012 would have occurred and ceased entirely before the issuance of E.O. 13661 on March 19, 2014 as the Sochi Olympics occurred between February 7-23, 2014. Accordingly, it cannot be used to support OFAC's determination, as the law did not

render consequences for such conduct at the time. Likewise, OFAC's allegation that, in or before July 2011, on at least one occasion, Deripaska's business activity transferred funds for Putin's personal use, or that in 2004—nearly a decade before E.O. 13661—Deripaska acted on Putin's instructions at a meeting, cannot be relied upon to support Deripaska's designation for a law that was passed after the time that such conduct ceased. Allowing such conduct to be relied upon to sustain an E.O. 13661 designation would allow Defendants to sanction anyone for anything they did in the past, regardless of whether a law rendered consequences for the conduct at the time it occurred and despite the fact that the activity had ceased prior to the law's existence. Such an interpretation would be plainly inconsistent with canons of statutory construction establishing a presumption against retroactive effect of laws. *See e.g.*, *Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006); *Landgraf v. USI Film Products*, 511 U.S. 244 (1994).

That leaves only one allegation from OFAC's unclassified summaries to address—i.e., that Deripaska financed "projects" upon the request of Putin and senior Russian officials as of January 2018. While OFAC does allege that Putin requested Deripaska finance "projects," OFAC fails to allege that the projects were Putin's projects such that it upholds OFAC's conclusion that Deripaska meets the designation criteria of E.O. 13661 because he has "acted in support of Putin's projects." OFAC also does not offer any explanation or evidence to demonstrate that other senior Russian officials were making such a request in support of Putin's project. Again, the Court cannot offer an explanation the agency has not itself provided nor can it substitute its reasoning for that of the agency. *See Bowman Transp., Inc.*, 419 U.S. at 286; *Chenery Corp.*, 332 U.S. at 196. Thus, OFAC must tie the allegations back to their conclusion that Deripaska has acted to support Putin's projects and must show that the alleged conduct occurred at a time in which the law rendered consequences for it. The findings represented in OFAC's unclassified summaries fail to do so and,

therefore, should not be relied upon to support OFAC's determination that Deripaska has acted in support of Putin's projects such that he meets the criteria for designation under E.O. 13661.

### III.   DEFENDANTS ACTED ARBITRARILY AND CAPRICIOUSLY WHEN THEY DENIED DERIPASKA'S E.O. 13662 DELISTING REQUEST

OFAC's denial of Deripaska's E.O. 13662 delisting request likewise constitutes arbitrary and capricious agency action in violation of the APA and should be set aside by this Court. OFAC denied Deripaska's delisting request following its determination that Deripaska "had not put forth arguments or evidence establishing that an insufficient basis exists for [his designation] or that the circumstances resulting in the designation are no longer applicable." SAC, Exhibit D.

OFAC's initial determination that Deripaska meets the criteria for designation under E.O. 13662 was based, in part, on his participation in international conferences related to energy and his proposal for a region-wide energy initiative. AR 0009-0010. According to Deripaska, however, these activities do not provide a reasoned basis that he operates in Russia's energy sector as—for instance—Deripaska's purported involvement in World Economic Forum-related projects related to energy does not establish any operation in the energy sector, much less in Russia's energy sector. AR 0197-0198, 0202, 0228-0229. OFAC rejected these arguments, finding that "these [WEF] projects related to energy and that DERIPASKA participated in these projects as part of his work in the En+ Group, which . . . operates in the Russian federation [sic] economy." AR 0161.

But OFAC offers no explanation as to how Deripaska's participation in WEF projects constitute operation in *Russia's* energy sector. Even assuming *arguendo* that Deripaska participated in these projects as a representative of En+ Group, OFAC made no finding that those WEF projects are related in some relevant, non-tenuous manner to Russia's energy sector. Instead, OFAC contends that since Deripaska participated in WEF projects as the representative of En+

Group—a holding company that owns companies operating globally in a variety of sectors—Deripaska's participation in the projects constitutes operation in that sector. But OFAC makes no attempt to connect the WEF projects in which Deripaska allegedly participated to the Russian energy sector and thus fails to provide a reasoned basis why Deripaska's alleged participation in WEF projects demonstrates operation in Russia's energy sector. Absent a finding that the WEF projects related to *Russia's* energy sector, OFAC's use of this finding to sustain its denial constitutes arbitrary and capricious agency decision-making, as there is no "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of U.S., Inc.*, 463 U.S. at 43.

OFAC also rejected Deripaska's arguments that his indirect ownership interests in ESE through his holdings in En+ cannot be relied upon to determine that Deripaska operates in Russia's energy sector. The first of these arguments noted that OFAC has not interpreted the term "energy sector" to capture entities, such as ESE, that are solely engaged in the production of electricity. AR 0161-0162. The second of these arguments is that if Deripaska can no longer be deemed to own or control ESE—through his interests in En+—then he cannot reasonably be determined to operate ESE as an entity, much less in Russia's energy sector.

With respect to the first argument, OFAC responded that it considers the term "energy sector" as used in E.O. 13662 to include power generation and that it retains the discretion to define the term "energy sector" in this manner because E.O. 13662 did not impose definitional limits. AR 0162. Moreover, and in response to Deripaska's claim that OFAC has previously interpreted the term "energy sector" in other sanctions programs to exclude electricity producers, OFAC stated that because each OFAC sanctions program is different, an interpretation in one program is not determinative of an interpretation in another. AR 0162.

OFAC's *ad hoc* determination, however, constitutes the kind of capricious agency decision-making that the APA was designed to prohibit. While "[a]gencies are free to change course as their expertise and experience may suggest or require . . . when they do so they must provide a reasoned analysis indicating that prior policies and standards are being deliberately changed . . ." *Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003). Indeed, an "agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision making." *Id*. at 1124. Here, OFAC made an *ad hoc* determination that the term "energy sector," as used in the context of the Russia/Ukraine sanctions program, is inclusive of entities engaged in the production of electricity. OFAC provided neither notice of its definition nor an explanation as to why the standards it traditionally followed were being changed or tailored more broadly for its administration of E.O. 13662. As Deripaska noted in his delisting request, the term "energy sector" has traditionally been defined by OFAC to include activities involving petroleum, natural gas, or petroleum products. AR 0198-0201. Further, Deripaska argued that the term "energy sector" was implicitly defined in the Ukraine Freedom and Support Act of 2014—a statute enacted by Congress—to be limited to investment in Russian crude oil projects. *Id*. In neither of these instances was the term "energy sector" defined to include the production of electricity, rendering OFAC's *ad hoc* finding that ESE operates in Russia's energy sector through its production of electricity "an inexcusable departure from the essential requirement of reasoned decision making." *Ramaprakash*, 346 F.3d at 1124.

OFAC also stated that Deripaska "continues to operate in the energy sector of the Russian Federation economy through his ownership stakes of ESE and En+," as he "owns a 44.95% percent of En+, votes 35 percent of En+ shares, and appoints four out of 12 board members to the En+ board of directors." AR 0163. Despite changes in Deripaska's level of ownership, OFAC found

that Deripaska "still owns a sufficiently significant stake such that circumstances have not sufficiently changed to warrant removal." AR 0163. OFAC offers no definition of the term "operate" nor does the agency implicitly provide such definition by underscoring its reasoning as to how Deripaska "operates" En+ or ESE to meet the criteria for designation.

OFAC's conclusion that Deripaska continues to operate in Russia's energy sector through his continued ownership and indirect involvement in En+ defies reasoned decision-making. The evidence is clear: En+ and ESE were both formerly designated under E.O. 13661 and E.O. 13662 for being owned or controlled by Deripaska, a person blocked under those authorities. AR 0413-0420. Those designations were later rescinded when En+ and ESE "committed to significantly diminish Deripaska's ownership and sever his control" with respect to the companies. Press Release, U.S. Dep't of Treasury, Office of Foreign Assets Control, OFAC Notifies Congress of Intent to Delist En+, Rusal, and EuroSibEnergo (Dec. 19, 2018). Accordingly, OFAC determined that En+ and ESE no longer met the criteria for designation under E.O. 13661 and E.O. 13662 and removed both companies from its SDN List. Press Release, U.S. Dep't of Treasury, Office of Foreign Assets Control, OFAC Delists En+, Rusal, and EuroSibEnergo (Jan. 27, 2019). In rescinding ESE's designation, OFAC ensured that all actions, policies, and personnel decisions of ESE rest solely with the General Director of ESE and En+, not with Deripaska. AR 0216. This, again, is due to the extinguishment of Deripaska's ownership and control of those entities.

In other words, OFAC determined that Deripaska no longer owns or controls En+ or ESE but that his continued interests in En+ evidence his operation in Russia's energy sector, despite the fact that OFAC has determined that ESE's actions, policies, and personnel decisions rest solely with the General Director of ESE and En+. *Id*. Reasoned decision-making does not permit OFAC to have it both ways, however. If OFAC has determined that Deripaska no longer owns or controls

En+ or ESE, and has no findings or evidence to demonstrate that he is involved in ESE's operations, then OFAC cannot determine that Deripaska operates in Russia's energy sector solely by virtue of his remaining interests in En+, as doing so would run counter to the evidence before the agency. *See Empresa Cubana Exportadora*, 516 F. Supp. 2d at 53. It is arbitrary and capricious agency action for OFAC to determine that Deripaska is operating in a sector through a company—ESE— due to indirect ownership alone when OFAC has already determined that Deripaska neither owns nor controls ESE or En+, and has ensured that ESE's actions, policies, and personnel decisions rest with the General Director of ESE and En+, and not Deripaska.

### IV.   DEFENDANTS ACTED IN VIOLATION OF DERIPASKA'S DUE PROCESS RIGHTS BY FAILING TO PROVIDE DERIPASKA WITH ADEQUATE NOTICE OF THE REASONS FOR THEIR ACTIONS

Persons must be provided notice and a hearing before the government can constitutionally deprive them of a protected interest. *Nat'l Council of Resistance of Iran v. U.S. Dep't of State*, 251 F.3d 192, 205 (D.C. Cir. 2001) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976)). While due process is a "flexible" concept requiring only "such procedural protections as the particular situation demands," *Fares v. Smith*, 249 F. Supp. 3d 115, 122 (D.D.C. 2017), *aff. Fares v. Smith*, 901 F.3d 315 (D.C. Cir. 2018) (quoting *Mathews*, 424 U.S. at 334-35), its purpose is to ensure that persons are afforded a meaningful opportunity to be heard. *Mathews*, 424 U.S. at 333 (1976). Such procedural protections are applicable in cases where foreign nationals have challenged their designations by OFAC. *See Fares v. Smith*, 901 F.3d 315, 323 (D.C. Cir. 2018) (noting that "[t]o determine whether OFAC's designation of a plaintiff provides constitutionally adequate notice— enabling him to meaningfully avail himself of his opportunity to be heard—courts weigh [the] three factors under the familiar *Mathews v. Eldridge* balancing test . . .").

While the D.C. Circuit has held that—at least with respect to foreign terrorist organizations—it has tolerated an approach by which due process requires the mere disclosure of the unclassified portions of the administrative record, that approach has only been "countenanced . . . in very limited, statutorily recognized circumstances . . ." *Fares*, 901 F.3d at 319. The D.C. Circuit has clarified that even "in [this] narrow category of cases," other procedural safeguards provide the meaningful protections of due process. *Id*. For instance, the D.C. Circuit has ensured that a designated person is provided adequate notice of the reasons for their designation by authorizing "strictly necessary adaptations of ordinary administrative and judicial process." *Id*. at 324. This includes requiring the government to provide designated persons "with sufficiently specific 'unclassified summaries . . . that provide [designees] with the 'who,' 'what,' 'when,' and 'where' of the allegations'" that have been withheld from disclosure. *Id*. at 324 (quoting *Kiareldeen v. Ashcroft*, 273 F.3d 542, 548 (3d Cir. 2001)); *see also Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014) (stating that where the classified record is essential to supporting OFAC's determination, the government may be required to make disclosures that provide the designee with "a basis from which to understand his designation, and thereby offer rebuttal arguments and evidence.").

Considering the alternative means by which OFAC may disclose the reasons for a person's designation without compromising national security interests, courts have frowned on OFAC's partial disclosure of the factual bases for a designation. *See Fares*, 901 F.3d at 322 ("[D]isclosure of some but not all of the allegations against [a designee] impairs their ability to fully clear their names for delisting . . ."). Indeed, where OFAC disclosed "only one of three reasons for its investigation and designation," the Ninth Circuit held that this "incomplete notice [did] not meet the requirements of due process." *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury,* 686

F.3d 965, 986 (9th Cir. 2012). Instead, due process requires that designated parties have an opportunity to present evidence to rebut the allegations in the administrative record or otherwise negate the determination that they meet the legal criteria for designation. *Nat'l Council of Resistance of Iran*, 251 F.3d at 209. This necessarily requires that designated persons have a full and complete understanding of the reasons for their designation.

Defendants selectively choose portions of the relevant case law to support its limited disclosures all the while ignoring the most recent developments in the D.C. Circuit. As an initial matter, Deripaska first learned of his designations when OFAC published a press release announcing it. AR 0413-0420. That press release merely rehearsed *verbatim* the legal criteria for designation under E.O. 13661 and E.O. 13662 without identifying any alleged conduct engaged in by Deripaska that is sanctionable under those authorities. *Id.* OFAC's press release then went on to make a series of allegations about Deripaska that were entirely untethered from, and irrelevant to, the legal criteria for his designation under E.O. 13661 and E.O. 13662. *Id.*

The administrative record and the later-disclosed unclassified summaries of privileged or classified information confirms the irrelevance of those allegations. None of the allegations contained in OFAC's press release were included in the section of the record titled "Basis for Determination." Instead, these allegations were contained in a section titled "Additional Information." AR 0010-0011. It appears, then, that OFAC's press release deliberately trafficked in irrelevant misinformation, which would have led Deripaska—had he sought immediate recourse to OFAC's delisting procedures—to rebut allegations of no particular relevance to his designations. This is particularly troubling, considering that Defendants have cited their press release as constituting effective notice to Deripaska as to the reasons for his designation. Defs. Mem. at 29 (citing OFAC's press release as evidence that the agency has provided Deripaska with sufficient

post-deprivation notice); *see also Al Haramain Islamic Found.*, 686 F.3d at 986; *Olenga v. Gacki*, 1:19-cv-01135 (RDM), ECF No. 6, Defs. Motion to Dismiss or, in the Alternative, for Summary Judgment (D.D.C. June 28, 2019).

Instead, the basis for Deripaska's designation is found in the "Basis for Determination" section of the evidentiary memorandum. AR 0008. That section identifies Section (a)(1)(C) of E.O. 13661 as the legal authority under which OFAC designated Deripaska. *Id.* It also identifies the conclusion that led to this legal determination—i.e., that Deripaska "has acted in support of Russian President Vladimir Putin's projects." *Id.* In support of that conclusion are nine paragraphs comprising the remainder of the "Basis for Determination" section related to Deripaska's E.O. 13661 designation—eight of which are entirely redacted in the version provided to Deripaska. AR 0008-0009. OFAC's unclassified summaries do not identify to which portions of the record the summaries relate or whether they include disclosure of all of the reasons for the designation. These summaries also contained generalized or conclusory allegations of conduct that do not provide a meaningful basis for Deripaska to offer rebuttal evidence.

Similar failings can be found with respect to OFAC's denial of Deripaska's delisting petition challenging his E.O. 13662 designation. Although OFAC's evidentiary memorandum in support of that denial contains substantial disclosures regarding the basis of the denial, OFAC redacts the entire last paragraph of the section of the memorandum and does not provide alternative means by which Deripaska can understand the findings contained therein. AR 0165-0166. Accordingly, there appears to be an entire basis for the denial that remains undisclosed—even in summary form—which presumptively bars Deripaska from meaningfully returning to the administrative delisting process to address his continued designation under E.O. 13662.

The significant redactions in the disclosed administrative records and the insufficiencies of the unclassified summaries likewise deprive Deripaska of a meaningful opportunity to respond to his designation. Defendants, however, defend these partial disclosures as sufficient for purposes of satisfying their due process obligations by arguing that "[the] information [disclosed] provides a clear path for [Deripaska] to challenge his designation under EO 13661 . . ." Defs. Mem. at 30. But, as the D.C. Circuit has stated, the "disclosure of some but not all of the allegations" renders Deripaska unable to entirely clear his name and leaves him "'stumbl[ing] towards a moving target.'" *See Fares*, 901 F.3d at 322 (quoting *Zevallos*, 793 F.3d at 118). Accordingly, even if Deripaska were to rebut the disclosed allegations, he could not challenge the redacted allegations relied upon by OFAC to designate, thereby leaving Deripaska in a position where he has had no opportunity to rebut agency findings that continue to serve as a basis for his designation. *See, e.g., Joumaa v. Mnuchin*, 1:17-cv-02780 (D.D.C. April 10, 2019) (where OFAC denied Joumaa's reconsideration petition because "the documents [provided by Joumaa] do not address the other aspects of [his] drug trafficking and money laundering network that served as the basis for designation.").

The law is clear: if OFAC uses classified information to support its decision to designate Deripaska, it must provide *sufficient* alternative means which afford him adequate notice as to the reasons for his designation and a meaningful opportunity to challenge the designation. *Fares*, 901 F.3d at 324. These alternative means include, for instance, the disclosure of "*sufficiently specific* unclassified summaries" that identify the 'who,' 'what,' 'when,' and 'where' of OFAC's allegations." *Id*. (emphasis added). Defendants have not provided Deripaska with "sufficiently specific" unclassified summaries nor alternative means by which Deripaska may learn of the reasons for his designation or the denial of his delisting petition.

Compounding the issue is the fact that the unclassified summaries disclosed to Deripaska are themselves inadequately specific to permit Deripaska a meaningful opportunity to rebut their allegations of sanctionable conduct. For instance, OFAC's unclassified summaries allege that, "[i]n late 2004, Deripaska reportedly acted on verbal instructions from President Vladimir Putin in a high-level bilateral meeting between Russian and Kyrgyz representatives." But OFAC does not provide information regarding the nature of these "verbal instructions," which undermines Deripaska's ability to provide countervailing evidence with respect to them. Similarly, an unclassified summary states that, "[i]n December 2016, Deripaska was reportedly identified as one of the individuals holding assets and laundering funds on behalf of Russian President Vladimir Putin." The date, however, may be misleading, as it refers to the time of the report mentioned by OFAC without mentioning the time of the alleged conduct. Moreover, the allegation that Deripaska was "laundering funds" on behalf of Putin is bereft of any meaningful information, including, for instance, the underlying criminal activity from which the funds originated or the manner of the alleged laundering. Also, to the extent that this allegation originates from open-source reporting (as the language of the summary suggests), obscuring the source of the report undermines Deripaska's ability to raise doubts about the purpose and the motivations of the reporting. These are serious deficiencies that evidence how far short OFAC's unclassified summaries fall from the standard set in *Fares*. Defendants have thus precluded Deripaska from understanding the allegations against him and meaningfully responding to his designations in violation of his due process rights under the Fifth Amendment. For these reasons, OFAC's incomplete notice fails "the requirements of due process." *Al Haramain*, 686 F.3d at 986.

Defendants also challenge Deripaska's standing to assert a constitutional right to due process, arguing that he is a "foreign national with no substantial connection to the United States."

Defs. Mem. at 27. Defendants, however, misinterpret the relevant case law and fail to properly understand the nature of Deripaska's claims. Deripaska has set forth a number of "colorable allegations," which Defendants fail to address, including that OFAC's actions have blocked property in which he holds an interest within the United States; have rendered him unable to travel to the United States and barred him from accessing his property there; and have forced his U.S. legal counsel to withdraw from legal representation of him in international legal matters. SAC ¶ 96-113. These claims—combined with OFAC's own admission that prior to the designation Deripaska held a U.S. visa and retained a U.S. lobbying group—are sufficient to permit him the protections afforded by the Fifth Amendment's due process clause. AR 0008.

While "non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections," there are exceptions if those persons have come to, and have established "substantial connections" in, the United States or "accepted some societal obligations." *Jifry v. FAA*, 370 F.3d 1174, 1182-83 (D.C. Cir. 2004) (finding that the court "need not decide whether or not [plaintiffs] are entitled to constitutional protections because, even assuming that they are, they have received all the process that they are due under our precedent."). The D.C. Circuit has not identified the precise criteria by which to determine whether a foreign national residing outside the United States can satisfy this "substantial connection" test when seeking to assert constitutional rights with respect to the blocking of their assets. *Kadi v. Geithner*, 42 F. Supp. 3d 1, 25 (D.D.C. 2012). This Court, however, has previously analogized to cases in which the D.C. Circuit has addressed the constitutional rights of foreign nationals in the context of FTO designations, including the *Nat'l Council of Resistance of Iran* decision relied upon by Defendants. *Id*. at 26. In doing so, the Court noted that those cases have considered the presence

38

of property as "the benchmark for satisfying the 'substantial connections' test," and whether persons can assert constitutional rights with respect to such property. *Id.*

Deripaska's Second Amended Complaint alleges that OFAC's designation blocked property in which he maintains an interest that is subject to U.S. jurisdiction. SAC ¶¶ 111-113. Defendants erroneously argue that Deripaska fails to allege that he has property in the United States, Defs. Mem. at 28, a contention at odds with Deripaska's express allegations that, *inter alia*, he "maintained an interest in properties in the United States, including an ownership interest in Basic Element, Inc.," which held company accounts at Wells Fargo. *Id.* ¶ 111. Deripaska also claimed that he "maintained a beneficial ownership interest in RUSAL America Corp.," a U.S. corporation "constructively blocked pursuant to OFAC's 50 Percent Rule . . ." *Id.* ¶ 112.

Defendants also argue that Deripaska "acknowledged" a lack of a physical presence in the United States, a claim which—had Deripaska asserted it—would have contradicted OFAC's own finding that Deripaska held a U.S. visa. Defs. Mem. at 28; AR 0008 n.2. But the truth is that Deripaska is no stranger to the United States, as he "was regularly invited to speak at D.C.-based think tanks and other forums regarding global developments." SAC ¶ 97, 105. Moreover, Deripaska alleged that at the time of his designation companies in which he maintained an interest were incorporated in the United States and held U.S.-based properties, including Basic Element, Inc., which "maintained . . . a property lease in the United States at the time of Deripaska's designation," and RUSAL America Corp., "which had offices in 660 Madison Ave., New York, NY." SAC ¶ 111, 112.

Moreover, Defendants' argument that property ownership, absent physical presence, would be insufficient under *Verdugo* and *Jifry* ignores the ongoing debate as to whether constitutional

rights turn on the presence of property in the United States or whether a foreign national can only raise certain constitutional claims. *Kadi*, 42 F. Supp. 3d at 25. Following a broad review of the jurisprudential landscape, the court in *Kadi* concluded that cases addressing this issue have considered property in the United States as the standard for satisfying the substantial connections test. *Id.* That is why, for instance, the D.C. Circuit held that a "colorable allegation" that a plaintiff has an interest in a bank account in the United States would appear to support their due process claims. *Nat'l Council of Resistance of Iran*, 251 F.3d at 204. Defendants' selective appeal to recent case law does not disturb the D.C. Circuit's finding in this respect, as it was found that the plaintiffs in those matters had not alleged *any* connection to the United States. Defs. Mem. at 28; *see, e.g.*, *Rakhimov v. Gacki*, 2020 WL 1911561 at *5 (D.D.C. Apr. 20, 2020) (finding that "Rakhimov's own pleadings and submissions fail to allege the existence of even a single piece of his property in the United States . . ."); *Fulmen Co. v. Office of Foreign Assets Control*, No. CV 18-2949 (RJL), 2020 WL 1536341, at *7 (D.D.C. Mar. 31, 2020) (finding that "Fulmen's own pleadings demonstrate no property or presence in the United States . . .").

Here, Deripaska has made colorable allegations that OFAC's action blocked his property and interests in property in the United States and specifically identified those U.S.-based companies, accounts, and properties in the Second Amended Complaint. SAC ¶ 111-113. Further, he expressly identified that OFAC's designation rendered him incapable of traveling to the United States, accessing his property there, and continuing to retain U.S. legal counsel in foreign legal disputes. *Id.* This is enough for Deripaska to have standing to set forth his due process claims.

## V. DEFENDANTS ACTED IN VIOLATION OF THE APA'S NOTICE REQUIREMENT BY FAILING TO PROVIDE DERIPASKA WITH ADEQUATE NOTICE OF THE REASONS FOR THEIR ACTIONS

It is a fundamental principle of administrative law that an agency's failure to set forth its reasons for a decision constitutes arbitrary and capricious agency action. *Tourus Records v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001) (quoting *Roelofs v. Sec. of the Air Force*, 628 F.2d 594, 599 (D.C. Cir. 1980)). Requiring agencies to set forth the reasons for their decision affords parties the chance to address any errors an agency may have made in making a decision, while also facilitating judicial review in the instance that the agency persists in its wrongful action. *Id*. This requirement "is indispensable to sound judicial review," mandating an agency to "explain 'why it chose to do what it did.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

This requirement also gives substance to the APA's own administrative reconsideration procedures, which allow for interested persons to appear before an agency to seek a "determination of an issue, request, or controversy in a proceeding . . ." 5 U.S.C. § 555(b). OFAC implements these procedural requirements through its own delisting procedures, which allow for persons to pursue administrative reconsideration of their designation or assert that the circumstances giving rise to the designation are no longer applicable. 31 C.F.R. § 501.807. Under these procedures, designated persons are expressly permitted to provide evidence or arguments that they believe establish that there is an insufficient basis for the designation or to propose remedial steps which they believe would negate the basis for designation. 31 C.F.R. § 501.807(a). These procedures can only prove functional if a designated person has an understanding of the reasons for his designation and is thus in a position to offer evidence believed to rebut OFAC's allegations or propose remedial steps that would negate the factual basis for designation.

Defendants concede that the APA requires OFAC to provide Deripaska with the administrative records underlying his designations and their denial of his delisting request, but contend that OFAC need only disclose the unclassified portions of those records. Defs. Mem. at 33. This purported limitation, however, is without basis in law and—if adopted—would undermine the very purpose of the reconsideration procedures discussed above. Indeed, as OFAC has redacted eight of the nine paragraphs describing the purported rationale for his E.O. 13661 designation, the mere provision of the unclassified portions of the administrative record clearly fails to inform Deripaska as to the reasons for OFAC's decision to designate him. This failure renders the agency's delisting procedures no more than an empty gesture, as Deripaska—absent a complete understanding of the reasons for his designation—cannot offer rebuttal evidence or propose remedial measures negating the basis for his designation, precluding him from meaningfully availing himself of OFAC's delisting procedures. Defendants' provision of unclassified summaries fares no better as they (1) do not provide Deripaska a complete understanding of the reasons for his designation; and (2) merely contain generalized and conclusory allegations of conduct that are insufficient to allow Deripaska a meaningful opportunity to provide rebuttal evidence. Similarly, OFAC's redaction of an entire basis for its denial of his E.O. 13662 delisting petition and its failure to provide any alternative means by which to understand the full bases for the denial impairs meaningful use of OFAC's delisting procedures. For these reasons, Defendants have violated the APA's notice requirement and acted arbitrarily and capriciously and without observance of procedure required by law. 5 U.S.C. §§ 706(2)(A), 706(2)(D).

## VI.   DEFENDANTS' IDENTIFICATION OF DERIPASKA IN THE SECTION 241 REPORT CONSTITUTES ARBITRARY AND CAPRICIOUS AGENCY ACTION

Defendants violated the APA when they publicly identified Deripaska as an "oligarch" and included his name in the Section 241 Report. By acting contrary to the plain meaning of the term

"oligarch" and the statutory criteria by which they were to compile the Section 241 Report, Defendants abused their discretion and failed to act in accordance with law and without observance of procedure required by law. Defendants also acted unlawfully by identifying Deripaska as an "oligarch" after defining the term in a capricious manner. For these reasons, and those described below, the Court should grant summary judgment in favor of Deripaska on Count X.

> A.    *Defendants' Section 241 Report Constitutes Arbitrary and Capricious Agency Action in Violation of the APA*

Reviewing courts are required to hold unlawful and set aside agency actions, findings, and conclusions that are determined to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). When applying the "arbitrary and capricious" standard, courts determine whether the agency has relied on factors not statutorily relevant for its consideration, whether it entirely failed to consider an important aspect of the problem, whether it provided an explanation for its decision that runs contrary to the evidence before it, or whether the explanation provided by the agency is so implausible that it could not be attributed either to agency expertise or to a difference in view. *Empresa Cubana Exportadora*, 516 F. Supp. 2d at 53.

First, Defendants defined the term "oligarch" in a manner contrary to its plain meaning and common usage in the English language; the statutory criteria identified in the CAATSA; and the manner in which the term has been interpreted by this Court. Section 241 of the CAATSA required the Secretary of the Treasury to identify "the most significant senior foreign political figures and oligarchs in the Russian Federation, as determined by their closeness to the Russian regime and their net worth." CAATSA, § 241. Defendants, however, ignored this statutory command and instead identified the term "oligarchs" solely to mean "Russian individuals with an estimated net worth of $1 billion or more." Press Release, U.S. Dep't of Treasury, Treasury Releases CAATSA

Reports, Including on Senior Foreign Political Figures and Oligarchs in the Russian Federation (Jan. 29, 2018). Defendants defend their interpretation by arguing CAATSA "contains no mandate to consider a putative Russian oligarch's closeness to the Russian regime." Defs. Mem. at 41.

But the statute is clear, as is the plain meaning and common usage of the term "oligarch." Read properly, the language "closeness to the Russian regime" and "net worth" solely qualify the last antecedent—i.e., "oligarchs in the Russian Federation." *See Lockhart v. United States*, 136 S. Ct. 958, 962-63 (2016) ("When this Court has interpreted statutes that include a list of terms or phrases followed by a limiting clause, we have typically applied an interpretive strategy called the 'rule of the last antecedent.'") (citing *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). This "timeworn textual canon" establishes that a limiting clause or phrase should be read to modify only the noun or the immediately subsequent phrase. *Id.* at 962 (*Barnhart*, 540 U.S. at 26). In applying this canon, the proper reading of the statute required the Secretary to identify the most significant oligarchs in the Russian Federation by *both their closeness to the Russian regime and their net worth*. Using only the latter qualifier to determine its list of oligarchs in the Russian Federation defies a "timeworn textual canon" repeatedly endorsed by the Supreme Court and rendered the Secretary's action arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

This reading is supported by the plain meaning and common usage of the term "oligarch." No English-language definition of the term "oligarch" solely relies on a person's wealth or net worth as the defining characteristic. Indeed, as defined in Webster's dictionary, the term "oligarch" refers to a "member or supporter of an autocratic clique . . . a member of a political oligarchy," the latter term itself defined as a "despotic power exercised by a privileged clique." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1572 (Philip Grove eds., 3d ed. 2002). Similarly, Black's Law Dictionary defines an oligarchy—of which an oligarch would be a member—as "[a] government

in which a small group of persons exercises control; the persons who constitute such a government." BRYAN GARNER, BLACK'S LAW DICTIONARY 1260 (10th ed. 2014). This plain meaning and common usage of the term was confirmed as well by this court, when Judge Bates described "Russian oligarchs" as individuals with close political connections to the Russian government who had obtained wealth and power through the transfer of state assets and dubious deals with Russian government officials. *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 23 (D.D.C. 2005). Accordingly, a person's wealth or net worth does not factor as a relevant characteristic of an "oligarch" under either the term's common or its legal definition.

Defendants cast aside this legal precedent and widely accepted definition by relying on a single legislative proposal—unenacted by the Congress and without force of law—which utilized language that more clearly explained that the term "oligarch" should give consideration to "closeness to the [] government" and "estimated net worth." Defs. Mem. at 41. This, according to Defendants, shows that "Congress knows how to combine such requirements, and that CAATSA did not adopt such an approach . . ." *Id*.

Defendants' argument is not only unavailing, but also self-defeating. First, Congress did not "speak" in the draft legislation relied on by Defendants, as the bill was neither enacted into law nor sponsored by more than a single member of the House of Representatives. *See* H.R. 7182, 115th Cong. (2018). Second, to the extent that the bill has any persuasive value in defining "oligarch," it is in opposition to the Defendants' position, as the bill expressly required the Secretary of the Treasury to consider both "closeness to the [] Government" and "estimated net worth" when identifying "oligarchs." *Id*. Those legislative criteria are consistent with the common meaning and precedential use of the term "oligarch," as discussed in detail above. Third, the Court should operate under the assumption that Congress was aware of the "rule of the last antecedent"

45

and drafted the language of Section 241 of the CAATSA with knowledge of the meaning that this "timeworn textual canon" would give to its words. *See Finley v. United States*, 490 U.S. 545, 556 (1989) (stating its preference "that Congress be able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts."). Defendants, however, make no attempt to marshal canons of statutory construction nor any other persuasive authority to justify their decision to adopt a definition of the term "oligarch" at odds with this plain meaning, common usage, and legal precedent.

B.      *Defendants' Identification of Deripaska as an "Oligarch" for Purposes of the Section 241 Report Constitutes Arbitrary and Capricious Agency Action in Violation of the APA*

For similar reasons, Defendants' identification of Deripaska as a Russian "oligarch" for purposes of the Section 241 Report constitutes arbitrary and capricious agency action in violation of the APA because Defendants failed to assess Deripaska's "closeness to the Russian regime" when assembling its list of oligarchs. Agencies act arbitrarily and capriciously when they "entirely fail[] to consider an important aspect of [a] problem." *Empresa Cubana Exportadora*, 516 F. Supp. 2d at 53. For purposes of the Section 241 List, an important aspect of the Secretary's determination as to whether a person is an "oligarch" is a person's "closeness to the Russian regime." CAATSA, § 241. By determining Deripaska is an "oligarch" solely on the basis of his net worth, Defendants entirely failed to consider a statutorily mandated factor as to whether a person is an "oligarch." For that reason, the Court should grant summary judgment in favor of Deripaska as to Count X.

C.      *Deripaska's Challenge to the Section 241 Report is Justiciable*

Defendants argue that "[b]ecause Treasury submitted the oligarch list . . . to Congress in response to Congress's demand for such information," Deripaska's challenge to the Section 241 Report and his identification in the Report are not subject to judicial review. Defs. Mem. at 35-6.

Defendants rely on the D.C. Circuit's holding in *Hodel* to support that argument. *Nat'l Resources Def. Council v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988).

However, *Hodel* neither sets precedent for, nor is applicable to, the case at hand. In *Hodel*, the D.C. Circuit considered a challenge to a statutory requirement mandating the Secretary of the Interior to consider offshore leasing proposals and to explain his rejection of any such proposals in a report to Congress. *Id*. at 316. The *Hodel* plaintiffs challenged the Secretary's alleged failure to provide "adequate explanation[]" for the Secretary's rejection of certain leasing proposals. *Id*. The D.C. Circuit held that Plaintiff's claim "[was] not susceptible of judicial review": (1) because Congress "[was] not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives;" and (2) due to a lack of "judicially manageable standards by which to gauge the fidelity of the Secretary's response" to the constraints of the underlying legislation. *Id.* at 319. The D.C. Circuit noted that its holding was cabined to "the issue before [it]" and did not address the "broad, theoretical question whether an interbranch reporting requirement can ever be reviewable," absent an express provision of judicial review. *Hodel*, 865 F.2d at 319, n.33.

This background evidences that *Hodel* is inapplicable with respect to Defendants' actions. First, Deripaska is the primary victim of Defendants' unlawful action, not the Congress; and, as the D.C. Circuit observed in *Hodel*, Congress has "provided broadly for judicial review of those actions, affecting as they do the lives and liberties of the American people." *Id*. at 318. Deripaska should not be entirely reliant on Congress to defend its own interests before the Executive in order to vindicate himself. Nothing in *Hodel* would require Deripaska to be so defenseless in response to Defendants' unlawful action. Second, this Court—unlike the court in *Hodel*—has clear "judicially manageable standards by which to gauge the fidelity of the Secretary's response" to the limitations of Section 241 of the CAATSA. *Id.* at 319. Indeed, Congress directed Treasury as to

what factors to consider when compiling its list of oligarchs—factors that are consistent with the common understanding of the term "oligarch." Far from being immune to judicial review, Defendants' Section 241 Report is ripe for it, and this Court need only apply CAATSA's statutory criteria to determine "the fidelity of the Secretary's response." *Hodel*, 865 F.2d at 319.

## D.   Deripaska Has Standing to Challenge the Section 241 Report

To establish standing, a plaintiff must have suffered an injury in fact fairly traceable to the action under challenge that is likely to be rectified by a favorable outcome. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That injury need be "actual or imminent," and a plaintiff "must show a 'substantial probability of injury' to establish imminent injury." *Sierra Club v. Jewell*, 764 F.3d 1, 7 (D.C. Cir. 2014) (quoting *Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011)).  Deripaska clearly satisfies this standard.

Deripaska's identification as an oligarch and his inclusion in the Section 241 Report led directly to the closure of his bank accounts and those of his companies. SAC ¶ 36. International financial institutions were concerned about the reputational risk associated with maintaining accounts on behalf of a U.S.-identified Russian "oligarch" and (correctly) believed that Deripaska's listing in the Section 241 Report foreshadowed the imposition of sanctions. *Id.*

Defendants argue that Deripaska's alleged injuries stem from third parties "disregarding Treasury's clear statements in the CAATSA report." Defs. Mem. at 37. But Defendants clouded the "clarity" of these statements only days following publication of the Section 241 Report when Secretary Mnuchin testified before Congress that sanctions would arise from the Report and should be imminent. *The Financial Stability Oversight Council Annual Report to Congress*, 115th Cong. 13 (2018) (statement of Sec. Mnuchin, Sec. of the Treasury). Second, sanctions were indeed

imposed on Deripaska merely two months after publication of the Section 241 Report, proving the concerns of international banks with respect to Deripaska's inclusion in the Section 241 Report well-founded. Third, Defendants admitted that the sanctions imposed on Deripaska "follow the Department of the Treasury's issuance of the CAATSA Section 241 report" and "target[] a number of the individuals listed in the Section 241 List." AR 0413-0420. In short, Defendants' public statements plainly demonstrate the causal relationship between Deripaska's Section 241 Report identification and his subsequent designation.

E.    *Defendants' Publication of the Section 241 Report Constitutes Reviewable Final Agency Action*

Final agency action is subject to judicial review. 5 U.S.C. § 704. For agency action to be "final" for purposes of the APA, two conditions must be met: (1) the action must signal the "consummation" of a decision-making process undertaken by the agency; and (2) rights or obligations must have been determined by the action or legal consequences flow from it. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). A court's inquiry into whether action is final should be "pragmatic" and "flexible." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1278 (D.C. Cir. 2005). For instance, agency action is final if it is "'definitive' and 'has a direct and immediate . . . effect on the day-to-day business' of the party challenging it." *Id.* (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 239 (1980)).

Defendants' identification of Deripaska as an "oligarch" for purposes of the Section 241 Report constitutes "final agency action" within the meaning of the APA. It is clear that the publication of the Section 241 Report signaled the consummation of Defendants' decision-making process insofar as Section 241 of the CAATSA required the Secretary to assemble a list of oligarchs—a statutory commitment he fulfilled through the Section 241 Report. *See* Press Release,

U.S. Dep't of Treasury, Treasury Releases CAATSA Reports, Including on Senior Foreign Political Figures and Oligarchs in the Russian Federation (Jan. 29, 2018). Further, there were "legal consequences," insofar as Deripaska was identified as an "oligarch" for purposes of the CAATSA, which followed the Secretary's fact-finding and his application of CAATSA's statutory criteria. *Id*. In addition, the identification was communicated in a final report submitted to Congress. *Id*. Moreover, Deripaska's designation under E.O. 13661 followed shortly after his inclusion on the Section 241 Report. AR 0413-0420.

For its part, Congress noted that the Report was intended to allow for its consideration of "[t]he potential impacts of imposing secondary sanctions with respect to Russian oligarchs . . ." CAATSA § 241. This purpose was echoed by Secretary Mnuchin mere days after publication, when he noted that sanctions would "come out of [the list]." *The Financial Stability Oversight Council Annual Report to Congress*, 115th Cong. 13 (2018) (statement of Sec. Mnuchin, Sec. of the Treasury). Moreover, when Deripaska was sanctioned, Defendants' press release stated that its action "follow[s] the Department of the Treasury's issuance of the CAATSA Section 241 report" and "targets a number of the individuals listed in the Section 241 List." AR 0413-0420. Accordingly, legal consequences did flow from Deripaska's identification as an "oligarch."

Defendants argue that because Deripaska's identification as a Russian oligarch in the Section 241 Report does not determine rights or obligations and no legal consequences flow from it, the Section 241 Report does not constitute final agency action reviewable under the APA. Defs. Mem. at 38-39. Defendants are wrong for all the reasons described above. There are clear legal consequences from the Secretary's action—ones that have "direct and immediate . . . effect" on Deripaska—including the closure of bank accounts held by him and his companies, as well as significant reputational harm. SAC ¶¶ 36, 96-113. Indeed, the most significant consequence of

Deripaska's identification as an "oligarch" was his targeting for the imposition of sanctions, as Defendants noted in their testimony before Congress and their press release.

### VII. DEFENDANTS FAILED TO PROVIDE DERIPASKA WITH A PROCESS TO CHALLENGE HIS INCLUSION IN THE SECTION 241 REPORT IN VIOLATION OF CONSTITUTIONAL DUE PROCESS

Defendants violated Deripaska's due process rights under the Fifth Amendment to the U.S. Constitution for two distinct reasons. First, Defendants failed to provide him adequate notice of the reasons for his inclusion in the Section 241 Report, including the administrative record underlying their determination that he meets the criteria for identification as an "oligarch." Second, Defendants failed to provide him with any opportunity to challenge his inclusion in the Section 241 Report through an administrative process.

Due process requires that "'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" *Mathews*, 424 U.S. at 348 (1976) (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring). For instance, due process requires OFAC to provide the designated person with information sufficient for the person to understand the agency's allegations and meaningfully respond to them. *KindHearts for Charitable Humanitarian Dev. v. Geithner*, 647 F. Supp. 2d 857, 901 (N.D. Ohio 2010). Due process also mandates that person's injured by the government's action be afforded the opportunity to be heard . . . in a meaningful manner." *Mathews*, 424 U.S. at 333 (1976). While due process "is flexible and calls [only] for such procedural protections as the particular situation demands," *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972), it also requires that injured persons have a "meaningful opportunity" to challenge the government's action. *Mathews*, 424 U.S. at 348.

Here, Defendants failed to provide Deripaska with the administrative record or any alternative form of notice to apprise him of the reasons for his identification in the Section 241 Report. This failure has imposed a significant bar to Deripaska understanding the basis for his identification in the Section 241 Report or meaningfully responding to Defendants' allegations. Defendants have also entirely failed to provide Deripaska with an opportunity to rectify the substantial harm caused by his identification in the Section 241 Report, including through any administrative process or other hearing. In doing so, Defendants have acted contrary to the twin pillars of constitutional due process—i.e., that a person affected by the government's action be provided notice and an opportunity to be heard.

Defendants attack Deripaska's standing to bring these claims, arguing that he "has not adequately alleged presence in and substantial contacts with the U.S. sufficient to confer due process rights upon him;" that the "purported reactions by third parties do not establish a viable procedural due process claim;" and that his "interest in reputation" does not trigger the protections of the Due Process Clause. Defs. Mem. at 42-43. Defendants' arguments fail upon examination.

First, as described above, Deripaska merits the protections of the Due Process Clause and can raise constitutional due process claims, at the very least with respect to Defendants' actions. Second, Deripaska has alleged the impairment of interests falling clearly within the protections of the Due Process Clause—e.g., his property interests. SAC ¶¶ 36, 96-113. Defendants counter that the actions of foreign banks and other parties responding to Deripaska's identification in the Section 241 List "do not establish a viable procedural due process claim," as the Due Process Clause's protections only apply when "the State seeks to remove or significantly alter that protected status." Defs. Mem. at 43 (quoting *Paul v. Davis*, 424 U.S. 693, 710-11 (1976)).

But, as explained above, Defendants compiled the Section 241 Report for the express purpose of identifying parties for whom sanctions could be imposed. Moreover, Defendants made public statements immediately following publication of the Section 241 Report identifying their intent to impose those sanctions in the near future. Accordingly, Defendants' attempts to pin the blame for Deripaska's injuries on the reactions of third parties disregards Defendants' clear role in creating the expectation that dealings with parties identified in the Section 241 Report would be subject to U.S. sanctions. Those expectations were realized, too, when OFAC designated Deripaska and other parties identified in the Section 241 Report under E.O. 13661 and/or E.O. 13662, declaring that its action "target[ed] a number of individuals listed on the Section 241 Report." AR 0413-0420. Defendants' identification of Deripaska as an "oligarch" in the Section 241 List thus "altered" the status of Deripaska's property interests, as Defendants have publicly communicated its intent to impose sanctions on Deripaska in the near future.

Third, the harm sustained by Deripaska was not merely reputational in nature, but also included immediate harm to his economic interests, as banks closed his or his companies' accounts in direct response to his identification in the Section 241 Report. SAC ¶ 36. For this reason, Deripaska's due process claims do not hinge on whether his reputation qualifies as a liberty or property interest protected by the Due Process Clause.

### VIII.   DEFENDANTS FAILED TO PROVIDE DERIPASKA WITH ADEQUATE NOTICE OF THE REASONS FOR HIS INCLUSION IN THE SECTION 241 REPORT

Defendants have also violated the APA by failing to provide Deripaska with adequate notice of the reasons for his identification in the Section 241 Report, including an administrative record underlying the Secretary's decision that Deripaska meets the criteria for identification in the Section 241 Report. As explained above, an agency is required to "'set forth its reasons' for

[a] decision," lest it engage in arbitrary and capricious action. *Tourus Records*, 259 F.3d at 736 (quoting *Roelofs*, 628 F.2d at 599). This requirement serves the purpose of ensuring that parties affected by agency action are able to correct factual mistakes made by the agency and that the courts are well-positioned to review the agency's action. *Id.*

Deripaska has not received any notice regarding the basis for his identification as an "oligarch" in the Section 241 Report, including the findings made by the Secretary in support of his decision to include Deripaska in the report. Deripaska has also not been given access to the administrative record or any portions thereof underlying that decision. Instead, the sole notice provided to Deripaska is the determination found in the Section 241 Report that Deripaska is a Russian individual with a net worth of greater than $1 billion. *See* U.S. DEP'T OF THE TREASURY, REPORT TO CONGRESS PURSUANT TO SECTION 241 OF THE COUNTERING AMERICA'S ADVERSARIES THROUGH SANCTIONS ACT OF 2017 REGARDING SENIOR FOREIGN POLITICAL FIGURES AND OLIGARCHS IN THE RUSSIAN FEDERATION AND RUSSIAN PARASTATAL ENTITIES (2018).

Defendants contend that Deripaska has adequate notice of the basis for his identification in the Section 241 Report, arguing that the report "expressly states that Russian nationals were included in the list of oligarchs if they have a net worth of at least one billion dollars." Defs. Mem. at 42. But Defendants confuse the Secretary's conclusion that Deripaska is a Russian individual with a net worth over $1 billion with the discrete findings and reasoning that went into producing this conclusion. The two are not the same: the APA's notice requirement demands that agencies produce the "reasons for [their] decision," not that agencies merely provide the conclusion reached. *See Tourus Records*, 259 F.2d at 737 (finding agency's notice deficient because its denial letter "[was] not a statement of reasoning, but of conclusion."); *see also Amerijet Int'l, Inc.*, 753 F.3d at 1350 (holding that "conclusory statements will not do; an 'agency's statement must be one of

*reasoning.*'"). Failing to disclose the reasons for the Secretary's determination that Deripaska meets the criteria for identification in the Section 241 Report has the impermissible effect of denying Deripaska the opportunity to provide rebuttal evidence to the Secretary's findings.

The obvious implication of the Secretary's unwillingness to produce the administrative record underlying its determination that Deripaska meets the criteria for identification in the Section 241 Report is that there is no administrative record. Indeed, it has been widely reported that Defendants merely cribbed the findings of the *Forbes* magazine report and produced no independent analysis of its own regarding the net wealth of the individuals identified in the Section 241 Report. SAC ¶¶ 31-33. This evidences that the Section 241 Report is not the product of reasoned agency decision-making.

## CONCLUSION

For the foregoing reasons, the Court should grant Deripaska's motion for summary judgment; deny Defendants' motion to dismiss or, in the alternative, for summary judgment; and enter judgment in favor of Deripaska on all claims.

Dated: June 5, 2020                                     Respectfully submitted,

/s/ Erich C. Ferrari
Erich C. Ferrari, Esq.
FERRARI & ASSOCIATES, P.C.
1455 Pennsylvania Avenue, NW
Suite 400
Washington, D.C. 20004
Telephone: (202) 280-6370
Fax: (877) 448-4885
Email: ferrari@falawpc.com
D.C. Bar No. 978253
