**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OLEG DERIPASKA,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>STEVEN T. MNUCHIN, Secretary of the UNITED STATES DEPARTMENT OF THE TREASURY, ANDREA M. GACKI, DIRECTOR OF THE OFFICE OF FOREIGN ASSESTS CONTROL,<br><br>　　　　　　Defendants. | Civil Action No. 19-cv-00727 (APM) |

<u>**DEFENDANTS' CONSOLIDATED REPLY IN SUPPORT OF MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**</u>

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

I. OFAC'S DESIGNATIONS OF PLAINTIFF WERE THE PRODUCT OF
REASONED DECISION-MAKING AND WITHIN THE SCOPE OF ITS
STATUTORY AUTHORITY.............................................................................................2

    A.    OFAC's designation of Plaintiff pursuant to EO 13661 was the product of
reasoned decision-making and sufficiently supported by the Administrative
Record ..................................................................................................................3

    B.    OFAC's thoroughly explained denial of Plaintiff's delisting petition was
neither arbitrary nor capricious .............................................................................7

    C.    OFAC's designations of Plaintiff pursuant to EO 13661 and 13662 fit well
within the scope of its authority under IEEPA......................................................10

II. PLAINTIFF LACKS STANDING TO BRING A DUE PROCESS CLAIM BUT,
IN ANY EVENT, RECEIVED SUFFICIENT PROCEDURAL PROTECTIONS ............13

    A.    Plaintiff lacks standing because he has no physical presence and has
insufficient contacts in the United States..............................................................14

    B.    Even if he had standing, Plaintiff's due process claim lacks merit because
OFAC provided him with ample notice of the basis for his designation................16

        1.    OFAC has satisfied due process requirements by providing Plaintiff
with the unclassified Administrative Record and unclassified
summaries ..................................................................................................17

        2.    OFAC has provided Plaintiff a sufficient basis to understand his
designation under EO 13661.......................................................................21

        3.    OFAC has provided Plaintiff a sufficient basis from which to
understand the denial of his delisting petition challenging his EO
13662 designation ......................................................................................25

        4.    Defendants provided Plaintiff with sufficient notice under the APA ..........26

III. PLAINTIFFS' CHALLENGES TO THE CAATSA REPORT ARE NOT
JUSTICIABLE BUT, IN ANY EVENT, FAIL ON THE MERITS...................................27

    A.    Plaintiff's CAATSA challenge is not justiciable ...................................................28

    B.    Because he has no cognizable injury traceable to the report, Plaintiff lacks
standing .................................................................................................................30

    C.    The CAATSA Report is not reviewable under the APA because it does not
constitute final agency action................................................................................31

D.      Plaintiff's APA challenge to his inclusion in the CAATSA Report fails on
        the merits ................................................................................................................... 33

E.      Plaintiff lacks standing to sustain his due process challenge to the CAATSA
        Report, which, in any event, fails on the merits ........................................................ 35

CONCLUSION ............................................................................................................................. 38

## TABLE OF AUTHORITIES

### Cases

*Alfa International Seafood v. Ross*,
  264 F. Supp. 3d 23 (D.D.C. 2017) ............................................................12

*Amerijet Intern., Inc. v. Pistole*,
  753 F.3d 1343 (D.C. Cir. 2014) ............................................................35

*Bazzi v. Gacki*,
  --- F.Supp. 3d ---, 2020 WL 3448010 (D.D.C. June 24, 2020)............................................17, 21

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................29

*Coll. Sports Council v. Gov't Accountability Office*,
  421 F. Supp. 2d 59 (D.D.C. 2006) ............................................................26

*Connecticut Nat. Bank v. Germain*,
  503 U.S. 249 (1992) ............................................................32

*Department of Homeland Security v. Regents of the University of California*,
  2020 WL 3271746 (2020) ............................................................11

*Fares v. Smith*,
  249 F. Supp. 3d 115 (D.D.C. 2017) ............................................................20, 23

*Fares v. Smith*,
  901 F.3d 315 (2018) ............................................................18, 19

*FBME Bank Ltd. v. Lew*,
  125 F. Supp. 3d 109 (D.D.C. 2015) ............................................................18

*Florida Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ............................................................11

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
  313 F.3d 852 (4th Cir. 2002) ............................................................29, 30

*Fulmen Co. v. Office of Foreign Assets Control*,
  Civil Case No. 18-2949 (RJL), 2020 WL 1536341 (D.D.C. March 31, 2020)............................9

*Gen. Elec. Co., v. Jackson*,
  610 F.3d 110 (D.C. Cir. 2010) ............................................................33

*Guerrero v. Clinton*,
  157 F.3d 1190 (9th Cir. 1998)............................................................26, 29

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ..................................................................................................22

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003) .......................................................................16, 18

*Humane Soc'y of the U.S. v. Perdue*,
    935 F.3d 598 (D.C. Cir. 2019) ..............................................................................14

*Islamic Am. Relief Agency v. Gonzales*,
    477 F.3d 728 (D.C. Cir. 2007) ..........................................................................6, 22

*Jifry v. FAA*,
    370 F.3d 1174 (D.C. Cir. 2004) ...............................................................12, 14, 17

*Joshi v. Nat'l Transp. Safety Bd.*,
    791 F.3d 8 (D.C. Cir. 2015) ...................................................................................30

*Joumaa v. Mnuchin*,
    798 F. App'x 667 (D.C. Cir. 2020) ..........................................................................5

*Joumaa v. Mnuchin*,
    No. CV 17-2780 (TJK), 2019 WL 1559453 (D.D.C. Apr. 20, 2019)............................5, 18, 21

*Kadi v. Geithner*,
    42 F. Supp. 3d 1 (D.D.C. 2012) .............................................................................14

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..........................................................................................27, 28

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ...............................................................................................15

*Mosrie v. Barry*,
    718 F.2d 1151 (D.C. Cir. 1983) .............................................................................33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...................................................................................................2

*National Council of Resistance of Iran v. Department of State*,
    251 F.3d 192 (D.C. Cir. 2001) .........................................................................14, 18

*Nat. Res. Def. Council v. Lujan*,
    768 F. Supp. 870 (D.D.C. 1991) ......................................................................26, 27

*Nat'l Shooting Sports Found., Inc. v. Jones*,
    716 F.3d 200 (D.C. Cir. 2013) ................................................................................5

*OKKO Bus. PE v. Lew*,
   133 F. Supp. 3d 17 (D.D.C. 2015) ...................................................................10

*Parsons v. U.S. Dep't of Justice*,
   878 F.3d 162 (6th Cir. 2017)..........................................................................30

*Paul v. Davis*,
   424 U.S. 693 (1976)........................................................................................33

*People's Mojahedin Org. of Iran v. Dep't of State*,
   327 F.3d 1238 (D.C. Cir. 2003) ......................................................................18

*Rakhimov v. Gacki*,
   Civil Action No. 19-2554 (JEB), 2020 WL 1911561 (D.D.C. Apr. 20, 2020)......................18, 19

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
   324 F.3d 726 (D.C. Cir. 2003) ........................................................................30

*Resources Def. Council, Inc. v. Hodel*,
   865 F.2d 288 (D.C. Cir. 1988) ..............................................................25, 26, 27

*Smith v. City of Jackson*,
   544 U.S. 228 (2005)........................................................................................31

*Tourus Records, Inc. v. DEA*,
   259 F.3d 731 (D.C. Cir. 2001) ..................................................................34, 35

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ....................................................................................11

*United States v. Fantin*,
   130 F. Supp. 2d 385 (W.D.N.Y. 2000) ............................................................13

*United States v. White*,
   869 F.2d 822 (5th Cir. 1989)...........................................................................26

*Zevallos v. Obama*,
   793 F.3d 106 (D.C. Cir. 2015) ..................................................................16, 19

*Zevallos v. Obama*,
   10 F. Supp. 3d (2015)................................................................................18, 23

## **Statutes**

50 U.S.C. § 1702 ..................................................................................................16

50 U.S.C. § 1701 ....................................................................................................1

**Regulations**

31 C.F.R. § 501.807 .................................................................................................6

31 C.F.R. § 589.101 ..............................................................................................7, 8

31 C.F.R. § 597.101(a) ............................................................................................3

31 C.F.R. § 597.301(a)(2) ........................................................................................3

31 C.F.R. § 1010.605(p) .........................................................................................32

Department of the Treasury, *Notice of OFAC Sanctions Actions*,
   83 Fed. Reg. 19,138 (May 1, 2018) ...................................................................20

**Other Authorities**

EXEC. ORDER NO. 13582 ......................................................................................28

EXEC. ORDER NO. 13661 ................................................................................. passim

EXEC. ORDER NO. 13662 ................................................................................. passim

Stop Corrupt Iranian Oligarchs and Entities Act ("SCIOEA"),
   H.R. 7182, 115th Cong. § 2(a)(1)(A) (2018) ....................................................31

The CAATSA Press Release
   https://home.treasury.gov/news/press-releases/sm0271......................................28

## **INTRODUCTION**

As set forth in Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") reasonably imposed sanctions on Plaintiff, a Russian oligarch, based on its determination that he has acted or purported to act for or on behalf of, directly or indirectly, Russian President Vladimir Putin, and that he operates in the energy sector of the Russian economy. OFAC's decisions reflect the broad authority given to it under the International Emergency Economic Powers Acts ("IEEPA"), 50 U.S.C. §§ 1701-06, and satisfy the criteria set forth in Executive Order ("EO") 13661 and EO 13662, pursuant to which the designations were made. Defendants also showed that Plaintiff lacks standing to pursue a due process challenge to these designations, but, even if he did have standing, such a challenge would fail because he was afforded sufficient procedural protections. Furthermore, Defendants' motion described why Plaintiff's challenge to his inclusion in a Treasury report identifying him as an oligarch that was provided to Congress under § 241 of the Countering America's Adversaries Through Sanctions Act ("CAATSA") cannot succeed. Not only are there multiple threshold barriers precluding the Court's review of such a claim, but OFAC also reasonably determined that Plaintiff met the definition of "oligarch" for purposes of the report. Dismissal of this case, or summary judgment in favor of Defendants, is therefore warranted.

In opposition, Plaintiff provides no reason to draw a different conclusion. Pursuant to the Administrative Procedure Act ("APA"), Plaintiff challenges his designation under EO 13661 and OFAC's denial of his delisting petition under EO 13662, but his cross-motion reveals no infirmity in the agency's decision-making process and Plaintiff's disagreement with OFAC's final decisions is not an APA violation. Citing extrinsic evidence regarding the national emergency EO 13661 and EO 13662 addressed does Plaintiff no good; the evidence does not detract from the stated purposes of the Executive Orders. Nor can Plaintiff sustain his due process challenge to his designations: his

cross-motion fails to demonstrate that he has both the requisite physical presence and sufficient contacts in the United States to establish standing, and the Administrative Record shows that he received sufficient notice of the reasons for his designation and OFAC's denial of his delisting petition.  Plaintiff's cross-motion, moreover, fails to overcome the threshold barriers to his CAATSA challenge or to demonstrate that OFAC's inclusion of him in the list of oligarchs was unjustified.  The Court should accordingly deny Plaintiff's cross-motion and grant Defendants' motion.

## ARGUMENT

## I.   OFAC'S DESIGNATIONS OF PLAINTIFF WERE THE PRODUCT OF REASONED DECISION-MAKING AND WITHIN THE SCOPE OF ITS STATUTORY AUTHORITY

Defendants' motion explained why Plaintiff's designations pursuant to EO 13661 and EO 13662 were the product of reasoned decision-making and thoroughly supported by the Administrative Record in this case.  Thus, these designations, including OFAC's March 2020 denial of Plaintiff's petition for delisting were not arbitrary or capricious.  *See* Defs.' Mem. In Supp. of Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. ("Defs.' Mot."), ECF No. 27-1, at 15-24.  OFAC's designations and its denial of the delisting petition were consistent with the agency's authority under IEEPA and the Executive Orders pursuant to which the designations were made.

In an attempt to salvage his APA claims, Plaintiff's cross-motion quibbles with certain assessments and conclusions OFAC reached in the evidentiary memoranda supporting OFAC's decisions, but his disagreement with OFAC's conclusions does nothing to undermine the "rational connection between the facts found and choice[s] [OFAC] made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Equally unavailing is Plaintiff's reliance on information outside the scope of the Administrative Record to suggest that his designations were targeted towards an undeclared national emergency and were thus outside the

scope of OFAC's IEEPA authority.  Defendants are accordingly entitled to judgment on Plaintiff's APA claims.

### A. OFAC's designation of Plaintiff pursuant to EO 13661 was the product of reasoned decision-making and is sufficiently supported by the Administrative Record

Plaintiff's challenge to his EO 13661 designation revolves around two contentions:  first, that OFAC considered a variety of Plaintiff's conduct when making its determination, despite the fact that the header in the evidentiary stating the basis for the EO 13661 designation refers only to Plaintiff's support for "Putin's projects"; and second, that OFAC cannot rely on past conduct that was not ongoing at the time of the designation.  *See* Pl.'s Mem. of Points and Authorities in Supp. of Pl.'s Cross-Mot. for Summ. J. and in Opp'n to Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. ("Pl.'s Cross-Mot."), ECF No. 31-1, at 24-27.  Neither contention has merit.

Plaintiff's first argument—that OFAC failed to abide by its self-imposed limitation concerning evidence that he supported Putin's projects—is based on two incorrect assumptions.  To begin, Plaintiff incorrectly presumes that EO 13661's reference to "act[ing] or purport[ing] to act for or on behalf of" necessarily implies an agency relationship, *see* Pl.'s Cross-Mot. at 24, even though EO 13661 itself contains no such interpretation or qualifying language.  This unsupported interpretation is Plaintiff's alone.  He invokes 31 C.F.R. § 597.301(a)(2)—a regulation promulgated as part of the Foreign Terrorist Organizations ("FTOs") sanctions program, pursuant to a separate and independent national emergency declaration—noting that OFAC's definition of the word "agent" there mirrors the language in EO 13661.  *Id.*  But Plaintiff elides the fact that, by their own terms, the definitions in the FTO regulations do not necessarily apply to other OFAC programs, including the Russian/Ukraine program.  *See* 31 C.F.R. § 597.101(a) ("Differing statutory authority and foreign policy and national security contexts may result in differing interpretations of similar language among the parts of this chapter.").  Moreover, the word "agent" does not even appear in

EO 13661 or the regulations administering OFAC's sanctions program, so Plaintiff seeks to import not only a definition but an entirely new term of art from a different sanctions program.  Because Plaintiff's argument stems from this flawed premise, the operative language in EO 13661 cannot be limited to describing an agency relationship.

Also flawed is Plaintiff's attempt to limit OFAC to the "Putin's projects" phrasing used in the evidentiary memorandum.  Plaintiff asserts that this phrase constitutes the sole justification for Plaintiff's designation under EO 13661, but this assertion is simply hair-splitting:  OFAC designated Plaintiff pursuant to EO 13661 because it determined that Plaintiff has acted or purported to act on or behalf of, directly or indirectly, a senior official of the Government of the Russian Federation," *see* DERIPASKA_0007,[1] and it cited multiple pieces of evidence in support of that determination. But even if OFAC were constrained in the manner Plaintiff suggests, the evidentiary memorandum and unclassified summaries of classified portions of that memorandum identify multiple examples of Plaintiff acting in support of Putin's projects.  The memorandum, for instance, states that Plaintiff, in response to encouragement from Putin, purchased an aluminum plant in Montenegro because "the Kremlin wanted an area of influence in the Mediterranean."  *See* DERIPASKA_0008.  Plaintiff further made an $800 million investment in a project associated with the Sochi Olympics at the behest of Putin, financed projects as late as 2018 at the request of Putin and senior Russian officials, and twice was involved in money-laundering schemes designed to benefit Putin[2].  *See* Second Am. Compl. ("SAC"), ECF No. 26, ¶ 54.  OFAC's discussion of this conduct provides a reasonably

---

[1] Although Defendants' motion cited to the Administrative Record using the "AR" prefix, Defendants here use "DERIPASKA" to reflect better the Bates numbering used in the Record.

[2] Plaintiff contends that the money-laundering scheme cannot be a basis for designation because it was not tied to a specific project of Putin.  *See* Pl.'s Cross-Mot. at 26.  Defendants respectfully direct the Court to DERIPASKA_0013 and the classified exhibits cited therein (Exhibits 14-16, 18-20, 23) for further information about the money-laundering scheme.

discernible path between the facts found—that Plaintiff on multiple occasions took action at the direction or with the encouragement of Putin at the time he was the head of the Russian government or one of its most senior officials—and OFAC's conclusion that Plaintiff acted or purported to act for or on behalf of, directly or indirectly, Putin.  *See Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (noting that a court must uphold an agency decision, even if it is "of less than ideal clarity," so long as "the agency's path may reasonably be discerned" (citation omitted)).

Next, Plaintiff suggests that certain instances of his conduct cannot serve as a basis for Plaintiff's EO 13661 designation because the conduct purportedly ceased prior to the April 6, 2018 designation.  This unfounded proposition cannot be reconciled with the language of EO 13661, which expressly contemplates that persons can be sanctioned on the basis of past conduct.  *See* DERIPASKA_0015 (EO 13661 referring, among other things, to persons who "*have acted* or *purported to act* for or on behalf of, directly or indirectly" senior Russian government officials (emphasis added)); *see also Holy Land Found. for Relief and Development v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) ("HLF also argues that Treasury was arbitrary and capricious in relying on information that predated the 1995 designation of Hamas as a terrorist organization.  However, as the district court noted, it was clearly rational for Treasury to consider HLF's genesis and history, which closely connect it with Hamas." (citation omitted)); *Joumaa v. Mnuchin*, No. CV 17-2780 (TJK), 2019 WL 1559453, at *8 (D.D.C. Apr. 20, 2019), *aff'd*, 798 F. App'x 667 (D.C. Cir. 2020) (holding that, in the context of denying a delisting petition, "OFAC may rationally consider [historical] evidence of [the plaintiff's pre-designation] illicit activities, networks, and capabilities to help it assess, and provide context for, evidence of his more recent conduct—both its own evidence and any purportedly exculpatory evidence provided by [the plaintiff]").

Furthermore, the Executive Orders issued under IEEPA are enacted to address national emergencies, particularly those involving national security and foreign policy implications, *see* 50 U.S.C. § 1701(a), and conduct by individuals or entities appropriately informs OFAC's assessments pursuant to these authorities. It is not for Plaintiff to second-guess an Executive Branch determination that sanctioning on the basis of past conduct will promote the national security and foreign policy of the United States. *See OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17, 28 (D.D.C. 2015) ("Whether continued blocking is an effective strategy at fulfilling OFAC's foreign policy objectives, however, is not a question for this court."); *cf. also Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007) (rejecting the argument that "OFAC cannot block an entity's assets unless it determines that the entity itself poses an 'unusual and extraordinary threat to national security'"); *United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997) (rejecting the argument that the Government must show that "the particular goods, when or if sold, constitute an actual threat to national security"). To hold otherwise would unduly constrain the Executive's "broad and flexible power" under IEEPA, *McKeeve*, 131 F.3d at 10, and impermissibly interfere with the Executive's ability to use economic sanctions as a foreign policy and national security tool. *See Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981). Tellingly, Plaintiff points to no language in either IEEPA or EO 13661 that precludes OFAC's ability to rely on past conduct to support a designation.

Regardless, Plaintiff's designation would still be valid even such a restriction existed. Although Plaintiff attempts to isolate each specific incident identified by OFAC, his broader course of conduct—as reflected in the evidentiary memorandum and unclassified summaries—shows that Plaintiff acted or purported to act for or on behalf of, directly or indirectly, Putin as early as 2004

and that this conduct continued at least through January 2018, *see* SAC ¶ 54, just three months prior to Plaintiff's designation.[3]

Furthermore, Plaintiff's attempts to cabin OFAC's authority under EO 13661 are wholly at odds with the broad deference afforded to OFAC when fulfilling its obligations under IEEPA. *See* Defs.' Mot. at 16; *see also Islamic Am. Relief Agency*, 477 F.3d at 734 (observing that, since blocking orders lie "at the intersection of national security, foreign policy, and administrative law," a court's review of such orders "is extremely deferential"). OFAC's designation of Plaintiff under EO 13661 passes muster under this deferential standard of review, for the reasons set forth above and in Defendants' motion. The Court should therefore reject Plaintiff's arbitrary-and-capricious challenge to his designation under EO 13661.

### B. OFAC's thoroughly explained denial of Plaintiff's delisting petition was neither arbitrary nor capricious

Just as Plaintiff's challenge to his EO 13661 designation must fail, so too must his challenge to OFAC's denial of his delisting petition under EO 13662. OFAC explained the reasons for its denial in a 12-page, largely unredacted evidentiary memorandum responding to the various arguments Plaintiff raised in his petition. *See* DERIPASKA_0158-69. The evidentiary memorandum supporting OFAC's designation of Plaintiff pursuant to EO 13662, moreover, is included in the Administrative Record and reflects OFAC's reasons for its original determination that Plaintiff operates in the energy sector of the Russian economy. *See* DERIPASKA_0009-11.

Plaintiff raises three challenges to the explanation provided in OFAC's March 2020 denial, none of which undermine that decision. First, Plaintiff objects to OFAC's assessment that Plaintiff's

---

[3] Notably, if Plaintiff believed that the circumstances warranting his designation under EO 13661 "no longer apply," he can petition OFAC for administrative reconsideration of that designation. *See* 31 C.F.R. § 501.807. Unlike with his designation pursuant to EO 13662, Plaintiff has not sought administrative reconsideration of his EO 13661 designation.

involvement in the World Economic Forum ("WEF") as part of his work in the En+ Group Ltd. ("En+") constituted operating in the Russian energy sector. *See* Pl.'s Cross-Mot. at 28-29. Plaintiff does not dispute the fact that this work pertained to the energy industry broadly but asserts that OFAC failed to link that work to the Russian energy sector specifically. *Id*. But OFAC's conclusion in this regard was based on statements that Plaintiff made on his own website, which describes En+ as a "*Russian* diversified power and metal group of companies" that participates in the WEF as part of the "Energy, Utilities, and Technology group." *See* DERIPASKA_0511 (emphasis added); *see also* DERIPASKA_0161 (citing to Plaintiff's website). That same website states that Plaintiff's "key companies actively participate in the WEF's industry groups." DERIPASKA_0511. It was therefore reasonable for OFAC to draw a conclusion, based on Plaintiff's own representations, that Plaintiff's involvement in energy-related WEF industry groups on behalf of En+—a Russian power company—evidenced his participation in the Russian energy sector.

Second, Plaintiff accuses OFAC of *ad hoc* decision-making for purportedly changing the definition of "energy sector" to include private electricity production or power generation for purposes of EO 13662, even though OFAC uses a different definition of the phrase for other programs. *See* Pl.'s Cross-Mot. at 29-30. This argument is contradicted by the evidentiary memorandum supporting OFAC's denial of the delisting petition, which fully addressed this argument when it was raised by Plaintiff in his delisting petition. OFAC explained that Plaintiff's invocation of definitions from other programs was not determinative of the matter under EO 13662, given that "an interpretation in one program is not determinative of an interpretation in other programs." *See* DERIPASKA_0162; *see also* 31 C.F.R. § 589.101 (explaining that, for purposes of the Ukraine Related Sanctions Regulations, "[d]iffering foreign policy and national security may result in different interpretations of similar language among the parts of this chapter"). And far from being a capricious departure from past precedent, as Plaintiff tries to suggest, *see* Pl.'s Cross-Mot.

8

at 30, OFAC's interpretation of "energy sector" to include private power generation or electricity production corresponds to how OFAC has interpreted that phrase in other programs and, more importantly, in the specific context of the Russia/Ukraine program.[4]  *See* DERIPASKA_0162 (explaining that "in no other program . . . has OFAC defined the term 'energy sector' to exclude power generation or electricity production" and further noting that "OFAC has designated at least one other individual for operating in the energy sector of the Russian Federation economy for power generation activities").

Third and finally, Plaintiff takes issue with OFAC's assessment that he continues to operate in the Russian energy sector by way of his ownership stakes in En+ and ESE, even though he no longer has a majority stake in either company.  *See* Pl.'s Cross-Mot. at 30-31.  But Plaintiff continues to have a significant minority stake in En+, by virtue of the fact that he still owns 44.95 percent of the company, votes 35 percent of its shares, and appoints four of the twelve—or one-third total—of the company's board of directors.  DERIPASKA_0163.  En+ also owns 100 percent of ESE stock, so OFAC also reasonably assessed that Plaintiff has a significant minority stake in ESE given his significant minority stake in En+.  *Id.*  In other words, although Plaintiff no longer exercises the same degree of control over En+ (or ESE, by way of his control over En+), his significant minority stake still allows him to wield influence over both entities.[5]  Plaintiff may disagree with OFAC's conclusion in this regard, but that does not mean that it is unreasonable or insufficiently explained.

---

[4] Tellingly, Plaintiff's basis for arguing that the phrase "energy sector" has been limited to activities involving petroleum,  natural gas, or petroleum products, *see* Pl.'s Cross-Mot. at 30, is OFAC's interpretation of the phrase in the context of its Iran sanctions program, *see* DERIPASKA_0200. But the fact that OFAC had this interpretation in one of its many sanctions programs hardly establishes any sort of traditional practice from which the interpretation under EO 13661 can be said to be "ad hoc."  This is especially true in light of OFAC's regulations stating that different meanings apply to different terms of art among the sanctions programs.  *See* 31 C.F.R. § 589.101.

[5] And in any event, EO 13662 does not require majority ownership in order for a person to be designated.  *See* DERIPASKA_0018 (setting forth criteria for designation under EO 13662, which

### C. OFAC's designations of Plaintiff pursuant to EO 13661 and 13662 fit well within the scope of its authority under IEEPA

Plaintiff's Second Amended Complaint purports to assert a cause of action claiming that OFAC exceeded its statutory authority under IEEPA in designating Plaintiff under EO 13661 and EO 13662 but fails to explain why Plaintiff believes this to be the case. *See* SAC ¶¶ 131, 146. In his cross-motion, Plaintiff makes clear that he is not claiming that the reasons stated by OFAC in the evidentiary memoranda justifying each designation exceed OFAC's authority, and with good reason. Those memoranda explain that OFAC determined that Plaintiff should be designated after careful review of evidence demonstrating that Plaintiff twice met at least one of the criteria set forth in the Executive Orders for designation (once for each designation). For Plaintiff's EO 13661 designation, OFAC determined that Plaintiff has acted or purported to act for or on behalf of, directly or indirectly, a senior Russian Government official. *See* DERIPASKA_0007-09; DERIPASKA_0015 (setting forth criteria for EO 13661). For Plaintiff's EO 13662 designation, OFAC determined that Plaintiff operates in the energy sector of the Russian economy. *See* DERIPASKA_0009-10; DERIPASKA_0018 (setting forth criteria for EO 13662). As recently recognized by a district court in this circuit, OFAC "has broad discretion to block individuals pursuant to IEEPA" once it determines that such individuals meet the designation criteria set forth in the applicable Executive Order. *Fulmen Co. v. Office of Foreign Assets Control*, Civil Case No. 18-2949 (RJL), 2020 WL 1536341, at *7 (D.D.C. March 31, 2020) (dismissing claim that OFAC

---

in relevant part states that a person must be determined only "to operate in such sectors of the Russian Federation economy as may be determined by the Secretary of the Treasury . . .").

designation exceeded the agency's statutory authority); *see also OKKO Bus.*, 133 F. Supp. 3d at 27-38 (same).

Plaintiff's cross-motion clarifies that his claim focuses exclusively on extra-record statements made by the Treasury Secretary in a press release announcing the designation of Plaintiff and others, as well as a statement in a December 2018 letter from the OFAC director to Congress. *See* Pl.'s Cross-Mot. at 19-22.  In particular, Plaintiff makes much of the Secretary's reference in the press release to Russia's "malign activities," contending that such activities fall outside the scope of the national emergency declared in EO 13661 and 13662.  *Id.*  This argument ignores the well-established principle of administrative law that grants OFAC significant deference in interpreting the scope of its authority under IEEPA, *see City of Arlington v. FCC*, 569 U.S. 290, 307 (2013), as well as the scope of the national emergency declared in EO 13661, *see Islamic Am. Relief Agency*, 477 F.3d at 734-35; *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012) ("We owe unique deference to the executive branch's determination that we face 'an unusual and extraordinary threat to the national security' of the United States.").

Plaintiff's argument, moreover, fails on its own terms.  The press release refers twice to "malign activities," and in the first of those references the Secretary provides examples of such activities, including Russia's "continuing to occupy Crimea" and its efforts to "instigate violence in eastern Ukraine."  DERIPASKA_0413.  Both of these examples of Russia's "malign" activities plainly relate to the national emergencies announced in the two Executive Orders.  *See* DERIPASKA_0015 (declaring that "the actions and policies of the Government of the Russian Federation with respect to Ukraine—including the recent deployment of Russian Federation military forces in the Crimea region of Ukraine . . . constitute an unusual and extraordinary threat to the national security and foreign policy of the United States" (EO 13661)); DERIPASKA_0018 (declaring that "the actions and policies of the Government of the Russian Federation, including its

purported annexation of Crimea and its use of force in Ukraine . . . constitute an unusual and extraordinary threat to the national security and foreign policy of the United States" (EO 13662)).

The Secretary's statement also referred to Treasury's desire to ensure that Russian oligarchs and elites are not insulated from the consequences of Russia's "destabilizing activities," *see* DERIPASKA_0413, language that likewise mirrors the destabilizing consequences identified in EO 13661 and EO 13662 when describing the threat to national security. *See* DERIPASKA_0015 (stating that Russia's actions and policies towards Ukraine "undermine democratic processes and institutions in Ukraine" and "threaten its peace, security, stability, sovereignty, and territorial integrity"); DERIPASKA_0018 (same). Plaintiff's efforts to portray the Secretary's statements as somehow untethered to the national emergency identified in the Executive Orders should therefore be rejected. Furthermore, the fact that the Secretary refers to other examples of Russia's malign activities in the press release does not affect this calculus: nothing in the press release nor the evidentiary memoranda suggests that Plaintiff was designated for any reason other than the fact that he met the criteria set forth in EO 13661 and EO 13662.[6]

Plaintiff's reliance on extra-record materials further violates the long-standing principle under the APA that review of agency action should be based on the written explanation for that action at the time the decision was made.[7] *See Fla. Power & Light*, 470 U.S. 729, 743-44 (1985); *see also Dep't of Homeland Security v. Regents of Univ. of Cal.*, --- S. Ct. ---, No. 18-587, 2020 WL

---

[6] This same analysis applies to Plaintiff's objections to a December 19, 2018 letter from OFAC Director Andrea Gacki to the Senate Majority Leader. *See* Pl.'s Cross-Mot. at 21. That letter's reference to "malign activities" similarly does not demonstrate that Plaintiff was designated for reasons other than addressing the national security threats identified in the relevant Executive Orders.

[7] Plaintiff does not argue that the Administrative Record is insufficient or otherwise should be supplemented.

3271746, at *9 (2020) ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." (citation and internal quotation marks omitted)).  Consistent with this principle, the Supreme Court recently affirmed the notion that the legality of a challenged Government action should be determined by reference to the Government's stated reasons for that action, not by reference to "extrinsic statements," even where such statements were made by Government officials involved in the decision-making process.  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018).  This is especially true with respect to the December 2018 letter from OFAC to Congress, which was sent more than nine months after Plaintiff was designated.[8]  Because the statements upon which Plaintiff relies neither form part of the Administrative Record in this case, nor are they inconsistent with the national security threats identified in the relevant Executive Orders, they provide no basis to conclude that OFAC exceeded its statutory authority.

## II.     PLAINTIFF LACKS STANDING TO BRING A DUE PROCESS CLAIM BUT, IN ANY EVENT, RECEIVED SUFFICIENT PROCEDURAL PROTECTIONS

Plaintiff's due process challenge to his designations fails for two reasons.  First, and at the outset of the analysis, Plaintiff lacks standing to bring such a claim because he is a foreign national without a physical presence in the United States or sufficient contacts.  Dismissal of his claim is warranted for this reason alone.  Second, even if he had standing, Plaintiff received sufficient notice of the basis for his designations and the opportunity to challenge those decisions.

---

[8] Plaintiff's reliance on *Alfa International Seafood v. Ross* is misplaced.  In that case, the plaintiffs submitted a press release from the Department of Commerce in an effort to show that an agency rule was promulgated in violation of the Appointments Clause.  264 F. Supp. 3d 23, 41-42 (D.D.C. 2017).  The press release was thus used not to show that the agency justified its action for reasons not mentioned in the final decisional document but rather in an effort to show which agency official was the one to have promulgated the rule.  *Id*. at 42.  Ultimately, the court in *Alfa International* did not rely on the press release to resolve the matter.  *Id*.

### A. Plaintiff lacks standing because he has no physical presence and has insufficient contacts in the United States

Defendants' motion made clear that Plaintiff lacks standing to pursue his due process challenge. Specifically, Plaintiff is a Russian citizen who lacks substantial connections with the United States. *See* Defs.' Mot. at 27-28. As a "non-resident alien[] who ha[s] insufficient contacts with the United States," Plaintiff is "not entitled to Fifth Amendment protections." *See Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004).

Plaintiff's cross-motion seeks to demonstrate both a physical presence and sufficient contacts with the United States, but it falls short on both fronts. With respect to physical presence, Plaintiff makes much of the fact that he once held a U.S. visa, as OFAC acknowledged in its evidentiary designating him pursuant to EO 13661. *See* DERIPASKA_0008. But that visa dates back to 2005, and, after a visit to the United States that same year, the Government reinstated a previously imposed visa ban for Plaintiff. *See* DERIPASKA_0080. With that visa ban in effect, Plaintiff presumably has not been able to visit the United States since that 2005 trip, and he provides no evidence to conclude otherwise.[9] Thus, to the extent Plaintiff ever had a physical presence in the United States, the Administrative Record shows it to have long since expired. *See United States v. Fantin*, 130 F. Supp. 2d 385, 391 (W.D.N.Y. 2000) (holding that past travel to the United States failed to establish standing to bring constitutional challenges because otherwise "every foreign visitor to the United States could conceivably invoke Fourth Amendment protections against searches in his own country").

---

[9] Although Plaintiff alleges that he was "regularly invited to speak at D.C.-based think tanks and other forums regarding global developments," *see* SAC ¶ 105; Pl.'s Cross-Mot. at 39, that allegation demonstrates only that Plaintiff *received* such invitations and does not show that he actually *embarked* on such trips.

Plaintiff fares no better in his effort to demonstrate that he has sufficient contacts with the United States.  Plaintiff relies heavily on three paragraphs in the Second Amended Complaint in which he alleges that he had an ownership interest in Basic Element, Inc., purportedly incorporated in Delaware, and had money in U.S. bank accounts, as well as an ownership interest in a RUSAL America Corp., which purportedly had offices in New York City and money in a U.S. bank account. *See* Pl.'s Cross-Mot. at 39 (citing SAC ¶¶ 111-13).  But Plaintiff cannot persuasively argue that he may assert constitutional rights based solely on his allegations that he has an interest in property that is held in the United States.  Plaintiff cites *Kadi v. Geithner* for the proposition that an interest in property alone is sufficient to establish standing, but that decision reached no such conclusion. To the contrary, *Kadi* merely confirmed that property ownership is relevant only insofar as it pertains to analyzing whether a designated person has substantial connections with the United States.  42 F. Supp. 3d 1, 25-26 (D.D.C. 2012).  Plaintiff also cites *National Council of Resistance of Iran v. Department of State*, but that case, too, is inapposite to Plaintiff's circumstances.  There, the D.C. Circuit determined that the plaintiff was entitled to constitutional protections because it "claim[ed] an interest in a small bank account" *and* had an "overt presence" at the National Press Building in Washington, D.C.  251 F.3d 192, 201 (D.C. Cir. 2001); *see also Jifry*, 370 F.3d at 1182 (observing that "[e]xceptions [to the general rule that non-resident aliens without sufficient contacts lack Fifth Amendment protections] may arise where aliens have come within the territory of the United States *and* established 'substantial connections' with this country" (emphasis added)).

Plaintiff's lack of standing to bring a constitutional challenge is all the more pronounced given the cross-motions for summary judgment now pending before the Court.  To proceed with his Fifth Amendment claim, Plaintiff should be able to identify portions of the Administrative Record that support a finding of sufficient contacts with the United States.  *See Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598, 602 (D.C. Cir. 2019) ("Now, on summary judgment, the plaintiffs must

prove injury in fact with 'specific facts' in the record.").  Yet the only record evidence cited by Plaintiff is the fact that he briefly held a U.S. visa in 2005, *see* Pl.'s Cross-Mot. at 38, which falls short of establishing standing, for the reasons discussed above.

Having failed to demonstrate at summary judgment that he has both a sufficient physical presence in and sufficient contacts with the United States, Plaintiff fails the standing inquiry.  His due process challenge should thus be rejected on this basis alone.

### B. Even if he had standing, Plaintiff's due process claim lacks merit because OFAC provided him with ample notice of the basis for his designation

Even if Plaintiff had standing, Defendants would still be entitled to judgment on his due process claim.  As Defendants explained in their motion, Treasury's press release announcing Plaintiff's designation set forth the basis for its conclusion that Plaintiff had purported to act, or had acted, directly or indirectly, on behalf of a senior official of the Government of the Russian Federation (EO 13661), and that he operates in the energy sector of Russia (EO 13662).  *See* Defs.' Mot. at 29.  The information in that press release, combined with the unclassified portions of the Administrative Record in support of his designation and the unclassified summaries of certain classified information relied upon for his designation under EO 13661, sufficiently informed Plaintiff of the reasons for his designation.  *Id*. at 29-30.  OFAC's administrative procedures, moreover, provide Plaintiff with the opportunity to contest his designation and the agency's stated reasons for it, and Plaintiff availed himself of precisely this opportunity when he petitioned OFAC for delisting under EO 13662.  *Id*. at 31-32.  Such procedures were more than sufficient to provide Plaintiff with "[t]he essence of due process":  that he receive "notice of the case against him and opportunity to meet it."  *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976).

In his cross-motion, Plaintiff does not challenge the adequacy of OFAC's administrative procedures by which he can challenge his designation but instead complains that the information he

received is inadequate.  Plaintiff's arguments fall roughly into one of two categories:  (1) challenges to the methods by which OFAC put Plaintiff on notice of his designation, and (2) challenges to the sufficiency of the information provided.  Both lack merit.

        1.     OFAC has satisfied due process requirements by providing Plaintiff with the unclassified Administrative Record and unclassified summaries

Plaintiff received sufficient notice of his designation and the basis for it from OFAC's April 6, 2018 press release announcing the designation; the unclassified portions of the Administrative Record, including the unclassified portions of the evidentiary memos for Plaintiff's designation under both EO 13661 and EO 13662; and the unclassified summaries of certain classified information relied upon for his designation under 13661.  *See* Defs.' Mot. at 29-33.  Plaintiff takes no issue with the ability of press releases and the Administrative Record to provide sufficient notice as a general matter, but he claims that OFAC's redactions to the Administrative Record to protect classified and privileged information prevent him from understanding the complete basis for his designation.  *See* Pl.'s Cross-Mot. at 35-37.

To begin, Plaintiff erroneously states that due process requires that notice and a hearing must be provided "before the government can constitutionally deprive [him] of a protected interest."  Pl.'s Cross-Mot. at 32.  Multiple D.C. Circuit rulings contravene Plaintiff's argument; these cases hold that post-deprivation notice is sufficient "where earlier notification would impinge upon the security and other foreign policy goals of the United States," *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 163 (D.C. Cir. 2003), or where providing advance notice "would create a substantial risk of asset flight," *Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015).  These cases leave no doubt that post-deprivation notice is sufficient here.[10]   *See* Defs.' Mot. at 29; *see also*

---

[10] Indeed, aside from this one reference to pre-deprivation notice in his cross-motion, Plaintiff does not otherwise argue that he is entitled to such notice.

DERIPASKA_0016 (EO 13661 concluding that "because of the ability of transfer funds or other assets instantaneously, prior notice to [persons who might have a constitutional presence in the United States] of measures to be taken pursuant to this order would render those measures ineffectual"); DERIPASKA_0019 (EO 13662 stating same).

Plaintiff next takes aim at OFAC's redactions to the Administrative Record to protect classified and privileged information, suggesting that OFAC is required to disclose "all of the reasons for [Plaintiff's] designation." Pl.'s Cross-Mot. at 35-36. But Plaintiff's argument in this regard must give way to the text of IEEPA, which expressly permits the Executive Branch to rely on classified information and submit that information to a court for *ex parte* and *in camera* review, 50 U.S.C. § 1702(c). That provision, moreover, does not require the Government to summarize or allow third parties to access classified information in connection with an administrative or judicial proceeding. *See id.* In other words, IEEPA contemplates that the government may designate a person based on classified information that the SDN[11] never sees. *Id.*

Ultimately, the D.C. Circuit has never concluded that OFAC must provide an SDN like Plaintiff *all* of the reasons for a designation. Instead, and in line with the text of IEEPA, the D.C. Circuit has repeatedly held that there is no due process violation when a federal agency makes a decision based on classified information not disclosed to a foreign national, and that it is entirely proper for a court to take this classified information into account during its *ex parte* and *in camera* review of the agency's action. *See* Defs.' Mot. at 32-33 (citing cases); *Bazzi v. Gacki*, --- F. Supp. 3d ---, 2020 WL 3448010, at *6 (D.D.C. June 24, 2020) ("[T]he [D.C.] Circuit has routinely rejected the argument that OFAC's notice of a designation violates due process whenever the agency relies

---

[11] As discussed in Defendants' motion, a "SDN" is a Specially Designated National. *See* Defs.' Mot. at 6.

upon classified information that the government refused to disclose." (citation and internal quotation marks omitted)).

In *Jifry v. FAA*, for example, the D.C. Circuit held that the Government satisfied the notice requirements of due process by informing foreign pilots that their airmen certificates had been revoked based on TSA's determination that they were a "security threat"; the court reached its decision even though the notice of that revocation "did not include the factual basis for" that determination, "which was based on classified information," and plaintiffs had argued that "without knowledge of the specific evidence on which TSA relied, they [were] unable to defend against the charge that they are security risks." *Jifry*, 370 F.3d at 1178 (noting that D.C. Circuit "rejected the same argument" that an agency is not permitted to rely on undisclosed classified information with respect to the designations of foreign terrorist organizations in two prior cases). Similarly, the D.C. Circuit has also held that due process permits the Government, pursuant to IEEPA, to rely on classified information submitted *ex parte* and *in camera* to support the designation of individuals and entities that, unlike Plaintiff, are domesticated in the United States, rejecting the argument "that due process prevents its designation based upon classified information to which it has not had access." *Holy Land Found*, 333 F.3d at 164.

The D.C. Circuit has also made clear that "'due process require[s] the disclosure of only the unclassified portions of the administrative record.'" *Id.* (quoting *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003)); *see also Nat'l Council*, 251 F.3d at 208-09 (holding that under the Due Process Clause, the agency "need not disclose the classified information to be presented *in camera* and *ex parte* to the court," and that "[t]his is within the privilege and prerogative of the executive, and we do not intend to compel a breach in the security which that branch is charged to protect"); *Rakhimov v. Gacki*, Civil Action No. 19-2554 (JEB), 2020 WL 1911561, at *5 (D.D.C. Apr. 20, 2020) ("The D.C. Circuit has made it abundantly clear that

OFAC can depend on classified materials when adding a person to the SDN list.").[12]   Thus the relevant question is not whether OFAC has provided Plaintiff "all of the reasons for his designation," *see* Pl.'s Cross-Mot. at 35, but rather whether OFAC has disclosed the unclassified record, and whether that record provided Plaintiff  "a basis from which to understand his designation, and thereby offer rebuttal arguments and evidence in response,"  *See Zevallos,* 10 F. Supp. 3d at 131. For the reasons discussed in Defendants' motion and *infra*, OFAC has satisfied this standard.

Plaintiff cites to *Fares v. Smith*, 901 F.3d 315 (D.C. Cir. 2018) to argue the contrary, *see* Pl.'s Cross-Mot. at 36, but his reliance on that case is misplaced.  First, the D.C. Circuit in *Fares* did not require that OFAC disclose all of the reasons for a designation; rather, the court affirmed the ability of the Executive Branch to rely on classified and law enforcement privileged information that is not disclosed to a designated individual.  *See Fares,* 901 F.3d at 324.  Further, while the court, in dicta, permitted the reliance on summaries of protected information to support a designation, it did not hold that such summaries are required by the Due Process Clause.  *Id*. at 324-25.  Plaintiff's suggestion that, per *Fares*, "disclosure of some but not all of the allegations renders [Plaintiff] unable to . . . clear his name," Pl.'s Cross-Mot. at 36 (citation omitted), is at best inaccurate.  The D.C. Circuit, in explaining why the plaintiffs' legal theory was unusual in the sanctions context, stated that "[d]esignees can contest that agency disclosure of some but not all of the allegations against them impairs their ability to fully clear their names for delisting, leaving them 'stumbl[ing] towards a moving target.'"  *Fares*, 901 F.3d at 322 (quoting *Zevallos*, 793 F.3d at 118).  An

---

[12] Although Plaintiff's cross-motion speaks only to classified information, these principles apply with equal force to information protected by the law enforcement privilege. *See Joumaa v. Mnuchin*, No. 17-2780, 2019 WL 1559453, at *10 n.14 (D.D.C. Apr. 20, 2019) (holding plaintiff "has no right to classified evidence that OFAC relies on for his designation, nor to law-enforcement privileged evidence OFAC relies on when he fails to assert any distinction between the two." (citing *Fares*, 901 F.3d at 323-24)); *see also FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 118-19 (D.D.C. 2015) ("[A]mple precedent" allows agencies to "use certain sensitive information, without disclosing it, in proceedings imposing targeted financial measures on persons and organizations.").

observation about what a designated individual may argue plainly does not establish a bright-line rule that OFAC must disclose each and every reason for its designation decisions, regardless of the classification of the underlying information.

In any event, here OFAC did not limit the information provided to Plaintiff to the unclassified portions of the Administrative Record but also provided Plaintiff with unclassified summaries of classified information pertaining to his designation under EO 13661. *See* Defs.' Mot. at 30. Contrary to Plaintiff's suggestion otherwise, *see* Pl.'s Cross-Mot. at 33, such unclassified summaries are neither routine nor necessary to comport with due process, *see FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 119 n.2 (D.D.C. 2015) (concluding that, while "unclassified summaries of classified information on which an agency relied may be helpful to litigants, they are not required"); *Rakhimov*, 2020 WL 1911561, at *7 (describing mandating the issuance of an unclassified summary in support of a designation as an "unprecedented remedy"). OFAC provided Plaintiff with these summaries not because it was obligated to do so but rather in an effort to disclose to Plaintiff as much information about his designation under EO 13661 as possible. OFAC thus exceeded its legal obligations in this case by providing Plaintiff not just the unclassified portions of the Administrative Record but also additional unclassified information to supplement the Administrative Record.

        2.    <u>OFAC has provided Plaintiff a sufficient basis to understand his designation under EO 13661</u>

The Administrative Record, in conjunction with the press release and unclassified summaries, more than adequately apprise Plaintiff of the basis for OFAC's decision to designate him under EO 13661. *See* Defs.' Mot. at 29-31; *see also Fares v. Smith*, 249 F. Supp. 3d 115, 125-28 (D.D.C. 2017) (holding that "the total body of information provided by OFAC to Plaintiffs"—which included the redacted administrative record, press release, and non-privileged summaries of

law enforcement sensitive information—"satisfie[d] due process").  Collectively, these materials

provide Plaintiff notice that the following information is related to his designation under EO 13661:

- Plaintiff was designated for having acted or purported to act for or on behalf of, directly or indirectly, a senior Russian government official.  *See, e.g.*, Department of the Treasury, *Notice of OFAC Sanctions Actions*, 83 Fed. Reg. 19,138, 19,138 (May 1, 2018);

- Plaintiff has acted in support of Russian President Vladimir Putin's projects, including Plaintiff's 2005 purchase of an aluminum plant in Montenegro at the encouragement of Putin.  *See* DERIPASKA_0008 (evidentiary memorandum);

- Plaintiff "has adhered to an unwritten understanding between Putin and the [Russian] oligarchs:  as long as they support the Kremlin, they can operate with impunity" and has further "taken on numerous projects dear to Putin," including the building of a new airport for the 2014 Winter Olympics in Sochi.  *See* DERIPASKA_0078 (article from *The Nation*);

- Plaintiff has said that "he does not separate himself from the Russian state," acknowledged having a Russian diplomatic passport, and claimed to have represented the Russian government in other countries.  *See* DERIPASKA_0414 (April 6, 2018 Treasury press release);

- Putin compelled Russian oligarchs to invest in projects associated with the 2014 Sochi Olympics, including an $800 million investment by Plaintiff.  *See* SAC ¶ 54 (unclassified summary);

- As of late January 2018, Plaintiff was reported to have financed projects at the request of Putin and senior Russian officials.  *See* SAC ¶ 54 (unclassified summary);

- Plaintiff reportedly cancelled an initial public offering of his company, Gaz, in order to hide Putin's use of the company for money laundering purposes; Putin used Gaz in this fashion as recently as September 2017.  *See* SAC ¶ 54 (unclassified summary);

- Plaintiff's December 2016 identification as one of the individuals holding assets and laundering funds on behalf of Putin.  *See* SAC ¶ 54 (unclassified summary);

- On or around July 2011, Plaintiff's business activity was reportedly used on at least one occasion as a cover to facilitate the transfer of funds for Putin's personal use.  *See* SAC ¶ 54 (unclassified summary);

- In late 2004, Plaintiff reportedly acted on verbal instructions from Putin in a high-level bilateral meeting between Russian and Kyrgyz representatives.  *See* SAC ¶ 54 (unclassified summary).

In light of OFAC's disclosure of all of the above information, Plaintiff's suggestion that he is unable to grasp the basis for his designation or respond meaningfully to it, Pl.'s Cross-Mot. at 35-36, strains credulity. *See Joumaa*, 2019 WL 1559453, at *11 ("[T]he Court struggles to see how Joumaa could fail to understand the connection between the specific information about his alleged laundering of drug proceeds in the summary, . . . and OFAC's conclusion that 'he continue[d] to meet the criteria [for designation].'"); *see also Bazzi*, 2020 WL 3448010, at *7 (holding that press release provided a "sufficiently detailed summary to adequately explain OFAC's reasons for designating" the plaintiff (citation and internal quotation marks omitted)). Indeed, although OFAC was not required to do so, this information demonstrates that OFAC to the best of its ability provided Plaintiff with the "'who,' 'what,' 'when,' and 'where' of OFAC's allegations," as he demands. *See* Pl.'s Cross-Mot. at 36 (citation omitted).

Plaintiff's objections to these disclosures are without merit. Plaintiff first suggests that OFAC's evidentiary memorandum is too heavily redacted to allow him to understand the reasons for his 2018 designation. Pl.'s Cross-Mot. at 35. But that memorandum is redacted only insofar as it contains classified or privileged information, *see* Certification of Admin. R. ¶ 4, ECF No. 28-1, which, as discussed above, OFAC need not disclose. Additionally, the unclassified evidence provided to Plaintiff—including that disclosed in OFAC's press release and the unclassified summaries of otherwise classified information—explains OFAC's determination that Plaintiff acted or purported to act for or on behalf of, directly or indirectly, a senior Russian government official.

Plaintiff next takes aim at the unclassified summaries that he received from OFAC, faulting them for failing to identify to which portions of the Administrative Record they relate and for containing "generalized or conclusory allegations" that Plaintiff purports to be unable to rebut. *See* Pl.'s Cross-Mot. at 35. The unclassified summaries, however, are plainly based on factual reporting obtained by OFAC, which it considered in determining that Plaintiff warrants designation pursuant

to EO 13661.  *See* DERIPASKA_0007 ("Information presented in this memorandum and accompanying exhibits provide reason to believe that OLEG VLADIMIROVICH DERIPASKA, has acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation . . . .")  And Plaintiff's assertion that OFAC must link each summary to a specific section of the Administrative Record—which would likely require OFAC to explain how the Government obtains or assesses classified intelligence—goes well beyond any requirement courts have imposed, particularly in cases implicating national security or foreign policy determinations.  *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010) ("The Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces of the puzzle . . . ."); *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007).

Nor should the Court give credence to Plaintiff's complaint that the unclassified summaries are insufficiently detailed to permit Plaintiff to respond to them.  *See* Pl.'s Cross-Mot. at 37.  The summaries inform Plaintiff of the approximate date of the interaction with the Russian government or the date when such interaction became known as well as the type of conduct upon which OFAC based its decision (*e.g.*, Plaintiff's allowing his company to be used to cover the transfer of money for Putin's personal use or his $800 million investment in projects connected to the Sochi Olympics at the behest of the Russian government).  For example, if Plaintiff disputes the reporting that he acted on verbal instructions from Putin in a 2004 high-level bilateral meeting between Russian and Kyrgyz representatives, *see* Pl.'s Cross-Mot. at 37, he could submit to OFAC information about his role during that meeting, why he was present, and whether he was acting at the direction of Putin or any other Russian government official.  Plaintiff's contention that he should be informed of the source for reporting about his laundering of funds on behalf of Putin because it appears to be open-sourced reporting constitutes baseless speculation.  OFAC withheld only classified and privileged

information from the Administrative Record, and Plaintiff is not entitled to that information, as discussed above.

In short, Plaintiff has no basis to complain that he has been "left in the dark as to the reasons for [his EO 13661] designation[], and . . . could not meaningfully refute the evidence against [him]." *Zevallos*, 10 F. Supp. 3d at 131.  To the contrary, "the total body of information provided by OFAC to [Plaintiff] satisfies due process."  *See Fares*, 249 F. Supp. 3d at 125.

### 3.   OFAC has provided Plaintiff a sufficient basis from which to understand the denial of his delisting petition challenging his EO 13662 designation

For similar reasons, OFAC afforded Plaintiff sufficient information to explain his designation under EO 13662 and the agency's reasons for denying his delisting petition.  As Plaintiff implicitly notes, *see* Pl.'s Cross-Mot. at 35, considerably less information was redacted from the evidentiary and other materials supporting Plaintiff's 13662 designation.  From the Administrative Record, Plaintiff received the evidentiary memorandum justifying his April 2018 designation under EO 13662 as well as all of the materials OFAC considered, directly or indirectly, in making that determination.  *See* DERIPASKA_0426-34.  The Administrative Record also contains OFAC's March 5, 2020 evidentiary memorandum denying Plaintiff's delisting petition, which responds to arguments Plaintiff made in that petition and explains why OFAC has determined that Plaintiff's designation is still warranted.  *See* DERIPASKA_0158-69.  Moreover, the Administrative Record shows that, between the time that he filed his delisting petition and OFAC's denial of that petition, OFAC sent Plaintiff two questionnaires seeking specific information about Plaintiff, thereby affording Plaintiff the opportunity to provide additional information to be used by OFAC in assessing Plaintiff's petition.  *See* DERIPASKA_0221-51.  Plaintiff's cross-motion is notably silent about this additional process he was afforded.

Instead, Plaintiff's sole complaint about the process he received with respect to his designation under EO 13662 is that one paragraph in a 12-page memorandum is redacted.  *See* Pl.'s Cross-Mot. at 35.  Plaintiff incorrectly asserts that this paragraph reflects "an entire basis for the denial."  *See id*.  In actuality, the basis to which this paragraph pertains is OFAC's determination that Plaintiff continues to operate in the energy sector of the Russian Federation economy through his ownership stake in En+, and there are four paragraphs supporting OFAC's conclusion in this regard, of which only one is redacted.  *See* DERIPASKA_0165.  Regardless, and as established above, Plaintiff's grievance has no merit because Defendants are permitted to rely on classified or privileged information to which the targeted individual has no access.  Nor does the withholding of this one paragraph undermine in anyway the fact that Plaintiff received considerable information about his EO 13662 designation, both in the original evidentiary as well as in the denial of his delisting petition.  Plaintiff was given ample information to explain the basis for his designation and, consequently, there is no basis on which to conclude that Defendants failed to provide sufficient due process.[13]

4. <u>Defendants provided Plaintiff with sufficient notice under the APA</u>

As Defendants discussed in their motion, Plaintiff raises an APA notice claim along with his due process challenge, and the former is duplicative of the latter.  *See* Defs.' Mo. at 33-34.  Plaintiff's cross-motion reinforces this point by simply summarizing his due process arguments, *see* Pl.'s Cross-Mot. at 41-42, and these arguments fare no better under the APA.  To begin, consistent with its statutory authority, OFAC withheld from the Administrative Record classified and privileged

---

[13] In addition, even if Plaintiff were correct that there were deficiencies in OFAC's process, either as a matter of due process or in violation of the APA, such errors were harmless, and judgment should still be entered for Defendants. The Administrative Record amply supports how OFAC provided Plaintiff with notice, and an opportunity to be heard; likewise, the record demonstrates the reasonableness of the agency's decision. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109-10 (D.C. Cir. 2014) (discussing harmless error standard under the APA).

information, to which Plaintiff is not entitled simply because he has alleged a cause of action under 5 U.S.C. § 706.  *See, e.g., Holy Land Found.*, 333 F.3d at 162, 164 (rejecting claim that re-designation decision was arbitrary and capricious, and affirming that agency need not disclose classified information); *Sulemane v. Mnuchin,* No. CV 16-1822 (TJK), 2019 WL 77428, at *7 (D.D.C. Jan. 2, 2019) ("The [APA] does not require OFAC to provide Sulemane the classified or law enforcement-privileged information supporting those grounds [for denying his delisting petition.]"); *Kadi*, 42 F. Supp. 3d at 24 (holding substantial evidence supported OFAC's decision, and affirming that designated individual was not entitled to classified information).

Instead, the APA requires only that an agency "'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made' to allow [a reviewing court] to evaluate the agency's decision-making process." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (citation omitted)). "[A]n agency's decision [need not] be a model of analytic precision to survive a challenge," and "[a] reviewing court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Frizelle*, 111 F.3d at 176 (internal quotation marks and citations omitted). OFAC has more than met this requirement, for the reasons discussed in Part II(B)-(C).  Accordingly, Defendants are entitled to judgment on Plaintiff's APA notice claims.

## III.   PLAINTIFFS' CHALLENGES TO THE CAATSA REPORT ARE NOT JUSTICIABLE BUT, IN ANY EVENT, FAIL ON THE MERITS

Plaintiff's challenge to his inclusion in the January 2018 report that Treasury provided to Congress pursuant to § 241 of CAATSA fails both at the threshold of the analysis and on the merits. With respect to the threshold inquiries, the adequacy of the report is not subject to judicial review, Plaintiff lacks standing to bring either an APA or due process challenge, and the report does not constitute final agency action subject to judicial review under the APA.  With respect to the merits,

Plaintiff's inclusion in the report comports with CAATSA's definition of "oligarch."  Defendants are therefore entitled to summary judgment on Plaintiff's CAATSA claims.

### A.  Plaintiff's CAATSA challenge is not justiciable

As set forth in Defendants' motion, the CAATSA Report[14] reflects the Executive Branch "reporting back" to Congress in compliance with its statutory obligations and is thus "committed to *congressional* discretion in measuring the fidelity of [the Department of the Treasury] to legislatively mandated requirements."  *See Nat'l Resources Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988) (emphasis added).  Plaintiff's cross-motion takes aim at *Hodel*, arguing that the case has no application here, but offers no other basis for the Court to conclude that it has authority to review Defendants' inclusion of Plaintiff in the report.

The Court should reject Plaintiff's efforts to distinguish *Hodel*.  Plaintiff focuses on what he believes to be the key holding from *Hodel*:  that an Executive Branch report is not reviewable where (1) Congress is harmed by the alleged Executive Branch failure but is not powerless to vindicate its own interests and (2) there are no judicially manageable standards by which a court can adjudge an agency's report.  *See* Pl.'s Cross-Mot. at 47.  As an initial matter, Plaintiff's focus on these two aspects of the *Hodel* decision misses the central point of the court's decision in that case:  the fact that Executive Branch reporting requirements reflect "an entirely different sort of agency action" where the "Executive Branch officer is simply reporting back to the source of its delegated power."  *Hodel*, 865 F.2d at 318.  And this point has been echoed repeatedly by courts applying *Hodel*.  *See, e.g.*, *Coll. Sports Council v. Gov't Accountability Office*, 421 F. Supp. 2d 59, 67 (D.D.C. 2006) (explaining that *Hodel* "held that because congressional reporting statutes are 'a management tool

---

[14] *Report to Congress Pursuant to Section 241 of the CAATSA Regarding Senior Foreign Political Figures and Oligarchs in the Russian Federation and Russian Parastatal Entities*, http://prod-upp-image-read.ft.com/40911a30-057c-11e8-9650-9c0ad2d7c5b5 (last visited May 14, 2020).

employed by Congress for its own purposes,' it was inappropriate to 'take the remarkable step'" of judicial review, notwithstanding alleged "material misstatements" in the report) (quoting *Hodel*, 865 F.2d at 319); *Nat. Res. Def. Council v. Lujan*, 768 F. Supp. 870, 882 (D.D.C. 1991) ("[T]he Report was not explicitly or implicitly intended as anything more than a vehicle to inform Congress.  The subsection of the statute is labeled 'Report to Congress.' . . . It is for Congress, not the courts, to determine if the Report satisfies the statutory requirements it enacted.") (internal citation omitted); *see also Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998); *United States v. White*, 869 F.2d 822, 829 (5th Cir. 1989) (per curiam).  Simply put, Congress has requested information from Defendants in the form of a report, which Defendants provided.  It is for Congress, and not Plaintiff or the judiciary, to determine whether Defendants have sufficiently met their reporting obligations.

Even under Plaintiff's reading of *Hodel*, Plaintiff's claim would still be unreviewable. Plaintiff first argues that, unlike in *Hodel*, he—not Congress—is being harmed by the alleged deficiency in the CAATSA Report.  *See* Pl.'s Cross-Mot. at 47.  But that argument presumes that the report has harmed Plaintiff in some way; however, as Defendants explained in their opening brief, Plaintiff has suffered no injury.  *See* Defs.' Mot. at 37 (discussing Plaintiff's lack of standing because, among other reasons, the report explicitly states that an individual's inclusion in the report carries no legal consequences, including sanctions-related consequences, and is not evidence of any improper behavior).  Any reporting error by Defendants would thus be for Congress to vindicate, not Plaintiff.

Equally without merit is Plaintiff's contention that § 241 contains "judicially manageable standards" that enable judicial review.  *See* Pl.'s Cross-Mot. at 47.  The operative statutory language in § 241—that Defendants submit a "detailed report" to Congress, *see* CAATSA § 241(a)—mirrors the reporting requirement in *Hodel*.  *See* 865 F.2d at 319 ("Whether a report to Congress is sufficiently 'detailed' within the meaning of section 111 is an inquiry which strikes us as inherently

elusive, especially in light of the statute's apparent purpose to inform and further the ongoing interbranch negotiation process."). In any event, the fact that CAATSA prescribes criteria about the type of information to be included in the report would "not be dispositive because [*Hodel*] did not rely on the absence of such standards to find the statute unreviewable." *Lujan*, 768 F. Supp. at 882-83 ("The existence of that checklist does not lessen the impropriety of the Court making a judgment peculiarly for Congress . . . .") (internal quotation marks omitted).

For these reasons, under *Hodel* and its progeny, Defendants' inclusion of Plaintiff in the § 241 report is not reviewable.

### B. Because he has no cognizable injury traceable to the report, Plaintiff lacks standing

Plaintiff's CAATSA challenges cannot proceed to the merits for the additional reason that Plaintiff has failed to establish "the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see also* Defs.' Mot. at 37-38. Even though there was no statutory requirement to do so, and even though Treasury explained in the report that inclusion on the oligarch list meant simply an estimated net worth of $1 billion or more according to public information, Treasury also stated in the CAATSA report that inclusion in the list of oligarchs neither carries any legal consequences for the individual, nor should be taken as evidence that he or she has engaged in any improper or illegal behavior. *See* CAATSA Report at 1-2. Plaintiff's standing hinges on the actions of independent third-parties not before this Court, making it "ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (internal quotation marks omitted).

Plaintiff falls well short of meeting this higher burden. Plaintiff accuses Defendants of "clouding the 'clarity'" of the statements in the report by referring back to the report when subsequently imposing sanctions, *see* Pl.'s Cross-Mot. at 48-49, but this argument misses the mark. In announcing the CAATSA Report in a press release, Treasury made clear, twice, that the "report

is not a sanctions list," and that inclusion does not constitute the determination that those individuals meet the criteria for sanctions, or "create any other restrictions, prohibitions, or limitations on dealings with such persons."  *See* U.S. Dep't of the Treasury, *Treasury Releases CAATSA Reports, Including on Senior Foreign Political Figures and Oligarchs in the Russian Federation* (Jan. 29, 2018) ("CAATSA Press Release").[15]   And the subsequently imposed sanctions highlighted by Plaintiff reinforce Defendants' disclaimer that the CAATSA Report was not a "sanctions list," as those sanctions applied to only seven oligarchs, *see* DERIPASKA_0413, whereas the unclassified CAATSA Report listed nearly one hundred such persons, CAATA Report. App. B.  Moreover, the sanctions were issued under a separate and distinct agency process involving a showing that the sanctions meet the prongs of EO 13661, EO 13662 (which were codified by CAATSA, and both of which served as the legal basis for Plaintiff's designation), and EO 13582.  *See* DERIPASKA_0413. The fact that Defendants invoked this separate legal authority to designate a small number of the individuals listed in the CAATSA Report following the report's issuance gives no basis to conclude that there is a causal relationship between the § 241 report and Plaintiff's subsequent designation, as Plaintiff suggests.  *See* Pl.'s Cross-Mot. at 49.

Having failed to establish standing, Plaintiff cannot sustain his challenge to the CAATSA Report, so his claim must be dismissed for this additional reason.

### C. The CAATSA Report is not reviewable under the APA because it does not constitute final agency action

In addition to Plaintiff's CAATSA challenges being non-justiciable and Plaintiff's lack of standing, Plaintiff's claim cannot surmount a third threshold barrier:  the fact that the report does not constitute final agency action for purposes of the APA.  *See* Defs.' Mot. at 38-39.  Under well-

---

[15] The CAATSA Press Release is available at https://home.treasury.gov/news/press-releases/sm0271.

established principles of administrative law, the report is not a final agency action because it is not an action "by which rights or obligations have been determined, or from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted); *see, e.g., Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 858-62 (4th Cir. 2002) (holding that report with "no direct regulatory effect" was not final agency action, even though its classification of environmental tobacco smoke as a human carcinogen caused "coercive pressures on third parties"), a conclusion made all the more apparent by the fact that the CAATSA Report is an informational report, *see Guerrero*, 157 F.3d 1195 ("Because [the report] triggers no legal consequences and determines no rights or obligations, no check on the substance of the report is necessary.").

Plaintiff tries to resist this conclusion by asserting that the report has legal consequences because he was ultimately designated. *See* Pl.'s Cross-Mot. at 50-51. But the logic underlying this assertion is flawed for multiple reasons. First, it ignores Defendants' express disclaimer in the report that a person's inclusion in the list of oligarchs neither carries any legal consequences nor should be taken as evidence that he or she has engaged in any improper or illegal behavior, *see* CAATSA Report at 2, as well as near-identical language in Treasury's press release announcing the report, *see* CAATSA Press Release ("The inclusion of individuals or entities in any portion of the report does not impose sanctions on those individuals or entities. Nor does it create any other restrictions, prohibitions, or limitations on dealings with such persons by either U.S. or foreign persons."). Second, the fact that Plaintiff, along with a small number of other individuals from the list out of more than 100 total, were subsequently designated pursuant to separate legal authority (EO 13661 and EO 13662, later codified in CAATSA) in no way means that those individuals were sanctioned *because of* their inclusion on this list. Plaintiff's suggestion to the contrary is a bridge too far.

Third, Plaintiff's allegations that he has had bank accounts closed and has suffered reputational harm due to his inclusion on this list, *see* Pl.'s Cross-Mot. at 50, do not transform the report into a final agency action. To the contrary, "harms caused by agency decisions are not legal consequences if they stem from independent actions taken by third parties." *Parsons v. U.S. Dep't of Justice*, 878 F.3d 162, 168 (6th Cir. 2017) (internal quotation marks omitted) (further holding that "[r]eliance on an agency report, without a legal obligation to consider or abide by that report, is . . . a practical consequence of a Congressional order to provide information"). Courts have repeatedly rejected arguments like Plaintiff's, instead holding that "practical consequences" are not the sort of "legal harms that can transform the Report[] into a" reviewable action. *Joshi v. Nat'l Transp. Safety Bd.*, 791 F.3d 8, 11-12 (D.C. Cir. 2015) (concluding that there was no review of a agency denial of petition for reconsideration of accident investigation report); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003) (same, for request for voluntary corrective action); *Parsons*, 878 F.3d at 168 (same, for report with gang designation); *Flue-Cured Tobacco.*, 313 F.3d at 858-62. Otherwise, "almost any agency policy or publication issued by the government would be subject to judicial review." *Flue-Cured*, 313 F.3d at 861.

Because the CAATSA Report is not a final agency action, Plaintiff has no basis for his APA challenge. Accordingly, it must be dismissed.

### D. Plaintiff's APA challenge to his inclusion in the CAATSA Report fails on the merits

Even if Plaintiff were able to overcome all three of these threshold hurdles that preclude review of his APA CAATSA challenge, that challenge should still fail because Treasury's inclusion of Plaintiff was consistent with the statutory language. *See* Defs.' Mot. at 39-41. Plaintiff's argument to the contrary revolves around a single assertion: that it was arbitrary and capricious for

Treasury to list Plaintiff based on his net worth without any reference to his "closeness to the Russian regime." *See* Pl.s Cross-Mot. at 43-46. This contention is without merit.

As Defendants explained previously, *see* Defs.' Mot. at 40, CAATSA calls upon Treasury to identify two sets of individuals ("the most significant senior foreign political figures" and "oligarchs") based on two sets of criteria ("closeness to the Russian regime" and "net worth"), and Plaintiff identifies nothing in the statute requiring Treasury to consider *both* criteria in identifying oligarchs. Had Congress intended to require Treasury to consider "closeness to the Russian regime" when identifying a list of oligarchs, it would have expressly said so, just like it did in the proposed legislation for the Stop Corrupt Iranian Oligarchs and Entities Act ("SCIOEA"), H.R. 7182, 115th Cong. § 2(a)(1)(A) (2018). *Cf. Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").[16]

Plaintiff instead seeks refuge in the rule of the last antecedent, claiming that both the phrases "net worth" and "closeness to the Russian regime" modify "oligarch" such that Congress intended to impose both as criteria for every oligarch identified. *See* Pl.'s Cross-Mot. at 44. But "canons of construction are no more than rules of thumb" and "courts must presume that a legislature says in a

---

[16] Plaintiff misses the point of Defendants' reference to the SCIOEA, claiming that Defendants' reliance is "self-defeating" because the bill expressly required Treasury to consider both closeness to the Iranian government and net worth for every Iranian oligarch so identified. *See* Pl.'s Cross-Mot. at 45-46; *see also* H.R. 7182, 115th Cong. § 2 (2018) (directing Treasury to identify "the most significant senior foreign political figures and oligarchs in Iran," to be "determined by the closeness to the Iranian Government of *each such* figure and oligarch, and the estimated net worth of *each such figure and oligarch*"). But the difference in the proposed statutory language in the SCIOEA and the language enacted in CAATSA proves Defendants' point: Congress knows how to use language requiring Treasury to consider both criteria for "each such" oligarch. Consequently, the proposed SCIOEA legislation represents a list where Treasury would be obligated to consider both for any identification; by contrast, CAATSA contains no such requirement.

statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Here, the statute incorporated 31 C.F.R. § 1010.605(p)'s definition of "senior foreign political figure," CAATSA § 241(c)(2)—which focuses on an individual's authority while in positions such as a foreign government or political party—and CAATSA directs Treasury to identify "the most significant senior foreign political figure," CAATSA § 241(a)(1)(A) (emphasis added). Thus, the statute is reasonably read to use "closeness to the Russian regime" in identifying "the most significant senior foreign political figures." In contrast, the "net worth" criterion bears no relevance to the definition of "senior political figure" incorporated by CAATSA, and thus that criterion is reasonably interpreted only to have applicability for determining whether an individual should be identified as an oligarch.

Plaintiff's reliance on various dictionary definitions of the word "oligarch" does nothing to alter this conclusion. Congress elected not to incorporate these definitions into the statute, let alone include any definition of the word at all. Rather, Congress set forth specific criterion ("net worth") to "determin[e]" whether one is an "oligarch[] in the Russian Federation." CAATSA § 241(a)(1)(A). Because Treasury relied on this latter criterion to include Plaintiff on the list, that determination was neither arbitrary nors capricious. Plaintiff's APA claim accordingly fails.

### E. Plaintiff lacks standing to sustain his due process challenge to the CAATSA Report, which, in any event, fails on the merits

As a final matter, Plaintiff's claim that his due process rights were violated because he lacks notice and an opportunity to challenge his inclusion in the report must fail. To begin, because he is a foreign person without presence in the United States or substantial contacts, Plaintiff is not entitled to the full panoply of procedural protections afforded by the Fifth Amendment. *See supra*, Part II(A). The harm Plaintiff allegedly suffered due to his inclusion in the report, moreover, stems directly from the actions of third parties, *see* SAC ¶ 36 ("Immediately following his inclusion in the

Section 241 Report and his public identification as a Russian 'oligarch' by the United States government, several foreign financial institutions at which Deripaska's companies held accounts began the process of terminating those account relationships."), or involve alleged reputational harm, *see id.* ¶ 100 (alleging that the CAATSA "identification is clearly intended to be defamatory in nature, aimed at causing reputational harm to Deripaska, and unfairly associating him with a corrupt elite").  Such allegations are plainly insufficient to give rise to a due process claim.  *See Gen. Elec. Co., v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010) (observing that "stigma alone is insufficient to invoke due process protections" (citing *Paul v. Davis*, 424 U.S. 693, 704-06 (1976)); *Mosrie v. Barry*, 718 F.2d 1151, 1162 (D.C. Cir. 1983) (holding that "business interests . . . cannot qualify as a deprivation of liberty because it does not amount to a change in legal status"; "[t]he reaction of others to unfavorable publicity about a person" is not a "change in legal status imposed by the government officials who generated the publicity" but instead constitutes "sanctions applied by public disapproval, not by law").

Plaintiff tries to circumvent this case law by again claiming that the CAATSA Report was assembled for the ultimate purpose of sanctioning individuals, as demonstrated by the fact that Treasury subsequently designated Plaintiff pursuant to EO 13661 and EO 13662.  *See* Pl.'s Cross-Mot. at 53.  Defendants addressed these arguments above, *see supra* Part III(B), and they fare no better here.  As Treasury noted in the report, the list of oligarchs carries no legal consequences and should not be taken as evidence of any improper or illegal behavior by individuals who were included, *see* CAATSA Report at 2, and that fact is not altered just because a small subset of individuals from the list were later designated pursuant to separate authority.  Contrary to Plaintiff's assertion, *see* Pl.'s Cross-Mot. at 53, the report did not evince Treasury's intent to impose sanctions on Plaintiff at a later date; indeed, the reports states precisely the opposite.  *See* CAATSA Report at 2 (explaining that the oligarch list "does not constitute the determination by any agency that any of

36

those individuals or entities meet the criteria for designation under any sanctions program"). Plaintiff's suspicions are thus not only unsupported by the report but are directly contradicted by it.

Nor does Plaintiff's contention that he is entitled to an explanation for his inclusion in the report have any merit.  The CAATSA Report makes clear why he was included:  at the time of the report, he was a Russian national who has a net worth of at least one billion dollars.  *See* CAATSA Report at 1; SAC ¶ 28.  Plaintiff faults Treasury for failing to provide him with an administrative record or other explanation for how Treasury determined that his net worth exceeds one billion dollars.[17]  *See* Pl.'s Cross-Mot. at 54-55.  Of course, compilation of an administrative record supporting the oligarch list in the CAATSA Report presupposes that the report constitutes a final agency action under the APA.  That is not true, for the reasons explained above.  *See supra*, Part III(C).

Furthermore, the case law Plaintiff relies on in this regard in actuality supports the conclusion that Treasury gave Plaintiff notice by providing "a brief statement of the grounds" for his inclusion in terms that were "self-explanatory."  *See Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001).  And unlike the explanations given in the cases cited by Plaintiff, which provided *no* explanation for the agency action at issue, Treasury in the CAATSA Report "articulate[d] a satisfactory explanation" for Plaintiff's inclusion.  *Compare* CAATSA Report at 1 ("To determine the list of oligarchs, the Department of the Treasury enumerated those individuals who, according to reliable public sources, have an estimated net worth of $1 billion or more.") *with Tourus Records*, 259 F.3d at 737 (DEA letter denying petition to proceed *in forma pauperis* stating that "Affidavit of Indigency you submitted in lieu of a cost bond is not adequately supported");

---

[17] Although Plaintiff in his Second Amended Complaint appears to desire access to the classified annex accompanying the report, *see* SAC ¶ 35, that no longer appears to be the case, given that he makes no mention of the classified annex in his cross-motion.

*Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343, 1351 (D.C. Cir. 2014) (concluding that TSA's rejection of airline's request for exclusion from certain types of CBP screening "are not in the best interest of safety and the public interest . . . [and] do not provide the level of security required under" the applicable regulations).

For these reasons, even if the Court concludes that review of the merits of Plaintiff's due process challenge to CAATSA is warranted, that challenge should still nonetheless fail.

## <u>CONCLUSION</u>

For the foregoing reasons, as well as for the reasons set forth in Defendants' original motion, the Court should grant Defendants' motion to dismiss or, in the alternative, grant Defendants' motion for summary judgment.

Dated:  July 6, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

DIANE KELLEHER
Assistant Director

  /s/ *Nathan M. Swinton*
NATHAN M. SWINTON
Trial Attorney (NY Bar)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel:  (202) 305-7667
Fax:  (202) 616-8470
E-mail:  Nathan.M.Swinton@usdoj.gov