# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| OLEG DERIPASKA | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Civil Action No. 19-0727 (APM) |
| v. | ) | |
| | ) | |
| STEVEN T. MNUCHIN, *et al.* | ) | |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

More than a half-century ago, Justice Frankfurter identified the core concern of Executive power that lies at root of the instant litigation:

> The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 593 (1952). While Defendants have engaged in a series of unlawful actions for purposes of imposing punitive sanctions on Deripaska and the consequences of those actions have severely harmed Deripaska, they are not the sole consequences arising from Defendants' actions. Instead, if Defendants' theory of the case— premised on a belief that they wield unquestionable authority—is accepted, then Defendants will have inched closer to the kind of unbound authority that endangers the constitutional scheme that maintains the equilibrium of power amongst the three branches of government.

Indeed, through their actions, Defendants have ignored the direction of Congress; exceeded the scope of statutory limitations placed on the power granted to them; and flouted their obligation to provide due process in violation of constitutional and administrative norms. Now, with these unlawful actions under this Court's scrutiny, they offer little in the way of legal justifications for those actions but instead argue that they are largely immune from judicial review.

The unlawful actions in question originate with the Secretary of the Treasury's assemblance of an "oligarch's list" on the basis of a definition of the term "oligarch" that defied statutory command, the plain language and common usage of the term, and this Court's prior consideration. In compiling that list, Defendants publicly identified Deripaska as an "oligarch" on their arbitrary usage of the term—causing significant harm to Deripaska— while denying him a process by to challenge his inclusion in that list.

Defendants then impermissibly exercised the legal authorities of E.O. 13661 and E.O. 13662 to sanction Deripaska in response to an undeclared national emergency—i.e., Russia's "worldwide malign activities." This rendered Deripaska's designation an unlawful exercise of power under the International Emergency Economic Powers Act ("IEEPA"), as the President's authorities thereunder are limited for use in response to threats for which a national emergency has been declared. This re-purposing of E.O. 13661 and E.O. 13662's authorities unlawfully bypassed the express limits placed by Congress on the President's authorities under IEEPA.

Third, Defendants abrogated its due process obligations, including by failing to provide notice of the reasons for Deripaska's designation. Instead, Defendants announced Deripaska's designation solely via a press release that wholly consisted of allegations untethered from the legal criteria for designation under E.O. 13661 and E.O. 13662. Considering that Defendants treat OFAC's press releases as constituting notice of the reasons for a sanctions designation, Defendants' action constituted misdirection as to the basis for Deripaska's designation. It was not until the onset of this litigation that Defendants disclosed an unclassified administrative record providing OFAC's findings with respect to Deripaska's designation under E.O. 13661, which nonetheless, redacted eight of the nine agency findings in support of that determination.

Those portions of the administrative record that were disclosed, however, only evidenced that OFAC's legal determination that Deripaska acted for or on behalf of, directly or indirectly, a senior official of the Russian government was unsupported by the agency's conclusions and related findings. Indeed, Defendants concluded from their findings that Deripaska "ha[d] acted in support of Russian President Vladimir Putin's projects," a qualitatively different conclusion—as reflected by E.O. 13661's varying designation criteria—than the legal determination that Deripaska acted for or on behalf of President Putin himself.

Finally, Defendants' denial of Deripaska's E.O. 13662 delisting request is emblematic of the arbitrary and capricious agency decision-making against which the APA protects. Despite finding that neither En+ nor ESE were any longer "owned or controlled" by Deripaska and offering no findings as to how Deripaska interacts with ESE, Defendants used Deripaska's remaining (non-controlling) interests in En+ to conclude Deripaska operates in Russia's energy sector. In doing so, Defendants reasoned that Deripaska operates in Russia's energy sector via companies that have themselves not been determined to operate in that sector. Because denial Deripaska's delisting request appears to have been a foregone conclusion for Defendants, and because Defendants believe that no authority—not even this Court—can hold them to account, this kind of irrational decision-making was offered by Defendants without any effort at a reasonable explanation.

In short, Defendants have spurned their legal obligations and abused their discretion at every turn. Their opposition seeks not only to paper over these legal deficiencies, but also to propagate a theory of their own power entirely divorced from any constitutional or legal scheme under which the Executive is subject to oversight. Faced with Defendants' far-reaching claim to be beyond the scope of judicial scrutiny, and its cavalierly unlawful actions, this Court's intervention is needed now more than ever.

## I.    DEFENDANTS UNLAWFULLY EXERCISED THEIR AUTHORITY UNDER IEEPA

Defendants argue that OFAC lawfully exercised its IEEPA authorities when designating Deripaska under E.O. 13661 and E.O. 13662 because (1) OFAC should be granted "significant deference" in defining the scope of its authority under IEEPA; (2) OFAC's press release identified Russia's actions in Ukraine as one of the "malign activities" to which the designation action was aimed; and (3) Deripaska's argument relies on "extra-record materials" that should not be considered by the Court. Defs. Consolidated Reply in Support of Mot. to Dismiss, or In the

Alternative, for Summ. J. and Opp. to Pl.'s Cross-Mot. for Summ. J. ("Defs Reply"), ECF No. 33 at 11, 12. For the reasons explained below, Defendants' arguments each fail for the same core reason: OFAC impermissibly repurposed Executive orders lawfully promulgated in response to a declared national emergency in order to respond to a threat for which no national emergency has been declared. In doing so, Defendants acted in excess of their statutory authority under IEEPA.

First, Defendants claim that OFAC should be granted "significant deference in interpreting the scope of its authority under IEEPA, as well as the scope of the national emergency declared in EO 13661." *Id*. at 11. None of the cited authorities, however, merit the Court's exercise of deference with respect to an agency's *exceeding* the scope of its statutory authorities. Indeed, quite the opposite: in *City of Arlington v. FCC*, the Supreme Court expressly held that "[w]here Congress has established a clear line, the agency cannot go beyond it." 569 U.S. 290, 307 (2013).

In enacting IEEPA, Congress provided significant authorities to the President, but these were expressly contingent on the President exercising them "only . . . to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." 50 U.S.C. § 1701(b). Indeed, IEEPA was enacted in order to limit the President's exercise of sanctions authorities. 7 S. Rep. No. 466, 95th Cong., 1st Sess. 2, *reprinted in* 1977 U.S. CODE CONG. & AD. NEWS 4540, 4541; *see also The International Emergency Economic Powers Act: A Congressional Attempt to Control Presidential Emergency Power*, 96 HARVARD L. REV. 1102-1120 (1983). Here, Defendants used Executive orders issued in response to a specific identified threat—i.e., Russia's actions and policies with respect to Ukraine—to impose sanctions in response to a threat for which no national emergency had been declared—i.e., "Russia's worldwide malign activities." In doing so, they failed to abide by the contingency on which their exercise of authority was dependent. No case law does not warrant the Court's deference to such a failure.

Next, Defendants claim that—because OFAC's press release includes reference to Russia's actions in Ukraine as an "example" of the "malign activities" for which the April 6 designation action was made—Deripaska's "argument . . . fails on its own terms." Defs. Reply at 11. Even fairly considered, though, Defendants' argument is in error. In Defendants' view, even if OFAC designated Deripaska in response to Russia's "worldwide malign activities"—a threat for which no national emergency has been declared—because one of those "malign activities" may constitute a threat for which a national emergency has been declared, OFAC's action is consistent with IEEPA. Defendants cite no authority for this proposition, nor could they as IEEPA expressly states that its authorities "may only be exercised" to deal with a threat for which a national emergency has been declared and "may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

Were the Court to accept Defendants' argument, Defendants could use IEEPA for a purpose for which no national emergency has been declared so long as a threat for which a national emergency has been declared is listed amongst the reasons for their action. This would upset the balance-of-power scheme exacted by Congress through IEEPA, which currently requires the President to immediately submit a report to Congress identifying, *inter alia*, "the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with [the threat]." 50 U.S.C. § 1703(b). If, however, the President or his delegees can exercise these same authorities with respect to a threat for which no national emergency has been declared, Congress's ability to exercise oversight over the President's use of IEEPA authorities stands to be grossly undermined.

Finally, Defendants argue that Deripaska's "reliance on extra-record materials . . . violates the long-standing principle under the APA that review of agency action should be based on the written explanation for that action at the time the decision was made." Defs. Reply at 12. According to Defendants, "the legality of a challenged Government action should be determined

by reference to the Government's stated reasons for that action, not by reference to 'extrinsic statements'. . ." *Id*. at 13. Here, Defendants misconstrue both the facts and the relevant law and are in the odd position of denying the relevance of their own stated reasons for their actions.

Factually, OFAC issued a press release to announce Deripaska's designation under E.O. 13661 and E.O. 13662. This press release plainly stated that the designation action was undertaken "in response to [Russia's] worldwide malign activity" of which Russia's actions in the eastern Ukraine constituted only a single part. AR 0413-0420. OFAC may have decided not to include this press release in the evidentiary memorandum underlying the designation action, but the press release nonetheless constitutes a "written explanation for th[e] action at the time the decision [to designate Deripaska] was made."[1] Defs. Reply at 12. Further, Defendants are unable to point to any language in OFAC's evidentiary memorandum that identifies a distinct purpose for which the sanctions were imposed on Deripaska. OFAC's press release, accordingly, constitutes the sole written explanation by Defendants as to the *objective* of their April 6 designation action.

Legally, to the extent that the Court regards the press release as "extrinsic evidence," nothing in *Trump v. Hawaii* would require the Court to ignore this evidence. *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) (". . . [W]e may consider plaintiffs' extrinsic evidence, but will uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds."). Moreover, unlike the facts in *Trump v. Hawaii*—where plaintiffs sought to introduce "extrinsic statements" predating the challenged action by months—OFAC's press release was not only coincident with the challenged actions but was responsible for announcing those actions to the public.

---

[1] Deripaska also challenges Defendants' characterization of the press release as "extra-record." The press release is clearly part of the administrative record. *See* AR 0413-0420.

6

Defendants' position is not only wrong, it is surprising in light of the position they have taken in other similar litigation. Earlier this year, in litigation challenging a OFAC's designation imposed pursuant to IEEPA, Defendants—in opposing an argument that the court could not consider information contained in OFAC's press release because it was not part of the administrative record—note[d] "that (1) the press release was prepared close in time with the agency decision; (2) the press release on its face conveys the basis for OFAC's decision; and (3) courts have considered information in OFAC's press releases when evaluating challenges to sanctions designations." Defs. Consolidated Opp. to Pl.'s Cross-Mot. for Summ. J. and Reply in Support of Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J., *Rakhimov v. Gacki*, 1:19-cv-02554-JEB, ECF No. 17 at *7 (D.D.C. Feb. 20, 2020).

Defendants' conduct is not trivial. If Defendants are permitted to repurpose Executive orders issued under IEEPA to respond to threats for which no national emergency has been declared, then the limitations on the President's authorities under IEEPA will be undone and the President will be freed from Congressional direction or oversight in exercising those authorities.

II.   **DEFENDANTS' DESIGNATION OF DERIPASKA UNDER E.O. 13661 AND THEIR DENIAL OF DERIPASKA'S E.O. 13662 DELISTING REQUEST CONSTITUTES ARBITRARY AND CAPRICIOUS AGENCY ACTION IN VIOLATION OF THE APA**

A.   *Defendants' Designation of Deripaska Under E.O. 13661 Constitutes Arbitrary and Capricious Agency Action*

Defendants seek to re-characterize the evidentiary memorandum in ways helpful to their argument but incongruous with its plain language. For instance, Defendants argue that Deripaska unfairly circumscribes the nature of OFAC's findings in support of its legal determination. However, there is no mistaking OFAC's conclusion in support of its determination that Deripaska meets the criteria for designation under E.O. 13661 as it is bolded, underlined, and introduces that portion of the record detailing OFAC's findings in support of the E.O. 13661 designation. That

conclusion reads as follows: "DERIPASKA Has Acted in Support of Russian President Vladimir Putin's Projects." AR 0008. Nothing in OFAC's evidentiary memorandum explains how these alleged actions "in support of [Putin's] projects" equate to Deripaska having "acted for or on behalf of [Putin]," as required by the E.O. 13661's designation criterion under which Deripaska was sanctioned. OFAC has not only failed to "articulate" a "satisfactory explanation," but has failed to provide any explanation at all as to how it rendered its legal determination from this conclusion, *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Further, OFAC failed to "consider an important aspect of the problem"—i.e., how Deripaska's purported a support of Putin's "projects" evidences his acting for or on behalf of Putin himself. *Id*.

Perhaps in recognition of this problem, Defendants resort to arguing that Deripaska is "hair-splitting," failing to acknowledge that OFAC "cited multiple pieces of evidence in support of [its legal] determination" that Deripaska has acted or purported to act for or on behalf of a senior official of the Russian government. Defs. Reply at 4. But again, this "evidence" only served to generate the conclusion cited above—i.e., that Deripaska has acted in support of Russian President Vladimir Putin's projects"—and is solely relevant in that context. AR 0008.  Defendants' argument thus requires the Court to ignore the structure of both the Executive Order and the evidentiary memorandum, tossing aside how OFAC's findings generated a conclusion that, in turn, provided a determination that Deripaska meets the criteria for designation under E.O. 13661. Indeed, if any "hair-splitting" has occurred, it occurred within E.O. 13661 itself insofar as that order creates separate designation criterion for providing support to a senior official of the Government of the Russian Federation, *see* E.O. 13661, § 1(a)(ii)(D)(i), and for having acted for or on behalf of such an official. See E.O. 13661, §1(a)(ii)(C)(1).

Defendants' argument therefore seeks to entirely remove its "conclusion" from the equation and asks the Court to supply its own explanation for how OFAC reached its legal determination from the evidence contained in the memorandum. That is clearly not permissible under the law. *See Bowman Transp., Inc. v. Arkansas Best Freight System, Inc.*, 419 U.S. 281, 286 (1974) (holding that a court "may not supply a reasoned basis for the agency's action that the agency itself has not given."); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that a court is limited to judging the permissibility of an agency's action on the basis of the contemporaneous explanation offered by the agency itself).

Defendants further argue that E.O. 13661 permits OFAC to designate persons on the basis of historical conduct and that the Court should not "second-guess an Executive Branch determination that sanctioning on the basis of past conduct will promote the national security and foreign policy of the United States." Defs. Reply at 5-6. Moreover, Defendants claim that even if OFAC's authorities were circumscribed in the manner suggested by Deripaska, the administrative record would still provide a "valid" basis for maintaining Deripaska's designation under E.O. 13661. *Id*. at 6-7. Defendants err on all counts.

Defendants' citation to the case law is unusual as none of the cited cases provide the support Defendants claim. Indeed, neither the court in *Holy Land Found. for Relief and Development v. Ashcroft* nor *Joumaa v. Mnuchin* held that OFAC could permissibly designate a person solely based on conduct taking place prior to the issuance of the relevant laws that rendered that conduct sanctionable. Instead, the courts in *Holy Land* and *Joumaa* both held that it was reasonable for OFAC to consider historical conduct when assessing, and drawing meaning from, evidence of more recent, if not contemporaneous, conduct. *Holy Land Found.*, 333 F.3d 156, 162 (D.C. Cir. 2003); *Joumaa*, No. CV 17-2780 (TJK), 2019 WL 1559453, at *8 (D.D.C. April 20, 2019), *aff'd*,

798 F. App'x 667 (D.C. Cir. 2020). Here, though, there is no indication that OFAC used evidence of alleged historical conduct to assess and draw conclusions from conduct that post-dated the promulgation of E.O. 13661. Indeed, OFAC's allegations of historical conduct are the principal basis for its determination that Deripaska meets the criteria for designation under E.O. 13661. Absent an explanation from OFAC regarding how it used this information, neither Deripaska nor the Court have insight into whether the agency impermissibly rendered sanctionable conduct that was not subject to sanctions at the time of its purported engagement.

Defendants' next argument—i.e., that OFAC merits total deference from the Court when adjudicating the limits of its own authorities under E.O. 13661—is plainly wrong. Under Defendants' conception of OFAC's powers, OFAC may make the laws; administer the laws; and adjudicate the contours of those laws without outside interference, including from the courts. *See e.g.*, Defs. Reply at 11 (arguing that OFAC should be "grant[ed] . . . significant deference in interpreting the scope of its authority under IEEPA."). Under their reading, basic principles of due process have no role in setting limits to OFAC's authority unless OFAC itself agrees to those limits. *See* Defs. Reply at 21 ("OFAC provided Plaintiff with [] summaries not because it was obligated to do so . . ."). Defendants' citation to *OKKO Bus. PE v Lew*, 133 F. Supp. 3d 17, 28 (D.D.C. 2015) to support this theory is misplaced insofar as the facts in that case—whether OFAC should license the unblocking of property in which an SDN maintains an interest—are entirely irrelevant with respect to the facts before this Court—i.e., whether OFAC lawfully designated Deripaska. Indeed, Deripaska is not arguing the bounds of OFAC's discretion, but rather the bounds of the law—a proper subject for the Court. Defendants' arguments otherwise do not evidence an agency that seeks to adhere to law, but rather one that sees itself as entirely unbound by it.

Finally, Defendants' argue that—even if OFAC's authority were limited to considering conduct that took place at a time in which OFAC rendered that conduct sanctionable—there remains a valid basis for maintaining Deripaska's designation in the evidentiary memorandum. Even assuming *arguendo* this is the case—it is not—it would require OFAC to provide a *post-hoc* explanation for its decision—i.e., that the evidence in the agency's possession provides a basis for determining that Deripaska meets the designation criteria—or for the Court to supply its own reasoning for OFAC's decision. This, too, would be impermissible, as the Court is limited to reviewing the challenged action on the basis for the contemporaneous explanation offered by the agency. *Chenery Corp.*, 332 U.S. at 196 (1947). In the absence of that explanation, the Court must set aside the decision and remand to the agency. *Id*.

        B.     *Defendants' Denial of Deripaska's E.O. 13662 Delisting Petition Constitutes Arbitrary and Capricious Agency Action*

Defendants argue that OFAC "explained the reasons for its denial" of Deripaska's E.O. 13662 delisting petition and that Deripaska's challenge to these reasons fails to "undermine [OFAC's] decision." Defs. Reply at 7. But OFAC's identification of the reasons for its denial decision provides little insight into whether those "reasons" were "reasonable" considering the evidence presented to or otherwise before the agency at the time of its decision. As explained below and in Deripaska's motion, OFAC's stated justification for denying Deripaska's E.O. 13662 delisting petition fail the arbitrary and capricious test.

Defendants note that Deripaska "takes issue with OFAC's assessment that he continues to operate in the Russian energy sector by way of his ownership stakes in En+ and ESE," arguing that his remaining interests in En+ "still allows him to wield influence over both entities." *Id*. at 9. This argument, however, ignores and fails to respond to crucial facts presented by Deripaska in his desilting petition that bear on whether OFAC's decision constituted reasonable agency action.

First, OFAC entered into a Terms of Removal Agreement ("TOR") with En+ and ESE after both entities "committed to significantly diminish Deripaska's ownership and sever his control." Press Release, U.S. Dep't of Treasury, Office of Foreign Assets Control, OFAC Notifies Congress of Intent to Delist En+, Rusal, and EuroSibEnergo (Dec. 19, 2018). This included, *inter alia*, a requirement that all actions, policies, and personnel decisions of ESE rest *solely* with its General Director and En+, not with Deripaska. AR 0216 (emphasis added). Indeed, Defendants rejected Deripaska's request for a meeting with respect to the TOR because Deripaska "has only minority ownership interests in, and does not control, the parties to the TOR"—i.e., Deripaska's interests in En+ and ESE are too insubstantial to merit a meeting with Deripaska with respect to the TOR. AR 0207. Second, the TOR led to OFAC's determination that En+ and ESE no longer met the criteria for designation under E.O. 13661 and E.O. 13662 and should be removed from its List of Specially Designated Nationals and Blocked Persons. Press Release, U.S. Dep't of Treasury, Office of Foreign Assets Control, OFAC Delists En+, Rusal, and EuroSibEnergo (Jan. 27, 2019).

Under the circumstances, OFAC's argument that Deripaska's continued interests in En+ and ESE evidence his operation in Russia's energy sector defies reason. OFAC not only determined that Deripaska no longer exercises ownership or control over En+ and ESE, but also that En+ and ESE no longer met the criteria for designation under E.O. 13662. Further, OFAC required that all actions, policies, and personnel decisions of ESE rest solely with its General Director and En+, negating Deripaska's ability to influence ESE. OFAC offers no argument that, despite these restrictions, Deripaska has had any influence over, or involvement with, ESE since the time of his delisting petition.

How, then, could Deripaska operate in Russia's energy sector through his non-majority, non-controlling interests in two entities that have been determined to *not* meet the criteria for

designation under E.O. 13662, and for which he has no role with respect to their actions, policies, or personnel decisions? OFAC's denial letter and its evidentiary memorandum altogether lack "satisfactory explanation" for these obvious anomalies in its reasoning. *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43. This Court must mandate OFAC to adequately explain how Deripaska can operate in Russia's energy sector via his remaining interests in these two companies in light of these facts and offer more than his mere retained interest in En+ to demonstrate such operation.

Defendants next argue that OFAC reasonably concluded that Deripaska's "involvement in energy-related WEF industry groups on behalf of En+ evidenced his participation in the Russian energy sector." Defs. Reply at 8. According to Defendants, OFAC reasonably concluded that Deripaska's involvement in WEF projects was related to *Russia's* energy sector because of "statements [Deripaska] made on his own website . . . describ[ing] En+ as a '*Russian* diversified power and metal group of companies.'" *Id*. This is an inadequate justification for OFAC's decision.

OFAC's evidentiary memorandum describes En+ "as a Russian diversified power and metals group of companies . . . operat[ing] in the Russian federation [sic] economy." AR 0161. OFAC does not, however, describe En+ as operating in Russia's *energy* sector. Accordingly, OFAC fails to substantiate how Deripaska's involvement in WEF energy-related projects can fairly constitute operation in *Russia's* energy sector where OFAC has not concluded (1) that the projects relate to Russia's energy sector or (2) that En+ itself operates that sector. Absent these conclusions, it is plainly unreasonable to conclude that Deripaska operates in Russia's energy sector simply because he participated in certain energy-related WEF projects on behalf of En+.

Defendants finally argue that OFAC's interpretation of the term "energy sector" "corresponds to how OFAC has interpreted that phrase in other programs and, more importantly, in the specific context of the Russia/Ukraine program." Defs. Reply at 9. Defendants, however,

fail to identify those other programs in which OFAC has interpreted the term "energy sector" in such manner; and, as Deripaska has noted, OFAC appears to have only defined the term "energy sector" in the context of other programs to exclude electricity producers. AR 0198-201.

Defendants further claim that OFAC has interpreted the term "energy sector" to include power companies "in the specific context of the Russia/Ukraine program" is misleading, at best. Defendants state that they have interpreted the term once before, but that "interpretation" purportedly occurred in the context of the designation of Viktor Vekselberg, an individual who was designated as part of the same April 6 designation action as Deripaska. AR 0162. Even if OFAC's "interpretation" were persuasive—it is not—the coincident timing does not alter the *ad hoc* nature of OFAC's determination that the term "energy sector" as used in the Russia/Ukraine sanctions program is inclusive of entities engaged in the production of electricity. Indeed, because OFAC's interpretation "fail[s] to come to grips with conflicting precedent," it constitutes unlawful agency action. *Ramakrapash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) (where D.C. Circuit found NTSB's deviation from its own precedent constituted arbitrary and capricious agency action). As Deripaska previously noted, OFAC did not provide notice of its interpretation of the term "energy sector" prior to his designation and offered no later explanation as to why its traditional view of the term was being changed for purposes of E.O. 13662. Pl.'s Cross-Mot. for Summ. J. and In Opp. to Defs. Mot. to Dismiss or, In the Alternative, for Summ. J. ("Pl.'s Cross-Mot."), ECF No. 31 at 30. That failure "constitutes an inexcusable departure from the essential requirement of reasoned decision making." *Ramaprakash*, 346 F.3d at 1124.

III.   **DEFENDANTS FAILED TO PROVIDE CONSTITUTIONALLY ADEQUATE NOTICE OF THEIR ACTIONS**

A.   *Deripaska Has Standing to Assert a Constitutional Right to Due Process*

Defendants argue that Deripaska "lacks standing to pursue his due process challenge," as "a Russian citizen who lacks substantial connections with the United States." Defs. Reply at 14. According to Defendants, Deripaska's prior U.S. visa is inadequate for the purpose of establishing presence in the United States, and Deripaska's alleged interests in certain companies, leases, and bank accounts in the United States fail to establish his substantial connection to the United States. *Id*. at 15. Moreover, Defendants claim Deripaska "should be able to identify portions of the Administrative Record that support a finding of sufficient contacts with the United States." *Id*. Defendants are wrong on all counts for the reasons explained below.

Deripaska's complaint argues both presence and substantial connections. First, Defendants entirely ignore that Deripaska "maintained an . . . ownership interest in Basic Element, Inc., a company incorporated in Delaware, which . . . maintained bank accounts and a property lease in the United States at the time of Deripaska's designation." Second Am. Compl., ECF No. 26 ("SAC") ¶ 111. In addition, Deripaska's complaint alleged "a beneficial ownership interest in RUSAL America Corp., which had offices in 660 Madison Ave., New York, NY and was assigned the lease held by Basic Element, Inc." SAC ¶ 112. That Deripaska maintained an interest in U.S.-based companies that rendered those companies subject to blocking sanctions clearly evidences his "presence" in the United States for purposes of constitutional due process.

Even if the Court were to nevertheless determine that Deripaska lacks "presence" in the United States, Defendants err in assuming that decides the matter. Indeed, the D.C. Circuit has held that while "non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections," there are exceptions when those persons have come to

and established "substantial connections" in the United States or otherwise "accepted some societal obligations." *Jifry v. FAA*, 370 F.3d 1174,1182-1183 (D.C. Cir. 2004). Here, Deripaska had significant interests in the United States, including ownership interests in certain U.S.-based companies and interests in the assets held by those companies, including in accounts held at U.S. financial institutions. SAC ¶ 111, 112. Moreover, these interests were directly affected by OFAC's actions, as the companies and their U.S.-based assets were blocked or "frozen." *Id*. These interests far exceed those at issue in the *Nat'l Council of Resistance of Iran v. U.S. Dep't of State*, where the D.C. Circuit found that the NCRI's "overt presence within the National Press Building" and its interest in a small U.S. bank account are sufficient to establish "substantial connections" to the United States for purposes of due process. *Nat'l Council of Resistance of Iran v. U.S. Dep't of State*, 251 F.3d 192, 201 (D.C. Cir. 2001). Indeed, the question of whether a foreign national holds property in the United States often serves as "the benchmark for satisfying the 'substantial connections' test" under the case law. *Kadi v. Geithner*, 42 F. Supp. 3d 1, 26 (D.D.C. 2012).

Finally, Defendants' argument that Deripaska is obligated "to identify portions of the Administrative Record that support a finding of sufficient contacts with the United States" is unsupported and fundamentally mistaken. Defs. Reply at 15. Indeed, it would be bizarre for an individual's constitutional right to due process to be dependent on whether an agency included facts related to his presence in, and substantial connections to, the United States in the record underlying the challenged agency action. If that were the rule, then agencies would have a clear incentive not to include that information so as to limit the scope of any challenge to their actions.

Defendants' citation to case law underscores their error, as it is not the "administrative record" that must include the evidence necessary to support standing, but rather the "record" before the Court, which would include Deripaska's pleadings and briefings in support of and opposition

to the pending motions. *See Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598, 602 (D.C. Cir. 2019). This latter "record" clearly provides a basis for this Court to find that Deripaska has standing to assert a constitutional right to due process.[2]

> B.    *Defendants Failed to Provide Adequate Notice of the Reasons for Deripaska's Designation Under E.O. 13661 or Their Denial of Deripaska's E.O. 13662 Delisting Petition*

Defendants argue that, even if Deripaska has standing to assert his constitutional claim to due process, OFAC has met its burden under the relevant standards. According to Defendants, "[t]he information in [its] press release, combined with the unclassified portions of the Administrative Record in support of his designation and the unclassified summaries of certain classified information relied upon for his designation under E.O. 13661, sufficiently informed [Deripaska] of the reasons for his designation." Defs. Reply at 16. Defendants' argument fails, however, for all the reasons previously explained.

As an initial matter, Defendants urge the Court to recognize a legal standard that does not exist—i.e., that OFAC need only disclose the unclassified portions of the administrative record in order to meet its due process obligations and that OFAC is permitted to base its decision on information that remains entirely concealed from the designee. *Id*. at 18-20. The D.C. Circuit, however, has held that "in [the] narrow category of cases" where courts have "countenanced" disclosure of only the unclassified portions of the administrative record, courts have required the government "to ensure a designee's notice and process via alternative means," including by authorizing "strictly necessary adaptations of ordinary administrative and judicial process." *Fares*

---

[2] To the extent that the Court requires additional information regarding Deripaska's interests in the U.S., the Court may provide opportunity for the parties to address the facts in dispute (i.e., Deripaska's property interests) pursuant to Fed. R. Civ. P. 56(e)(1). In addition, the Court could take limited discovery of "blocking reports" in Defendants' possession to gauge the scope of Deripaska's blocked interests.

*v. Smith*, 901 F.3d 315, 319, 324 (D.C. Cir. 2018). These alternative means may involve the provision of "sufficiently specific 'unclassified summaries . . . [that] provide [plaintiffs] with the 'who,' 'what,' 'when' and 'where' of the allegations,'" *Id*. at 324 (quoting *Kiareldeen v. Ashcroft*, 273 F.3d 542, 548 (3d Cir. 2001)). And, while the D.C. Circuit has not required any particular "alternative" form of disclosure, there is no doubting the *Fares* court's view that—if OFAC is to disclose only the unclassified portions of the administrative record—then it must use *some* alternative mechanism by which to inform designee of the basis for its designation. *Id*.

With respect to Deripaska's E.O. 13661 designation, Defendants have clearly failed to meet this standard. First, the claim that OFAC's press release provides notice to Deripaska of the basis for his designation is incomprehensible, given that the press release makes no reference to the conclusions and findings underlying Deripaska's designation—i.e., no mention of support for Putin's projects, power plants in Montenegro, the Sochi Olympics, etc. If anything, OFAC's press release trafficked in disinformation, which—had Deripaska relied upon it—would have led him to rebut allegations of no significance to the actual reasons for his designation. Second, OFAC's unclassified administrative record fares little better, as that record redacts almost all substantive portions of the record identifying the agency's findings in support of the designation. If Deripaska were to return to the delisting process on this basis, he would be disabled from meaningfully challenging almost all of the reasons for his designation. Finally, Defendants argue that OFAC's provision of unclassified summaries satisfy any relevant due process obligations owed by the agency. Defs. Reply at 21. But these summaries fail to meet the standard in *Fares*—i.e., the summaries are not "sufficiently specific" to provide the "who," "what," "when," and "where" of OFAC's allegations. Instead, Defendants cobble together disparate summaries in order to show that OFAC has provided sufficient information regarding the conduct at issue; the time period in

which the conduct occurred; and the location of the conduct. However, the requirement is that OFAC provide the "who," "what," "when," and "where" for each separate basis of designation, not that—when taken in aggregate—the summaries check all the relevant boxes. Further, OFAC's unclassified summaries do not indicate whether OFAC has provided this information with respect to all of the bases for Deripaska's designation under E.O. 13661. If not, Deripaska remains unable to meaningfully challenge his designation insofar as OFAC could rely on his failure to rebut an undisclosed independent basis for designation in order to deny a future delisting petition. This, per the relevant case law, contradicts Defendants' due process obligations.

## IV. DEFENDANTS FAILED TO PROVIDE ADEQUATE NOTICE OF THE REASONS FOR THEIR ACTIONS IN VIOLATION OF THE APA

Defendants argue that Deripaska's APA notice claims fail because he "is not entitled [to classified and privileged information] simply because he has alleged a cause of action under 5 U.S.C. § 706." Defs. Reply at 26-27. According to Defendants, the APA "requires only that an agency 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made to allow [a reviewing court] to evaluate the agency's decision-making process." *Id*. at 26. Defendants entirely reject the premise that notice is required at all for purposes of the APA.

The rule is long-standing, though: an agency must set forth the reasons for its decision and that its failure to do so constitutes arbitrary and capricious agency action. *See Tourus Records v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001) (citing *Roelofs v. Sec. of the Air Force*, 628 F.2d 594, 599 (D.C. Cir. 1980); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("[t]he requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."). This requirement exists in order to "give parties the opportunity to apprise the agency of any errors it may have made and, if the agency persists in its decision,

facilitates judicial review." *Id*. at 737. Deripaska does not suggest that Defendants must disclose classified or otherwise privileged information contained in the administrative record underlying its decisions. Rather, Deripaska notes that there are several paths by which Defendants can provide adequate notice to Deripaska for the reasons for its decision without necessarily disclosing classified or otherwise privileged information. This includes at least one method traditionally used by Defendants—i.e., the provision of adequate unclassified summaries of classified or otherwise privileged information contained in the administrative record. To the extent Defendants believe that disclosure of additional portions of the administrative record is not possible due to classification and privilege issues, Defendants can make use of these alternative means to ensure that Deripaska understands the full sum of reasons for the agency's decision.

## V.   DEFENDANTS' IDENTIFICATION OF DERIPASKA IN THE SECTION 241 LIST WAS ARBITRARY AND CAPRICIOUS AND VIOLATED HIS DUE PROCESS RIGHTS

### A.   *Deripaska's Challenge to the Section 241 List is Plainly Justiciable*

Defendants claim that Deripaska's challenge to his identification in the Section 241 List is not justiciable because (1) "[i]t is for Congress . . . to determine whether Defendants have sufficiently met their reporting obligations," (2) Deripaska "has suffered no injury" from his identification; and (3) CAATSA lacks "judicially manageable standards" by which to judge the permissibility of the challenged action. Defs. Reply at 29-30. Defendants err on all counts, and their opposition fails to undermine Deripaska's argument that he alone can vindicate his interests or that CAATSA has "judicially manageable standards by which to gauge the fidelity of the Secretary's response." *Nat'l Resources Def. Council v. Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988).

Defendants argue that a public report issued by the United States Government that identifies individuals as "Russian oligarchs" bears no negative consequences for the individuals so identified, despite Defendants' public promise to follow-up the report with economic sanctions.

Defs. Reply at 30-31. That notion is illogical and belied by the fact that, as a direct result of Defendants' action, foreign banks terminated Deripaska's accounts out of concern for the reputational harm associated with maintaining those accounts in the wake of the Section 241 List and the threat of impending sanctions on Deripaska. SAC ¶ 36. Moreover, unlike in *Hodel*, where Congress "[was] not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives," *Hodel*, 865 F.2d at 319, Deripaska has claim to be the victim of the Secretary's action, and Deripaska is powerless to vindicate his interests absent judicial intervention.

Defendants argue that the Court lacks "judicially manageable standards" to enable judicial review, claiming the "the operative statutory language"—i.e., that Defendants submit a "detailed report to Congress"—to be "inherently elusive." Defs. Reply at 29. The issue at hand, however, is that Section 241 of the CAATSA required the Secretary of the Treasury to identify "the most significant . . . oligarchs in the Russian Federation, as determined by their closeness to the Russian regime and their net worth." CAATSA, § 241. This is the operative language of Section 241 that provides "judicially manageable standards" for the Court. There is nothing "inherently elusive" about deciding whether Defendants adhered to their statutory mandate by identifying "the most significant [Russian] oligarchs," particularly where CAATSA defines the terms by which such individuals are to be so identified (i.e., "as determined by their closeness to the Russian regime and their net worth."). This renders the challenged action distinct from *Hodel* and justiciable.

B.   *Deripaska Is Clearly Injured by His Identification in the Section 241 List*

Defendants also repeat their argument that Deripaska suffered no injury from his identification in the Section 241 List and thus lacks standing to pursue his APA claims. Defs. Reply at 30-31. Defendants miss the mark, however. As a direct result of Defendants' action, foreign financial institutions terminated accounts held on behalf of Deripaska and his companies

21

out of concern about the risk associated with maintaining an account for a U.S.-designated Russian "oligarch" and out of the (correct) presumption that Deripaska's identification in the Section 241 List was a mere stepping stone to the imposition of U.S. sanctions, as promised by the Secretary. SAC ¶ 36. Defendants cannot pin the blame on third parties for their action, as the Secretary testified that sanctions arising from the Section 241 List would be imminent and OFAC itself stated that the sanctions imposed on Deripaska "follow the Department of the Treasury's issuance of the CAATSA Section 241 Report." *See* Pl.'s Cross-Mot. at 48-49. It is clear why third parties took the actions that they did: Defendants had made obvious their intent to impose sanctions on Deripaska, and his identification in the Section 241 List was merely a shot across the bow.

C.   *The Section 241 List Constitutes Reviewable Final Agency Action*

Defendants also further argue that the Section 241 List does not constitute final agency action "because it not an action 'by which rights and obligations have been determined, or from which legal consequences will flow." Defs. Reply at 32. Defendants entirely focus on Deripaska's argument that the Section 241 List had "legal consequences because [Deripaska] was ultimately designated." *Id*. at 32. In doing so, however, they ignore the other "legal consequences" cited by Deripaska, including his identification as an "oligarch" for purposes of CAATSA; the transmission of the Section 241 List to Congress and the public, including his identification as a Russian "oligarch;" the closure of accounts held by Deripaska at foreign banks; and his later designations under E.O. 13661 and E.O. 13662, which follow[ed] the Department of the Treasury's issuance of the CAATSA Section 241 Report." Pl.'s Cross-Mot. at 49, 50. In the Secretary's words, "Russian oligarchs . . . who profit from [Russia's] corrupt system will no longer be insulated from the consequences of their government's destabilizing activities." AR 0413. It would be difficult to find

a plainer statement that Deripaska's identification as a "Russian oligarch" had direct "legal consequences," rendering the Section 241 List "reviewable final agency action."

  D.  *The Section 241 List Constitutes Arbitrary and Capricious Agency Action*

  Defendants argue that "Treasury's inclusion of [Deripaska] was consistent with the statutory language," claiming "CAATSA calls upon Treasury to identify two sets of individuals based on two sets of criteria" and "nothing in the statute requir[es] Treasury to consider *both* criteria in identifying oligarchs." Defs. Reply at 33. Defendants further contend that Deripaska's invocation of the "rule of the last antecedent" is without merit, as "'canons of construction are no more than rules of thumb . . .'" *Id.* at 33-34.

  Defendants' argument is curious. Instead of reliance on "timeworn textual canon[s]," *Lockhart v. United States*, 136 S. Ct. 958, 962 (2016), Defendants appear to argue for a "plain reading" of Section 241, which—according to Defendants—indicates that the Secretary was not required to consider "closeness to the Russian regime" when assembling a list of oligarchs. The statutory text does not invite such a "plain reading," unless via the interpretive tools outlined by Deripaska in his motion. This is because Defendants defined the term "oligarch" in a manner contrary to its plain meaning and common usage in the English language, as well as the manner in which the terms has been interpreted by this Court. Pl.'s Cross-Mot. at 43. Deripaska sees no evidence in Section 241 that Congress plainly intended to define the term "oligarch" in the manner suggested by Defendants, nor any evidence that Congress understood itself to be defining the term in a way contrary to common understanding. Defendants' rejection of "timeworn textual canon[s]" is not surprising, however, as reliance on those canons clearly shows that the proper reading of Section 241 required identification of the most significant oligarchs in the Russian Federation by *both their closeness to the Russian regime and their net worth*. The Secretary's use of only the

latter qualifier to determine its list of "oligarchs" was contrary to statutory requirements and rendered the Section 241 List and Deripaska's identification on it arbitrary and capricious.

> E.   *Defendants' Failure to Provide Notice or an Opportunity to Be Heard Violates His Due Process Rights Under the Fifth Amendment and the APA*

Defendants' argument that Deripaska lacks standing to assert a constitutional due process right errs for all the reasons described above. Defs. Reply at 36-37; *see supra* 14-17.

On the merits, Defendants fall back on their argument that the Section 241 List provided notice for the reasons for Deripaska's identification: "at the time of the report, he was a Russian national who has a net worth of at least one billion dollars." Defs. Reply at 37. But that is Defendants' *legal conclusion*, and Deripaska is owed notice of the basis for Defendants' action, including the findings and conclusions in support of that determination. *See supra* 17-19. Defendants even admit that they have not assembled an administrative record underlying their action since, in their view, the challenged action does not qualify as "final agency action." Defs. Reply at 37. That in itself qualifies as a breach of due process in Defendants' own cabined conception of its due process obligations. *See* Defs. Reply at 19 ("[D]ue process require[s] the disclosure of only the unclassified portions of the administrative record.").

Defendants offer no attempt to counter the fact that Deripaska is denied any process by which to challenge his identification in the Section 241 List. Presumably, Defendants' view is that Deripaska has no right to such process. But it remains a bedrock principle of due process jurisprudence that "a person in jeopardy of serious loss [be given] notice of the case against him *and opportunity to meet it*." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). Indeed, the purpose of due process's notice requirement is to allow a person a meaningful opportunity to respond to the Government. *KindHearts for Charitable Humanitarian Dev. v. Geithner*, 647 F. Supp. 2d 857,

901 (N.D. Ohio 2010). Here, Defendants have admittedly provided no process—administrative or otherwise—by which Deripaska may contest his identification in the Section 241 List.

## CONCLUSION

For the foregoing reasons, the Court should grant Deripaska's motion for summary judgment and enter judgment in favor of Deripaska on all claims.

Dated: July 17, 2020                                    Respectfully submitted,

<u>/s/ Erich C. Ferrari</u>
Erich C. Ferrari, Esq.
FERRARI & ASSOCIATES, P.C.
1455 Pennsylvania Avenue, NW
Suite 400
Washington, D.C. 20004
Telephone: (202) 280-6370
Fax: (877) 448-4885
Email: ferrari@falawpc.com
D.C. Bar No. 978253

Attorney for Plaintiff
*Oleg Deripaska*