**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |
|---|---|
| OLEG DERIPASKA ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | Civil Action No. 19-0727 (APM) |
| v. ) | |
| ) | |
| STEVEN T. MNUCHIN, *et al.* ) | |
| ) | |
| *Defendants*. ) | |

---

## JOINT APPENDIX

Pursuant to LCvR 7(n), Plaintiff is hereby providing the joint appendix "containing copies of those portions of the administrative record that are cited or otherwise relied upon in [the] memorand[a] in support of or in opposition to [the] dispositive motion[s]" at issue. The joint appendix has been agreed on by the parties consistent with LCvR 7(n)(2).

Dated: January 12, 2021                    Respectfully submitted,

/s/ Erich C. Ferrari
Erich C. Ferrari, Esq.
FERRARI & ASSOCIATES, P.C.
1455 Pennsylvania Avenue, NW
Suite 400
Washington, D.C. 20004
Telephone: (202) 280-6370
Fax: (877) 448-4885
Email: ferrari@falawpc.com
D.C. Bar No. 978253

*Counsel for Plaintiff*

**UNCLASSIFIED**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case IDs:  UKRAINE2-3792, UKRAINE-EO13661-13363, UKRAINE-EO13661-13367,
UKRAINE-EO13661-13389, UKRAINE-EO13661-13382, UKRAINE-EO13661-13434,
UKRAINE-EO13661-13384, UKRAINE-EO13661-13385, UKRAINE-EO13661-13334,
UKRAINE-EO13661-13370, UKRAINE-EO13661-13321, UKRAINE-EO13661-13417,
UKRAINE-EO13661-13372

OFFICE OF FOREIGN ASSETS CONTROL

### SPECIAL DESIGNATION AND BLOCKING MEMORANDUM

Pursuant to Executive Order 13661 of March 16, 2014, "Blocking Property of Additional
Persons Contributing to the Situation in Ukraine" (the Order), 31 C.F.R. § 589.802, and section
203 of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, I hereby
determine, in consultation with the Department of State, that the persons listed below, and
further addressed in the evidentiary memoranda listed at the top of this page and attached to this
memorandum meet one or more of the criteria for designation set forth in the Order. Therefore,
the persons listed below are designated pursuant to the Order and will now appear on the Office
of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List.

#### Individuals:

1. AKIMOV, Andrey Igorevich, Russia; DOB 1953; POB Leningrad, Russia; Gender Male;
   Chairman of the Management Board of Gazprombank (individual) [UKRAINE-
   EO13661].

2. DERIPASKA, Oleg Vladimirovich, Moscow, Russia; 64 Severnaya Street, Oktyabrsky,
   Khutor, Ust-Labinsky District, Krasnodar Territory 352332, Russia; 5, Belgrave Square,
   Belgravia, London SW1X 8PH, United Kingdom; DOB 02 Jan 1968; POB Dzerzhinsk,
   Nizhny Novgorod Region, Russia; citizen Russia; alt. citizen Cyprus; Gender Male
   (individual) [UKRAINE-EO13661] [UKRAINE-EO13662].

3. DYUMIN, Alexey Gennadyevich (a.k.a. DYUMIN, Alexei), Russia; DOB 28 Aug 1972;
   POB Kursk, Russian Federation; Gender Male (individual) [UKRAINE-EO13661].

4. FRADKOV, Mikhail Efimovich (Cyrillic: ФРАДКОВ, Михаил Ефимович), Russia;
   DOB 01 Sep 1950; POB Kurumoch, Knibyshev Region, Russia; Gender Male; Director
   of the Russian Institute for Strategic Studies (individual) [UKRAINE-EO13661].

5. FURSENKO, Sergei (a.k.a. FURSENKO, Sergey; a.k.a. FURSENKO, Sergey
   Aleksandrovich); DOB 11 Mar 1954; POB Saint-Petersburg (F.K.A. Leningrad), Russian
   Federation; citizen Russia; Gender Male (individual) [UKRAINE-EO13661].

DERIPASKA_0001

6. GOVORUN, Oleg, Russia; DOB 15 Jan 1969; POB Bratsk, Irkutsk Region, Russia; Gender Male; Head of the Presidential Directorate for Social and Economic Cooperation with the Commonwealth of Independent States Member Countries, the Republic of Abkhazia, and the Republic of South Ossetia (individual) [UKRAINE-EO13661].

7. KERIMOV, Suleiman Abusaidovich (Cyrillic: КЕРИМОВ, Сулейман Абусаидович) (a.k.a. KERIMOV, Suleyman), Moscow, Russia; Antibes, France; DOB 12 Mar 1966; POB Derbent, Republic of Dagestan, Russia; citizen Russia; Gender Male (individual) [UKRAINE-EO13661].

8. KOLOKOLTSEV, Vladimir Alexandrovich, Russia; DOB 11 May 1961; POB Nizhny Lomov, Penza Region, Russia; Gender Male; Minister of Internal Affairs of the Russian Federation, General of the Police of the Russian Federation (individual) [UKRAINE-EO13661].

9. KOSACHEV, Konstantin, Russia; DOB 17 Sep 1962; POB Moscow, Russia; nationality Russia; Gender Male; Chairperson of the Council of the Federation Committee on Foreign Affairs (individual) [UKRAINE-EO13661].

10. KOSTIN, Andrey Leonidovich, Moscow, Russia; DOB 21 Sep 1956; POB Moscow, Russian Federation; Gender Male (individual) [UKRAINE-EO13661].

11. MILLER, Alexey Borisovich, Moscow, Russia; DOB 31 Jan 1962; POB Saint-Petersburg, Russian Federation; Gender Male (individual) [UKRAINE-EO13661].

12. REZNIK, Vladislav Matusovich, Moscow, Russia; DOB 17 May 1954; Gender Male (individual) [UKRAINE-EO13661].

13. PATRUSHEV, Nikolai Platonovich, Russia; DOB 11 Jul 1951; POB Leningrad, Russian Federation; nationality Russia; Gender Male; Secretary of the Russian Federation Security Council (individual) [UKRAINE-EO13661].

14. SHKOLOV, Evgeniy Mikhailovich, Russia; DOB 31 Aug 1955; POB Dresden, Germany; nationality Russia; Gender Male; Aide to the President of the Russian Federation (individual) [UKRAINE-EO13661].

15. SKOCH, Andrei Vladimirovich (a.k.a. SKOCH, Andrey), Russia; DOB 30 Jan 1966; POB Nikolsky (Moscow), Russia; Gender Male; Deputy of State Duma (individual) [UKRAINE-EO13661].

16. TORSHIN, Alexander Porfiryevich, Moscow, Russia; DOB 27 Nov 1953; POB Mitoga village, Ust-Bolsheretsky district, Kamchatka region, Russian Federation; Gender Male (individual) [UKRAINE-EO13661].

17. USTINOV, Vladimir Vasilyevich, Russia; DOB 25 Feb 1953; POB Nikolayevsk-on-Amur, Russian Federation; Gender Male (individual) [UKRAINE-EO13661].

DERIPASKA_0002

**UNCLASSIFIED**

18. VALIULIN, Timur Samirovich, Russia; DOB 20 Dec 1962; POB Krasnozavodsk, Zagorsk District, Moscow Region, Russia; Gender Male; Chief of the General Administration for Combating Extremism of the Ministry of Internal Affairs of the Russian Federation (individual) [UKRAINE-EO13661].

19. ZHAROV, Alexander Alexandrovich (a.k.a. ZHAROV, Aleksandr), Russia; DOB 11 Aug 1964; POB Chelyabinsk, Russia; Gender Male; Head of the Federal Service for Supervision of Communications, Information Technology, and Mass Media (individual) [UKRAINE-EO13661].

20. ZOLOTOV, Viktor Vasiliyevich, Russia; DOB 27 Jan 1954; POB Ryazanskaya oblast, Russia; nationality Russia; Gender Male; Director of the Federal Service of National Guard Troops and Commander of the National Guard Troops of the Russian Federation (individual) [UKRAINE-EO13661].

**Entities:**

1. AGROHOLDING KUBAN (a.k.a. KUBAN AGRO; a.k.a. KUBAN AGROHOLDING), 77 Mira St., Ust-Labinsk, Krasnodar Territory 352330, Russia; 1 Montazhnaya St., Ust-Labinsk, Krasnodar Territory, Russia; 116 Mira St., Ust-Labinsk, Krasnodar Territory, Russia; 1 G. Konshinykh St., Krasnodar Territory, Russia; 2 Rabochaya St., Ust-Labinsk, Krasnodar Territory, Russia [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: BASIC ELEMENT LIMITED).

2. BASIC ELEMENT LIMITED (a.k.a. BAZOVY ELEMENT), Esplanade 44, Saint Helier JE4 9WG, Jersey; 30 Rochdelskaya Street, Moscow 123022, Russia; Registration ID 84039 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

3. B-FINANCE LTD, Vanterpool Plaza, 2nd Floor, Wickhams Cay, Road Town, Tortola, Virgin Islands, British [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

4. EN+ GROUP PLC, Esplanade 44, Saint Helier JE4 9WG, Jersey; 8 Cleveland Row, London SW1A 1DH, United Kingdom; 1 Vasilisy Kozhinoy St., Moscow 121096, Russia; Registration ID 91061 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

5. GAZ GROUP, 88 Lenin Avenue, Nizhny Novgorod 603950, Russia; 15/1 Rochdelskaya Str., Moscow 123022, Russia [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: RUSSIAN MACHINES).

6. JSC EUROSIBENERGO, 165 Chkalova Street, Divnogorsk, Krasnoyarsk Krai 663091, Russia; 1 Vasilisy Kozhinoy Street, Moscow 121096, Russia; Registration ID 5087746073817; Tax ID No. 7706697347; Identification Number 88303955 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: EN+ GROUP PLC).

DERIPASKA_0003

UNCLASSIFIED

7.  RUSSIAN MACHINES (a.k.a. RUSSKIE MASHINY), Ul. Rochdelskaya 15, 8, Moscow 123022, Russia; Registration ID 1112373000596; Tax ID No. 2373000582; Identification Number 37100386 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: BASIC ELEMENT LIMITED).

8.  UNITED COMPANY RUSAL PLC, 44 Esplanade, St. Helier JE4 9WG, Jersey; 1 Vasilisy Kozhinoy Str., Moscow 121096, Russia; 11/F Central Twr., 28 Queen's Rd. C, Central District, Hong Kong; Registration ID 94939; Company Number F-17314 (Hong Kong); Business Number 51566843 (Hong Kong) [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: EN+ GROUP PLC).

Accordingly, except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, (1) all real, personal, and any other property and interests in property of the persons listed above that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any U.S. person are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in, and (2) any transaction or dealing by a U.S. person or within the United States in property or interests in property of the persons named above is prohibited, including the making or receiving of any contribution or provision of funds, goods, or services by, to, for the benefit of, or from these persons.

Additionally, except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, the following are prohibited: (1) any transaction by a U.S. person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions contained in the Order; and (2) any conspiracy formed to violate any of the prohibitions in the Order.

The President determined in section 7 of the Order that, because of the ability to transfer funds or other assets instantaneously, prior notice to persons determined to be subject to the Order who might have a constitutional presence in the United States would render ineffectual the blocking and other measures authorized by the Order. Therefore, the President determined that there need be no prior notice of such a determination. In making these determinations pursuant to the Order, I also find that no prior notice should be afforded to the persons named above because to do so would provide an opportunity to evade the measures authorized in the Order and, consequently, would render those measures ineffectual.

April 6, 2018
Date

Andrea M. Gacki
Acting Director
Office of Foreign Assets Control

DERIPASKA_0004



# CLEARANCE SHEET

**Case ID: UKRAINE-EO13661-13321**

**Date: April 3, 2018**

**SUBJECT:** Oleg Deripaska: Designation Pursuant to E.O. 13661 of March 16, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine," and E.O. 13662 of March 20, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine."

Designation Date (if applicable): 4/5/2018

## MEMORANDUM FOR:
X☐ DIRECTOR
☐ DEPUTY DIRECTOR
☐ Associate Director, Office of Sanctions Support and Operations
X☐ Associate Director, Office of Global Targeting
☐ Associate Director, Office of Sanctions Policy and Implementation
☐ Associate Director, Office of Compliance and Enforcement
☐ Chief Counsel, Office of Chief Counsel

## REVIEW OFFICES:

| | | |
|---|---|---|
| ☐ OSSO/TSLIT | ☐ OGT/GCN | ☐ OCE/ENF |
| ☐ OSSO/MPD | ☐ OGT/AST | ☐ OSPI/LIC |
| ☐ OSSO/SSD | X☐ OGT/MME | ☐ OSPI/POL |
| ☐ OSSO/IDS | ☐ OGT/CHC | ☐ OSPI/RA |
| X☐ OCC | ☐ OCE/SC&E | ☐ Advisor: _____ |

REFERRALS:  ☐ State  ☐ Other: _____

| NAME | INITIALS/ E-SIGN | DATE | DIVISION | PHONE NO. |
|---|---|---|---|---|
| **DRAFTER/INITIATOR(S)** | | | | |
| ▮▮▮▮▮▮ | | | | |
| **REVIEWER/CLEARER(S)** | | | | |
| ▮▮▮▮▮▮ | eSign | 3/22/2018 | GLOBAL WMD, MID-EAST, EURASIA (GME) | ▮▮▮▮▮▮ |
| ▮▮▮▮▮▮ | eSign | 3/23/2018 | Chief Counsels Office | ▮▮▮▮▮▮ |

DERIPASKA_0005



TOP SECRET

**THE DEPUTY SECRETARY OF THE TREASURY**
WASHINGTON

**Case No. UKRAINE-EO13661-13321**

## EVIDENTIARY MEMORANDUM

(U) MEMORANDUM FOR: JOHN E. SMITH     ~~ 7ES   4·5·2018
                        **DIRECTOR**
                        OFFICE OF FOREIGN ASSETS CONTROL

(U) THROUGH:            **GREGORY T. GATJANIS**     ~~GG
                        **ASSOCIATE DIRECTOR**
                        OFFICE OF GLOBAL TARGETING

                        **TODD C. CONKLIN**
                        **DEPUTY ASSOCIATE DIRECTOR**
                        OFFICE OF GLOBAL TARGETING

                        **LEILA M. BAHERI**
                        **ASSISTANT DIRECTOR**
                        GLOBAL WMD, MID-EAST EURASIA DIVISION

                        **ACTING SECTION CHIEF**
                        GLOBAL WMD, MID-EAST EURASIA DIVISION
                        RUSSIA-UKRAINE/SYRIA SECTION

(U) FROM:

                        GLOBAL WMD, MID-EAST EURASIA DIVISION
                        RUSSIA-UKRAINE/SYRIA SECTION

(U) SUBJECT:            **OLEG VLADIMIROVICH DERIPASKA:** Designation
                        Pursuant to Executive Order 13661 of March 16, 2014, "Blocking
                        Property of Additional Persons Contributing to the Situation in
                        Ukraine" and Executive Order 13662 of March 20, 2014,
                        "Blocking Property of Additional Persons Contributing to the
                        Situation in Ukraine"

## (U) I. INTRODUCTION

(U) On March 16, 2014, the President issued Executive Order 13661, "Blocking Property of
Additional Persons Contributing to the Situation in Ukraine," ("E.O. 13661"). [Exhibit 1]

DERIPASKA_0006

(U) E.O. 13661 blocks the property and interests in property of any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, to meet one or more of the criteria in E.O. 13661. [Exhibit 1]

(U) On March 20, 2014, the President issued Executive Order 13662, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine," ("E.O. 13662").

(U) E.O. 13662 blocks the property and interests in property of any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, to meet one or more of the criteria in E.O. 13662. [Exhibit 2, p. 1]

(U//FOUO) On July 16, 2014, the Secretary of the Treasury, in consultation with the Secretary of State, determined that section 1(a)(i) of E.O. 13662 shall apply to the energy sector of the Russian Federation economy. [Exhibit 3, p. 1]

(U) Information presented in this memorandum and accompanying exhibits provides reason to believe that **OLEG VLADIMIROVICH DERIPASKA**, has acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation, [Exhibit 1, p. 1] and operates in the energy sector of the Russian Federation economy [Exhibit 2, p. 1] and therefore should be added to the list of Specially Designated Nationals and Blocked Persons.[1]

## (U) II. IDENTIFYING INFORMATION

- (U) **OLEG VLADIMIROVICH DERIPASKA** [Exhibit 4, p. 5]
- (U) D.O.B.: January 2, 1968 [Exhibit 4, p. 4]
- (U) P.O.B.: Dzerzhinsk, Nizhny Novgorod Region, Russia [Exhibit 5, p. 1]
- (U) Address: Moscow, Russia [Exhibit 6, p. 1]
- (U) alt. Address: 64 Severnaya Street, Oktyabrsky, Khutor, Ust-Labinsky District, Krasnodar Territory, Russia 352332 [Exhibit 29, p. 1]
- (U) alt. Address: 5, Belgrave Square, Belgravia, London, SW1X 8PH, United Kingdom [Exhibit 7, p. 2] [Exhibit 8, p. 1]
- (U) Gender: Male [Exhibit 6, p. 1]
- (U) Citizenship: Russia [Exhibit 6, p. 1]
- (U) alt. Citizenship: Cyprus [Exhibit 12, pp. 1 and 2]

---

[1] (U) The name of the proposed target will appear in BOLD CAPITAL letters. Throughout this memorandum, an asterisk (*) following a name in ALL CAPS denotes an individual or entity whose property and interests in property have been blocked.

2

DERIPASKA_0007

TOP SECRET//▮▮▮▮▮▮▮▮

## (U) III. BASIS FOR DETERMINATION

### (U) OLEG VLADIMIROVICH DERIPASKA (DERIPASKA)

*(U) DERIPASKA has acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation[2]*

(S//NF) DERIPASKA Has Acted in Support of Russian President Vladimir Putin's Projects



(S)
[Exhibit 14, p. 2]

(S//NF)
[Exhibit 15, pp. 2 and 3]

(S)
[Exhibit 16, p. 2]

(U) *The Nation* reported on October 1, 2008, that DERIPASKA told one of his closest associates that he bought an aluminum plant in Montenegro in 2005 "because Putin encouraged him to do it. ...the Kremlin wanted an area of influence in the Mediterranean." [Exhibit 22, p. 5]

---

[2] (S//NF) Investigator Comment: The Endeavor Group, which provided legal advice to DERIPASKA on issues regarding his U.S. visa, asserted in its May 2009 Foreign Agents Registration Act ("FARA") filing of lobbying on his behalf that DERIPASKA was not supervised, owned, directed, controlled, financed, or subsidized by a foreign government, foreign political party or other foreign principal. [Exhibit 13, pp. 1-3] However, OFAC assesses that DERIPASKA has acted on behalf of senior Russian officials, such as President Vladimir Putin, as demonstrated by the information in this evidentiary memorandum.

(U) [Exhibit 14, p. 1]

(U) [Exhibit 15, p. 2]

(S) [Exhibit 15, pp. 2-3]

(S) [Exhibit 16, p. 1]

TOP SECRET//▮▮▮▮▮▮▮▮

3

DERIPASKA_0008



TOP SECRET//

[Exhibit 23, pp. 1-2]

[Exhibit 18, p. 2]

[Exhibit 19, p. 2]

[Exhibit 20, p. 3]

*(U) DERIPASKA Operates in the Energy Sector of the Russian Federation Economy*

(U) According to **DERIPASKA's** web site, accessed on March 22, 2018, **DERIPASKA** is involved in several World Economic Forum projects including ones on "New Energy Architecture" and the "Interaction between the Power Industry and Society." As part of his work



[7] (U) [Exhibit 18, p. 2]
(S//NF) Investigator Comment: Gaz is actually a **DERIPASKA** business that manufactures commercial vehicles. [Exhibit 25, p. 2]
[9] (U) [Exhibit 19, p. 2]
[10] (U) [Exhibit 20, p. 2]
[11] (U) On July 29, 2014, pursuant to E.O. 13662, OFAC imposed sanctions against VTB BANK°, prohibiting U.S. persons from providing new financing and limiting their access to U.S. capital markets. [Exhibit 21, p. 1]

4

TOP SECRET//

TOP SECRET//

on the APEC Business Advisory Council, **DERIPASKA** focuses on multiple issues including energy efficiency and energy security. At a February 2012 meeting of the Council, **DERIPASKA's** representative presented the North East Asian Region Electrical System Ties Initiative (NEAREST), whose goal is to improve ties between the power grids of Eastern Siberia, Northern and North Eastern China, Japan, and South Korea through the creation of a transnational power grid in Northeast Asia. [Exhibit 24, pp. 1 and 3]

(U) According to **DERIPASKA's** web site, as of January 31, 2018, **DERIPASKA's** key companies operate in multiple sectors of the economy, to include the energy sector. EuroSibEnergo is the largest private power company in Russia, and produces around 9 percent of Russia's total electricity generation. [Exhibit 25, pp. 1 and 5]

(U) According to a November 3, 2017 prospectus of an offering, En+ Group[12] was initially established to hold certain aluminum and alumina assets acquired by **DERIPASKA**. It eventually evolved to become "a leading international vertically integrated aluminum and power producer" with core assets located in Russia. All power assets owned by companies related to **DERIPASKA** were combined under EuroSibEnergo plc, a Cypriot intermediary holding subsidiary of EN+ Group. As of the date of the prospectus, EN+ Group[13] owned 100 percent of EuroSibEnergo plc which in turn owned 100 percent of JSC EuroSibEnergo in Russia. [Exhibit 26, pp. 7, 9, 20, and 25] According to EuroSibEnergo's web site, as of February 12, 2018, EuroSibEnergo, a part of EN+ Group, is the largest independent power company in Russia, operating power plants across Russia, and one of the largest hydropower generation companies in the world. EuroSibEnergo produces around 9 percent of Russia's total electricity volume and is Siberia's largest power producer. [Exhibit 27, pp. 1 and 2]

**(U) Additional Information**

(S//NF) Pursuant to Section 241 of the Countering America's Adversaries Through Sanctions Act of 2017 (CAATSA), the U.S. Department of the Treasury submitted a report to Congress, dated January 29, 2018, that identifies senior foreign political figures and oligarchs in the Russian Federation.

[Exhibit 28, pp. 1, 2, and 6]

---

[12] (U) The prospectus states that after the offering is completed and an option in it is fully exercised, **DERIPASKA's** holding in EN+ Group would be 65.2% upon admission to the London Stock Exchange. [Exhibit 26, p. 4]

[13] (U) Investigator Comment: Although identified on page 9 of Exhibit 26 as EN+ Group Limited, OFAC assesses this to be EN+ Group plc based on its consistent usage throughout the exhibit while EN+ Group Limited is only used the single time.

DERIPASKA_0010

(U) In a declaration filed with the Supreme Court of the State of New York County of New York on June 9, 2016, **DERIPASKA** stated that, "I have a diplomatic passport from Russia, and on occasion I have represented the Russian government in countries outside Russia." [Exhibit 17, p. 4]

(U) On October 28, 2008, the *Financial Times* reported that **DERIPASKA** had previously told the newspaper that he would give up his company RUSAL if the Russian government asked him to, noting, "I don't separate myself from the state. I have no other interests." [Exhibit 11, p. 5]

(U) On July 10, 2012, *The Telegraph* reported that an Uzbek businessman, Djalol Khaidarov, told U.S., Israeli, and Russian prosecutors that **DERIPASKA** was involved in bribing a governor in Siberia to secure the takeover of an aluminum plant. Khaidarov also claimed that **DERIPASKA** was a member of an organized crime group and ordered the murder of a businessman in 1995. [Exhibit 9, p. 1] The previous day, July 9, *The Times* reported that in testimony to a German court, Khaidarov[14], claimed **DERIPASKA** had links to a Russian organized crime group, stating that, "one could certainly say he [DERIPASKA] knew about the murders and operating methods [of the Russian mafia]." The judge in the case said that even though he implicated himself in criminality Khaidarov's testimony was credible, adding that "there were no indications of ostentatious grudge-settling." [Exhibit 10, pp. 1 and 2]

(U) *The Nation* reported on October 1, 2008 that **DERIPASKA** has been investigated for money-laundering in Germany as well as accused of threatening the lives of two rivals in the aluminum industry in the United States and illegally wiretapping an Israeli official. These along with other accusations of involvement in extortion and racketeering resulted in **DERIPASKA** being denied a visa to enter the United States, with only a brief lapse, since 1998. [Exhibit 22, pp. 6, 7, and 9]

---

[14] (U) Investigator Comment: Although spelled in this exhibit as "Dschalol Hajdarov," "Djalol Khaidarov" will be used throughout this memorandum for consistency.

DERIPASKA_0011

**TOP SECRET/**

## (U) LIST OF EXHIBITS

(U) Exhibit 1: Executive Order 13661 of March 16, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine," 79 Fed. Reg. 15535 (March 19, 2014). (U)

(U) Exhibit 2: Executive Order 13662 of March 20, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine," 79 Fed. Reg. 16169 (March 24, 2014). (U)

(U) Exhibit 3: U.S. Department of the Treasury, "Determination Pursuant to Section 1(a)(i) of Executive Order 13662," July 16, 2014. (U//FOUO)

(U) Exhibit 4: *Bloomberg*, "Bloomberg Billionaires Index #179 Oleg Deripaska," available at www.bloomberg.com/billionaires/profiles/oleg-deripaska/, accessed January 31, 2018. (U)

(U) Exhibit 5: Web site of Oleg Deripaska, Family, available at www.deripaska.com/about/biography/, accessed January 31, 2018. (U)

(U) Exhibit 6: *Forbes*, Oleg Deripaska, available at www.forbes.com/profile/oleg-deripaska/, accessed January 31, 2018. (U)

(U) Exhibit 7: *The Guardian*, "Mega-Rich Homes Tour Puts Spotlight on London's Oligarchs," Luke Harding, February 4, 2016, available at www.the guardian.com/uk-news/2016/feb/04/mega-rich-homes-tour-london-oligarchs-russia-alexei-navalny-putin. (U)

(U) Exhibit 8: Google.com, 5 Belgrave Square London, available at www.google.com/maps/, accessed February 28, 2018. (U)

(U) Exhibit 9: *The Telegraph*, "Oligarch Linked to Politicians 'Ordered Murder of Banker,'" Sam Marsden, July 10, 2012, available at www.telegraph.co.uk/finance/financial-crime/9387913/Oligarch-linked-to-politicians-ordered-murder-of-banker.html. (U)

(U) Exhibit 10: *The Times*, "Billionaire 'With Mafia Links Spied on Rivals,'" Roger Boyes and Alex Spence, July 9, 2012, available at www.thetimes.co.uk/article/billionaire-with-mafia-links-spied-on-rivals-5bgt5k5brb6. (U)

(U) Exhibit 11: *Financial Times*, "Close to the Wind: Russia's Oligarchs," Catherine Belton, October 24, 2008, available at www.ft.com/content/d96aa8ac-a1f9-11dd-a32f-000077b07658. (U)

(U) Exhibit 12: OCCRP, "Russian Billionaire Linked to Trump, Manafort Has New Cyprus Passport," Sara Farolfi and Stelios Orphanides, March 5, 2018,

**TOP SECRET/**

DERIPASKA_0012

**TOP SECRET/**

available at: www.occrp.org/en/goldforvisas/russian-billionaire-linked-to-trump-manafort-has-new-cyprus-passport. (U)

| | |
|---|---|
| (U) Exhibit 13: | U.S. Department of Justice, Foreign Agents Registration Act Filing – Endeavor Group, May 8, 2009. (U) |
| (U) Exhibit 14: | |
| (U) Exhibit 15: | (S//NF) |
| (U) Exhibit 16: | |
| (U) Exhibit 17: | Declaration of Oleg Deripaska in Opposition to Gliklad's Motion for Summary Judgement and in Support of Deripaska's Cross Motion, *Alexander Gliklad v. Oleg Deripaska*, 652641/2015 (Supreme Court of the State of New York County of New York), filed on June 9, 2016. (U) |
| (U) Exhibit 18: | (S//NF) |
| (U) Exhibit 19: | (S//NF) |
| (U) Exhibit 20: | (S//NF) |
| (U) Exhibit 21: | U.S. Department of the Treasury web site, Press Release, "Announcement of Additional Treasury Sanctions on Russian Financial Institutions and on a Defense Technology Entity," July 29, 2014, available at www.treasury.gov/press-center/press-releases/Pages/jl2590.aspx. (U) |
| (U) Exhibit 22: | *The Nation*, "McCain's Kremlin Ties," Mark Ames and Ari Berman, October 1, 2008, available at www.thenation.com/artticle/mccains-kremlin-ties/. (U) |
| (U) Exhibit 23: | |
| (U) Exhibit 24: | Web site of Oleg Deripaska, Initiatives, available at www.deripaska.com/business/, accessed March 22, 2018. (U) |
| (U) Exhibit 25: | Web site of Oleg Deripaska, Business, available at www.deripaska.com/business/, accessed January 31, 2018. (U) |
| (U) Exhibit 26: | EN+ Group, "Prospectus," November 3, 2017, available at www.enplus.ru/content/dam/enplus/corporate/investors/regulatory-news/enplus-group-prospectus.pdf. (U) |
| (U) Exhibit 27: | Web site of EuroSibEnergo, www.eurosib.ru/en/, accessed February 12, |

8

**TOP SECRET/**

DERIPASKA_0013

TOP SECRET/ ███████████████████

2018. (U)

(U) Exhibit 28:

███████████████████████████████

(S/NF)

(U) Exhibit 29:    Complaint - Oleg V. Deripaska v. The Associated Press, 1:17-cv-00913, May 5, 2017 (DC). (U)

TOP SECRET/ ███████████████

9

Exhibit 1

15535

Federal Register

Vol. 79, No. 53

Wednesday, March 19, 2014

# Presidential Documents

Title 3—

The President

Executive Order 13661 of March 16, 2014

## Blocking Property of Additional Persons Contributing to the Situation in Ukraine

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 212(f) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(f)), and section 301 of title 3, United States Code,

I, BARACK OBAMA, President of the United States of America, hereby expand the scope of the national emergency declared in Executive Order 13660 of March 6, 2014, finding that the actions and policies of the Government of the Russian Federation with respect to Ukraine—including the recent deployment of Russian Federation military forces in the Crimea region of Ukraine—undermine democratic processes and institutions in Ukraine; threaten its peace, security, stability, sovereignty, and territorial integrity; and contribute to the misappropriation of its assets, and thereby constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. Accordingly, I hereby order:

Section 1. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person (including any foreign branch) of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in:

(i) the persons listed in the Annex to this order; and

(ii) persons determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(A) to be an official of the Government of the Russian Federation;

(B) to operate in the arms or related materiel sector in the Russian Federation;

(C) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly:

(1) a senior official of the Government of the Russian Federation; or
(2) a person whose property and interests in property are blocked pursuant to this order; or

(D) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of:

(1) a senior official of the Government of the Russian Federation; or
(2) a person whose property and interests in property are blocked pursuant to this order.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order.

Sec. 2. I hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of aliens determined to meet one or more of the criteria in section 1(a) of this order would be detrimental to the interests of the United States, and I hereby suspend entry into the United

1

DERIPASKA_0015

## Exhibit 1

States, as immigrants or nonimmigrants, of such persons. Such persons shall be treated as persons covered by section 1 of Proclamation 8693 of July 24, 2011 (Suspension of Entry of Aliens Subject to United Nations Security Council Travel Bans and International Emergency Economic Powers Act Sanctions).

Sec. 3. I hereby determine that the making of donations of the type of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order would seriously impair my ability to deal with the national emergency declared in Executive Order 13660, and I hereby prohibit such donations as provided by section 1 of this order.

Sec. 4. The prohibitions in section 1 of this order include but are not limited to:

(a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and

(b) the receipt of any contribution or provision of funds, goods, or services from any such person.

Sec. 5. (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 6. For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States; and

(d) the term the "Government of the Russian Federation" means the Government of the Russian Federation, any political subdivision, agency, or instrumentality thereof, including the Central Bank of the Government of the Russian Federation, and any person owned or controlled by, or acting for or on behalf of, the Government of the Russian Federation.

Sec. 7. For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in Executive Order 13660, there need be no prior notice of a listing or determination made pursuant to section 1 of this order.

Sec. 8. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA, as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government consistent with applicable law. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

Sec. 9. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to determine that circumstances no longer warrant the blocking of the property and interests in property of a person

2

DERIPASKA_0016

## Exhibit 1

Federal Register / Vol. 79, No. 53 / Wednesday, March 19, 2014 / Presidential Documents    **15537**

listed in the Annex to this order, and to take necessary action to give effect to that determination.

**Sec. 10.** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Sec. 11.** This order is effective at 12:01 a.m. eastern daylight time on March 17, 2014.

THE WHITE HOUSE,
*March 16, 2014.*

Billing code 3295-F4-P

Exhibit 2

16169

Federal Register

Vol. 79, No. 56

Monday, March 24, 2014

## Presidential Documents

Title 3—

Executive Order 13662 of March 20, 2014

**The President**

**Blocking Property of Additional Persons Contributing to the Situation in Ukraine**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 212(f) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(f)), and section 301 of title 3, United States Code,

I, BARACK OBAMA, President of the United States of America, hereby expand the scope of the national emergency declared in Executive Order 13660 of March 6, 2014, and expanded by Executive Order 13661 of March 16, 2014, finding that the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine, continue to undermine democratic processes and institutions in Ukraine; threaten its peace, security, stability, sovereignty, and territorial integrity; and contribute to the misappropriation of its assets, and thereby constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. Accordingly, I hereby order:

Section 1. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person (including any foreign branch) of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in: any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(i) to operate in such sectors of the Russian Federation economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State, such as financial services, energy, metals and mining, engineering, and defense and related materiel;

(ii) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any person whose property and interests in property are blocked pursuant to this order; or

(iii) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order.

Sec. 2. I hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of aliens determined to meet one or more of the criteria in section 1(a) of this order would be detrimental to the interests of the United States, and I hereby suspend entry into the United States, as immigrants or nonimmigrants, of such persons. Such persons shall be treated as persons covered by section 1 of Proclamation 8693 of July 24, 2011 (Suspension of Entry of Aliens Subject to United Nations Security Council Travel Bans and International Emergency Economic Powers Act Sanctions).

1

DERIPASKA_0018

Exhibit 2

Sec. 3. I hereby determine that the making of donations of the type of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order would seriously impair my ability to deal with the national emergency declared in Executive Order 13660, and expanded in Executive Order 13661 and this order, and I hereby prohibit such donations as provided by section 1 of this order.

Sec. 4. The prohibitions in section 1 of this order include but are not limited to:

(a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and

(b) the receipt of any contribution or provision of funds, goods, or services from any such person.

Sec. 5. (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 6. For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States; and

(d) the term the "Government of the Russian Federation" means the Government of the Russian Federation, any political subdivision, agency, or instrumentality thereof, including the Central Bank of the Russian Federation, and any person owned or controlled by, or acting for or on behalf of, the Government of the Russian Federation.

Sec. 7. For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in Executive Order 13660, and expanded in Executive Order 13661 and this order, there need be no prior notice of a listing or determination made pursuant to section 1 of this order.

Sec. 8. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA, as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government consistent with applicable law. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

2

DERIPASKA_0019

Exhibit 2

Federal Register / Vol. 79, No. 56 / Monday, March 24, 2014 / Presidential Documents      **16171**

Sec. 9. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 20, 2014.*

[FR Doc. 2014-06612
Filed 3-21-14; 11:15 am]
Billing code 3295-F4

3

DERIPASKA_0020

Exhibit 3




**DEPARTMENT OF THE TREASURY**
**WASHINGTON, D.C.**

SECRETARY OF THE TREASURY

Determination Pursuant to Section 1(a)(i) of Executive Order 13662

Section 1(a) of Executive Order 13662 of March 20, 2014 ("Blocking Property of Additional Persons Contributing to the Situation in Ukraine") ("E.O. 13662") imposes economic sanctions on any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, to operate in such sectors of the Russian Federation economy as may be determined, pursuant to section 1(a)(i) of the order, by the Secretary of the Treasury, in consultation with the Secretary of State.

To further address the extraordinary threat to the national security and foreign policy of the United States described in E.O. 13662, and in consultation with the Secretary of State, I hereby determine that section 1(a)(i) shall apply to the financial services and energy sectors of the Russian Federation economy. Any person I or my designee subsequently determine, in consultation with the Secretary of State, operates in such sectors shall be subject to sanctions pursuant to section 1(a)(i).

Jacob J. Lew

Date: July 16, 2014

UNCLASSIFIED//FOUO

1

N

RUSSIA   OCTOBER 20, 2008 ISSUE

# McCain's Kremlin Ties

*He may talk tough about Russia, but John McCain's political advisors have advanced Putin's imperial ambitions.*

*By Mark Ames and Ari Berman*

OCTOBER 1, 2008



Vladimir Putin listens to aluminum tycoon Oleg Deripaska during their meeting in Putin's Novo-Ogaryovo residence outside Moscow, Wednesday, August 2, 2006. *(AP Photo / ITAR-TASS / Presidential Press Service, Dmitry Astakhov)*

DERIPASKA_0072

**EDITOR'S NOTE:** *Research support was provided by the Puffin Foundation Investigative Fund at The Nation Institute.*

Over the course of the presidential campaign, John McCain has repeatedly emphasized his willingness to stand up to Russian Prime Minister Vladimir Putin as proof that only he possesses the fortitude and judgment to become the next leader of the free world. In his acceptance speech at the Republican convention, McCain lashed out at Putin and the Russian oligarchs, who, "rich with oil wealth and corrupt with power…[are] reassembling the old Russian Empire." McCain rushed to publicly support the Georgian republic during its recent conflict with Russia and amplified his threat to expel Moscow from the G-8 club of major powers. His running mate, Sarah Palin, suggested in her first major interview that the United States might have to go to war with Russia one day in order to protect Georgia—the kind of apocalyptic scenario the United States avoided during the cold war.

Yet despite McCain's tough talk, behind the scenes his top advisers have cultivated deep ties with Russia's oligarchy—indeed, they have promoted the Kremlin's geopolitical and economic interests, as well as some of its most unsavory business figures, through greedy cynicism and geopolitical stupor. The most notable example is the tale of how McCain and his campaign

DERIPASKA_0073

manager, Rick Davis, advanced what became a key victory for the Kremlin: gaining control over the small but strategically important country of Montenegro.

According to two former senior US diplomats who served in the Balkans, Davis and his lobbying firm, Davis Manafort, received several million dollars to help run Montenegro's independence referendum campaign of 2006. The terms of the agreement were never disclosed to the public, but top Montenegrin officials told the US diplomats that Davis's work was underwritten by powerful Russian business interests connected to the Kremlin and operating in Montenegro. Neither Davis nor the McCain campaign responded to repeated requests for comment. (Davis's extensive lobbying work, especially on behalf of collapsed mortgage giants Fannie Mae and Freddie Mac, has already attracted critical media scrutiny.)

At the time, Putin wanted to establish a Russian outpost in the Mediterranean, and Montenegro–a coastal republic across the Adriatic from Italy—was seen as his best hope. McCain also lobbied for Montenegro's independence from Serbia, calling it "the greatest European democracy project since the end of the cold war." For McCain, the simplistic notion of "independence" from a country America had gone to war with in the late 1990s was all that mattered. What Montenegro looked like after independence seemed not to interest him. This suited

DERIPASKA_0074

Putin just fine. Russia had generally sided with Serbia against the West during the Balkan wars of the 1990s, but for the Kremlin, cutting Montenegro free from Serbia meant dealing with a Montenegro that could be more easily controlled. Indeed, today, after its "independence," Montenegro is nicknamed "Moscow by the Mediterranean." Russian oligarchs control huge chunks of the country's industry and prized coastline—and Russians exert a powerful influence over the country's political culture. "Montenegro is almost a new Russian colony, as rubles flow in to buy property and business in the tiny state," Denis MacShane, Tony Blair's former Europe minister, wrote in *Newsweek* in June. The takeover of Montenegro has been a Russian geostrategic victory –quietly accomplished, paradoxically enough, with the help of McCain and his top aides.

In mid-September *The Nation*'s website published a photo of McCain celebrating his seventieth birthday in Montenegro in August 2006 at a yacht party hosted by convicted Italian felon Raffaello Follieri and his movie-star girlfriend Anne Hathaway. On the same day one of the largest mega-yachts in the world, the Queen K, was moored in the same bay of Kotor. This was where the real party was. The owner of the Queen K was known as "Putin's oligarch": Oleg Deripaska, controlling shareholder of the Russian aluminum giant RusAl, currently listed as the ninth-richest man in the world, with a rap sheet as abundant as his wealth. By

DERIPASKA_0075

mid-2005 Deripaska had already virtually taken control of Montenegro's economy by snapping up its aluminum plant, KAP—which accounts for up to 40 percent of the country's GDP and some 80 percent of its export earnings—in a nontransparent privatization tender strongly criticized by NGO watchdogs, Montenegrin politicians and journalists. *The Nation* has learned that Deripaska told one of his closest associates that he bought the plant "because Putin encouraged him to do it." The reason: "the Kremlin wanted an area of influence in the Mediterranean."

In mid-2005 Ambassador Richard Sklar, the former lead US official in the Balkans, ceased advising the Montenegrin government (he'd worked as a pro bono adviser after leaving the US diplomatic service) when it became clear the plant was being handed to Deripaska under heavy Russian pressure. "I quit because it was a bad deal, not for any political reasons. The Russians scared all the other buyers off. They offered far too little money and got themselves a sweetheart deal."

Russia's virtual takeover of Montenegro was well under way by January 2006, when Rick Davis introduced Deripaska to McCain at a villa in Davos, Switzerland. They met again seven months later, at a reception in Montenegro celebrating McCain's birthday, as reported in *The Washington Post.*

DERIPASKA_0076

The story of how Oleg Deripaska, 40, rose from a
Cossack village to become a Putin-blessed aluminum
tycoon with an estimated $40 billion fortune does not
begin with a lemonade stand and old-fashioned elbow
grease. Like most post-Soviet success stories,
Deripaska's rise began abruptly and violently, during
the chaotic reign of Boris Yeltsin. Among all the
battles for control of valuable state assets in the 1990s,
none were as bloody as the "aluminum wars," in
which organized-crime gangs hired by competing
interests assassinated dozens of executives,
shareholders and bankers. During a visit to the United
States in 1995, Deripaska threatened the lives of two
aluminum rivals, Yuri and Mikhail Zhivilo, according
to a RICO lawsuit filed against Deripaska in New
York district court in 2000. The RICO case is just one
of many lawsuits, including one filed in Israel by a
former business partner claiming that Deripaska
illegally wiretapped an Israeli cabinet minister. In
addition, German prosecutors have begun a criminal
money-laundering investigation in Stuttgart.
(Deripaska did not respond to requests for comment.)

Deripaska understands that success in Russia today
comes from a mixture of brute force, political
influence and personal connections. In 2001, about a
year after Putin signed a decree granting legal
immunity to Yeltsin's family, Deripaska married
Yeltsin's granddaughter, thereby cementing his own
immunity and power. Throughout Putin's reign,

DERIPASKA_0077

Deripaska has adhered to an unwritten understanding between Putin and the oligarchs: as long as they support the Kremlin, they can operate with impunity. Deripaska has thus taken on numerous projects dear to Putin, such as building a new airport in Sochi for the 2014 Olympics and buying out Tajikistan's aluminum plant to help Putin reassert control over that key ex-Soviet republic. Deripaska openly admits that his RusAl holdings are subservient to the Kremlin's wishes, telling the *Financial Times* last year, "If the state says we need to give it up, we'll give it up."

Yet Deripaska faced a serious obstacle to his business ambitions, hampering his duties as a Putin surrogate. Because of numerous accusations of involvement in death threats, extortion, racketeering and money laundering, he had been barred from entering America since 1998. Putin has lobbied for Deripaska's US visa. In an interview with *Le Monde* earlier this year, Putin complained, "I have asked my American colleagues why. If you have reasons for not delivering him a visa, if you have documents on illegal activities, give us them…. They give us nothing, explain to us nothing, and forbid him from entry."

The visa ban was costing Deripaska billions: for years he and fellow RusAl shareholders had sought to cash in their wealth by launching an IPO in London, which could have netted up to $10 billion for RusAl's owners. However, finding institutional buyers would

DERIPASKA_0078

be difficult if not impossible as long as RusAl's primary owner was barred from entering the United States.

Despite rampant Russophobia among Republicans, Deripaska turned to powerful GOP figures to solve his problem—especially to Republicans connected with McCain. In 2003 Deripaska hired former presidential candidate Bob Dole, who had nearly picked McCain as his running mate, and Dole's lobbying partner Bruce Jackson (also a McCain aide) to lobby the State Department to overturn the visa ban, according to Glenn Simpson and Mary Jacoby of *The Wall Street Journal*. Over the next few years Dole's firm, Alston & Bird, was paid more than $500,000 to push for Deripaska's visa.

Deripaska also reached out to a Washington-based intelligence firm, Diligence, chaired by GOP foreign policy hand Richard Burt, McCain's top foreign policy adviser in 2000 and an adviser in '08 (Burt left Diligence in 2007 to join Henry Kissinger's consulting firm). Deripaska's business partner in London, Nathaniel Rothschild, an heir to the English Rothschild fortune, bought a stake in Diligence, according to the *New York Times* and confirmed by a Rothschild spokesman. The firm offered Deripaska many useful services: corporate intelligence gathering, visa lobbying through considerable GOP connections and, crucially, help in obtaining a $150 million World

DERIPASKA_0079

Bank/European Bank for Reconstruction and
Development loan for a Deripaska subsidiary, the
Komi Aluminum Project. Getting the loan was useful
in providing a layer of comfort to Western investors
skittish about RusAl. So Diligence, now partly owned
by Rothschild, provided a "due diligence" report to the
World Bank, which the Bank then used to approve its
loan to Deripaska.

Not surprisingly, the lobbying worked: in December
2005 Deripaska was issued a multientry US visa,
according to the State Department. During his brief
stay he signed his World Bank loan, spoke at a
Carnegie Endowment meeting and attended a dinner
for Harvard University's Belfer Center, where, thanks
to a generous donation, he became a member of its
international council.

However, Deripaska's trip did not end well. Under the
visa's terms, he was forced to endure lengthy FBI
questioning. According to the mining-industry
newsletter *Mineweb*, the list of his enemies had grown
from jilted former business partners to the heads of
powerful US metals companies and government
officials unhappy with RusAl's control of key Third
World bauxite mines, which threatened beleaguered
US aluminum giants. The interview went
badly—according to people who know him, Deripaska
had little patience for prying bureaucrats. When he left
the country, the visa ban was reinstated. Once again

DERIPASKA_0080

Deripaska turned to powerful Republicans—this time,
to McCain and campaign manager Davis, who
arranged the January 2006 Davos introduction. The
McCain campaign later claimed that "any contact
between Mr. Deripaska and the senator was social and
incidental," but afterward Deripaska thanked Davis for
arranging "such an intimate setting." *The Washington
Post* reported that Davis was "seeking to do business
with the billionaire." Indeed, Deripaska's subsequent
thank-you letter mentioned his possible investment in
a metals company Davis represented through a hedge-
fund client.

If you're wondering how Deripaska came to know
Davis & Co., the answer lies in Russia's next-door
neighbor Ukraine.

In December 2004 Ukrainians poured into the streets
of Kiev and other cities in the peaceful "Orange
Revolution," which overthrew a Putin-backed corrupt
leader, Viktor Yanukovich, who had tried to steal the
country's presidential election that year (during which
the pro-Western opposition candidate, Viktor
Yushchenko, was poisoned and almost died). It was a
serious blow to Russia's geopolitical standing.

Putin's Ukrainian proxies were also in trouble. Shortly
after the Orange Revolution, a murder investigation
was launched against the country's richest oligarch,
Rinat Akhmetov, Yanukovich's main backer.
Akhmetov fled the country. In exile in Monaco, he

DERIPASKA_0081

turned to Davis's business partner, Paul Manafort--the second name in the lobbying firm Davis Manafort. An old GOP hand, Manafort, like Davis, had played a key role in Dole's failed 1996 presidential run and had worked for dictators like Ferdinand Marcos of the Philippines and Mobutu Sese Seko of Zaire. Akhmetov initially hired Manafort to improve the image of his beleaguered conglomerate, SCM, but soon Manafort's role shifted to helping Yanukovich.

Manafort assembled a skilled team of political operatives in Ukraine and set about raising the popularity of Yanukovich's pro-Russian Party of Regions, which Akhmetov financed. It was a very lucrative deal for Davis Manafort—and successful (according to Ukrainian investigative journalist Mustafa Nayem, Akhmetov paid Manafort upward of $3 million). Yanukovich's disgraced party won a resounding victory in the March 2006 elections—and Akhmetov returned as the top Ukrainian oligarch. Thanks in part to the work of Davis Manafort, the Orange Revolution was essentially undone, putting Putin back in the chess match over Ukraine's future.

Publicly McCain and his campaign chief's lobbying firm were on opposite sides. In 2005 McCain had nominated Orange Revolution hero Yushchenko for the Nobel Prize, and that spring he'd honored Yushchenko in the headquarters of the International Republican Institute, whose board McCain has chaired

DERIPASKA_0082

since 1993. But behind the scenes the former head of
IRI's Moscow office, Philip Griffin, was recruited by
Manafort to work on Yanukovich's campaign against
Yushchenko. Davis Manafort's work was considered
so detrimental to US interests that a National Security
Council official called McCain's office to complain,
according to the *New York Times*. The McCain
campaign denies receiving the NSC complaint.

But the firm's work was only just beginning. The same
month Davis Manafort helped deliver this victory to
Putin's proxies, it started work on another key Kremlin
success story: an independent and Russia-dominated
Montenegro.

First, a little history. Montenegro was the smallest of
the former Yugoslavia's six republics. When Slobodan
Milosevic was overthrown in October 2000,
Montenegro's longtime strongman, Milo Djukanovic,
figured the West would reward him by supporting his
push for independence. But the European Union and
the United States opposed Montenegro's secession,
which they feared would undermine the new, pro-
Western leaders in Serbia and bring more war. So
under heavy pressure from the EU, an agreement was
struck in 2002 putting off an independence referendum
for at least three years.

Djukanovic then looked beyond the West for support.
That same year his closest ally and mentor, Milan
Rocen, was dispatched to Moscow as ambassador of

DERIPASKA_0083

the Serbia-Montenegro confederation. Rocen nurtured
ties to Putin's Russia, and by 2005 the biggest
Montenegrin industrial asset, the KAP aluminum
plant, was snatched up by Deripaska at Putin's request.
After that, Russia surprised everyone by dropping its
objections to Montenegrin independence, which
Russia's historic ally Serbia vigorously opposed.
"There seemed to be a belief that Deripaska and the
Russians wanted to gain control of the aluminum plant
as part of a Russian move for greater influence
throughout Montenegro," says former ambassador
Sklar.

Meanwhile, Rick Davis was also eager for a piece of
Montenegro's independence, lobbying hard for Davis
Manafort to run the referendum campaign. Bob Dole,
who has been paid $1.38 million by the Montenegrin
government since 2001 to lobby for it in Washington,
urged his Montenegrin friends to hire Davis. Whether
it was because of Dole or, as some speculate, the
Russians, Davis got his deal.

Though Davis has claimed no connection to his partner
Manafort's controversial activities in Ukraine, he
nevertheless hired at least three specialists
recommended by Manafort, from the same team
Manafort used for Yanukovich's victory, to work on
Montenegro's independence referendum. They
included Russian political operative Andrei Ryabchuk,
an elections specialist who had previously worked on

DERIPASKA_0084

pro-Putin campaigns in Russia. Ryabchuk told *The Nation* that he was "recruited by Manafort's people" out of Moscow to the Ukraine operation and then on to Montenegro.

Davis's team was vetted by Montenegro's Russian ambassador Rocen, who was returning from Moscow to oversee the independence campaign. Why was Davis hired? The top McCain aide was as much a political symbol as a campaign consultant. "I think the Montenegrins hired Rick to have political cover–it was important to show they had support from the United States," said an American democracy expert who's worked in Montenegro. Though disclosure is required by Montenegrin law, Davis Manafort's contract with the ruling Montenegrin party was never publicly released. In addition, Djukanovic's party never listed payments to Davis Manafort on its election filings, lending credence to private claims by top Montenegrin officials that Russian business interests paid for Davis's work through hired third parties, an oft-used though illegal tactic in Eastern Europe to disguise money trails.

At key points in the campaign, Davis reached out to Deripaska's allies for help. With the referendum too close to call, the Serbs tried to sway public opinion by threatening to revoke scholarships and other education privileges of Montenegrin students if the country should secede. This caused a panic–so to counter the

DERIPASKA_0085

Serbs, Davis turned to Deripaska emissary Nathaniel
Rothschild (Rothschild has reportedly become the
richest of all the Rothschilds, thanks to his privileged
role as a Deripaska adviser).

Three weeks before the independence referendum,
Davis asked Rothschild to come to Montenegro. After
arriving in his private Gulfstream jet, Rothschild was
trotted out before the cameras with the Montenegrin
prime minister, where he pledged $1 million to support
students who might be hurt by Serbia's scholarship
threat. Another Deripaska ally brought in to secure the
student vote was Canadian billionaire Peter Munk,
CEO of Barrick Gold, the world's largest gold-mining
corporation (it was Munk who had hosted the Davos
meeting between McCain and Deripaska a few months
earlier). Munk, who serves on the advisory board of
RusAl, delivered pledges of support from Canadian
universities.

At the same time Deripaska's allies were employed by
Davis, Dole was lobbying McCain to promote
Montenegro's independence. Dole's aides held a
teleconference with McCain's Senate office when
Montenegro's foreign minister visited Washington;
shortly thereafter, the referendum passed by a razor-
thin 0.5 percent. In April 2006 McCain announced that
Montenegro's independence was the "greatest
European democracy project since the end of the cold
war." Despite opposition cries of vote rigging, the

United States and other major powers accepted the results—and Putin's Russia recognized newly independent Montenegro before the EU did.

A few months after the vote, McCain and a contingent of GOP senators visited Montenegro. The day before they arrived, Djukanovic had flown to Putin's dacha on the Black Sea. "Your government made it possible for large-scale Russian investments," Putin told the Montenegrin leader. Djukanovic then returned to Montenegro and warmly received McCain, who also met with the Montenegrin president, speaker of Parliament and opposition leader Predrag Bulatovic. Bulatovic told McCain about how Russian capital was taking over the country and of his concern that "this investment can have a negative impact on the democratic process." McCain listened but kept criticism of Russia to himself. Meanwhile, Davis was still in the country, helping Djukanovic's Russia-allied party win the upcoming parliamentary elections. (At the time, Djukanovic was under investigation by Italian prosecutors for cigarette smuggling and "Mafia-type activities.")

Soon after the referendum, the powerful figures behind Montenegro's independence were carving up the country. That summer Rothschild started discussions with top Montenegrin officials about gaining control of the valuable shoreline, including the half-billion-dollar Porto Montenegro project, which aims to

DERIPASKA_0087

become the world's top mega-yacht marina, complete
with luxury hotels, shopping and the country's first
eighteen-hole golf course. The property was handed to
the Munk-Rothschild-fronted offshore consortium for
a pittance, according to MANS, the local NGO partner
of Transparency International, in yet another backroom
deal. Eventually, Deripaska's role in Porto
Montenegro, which was initially secret, was formally
acknowledged, although the full list of owners is still a
mystery. Deripaska is also developing an 8 billion-
euro resort in southern Montenegro and seeking
control of a coal mine and a thermal power plant.

Roughly two years later, in March of this year,
Rothschild hosted a high-dollar fundraiser for McCain
at London's posh eighteenth-century Spencer House,
which Rothschild donated for the occasion. Given the
close relationship between Rothschild and Deripaska,
some speculated that Deripaska was the hidden hand
behind the event. The conservative watchdog group
Judicial Watch filed a complaint with the Federal
Election Commission, alleging that the fundraiser
amounted to an illegal contribution by foreign
nationals to McCain's campaign.

Aside from a little campaign dough, what has McCain
gotten out of all this? It's hard to tell—either he was
utterly clueless while his top advisers and political
allies ran around the former Soviet domain promoting
the Kremlin's interests for cash, or he was aware of it

DERIPASKA_0088

and didn't care. McCain was reportedly so angry about Davis Manafort's role in stifling Ukraine's Orange Revolution that he almost removed Davis as campaign manager. But in the case of Montenegro, he should have known what Davis & Co. were up to. After all, McCain lent a helping hand. And by the time he visited the country, the Russian takeover was plain to see.

The story of how McCain's closest aides and employees have been undermining his vociferously expressed opposition to Putin and Russia's oligarchs offers a highly disturbing preview of what a McCain administration might look like. When McCain's campaign proclaims "country first," one has to wonder, Which country? The one with the highest bidder?

MARK AMES Mark Ames is the founding editor of the *eXile* and author of *Going Postal: Rage, Murder and Rebellion: From Reagan's Workplaces to Clinton's Columbine.* He is an editor at *The eXiled Online* and a regular guest on MSNBC's *The Dylan Ratigan Show.*

ARI BERMAN    Ari Berman is a former senior contributing writer for *The Nation.*

To submit a correction for our consideration, click *here.*
For Reprints and Permissions, click *here.*

DERIPASKA_0089



UNCLASSIFIED//FOUO



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

### (U) EVIDENTIARY MEMORANDUM

**(U) Case ID: UKRAINE-EO13662-16174**

| | |
|---|---|
| (U) MEMORANDUM FOR: | Andrea Gacki  AMG  3.5.2020<br>Director<br>Office of Foreign Assets Control |
| (U) THROUGH: | Gregory T. Gatjanis<br>Associate Director<br>Office of Global Targeting |
| | Ripley Quinby<br>Acting Deputy Associate Director<br>Office of Global Targeting |
| | Leila M. Baheri<br>Assistant Director<br>Global WMD, Mid-East Eurasia Division |
| | ▮▮▮▮▮<br>Section Chief<br>Global WMD, Mid-East Eurasia Division |
| (U) FROM: | ▮▮▮▮▮<br>Sanctions Investigator<br>Global WMD, Mid-East Eurasia Division |
| (U) SUBJECT: | Recommendation to Deny **OLEG VLADIMIROVICH DERIPASKA**'s Petition Seeking Delisting Pursuant to Executive Order 13662. |

### I.   (U) INTRODUCTION

(U) This memorandum recommends denial of **OLEG VLADIMIROVICH DERIPASKA**'s **(DERIPASKA)** petition seeking removal of his designation pursuant to Section 1(a)(i) of Executive Order (E.O.) 13662 for operating in the energy sector of the Russian Federation Economy.

1

DERIPASKA_0158

UNCLASSIFIED//~~FOUO~~

## II.   (U) **BACKGROUND**

(U) On April 6, 2018, **DERIPASKA** was designated pursuant to Section 1(a)(ii)(C)(1) of E.O. 13661 for acting or purporting to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation.  Also on April 6, 2018, **DERIPASKA** was designated pursuant to Section 1(a)(i) of E.O. 13662 for operating in the energy sector of the Russian Federation Economy.  [Exhibit 25, p. 1]

(U) **DERIPASKA**'s name appears on the Specially Designated Nationals and Blocked Persons List ("SDN List") as follows:

> (U) DERIPASKA, Oleg Vladimirovich, Moscow, Russia; 64 Severnaya Street, Oktyabrsky, Khutor, Ust-Labinsky District, Krasnodar Territory 352332, Russia; 5 Belgrave Square, Belgravia, London SW1X 8PH, United Kingdom; DOB ▮▮▮ ▮▮; POB Dzerzhinsk, Nizhny Novgorod Region, Russia; citizen Russia; alt citizen Cyprus; Gender Male (individual) [UKRAINE-EO13661] [UKRAINE-EO13662].  [Exhibit 25, p. 1]

(U) On March 15, 2019, **DERIPASKA** sued the Office of Foreign Assets Control (OFAC) in the U.S. District Court for the District of Columbia, challenging his designations pursuant to both E.O. 13661 and E.O. 13662 under the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment.  *Deripaska v. Mnuchin*, No. 19-cv-727 (D.D.C.).

(U) On June 20, 2019, **DERIPASKA** amended his complaint to drop his claims relating to his designation pursuant to E.O. 13662.  In his amended complaint, he noted that he would seek to challenge his E.O. 13662 designation through OFAC's administrative petition process.  [Exhibit 19]

(U) On June 27, 2019, **DERIPASKA** submitted a petition for administrative reconsideration to OFAC, arguing that he did not meet the criteria for designation under E.O. 13662 and seeking rescission of his designation under E.O. 13662.  [Exhibit 3]

(U) On November 13, 2019, OFAC sent **DERIPASKA** a questionnaire requesting additional information in order for OFAC to evaluate **DERIPASKA**'s delisting petition. [Exhibit 4]  On January 6, 2020, **DERIPASKA**, through his counsel, responded to the questionnaire, and stated objections to four of the five questions without answering them. [Exhibit 5]  On February 14, 2020, OFAC sent a follow up to the questionnaire to **DERIPASKA**, repeating three of the four unanswered questions and providing a modified version of the fourth question.  [Exhibit 6]  On February 21, 2020, **DERIPASKA**, through his counsel, responded to the follow up questionnaire, by reasserting his objections and refusing to answer the questions.  [Exhibit 7]

(U) Having considered **DERIPASKA**'s petition, his responses to the questionnaires, and the evidence available to OFAC, OFAC not only finds **DERIPASKA**'s petition unpersuasive, but also finds that there is reason to believe that **DERIPASKA** continues to meet the criteria for designation set forth in section 1(a)(i) of E.O. 13662 because he continues to operate in the energy sector of the Russian Federation economy.  Accordingly, **DERIPASKA**'s petition for

2

DERIPASKA_0159

reconsideration of his designation pursuant to E.O. 13662 should be denied and he should remain listed on OFAC's SDN List pursuant to E.O. 13662.

## III.    (U) BASIS FOR DENIAL

(U) In his request for administrative reconsideration, **DERIPASKA** argued that he should be delisted pursuant to E.O. 13662 because: a) the basis of **DERIPASKA**'s designation under E.O. 13662 was both factually and legally insufficient; and b) there has been a change in circumstances. [Exhibit 3, pp. 8-12] OFAC has considered these arguments, but finds them unpersuasive, for the reasons below.

A. (U) OFAC has sufficient factual evidence to demonstrate that **DERIPASKA** operates in the energy sector of the Russian Federation economy.

(U) In his June 27, 2019 request for administrative reconsideration, **DERIPASKA** claims his designation pursuant to E.O. 13662 is factually insufficient because, he argues, his alleged participation in international conferences related to energy and his purported proposal for a region-wide energy initiative do not evidence his operating in the energy sector of the Russian Federation. [Exhibit 3, p. 8] Specifically, according to **DERIPASKA**, the following does not evidence his operating in the energy sector of the Russian Federation:

- (U) **DERIPASKA**'s involvement in World Economic Forum projects related to energy. [Exhibit 3, p. 8]
- (U) **DERIPASKA**'s focuses on multiple issue including energy efficiency and energy security in his position on the APEC Business Advisory council. [Exhibit 3, p. 9]
- (U) The presentation by a representative of **DERIPASKA** at the February 2012 meeting of the APEC Business Advisory Council proposing a regional initiative for the creation of a transnational power grid. [Exhibit 3, p. 9]

(U) According to Section 1(a) of E.O. 13662, all property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person (including any foreign branch) of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in: any person determined by the Secretary of the Treasury, in consultation with the Secretary of State: (i) to operate in such sectors of the Russian Federation economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State, such as financial services, energy, metals and mining, engineering, and defense and related materiel. [Exhibit 1, p. 2]

(U) On July 16, 2014, the Secretary of the Treasury, in consultation with the Secretary of State, determined that section 1(a) of E.O. 13662 shall apply to the energy sector of the Russian Federation Economy. [Exhibit 12, p. 4] On April 6, 2018, **DERIPASKA** was designated for operating in the energy sector of the Russian Federation economy. In E.O. 13662 and the Secretary of the Treasury's subsequent determination, neither the term "operating," nor the term "energy sector" are specifically defined.

3

DERIPASKA_0160

UNCLASSIFIED//~~FOUO~~

(U) OFAC views **DERIPASKA**'s involvement in World Economic Forum projects, including projects on "New Energy Architecture" and the "Interaction between the Power Industry and Society," [Exhibit 22, p. 1] as constituting operation in the energy sector of the Russian Federation due to the fact that these projects relate to energy and that **DERIPASKA** participated in these projects as part of his work in the En+ Group, which, as a Russian diversified power and metals group of companies, operates in the Russian federation economy.

(U) OFAC also considers **DERIPASKA**'s focus on energy efficiency and energy security on the APEC Business Advisory Council, and the presentation of **DERIPASKA**'s representative on the North East Asian Region Electrical System Ties Initiative (NEAREST)—whose goal is to improve the power grids of Eastern Siberia, Northern and North Eastern China, Japan, and South Korea through the creation of a transnational power grid in Northeast Asia—at a meeting of the APEC Business Advisory Council in 2012, to be activities that constitute operation in the energy sector of the Russian Federation economy due to the fact that this activity relates to the energy sector and that **DERIPASKA** participated in these organizations as the appointee of the Russian Federation government and to represent a business sector of the Russian Federation economy. For example, according to a November 10, 2017 post on the website of the Russian Federation in the Kingdom of Thailand, the Russian Federation was represented on the APEC Business Advisory Council by **DERIPASKA** and two other individuals. The website states that the representatives were appointed by the respective head of state and government of each APEC country. [Exhibit 20, p. 1] According to the website of APEC Business Advisory Council, APEC members are appointed by their respective economic leader and represent a broad range of business sectors including micro, small, and medium enterprises. [Exhibit 21, p. 1][1]

(U) Finally, even in the absence of this evidence, **DERIPASKA** nevertheless continues to operate in the energy sector of the Russian Federation economy through his ownership stakes in En+ Group PLC (En+) and JSC Eurosibenergo (ESE), as discussed below.

B. (U) The term "energy sector" as used in E.O. 13662 is broad enough to include power generation.

(U) Second, in his request for administrative reconsideration, **DERIPASKA** claims that electricity producers and suppliers are not within scope of the term "energy sector" in the context of U.S. sanctions. [Exhibit 3, p. 9] Specifically, according to **DERIPASKA**, an "energy" sector of a foreign economy cannot include private electricity production or power generation for the following reasons:

---

[1] According to **DERIPASKA**'s January 6, 2020 response to OFAC's November 13, 2019 questionnaire, **DERIPASKA** has not participated in the World Economic Forum in either 2018 or 2019. Furthermore, while **DERIPASKA** remained the Russian economy's representative to the APEC Business Advisory Council, he did not intend to participate in the next event of the APEC Business Advisory council, scheduled for February 2020. **DERIPASKA** would provide a delegate to the event, but his delegate would not participate in panels related to the energy sector. Finally, **DERIPASKA** states that he has nothing further to do with the North East Asian Region Electrical System Ties Initiative. [Exhibit 5, p. 6]

UNCLASSIFIED//~~FOUO~~

DERIPASKA_0161

- (U) OFAC has not previously defined or interpreted sanctionable activity involving an "an energy sector" of a foreign economy to include private electricity production or supply, including in the Russia/Ukraine and North Korea contexts. [Exhibit 3, pp. 9, 11]
- (U) While Congress has not defined the "energy sector of the Russian Federation," it nevertheless has intended those U.S. sanctions to be limited to oil-related activity and not to include activities occurring in the power sector. [Exhibit 3, p. 10]
- (U) OFAC has provided its interpretation of "energy sector" in the Iran sanctions program as recently as August 2018, when it reiterated its interpretation that "energy sector" sanctions are limited to activities involving oil and gas. [Exhibit 3, p. 11]

(U) **DERIPASKA**'s designation at issue in this petition was made pursuant to the authority of E.O. 13662. The term "energy sector" was not specifically defined within E.O. 13662 or the Secretary of the Treasury's determination, and the nature of the activity that would qualify **DERIPASKA** for operating in the energy sector is not limited to oil and gas activity as **DERIPASKA** suggests. Further, OFAC has never limited its interpretation of the term "energy sector" in the Russia/Ukraine context.

(U) Although **DERIPASKA** points to use of the term "energy sector" in other OFAC-administered programs, each OFAC program is different, and an interpretation in one program is not determinative of an interpretation in other programs. Indeed, the Ukraine Related Sanctions Regulations, which implement E.O. 13662, among others, explicitly states that "[d]iffering foreign policy and national security circumstances may result in differing interpretations of similar language among the parts of this chapter." 31 C.F.R. 598.101. In Iran, for example, OFAC's interpretation of the term "energy sector" is informed by a complex framework of statutes and implementing executive orders. And in no other program—including Russia/Ukraine or North Korea—has OFAC defined the term "energy sector" to exclude power generation or electricity production, both of which can be encompassed by the term "energy sector." For example, OFAC has designated at least one other individual for operating in the energy sector of the Russian Federation economy for power generation activities.[2]

(U) Finally, the petitioner's argument relating to congressional intent of the scope of the term Russian energy sector as used in the Countering America's Adversaries Through Sanctions Act of 2017 (CAATSA) is similarly unpersuasive, as **DERIPASKA** is designated under E.O. 13662, an Executive Order issued by the President under the authority of the International Emergency Economic Powers Act (IEEPA). IEEPA authorizes the President to impose economic sanctions to address unusual or extraordinary threats to the U.S. economy, national security, or foreign policy. E.O. 13662 was issued by the President pursuant to IEEPA in 2014 to address and expand the scope of the national emergency declared in prior executive orders relating to Russian aggression towards Ukraine, including its annexation of Crimea. The Secretary of the Treasury also determined that Section 1(a)(i) of E.O. 13662 applied to the energy sector" in 2014. Neither E.O. 13662, the Secretary's determination, or the implementing Ukraine Related Sanctions

---

[2] On April 6, 2018, Viktor Vekselberg was designated for operating in the energy sector of the Russian Federation economy pursuant to E.O. 13662. As noted in the press release accompanying the action, Vekselberg was the founder and Chairman of the Board of Directors of the Renova Group. [Exhibit 25, p.2] [Exhibit 26, pp. 3-4]

UNCLASSIFIED//~~FOUO~~

Regulations, 31 C.F.R. Part 589 define "energy sector" to be so limited as to only include oil and gas activity. And CAATSA was not passed until 2017, three years after E.O. 13662 was issued. OFAC's interpretation of the term "energy sector" to include power generation or electricity production is reasonable, and furthers the objectives of E.O. 13662 in addressing the national emergency related to Russia's aggression towards Ukraine.[3]

C. (U) Although **DERIPASKA**'s level of ownership in ESE via En+ has changed, he still owns a sufficiently significant stake such that circumstances have not sufficiently changed to warrant removal.

(U) Third, **DERIPASKA** claims that since his designation there has been a change in circumstances that negates the basis for his designation under E.O. 13662. [Exhibit 3, pp. 12-13] According to **DERIPASKA**, OFAC designated **DERIPASKA** in part due to the allegation that **DERIPASKA** operated in the energy sector of the Russian Federation through his past ownership and control of ESE. However, the Terms of Removal (TOR)[4] agreement negotiated among OFAC, En+, UC Rusal PLC (Rusal), and ESE related to the delisting of those three entities terminated **DERIPASKA**'s majority ownership in and control over En+ and expressly premised ESE's removal from the SDN List on its continued independence from **DERIPASKA**'s control. According to **DERIPASKA**, because he no longer exercises control over ESE, OFAC no longer has a lawful basis under which to maintain **DERIPASKA**'s designation under E.O.13662. According to **DERIPASKA**, the central basis for his designation under that authority—*i.e.*, ESE's involvement in the production and supply of electricity in the Russian Federation—has been negated by the cessation of his control over ESE. [Exhibit 3, pp. 12-13]

(U) While **DERIPASKA** has terminated his majority ownership and control over En+, he still maintains a 44.95 percent ownership interest in En+, which in turn, maintains a 100 percent ownership interest in ESE. Given that En+ and ESE operate in the energy sector of the Russian Federation economy, OFAC views **DERIPASKA**'s continued ownership interest in En+ and ESE as evidence of his continued operation in the energy sector of the Russian Federation economy.

D. (U) **DERIPASKA** continues to operate in the energy sector of the Russian Federation economy through his ownership stakes of ESE and En+.

a. (U) **DERIPASKA** owns 44.95 percent of En+, votes 35 percent of En+ shares, and appoints four of 12 board members to the En+ board of directors.

(U) According to En+'s "Notes to the separate interim condensed financial information for the nine months ended 30 September 2019," as of September 30, 2019, **DERIPASKA** beneficially

---

[3] **DERIPASKA** refused to answer questions posed by OFAC during the delisting process in part due to his objection that his power generation holdings were not relevant to the question of whether he operates in the energy sector. [Exhibits 5, 7] For the reasons discussed above, the term "energy sector" is not explicitly defined in the Russia/Ukraine context, and OFAC has interpreted it to include power generation and electricity production.
[4] The Terms of Removal (TOR) is a December 19, 2018 agreement among En+ Group PLC, US Rusal, and OFAC on the terms of removal of En+ Group PLC, UC Rusal PLC, and JSC Eurosibenergo from the SDN List, conditioned upon agreement and adherence by the above-mentioned parties to certain conditions. [Exhibit 3, Annex B]

6

UNCLASSIFIED//~~FOUO~~

controls and exercises voting rights in respect of 35 percent of the voting shares of the company
and cannot exceed his shareholding over 44.95 percent of the shares of the company. [Exhibit 2,
p. 11]

(U) According to **DERIPASKA**'s February 21, 2020 'Response to OFAC's February 14, 2020
questionnaire,' **DERIPASKA** continues to act in a manner consistent with the TOR (which
called for **DERIPASKA** to reduce his shareholding in En+ from approximately 70 percent to
44.95 percent, to vote no more than 35 percent of En+ shares, and to appoint no more than four
of 12 board members to the En+ board of directors [Exhibit 3, Annex B, pp. 1-2]). [Exhibit 7, p.
4] **DERIPASKA** also confirmed in his February 21, 2020 response that he continues to hold a
44.95 percent stake in En+, continues to vote 35 percent of his En+ shares, and appoint four of
12 board members to the En+ board of directors, as specified in the TOR. [Exhibit 7, pp. 3 - 4]

(U) According to a January 28, 2019 TASS article, **DERIPASKA** has reduced his stake in En+
Group to 44.95 percent in accordance with U.S. requirements as part of efforts to remove
sanctions from En+, the company said in a statement. **DERIPASKA**'s stake was earlier
estimated at approximately 70 percent. [Exhibit 18, p. 2]

> b.  **DERIPASKA** continues to operate in the energy sector of the Russian Federation
>     economy through his ownership stake in ESE, held through En+.

(U) According to an Orbis[5] report, as of December 2017, En+ is the controlling shareholder of
ESE, with an ownership stake of 100 percent. [Exhibit 14, p. 8]

(U) According to a November 3, 2017 prospectus of an offering by En+ and Basic Element, an
En+ shareholder, En+ owned 100 percent of Eurosibenergo plc, which in turn owned 100 percent
of ESE. [Exhibit 24, pp. 1, 9] According to En+'s "Notes to the separate interim condensed
financial information for the nine months ended 30 September 2019," uploaded to the En+
website on November 14, 2019, En+ Holding Ltd is the new name of Eurosibenergo
plc. [Exhibit 2, pp. 1, 14]

(U) According to the En+ 2018 Sustainability Report, uploaded to the En+ website on September
18, 2019, En+'s Power Segment is represented by ESE. [Exhibit 15, pp. 1, 27] Additionally,
according to the En+ 2018 Sustainability Report, ESE is a 100 percent owned subsidiary of En+,
managing its power assets. [Exhibit 15, p. 29]

(U) According to ESE's website "About Us" page, ESE is a part of the Russian industrial group
En+[6]. [Exhibit 10, p. 1] The website states that ESE is a major private Russian power company,
and one of the country's top green energy leaders. The website states that ESE manages power
plants with a total installed capacity of 19.7 GW and produces eight percent of all of Russia's
electricity. According to the website, 15 GW of ESE's capacity is attributed to large Russian
hydro power plants; the website also states that in December 2015, ESE commissioned the

---

[5] (U) According to its website, Orbis is a resource for company data that has information on more than 360 million
companies across the globe. [Exhibit 23, p.1]

[6] (U) OFAC assesses that the "industrial group En+" is the same as En+ Group PLC because according to Orbis,
En+ Group PLC is the global ultimate owner of JSC Eurosibenergo. [Exhibit 14, p. 1]

7

DERIPASKA_0164

Case 1:19-cv-00727-APM   Document 43   Filed 01/12/21   Page 48 of 153

Abakan Solar Power Plant in the Republic of Khakassia. Additionally, the website identifies ESE as possessing the most extensive experience in Russia in private energy assets management. [Exhibit 10, pp. 1-2]

> c. (U) **DERIPASKA** continues to operate in the energy sector of the Russian Federation economy through his ownership stake in En+.

(U) According to **DERIPASKA**'s February 21, 2020 'Response to OFAC's February 14, 2020 questionnaire', En+ is an electric utility company. [Exhibit 7, p. 3]

(U) According to En+'s homepage, En+ is engaged in three areas: Low Carbon Aluminum, Renewable Energy, and Sustainable Growth. [Exhibit 16, p. 1] According to the En+ website associated with the "Renewable Energy" area, the power segment of En+ is one of the largest independent power companies in Russia in terms of installed power capacity and the largest independent hydropower generator globally. The website also states that En+'s power generation assets are located in the east Siberian and Volga regions, and the company is engaged in all major areas of the Russian power industry: electricity and heat generation; electricity, capacity, and heat sales; heat distribution; retail energy trading and supply; engineering services; and electricity distribution and transmission. [Exhibit 17, p. 1]

(U) According to a November 8, 2019 article from the World Renewable Energy Association (WoREA)[7], citing a report done by Energy Intelligence that identified the world's most efficient power producers, the power segment of En+, described as a leading internationally vertically integrated aluminum and power producer, achieved the highest position of all Russian renewable energy companies in Energy Intelligence's 2019 Green Utilities report. [Exhibit 8, pp. 1-2]

(U) According to a November 23, 2019 Bloomberg article, Bitriver is the largest data center in the former Soviet Union and has clients from all over the world, including the United States, Japan, and China, most of whom mine bitcoins. The company rents a building near the Bratsk aluminum plant. The world's single largest aluminum smelter was built by the USSR in the 1960s along with the nearby hydropower plant as energy is the largest cost in aluminum smelting. Billionaire **DERIPASKA**'s team came up with the idea of building the data center in Bratsk about five years prior to the article's publication. According to the article, En+ and its unit Rusal own the Bratsk hydropower (and aluminum) plants, and En+ supplies up to 100 megawatts of power to Bitriver per year as a way to diversify its client base and sell excess energy. [Exhibit 11, pp. 1–2]

(U//<del>FOUO</del>)



[Exhibit 13, p. 22]

---

[7] (U) According to its website, WoREA is a global trade association for the renewables industry. [Exhibit 9, p. 1]
[8] (U//<del>FOUO</del>) The Deloitte report covered the period April 6, 2018 to March 18, 2019. [Exhibit 13, p. 16].

UNCLASSIFIED//FOUO

[Exhibit 13, p .22]
[Exhibit 13, p. 31]

9

DERIPASKA_0166

UNCLASSIFIED//~~FOUO~~

## (U) LIST OF EXHIBITS

(U) Exhibit 1:      Executive Order 13662 of March 20, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine," 79 Fed. Reg. 16169 (March 24, 2014). (U)

(U) Exhibit 2:      Website of En+, "Separate interim condensed financial information for the nine months ended 30 September 2019," uploaded on November 14, 2019 available at https://www.enplusgroup.com/en.investors/results-and-disclosure/. (U)

(U) Exhibit 3:      Ferrari & Associates, "Request for Administrative Reconsideration," June 27, 2019. (U)

(U) Exhibit 4:      Office of Foreign Assets Control, "Questionnaire," November 13, 2019. (U)

(U) Exhibit 5:      Ferrari & Associates, "Response to OFAC's November 13, 2019 Questionnaire," January 5, 2020 (sent January 6, 2020). (U)

(U) Exhibit 6:      Office of Foreign Assets Control, "Follow Up Questionnaire", February 14, 2020. (U)

(U) Exhibit 7:      Ferrari & Associates, "Response to OFAC's February 14, 2020 Questionnaire," February 21, 2020. (U)

(U) Exhibit 8:      World of Renewables Website, "En+ Group is Highest Ranked Russian Renewable Energy Company in 2019 Green Utilities Global Report," November 8, 2019, available at "https://worldof renewables.com/en-group-is-highest-ranked-russian-renewable-energy-company-in-2019-green-utilities-global-report/, accessed on February 24, 2020. (U)

(U) Exhibit 9:      World of Renewables Website, "About Us," available at https://worldof renewables.com/about-us/, accessed on February 24, 2020. (U)

(U) Exhibit 10:     Eurosibenergo Website, "About Eurosibenergo," available at http://pomplo.ru/en/about/, accessed on February 18, 2020. (U)

(U) Exhibit 11:     Bloomberg, "Russia's Largest Bitcoin Mine Turns Water into Cash," November 23, 2019, available at https://www.bloomberg.com/news/features/2019-11-24/seo-inside-russia-s-largest-bitcoin-mine, accessed on February 24, 2020. (U)

(U) Exhibit 12:     "Sanctions Actions Pursuant to Executive Orders 13660, 13661 and 13662," 79 Fed. Reg.63021 (October 21, 2014). (U)

10

DERIPASKA_0167

UNCLASSIFIED//~~FOUO~~

| | |
|---|---|
| (U) Exhibit 13: | Deloitte, "En+ Group plc: Report of Actual Findings," June 3, 2019. (U//~~FOUO~~) |
| (U) Exhibit 14: | Orbis, " JSC Eurosibenergo," December 2017, accessed on February 21, 2020. (U) |
| (U) Exhibit 15: | En+ Group website, " En+ Group Sustainability Report 2018," September 18, 2019, available at https://www.enplusgroup.com/en/investors /results-and-disclosure/, accessed on February 25, 2020. (U) |
| (U) Exhibit 16: | En+ Group website, available at https://www.enplusgroup.com/en/investors /res, accessed on February 18, 2020. (U) |
| (U) Exhibit 17: | En+ Group website, "Power Segment," available at https://www.enplusgroup.com/en/explore-enplus/power-segment/, accessed on February 18, 2020. (U) |
| (U) Exhibit 18: | TASS, "Deripaska reduces stake in En+ to 44.95%," January 28, 2019, available at https://tass.com/economy/1042031, accessed on February 26, 2020. (U) |
| (U) Exhibit 19: | *Deripaska v. Mnuchin*, No. 19-cv-727, United States District Court for the District of Columbia, "Amended Complaint," ECF No. 7, filed June 20, 2019. (U) |
| (U) Exhibit 20: | Embassy of the Russian Federation in the Kingdom of Thailand, "Meeting with members of APEC Business Advisory Council," November 10, 2017, available at https://thailand.mid.ru/en/key-issues/3286-meeting-with-members-of-apec-business-advisory-council, accessed on February 28, 2020. (U) |
| (U) Exhibit 21: | APEC, "APEC Business Advisory Council," available at https://www.apec.org/Groups/Other-Groups/APEC-Business-Advisory-Council, accessed on February 28, 2020. (U) |
| (U) Exhibit 22: | Website of Oleg Deripaska, Initiatives, available at www.deripaska.com/business, accessed on March 22, 2018. (U) |
| (U) Exhibit 23: | Website of Orbis, Overview, available at https://www.bvdinfo.com/en-gb/our-products/data/international/orbis, accessed on March 1, 2020. (U) |
| (U) Exhibit 24: | Excerpts of En+ Group, "Prospectus," November 3, 2017, available at www.enplus.ru/content/dam/enplus/corporate/investors/regulatory-news/enplus-group-prospectus.pdf. (U) |

11

DERIPASKA_0168

UNCLASSIFIED//~~FOUO~~

(U) Exhibit 25:      Notice of OFAC Sanctions Actions, 83 Fed. Reg. 19138 (May 1, 2018).
                     (U)

(U) Exhibit 26:      U.S. Department of the Treasury Press Release, "Treasury Designates
                     Russian Oligarchs, Officials, and Entities in Response to Worldwide
                     Malign Activity, April 6, 2018, available at
                     https://home.treasury.gov/news/press-releases/sm0338.  (U)

12

DERIPASKA_0169

Exhibit 1



# FEDERAL REGISTER

Vol. 79        Monday,

No. 56        March 24, 2014

Part IV

The President

Executive Order 13662—Blocking Property of Additional Persons
Contributing to the Situation in Ukraine

DERIPASKA_0170

Exhibit 1
16169

**Federal Register**

Vol. 79, No. 56

Monday, March 24, 2014

## Presidential Documents

Title 3—

**The President**

Executive Order 13662 of March 20, 2014

**Blocking Property of Additional Persons Contributing to the Situation in Ukraine**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 212(f) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(f)), and section 301 of title 3, United States Code,

I, BARACK OBAMA, President of the United States of America, hereby expand the scope of the national emergency declared in Executive Order 13660 of March 6, 2014, and expanded by Executive Order 13661 of March 16, 2014, finding that the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine, continue to undermine democratic processes and institutions in Ukraine; threaten its peace, security, stability, sovereignty, and territorial integrity; and contribute to the misappropriation of its assets, and thereby constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. Accordingly, I hereby order:

Section 1. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person (including any foreign branch) of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in: any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(i) to operate in such sectors of the Russian Federation economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State, such as financial services, energy, metals and mining, engineering, and defense and related materiel;

(ii) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any person whose property and interests in property are blocked pursuant to this order; or

(iii) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order.

Sec. 2. I hereby find that the unrestricted immigrant and nonimmigrant entry into the United States of aliens determined to meet one or more of the criteria in section 1(a) of this order would be detrimental to the interests of the United States, and I hereby suspend entry into the United States, as immigrants or nonimmigrants, of such persons. Such persons shall be treated as persons covered by section 1 of Proclamation 8693 of July 24, 2011 (Suspension of Entry of Aliens Subject to United Nations Security Council Travel Bans and International Emergency Economic Powers Act Sanctions).

Exhibit 1

Sec. 3. I hereby determine that the making of donations of the type of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order would seriously impair my ability to deal with the national emergency declared in Executive Order 13660, and expanded in Executive Order 13661 and this order, and I hereby prohibit such donations as provided by section 1 of this order.

Sec. 4. The prohibitions in section 1 of this order include but are not limited to:

(a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and

(b) the receipt of any contribution or provision of funds, goods, or services from any such person.

Sec. 5. (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 6. For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States; and

(d) the term the "Government of the Russian Federation" means the Government of the Russian Federation, any political subdivision, agency, or instrumentality thereof, including the Central Bank of the Russian Federation, and any person owned or controlled by, or acting for or on behalf of, the Government of the Russian Federation.

Sec. 7. For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in Executive Order 13660, and expanded in Executive Order 13661 and this order, there need be no prior notice of a listing or determination made pursuant to section 1 of this order.

Sec. 8. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA, as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government consistent with applicable law. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

DERIPASKA_0172

Sec. 9. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 20, 2014.*

[FR Doc. 2014-06612
Filed 3-21-14; 11:15 am]
Billing code 3295-F4

 **Ferrari & Associates, P.C.**

Exhibit 3
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Tel. 202-280-6370
Fax. 877-448-4885

June 27, 2019

## SENT VIA EMAIL AND FEDERAL EXPRESS: # 8148 6145 0155

Office of Foreign Assets Control
United States Department of the Treasury
ATTN: Office of Global Targeting
1500 Pennsylvania Ave., NW
Freedman's Bank Building
Washington, D.C. 20220
Email: OFAC.Reconsideration@treasury.gov

**Re:    Request for Administrative Reconsideration, 31 C.F.R. § 501.807[1]**
*Oleg Deripaska—Executive Order 13662*

Dear Sir or Madam:

On April 6, 2018, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Oleg Deripaska under Executive Order ("E.O.") 13662 for allegedly operating in the energy sector of the Russian Federation economy.[2] By means of this submission, Mr. Deripaska respectfully requests the administrative reconsideration of that designation pursuant to OFAC's "Procedures Governing Delisting from the Specially Designated Nationals and Blocked Persons List."[3] Specifically, given that the information presented in this submission demonstrates that Mr. Deripaska does not meet the criteria for designation under E.O. 13662, Mr. Deripaska requests that OFAC take immediate steps to rescind his designation under E.O. 13662 within 90 days from the date of this submission.

Please note that this delisting request solely seeks the rescission of Mr. Deripaska's designation under E.O. 13662. As OFAC is aware, Mr. Deripaska is pursuing judicial relief with respect to OFAC's designation action targeting Mr. Deripaska pursuant to E.O. 13661.

---

[1] Because this request contains business information and/or other information of a sensitive nature, undersigned counsel respectfully requests that OFAC treat this correspondence confidentially. If OFAC believes that it is required to release this document or any of the information contained herein to the public pursuant to the Freedom of Information Act ("FOIA") or any other federal law, please notify undersigned counsel as soon as possible. Undersigned counsel intends to provide additional information in support of this request for confidentiality.

[2] Press Release, U.S. Dep't of the Treasury, Office of Foreign Assets Control, Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity (April 6, 2018).

[3] 31 C.F.R. § 501.807.

DERIPASKA_0190

Exhibit 3

## I.     Factual Background

### A.     OFAC Designations

On April 6, 2018, OFAC designated Mr. Deripaska separately under E.O. 13661 for allegedly having acted or purported to act for or on behalf of a senior official of the Government of the Russian Federation and E.O. 13662 for allegedly operating in the energy sector of the Russian Federation economy.[4]  As a result, Mr. Deripaska was identified on OFAC's List of Specially Designated Nationals and Blocked Persons ("SDN List"), and all property and interests in property in which Mr. Deripaska has an interest that is or comes within U.S. jurisdiction is blocked.

Simultaneous with Mr. Deripaska's designation, OFAC derivatively designated certain entities alleged to operate under his ownership or control, including, for purposes relevant herein, En+ Group plc ("En+"), United Company RUSAL PLC ("Rusal"), and JSC EuroSibEnergo ("ESE"). Those blocked entities were placed on OFAC's SDN List and also became subject to U.S. secondary sanctions authorities under the Countering America's Adversaries Through Sanctions Act ("CAATSA").

In the press release announcing these designations, OFAC describes EN+ as "a leading international vertically integrated aluminum and power producer," and ESE as "one of the largest independent power companies in Russia, operating power plants across Russia and producing around nine percent of Russia's total electricity."[5]  An exhibit in the administrative record further describes ESE as "the largest independent power company in Russia, operating power plants across Russia, and one of the largest hydropower generation companies in the world."[6]

### A.     May 31, 2019 Email Correspondence

On May 31, 2019, OFAC—through its legal counsel at the U.S. Department of Justice— confirmed to undersigned counsel that Mr. Deripaska no longer exercises ownership or control over either En+ or ESE.[7]  The Department of Justice acknowledged that fact in response to Mr. Deripaska's request for a meeting to discuss the  implementation of a Terms of Removal Agreement ("TOR") covering En+, ESE, and Rusal.[8]  In denying Mr. Deripaska's meeting request, OFAC stated that Mr. Deripaska "has only minority ownership interests in, and does not

---

[4] *Supra* note 2.
[5] *Id.*
[6] A.R. at 000013.
[7] Annex A—Email Correspondence from U.S. Dep't of Justice, May 31, 2019.
[8] *Id.*

Exhibit 3

control, the parties to the TOR"—i.e., En+, Rusal, and ESE—and that discussion of the TOR with a nonparty to the agreement would be inappropriate.[9]

### B.    Terms of Removal Agreement

Following a petition for their removal from the SDN List, En+, Rusal, and ESE entered into a TOR with OFAC under which the entities agreed to take certain steps to limit Mr. Deripaska's ownership and control. The TOR's conditions for removal[10] are directly relevant to reconsideration of Mr. Deripaska's E.O. 13662 designation. The TOR and the delistings according to its terms negate any reason to believe that Mr. Deripaska operates in the energy sector the Russian Federation economy as of January 27, 2019. On that date, OFAC delisted En+, Rusal, and ESE following its determination that they had adequately separated from Mr. Deripaska pursuant to the terms of the TOR.[11]

Specifically, the TOR required En+ to undertake the following measures:

- Prohibit Mr. Deripaska from voting more than 35% of En+ shares;[12]
- Reduce Mr. Deripaska's ownership stake in En+ to not more than 44.95%;[13]
- Limit Mr. Deripaska's right to nominate no more than four of En+'s 12 directors;[14] and
- Require Mr. Deripaska to execute a deed letter under which he agreed to take the steps outlined in the TOR and refrain from acting in any manner that would allow him to exercise a controlling influence over En+'s management or entities owned or controlled by En+.[15]

OFAC predicated its delisting of En+ on the entity taking these measures necessary to sever Mr. Deripaska's ownership and control.

Under the terms of the TOR, ESE—which was designated under E.O. 13661 and E.O. 13662 for being owned or controlled by Mr. Deripaska and En+ Group—committed to submit ongoing monthly certifications to OFAC asserting its continued independence from Mr. Deripaska. The entity, through its General Director, continuously certifies that (1) he or she is not acting for or on behalf of Mr. Deripaska or any other Specially Designated National ("SDN")

[9] *Id.*
[10] Annex B—Terms of Removal Agreement.
[11] Press Release, U.S. Dep't of the Treasury, Office of Foreign Assets Control, OFAC Delists En+, Rusal, and EuroSibEnergo (Jan. 27, 2019).
[12] TOR, ¶ A.1.
[13] TOR, ¶ A.2.
[14] TOR, ¶ A.4.
[15] TOR, ¶¶ A.8 and A.9.

and (2) he or she exercises full control over ESE's actions, policies, and personnel decisions.[16] As En+ Group owns ESE, and because Mr. Deripaska's prior ownership and control of En+ was severed under the TOR, ESE's sole obligation under the TOR is to provide routine certifications to OFAC detailing its independence from Mr. Deripaska and any entity over which he exercises ownership or control.

### C. Basis and Criteria for Designation

On March 15, 2019, Mr. Deripaska filed a lawsuit challenging OFAC's decision to designate him under E.O. 13661 and 13662.[17] Following the filing of that lawsuit, OFAC provided Mr. Deripaska with the redacted version of the administrative record underlying his designations. This administrative record included the evidentiary memorandum supporting OFAC's decision to designate Mr. Deripaska under E.O. 13662. OFAC's evidentiary memorandum identified the legal basis for OFAC's E.O. 13662 designation of Mr. Deripaska, as well as the agency's factual findings and conclusions in support of its determination that Mr. Deripaska met the legal criteria for designation under E.O. 13662.

In the section of the evidentiary memorandum titled "Basis for Determination," OFAC included a subheading that tracks the language of E.O. 13662 and alleges that Mr. Deripaska "operates in the energy sector of the Russian Federation economy."[18] The following three sets of allegations from the evidentiary memorandum comprise all of OFAC's findings and conclusions in support of its determination that Mr. Deripaska met the legal criteria for designation under E.O. 13662 and "operates in the energy sector of the Russian Federation economy." Specifically, OFAC states the following:

- Mr. Deripaska "is involved in several World Economic Forum projects including ones on 'New Energy Architecture' and the 'Interaction between the Power Industry and Society.'"[19]

- Mr. Deripaska—in his position on the APEC Business Advisory Council— "focuses on multiple issues including energy efficiency and energy security." During a February 2012 meeting of the Council, a representative of Mr. Deripaska "presented the North East Asian Region Electrical System Ties Initiative, whose goal is to improve ties between the power grids of Eastern

---

[16] TOR, ¶ B.1.

[17] *Deripaska v. U.S. Dep't of the Treasury*, Case No. 1-19-cv-00727 (APM) (D.D.C. March 15, 2019).

[18] A.R. at 000012.

[19] *Id.*

Siberia, Northern and North Eastern China, Japan, and South Korea through the creation of a transnational power grid in Northeast Asia."[20]

- Mr. Deripaska-related companies "combined" all of their power assets under EuroSibEnergo plc—"[a]s of the date of the prospectus, EN+ Group owned 100 percent of EuroSibEnergo plc which in turn owned 100 percent of JSC EuroSibEnergo in Russia."[21] EuroSibEnergo "is the largest independent power company in Russia, operating power plants across Russia, and one of the largest hydropower generation companies in the world."[22]

As there are no substantive redactions of the bases for Mr. Deripaska's designation under E.O. 13662, these findings and conclusions comprise the entirety of the reasons for OFAC's determination that he "operates in the energy sector of the Russian Federation economy" and meets the basis for designation under E.O. 13662.

## II.   Legal Background

### A.   Statutory and Regulatory Framework

On October 28, 1977, the President signed into law the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, which provides the statutory authority for most U.S. economic sanctions programs implemented and administered by OFAC. IEEPA authorizes the President to impose economic sanctions to address unusual or extraordinary threats to the U.S. economy, national security, or foreign policy, which has its source in whole or in substantial part outside of the U.S. upon a Presidential declaration of a national emergency with respect to such threat."[23]   Those authorities include the power to regulate, prevent, or prohibit, any transactions involving property in which a foreign country or a foreign national has an interest by any person, or with respect to any property, subject to U.S. jurisdiction.[24]   The President is authorized to issue Executive orders to impose sanctions under, and to issue regulations to exercise the authorities in, IEEPA.[25]

---

[20] A.R. at 000013.
[21] *Id.*
[22] *Id.*
[23] 50 U.S.C. § 1701(a).
[24] 50 U.S.C. § 1702(a)(1)(B).
[25] 50 U.S.C. § 1704.

Exhibit 3

i.   Executive Order 13662 and the Ukraine-Related Sanctions Regulations, 31 C.F.R. Part 589

On March 20, 2014, acting pursuant to IEEPA, the President issued E.O. 13662 thereby expanding the scope of a national emergency related to the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine.[26]

As relevant here, E.O. 13662 blocks the property and interests in property of persons determined by the Secretary of the Treasury to operate in those sectors of the Russian Federation economy identified by the Secretary of the Treasury. On July 16, 2014, the Secretary of the Treasury determined that persons operating within Russia's energy sector are subject to designation under E.O. 13662.[27] The Secretary of the Treasury is authorized to promulgate rules and regulations necessary to carry out the purposes of E.O. 13662 and to redelegate the authorities it provides.[28]

On May 2, 2014, OFAC—acting under a delegation of authority from the Secretary of the Treasury[29]—issued the Ukraine-Related Sanctions Regulations ("URSR"), 31 C.F.R. Part 589, which implement E.O. 13662 and other Ukraine-related Executive orders. The URSR prohibit all transactions that are themselves prohibited by those Executive orders, including E.O. 13662.[30] Persons whose property and interests in property are blocked by the URSR are included on OFAC's SDN List with the identifying tag "[UKRAINE]."[31]

ii.   Procedures Governing Delisting from the SDN List

Persons blocked under the provisions of any part of 31 C.F.R. Chapter V and identified on the SDN List may seek the rescission of the designation that led to the blocking.[32] In seeking the rescission of their designation, blocked persons may argue that an insufficient basis exists for the designation or that the circumstances underlying the designation no longer apply.[33] Designated persons may also propose remedial steps that they believe would negate the basis for

---

[26] E.O. 13662.

[27] Press Release, U.S. Dep't of the Treasury, Office of Foreign Assets Control, Announcement of Treasury Sanctions on Entities Within the Financial Services and Energy Sectors of Russia, Against Arms and Related Materiel Entities, and Those Undermining Ukraine's Sovereignty (July 16, 2014).

[28] E.O. 13662, § 8.

[29] See 31 C.F.R. § 589.802.

[30] 31 C.F.R. § 589.201.

[31] NOTE 1 to 31 C.F.R. § 589.201.

[32] 31 C.F.R. § 501.807(a).

[33] Id.

Exhibit 3

their designation.[34] Following its review of information submitted in reconsideration of a designation, OFAC will provide a written decision to the blocked person.[35] OFAC's delisting procedures are applicable to all U.S. sanctions programs administered by OFAC, including for designations under the URSR and E.O. 13662.

OFAC has also published Frequently Asked Questions ("FAQs") regarding petitions for removal from its SDN List which provide additional guidance relating to arguments that can be made by designated parties seeking the rescission of their designation.[36] OFAC's FAQs identify several examples of situations that may result in delisting, including where there is a positive change in behavior or when the basis for the designation no longer exists.[37]

### iii.    Administrative Procedure Act, 5 U.S.C. § 551

All U.S. federal agencies are required to act consistent with the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*. The APA governs OFAC's administration of U.S. economic sanctions, including its implementation and administration of the URSR and E.O. 13662, and any actions taken pursuant to those authorities. This includes OFAC's actions regarding requests for reconsideration made pursuant to 31 C.F.R. § 501.807.

The APA also provides judicial review for persons suffering legal wrong due to agency action (or lack thereof), or persons adversely affected or aggrieved by agency action.[38] For purposes of the APA, agency action includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act . . ."[39] Specifically, the APA provides that the courts "shall compel agency action unlawfully withheld or unreasonably delayed," as well as to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . ."[40]

Courts have held that agency action "is arbitrary and capricious if it departs from agency precedent without explanation" and that an "agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision making."[41] If an agency decides to "change course as their expertise and experience

---

[34] *Id.*

[35] 31 C.F.R. § 501.807(d).

[36] U.S. Dep't of the Treasury, Office of Foreign Assets Control, Filing a Petition for Removal from an OFAC List (May 2, 2017).

[37] *Id.*

[38] 5 U.S.C. § 706.

[39] 5 U.S.C. § 551(13).

[40] 5 U.S.C. § 706(1) and (2)(A).

[41] *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1124-1125 (D.C. Cir. 2003).

DERIPASKA_0196

may suggest or require," which is within their right, then they "must provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."[42]

### III.    Legal Analysis

> **A.**    *The Basis of Mr. Deripaska's E.O. 13622 Designation is both Factually and Legally Insufficient*

The designation of Mr. Deripaska under E.O. 13662 "for operating in the energy sector of the Russian Federation economy" is not reasonably supported by the factual claims made in OFAC's evidentiary memorandum or supporting exhibits. Further, the designation is plainly arbitrary and capricious in light of long-standing OFAC precedent across sanctions programs.

> i.    Mr. Deripaska's alleged participation in international conferences related to energy and his purported proposal for a region-wide energy initiative do not evidence his operating in the energy sector of the Russian Federation economy

As noted above, OFAC has identified three sets of allegations in support of its determination that Mr. Deripaska operates in the energy sector the Russian Federation. None of these allegations—viewed either in conjunction with or distinct from each other—however, provide a reasoned basis for a determination the he operates in any particular energy sector, much less in the energy sector of the Russian Federation economy.

First, OFAC's factual claims simply show Mr. Deripaska's was involved in World Economic Forum projects related to energy. Specifically, OFAC alleges that Mr. Deripaska "is involved in several World Economic Forum ("WEF") projects related to energy, including ones on 'New Energy Architecture' and the 'Interaction between the Power Industry and Society.'" But OFAC makes no effort to describe the nature of Mr. Deripaska's involvement in those projects nor how such involvement evidence his operating in the energy sector of the Russian Federation economy.

Second, OFAC's evidentiary memorandum does not provide any rational basis for its determination that Mr. Deripaska's participation in those WEF projects equates to his operating in Russia's energy sector. Mr. Deripaska's involvement in those projects—which merely involved his participation in a few conference panels—simply does not provide OFAC with a reasoned basis for finding that Mr. Deripaska operates in Russia's energy sector. Indeed, neither the evidentiary memorandum nor the supporting exhibits disclosed during the course of the

---

[42] *Id.* at 1125.

litigation explain how Mr. Deripaksa's involvement with certain conference panels equates to his operating in the energy sector of the Russian Federation economy.

Second, OFAC's claim that Mr. Deripaska "focuses on multiple issues including energy efficiency and energy security . . . in his position on the APEC Business Advisory Council" likewise fails to support a finding that he operates in Russia's energy sector. Again, OFAC has made no effort to identify or analyze the nature of Mr. Deripaska's activities on the APEC Business Advisory Council, nor how those activities could reasonably support a specific finding that Mr. Deripaska operates in Russia's energy sector. In other words, there is no conclusion, reasoning, or finding made to rationally connect Mr. Deripaska's focus on issues of energy efficiency and security in his role on the APEC Business Advisory Council with "operating in the energy sector of the Russian Federation."

OFAC further alleges that a representative of Mr. Deripaska made a presentation at the February 2012 meeting of the APEC Business Advisory Council proposing a regional initiative for the creation of a transnational power grid. The administrative record, however, fails to draw a rational connection between that presentation and proposal—made more than a half-decade ago to a private international business council—and OFAC's determination that Mr. Deripaska operates in the energy sector of the Russian Federation economy.

> ii.   Electricity producers and suppliers are not within the scope of the term "energy sector" in the context of U.S. sanctions

Prior to its designation of Mr. Deripaska, OFAC had never considered involvement in the power sector of a foreign economy to constitute operating in an energy sector. Now, however, OFAC has conflated Mr. Deripaska's prior ownership or control of ESE, "the largest independent power company in Russia, operating power plants across Russia,"[43] with operating in the energy sector of the Russian Federation. In doing so, OFAC has acted arbitrarily and capriciously by departing from its own precedent without a reasoned explanation. Furthermore, OFAC acted contrary to its clear Congressional mandate.

Although neither Congress nor OFAC has defined "energy sector of the Russian Federation" for purposes of E.O. 13662 or CAATSA, sanctionable activity involving an "energy sector" of a foreign economy has never been defined or interpreted to include private electricity production or supply under any U.S. sanctions program. OFAC's interpretation of the "energy sector" of the Russian Federation to include the production and supply of electricity—absent a reasoned analysis indicating that its prior policies and standards are being deliberately changed—

---

[43] A.R. at 000013.

defies the agency's obligations under the APA to refrain from taking action that is arbitrary and capricious.

a.    Congressional Intent

While Congress does not expressly define the "energy sector of the Russian Federation," it nevertheless has intended those U.S. sanctions to be limited to oil-related activity. That is clear from the meaning given to the "energy sector" in both Russia-related sanctions legislation, as well as Congressional acts targeting the energy sector of Iran. For instance, the Ukraine Freedom Support Act of 2014, Section 4(b)—titled "Sanctions Related to the Energy Sector"—solely targets investment in certain Russian crude oil projects and "items for use in the energy sector of the Russian Federation, including equipment used for tertiary oil recovery."[44] Similarly, Section 232 of CAATSA imposes sanctions on persons determined to invest in or provide goods, services, technology, information, or support for purposes of, the construction of Russian energy export pipelines. The U.S. State Department clarified that Section 232 of the CAATSA would be interpreted to solely include energy export pipelines that "transport hydrocarbons across an international land or maritime border for delivery to another country."[45] The term "energy" as used in Section 232 of CAATSA was thus interpreted to only mean "hydrocarbons," not the production or supply of electricity.

In the sole instance in which Congress explicitly defined the term "energy sector" for purposes of U.S. economic sanctions, it expressly limited the term to activities involving petroleum, natural gas, and nuclear development. Specifically, Section 201 of the Comprehensive Iran Sanctions Accountability and Divestment Act ("CISADA") defines the term "energy sector of Iran" to "refer to activities to develop petroleum or natural gas resources or nuclear power in Iran."[46] Moreover, Section 5 of the Iran Sanction Act ("ISA")—titled "Sanctions Relating to the Energy Sector of Iran"—imposes sanctions with respect to parties determined to engage in certain dealings with or otherwise involving Iran's oil sector, including with respect to petroleum resources, petroleum products, and crude oil.[47] Neither CISADA, ISA, nor any other economic sanctions legislation defines the term "energy sector" to include activities relating to the production or supply of electricity.

It is clear that Congress has never authorized, mandated, or in any way intended sanctions targeting an "energy sector" to include activities occurring in the power sector—i.e., the production or supply of electricity.

---

[44] 22 U.S.C. § 8923(b).

[45] Public Guidance, U.S. Dep't of State, Bureau of Energy Resources, CAATSA/CRIEEA Section 232 Public Guidance (Oct. 31, 2017).

[46] 22 U.S.C. § 8531.

[47] 50 U.S.C. § 1701 note.

DERIPASKA_0199

Exhibit 3

### b.    OFAC's Public Guidance

OFAC has provided its interpretation of "energy sector" in the Iran sanctions program. Following the August 2018 reimposition of "energy sector" sanctions on Iran, OFAC reiterated its long-standing interpretation that "energy sector" sanctions are limited to activities involving oil and gas.[48]  Specifically, in response to a Frequently Asked Question regarding how the energy sector of Iran would be defined for the purposes of the Iran Freedom and Counter-Proliferation Act, OFAC responded that future regulations "will define 'energy sector of Iran' to include activities involving the exploration, extraction, production, refinement, or liquefaction of petroleum, natural gas, or petroleum products in Iran."[49]  This is the sole instance where OFAC has provided some semblance of guidance as to how "energy sector" is defined for purposes of one of its sanctions programs.

### c.    Designation Actions

Prior to its designation of Mr. Deripaska, OFAC consistently interpreted the term "energy sector" to be limited to activities and transactions related to oil and gas production. That clear, consistent interpretation is readily evident in OFAC designations targeting entities that operate in Russia's energy sector as well as in North Korea's energy industry.

For example, OFAC has only identified oil and gas-related companies in its sectoral sanctions targeting the energy sector of the Russian Federation economy. Those sectoral sanctions are based on the Secretary of the Treasury's determination that § 1(a)(i) of E.O. 13662 shall apply to the energy sector of the Russian Federation economy. OFAC issued Directive 2 to E.O. 13662 concurrently with that determination to prohibit certain transactions with persons identified as operating in Russia's "energy sector." To date, OFAC has identified 53 separate Russian entities as operating in Russia's energy sector under Directive 2. These 53 entities are included in 177 separate entries on the Sectoral Sanctions Identification List. The activities of all 53 of those entities relate to Russian oil and gas production. None of the sanctioned entities appear to be involved in the production or supply of electricity. This means that OFAC has in 53 separate cases determined that oil and gas-related companies operate in the Russian "energy sector," but has not done so for a single electricity producer or supplier.

Similarly, when OFAC has designated entities for "operating in the energy industry of the North Korean economy" under E.O. 13722, it has solely targeted parties engaged in sale and purchase transactions related to oil and gas. OFAC has not interpreted its authority under E.O.

---

[48] U.S. Dep't of the Treasury, Office of Foreign Assets Control, Frequently Asked Question # 293 (Aug. 6, 2018).
[49] *Id.*

13722 to include entities operating in the power industry—i.e., entities engaged in the production and supply of electricity.

### B. Change in Circumstances

To the extent that OFAC believes there was a sufficient basis for its initial determination that Mr. Deripaska operates in the energy sector of the Russian Federation economy, there has nonetheless been a change in circumstances that irrevocably negates the basis for his E.O. 13662 designation.

As detailed above, OFAC designated Mr. Deripaska under E.O. 13662 on the basis of three factual allegations—the most substantial of which appears to be Mr. Deripaska's prior ownership of ESE. According to an open source attachment in the administrative record, ESE "is the largest independent power company in Russia, operating power plants across Russia, and one of the largest hydropower generation companies in the world."[50] Based on the administrative record, OFAC appears to support its determination that Mr. Deripaska operates in the energy sector of the Russian Federation economy through his past ownership and control of ESE.

However, pursuant to the TOR governing ESE's delisting from OFAC's SDN List, Mr. Deripaska no longer exercises ownership of or control of ESE. OFAC itself readily admits this fact, as reflected in by a May 31, 2019 email from its counsel denying Mr. Deripaska's request for a meeting to discuss implementation of the TOR.[51] As OFAC expressly acknowledged in that email correspondence, Mr. Deripaska "has only minority ownership interests in, and does not control, the parties to the TOR," the terms of which specifically include ESE.[52] Insofar as Mr. Deripaska was alleged to exercise ownership of and control over ESE through his interest in En+, the TOR terminated Mr. Deripaska's majority ownership in and control over En+ and expressly premised ESE's removal from the SDN List on its continued independence from Mr. Deripaska. The TOR thus fundamentally and permanently changed the circumstances that had resulted in Mr. Deripaska's designation under E.O. 13662.

As Mr. Deripaska no longer exercises ownership or control over ESE, OFAC no longer has a lawful basis under which to maintain Mr. Deripaska's designation under E.O. 13662. The central basis for his designation under that authority—i.e., ESE's involvement in the production and supply of electricity in the Russian Federation—has been negated by the cessation of his interest in and control over ESE.

---

[50] *Supra* note 6.

[51] Annex A—Email Correspondence from U.S. Dep't of Justice to Counsel (May 31, 2019).

[52] *Id.*

DERIPASKA_0201

The remaining basis for OFAC's decision to designate Mr. Deripaska cannot itself sustain his designation under E.O. 13662, as none of the factual allegations evidence Mr. Deripaska's operating in the energy sector of the Russian Federation economy. Those allegations are:

- Mr. Deripaska's "involvement" in certain World Economic Forum projects whose titles may appear related to energy; and

- Mr. Deripaska's representative's presentation of a regional electricity-related project at a February 2012 meeting of the APEC Business Advisory Council.

The administrative record does not explain the nature of Mr. Deripaska's involvement in the World Economic Forum projects, or how such projects relate to the energy sector of the Russian Federation economy. Moreover, the mere presentation of a regional power generation initiative at an international business conference made more than five years ago by a representative of Mr. Deripaska does not establish a reasoned basis to believe that Mr. Deripaska operates in the energy sector of the Russian Federation economy. Even when viewed alongside ESE's involvement in electricity production and supply, these facts simply did not support a designation under E.O. 13662 at the time of Mr. Deripaska's designation, and certainly do not now that Mr. Deripaska has no ownership or control of ESE.

## IV.    Policy Considerations

### A.    *U.S. Sanctions are Intended to Spur a Change in Behavior, the Result of Which Should Lead to the Lifting of Sanctions*

According to OFAC, "[t]he power and integrity of [its] sanctions derive not only from its ability to designate and add persons to the Specially Designated Nationals and Blocked Persons List (SDN List), but also from its willingness to remove persons from the SDN List consistent with the law."[53] OFAC has stated that "[t]he ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior."[54]  Evidencing this commitment, OFAC has regularly noted that each year it "removes hundreds of individuals and entities from the SDN List."[55]

Traditionally, OFAC's removal of an individual or entity from the SDN List follows receipt of a petition for reconsideration from the designated party, wherein the designee provides evidence showing that the factual basis for OFAC's designation was in error and/or that there has

---

[53] U.S. Dep't of the Treasury, Office of Foreign Assets Control, Filing a Petition for Removal from an OFAC List (May 2, 2017).
[54] *Id.*
[55] *Id.*

Exhibit 3

been a fundamental change in circumstances that negates the reasons for the designation and warrants rescission of the designation.

Specifically, as a result of the TOR, Mr. Deripaska no longer exercises ownership or control over ESE and can thus no longer be found to operate in the energy sector of the Russian Federation economy—if he ever could have been said to have done so. Absent a legal predicate to maintain Mr. Deripaska's designation under E.O. 13662, OFAC must take steps to rescind that designation as to do otherwise would transform the imposed sanction from a conduct- or status-based designation intended to compel a change in behavior to a purely punitive act. If that is the case, OFAC is reversing its long-held policy of using sanctions to change a target's behavior—not for punishment—an action that would have far-reaching consequences beyond Mr. Deripaska's immediate designation.

As set forth above, Mr. Deripaska does not operate in the energy sector of the Russian Federation economy. Furthermore, a fundamental change in the circumstances underlying Mr. Deripaska's designation under E.O. 13662 negates any reasonable basis to conclude otherwise. OFAC readily acknowledges this change in circumstances in correspondence with undersigned counsel.

> B.    *U.S. Sanctions are Intended to Target State-Owned Entities Operating in Russia's Energy Sector that Exercise Leverage and Influence over Europe and Eurasia, Not Privately-Owned Domestic Producers of Electricity*

Congress did not delegate authority to OFAC to designate *private* producers and suppliers of electricity. The relevant designation authorities are limited to targeting state-owned entities operating in Russia's energy sector. Congress, which through CAATSA codified E.O. 13662, made a finding in Section 257 of CAATSA that "[t]he Government of the Russian Federation uses its strong position in the energy sector as leverage to manipulate the internal politics and foreign relations of the countries of Europe and Eurasia." This finding is consistent with the preamble of E.O. 13662 which explains the President's determination that "the actions and policies of the Government of the Russian Federation undermine democratic processes and institutions in Ukraine; threaten its peace, security, stability, sovereignty, and territorial integrity; and contribute to the misappropriation of its assets.[56] The language is also consistent with the broader policy concerns enumerated by successive administrations regarding Russia's power, leverage, and influence over Europe and Eurasia with respect to energy resources. As Assistant Secretary of State for Energy Resources Francis R. Fannon noted in December 2018, Russia's

---

[56] E.O. 13662 (March 20, 2014).

DERIPASKA_0203

Exhibit 3

energy companies are an extension of the Russian state, which uses energy for coercive geopolitical aims.[57]

The U.S. policy focus on Russian state-owned companies in the oil and gas sector is broadly consistent with its use of the sanctions authorities under E.O. 13662 and CAATSA, as described above. This further demonstrates the arbitrary and capricious nature of this designation, as Mr. Deripaska's purported prior involvement in the energy sector of the Russian Federation economy related to electricity production and supply, and not oil and gas. Additionally, ESE—the entity through which Mr. Deripaska ostensibly operated in the energy sector—is a privately-owned power company whose activities involve the production and supply of electricity *inside* of Russia. Even OFAC's evidentiary memorandum in support of Mr. Deripaska's designation identifies ESE as "one of the largest independent *power* companies, operating *power* plants across Russia and producing more than nine percent of Russia's total *electricity*."[58] (emphasis added).

Thus, Mr. Deripaska's designation under E.O. 13662 was inconsistent with Congressional intent and U.S. foreign policy objectives to target state-owned entities operating in Russia that provide the Russian government with power, leverage, and influence over Europe and Eurasia. In short, E.O. 13662 was neither promulgated nor later codified by Congress with the purpose of targeting companies engaged in the domestic production and supply of electricity inside of Russia. Sanctioning Mr. Deripaska under E.O. 13662 for engaging in conduct that has not been deemed to pose a threat to the United States is not consistent with U.S. interests, alters OFAC's prior policy without justification, and is not done in accordance with the law.

## V.     Conclusion

For the foregoing reasons, Mr. Deripaska respectfully requests OFAC take immediate steps to rescind his designation under E.O. 13662, as he does not meet the criteria for designation under E.O. 13662. Mr. Deripaska further requests that OFAC rescind his designation within 90 days from the date of this petition, as OFAC has been sufficiently apprised of the change in circumstances negating the basis for Mr. Deripaska's designation under E.O. 13662 since at least December 2018.

Please forward all correspondence relating to this request to:

Erich C. Ferrari
Ferrari & Associates, P.C.

---

[57] Transcript, U.S. Dep't of State, Bureau of Public Affairs, Telephonic Press Briefing with Assistant Secretary Francis R. Fannon, Bureau of Energy Resources (Dec. 11, 2018).
[58] A.R. at 000013.

DERIPASKA_0204

Exhibit 3

1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Email: ferrari@falawpc.com

Thank you for your consideration, and we look forward to your response.

Sincerely,

Erich C. Ferrari

DERIPASKA_0205

Exhibit 3

# Annex A

Exhibit 3



**Ferrari &
Associates, P.C.**

Erich Ferrari <ferrari@falawpc.com>

## Deripaska v. Mnuchin, No. 19cv727 (D.D.C.)

**Cartier, Nicholas (CIV)** <Nicholas.Cartier@usdoj.gov>                     Fri, May 31, 2019 at 10:53 PM
To: Erich Ferrari <ferrari@falawpc.com>
Cc: "Cartier, Nicholas (CIV)" <Nicholas.Cartier@usdoj.gov>

Erich,

OFAC declines your request for a meeting.

First, Mr. Deripaska is not a party to the Terms of Removal ("TOR"). He has only minority ownership interests in, and does not control, the parties to the TOR. OFAC is engaged in ongoing dialogue with the parties to the TOR and their counsel, including with respect to matters referenced in your April 18, 2019 email to Andrea Gacki requesting a meeting. OFAC will not have parallel discussions about those matters, or any other matters related to the TOR, with a non-party to that document.

Second, any thorough discussion of the topics specified in your April 18 email would surely touch on matters related to the litigation. That is because Mr. Deripaska's designation – the subject of his suit – is the reason the TOR exists. OFAC's positions on the parties' requests in connection with the TOR are necessarily informed by its views as to the bases for Mr. Deripaska's designation, and the need to ensure that the effects of that designation remain in force. (It is also worth noting that Mr. Deripaska's complaint specifically mentions the TOR, at paragraph 49, and makes other allegations of bias related to the delisting of companies formerly owned by Deripaska, at paragraphs 52 and 53.)

Best,

Nick

**From:** Erich Ferrari <ferrari@falawpc.com>
**Sent:** Friday, April 19, 2019 8:51 PM
**To:** Cartier, Nicholas (CIV) <NCartier@civ.usdoj.gov>
**Subject:** Re: Deripaska v. Mnuchin, No. 19cv727 (D.D.C.)

Nick,

Thank you for your email and the update. Just to be clear on our intent as to yesterday's correspondence with OFAC, we do not view it to be connected to the current litigation or the status of Mr. Deripaska's current designation. We are merely trying to understand OFAC's position as to Mr. Deripaska's role in relation to his performance under the TOR between OFAC and companies Mr. Deripaska formerly owned or controlled. His performance in relation to that TOR is not at issue in the current litigation. That is why we emailed them directly and did not seek to communicate with DOJ as to that question. We will, of course, route all communications connected to the current litigation to you or any other DOJ lawyers representing the agency in that matter.

DERIPASKA_0207

Thank you and have a great holiday weekend.                                    Exhibit 3

On Fri, Apr 19, 2019 at 5:29 PM Cartier, Nicholas (CIV) <Nicholas.Cartier@usdoj.gov> wrote:

> Dear Mr. Ferrari,
>
> I'm the DOJ lawyer representing OFAC in the above-referenced case. OFAC has informed us of your request for a
> meeting to discuss the Terms of Removal Agreement applicable to En+ Group plc, JSC EuroSib Energo, and UC Rusal
> plc. OFAC is currently evaluating your request. Once OFAC has determined how to respond, I will be in touch. I
> request that, in light of Mr. Deripaska's lawsuit against OFAC, you communicate with me about any future matters
> connected to the current litigation.
>
> Best,
>
> Nick
>
>
>
> Nicholas Cartier
>
> U.S. Department of Justice
>
> Civil Division, Federal Programs Branch
>
> 1100 L Street, NW
>
> Washington, DC 20005
>
> (202) 616-8351 (p); (202) 616-8470 (f)
>
> nicholas.cartier@usdoj.gov

--

Best,

Erich C. Ferrari

Ferrari & Associates, P.C.

1455 Pennsylvania Ave., NW

Suite 400

Washington, DC 20004

Phone:202.280.6370

Fax: 877.448.4885

email: ferrari@falawpc.com

DERIPASKA_0208

www.sanctionlaw.com

**Exhibit 3**

Twitter: https://twitter.com/FerrariLegal

LinkedIn: https://www.linkedin.com/pub/erich-ferrari/22/320/a06

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

Exhibit 3

# Annex B

DERIPASKA_0210

Exhibit 3

# Appendix
# Terms of Removal

DERIPASKA_0211

Exhibit 3

### AGREEMENT BETWEEN EN+ GROUP PLC, UC RUSAL, AND OFAC ON THE TERMS OF REMOVAL OF EN+ GROUP PLC, UC RUSAL PLC, AND JSC EUROSIBENERGO FROM THE LIST OF SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS

En+ Group plc ("En+"), UC Rusal plc ("Rusal"), JSC EuroSibEnergo ("ESE"), and the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) (referenced collectively as the "parties") hereby enter this agreement ("Agreement") for the removal of En+, Rusal, and ESE (collectively, "the petitioners") from the OFAC List of Specially Designated Nationals and Blocked Persons ("SDN List"). The removal will be conditioned upon agreement and adherence by the petitioners to the conditions set forth in the following paragraphs. All information provided to OFAC should be accompanied by a certification from an appropriate officer of En+, Rusal, or ESE.

WHEREAS, on April 6, 2018, OFAC designated En+ for being owned or controlled by, directly or indirectly, Oleg Deripaska ("Deripaska") and placed it on the SDN List pursuant to Executive Order 13661 of March 16, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine" ("E.O. 13661") and Executive Order 13662 of March 20, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine" ("E.O. 13662").

WHEREAS, on the same date, OFAC designated Rusal for being owned or controlled by, directly or indirectly, En+ and placed it on the SDN List pursuant to E.O. 13661 and E.O. 13662.

WHEREAS, on the same date, OFAC designated ESE for being owned or controlled by, directly or indirectly, En+ and Deripaska and placed it on the SDN List pursuant to E.O. 13661 and E.O. 13662.

WHEREAS, the economic sanctions in E.O. 13661 and E.O. 13662 are designed to change behavior, and the petitioners have agreed to undertake a significant restructuring effort to change the circumstances that led to their designations by OFAC, including reducing the shareholding stake of Deripaska and related persons in En+, changing the composition of their boards of directors, and taking other steps outlined in this Agreement related to their corporate governance.

WHEREAS, OFAC has determined that the measures agreed to by petitioners would warrant delisting of petitioners under the procedures outlined in 31 C.F.R. § 501.807.

#### A. En+ agrees to the following:

1. En+ will ensure that Deripaska will be prohibited from voting more than 35% of En+ shares. This prohibition will be implemented by Deripaska assigning any voting rights above 35% of En+ shares to a voting trust that shall be obligated to vote in the same manner as the majority of shares held by shareholders other than Deripaska voted on the matter.

2. En+ will ensure that Deripaska reduces his stake in En+ from approximately 70% to 44.95%, and En+ will take all necessary and appropriate steps to ensure that Deripaska's

1

DERIPASKA_0212

Exhibit 3

stake does not at any time rise above 44.95%. The steps taken to effect these changes will include:

   a. The contribution by Deripaska of a 3.22% stake in En+ (20,570,935 shares) to the charitable foundation Volnoe Delo;
   b. The transfer of 14.33% of En+ shares (91,535,714 shares) from two entities holding Deripaska's shares, Eastern Carriers Trading Limited and Basic Element Limited, as well as releases from physical delivery obligations, to JSC VTB Bank or another non-SDN assignee approved by OFAC ("VTB Bank");
   c. The subscription by Glencore or a Glencore subsidiary for En+ Global Depository Receipts representing 10.55% (67,420,324 shares) in newly issued Ordinary Shares of En+ in exchange for Amokenga Holdings Limited ("AHL") transferring to En+ AHL's shareholding in UC Rusal; and
   d. Completing the transfer of 1.64% of En+ shares (10,500,000) from Eclipse Star Holding Limited to the Liberi Foundation.

3. En+ will ensure that Orandy Capital Limited will not exercise its rights under a call option agreement in the shares of En+ held by Polina Yumasheva.

4. En+ agrees to create a board of directors of 12 directors. En+ will ensure that Deripaska will have the right to nominate no more than four of the 12 directors. The remaining eight directors (the "Barker Plan Directors") will not be nominated by Deripaska, are independent from Deripaska, and were identified using executive search firms utilizing a vetting process to confirm that candidates have no business, professional, or family ties to Deripaska or any other Specially Designated National. Specifically, the initial independent board members were identified through a search process conducted by (i) an independent, non-Russian executive search firm (for non-Russian nominees) under criteria that included having no professional or personal connections with Deripaska; and (ii) an independent Russian executive search firm (for Russian nominees) under criteria that included: not having been employed by En+, Rusal, or Basic Element; having no business relationship with En+, Rusal, or Basic Element or their owners; and having no family ties with the companies' owners or executives.

5. Directors nominated by Deripaska will be prohibited from serving on En+'s Audit Committee, as well as its Nominations Committee.

6. En+ will ensure that the voting rights of the Liberi Foundation (1.64%), Volnoe Delo (3.22%), Orandy Capital Limited (1.78%), VTB Bank (14.33%), Polina Yumasheva (5.19%), and Valentin Yumashev (1.57%) are assigned to an independent third party. The independent third party will have no personal or professional ties to Deripaska.

7. En+ will certify that it has not granted Deripaska or any of his relatives any rights beyond those of ordinary shareholders with respect to En+ and any entity owned or controlled by En+, except for the right of Deripaska to nominate four of the 12 directors on the board of En+ as described in Paragraph A.4.

DERIPASKA_0213

Exhibit 3

8. En+ will enter into a deed letter approved by OFAC that adequately reflects the terms of this Agreement and commitments by Deripaska needed for de-listing of the petitioners.

9. En+ will ensure that Deripaska will agree explicitly in the deed letter not to act in any manner or to enter into any arrangement, whether by contract, trust, or otherwise, that directly or indirectly provides Deripaska with the ability to exercise a controlling influence over the management or policies of En+ or any entity owned or controlled by En+, including Rusal and ESE.

10. Future shareholder dividend payments to Deripaska or any entity owned 50 percent or more by Deripaska, by En+, or any entity owned or controlled by En+ will be placed in a blocked account or an escrow account approved by OFAC. Dividend payments by En+ to persons not on the SDN List who are not owned 50 percent or more by Deripaska, including VTB Bank, and any revenue from the sale of En+ shares pursuant to the VTB Transaction, as described in the En+ submission of July 20, 2018, are not within the scope of the above limitation in this paragraph.

11. En+ will provide OFAC with the final report of the audit commissioned by Lord Barker of En+'s and Rusal's engagements with and obligations to Deripaska and any Deripaska-controlled entities. En+ will also provide OFAC with any future final reports of audits undertaken consistent with Paragraph C.5.a of this Agreement.

12. En+ will comply with the following certification and reporting requirements:

    a. En+ will certify on a monthly basis that En+ remains in compliance with all elements of this Agreement and that none of the changes required by this Agreement have been reversed by the petitioners.

    b. En+ will certify that any engagements or obligations between En+ or Rusal and Deripaska identified in the audit report referenced in Paragraph A.11 or identified pursuant to an audit undertaken consistent with the commitment in Paragraph C.5.a have been terminated or, if not terminated, will report to OFAC on why such engagements and obligations do not constitute control by Deripaska over En+ or Rusal.

    c. En+ will submit copies of its regular company quarterly reports to OFAC.

    d. En+ will submit copies of its board minutes to OFAC, with approval to redact those portions that raise concerns with protection of personal data and/or sensitive proprietary or commercial information, and with a certification from the board chairman that any such redacted material does not relate to an issue pertinent to compliance with this Agreement. At OFAC's request, En+ will provide copies of its board minutes removing any redactions identified by OFAC.

    e. To the extent that there are anticipated changes in the composition of the Barker Plan Directors of En+, En+ will immediately notify OFAC of any such anticipated change and describe the process for the identification and selection of replacement candidates, which must be consistent with this Agreement insofar as it shall rely on an independent executive search company to identify qualified, independent candidates with no business, professional, or family ties to Deripaska

3

DERIPASKA_0214

Exhibit 3

or any other Specially Designated National. Any such submission will be accompanied by a certification from En+ that the identification and selection process was consistent with this Agreement and that any replacement Barker Plan Director has no business, professional, or family ties to Deripaska or any other Specially Designated National.

f. To the extent that there are anticipated changes to the identity of any independent third party assigned voting rights in relation to En+ as part of the fulfillment of the conditions of this Agreement, En+ will immediately notify OFAC of any such anticipated change and describe the process for the identification and selection of the replacement independent third party. Any such submission will be accompanied by a certification from En+ that the selected individual has no business, professional, or family ties to Deripaska or any other Specially Designated National.

g. To the extent that there are anticipated changes in ownership of any shares for which this Agreement provides for the assignment of the associated voting rights to an independent third party, En+ will immediately notify OFAC of such anticipated change of ownership and certify that the anticipated change in ownership is consistent with the commitments contained in this Agreement, including Deripaska's commitment not to increase his direct and indirect shareholdings in En+ beyond 44.95%.

h. To the extent that there are anticipated changes to any constituent documents of any of the petitioners, En+ will immediately notify OFAC of such anticipated changes and certify that the anticipated changes are consistent with the commitments contained in this Agreement.

i. To the extent that the board seated consistent with this section affirmatively votes to authorize the change of incorporation to Russia from any other jurisdiction of any entity owned or controlled by En+, including En+ and Rusal, En+ will provide immediate notice of such vote to OFAC,

En+ will direct all submissions made pursuant to this provision to OFAC's Office of Global Targeting.

13. En+ will agree to respond fully and expeditiously to any request for information from OFAC regarding En+'s compliance with any of the elements of this Agreement and general compliance with sanctions regulations. If OFAC provides En+ with information that bears on En+'s compliance with any of the elements of this Agreement (including with respect to the independence of any of the Barker Plan Directors), En+ will expeditiously develop a proposed response to the information and submit that proposed response (including any response that calls for taking no action) to OFAC for review prior to implementation.

14. These requirements and conditions are to remain in place for as long as Deripaska remains on the SDN List.

15. No company owned or controlled by En+, including En+ and Rusal, will take any action causing its place of incorporation to change to Russia from any other jurisdiction without

4

Exhibit 3

an affirmative vote of the En+ board seated consistent with this section.

16. En+'s counsel has submitted to OFAC copies of all agreements, corporate resolutions, and other documents (collectively, "Documents") that will be executed to implement this Agreement and has attested that the Documents effectively implement the terms of this Agreement with respect to En+. En+'s counsel will submit to OFAC copies of the executed Documents within 10 days of their execution. En+ agrees not to amend the company's constituent documents or take any other corporate action in conflict with the agreed to plan and its requirements for as long as Deripaska remains on the SDN List. Nothing in this provision shall be construed to prevent En+ from amending the company's constituent documents or taking any other corporate action that is not in conflict with the TOR, consistent with the requirements of this section.

## B. En+ agrees to effect the following with respect to ESE:

1. The General Director of ESE will provide OFAC monthly certifications that he or she is not acting for or on behalf of Deripaska or any other Specially Designated National and that control over the actions, policies, and personnel decisions of ESE rests with the General Director of ESE and En+.

## C. Rusal and En+ agree to the following with respect to Rusal:

1. Following the implementation of the changes in shareholding described in Section A of this Agreement, the shareholding structure of Rusal will be as follows:

   a. En+: 56.88%
   b. SUAL Partners Ltd.: 22.50%
   c. Zonoville Investments Ltd.: 4.00%
   d. Amokenga Holdings (Glencore): 0.00%
   e. Oleg Deripaska: 0.01%
   f. Public Float: 16.61%

2. En+ will retain its right to nominate the CEO of Rusal. Should En+ and Rusal choose to modify the current shareholder agreement governing Rusal, they will submit a revised version of the shareholder agreement to OFAC prior to its adoption.

3. The board of directors of Rusal will consist of 14 directors: three (3) Executive Directors; three (3) Non-Executive Directors; and eight (8) Independent Non-Executive Directors (INED).

   Mr. Matthias Warnig will not be a member of the board. The Chairman of the Board of Rusal will be an INED. All INEDs will have no business, professional, or family ties to Deripaska or any other Specially Designated National. The Executive Directors and Non-Executive Directors of Rusal will have no business, professional, or family ties to Deripaska or any other Specially Designated National, other than their professional backgrounds as employees of Rusal or En+.

DERIPASKA_0216

Exhibit 3

4. If vacancies arise among the INEDs, the En+ board and the Chairman of the En+ board will rely on independent executive search firms to identify replacement candidates. Specifically, independent board members will be identified through a search process conducted by (i) an independent, non-Russian executive search firm (for non-Russian nominees) under criteria that include having no professional or personal connections with Deripaska or any other Specially Designated National; and (ii) an independent Russian executive search firm (for Russian nominees) under criteria that include: not having been employed by En+, Rusal, or Basic Element; having no business relationship with En+, Rusal, or Basic Element or their owners; and having no family ties with the companies' owners or executives.

5. En+ will exercise its effective control over Rusal to:

   a. Conduct auditing and monitoring on an annual basis to ensure that Rusal is not controlled by Deripaska or any other person or combination of persons on the SDN List and that there are no arrangements or mechanisms that might allow for direct or indirect control by any Specially Designated National or combination of Specially Designated Nationals.

   b. Utilize the authority of the En+ board as newly constituted consistent with Section A of this Agreement to ensure that the Rusal board remains independent of Deripaska and any other Specially Designated National.

   c. Effect that the short list of all candidates to become directors of the Rusal board in the future will be reviewed by the En+ Nominations Committee.

   d. Utilize the authority of En+ as majority shareholder, under the governing shareholder agreement and applicable law, to ensure that individuals who may be appointed in the future for a position on the Rusal board via the annual general meeting will act independently of Deripaska and any other Specially Designated National as long as he remains on the SDN List.

   e. Undertake reasonable efforts on a sustained basis to assure that as long as Deripaska remains on the SDN List, there are no board appointments, developments, or arrangements that would permit Deripaska or any other Specially Designated National to exercise control over Rusal.

   f. Require Rusal to adhere to recognized best practices of corporate governance, transparency, and accountability.

   g. Model Rusal's board leadership and accountability based on the standards of the Hong Kong Corporate Governance Code.

6. The Rusal board will pass a resolution affirming the governance principles and steps set forth herein in Section C of this Agreement.

7. Rusal will comply with the following certification and reporting requirements:

   a. The CEO and Chairman of the Board of Rusal will certify to OFAC on a monthly basis that they are not acting for or on behalf of Deripaska or any other Specially Designated National and that control over the actions, policies, and personnel decisions of Rusal rests with the Rusal board of directors and shareholders,

Exhibit 3

consistent with governing law.

b. Rusal will certify on a monthly basis that Rusal remains in compliance with all elements of this Agreement and that none of the changes required by this Agreement have been reversed by Rusal.

c. Rusal will submit copies of its regular company quarterly reports to OFAC.

d. Rusal will submit copies of its board minutes to OFAC, with approval to redact those portions that raise concerns with protection of personal data and/or sensitive proprietary or commercial information, and with a certification from the board chairman that any such redacted material does not relate to an issue pertinent to compliance with this Agreement. At OFAC's request, Rusal will provide copies of its board minutes removing any redactions identified by OFAC.

e. To the extent that there are anticipated changes in the composition of the board of directors of Rusal, Rusal will immediately notify OFAC of any such anticipated change and describe the process for the identification and selection of any replacement INED candidates, which must be consistent with this Agreement, insofar as it shall rely on an independent executive search company to identify qualified, independent INED candidates with no business, professional, or family ties to Deripaska or any other Specially Designated National. Any such submission will be accompanied by a certification from Rusal and En+ that the identification and selection process was consistent with this Agreement and that any replacement director meets the selection criteria described in Paragraph C.4, including that the replacement INED candidate has no business, professional, or family ties to Deripaska or any other Specially Designated National.

En+ and Rusal will direct all submissions made pursuant to this provision to OFAC's Office of Global Targeting.

8. Consistent with Paragraph A.10, and for the avoidance of doubt, future shareholder dividend payments to Deripaska or any entity owned 50 percent or more by Deripaska by Rusal or any entity it owns or controls will be placed in a blocked account or an escrow account approved by OFAC. Payments of dividends by Rusal to persons not on the SDN List who are not owned 50 percent or more by Deripaska are not within the scope of this limitation.

9. Rusal will agree to respond fully and expeditiously to any request for information from OFAC regarding Rusal's compliance with any of the elements of this Agreement and general compliance with sanctions regulations. If OFAC provides En+ or Rusal with information that bears on Rusal's compliance with any of the elements of this Agreement (including with respect to the independence of any of the INEDs), En+ or Rusal will expeditiously develop a proposed response to the information and submit that proposed response (including any response that calls for taking no action) to OFAC for review prior to implementation.

10. These requirements and conditions are to remain in place for as long as Deripaska remains on the SDN List.

7

Exhibit 3

## D. OFAC agrees to the following:

1. Following (1) the satisfaction by the petitioners of the conditions set forth above, with the exception of ongoing audit, certification, reporting, and other delisting requirements that will be satisfied on an ongoing basis, and with the exception of the Glencore transaction and board appointments (which will be satisfied as described in Paragraphs D.1.a and D.1.b), and (2) the execution of this Agreement by all parties, and consistent with the requirements of applicable law, OFAC will remove the petitioners from the SDN List.

   a. Due to Hong Kong securities regulatory requirements, the Glencore transaction described in TOR A.2.c may not be finalized until after the removal of the petitioners from the SDN List. En+ will have satisfied the condition of TOR A.2.c by the issuance of new En+ Ordinary Shares to achieve dilution of existing En+ shareholdings prior to removal from the SDN List, with the completion of the Glencore transaction to occur as soon as possible in accordance with the rules of the Hong Kong securities regulator.

   b. En+ board member appointments in TOR A.4 and Rusal board changes in TOR C.3, will occur within 15 business days after the removal of petitioners from the SDN List. Prior to the seating of the new boards of En+ and Rusal, the existing boards of En+ and Rusal will not take any action inconsistent with this Agreement.

2. OFAC will treat all information obtained or disclosed pursuant to this Agreement as confidential and will handle it consistent with the terms of applicable laws, including the Trade Secrets Act, the Privacy Act, and the Freedom of Information Act.

3. OFAC reserves the right to relist any or all of the petitioners to the extent that the change in circumstances represented by petitioners' entering into and adherence to the terms of this Agreement is reversed, including by a material breach of any of the conditions above.

4. Persons who are not U.S. persons who undertake transactions to implement the terms of this Agreement will not be subject to sanctions as a result of those transactions pursuant to Russia-related statutory sanctions authorities administered by the Department of the Treasury.

DERIPASKA_0219

Exhibit 3

E. The parties agree to the following:

1. The parties agree that this document reflects and represents the entire understanding and agreement between the parties. Any modification or amendment shall not be effective unless made in writing and executed by the parties.

2. The parties agree that no statement, representation, or promise made in this Agreement shall be treated or used as an admission of liability by the parties.

AGREED:

Rt. Hon. Lord Barker of Battle
Chairman of the Board
En+ Group plc
On behalf of En+ Group plc and JSC EuroSibEnergo

19.12.18
Date

Evgenii Nikitin
CEO and Director
UC Rusal plc

18.12.18
Date

Andrea M. Gacki
Director
Office of Foreign Assets Control
U.S. Department of the Treasury

December 19, 2018
Date

9

DERIPASKA_0220

Exhibit 4



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case ID: UKRAINE-EO13662-16174

Ferrari & Associates P.C.
1455 Pennsylvania Ave. NW, Suite 400                    **NOV 1 3 2019**
Washington, DC 20004
Email: ferrari@falawpc.com

Dear Mr. Ferrari:

Thank you for request, dated June 27, 2019, seeking the removal of your client, Oleg Deripaska, from OFAC's list of Specially Designated Nationals and Blocked Persons ("SDN List") under Executive Order 13662 (E.O. 13662).

In order for OFAC to properly evaluate your client's request for removal from the SDN List, please provide detailed responses to the following requests for information in a signed original statement submitted with documentation in support of the answers given:[1]

1. Please provide a comprehensive list of all companies in which Mr. Deripaska owns a stake of 25 percent or more and include a description of the operations of each of those companies and any subsidiaries of these companies.

2. Please provide OFAC with a list of all entities associated with the Russian energy sector, to include any entity involved in the generation or sale of power, with which Mr. Deripaska has any direct or indirect ownership interests or in which he has held board seats, directorships, advisory positions, or other senior roles since April 6, 2018. Please characterize the nature of his involvement with these entities.

3. Please confirm that Mr. Deripaska continues to hold a 44.95 percent stake in En+ and that Mr. Deripaska continues to vote 35 percent of his En+ shares, as specified in the Terms of Removal Agreement (TOR) with OFAC, paragraphs A.1 and A.2. Please also provide OFAC with a list of all occasions on which Mr. Deripaska has voted as an En+ shareholder, or taken any other action with respect to En+, since the company's removal from the SDN List.

4. Please provide OFAC with a list of all consultations directly related to the business of En+ between Mr. Deripaska and those En+ board members nominated by Mr. Deripaska: Vadim Geraskin, Ekaterina Tomilina, Elena Nesvetaeva, and Anastasia Gorbatova, since En+'s removal from the SDN List.

5. Please indicate whether Mr. Deripaska has continued to participate in domestic or international energy organizations or fora, such as the World Economic Forum, the

---

[1] Original statements and supplemental documents prepared in a language other than English should be accompanied by English translations.

1

Exhibit 4

APEC Business Advisory Council, or the North East Asian Region Electrical System Ties Initiative, or any other similar organization.

Please note that on August 2, 2017, U.S. Congress enacted Public Law 115-44, "Countering America's Adversaries Through Sanctions Act" (CAATSA), which provides for Congressional review of an action to terminate the application of sanctions provided for under Russia/Ukraine authorities codified in CAATSA section 222.

You may provide any additional information you deem appropriate that could assist OFAC in the review of your request. In the future, please direct all questions and correspondence related to your request to OFAC.Reconsideration@treasury.gov. You may also call 202-622-2420 or write to OFAC at the following mailing address:

> Office of Foreign Assets Control
> U.S. Department of the Treasury
> ATTN: Office of Global Targeting
> 1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
> Washington, D.C. 20220

Please reference Case ID UKRAINE-EO13662-16174 cited at the top of this letter in all future correspondence.

If you do not wish to provide responses to the questions above, or any other additional information, or if no such information is available, please submit to OFAC a response stating that no such information will be forthcoming. Failure to provide a response to this letter within 90 days may result in Treasury's denial and administrative closure of the matter, without prejudice to future requests. If you need additional time respond to the questions listed in this letter, please notify OFAC, in writing, specifying how much additional time you will need. Please be aware that OFAC may follow up this letter with additional questions and documentary requests. Thank you for your cooperation in the matter.

Sincerely,

Leila Baberi
Assistant Director
Global WMD, Mid-East, Eurasia Division
Office of Foreign Assets Control

2

DERIPASKA_0222

Exhibit 4

| From: | Erich Ferrari |
|---|---|
| To: | OFAC Reconsideration; Cartier, Nicholas |
| Cc: | Tyler Cullis |
| Subject: | UKRAINE-EO13662-16174--Oleg Deripaska-November 13, 2019 Questionnaire Response |
| Date: | Monday, January 6, 2020 8:41:03 PM |
| Attachments: | Oleg Deripaska OFAC Nov. 13, 2019 Questionnaire Response 1.5.20.pdf |

Dear Ms. Baheri,

Please find attached Oleg Deripaska's response to OFAC's November 13, 2019 Questionnaire issued in Case ID UKRAINE-EO13662-16174. A physical copy has been sent to OFAC via Federal Express tracking number #8148 6145 0063.

Thank you for your consideration and we look forward to your response.

--
Best,

Erich C. Ferrari
Ferrari & Associates, P.C.
1455 Pennsylvania Ave., NW
Suite 400
Washington, DC 20004
Phone:202.280.6370
Fax: 877.448.4885
email: ferrari@falawpc.com
https://hyperlink.services.treasury.gov/agency.do?origin=www.sanctionlaw.com
Twitter: https://hyperlink.services.treasury.gov/agency.do?
origin=https://twitter.com/FerrariLegal
LinkedIn: https://hyperlink.services.treasury.gov/agency.do?
origin=https://www.linkedin.com/pub/erich-ferrari/22/320/a06

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

DERIPASKA_0223



Exhibit 4

1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Tel. 202-280-6370
Fax. 877-448-4885

January 5, 2020

### SENT VIA EMAIL AND FEDERAL EXPRESS: # 8148 6145 0063

Leila Baheri
Assistant Director
Global WMD, Mid-East, Eurasia Division
Office of Foreign Assets Control
U.S. Department of the Treasury
ATTN: Office of Global Targeting
1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
Washington, D.C. 20220
Email: OFAC.Reconsideration@treasury.gov

Re:    **Response to OFAC's November 13, 2019 Questionnaire**
       *Case ID UKRAINE-EO13662-16174*

Dear Ms. Baheri:

On June 27, 2019, Oleg Deripaska sought a rescission of his designation under Executive Order ("E.O.") 13662 and the removal of his name from the List of Specially Designated Nationals and Blocked Persons ("SDN List") maintained by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"). That request was made pursuant to 31 C.F.R. §§ 589.101 and 501.807.

On November 13, 2019, OFAC sent undersigned counsel a questionnaire to assist it in "properly evaluat[ing] [Deripaska's] request for removal from the SDN List."[1] OFAC's questionnaire immediately followed Mr. Deripaska's filing of a Motion for Leave to File a Supplemental Pleading in Case No. 1:19-cv-00727-APM in the U.S. District Court for the District of Columbia.

Following briefing on that motion, OFAC notified Mr. Deripaska of its intent to reach a decision on his pending delisting petition within sixty (60) days of receiving a response to the questionnaire or a written indication that Mr. Deripaska does not intend to provide a response to the questionnaire. Below, Mr. Deripaska submits his response to the questionnaire, reiterating his

---

[1] Letter from Leila Baheri to Erich C. Ferrari (Nov. 13, 2019).

DERIPASKA_0224

Exhibit 4

arguments in support of his delisting petition and providing additional arguments that demonstrate that Mr. Deripaska does not meet the criteria for designation under E.O. 13662.

**I.     Responses to OFAC's November 13, 2019 Questionnaire**

1.     Please provide a comprehensive list of all companies in which Mr. Deripaska owns a stake of 25 percent or more and include a description of the operations of each of those companies and any subsidiaries of these companies.

**RESPONSE:** This question is not relevant to the arguments advanced in Mr. Deripaska's delisting petition, nor to the basis for the determination for his designation under E.O. 13662 as reflected by the administrative record compiled in support of that designation. Accordingly, he objects to this question.

Under OFAC's delisting procedures, a designated person may seek the rescission of their designation by submitting arguments or evidence establishing that an insufficient basis exists for the designation or by proposing remedial measures that would negate the basis for the designation.[2] In adjudicating such a request, OFAC reviews information submitted by the designated party to determine whether the bases for the designation remain applicable.[3] In doing so, OFAC "may request clarifying, corroborating, or other additional information" from the designated party when reviewing this information.[4]

The delisting petition submitted by Mr. Deripaska in this matter is consistent with these procedures, as the information presented in that request demonstrates that an insufficient basis for the E.O. 13662 designation exists given that the circumstances resulting in the designation no longer apply.[5] OFAC's question—which seeks information regarding all companies in which Mr. Deripaska maintains an ownership interest of 25% or greater—has no relevance to the delisting petition submitted to OFAC in this reconsideration matter. Specifically, it does not seek clarification or corroboration of, and is not otherwise seeking additional information relevant to, the arguments and evidence submitted by Mr. Deripaska in support of his assertion of changed circumstances. For this reason, Mr. Deripaska objects to this question as it has no bearing on OFAC's ongoing consideration of Mr. Deripaska's delisting request.

---

[2] 31 C.F.R. § 501.807(a).
[3] 31 C.F.R. § 501.807(b).
[4] *Id.*
[5] 31 C.F.R. § 501.807.

2

Exhibit 4

2.    Please provide OFAC with a list of all entities associated with the Russian energy sector, to include any entity involved in the generation or sale of power, with which Mr. Deripaska has any direct or indirect ownership interests or in which he has held board seats, directorships, advisory positions, or other senior roles since April 6, 2018. Please characterize the nature of his involvement with these entities.

**RESPONSE:** Mr. Deripaska objects to this question, as it is not relevant to the evidence and arguments presented in his delisting petition submitted in this matter.

For reasons similar to those described above, OFAC's question does not seek clarification or corroboration of, nor additional information relevant to, the evidence and arguments submitted by Mr. Deripaska in his delisting petition. Instead, OFAC seeks information regarding Mr. Deripaska's involvement in the power sector of the economy of the Russian Federation. As argued in the delisting petition submitted in this matter, OFAC's conflation of the energy and power sectors for purposes of supporting a designation under E.O. 13662 is not supported by law. Further, this question does not seek to clarify, corroborate, or obtain additional information concerning that argument, but rather seeks factual information on Mr. Deripaska's involvement in the power sector of the economy of the Russian Federation. That information has no legal relevance to the designation criteria of E.O. 13662 and has no connection to the basis for determination of Mr. Deripaska's designation as reflected in the administrative record compiled in support of that designation.

3.    Please confirm that Mr. Deripaska continues to hold a 44.95 percent stake in En+ and that Mr. Deripaska continues to vote 35 percent of his En+ shares, as specified in the Terms of Removal Agreement (TOR) with OFAC, paragraphs A.1 and A.2. Please also provide OFAC with a list of all occasions on which Mr. Deripaska has voted as an En+ shareholder, or taken any other action with respect to En+, since the company's removal from the SDN List.

**RESPONSE:** Mr. Deripaska continues to act consistent with the Terms of Removal Agreement ("TOR") entered into by OFAC, En+, RUSAL, and ESE, as well as the deed letter to which his agreement constituted an integral part of the TOR. By virtue of the TOR, OFAC determined that En+, RUSAL, and ESE no longer met the criteria for

Exhibit 4

designation under E.O. 13662, as the entities were no longer determined to be owned or controlled by Mr. Deripaska.

As reflected in the administrative record compiled in support of Mr. Deripaska's E.O. 13662 designation, OFAC predicated the designation on Mr. Deripaska's prior ownership of companies purportedly operating in the energy sector—though the companies do not, in fact, operate in the energy sector—specifically ESE, which was 100% held by En+. OFAC, however, has already made a finding—through its agreement to and execution of the TOR—that Mr. Deripaska no longer owns nor controls En+ or ESE. Accordingly, neither Mr. Deripaska's remaining interest in En+ nor acts carried out in a manner consistent with the TOR can reasonably serve as a basis under which to determine that the circumstances underlying his E.O. 13662 designation still apply. Accordingly, this question calls for information that is irrelevant to the evidence and arguments advanced by Mr. Deripaska's delisting petition and therefore is objected to.

    4.      Please provide OFAC with a list of all consultations directly related to the business of En+ between Mr. Deripaska and those En+ board members nominated by Mr. Deripaska: Vadim Geraskin, Ekaterina Tomilina, Elena Nesvetaeva, and Anastasia Gorbatova, since En+'s removal from the SDN List.

**RESPONSE:** Mr. Deripaska objects to this question, as it does not seek clarification or corroboration of, nor seeks other information relevant to, the information or arguments advanced by Mr. Deripaska in support of his delisting petition. In his delisting petition, Mr. Deripaska argued, *inter alia*, that there has been a change of circumstances negating the basis for his designation under E.O. 13662 insofar as:

    (1)      OFAC's determination that Mr. Deripaska operates in Russia's energy sector and therefore meets the criteria for designation under E.O. 13662 was predicated on Mr. Deripaska's ownership and control over En+; and

    (2)      OFAC has made a determination that Mr. Deripaska no longer exercises ownership or control with respect to En+ and that En+ no longer meets the criteria for designation under E.O. 13662.

As reflected in the administrative record compiled in support of Mr. Deripaska's E.O. 13662 designation, OFAC predicated the designation on Mr. Deripaska's prior ownership of companies purportedly operating in the energy sector—when, in fact, they are not in that sector—through ESE, which was 100% held by En+. Thus, any contacts Mr. Deripaska may or may not have had with these individuals are irrelevant to the argument

Exhibit 4

presented in the delisting petition—i.e., that OFAC's finding the Deripaska no longer owns or controls En+ or ESE inherently negates the basis of his designation as identified in the administrative record. Therefore, Mr. Deripaska objects to this question.

5. Please indicate whether Mr. Deripaska has continued to participate in domestic or international energy organizations or fora, such as the World Economic Forum, the APEC Business Advisory Council, or the North East Asian Region Electric System Ties Initiative, or any other similar organization.

**RESPONSE**: Mr. Deripaska has not actively participated in domestic or international energy organizations or fora since the time of his April 6, 2018 designation to the date of this instant submission. Moreover, Mr. Deripaska did not participate in the World Economic Forum in either 2018 or 2019.

Mr. Deripaska remains the Russian economy's representative to the APEC Business Advisory Council, as his mandate is set to expire in 2022. He does not, however, intend to participate in the next event of the APEC Business Advisory Council scheduled for February 2020. Further, his delegate to this event does not intend to participate in panels related to the energy sector but will instead solely participate in matters related to climate change and other environmental issues, as well as regional trade matters. Mr. Deripaska's participation on the APEC Business Advisory Council is with respect to two specific working groups—"Regional Economic Integration" and "Sustainable Development."

In addition, Mr. Deripaska is not involved with the North East Asian Region Electric System Ties Initiative, as that idea was proposed and led by a representative of En+. Because Mr. Deripaska is no longer a majority owner of, or otherwise exercising control with respect to, En+, Mr. Deripaska has nothing further to do with that initiative.

Further, Mr. Deripaska's purported involvement in the World Economic Forum and his position on the APEC Business Advisory Council does not provide a rational basis by which to conclude that Mr. Deripaska operates in the energy sector of the Russian Federation's economy. Neither the World Economic Forum nor the APEC Business Advisory Council are, in any meaningful sense, "international energy organizations or fora," as their mandates are far broader in scope. Indeed, Mr. Deripaska's participation in both organizations has been the result of his interest in and concern for environmental issues, including global climate change.[6] OFAC's administrative record provides no

---

[6] Indeed, Mr. Deripaska's prior participation at the World Economic Forum has primarily focused on measures to combat global climate change. *See, e.g.*, World Economic Forum, Carbon Pricing Vital to Avoid Coal-Powered Climate Catastrophe (Jan. 18, 2017), https://www.weforum.org/press/2017/01/carbon-pricing-vital-to-avoid-coal-

Exhibit 4

reasoned basis by which to conclude that its factual allegations regarding his involvement with the World Economic Forum and the APEC Business Advisory Council independently support the agency's determination that Mr. Deripaska operates in the energy sector of the Russian Federation.

Because there has been a change in the circumstances resulting in Mr. Deripaska's designation, any purported evidence of Mr. Deripaska's continued or historic participation in domestic or international energy organizations or fora could not sustain a legal determination that Mr. Deripaska operates in the energy sector of the Russian Federation's economy.

## II.     Legal Analysis

### A.     Basis for Designation Under E.O. 13662

On April 6, 2018, OFAC designated Mr. Deripaska pursuant to E.O. 13662 for allegedly operating in Russia's energy sector, and placed his name on OFAC's Specially Designated Nationals and Blocked Persons List ("SDN List").[7] As a result, all property in which Mr. Deripaska has an interest that is or comes within U.S. jurisdiction is blocked and persons—U.S. and foreign—who transact or otherwise engage in dealings with Mr. Deripaska may be subject to designation or other U.S. sanctions.[8]

Based on the administrative record disclosed to Mr. Deripaska, OFAC determined that Mr. Deripaska "operates in the energy sector of the Russian Federation economy" based on the following findings:

- Mr. Deripaska "is involved in several World Economic Forum projects including ones on 'New Energy Architecture' and the 'Interaction between the Power Industry and Society.'"

- Mr. Deripaska—in his position on the APEC Business Advisory Council—"focuses on multiple issues including energy efficiency and energy security." During a February 12 meeting of the Council, Mr. Deripaska's representative "presented the North East Asian Region Electrical Systems Ties Initiative, whose goal is to improve ties between the power grids of Eastern Siberia, Northern and North Eastern China,

---

powered-climate-catastrophe/; World Economic Forum, UN Climate Deal Will Create Jobs and Growth: Global CEOs Pledge Support for Governments (Nov. 23, 2015), https://www.weforum.org/press/2015/11/un-climate-deal-will-create-jobs-and-growth-global-ceos-pledge-support-for-governments/.

[7] Press Release, U.S. Dep't of the Treasury, Office of Foreign Assets Control, Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity (April 6, 2018).

[8] See, e.g., 31 C.F.R. § 589.201; Exec. Order 13662 (March 20, 2014).

Exhibit 4

Japan, and South Korea through the creation of a transnational power grid in Northeast Asia."

▪ Mr. Deripaska-related companies "combined" all of the power assets under EuroSibEnergo plc—"[a]s of the date of the prospectus, EN+ Group owned 100 percent of EuroSibEnergo plc which in turn owned 100 percent of [ESE] in Russia." ESE "is the largest independent power company in Russia, operating power plants across Russia, and one of the largest hydropower generation companies in the world."

These findings comprise the full and complete factual basis underlying OFAC's determination that Mr. Deripaska "operates in the energy sector of the Russian Federation economy" and thus meets the criteria for designation under E.O. 13662.

### B.    Request for Reconsideration

On June 27, 2019, Mr. Deripaska requested a rescission of his designation under E.O. 13662 pursuant to OFAC's delisting procedures set forth at 31 C.F.R. § 501.807. Mr. Deripaska's delisting petition included information and documents demonstrating that he does not meet the criteria for designation under E.O. 13662, and his designation thereunder should be rescinded as a matter of law. Mr. Deripaska argued both there was an insufficient basis for OFAC's designation and, in the alternative, that there had been a change in circumstances negating the basis for his designation. These arguments were made consistent with OFAC's delisting procedures.

#### i.    Insufficient Basis for Designation

Mr. Deripaska argued that OFAC's findings in support of its determination were both factually and legally insufficient to support the E.O. 13662 designation. First, Mr. Deripaska noted that OFAC's finding that Mr. Deripaska "is involved in several World Economic Forum projects related to energy" fails to provide a reasoned basis for determining that Mr. Deripaska "operates in the energy sector of the Russian Federation economy," insofar as Mr. Deripaska's purported "involvement" in the WEF projects merely involve his participation in conferences and panel discussions. Mr. Deripaska's participation in WEF conferences and panel discussions, however, does not rationally evidence his operation in Russia's energy sector, and Mr. Deripaska has not and does not intend to participate on any energy-related panels at the World Economic Forum in the future.

Second, Mr. Deripaska contended that OFAC's finding that he "focuses on multiple issues including energy efficiency and energy security . . . in his position on the APEC Business Advisory Council" also fails to support its conclusion that Mr. Deripaska operates in Russia's

7

Exhibit 4

energy sector. For instance, OFAC alleges that Mr. Deripaska's representative made a presentation at the February 2012 meeting of the APEC Business Advisory Council in which a regional initiative for the creation of a transnational power grid was proposed. Even assuming *arguendo* that this factual claim was true, OFAC undertakes no effort to show how the mere proposal of this regional initiative supports a legal conclusion that Mr. Deripaska operates in the energy sector of the Russian Federation's economy. Moreover, the APEC Business Advisory Council is not an international energy organization or fora in any meaningful sense, as its purpose is far broader in scope. Indeed, as discussed above, Mr. Deripaska's involvement with the APEC Business Advisory Council stems primarily from his interest in, and concern over, environmental issues, including global climate change.

Third, and most critically, Mr. Deripaska argued that OFAC had erred in considering Mr. Deripaska's purposed involvement in the power sector of the Russian economy as evidence of his operation in Russia's energy sector. Indeed, OFAC has never previously indicated that it views involvement in the power sector of an economy to be equivalent to involvement in the energy sector of an economy. Mr. Deripaska evidenced that the U.S. government had consistently viewed the "energy sector" to be exclusive of power or electricity generation and that OFAC had only identified oil- and gas-related companies in its sectoral sanctions targeting the energy sector of the Russian Federation economy prior to its designation of Mr. Deripaska.

### ii.   Change in Circumstances

Furthermore, Mr. Deripaska argued that there had been a change in the circumstances resulting in his designation. As noted above, Mr. Deripaska's E.O. 13662 designation was largely predicated on his ownership and control over En+ through which he was alleged to have had a controlling interest in ESE, which according to OFAC, was "the largest independent power company in Russia." As OFAC is aware and has admitted, however, Mr. Deripaska no longer exercises ownership or control with respect to En+ and does not have control of ESE. For this reason, the factual circumstances resulting in Mr. Deripaska's designation have fundamentally changed and no longer apply.

Both En+ and ESE were originally designated under E.O. 13662 for being owned or controlled by Mr. Deripaska or entities over which Mr. Deripaska exercised ownership or control.[9] OFAC, however, rescinded the E.O. 13662 designation of En+ and ESE, determining that neither En+ nor ESE were any longer owned or controlled by Mr. Deripaska or his companies following entrance into the TOR.[10] In light of the TOR, Mr. Deripaska argued that the

---

[9] Press Release, U.S. Dep't of the Treasury, Office of Foreign Assets Control, Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity (April 6, 2018).

[10] Press Release, U.S. Dep't of the Treasury, Office of Foreign Assets Control, OFAC Delists En+, Rusal, and EuroSibEnergo (Jan. 27, 2019).

Exhibit 4

circumstances underlying his E.O. 13662 designation are no longer applicable, as the factual basis for that designation was predicated on his ownership and control over En+ through which he was alleged to exercise control over ESE.

## III.    Conclusion

For the foregoing reasons, Mr. Deripaska respectfully reiterates his request that OFAC take immediate steps to rescind his designation under E.O. 13662, as the circumstances resulting in his designation no longer apply, and there is otherwise an insufficient basis exists for that designation. If OFAC seeks clarification or corroboration of, or additional information with respect to, the evidence and arguments presented in Mr. Deripaska's delisting petition, Mr. Deripaska expresses his good-faith intent to provide responses to those requests.

Thank you for your consideration, and we look forward to your response.

Sincerely,

Erich C. Ferrari

DERIPASKA_0232



Exhibit 7
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Tel. 202-280-6370
Fax. 877-448-4885

February 21, 2020

## SENT VIA EMAIL AND FEDERAL EXPRESS: # 8155 6107 4480

United States Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Avenue, NW (Annex)
Washington, D.C. 20220

**Re:** **Response to OFAC's February 14, 2020 Questionnaire[1]**
*Oleg Deripaska—Case ID UKRAINE-EO13662-16174*

Dear OFAC Reconsideration:

      This letter responds to the United States Department of the Treasury's Office of Foreign Assets Control's ("OFAC") February 14, 2020 letter disagreeing with certain objections made in Oleg Deripaska's recent correspondence with OFAC and requesting that he provide responses to revised or restated questions from OFAC's November 13, 2019 Questionnaire. For the reasons described below, Mr. Deripaska reasserts those objections identified in his January 5, 2020 response to OFAC's questionnaire as those questions exceed the scope of the arguments provided in Mr. Deripaska's delisting petition filed in this matter.

### I.    Factual Background

      On June 27, 2019, Mr. Deripaska submitted a delisting petition seeking the rescission of his designation under Executive Order ("E.O.") 13662. That petition—which was made pursuant to, and consistent with, OFAC's delisting procedures—provided arguments and evidence establishing that an insufficient basis exists for the designation and that there had been a change in circumstances that rendered the designation inapplicable. For the reasons described in the petition, Mr. Deripaska requested OFAC take immediate steps to rescind his designation within 90 days from the date of his request, as the information provided in the petition evidenced that the basis for Mr. Deripaska's designation was no longer applicable.

---

[1] Because this request contains business information and/or other information of a sensitive nature, undersigned counsel respectfully requests that OFAC treat this correspondence confidentially. If OFAC believes that it is required to release this document or any of the information contained herein to the public pursuant to the Freedom of Information Act ("FOIA") or any other federal law, please notify undersigned counsel as soon as possible. Undersigned counsel intends to provide additional information in support of this request for confidentiality.

Exhibit 7

On June 28, 2019, OFAC acknowledged receipt of Mr. Deripaska's delisting petition and assigned the request Case ID UKRAINE-EO13662-16174. However, once the 90-day period requested by the delisting petition had passed with no response or substantive engagement from OFAC, Mr. Deripaska moved the United States District Court for the District of Columbia for leave to file a supplemental pleading in Case No. 1:19-cv-00727 (APM). That supplemental pleading sought to argue unreasonable delay with respect to OFAC's processing of the delisting petition.

Following Mr. Deripaska's motion for leave to file a supplemental pleading, OFAC issued a questionnaire with respect to Mr. Deripaska's delisting petition. OFAC's questionnaire, however, did not seek to clarify the information and arguments presented by Mr. Deripaska's delisting petition. Indeed, the questions posed by the questionnaire sought little information that could be deemed clarifying, corroborating, or in addition to the evidence and arguments advanced by Mr. Deripaska's delisting petition. Accordingly, Mr. Deripaska objected to a number of the questions posed by that questionnaire.

As a result of OFAC's issuance of a questionnaire, the parties entered into an agreement under which OFAC would withdraw its opposition to Mr. Deripaska's motion for leave to file a supplemental complaint. Further, OFAC agreed that it would "endeavor to reach a decision on the request for administrative reconsideration within 60 days of receiving a response to [OFAC's questionnaire] or receiving a written indication from [Mr. Deripaska] [that] he does not intend to respond."

On January 5, 2020, Mr. Deripaska submitted his responses to OFAC's November 13, 2020 Questionnaire. Of the five questions posed by that questionnaire, Mr. Deripaska objected to four of them. Mr. Deripaska's objections were based on the questions' lack of relevance to the information and arguments submitted in support of Mr. Deripaska's delisting petition. As Mr. Deripaska noted in those objections, under OFAC's delisting procedures, the agency "may request clarifying, corroborating, or other additional information" from a designated person when reviewing the information submitted by the person as part of their delisting request.[2]

On February 14, 2020, OFAC sent Mr. Deripaska a letter stating that the agency "disagrees with the rationale for [his] objections and considers [its] questions to be within the scope of his delisting petition and OFAC's reinvestigation into whether Mr. Deripaska still meets the criteria for designation." According to OFAC, "Mr. Deripaska's willingness to answer these questions truthfully will demonstrate his credibility and commitment to the delisting process." OFAC also noted that it had withdrawn Question No. 4 and replaced it with Question No. 4a.

---

[2] 31 C.F.R. § 501.807(b).

Exhibit 7

Mr. Deripaska reasserts his objections to OFAC's questions identified below, as he does not regard them as being within the scope of his delisting petition nor OFAC's mandate under its delisting procedures. Further, Mr. Deripaska notes that he was not under any obligation to answer the initial questionnaire at all but did so voluntarily. Indeed, as part of the agreement with DOJ to stay the proceedings, Mr. Deripaska was provided the option of notifying OFAC whether he would respond at all to the questionnaire.

## II.    Responses to February 14, 2020 Questionnaire

2.    Please provide OFAC with a list of all entities associated with the Russian energy sector, to include any entity involved in the generation or sale of power, with which Mr. Deripaska has any direct or indirect ownership interests or in which he has held board seats, directorships, advisory positions, or other senior roles since April 6, 2018. Please characterize the nature of his involvement with these entities.

**RESPONSE:** Mr. Deripaska reasserts his objection to this question on the same grounds identified in his prior questionnaire response dated January 5, 2020.

Mr. Deripaska does not consider that En+ is properly characterized as an energy company; it is an electric utility company. Therefore, he does not have any interests in Russia's energy sector. Any interest that he has had or maintains in entities associated with Russia's electric utility sector are solely through his interest in En+.

As OFAC is aware, pursuant to the December 19, 2018 Terms of Removal Agreement ("TOR") and the associated deed letter, Mr. Deripaska holds a 44.95 percent equity interest in En+ (35 percent voting interest) and appoints four out of twelve board members. He cannot provide any further information with respect to those entities as the entities are run by an independent board chaired by Lord Barker. For additional information, OFAC should consult with En+ management.

3.    Please confirm that Mr. Deripaska continues to hold a 44.95 percent stake in En+ and that Mr. Deripaska continues to vote 35 percent of his En+ shares, as specified in the Terms of Removal Agreement (TOR) with OFAC, paragraphs A.1 and A.2. Please also provide OFAC with a list of all occasions on which Mr. Deripaska has voted as an En+ shareholder, or taken any other action with respect to En+, since the company's removal from the SDN list.

Exhibit 7

**RESPONSE:** Mr. Deripaska reasserts his objection to this question on the same grounds as identified in his prior questionnaire response dated January 5, 2020.

As also noted in Mr. Deripaska's January 5, 2020 questionnaire response, he continues to act in manner consistent with the TOR. Therefore, he continues to hold a 44.95 percent stake in En+ and continues to vote 35 percent of his En+ shares as specified in the TOR.

4a.    Please provide OFAC with a list of all consultations between Mr. Deripaska and employees of En+, Rusal, and its subsidiaries, other than the four En+ board members nominated by Mr. Deripaska, since En+'s removal from the SDN list.

**RESPONSE:** Mr. Deripaska reasserts his objection to this question on the same grounds underlying his objection to Question #4 in OFAC's November 13, 2019 Questionnaire as identified in his January 5, 2020 response to that questionnaire.

5.    Please indicate whether Mr. Deripaska has continued to participate in domestic or international energy organizations or for a, such as the World Economic Forum, the APEC Business Advisory Council, or the North East Asian Region Electric System Ties Initiative, or any other similar organization.

**RESPONSE:** Mr. Deripaska provided a substantive response to this question in his January 5, 2020 Questionnaire Response to OFAC. Contrary to OFAC's indication otherwise, Mr. Deripaska did not previously raise an objection to this question.

### III.    Additional Information

Last week, the Daily Beast reported that, as of December 2019, the U.S. government was preparing to impose additional sanctions against Mr. Deripaska.[3] In reporting on these possible additional sanctions, the Daily Beast noted that the U.S. Treasury Department was seeking to impose these additional sanctions because they felt the current sanctions had not done enough to change Mr. Deripaska's behavior. This reporting is troubling for several reasons.

First, Mr. Deripaska entered into the deed letter associated with the TOR entered into by En+ Group plc, UC RUSAL plc, JSC EuroSibEnergo, and OFAC, thereby supporting the TOR's

---

[3] Exhibit A-Daily Beast Article, updated February 18, 2020.

Exhibit 7

implementation. By doing so, he did not impede OFAC's aims or policy objectives, and thus had not engaged in any conduct warranting additional sanctions.

Second, Mr. Deripaska is pursuing litigation to address legal issues arising from OFAC's initial designation of him under E.O. 13661. It is possible that, once those legal issues are resolved by the Court, Mr. Deripaska could return to OFAC with a delisting petition seeking a rescission of that designation. While Mr. Deripaska does not concede that he has ever acted or purported to act on behalf of Russian President Vladimir Putin, his actions since the time of his April 6, 2018 designation and his actions moving forward all have one aim—to proactively resolve his designation and address OFAC's concerns. It is unclear why OFAC and the U.S. government would continue to pursue action against Mr. Deripaska—as reported by the Daily Beast—when he is proactively and transparently addressing OFAC's allegations and concerns. The fact that OFAC and the U.S. Government would even be contemplating such an action demonstrates that they are not dealing with Mr. Deripaska in good-faith, and it is reasonable to infer that any future actions taken against him are being done either in retribution for the litigation, for challenging OFAC's initial action, or for objecting to OFAC's questioning.

Finally, when this reporting is considered in light of OFAC's questionnaire, it suggests that OFAC is not seeking information relevant to the delisting matter but is rather seeking information in order to identify and impose sanctions against other potential targets that OFAC views as having ties to Mr. Deripaska. This would be an inappropriate use of OFAC's delisting process and would support Mr. Deripaska's objections to the inquiries found in the November 13, 2019 questionnaire and OFAC's February 14, 2020 letter.

## IV. Conclusion

Mr. Deripaska respectfully reiterates his request that OFAC rescind his designation under E.O. 13662, as there is an insufficient basis for the designation and the circumstances resulting in the designation are no longer applicable. Mr. Deripaska, however, objects to inquiries that are outside the scope of that delisting petition and that appear aimed towards imposing additional consequences against Mr. Deripaska or others.

Thank you for your consideration, and we look forward to OFAC's decision.

Sincerely,

Erich C. Ferrari

5

DERIPASKA_0237

Exhibit 7

# EXHIBIT

# A

DERIPASKA_0238

2/21/2020     U.S. Readied Sanctions on Russian Oligarch Oleg Deripaska's Associates, Then Mysteriously Backed Off

Exhibit 7



**BEAST INSIDE**
**Dig Deeper**

**DAILY BEAST** ✈ **NEWSLETTERS**    JOIN    **LOG IN**

**CHEAT SHEET**   **JOIN NOW**    **ENTERTAINMENT**   **WORLD NEWS**   **HALF FULL**   **CULTURE**   **U.S. NEWS**   **INNOVATION**   **SCOUTED**   **TRAVEL**

# U.S. Readied Sanctions on Russian Oligarch's Associates—Then Mysteriously Backed Off

| CASHED OUT |————————————

"Somebody overruled [Treasury], essentially," one sanctions expert said. "That's the most likely scenario."

**Betsy Swan**   Updated Feb. 18, 2020 2:29PM ET
Political Reporter Published Feb. 14, 2020 4:36AM ET



EXCLUSIVE

## READ THIS LIST

**Ilhan Omar's Challenger Is Literally on the Run From the Law**
WILL SOMMER

**How Klobuchar's Signature Bill Became a Disaster for Dems**
SAM BRODEY

**Weinstein Jury Appears Deadlocked on Most Serious Charges**
PILAR MELENDEZ

**Roger Stone Judge Amy Berman Jackson Kicks A\*\***
MOLLY JONG-FAST

**Doomsday Mom of Missing Kids Arrested in Hawaii**
TRACY CONNOR

**JOIN**
**EXCLUSIVE CONTENT**
**MY ACCOUNT**
**LOG OUT**

DERIPASKA_0239



Exhibit 7

Something strange happened in mid-December involving Oleg Deripaska, the Russian oligarch.

Late last year, the U.S. government signaled that it was about to level a new round of sanctions targeting people and entities linked to Deripaska, according to two Western officials with knowledge of the communication. Back in April 2018, the U.S. sanctioned the oligarch, who once lent millions of dollars to convicted Trump campaign chief Paul Manafort as part of a decades-long relationship between the two men. Over the following months, Deripaska's allies made a deal with Treasury to limit

**JOIN**

**EXCLUSIVE CONTENT**

**MY ACCOUNT**

**LOG OUT**

DERIPASKA_0240

Exhibit 7



the sanctions on the oligarch
himself are still in place. In
the year since then, it's been
all quiet on the Deripaska
sanctions front.

Until December, that is.
What's strange is that despite
the signal, Treasury didn't
follow through and the
sanctions—which would have
targeted the unnamed people
and entities because of their
proximity to Deripaska—
didn't materialize. It's been
two months since the U.S.
indicated that the new
sanctions were about to come
out, and there's been no
movement from Treasury on
the oligarch. The two months
of inaction has stirred
suspicions of political
interference in the sanctions
process.

"Sanctions are part of foreign
policy, as directed by the
president of the United States
and political appointees that

**JOIN**
**EXCLUSIVE CONTENT**
**MY ACCOUNT**
**LOG OUT**

Exhibit 7



respond to requests for comment. A State Department spokesperson said Foggy Bottom does not preview specific sanctions actions and would not confirm or deny whether any specific person or entity was being considered for sanctions.

"We have and will continue to impose costs on Russia until it ceases its reckless behavior," the spokesperson added.

Brian O'Toole, formerly a senior official at OFAC, said the apparent freeze on pending Deripaska sanctions may be a case of political meddling. If Treasury canceled the sanctions because officials there thought Russian authorities were getting in line and rendering them unnecessary, then that could explain the pause, he said.

**JOIN**
**EXCLUSIVE CONTENT**
**MY ACCOUNT**
**LOG OUT**

Exhibit 7



pulling of the action suggests
that there was a political
decision to pull it, not a
technocratic decision,"
O'Toole added. "Somebody
overruled OFAC, essentially—
that's the most likely
scenario."

And Rep. Lloyd Doggett, a
Texas Democrat who has
focused on Deripaska, said
the news concerned him.

"In the latest episode of the
sordid spectacle of Trump
helping Putin, attempted
constraint of a Putin buddy
has apparently once again
been thwarted," he said in a
statement. "In previous
episodes, Trump granted
special treatment for
Deripaska. A strong
bipartisan House vote
resolved no way. Trump
sycophant McConnell blocks
the resolution shortly before
the announcement of a new
Russian aluminum plant in

**JOIN**

**EXCLUSIVE CONTENT**

**MY ACCOUNT**

**LOG OUT**



Putin is always right in the Trump Administration."

Deripaska, a Russian aluminum magnate with an estimated net worth of $4.5 billion, entered the Treasury Department's crosshairs in the wake of the Kremlin's campaign to shape American opinion about the 2016 election.

Manafort and Deripaska have known each other for more than a decade. Manafort said he represented Deripaska "on business and personal matters," per a statement to CNN. In 2005, according to the AP, Manafort pitched Deripaska on a public relations campaign that would "greatly benefit the Putin government."

**JOIN**
**EXCLUSIVE CONTENT**
**MY ACCOUNT**
**LOG OUT**



"Treasury's communication

Exhibit 7



**BEAST INSIDE**
**Dig Deeper**

**DAILY BEAST**   NEWSLETTERS   JOIN   **LOG IN**

| CHEAT SHEET | JOIN NOW | **ENTERTAINMENT** | **WORLD NEWS** | **HALF FULL** | **CULTURE** | **U.S. NEWS** | **INNOVATION** | **SCOUTED** | **TRAVEL** |

*sanctions likely indicates that as of mid-December, the department felt the current measures aren't doing enough to change the oligarch's behavior."*

**RELATED IN POLITICS**

    

| Manafort and Rudy's Indicted | Parnas Lawyer: Giuliani Delivered | Fox Can't Quit Rudy Giuliani, |

**JOIN**

**EXCLUSIVE CONTENT**

**MY ACCOUNT**

**LOG OUT**



2/21/2020    U.S. Readied Sanctions on Russian Oligarch Oleg Deripaska's Associates, Then Mysteriously Backed Off

Exhibit 7

NEWSLETTERS   JOIN   **LOG IN**

**CHEAT SHEET**   JOIN NOW   **ENTERTAINMENT**   **WORLD NEWS**   **HALF FULL**   **CULTURE**   **U.S. NEWS**   **INNOVATION**   **SCOUTED**   **TRAVEL**

complicated when, per 2014 Cayman Island court documents, Manafort came to owe Deripaska $19 million. Despite that, they appear to have kept an open communication channel during the 2016 presidential campaign. Manafort's spokesperson confirmed that he and an associate discussed sharing updates on the campaign with Deripaska during his time as chairman.

"If he needs briefings we can accommodate," Manafort wrote in one email.

On April 6, 2018, the department announced sanctions on Deripaska and En+ Group, a holding company that controlled Deripaska's Russian aluminum giant, Rusal. At the time of the sanctions, Deripaska was the majority shareholder of En+.

**JOIN**

**EXCLUSIVE CONTENT**

**MY ACCOUNT**

**LOG OUT**

The sanctions sent global

Exhibit 7



BEAST INSIDE
Dig Deeper

DAILY BEAST    NEWSLETTERS    JOIN    LOG IN

CHEAT SHEET    JOIN NOW    ENTERTAINMENT    WORLD NEWS    HALF FULL    CULTURE    U.S. NEWS    INNOVATION    SCOUTED    TRAVEL

Sweden—panicked about the impact sanctions would have. Then a mad scramble commenced to find a way to punish Deripaska without upending a major sector of the global economy. Lord Gregory Barker, the chairman of the board of En+, negotiated a deal with Treasury that purported to limit Deripaska's control of Rusal and EN+ in exchange for sanctions relief. Treasury signed on, and Deripaska began to unwind himself from En+.

But the deal immediately drew criticism. A document reviewed by *The New York Times* indicated that the agreement would let Deripaska and his allies maintain control of En+ while also letting him get out of nine figures' worth of debt.

On top of that, Rusal—the aluminum company that En+

**JOIN**
**EXCLUSIVE CONTENT**
**MY ACCOUNT**
**LOG OUT**

DERIPASKA_0247

Exhibit 7



who regularly appeared on Russian state TV and defended Putin's invasion of Ukraine, as The Daily Beast first reported.

The addition of Thomas was viewed as an apparent effort by Rusal to poke the U.S. in the eye; Treasury specifically said Russia's enabling of Syrian President Bashar al-Assad's chemical weapons attacks on civilians was part of the reason for the new sanctions. Thomas, however, had pushed conspiracy theories trying to exonerate Assad from responsibility for those very chemical weapons attacks. Two weeks after The Daily Beast story ran, he was kicked off Rusal's board at the orders of Treasury, per the company.

Treasury's communication about plans for additional sanctions likely indicates that as of mid-December, the

**JOIN**
**EXCLUSIVE CONTENT**
**MY ACCOUNT**
**LOG OUT**

Exhibit 7



BEAST INSIDE
Dig Deeper
CHEAT SHEET
JOIN NOW
ENTERTAINMENT   WORLD NEWS   HALF FULL   CULTURE   U.S. NEWS   INNOVATION   SCOUTED   TRAVEL

NEWSLETTERS   JOIN   LOG IN

that followed got Treasury officials to change their minds or if intervention from some outside force kept them from following through.

*UPDATE 2/18/2020: A spokesperson for Deripaska passed along the following letter from the oligarch.*

*Dear Ms. Swan, I am not going to comment on your bizarre political fantasies regarding the US Treasury's collective thought processes.*

*What does concern me is that the article repeats a number of defamatory and simply false allegations. It is a matter of public record that I have not had any dealings with Paul Manafort for several years — long before the 2016 US presidential election — as even some cursory desktop research would have revealed. The only indirect contact has been via my representatives*

**JOIN**
**EXCLUSIVE CONTENT**
**MY ACCOUNT**
**LOG OUT**

DERIPASKA_0249



 NEWSLETTERS    JOIN    **LOG IN**

**CHEAT SHEET**  **JOIN NOW**  **ENTERTAINMENT**  **WORLD NEWS**  **HALF FULL**  **CULTURE**  **U.S. NEWS**  **INNOVATION**  **SCOUTED** **TRAVEL**

*I see how it might be inconvenient for you to acknowledge this point. Without the alleged links to Manafort during the election period, your whole argument falls apart. Evidently, you decided not to let facts get in the way of what you saw as a good story.*

*I therefore ask you to publish this letter and amend the article to clearly reflect my position.*

*Sincerely,*

*Oleg Deripaska*



**Betsy Swan**
Political Reporter
🐦 @woodruffbets
✉ betsy.woodruff@thedailybeast.com

Got a tip? Send it to The Da

**JOIN**

**EXCLUSIVE CONTENT**

**MY ACCOUNT**

**LOG OUT**

2/21/2020                    U.S. Readied Sanctions on Russian Oligarch Oleg Deripaska's Associates, Then Mysteriously Backed Off

Exhibit 7



**Advertise With Us**

ABOUT  CONTACT  TIPS  JOBS  HELP  PRIVACY  CODE OF ETHICS & STANDARDS  TERMS & CONDITIONS  COPYRIGHT & TRADEMARK

SITEMAP  COUPONS

© 2020 The Daily Beast Company LLC

DERIPASKA_0251

# Oleg**Deripaska**

Home    About Oleg Deripaska    Business    Charity    Initiatives

Hot topic    Fighting Ebola



"Without a significant change of thinking and a better understanding of the opportunities that integration with Asia can bring to Russia, development will be limited."

---

**World Economic Forum**

APEC Business Advisory Council

Developing Eastern Siberia and the Far East

Russian Union of Industrialists and Entrepreneurs

Supporting Russian Education and Science

Climate change regulation initiatives

Fighting the spread of the Ebola virus

Public—private partnership with Rusal: Ebola response initiative in the Republic of Guinea

Oleg Deripaska and Rusal's public—private partnership: Ebola response

Rusal and Russia develop Ebola vaccine

Rusal's Guinea Ebola response

Rusal's Ebola response in Guinea: building the CEMRT

Rusal's public—private partnership in Guinea: stopping Ebola in its tracks

Public health in Guinea: the

Oleg Deripaska has regularly participated in the annual meetings of the World Economic Forum in Davos since the late 1990s. These meetings have become the main event of the Forum which brings together around 1,000 companies and organisations from all over the world. Basic Element is a strategic partner of the forum - the highest level of cooperation with the World Economic Forum that a business organisation can have. Oleg Deripaska's key companies actively participate in the WEF's industry groups and are involved in a number of WEF initiatives. UC RUSAL, the world's leading aluminium company, participates in the work of the Mining and Metals Group.

As part of his work in the Group, Oleg Deripaska discusses current industry situations with other key players in the market, helping to develop a strategy for the industry, defining procedures for cross-industry interaction and developing standard approaches to tackle global problems. In 2010 Oleg Deripaska was elected to the Management Council of the Group.

En+ Group, a leading Russian diversified power and metals group of companies, participates in the work of the Energy, Utilities and Technology group ✉ . As part of the work in the group Oleg Deripaska is involved in several projects, such as the New Energy Architecture and the Interaction between the Power Industry and Society.

In his work in the WEF, Oleg Deripaska devotes special attention to climate change. He is one of the 16 business leaders who developed the CEO Climate Policy Recommendations to G8 Leaders, a document that summed up proposals and recommendations on how to counter global warming. This document was developed as part of the Gleneagles Dialogue group and was signed by the CEOs of the 100 largest companies of the world. These recommendations were presented to G8 leaders at the G8 summit in Japan in July 2008.

Oleg Deripaska was also part of the WEF's Task Force on Low Carbon Prosperity, which brought together representatives of business and science. The task force interacted with the governments of leading nations of the world to prepare climate change discussions in Copenhagen in December 2009.

Oleg Deripaska also supported the global Partnering Against Corruption Initiative ✉ (PACI). This initiative was proposed by the CEOs of companies

Vision

Interview

DERIPASKA_0365

Exhibit 22
http://www.deripaska.com/initiative/

Ebola crisis and Rusal's
public–private partnership

Rusal boosts Guinea's
sustainable development

Foreign direct investment (FDI)
in Guinea

Public–private partnerships
(PPPs) help Guinea grow

Rusal corporate social
responsibility (CSR)

How Rusal is using public–
private partnerships around the
world

Fighting Ebola: part of Rusal's
commitment to sustainability

How Rusal helps Guinea use
bauxite mining to push forward
with development

How sustainable mining is
helping Guinea build a
sustainable future

Public–private partnerships:
Driving force of the developing
world

Racing against time on Ebola
vaccine research

Guinea and Kindia reap benefits
of mining

Rusal takes the lead in Ebola
research

Rusal's social projects support
development in Guinea

operating in all industries with the aim of consolidating the business
community's efforts to counter corruption.

DERIPASKA_0366

Exhibit 22
http://www.deripaska.com/initiative/

# Oleg**Deripaska**



Home   About Oleg Deripaska   Business   Charity   **Initiatives**

Hot topic   Fighting Ebola



"Without a significant change of thinking and a
better understanding of the opportunities that
integration with Asia can bring to Russia,
development will be limited."

---

World Economic Forum



Developing Eastern Siberia and
the Far East

Russian Union of Industrialists
and Entrepreneurs

Supporting Russian Education
and Science

Climate change regulation
initiatives

Fighting the spread of the Ebola
virus

Public-private partnership with
Rusal: Ebola response initiative
in the Republic of Guinea

Oleg Deripaska and Rusal's
public-private partnership
Ebola response

Rusal and Russia develop Ebola
vaccine

Rusal's Guinea Ebola response

Rusal's Ebola response in
Guinea: building the CEMRT

Rusal's public-private
partnership in Guinea: stopping
Ebola in its tracks

Public health in Guinea: the

## APEC Business Advisory Council

The APEC Business Advisory Council was set up in November 1995. The Council was supposed to prepare recommendations on how to carry out the Osaka action plan and achieve APEC's other tasks. The Business Advisory Council is a key organisation through which the Forum interacts with the business community. Every year the Business Advisory Council offers recommendations to APEC summits on how to implement its programmes. Members of the Business Advisory Council are appointed by the leaders of their countries.

In 2004 Oleg Deripaska was appointed to represent Russia in the Council for the first time. His status was confirmed twice in 2007 and in 2010. In 2007 Oleg Deripaska became chair of the Russian section of the Council.

As part of his work on the Council, Oleg Deripaska focuses primarily on energy efficiency and energy security, international trade, refinement of financial instruments and regulations, food availability and sustainable development. In 2005 Oleg Deripaska supported an anti-corruption initiative proposed by the US section of the APEC Business Advisory Council.

At this year's first meeting of the Business Advisory Council in Hong Kong in February 2012, Oleg Deripaska's representative presented the North East Asian Region Electrical System Ties initiative (NEAREST). The goal of this initiative is to improve ties between the power grids of Eastern Siberia, Northern and North Eastern China, Japan, the Republic of Korea and other countries in the region. The name was suggested by a consortium of Russian, Korean and Japanese R&D institutes in 2008. In practice NEAREST proposes creating a transnational power grid in North Eastern Asia with a total capacity of up to 200 GW by building connecting power transmission lines and laying underwater cables. Modern technology makes it possible to exchange electricity between grids and compensate daily and seasonal imbalances in the production and consumption of electric power.

Due to differences in time zones and climates the peak loads in neighbouring grids occur at different times, so it would make sense to connect them up into a single mega-grid. Once this is done, it will be possible to produce cheaper, safer and more environmentally friendly electricity for all the economies in North Eastern Asia. In addition, NEAREST

---

Vision

Interview

DERIPASKA_0367

Exhibit 22
http://www.deripaska.com/initiative/

Ebola crisis and Rusal's
public–private partnership

Rusal boosts Guinea's
sustainable development

Foreign direct investment (FDI)
in Guinea

Public–private partnerships
(PPPs) help Guinea grow

Rusal corporate social
responsibility (CSR)

How Rusal is using public–
private partnerships around the
world

Fighting Ebola: part of Rusal's
commitment to sustainability

How Rusal helps Guinea use
bauxite mining to push forward
with development

How sustainable mining is
helping Guinea build a
sustainable future

Public–private partnerships:
Driving force of the developing
world

Racing against time on Ebola
vaccine research

Guinea and Kindia reap benefits
of mining

Rusal takes the lead in Ebola
research

Rusal's social projects support
development in Guinea

will allow participating countries to help each other out in emergencies.

A pilot project to test out NEAREST concepts is a 400 km long 500 KW set
of power transmission lines with a total output of 1GW, connecting Eastern
Siberia and North Eastern China.

The best examples of similar systems elsewhere in the world include the
Super-grid in Europe, the power link between Canada and the US. This
demonstrates that there is currently a worldwide trend toward connecting
national grids into larger transnational super grids and to increase the use
of renewable energy.

The Russian section of the Business Advisory Council recommended that
the NEAREST project be included as part of the APEC agenda, as well as
the Business Advisory Council 2012 agenda. Representatives of business,
science and finance from APEC nations and international organisations were
invited to participate in NEAREST. In addition, a proposal was put forward
to develop a feasibility study for use in bilateral and multilateral cooperation
projects.

DERIPASKA_0368

Initiatives

Exhibit 22
http://www.deripaska.com/initiative/

# Oleg**Deripaska**

Home   About Oleg Deripaska   Business   Charity   Initiatives

Hot topic   Fighting Ebola



"Without a significant change of thinking and a better understanding of the opportunities that integration with Asia can bring to Russia, development will be limited."

World Economic Forum

APEC Business Advisory Council

Developing Eastern Siberia and the Far East

Russian Union of Industrialists and Entrepreneurs

Supporting Russian Education and Science

Climate change regulation initiatives

Fighting the spread of the Ebola virus

Public-private partnership with Rusal: Ebola response initiative in the Republic of Guinea

Oleg Deripaska and Rusal's public-private partnership Ebola response

Rusal and Russia develop Ebola vaccine

Rusal's Guinea Ebola response

Rusal's Ebola response in Guinea: building the CEMRT

Rusal's public-private partnership in Guinea: stopping Ebola in its tracks

Public health in Guinea: the

## Climate change regulation initiatives

Oleg Deripaska is one of the staunchest advocates for introduction of a global carbon tax (carbon levy), a universal mechanism for financing international climate programs that would reduce demand for high-carbon emission fuels and discourage businesses from emitting greenhouse gases.

He also speaks out for a creation of an international carbon fund refilled via the revenues generated from the tax and used to support innovative renewable projects. At its essence the idea would be that all countries agree to a minimum carbon tax and apply it to their carbon emitting producers, with each country administering the tax nationally.

Oleg Deripaska is among a few world's business leaders who openly voice concerns about a global threat of deforestation. He calls for the mechanism of economic stimulus for forests' maintenance and reproduction. Each hectare of forest, depending on its absorbing capacities, should be subsidized. Subsidies from the international carbon fund will be the source of finance for national subsidies what will eventually help to create a clear mechanism to stimulate the implantation of new forests.

Deripaska's RUSAL is taking active measures to address global warming. Since 1990, RUSAL has reduced its greenhouse gas emissions by 54% making 90% of its aluminum production sourced by hydro energy.

Among RUSAL's latest steps to mitigate the global warning effects was a creation of a 'Climate partnership of Russia', an initiative that consolidates efforts of Sberbank, RusNano, RusHydro and Ingosstrakh that will work closely with in Russia and abroad to seek optimum solutions which will enable the companies prevent the damaging effects of global climate change.

Vision

Interview

DERIPASKA_0369

Exhibit 25



the Federal Railroad Administration (FRA) seeking approval to discontinue or modify a signal system. FRA assigned the petition Docket Number FRA–2018–0042.

*Applicant:* CSX Transportation, Mr. Carl Walker, Chief Engineer Communications & Signals, 500 Water Street, Speed Code J—350, Jacksonville, FL 32202.

CSX seeks approval to discontinue the signal system on the main tracks between control point (CP) Strick, milepost (MP) OWI 208.1 on the EK Subdivision, Winchester, KY, and CP Blackey, MP OVB 267.1 on the Rockhouse Subdivision, Blackey, KY. CSX proposes to discontinue the CP–511 and TC–510 Rules in the track segment and operate under TWC–D–505 Rules.

CSX states the reason for the proposed change is that CP–511 and TC–510 Rules are no longer needed for present day operation.

A copy of the petition, as well as any written communications concerning the petition, is available for review online at *www.regulations.gov* and in person at the U.S. Department of Transportation's (DOT) Docket Operations Facility, 1200 New Jersey Avenue SE, W12–140, Washington, DC 20590. The Docket Operations Facility is open from 9 a.m. to 5 p.m., Monday through Friday, except Federal Holidays.

Interested parties are invited to participate in these proceedings by submitting written views, data, or comments. FRA does not anticipate scheduling a public hearing in connection with these proceedings since the facts do not appear to warrant a hearing. If any interested parties desire an opportunity for oral comment and a public hearing, they should notify FRA, in writing, before the end of the comment period and specify the basis for their request.

All communications concerning these proceedings should identify the appropriate docket number and may be submitted by any of the following methods:

• *Website: http://www.regulations.gov.* Follow the online instructions for submitting comments.

• *Fax:* 202–493–2251.

• *Mail:* Docket Operations Facility, U.S. Department of Transportation, 1200 New Jersey Avenue SE, W12–140, Washington, DC 20590.

• *Hand Delivery:* 1200 New Jersey Avenue SE, Room W12–140, Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal Holidays.

Communications received by June 15, 2018 will be considered by FRA before

final action is taken. Comments received after that date will be considered if practicable.

Anyone can search the electronic form of any written communications and comments received into any of our dockets by the name of the individual submitting the comment (or signing the document, if submitted on behalf of an association, business, labor union, etc.). In accordance with 5 U.S.C. 553(c), DOT solicits comments from the public to better inform its processes. DOT posts these comments, without edit, including any personal information the commenter provides, to *www.regulations.gov,* as described in the system of records notice (DOT/ALL–14 FDMS), which can be reviewed at *https://www.transportation.gov/privacy.* See also *https://www.regulations.gov/privacyNotice* for the privacy notice of *regulations.gov.*

Issued in Washington, DC

**Robert C. Lauby,**
*Associate Administrator for Railroad Safety, Chief Safety Officer.*
[FR Doc. 2018–09123 Filed 4–30–18; 8:45 am]
**BILLING CODE 4910–06–P**

## DEPARTMENT OF THE TREASURY

### Office of Foreign Assets Control

### Notice of OFAC Sanctions Actions

**AGENCY:** Office of Foreign Assets Control, Treasury.
**ACTION:** Notice.

**SUMMARY:** The Department of the Treasury's Office of Foreign Assets Control (OFAC) is publishing the names of one or more persons that have been placed on OFAC's Specially Designated Nationals and Blocked Persons List based on OFAC's determination that one or more applicable legal criteria were satisfied. All property and interests in property subject to U.S. jurisdiction of these persons are blocked, and U.S. persons are generally prohibited from engaging in transactions with them.

**DATES:** See **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** OFAC: Associate Director for Global Targeting, tel.: 202–622–2420; Assistant Director for Licensing, tel.: 202–622–2480; Assistant Director for Regulatory Affairs, tel.: 202–622–4855; Assistant Director for Sanctions Compliance & Evaluation, tel.: 202–622–2490; or the Department of the Treasury's Office of the General Counsel: Office of the Chief Counsel (Foreign Assets Control), tel.: 202–622–2410.

**SUPPLEMENTARY INFORMATION:**

### Electronic Availability

The list of Specially Designated Nationals and Blocked Persons (SDN List) and additional information concerning OFAC sanctions programs are available on OFAC's website (*http://www.treasury.gov/ofac*).

### Notice of OFAC Actions

On April 6, 2018, OFAC determined that the property and interests in property subject to U.S. jurisdiction of the following persons are blocked under the relevant sanctions authorities listed below.

#### Individuals

1. AKIMOV, Andrey Igorevich, Russia; DOB 1953; POB Leningrad, Russia; Gender Male; Chairman of the Management Board of Gazprombank (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(i)(A) of Executive Order 13661 of March 16, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine" (E.O. 13661) for being an official of the Government of the Russian Federation.

2. BOGDANOV, Vladimir Leonidovich, Russia; DOB 28 May 1951; POB Suyerka, Uporovsky District, Tyumen Region, Russian Federation; Gender Male (individual) [UKRAINE–EO13662]. Designated pursuant to section 1(a)(i) of Executive Order 13662 of March 20, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine" (E.O. 13662) for operating in the energy sector of the Russian Federation economy.

3. DERIPASKA, Oleg Vladimirovich, Moscow, Russia; 54 Severnaya Street, Oktyabrsky, Khutor, Ust-Labinsky District, Krasnodar Territory 352332, Russia; 5, Belgrave Square, Belgravia, London SW1X 8PH, United Kingdom; DOB 02 Jan 1968; POB Dzarzhinsk, Nizhny Novgorod Region, Russia; citizen Russia; alt. citizen Cyprus; Gender Male (individual) [UKRAINE–EO13661] [UKRAINE–EO13662]. Designated pursuant to section 1(a)(ii)(C)(1) of E.O. 13661 for having acted or purported to act for or on behalf of, directly or indirectly, a senior official of the of the Government of the Russian Federation.

Also designated pursuant to section 1(a)(i) of E.O. 13662 for operating in the energy sector of the Russian Federation economy.

4. DYUMIN, Alexey Gennadyevich (a.k.a. DYUMIN, Alexei), Russia; DOB 28 Aug 1972; POB Kursk, Russian Federation; Gender Male (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(i)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

5. FRADKOV, Mikhail Efimovich (Cyrillic: ФРАДКОВ, Михаил Ефимович), Russia; DOB 01 Sep 1950; POB Kurumoch, Kuibyshev Region. Russia; Gender Male; Director of the Russian Institute for Strategic Studies (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

6. FURSENKO, Sergei [a.k.a. FURSENKO, Sergey; a.k.a. FURSENKO, Sergey Aleksandrovich]; DOB 11 Mar 1954; POB Saint-Petersburg [F.K.A. Leningrad], Russian Federation; citizen Russia; Gender Male (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

7. GOVORUN, Oleg, Russia; DOB 15 Jan 1969; POB Bratsk, Irkutsk Region, Russia; Gender Male; Head of the Presidential Directorate for Social and Economic Cooperation with the Commonwealth of Independent States Member Countries, the Republic of Abkhazia, and the Republic of South Ossetia (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

8. KERIMOV, Suleiman Abusaidovich (Cyrillic: КЕРИМОВ, Сулейман Абусаидович) [a.k.a. KERIMOV, Suleyman], Moscow, Russia; Antibes, France; DOB 12 Mar 1966; POB Derbent, Republic of Dagestan, Russia; citizen Russia; Gender Male (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

9. KOLOKOLTSEV, Vladimir Alexandrovich, Russia; DOB 11 May 1961; POB Nizhny Lomov, Penza Region, Russia; Gender Male; Minister of Internal Affairs of the Russian Federation, General of the Police of the Russian Federation (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

10. KOSACHEV, Konstantin, Russia; DOB 17 Sep 1962; POB Moscow, Russia; nationality Russia; Gender Male; Chairperson of the Council of the Federation Committee on Foreign Affairs (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

11. KOSTIN, Andrey Leonidovich, Moscow, Russia; DOB 21 Sep 1956; POB Moscow, Russian Federation; Gender Male (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

12. MILLER, Alexey Borisovich, Moscow, Russia; DOB 31 Jan 1962; POB Saint-Petersburg, Russian Federation; Gender Male (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

13. REZNIK, Vladislav Matusovich, Moscow, Russia; DOB 17 May 1954; Gender Male (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

14. ROTENBERG, Igor Arkadyevich [a.k.a. ROTENBERG, Igor Arkadevich]; DOB 09 May 1973; POB Leningrad, Russia; Gender Male (individual) [UKRAINE–EO13662]. Designated pursuant to section 1(a)(i) of E.O. 13662 for operating in the energy sector of the Russian Federation economy.

15. PATRUSHEV, Nikolai Platonovich, Russia; DOB 11 Jul 1951; POB Leningrad,

Russian Federation; nationality Russia; Gender Male; Secretary of the Russian Federation Security Council (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

16. SHAMALOV, Kirill Nikolaevich, DOB 22 Mar 1982; POB Leningrad, Russia; Gender Male (individual) [UKRAINE–EO13662]. Designated pursuant to section 1(a)(i) of E.O. 13662 for operating in the energy sector of the Russian Federation economy.

17. SHKOLOV, Evgeniy Mikhailovich, Russia; DOB 31 Aug 1955; POB Dresden, Germany; nationality Russia; Gender Male; Aide to the President of the Russian Federation (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

18. SKOCH, Andrei Vladimirovich [a.k.a. SKOCH, Andrey], Russia; DOB 30 Jan 1966; POB Nikolsky [Moscow], Russia; Gender Male; Deputy of State Duma (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

19. TORSHIN, Alexander Porfiryevich, Moscow, Russia; DOB 27 Nov 1953; POB Mitoga village, Ust-Bolsheretsky district, Kamchatka region, Russian Federation; Gender Male (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

20. USTINOV, Vladimir Vasilyevich, Russia; DOB 25 Feb 1953; POB Nikolayevsk-on-Amur, Russian Federation; Gender Male (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

21. VALIULIN, Timur Samirovich, Russia; DOB 20 Dec 1962; POB Krasnozavodsk, Zagorsk District, Moscow Region, Russia; Gender Male; Chief of the General Administration for Combating Extremism of the Ministry of Internal Affairs of the Russian Federation (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

22. VEKSELBERG, Viktor Feliksovich, Russia; DOB 14 Apr 1957; POB Drogobych, Lviv region, Ukraine; Gender Male (individual) [UKRAINE–EO13662]. Designated pursuant to section 1(a)(i) of E.O. 13662 for operating in the energy sector of the Russian Federation economy.

23. ZHAROV, Alexander Alexandrovich [a.k.a. ZHAROV, Aleksandr], Russia; DOB 11 Aug 1964; POB Chelyabinsk, Russia; Gender Male; Head of the Federal Service for Supervision of Communications, Information Technology, and Mass Media (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

24. ZOLOTOV, Viktor Vasiliyevich, Russia; DOB 27 Jan 1954; POB Ryazanskaya oblast, Russia; nationality Russia; Gender Male; Director of the Federal Service of National Guard Troops and Commander of the

National Guard Troops of the Russian Federation (individual) [UKRAINE–EO13661]. Designated pursuant to section 1(a)(ii)(A) of E.O. 13661 for being an official of the Government of the Russian Federation.

### Entities

1. AGROHOLDING KUBAN [a.k.a. KUBAN AGRO; a.k.a. KUBAN AGROHOLDING], 77 Mira St., Ust-Labinsk, Krasnodar Territory 352330, Russia; 1 Moniezhnaya St., Ust-Labinsk, Krasnodar Territory, Russia; 110 Mira St., Ust-Labinsk, Krasnodar Territory, Russia; 1 G. Konshinykh St., Krasnodar Territory, Russia; 2 Rabochaya St., Ust-Labinsk, Krasnodar Territory, Russia [UKRAINE–EO13661] [UKRAINE–EO13662] [Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: BASIC ELEMENT LIMITED]. Designated pursuant to section 1(a)(ii)(C)(2) of E.O. 13661 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13661.

Also designated pursuant to section 1(a)(ii)(C)(2) of E.O. 13661 for being owned or controlled by BASIC ELEMENT LIMITED, a person determined to be subject to E.O. 13661.

Also designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13662.

Also designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by BASIC ELEMENT LIMITED, a person determined to be subject to E.O. 13662.

2. BASIC ELEMENT LIMITED [a.k.a. BAZOVY ELEMENT], Esplanade 44, Saint Helier JE4 9WG, Jersey; 30 Rochdelskaya Street, Moscow 123022, Russia; Registration ID 84039 [UKRAINE–EO13661] [UKRAINE–EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich). Designated pursuant to section 1(a)(ii)(C)(2) of E.O. 13661 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13661.

Also designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13662.

3. B–FINANCE LTD, Vanterpool Plaza, 2nd Floor, Wickhams Cay, Road Town, Tortola, Virgin Islands, British [UKRAINE–EO13661] [UKRAINE–EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich). Designated pursuant to section 1(a)(ii)(C)(2) of E.O. 13661 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13661.

Also designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13662.

4. EN+ GROUP PLC, Esplanade 44, Saint Helier JE4 9WG, Jersey; 8 Cleveland Row, London SW1A 1DH, United Kingdom; 1 Vasilisy Kozhinoy St., Moscow 121099, Russia; Registration ID 91061 [UKRAINE–EO13661] [UKRAINE–EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

Designated pursuant to section 1(a)(ii)(C)(2) of E.O. 13661 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13661.

Also designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13662.

5. GAZ GROUP, 88 Lenin Avenue. Nizhny Novgorod 603050, Russia, 15/1 Rochdelskaya Str., Moscow 123022, Russia [UKRAINS–EO13661] [UKRAINE–EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: RUSSIAN MACHINES). Designated pursuant to section 1(a)(ii)(C)(2) of E.O. 13661 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13661.

Also designated pursuant to section 1(a)(ii)(C)(2) of E.O 13661 for being owned or controlled by RUSSIAN MACHINES, a person determined to be subject to E.O. 13661.

Also designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13662.

Also designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by RUSSIAN MACHINES, a person determined to be subject to E.O. 13662.

6. GAZPROM BURENIE, OOO (f.k.a. BUROVAYA KOMPANIYA OAO GAZPROM, DOCHERNEE OBSHCHESTVO S OGRANICHENNOI OTVETSTVENNOSTYU, a.k.a. GAZPROM BURENIYE LLC; a.k.a. LIMITED LIABILITY COMPANY GAZPROM BURENIYE; a.k.a OBSHCHESTVO S OGRANICHENNOI OTVETSTVENNOSTYU GAZPROM BURENIE), 12A. ul. Nametkina, Moscow 117420, Russia; website www.burgaz.ru; Email Address mail@burgaz.gazprom.ru; Registration ID 1028900620319; Tax ID No. 5003025493, Government Gazette Number 00156251 [UKRAINS–EO13662] (Linked To: ROTENBERG, Igor Arkadyevich). Designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by Igor Arkadyevich ROTENBERG, a person determined to be subject to E.O. 13662.

7. JSC EUROSIBENERGO. 165 Chkalova Street, Divnogorsk. Krasnoyarsk Kral 663001, Russia; 1 Vasiliay Kozhinoy Street, Moscow 121098, Russia: Registration ID 5087746073817; Tax ID No. 7705607347, Identification Number 88303955 [UKRAINE–EO13661] [UKRAINE–EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: EN+ GROUP PLC). Designated pursuant to section 1(a)(ii)(C)(2) of E.O. 13661 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13661.

Also designated pursuant to section 1(a)(ii)(C)(2) of E.O. 13661 for being owned or controlled by EN+ GROUP PLC, a person determined to be subject to E.O. 13661.

Also designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13662.

Also designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by EN+ GROUP PLC, a person determined to be subject to E.O. 13662.

8. LADOGA MENEDZHMENT, OOO (a.k.a. OBSHCHESTVO S OGRANICHENNOI OTVETSTVENNOSTYU LADOGA MENEDZHMENT; a.k.a OOO LADOGA MANAGEMENT), 10 naberezhnaya Presnenskaya, Moscow 123317, Russia; Registration ID 1147748143971; Tax ID No. 7729442761; Government Gazette Number 29437172 [UKRAINS–EO13662] (Linked To: SHAMALOV, Kirill Nikolaevich). Designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by Kirill Nikolaevich SHAMALOV, a person determined to be subject to E.O. 13662.

9. NPV ENGINEERING OPEN JOINT STOCK COMPANY (a.k.a. AKTSIONERNOE OBSHCHESTVO ENPIVI INZHINIRING; a.k.a. AO ENPIVI INZHINIRING; a.k.a. ENPIVI INZHINIRING, AO; a.k.a. NPV ENGINEERING JOINT STOCK COMPANY, a.k.a. OJSC NPV ENGINEERING), 8, per. Strochenovskii B., Moscow 115054, Russia; PER. Strochenovskii B D.5, Moscow 115054, Russia; website www.npve.narod.ru; Email Address npv@npv.ru; Registration ID 1087748538936; Tax ID No. 7707587605; Government Gazette Number 95633058 [UKRAINE–EO13662] (Linked To: ROTENBERG, Igor Arkadyevich). Designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by Igor Arkadyevich ROTENBERG, a person determined to be subject to E.O. 13662.

10. RENOVA GROUP (a.k.a. JOINT-STOCK COMPANY RENOVA GROUP OF COMPANIES; a.k.a. JSC RENOVA GROUP OF COMPANIES), V, 28 Balaklavskiy Prospekt, Moscow 117452, Russia; 40, Malaya Ordynka, Moscow 115184, Russia, Registration ID 1047796890548; Tax ID No. 7727526670; Government Gazette Number 77270100t [UKRAINE–EO13662] (Linked To: VEKSELBERG, Viktor Feliksovich). Designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by Viktor Feliksovich VEKSELBERG, a person determined to be subject to E.O. 13662.

11. ROSOBORONEKSPORT OAO (a.k.a. OJSC ROSOBORONEXPORT; a.k.a. ROSOBORONEKSPORT OJSC; a.k.a. ROSOBORONEXPORT; a.k.a. ROSOBORONEXPORT JSC, a.k.a. RUSSIAN DEFENSE EXPORT ROSOBORONEXPORT), 27 Stromynka ul., Moscow 107076, Russia, website www.roe.ru; Executive Order 13662 Directive Determination—Subject to Directive 3, Registration ID 1117746521452, Tax ID No. 7718852163; Government Gazette Number 56467052, For more information on directives, please visit the following link: http://www.treasury.gov/resource-center/sanctions/Programs/Pages/ukraine.aspx#directives [SYRIA] [UKRAINE–EO13662] [Linked To: ROSTEC). Designated pursuant to section 1(b)(i) of Executive Order 13582 of August 7, 2011, "Blocking Property of the Government of Syria and Prohibiting Certain Transactions With Respect to Syria" (E.O. 13582) for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the Government of Syria.

12. RUSSIAN FINANCIAL CORPORATION (a.k.a. AO RFK–BANK; a.k.a. BANK ROSSISKAYA FINANSOVAYA KORPORATSIYA AKTSIONERNOE OBSHCHESTVO; a.k.a. RFC–BANK; a.k.a. RUSSIAN FINANCIAL CORPORATION BANK JSC). St. George's Lane, D. 1, p. 1, Moscow 125009, Russia; d. 1 korp. 1 per. Georgievskii, Moscow 125009, Russia; SWIFT/BIC RFCBRUMM; BIK (RU) 044525257 [SYRIA]. Designated pursuant to section 1(b)(ii) of E.O. 13582 for being owned or controlled by ROSOBORONEKSPORT OAO, a person determined to be subject to E.O. 13582.

13. RUSSIAN MACHINES (a.k.a. RUSSKIE MASHINY], Ul. Rochdelskaya 15, 8, Moscow 123022, Russia; Registration ID 1112373000590; Tax ID No. 2373000582; Identification Number 37100386 [UKRAINS–EO13661] [UKRAINE–EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: BASIC ELEMENT LIMITED). Designated pursuant to section 1(a)(ii)(C)(2) of E.O. for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13661.

Also designated pursuant to section 1(a)(ii)(C)(2) of E.O. for being owned or controlled by BASIC ELEMENT LIMITED, a person determined to be subject to E.O. 13661.

Also designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by Oleg Vladimirovich DERIPASKA, a person determined to be subject to E.O. 13662.

Also designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by BASIC ELEMENT LIMITED, a person determined to be subject to E.O. 13662.

14. UNITED COMPANY RUSAL PLC, 44 Esplanade, St. Helier JE4 9WG. Jersey; 1 Vasiliay Kozhinoy Str., Moscow 121098, Russia; 11/F Central Twr., 28 Queen's Rd. C, Central District, Hong Kong; Registration ID 94939; Company Number F–17314 (Hong Kong); Business Number 51566843 (Hong Kong) [UKRAINS–EO13661] [UKRAINE–EO13662] (Linked To: EN+ GROUP PLC) Designated pursuant to section 1(a)(ii)(C)(2) of E.O. 13661 for being owned or controlled by EN+ GROUP PLC, a person determined to be subject to E.O. 13661.

Also designated pursuant to section 1(a)(iii) of E.O. 13662 for being owned or controlled by EN+ GROUP PLC, a person determined to be subject to E.O. 13662.

Dated: April 6, 2018.

**Andrea M. Gacki,**

*Acting Director, Office of Foreign Assets Control.*

[FR Doc. 2018–09147 Filed 4–30–18; 8:45 am]

BILLING CODE 4810–AL–P

# DEPARTMENT OF THE TREASURY

## Open Meeting of the Federal Advisory Committee on Insurance

**AGENCY:** Departmental Offices, U.S. Department of the Treasury.

**ACTION:** Notice of open meeting.

Exhibit 25

DERIPASKA_0412

# U.S. DEPARTMENT OF THE TREASURY

## Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide Malign Activity

April 6, 2018

WASHINGTON – The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC), in consultation with the Department of State, today designated seven Russian oligarchs and 12 companies they own or control, 17 senior Russian government officials, and a state-owned Russian weapons trading company and its subsidiary, a Russian bank.

"The Russian government operates for the disproportionate benefit of oligarchs and government elites," said Treasury Secretary Steven T. Mnuchin. "The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities. Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

Today's actions are pursuant to authority provided under Executive Order (E.O.) 13661 and E.O. 13662, authorities codified by the Countering America's Adversaries Through Sanctions Act (CAATSA), as well as E.O. 13582. These actions follow the Department of the Treasury's issuance of the CAATSA Section 241 report in late January 2018. In the Section 241 report, Treasury identified senior Russian government officials and oligarchs. Today's action targets a number of the individuals listed in the Section 241 report, including those who benefit from the Putin regime and play a key role in advancing Russia's malign activities.

DERIPASKA_0413

Concurrent with this action, OFAC is issuing two general licenses to minimize immediate disruptions to U.S. persons, partners, and allies.  For details, see General Licenses General Licenses 12      and General Licenses 13      , as well as related FAQs.

All assets subject to U.S. jurisdiction of the designated individuals and entities, and of any other entities blocked by operation of law as a result of their ownership by a sanctioned party, are frozen, and U.S. persons are generally prohibited from dealings with them.  Additionally, non-U.S. persons could face sanctions for knowingly facilitating significant transactions for or on behalf of the individuals or entities blocked today.

## DESIGNATED RUSSIAN OLIGARCHS

Vladimir Bogdanov is being designated for operating in the energy sector of the Russian Federation economy.  Bogdanov is the Director General and Vice Chairman of the Board of Directors of Surgutneftegaz, a vertically integrated oil company operating in Russia. OFAC imposed sectoral sanctions on Surgutneftegaz pursuant to Directive 4 issued under E.O. 13662 in September 2014.

Oleg Deripaska is being designated pursuant to E.O. 13661 for having acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation, as well as pursuant to E.O. 13662 for operating in the energy sector of the Russian Federation economy.  Deripaska has said that he does not separate himself from the Russian state.  He has also acknowledged possessing a Russian diplomatic passport, and claims to have represented the Russian government in other countries.  Deripaska has been investigated for money laundering, and has been accused of threatening the lives of business rivals, illegally wiretapping a government official, and taking part in extortion and racketeering. There are also allegations that Deripaska bribed a government official, ordered the murder of a businessman, and had links to a Russian organized crime group.

Suleiman Kerimov is being designated for being an official of the Government of the Russian Federation.  Kerimov is a member of the Russian Federation Council.  On November 20, 2017, Kerimov was detained in France and held for two days. He is

DERIPASKA_0414

alleged to have brought hundreds of millions of euros into France – transporting as much as 20 million euros at a time in suitcases, in addition to conducting more conventional funds transfers – without reporting the money to French tax authorities. Kerimov allegedly launders the funds through the purchase of villas. Kerimov was also accused of failing to pay 400 million euros in taxes related to villas.

Igor Rotenberg is being designated for operating in the energy sector of the Russian Federation economy. Rotenberg acquired significant assets from his father, Arkady Rotenberg, after OFAC designated the latter in March 2014. Specifically Arkady Rotenberg sold Igor Rotenberg 79 percent of the Russian oil and gas drilling company Gazprom Burenie. Igor Rotenberg's uncle, Boris Rotenberg, owns 16 percent of the company. Like his brother Arkady Rotenberg, Boris Rotenberg was designated in March 2014.

Kirill Shamalov is being designated for operating in the energy sector of the Russian Federation economy. Shamalov married Putin's daughter Katerina Tikhonova in February 2013 and his fortunes drastically improved following the marriage; within 18 months, he acquired a large portion of shares of Sibur, a Russia-based company involved in oil and gas exploration, production, processing, and refining. A year later, he was able to borrow more than one $1 billion through a loan from Gazprombank, a state-owned entity subject to sectoral sanctions pursuant to E.O. 13662. That same year, long-time Putin associate Gennady Timchenko, who is himself designated pursuant to E.O. 13661, sold an additional 17 percent of Sibur's shares to Shamalov. Shortly thereafter, Kirill Shamalov joined the ranks of the billionaire elite around Putin.

Andrei Skoch is being designated for being an official of the Government of the Russian Federation. Skoch is a deputy of the Russian Federation's State Duma. Skoch has longstanding ties to Russian organized criminal groups, including time spent leading one such enterprise.

Viktor Vekselberg is being designated for operating in the energy sector of the Russian Federation economy. Vekselberg is the founder and Chairman of the Board of Directors of the Renova Group. The Renova Group is comprised of asset management companies and investment funds that own and manage assets in several sectors of

the Russian economy, including energy. In 2016, Russian prosecutors raided Renova's offices and arrested two associates of Vekselberg, including the company's chief managing director and another top executive, for bribing officials connected to a power generation project in Russia.

## DESIGNATED OLIGARCH-OWNED COMPANIES

In addition to sanctioning the individuals listed above, OFAC today designated 12 companies that constitute some of the most prominent among the entities that are owned or controlled by the individuals designated today. This list of 12 companies owned or controlled by the sanctioned oligarchs should not be viewed as exhaustive, and the regulated community remains responsible for compliance with OFAC's 50 percent rule.

B-Finance Ltd., based in the British Virgin Islands, is being designated for being owned or controlled by, directly or indirectly, Oleg Deripaska.

Basic Element Limited is being designated for being owned or controlled by, directly or indirectly, Oleg Deripaska. Basic Element Limited is based in Jersey and is the private investment and management company for Deripaska's various business interests.

EN+ Group is being designated for being owned or controlled by, directly or indirectly, Oleg Deripaska, B-Finance Ltd., and Basic Element Limited. EN+ Group is located in Jersey and is a leading international vertically integrated aluminum and power producer.

EuroSibEnergo is being designated for being owned or controlled by, directly or indirectly, Oleg Deripaska and EN+ Group. EuroSibEnergo is one of the largest independent power companies in Russia, operating power plants across Russia and producing around nine percent of Russia's total electricity.

United Company RUSAL PLC is being designated for being owned or controlled by, directly or indirectly, EN+ Group. United Company RUSAL PLC is based in Jersey and is one of the world's largest aluminum producers, responsible for seven percent of global aluminum production.

DERIPASKA_0416

Russian Machines is being designated for being owned or controlled by, directly or indirectly, Oleg Deripaska and Basic Element Limited. Russian Machines was established to manage the machinery assets of Basic Element Limited.

GAZ Group is being designated for being owned or controlled by, directly or indirectly, Oleg Deripaska and Russian Machines. GAZ Group is Russia's leading manufacturer of commercial vehicles.

Agroholding Kuban, located in Russia, is being designated for being owned or controlled by, directly or indirectly, Oleg Deripaska and Basic Element Limited.

Gazprom Burenie, OOO is being designated for being owned or controlled by Igor Rotenberg. Gazprom Burenie, OOO provides oil and gas exploration services in Russia.

NPV Engineering Open Joint Stock Company is being designated for being owned or controlled by Igor Rotenberg. NPV Engineering Open Joint Stock Company provides management and consulting services in Russia.

Ladoga Menedzhment, OOO is being designated for being owned or controlled by Kirill Shamalov. Ladoga Menedzhment, OOO is located in Russia and engaged in deposit banking.

Renova Group is being designated for being owned or controlled by Viktor Vekselberg. Renova Group, based in Russia, is comprised of investment funds and management companies operating in the energy sector, among others, in Russia's economy.

## DESIGNATED RUSSIAN STATE-OWNED FIRMS

Russia has contributed to the instability of the Government of Syria through the sales and transfer of Russian-origin military equipment in support of Assad's regime, enabling Assad to continue carrying out attacks against Syrian citizens. These attacks have included chemical weapons attacks, which claimed the lives of hundreds of Syrian citizens.

Rosoboroneksport is a state-owned Russian weapons trading company with longstanding and ongoing ties to the Government of Syria, with billions of dollars' worth of weapons sales over more than a decade. Rosoboroneksport is being designated under E.O. 13582 for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the Government of Syria.

The Russian Financial Corporation Bank (RFC Bank) is being designated for being owned by Rosoboroneksport. RFC Bank incorporated in Moscow, Russia and its operations include deposit banking activities.

## DESIGNATED RUSSIAN GOVERNMENT OFFICIALS

Andrey Akimov is the Chairman of the Management Board of state-owned Gazprombank. Akimov is being designated pursuant E.O. 13661 for being an official of the Government of the Russian Federation.

Mikhail Fradkov is the President of the Russian Institute for Strategic Studies (RISS), a major research and analytical center established by the President of the Russian Federation, which provides information support to the Presidential Administration, Federation Council, State Duma, and Security Council. Fradkov is being designated pursuant E.O. 13661 for being an official of the Government of the Russian Federation.

Sergey Fursenko is a member of the board of directors of Gazprom Neft, a subsidiary of state-owned Gazprom. Fursenko is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Oleg Govorun is the Head of the Presidential Directorate for Social and Economic Cooperation with the Commonwealth of Independent States Member Countries. Govorun is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Alexey Dyumin is the Governor of the Tula region of Russia. He previously headed the Special Operations Forces, which played a key role in Russia's purported annexation of Crimea. Dyumin is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

DERIPASKA_0418

Vladimir Kolokoltsev is the Minister of Internal Affairs and General Police of the Russian Federation. Kolokoltsev is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Konstantin Kosachev is the Chairperson of the Council of the Federation Committee on Foreign Affairs. Kosachev is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Andrey Kostin is the President, Chairman of the Management Board, and Member of the Supervisory Council of state-owned VTB Bank. Kostin is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Alexey Miller is the Chairman of the Management Committee and Deputy Chairman of the Board of Directors of state-owned company Gazprom. Miller is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Nikolai Patrushev is Secretary of the Russian Federation Security Council. Patrushev is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Vladislav Reznik is a member of the Russian State Duma. Reznik is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Evgeniy Shkolov is an Aide to the President of the Russian Federation. Shkolov is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Alexander Torshin is the State Secretary – Deputy Governor of the Central Bank of the Russian Federation. Torshin is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Vladimir Ustinov is the Plenipotentiary Envoy to Russia's Southern Federal District. Ustinov is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Treasury Designates Russian Oligarchs, Officials, and Entities in Response to Worldwide ...   Page 8 of 8

Timur Valiulin is the head of the General Administration for Combatting Extremism within Russia's Ministry of Interior. Valiulin is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Alexander Zharov is the head of Roskomnadzor (the Federal Service for the Supervision of Communications, Information Technology, and Mass Media). Zharov is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Viktor Zolotov is the Director of the Federal Service of National Guard Troops and Commander of the National Guard Troops of the Russian Federation. Zolotov is being designated pursuant to E.O. 13661 for being an official of the Government of the Russian Federation.

Additional information on the individuals and entities listed today.

#### 

DERIPASKA_0420



**UNCLASSIFIED**
**DEPARTMENT OF THE TREASURY**
**WASHINGTON, D.C. 20220**

Case IDs: UKRAINE-EO13662-13412, UKRAINE-EO13662-13226, UKRAINE-EO13662-13414, UKRAINE-EO13661-13434, UKRAINE-EO13661-13321, UKRAINE-EO13662-13323, UKRAINE-EO13662-13366

OFFICE OF FOREIGN ASSETS CONTROL

## SPECIAL DESIGNATION AND BLOCKING MEMORANDUM

Pursuant to Executive Order 13662 of March 20, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine" (the Order), 31 C.F.R. §589.802, and section 203 of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, and following the Secretary of the Treasury's determination pursuant to section 1(a)(i) of the Order with respect to the energy sector of the Russian Federation economy, I hereby determine, in consultation with the Department of State, that the persons listed below, and further addressed in the evidentiary memoranda listed at the top of this page and attached to this memorandum meet one or more of the criteria for designation set forth in the Order. Therefore, the persons listed below are designated pursuant to the Order and will now appear on the Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List.

### Individuals:

1. BOGDANOV, Vladimir Leonidovich, Russia; DOB 28 May 1951; POB Suyerka, Uporovsky District, Tyumen Region, Russian Federation; Gender Male (individual) [UKRAINE-EO13662].

2. DERIPASKA, Oleg Vladimirovich, Moscow, Russia; 64 Severnaya Street, Oktyabrsky, Khutor, Ust-Labinsky District, Krasnodar Territory 352332, Russia; 5, Belgrave Square, Belgravia, London SW1X 8PH, United Kingdom; DOB 02 Jan 1968; POB Dzerzhinsk, Nizhny Novgorod Region, Russia; citizen Russia; alt. citizen Cyprus; Gender Male (individual) [UKRAINE-EO13661] [UKRAINE-EO13662].

3. ROTENBERG, Igor Arkadyevich (a.k.a. ROTENBERG, Igor Arkadevich); DOB 09 May 1973; POB Leningrad, Russia; Gender Male (individual) [UKRAINE-EO13662].

4. SHAMALOV, Kirill Nikolaevich; DOB 22 Mar 1982; POB Leningrad, Russia; Gender Male (individual) [UKRAINE-EO13662].

5. VEKSELBERG, Viktor Feliksovich, Russia; DOB 14 Apr 1957; POB Drogobych, Lviv region, Ukraine; Gender Male (individual) [UKRAINE-EO13662].

1
**UNCLASSIFIED**

DERIPASKA_0421

## UNCLASSIFIED

### Entities:

1. AGROHOLDING KUBAN (a.k.a. KUBAN AGRO; a.k.a. KUBAN AGROHOLDING), 77 Mira St., Ust-Labinsk, Krasnodar Territory 352330, Russia; 1 Montazhnaya St., Ust-Labinsk, Krasnodar Territory, Russia; 116 Mira St., Ust-Labinsk, Krasnodar Territory, Russia; 1 G. Konshinykh St., Krasnodar Territory, Russia; 2 Rabochaya St., Ust-Labinsk, Krasnodar Territory, Russia [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: BASIC ELEMENT LIMITED).

2. BASIC ELEMENT LIMITED (a.k.a. BAZOVY ELEMENT), Esplanade 44, Saint Helier JE4 9WG, Jersey; 30 Rochdelskaya Street, Moscow 123022, Russia; Registration ID 84039 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

3. B-FINANCE LTD, Vanterpool Plaza, 2nd Floor, Wickhams Cay, Road Town, Tortola, Virgin Islands, British [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

4. EN+ GROUP PLC, Esplanade 44, Saint Helier JE4 9WG, Jersey; 8 Cleveland Row, London SW1A 1DH, United Kingdom; 1 Vasilisy Kozhinoy St., Moscow 121096, Russia; Registration ID 91061 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich).

5. GAZ GROUP, 88 Lenin Avenue, Nizhny Novgorod 603950, Russia; 15/1 Rochdelskaya Str., Moscow 123022, Russia [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: RUSSIAN MACHINES).

6. GAZPROM BURENIE, OOO (f.k.a. BUROVAYA KOMPANIYA OAO GAZPROM, DOCHERNEE OBSHCHESTVO S OGRANICHENNOI OTVETSTVENNOSTYU; a.k.a. GAZPROM BURENIYE LLC; a.k.a. GAZPROM DRILLING; a.k.a. LIMITED LIABILITY COMPANY GAZPROM BURENIYE; a.k.a. OBSHCHESTVO S OGRANICHENNOI OTVETSTVENNOSTYU GAZPROM BURENIE), 12A, ul. Namefkina, Moscow 117420, Russia; Website www.burgaz.ru; Email Address mail@burgaz.gazprom.ru; Registration ID 1028900620319; Tax ID No. 5003026493; Government Gazette Number 00156251 [UKRAINE-EO13662] (Linked To: ROTENBERG, Igor Arkadyevich).

7. JSC EUROSIBENERGO, 165 Chkalova Street, Divnogorsk, Krasnoyarsk Krai 663091, Russia; 1 Vasilisy Kozhinoy Street, Moscow 121096, Russia; Registration ID 5087746073817; Tax ID No. 7706697347; Identification Number 88303955 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: EN+ GROUP PLC).

8. LADOGA MENEDZHMENT, OOO (a.k.a. OBSHCHESTVO S OGRANICHENNOI OTVETSTVENNOSTYU LADOGA MENEDZHMENT; a.k.a. OOO LADOGA MANAGEMENT), 10, naberezhnaya Presnenskaya, Moscow 123317, Russia; Registration ID 1147748143971; Tax ID No. 7729442761; Government Gazette Number 29437172 [UKRAINE-EO13662] (Linked To: SHAMALOV, Kirill Nikolaevich).

2

DERIPASKA_0422

**UNCLASSIFIED**

9. NPV ENGINEERING OPEN JOINT STOCK COMPANY (a.k.a. AKTSIONERNOE OBSHCHESTVO ENPIVI INZHINIRING; a.k.a. AO ENPIVI INZHINIRING; a.k.a. ENPIVI INZHINIRING, AO; a.k.a. NPV ENGINEERING JOINT STOCK COMPANY; a.k.a. OJSC NPV ENGINEERING), 5, per. Strochenovski B., Moscow 115054, Russia; PER. Strochenovskii B D.5, Moscow 115054, Russia; Website www.npve.narod.ru; Email Address npw@npv.su; Registration ID 1067746653683; Tax ID No. 7707587805; Government Gazette Number 95533058 [UKRAINE-EO13662] (Linked To: ROTENBERG, Igor Arkadyevich).

10. RENOVA GROUP (a.k.a. JOINT-STOCK COMPANY RENOVA GROUP OF COMPANIES; a.k.a. JSC RENOVA GROUP OF COMPANIES), V, 28 Balaklavskiy Prospekt, Moscow 117452, Russia; 40, Malaya Ordynka, Moscow 115184, Russia; Registration ID 1047796880548; Tax ID No. 7727526670; Government Gazette Number 772701001 [UKRAINE-EO13662] (Linked To: VEKSELBERG, Viktor Feliksovich).

11. RUSSIAN MACHINES (a.k.a. RUSSKIE MASHINY), Ul. Rochdelskaya 15, 8, Moscow 123022, Russia; Registration ID 1112373000596; Tax ID No. 2373000582; Identification Number 37100386 [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: DERIPASKA, Oleg Vladimirovich; Linked To: BASIC ELEMENT LIMITED).

12. UNITED COMPANY RUSAL PLC, 44 Esplanade, St. Helier JE4 9WG, Jersey; 1 Vasilisy Kozhinoy Str., Moscow 121096, Russia; 11/F Central Twr., 28 Queen's Rd. C, Central District, Hong Kong; Registration ID 94939; Company Number F-17314 (Hong Kong); Business Number 51566843 (Hong Kong) [UKRAINE-EO13661] [UKRAINE-EO13662] (Linked To: EN+ GROUP PLC).

Accordingly, except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, (1) all real, personal, and any other property and interests in property of the persons listed above that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any U.S. person are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in, and (2) any transaction or dealing by a U.S. person or within the United States in property or interests in property of the persons named above is prohibited, including the making or receiving of any contribution or provision of funds, goods, or services by, to, for the benefit of, or from these persons.

Additionally, except to the extent otherwise provided by law or unless licensed or otherwise authorized by the Office of Foreign Assets Control, the following are prohibited: (1) any transaction by a U.S. person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions contained in the Order; and (2) any conspiracy formed to violate any of the prohibitions in the Order.

The President determined in section 7 of the Order that, because of the ability to transfer funds or other assets instantaneously, prior notice to persons determined to be subject to the Order who might have a constitutional presence in the United States would render ineffectual the blocking and other measures authorized by the Order. Therefore, the President determined that there need

DERIPASKA_0423

**UNCLASSIFIED**

be no prior notice of such a determination. In making these determinations pursuant to the Order, I also find that no prior notice should be afforded to the persons named above because to do so would provide an opportunity to evade the measures authorized in the Order and, consequently, would render those measures ineffectual.

April 6, 2018
Date

Andrea M. Gacki
Acting Director
Office of Foreign Assets Control

DERIPASKA_0424

**TOP SECRET**

THE DEPUTY SECRETARY OF THE TREASURY
WASHINGTON

**Case No. UKRAINE-EO13661-13321**

**EVIDENTIARY MEMORANDUM**

(U) MEMORANDUM FOR: JOHN E. SMITH         for TES  4-5-2018
                    DIRECTOR
                    OFFICE OF FOREIGN ASSETS CONTROL

(U) THROUGH:        GREGORY T. GATJANIS              GG
                    ASSOCIATE DIRECTOR
                    OFFICE OF GLOBAL TARGETING

                    TODD C. CONKLIN
                    DEPUTY ASSOCIATE DIRECTOR
                    OFFICE OF GLOBAL TARGETING

                    LEILA M. BAHERI
                    ASSISTANT DIRECTOR
                    GLOBAL WMD, MID-EAST EURASIA DIVISION

                    ACTING SECTION CHIEF
                    GLOBAL WMD, MID-EAST EURASIA DIVISION
                    RUSSIA-UKRAINE/SYRIA SECTION

(U) FROM:

                    GLOBAL WMD, MID-EAST EURASIA DIVISION
                    RUSSIA-UKRAINE/SYRIA SECTION

(U) SUBJECT:        OLEG VLADIMIROVICH DERIPASKA: Designation
                    Pursuant to Executive Order 13661 of March 16, 2014, "Blocking
                    Property of Additional Persons Contributing to the Situation in
                    Ukraine" and Executive Order 13662 of March 20, 2014,
                    "Blocking Property of Additional Persons Contributing to the
                    Situation in Ukraine"

## (U) I. INTRODUCTION

(U) On March 16, 2014, the President issued Executive Order 13661, "Blocking Property of
Additional Persons Contributing to the Situation in Ukraine," ("E.O. 13661"). [Exhibit 1]

**TOP SECRET**

1

—TOP SECRET//

(U) E.O. 13661 blocks the property and interests in property of any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, to meet one or more of the criteria in E.O. 13661. [Exhibit 1]

(U) On March 20, 2014, the President issued Executive Order 13662, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine," ("E.O. 13662").

(U) E.O. 13662 blocks the property and interests in property of any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, to meet one or more of the criteria in E.O. 13662. [Exhibit 2, p. 1]

(U//FOUO) On July 16, 2014, the Secretary of the Treasury, in consultation with the Secretary of State, determined that section 1(a)(i) of E.O. 13662 shall apply to the energy sector of the Russian Federation economy. [Exhibit 3, p. 1]

(U) Information presented in this memorandum and accompanying exhibits provides reason to believe that **OLEG VLADIMIROVICH DERIPASKA**, has acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation, [Exhibit 1, p. 1] and operates in the energy sector of the Russian Federation economy [Exhibit 2, p. 1] and therefore should be added to the list of Specially Designated Nationals and Blocked Persons.[1]

## (U) II. IDENTIFYING INFORMATION

- (U) **OLEG VLADIMIROVICH DERIPASKA** [Exhibit 4, p. 5]
- (U) D.O.B.: January 2, 1968 [Exhibit 4, p. 4]
- (U) P.O.B.: Dzerzhinsk, Nizhny Novgorod Region, Russia [Exhibit 5, p. 1]
- (U) Address: Moscow, Russia [Exhibit 6, p. 1]
- (U) alt. Address: 64 Severnaya Street, Oktyabraky, Khutor, Ust-Labinsky District, Krasnodar Territory, Russia 352332 [Exhibit 29, p. 1]
- (U) alt. Address: 5, Belgrave Square, Belgravia, London, SW1X 8PH, United Kingdom [Exhibit 7, p. 2] [Exhibit 8, p. 1]
- (U) Gender: Male [Exhibit 6, p. 1]
- (U) Citizenship: Russia [Exhibit 6, p. 1]
- (U) alt. Citizenship: Cyprus [Exhibit 12, pp. 1 and 2]

---

[1] (U) The name of the proposed target will appear in BOLD CAPITAL letters. Throughout this memorandum, an asterisk (*) following a name in ALL CAPS denotes an individual or entity whose property and interests in property have been blocked.

—TOP SECRET//

2

TOP SECRET//

## (U) III. BASIS FOR DETERMINATION

### (U) OLEG VLADIMIROVICH DERIPASKA (DERIPASKA)

*(U) DERIPASKA has acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation[2]*

(S//NF) DERIPASKA Has Acted in Support of Russian President Vladimir Putin's Projects



[Exhibit 14, p. 2]

[Exhibit 15, pp. 2 and 3]

[Exhibit 16, p. 2]

(U) *The Nation* reported on October 1, 2008, that DERIPASKA told one of his closest associates that he bought an aluminum plant in Montenegro in 2005 "because Putin encouraged him to do it. ...the Kremlin wanted an area of influence in the Mediterranean." [Exhibit 22, p. 5]

---

[2] (S//NF) Investigator Comment: The Endeavor Group, which provided legal advice to DERIPASKA on issues regarding his U.S. visa, asserted in its May 2009 Foreign Agents Registration Act ("FARA") filing of lobbying on his behalf that DERIPASKA was not supervised, owned, directed, controlled, financed, or subsidized by a foreign government, foreign political party or other foreign principal. [Exhibit 13, pp. 1-3] However, OFAC assesses that DERIPASKA has acted on behalf of senior Russian officials, such as President Vladimir Putin, as demonstrated by the information in this evidentiary memorandum.

[3]

[Exhibit 14, p. 1]

[Exhibit 15, p. 2]

[Exhibit 15, pp. 2-3]

[Exhibit 16, p. 1]

3

TOP SECRET//

DERIPASKA_0428



TOP SECRET//

[Exhibit 23, pp. 1-2]

[Exhibit 18, p. 2]

[Exhibit 19, p. 2]

[Exhibit 20, p. 3]

*(U) DERIPASKA Operates in the Energy Sector of the Russian Federation Economy*

(U) According to **DERIPASKA's** web site, accessed on March 22, 2018, **DERIPASKA** is involved in several World Economic Forum projects including ones on "New Energy Architecture" and the "Interaction between the Power Industry and Society." As part of his work



[7] (U)
[Exhibit 18, p. 2]
[8] (S//NF) Investigator Comment: Gaz is actually a **DERIPASKA** business that manufactures commercial vehicles. [Exhibit 25, p. 2]
[9] (U)
[Exhibit 19, p. 2]
[10] (U)
[Exhibit 20, p. 3]
[11] (U) On July 29, 2014, pursuant to E.O. 13662, OFAC imposed sanctions against VTB BANK*, prohibiting U.S. persons from providing new financing and limiting their access to U.S. capital markets. [Exhibit 21, p. 1]

TOP SECRET//

4

—TOP SECRET//

on the APEC Business Advisory Council, **DERIPASKA** focuses on multiple issues including energy efficiency and energy security. At a February 2012 meeting of the Council, **DERIPASKA's** representative presented the North East Asian Region Electrical System Ties Initiative (NEAREST), whose goal is to improve ties between the power grids of Eastern Siberia, Northern and North Eastern China, Japan, and South Korea through the creation of a transnational power grid in Northeast Asia. [Exhibit 24, pp. 1 and 3]

(U) According to **DERIPASKA's** web site, as of January 31, 2018, **DERIPASKA's** key companies operate in multiple sectors of the economy, to include the energy sector. EuroSibEnergo is the largest private power company in Russia, and produces around 9 percent of Russia's total electricity generation. [Exhibit 25, pp. 1 and 5]

(U) According to a November 3, 2017 prospectus of an offering, En+ Group[12] was initially established to hold certain aluminum and alumina assets acquired by **DERIPASKA**. It eventually evolved to become "a leading international vertically integrated aluminum and power producer" with core assets located in Russia. All power assets owned by companies related to **DERIPASKA** were combined under EuroSibEnergo plc, a Cypriot intermediary holding subsidiary of EN+ Group. As of the date of the prospectus, EN+ Group[13] owned 100 percent of EuroSibEnergo plc which in turn owned 100 percent of JSC EuroSibEnergo in Russia. [Exhibit 26, pp. 7, 9, 20, and 25] According to EuroSibEnergo's web site, as of February 12, 2018, EuroSibEnergo, a part of EN+ Group, is the largest independent power company in Russia, operating power plants across Russia, and one of the largest hydropower generation companies in the world. EuroSibEnergo produces around 9 percent of Russia's total electricity volume and is Siberia's largest power producer. [Exhibit 27, pp. 1 and 2]

**(U) Additional Information**

(S//NF) Pursuant to Section 241 of the Countering America's Adversaries Through Sanctions Act of 2017 (CAATSA), the U.S. Department of the Treasury submitted a report to Congress, dated January 29, 2018, that identifies senior foreign political figures and oligarchs in the Russian Federation.

[Exhibit 28, pp. 1, 2, and 6]

---

[12] (U) The prospectus states that after the offering is completed and an option in it is fully exercised, **DERIPASKA's** holding in EN+ Group would be 65.2% upon admission to the London Stock Exchange. [Exhibit 26, p. 4]

[13] (U) Investigator Comment: Although identified on page 9 of Exhibit 26 as EN+ Group Limited, OFAC assesses this to be EN+ Group plc based on its consistent usage throughout the exhibit while EN+ Group Limited is only used the single time.

—TOP SECRET//

DERIPASKA_0430

**TOP SECRET//**

(U) In a declaration filed with the Supreme Court of the State of New York County of New York on June 9, 2016, **DERIPASKA** stated that, "I have a diplomatic passport from Russia, and on occasion I have represented the Russian government in countries outside Russia." [Exhibit 17, p. 4]

(U) On October 28, 2008, the *Financial Times* reported that **DERIPASKA** had previously told the newspaper that he would give up his company RUSAL if the Russian government asked him to, noting, "I don't separate myself from the state. I have no other interests." [Exhibit 11, p. 5]

(U) On July 10, 2012, *The Telegraph* reported that an Uzbek businessman, Djalol Khaidarov, told U.S., Israeli, and Russian prosecutors that **DERIPASKA** was involved in bribing a governor in Siberia to secure the takeover of an aluminum plant. Khaidarov also claimed that **DERIPASKA** was a member of an organized crime group and ordered the murder of a businessman in 1995. [Exhibit 9, p. 1] The previous day, July 9, *The Times* reported that in testimony to a German court, Khaidarov[14], claimed **DERIPASKA** had links to a Russian organized crime group, stating that, "one could certainly say he [DERIPASKA] knew about the murders and operating methods [of the Russian mafia]." The judge in the case said that even though he implicated himself in criminality Khaidarov's testimony was credible, adding that "there were no indications of ostentatious grudge-settling." [Exhibit 10, pp. 1 and 2]

(U) *The Nation* reported on October 1, 2008 that **DERIPASKA** has been investigated for money-laundering in Germany as well as accused of threatening the lives of two rivals in the aluminum industry in the United States and illegally wiretapping an Israeli official. These along with other accusations of involvement in extortion and racketeering resulted in **DERIPASKA** being denied a visa to enter the United States, with only a brief lapse, since 1998. [Exhibit 22, pp. 6, 7, and 9]

---

[14] (U) Investigator Comment: Although spelled in this exhibit as "Dschalol Hajdarov," "Djalol Khaidarov" will be used throughout this memorandum for consistency.

**TOP SECRET//**

DERIPASKA_0431

## (U) LIST OF EXHIBITS

(U) Exhibit 1: Executive Order 13661 of March 16, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine," 79 Fed. Reg. 15535 (March 19, 2014). (U)

(U) Exhibit 2: Executive Order 13662 of March 20, 2014, "Blocking Property of Additional Persons Contributing to the Situation in Ukraine," 79 Fed. Reg. 16169 (March 24, 2014). (U)

(U) Exhibit 3: U.S. Department of the Treasury, "Determination Pursuant to Section 1(a)(i) of Executive Order 13662," July 16, 2014. (U//FOUO)

(U) Exhibit 4: *Bloomberg*, "Bloomberg Billionaires Index #179 Oleg Deripaska," available at www.bloomberg.com/billionaires/profiles/oleg-deripaska/, accessed January 31, 2018. (U)

(U) Exhibit 5: Web site of Oleg Deripaska, Family, available at www.deripaska.com/about/biography/, accessed January 31, 2018. (U)

(U) Exhibit 6: *Forbes*, Oleg Deripaska, available at www.forbes.com/profile/oleg-deripaska/, accessed January 31, 2018. (U)

(U) Exhibit 7: *The Guardian*, "Mega-Rich Homes Tour Puts Spotlight on London's Oligarchs," Luke Harding, February 4, 2016, available at www.the guardian.com/uk-news/2016/feb/04/mega-rich-homes-tour-london-oligarchs-russia-alexei-navalny-putin. (U)

(U) Exhibit 8: Google.com, 5 Belgrave Square London, available at www.google.com/maps/, accessed February 28, 2018. (U)

(U) Exhibit 9: *The Telegraph*, "Oligarch Linked to Politicians 'Ordered Murder of Banker,'" Sam Marsden, July 10, 2012, available at www.telegraph.co.uk/finance/financial-crime/9387913/Oligarch-linked-to-politicians-ordered-murder-of-banker.html. (U)

(U) Exhibit 10: *The Times*, "Billionaire 'With Mafia Links Spied on Rivals,'" Roger Boyes and Alex Spence, July 9, 2012, available at www.thetimes.co.uk/article/billionaire-with-mafia-links-spied-on-rivals-5bgt5k5brb6. (U)

(U) Exhibit 11: *Financial Times*, "Close to the Wind: Russia's Oligarchs," Catherine Belton, October 24, 2008, available at www.ft.com/content/d96aa8ac-a1f9-11dd-a32f-000077b07658. (U)

(U) Exhibit 12: OCCRP, "Russian Billionaire Linked to Trump, Manafort Has New Cyprus Passport," Sara Farolfi and Stelios Orphanides, March 5, 2018,

7

DERIPASKA_0432

-TOP SECRET/

available at: www.occrp.org/en/goldforvisas/russian-billionaire-linked-to-trump-manafort-has-new-cyprus-passport. (U)

(U) Exhibit 13:      U.S. Department of Justice, Foreign Agents Registration Act Filing – Endeavor Group, May 8, 2009. (U)

(U) Exhibit 14:

(U) Exhibit 15:                              (S//NF)

(U) Exhibit 16:

(U) Exhibit 17:      Declaration of Oleg Deripaska in Opposition to Gliklad's Motion for Summary Judgement and in Support of Deripaska's Cross Motion, Alexander Gliklad v. Oleg Deripaska, 652641/2015 (Supreme Court of the State of New York County of New York), filed on June 9, 2016. (U)

(U) Exhibit 18:                              (S//NF)

(U) Exhibit 19:                              (S//NF)

(U) Exhibit 20:                              (S//NF)

(U) Exhibit 21:      U.S. Department of the Treasury web site, Press Release, "Announcement of Additional Treasury Sanctions on Russian Financial Institutions and on a Defense Technology Entity," July 29, 2014, available at www.treasury. gov/press-center/press-releases/Pages/jl2590.aspx. (U)

(U) Exhibit 22:      *The Nation*, "McCain's Kremlin Ties," Mark Ames and Ari Berman, October 1, 2008, available at www.thenation.com/artticle/mccains-kremlin-ties/. (U)

(U) Exhibit 23:

(U) Exhibit 24:      Web site of Oleg Deripaska, Initiatives, available at www.deripaska. com/business/, accessed March 22, 2018. (U)

(U) Exhibit 25:      Web site of Oleg Deripaska, Business, available at www.deripaska. com/business/, accessed January 31, 2018. (U)

(U) Exhibit 26:      EN+ Group, "Prospectus," November 3, 2017, available at www.enplus. ru/content/dam/enplus/corporate/investors/regulatory-news/enplus-group-prospectus.pdf. (U)

(U) Exhibit 27:      Web site of EuroSibEnergo, www.eurosib.ru/en/, accessed February 12,

8

-TOP SECRET/

DERIPASKA_0433

TOP SECRET//███████████████████

2018. (U)

(U) Exhibit 28:

████████████████████████████████████
████████████████████████████████████

(S//NF)

(U) Exhibit 29: Complaint - Oleg V. Deripaska v. The Associated Press, 1:17-cv-00913, May 5, 2017 (DC). (U)

DERIPASKA_0434

Initiatives

Exhibit 24

http://www.deripaska.com/initiative/

# Oleg**Deripaska**

Home    About Oleg Deripaska    Business    Charity    Initiatives

Hot topic   Fighting Ebola



"Without a significant change of thinking and a better understanding of the opportunities that integration with Asia can bring to Russia, development will be limited."

---

**APEC Business Advisory Council**

Developing Eastern Siberia and the Far East

Russian Union of Industrialists and Entrepreneurs

Supporting Russian Education and Science

Climate change regulation initiatives

Fighting the spread of the Ebola virus

Public-private partnership with Rusal: Ebola response initiative in the Republic of Guinea

Oleg Deripaska and Rusal's public-private partnership Ebola response

Rusal and Russia develop Ebola vaccine

Rusal's Guinea Ebola response

Rusal's Ebola response in Guinea: building the CEMRT

Rusal's public-private partnership in Guinea: stopping Ebola in its tracks

Public health in Guinea: the

## World Economic Forum

Oleg Deripaska has regularly participated in the annual meetings of the World Economic Forum in Davos since the late 1990s. These meetings have become the main event of the Forum which brings together around 1,000 companies and organisations from all over the world. Basic Element is a strategic partner of the forum - the highest level of cooperation with the World Economic Forum that a business organisation can have. Oleg Deripaska's key companies actively participate in the WEF's industry groups and are involved in a number of WEF initiatives. UC RUSAL, the world's leading aluminium company, participates in the work of the Mining and Metals Group.

As part of his work in the Group, Oleg Deripaska discusses current industry situations with other key players in the market, helping to develop a strategy for the industry, defining procedures for cross-industry interaction and developing standard approaches to tackle global problems. In 2010 Oleg Deripaska was elected to the Management Council of the Group.

En+ Group, a leading Russian diversified power and metals group of companies, participates in the work of the Energy, Utilities and Technology group. As part of the work in the group Oleg Deripaska is involved in several projects, such as the New Energy Architecture and the Interaction between the Power Industry and Society.

In his work in the WEF, Oleg Deripaska devotes special attention to climate change. He is one of the 16 business leaders who developed the CEO Climate Policy Recommendations to G8 Leaders, a document that summed up proposals and recommendations on how to counter global warming. This document was developed as part of the Gleneagles Dialogue group and was signed by the CEOs of the 100 largest companies of the world. These recommendations were presented to G8 leaders at the G8 summit in Japan in July 2008.

Oleg Deripaska was also part of the WEF's Task Force on Low Carbon Prosperity, which brought together representatives of business and science. The task force interacted with the governments of leading nations of the world to prepare climate change discussions in Copenhagen in December 2009.

Oleg Deripaska also supported the global Partnering Against Corruption Initiative (PACI). This initiative was proposed by the CEOs of companies

Vision

Interview

---

1

DERIPASKA_0511

Exhibit 24

**Initiatives**

Ebola crisis and Rusal's
public–private partnership

Rusal boosts Guinea's
sustainable development

Foreign direct investment (FDI)
in Guinea

Public–private partnerships
(PPPs) help Guinea grow

Rusal corporate social
responsibility (CSR)

How Rusal is using public–
private partnerships around the
world

Fighting Ebola: part of Rusal's
commitment to sustainability

How Rusal helps Guinea use
bauxite mining to push forward
with development

How sustainable mining is
helping Guinea build a
sustainable future

Public–private partnerships:
Driving force of the developing
world

Racing against time on Ebola
vaccine research

Guinea and Rusal reap benefits
of mining

Rusal takes the lead in Ebola
research

Rusal's social projects support
development in Guinea

operating in all industries with the aim of consolidating the business
community's efforts to counter corruption.

03/22/2018 03:53 PM

2

DERIPASKA_0512

Exhibit 24

# Oleg**Deripaska**

Home   About Oleg Deripaska   Business   Charity   Initiatives

Hot topic   Fighting Ebola



"Without a significant change of thinking and a better understanding of the opportunities that integration with Asia can bring to Russia, development will be limited."

**World Economic Forum**



Developing Eastern Siberia and the Far East

Russian Union of Industrialists and Entrepreneurs

Supporting Russian Education and Science

Climate change regulation initiatives

Fighting the spread of the Ebola virus

Public–private partnership with Rusal: Ebola response initiative in the Republic of Guinea

Oleg Deripaska and Rusal's public–private partnership Ebola response

Rusal and Russia develop Ebola vaccine

Rusal's Guinea Ebola response

Rusal's Ebola response in Guinea: building the CEMRT

Rusal's public–private partnership in Guinea: stopping Ebola in its tracks

Public health in Guinea: the

## APEC Business Advisory Council

The APEC Business Advisory Council was set up in November 1995. The Council was supposed to prepare recommendations on how to carry out the Osaka action plan and achieve APEC's other tasks. The Business Advisory Council is a key organisation through which the Forum interacts with the business community. Every year the Business Advisory Council offers recommendations to APEC summits on how to implement its programmes. Members of the Business Advisory Council are appointed by the leaders of their countries.

In 2004 Oleg Deripaska was appointed to represent Russia in the Council for the first time. His status was confirmed twice in 2007 and in 2010. In 2007 Oleg Deripaska became chair of the Russian section of the Council.

As part of his work on the Council, Oleg Deripaska focuses primarily on energy efficiency and energy security, international trade, refinement of financial instruments and regulations, food availability and sustainable development. In 2005 Oleg Deripaska supported an anti-corruption initiative proposed by the US section of the APEC Business Advisory Council.

At this year's first meeting of the Business Advisory Council in Hong Kong in February 2012, Oleg Deripaska's representative presented the North East Asian Region Electrical System Ties initiative (NEAREST). The goal of this initiative is to improve ties between the power grids of Eastern Siberia, Northern and North Eastern China, Japan, the Republic of Korea and other countries in the region. The name was suggested by a consortium of Russian, Korean and Japanese R&D Institutes in 2008. In practice NEAREST proposes creating a transnational power grid in North Eastern Asia with a total capacity of up to 200 GW by building connecting power transmission lines and laying underwater cables. Modern technology makes it possible to exchange electricity between grids and compensate daily and seasonal imbalances in the production and consumption of electric power.

Due to differences in time zones and climates the peak loads in neighbouring grids occur at different times, so it would make sense to connect them up into a single mega-grid. Once this is done, it will be possible to produce cheaper, safer and more environmentally friendly electricity for all the economies in North Eastern Asia. In addition, NEAREST

Vision

Interview

DERIPASKA_0513

Exhibit 24

**Ebola crisis and Rusal's public—private partnership**

**Rusal boosts Guinea's sustainable development**

**Foreign direct investment (FDI) in Guinea**

**Public—private partnerships (PPPs) help Guinea grow**

**Rusal corporate social responsibility (CSR)**

**How Rusal is using public—private partnerships around the world**

**Fighting Ebola: part of Rusal's commitment to sustainability**

**How Rusal helps Guinea use bauxite mining to push forward with development**

**How sustainable mining is helping Guinea build a sustainable future**

**Public—private partnerships: Driving force of the developing world**

**Racing against time on Ebola vaccine research**

**Guinea and Kindia reap benefits of mining**

**Rusal takes the lead in Ebola research**

**Rusal's social projects support development in Guinea**

will allow participating countries to help each other out in emergencies.

A pilot project to test out NEAREST concepts is a 400 km long 500 KW set of power transmission lines with a total output of 1GW, connecting Eastern Siberia and North Eastern China.

The best examples of similar systems elsewhere in the world include the Super-grid in Europe, the power link between Canada and the US. This demonstrates that there is currently a worldwide trend toward connecting national grids into larger transnational super grids and to increase the use of renewable energy.

The Russian section of the Business Advisory Council recommended that the NEAREST project be included as part of the APEC agenda, as well as the Business Advisory Council 2012 agenda. Representatives of business, science and finance from APEC nations and international organisations were invited to participate in NEAREST. In addition, a proposal was put forward to develop a feasibility study for use in bilateral and multilateral cooperation projects.

DERIPASKA_0514

Exhibit 24

# Oleg**Deripaska**

Home    About Oleg Deripaska    Business    Charity    Initiatives

Hot topic: Fighting Ebola



"Without a significant change of thinking and a better understanding of the opportunities that integration with Asia can bring to Russia, development will be limited."

World Economic Forum

APEC Business Advisory Council

Developing Eastern Siberia and the Far East

Russian Union of Industrialists and Entrepreneurs

Supporting Russian Education and Science



Fighting the spread of the Ebola virus

Public—private partnership with Rusal: Ebola response initiative in the Republic of Guinea

Oleg Deripaska and Rusal's public—private parmership Ebola response

Rusal and Russia develop Ebola vaccine

Rusal's Guinea Ebola response

Rusal's Ebola response in Guinea: building the CEMRT

Rusal's public—private parmership in Guinea: stopping Ebola in its tracks

Public health in Guinea: the

## Climate change regulation initiatives

Oleg Deripaska is one of the staunchest advocates for introduction of a global carbon tax (carbon levy), a universal mechanism for financing international climate programs that would reduce demand for high-carbon emission fuels and discourage businesses from emitting greenhouse gases.

He also speaks out for a creation of an international carbon fund refilled via the revenues generated from the tax and used to support innovative renewable projects. At its essence the idea would be that all countries agree to a minimum carbon tax and apply it to their carbon emitting producers, with each country administering the tax nationally.

Oleg Deripaska is among a few world's business leaders who openly voice concerns about a global threat of deforestation. He calls for the mechanism of economic stimulus for forests' maintenance and reproduction. Each hectare of forest, depending on its absorbing capacities, should be subsidized. Subsidies from the international carbon fund will be the source of finance for national subsidies what will eventually help to create a clear mechanism to stimulate the implantation of new forests.

Deripaska's RUSAL is taking active measures to address global warming. Since 1990, RUSAL has reduced its greenhouse gas emissions by 54% making 90% of its aluminum production sourced by hydro energy.

Among RUSAL's latest steps to mitigate the global warming effects was a creation of a 'Climate partnership of Russia', an initiative that consolidates efforts of Sberbank, RusNano, RusHydro and Ingosstrakh that will work closely with in Russia and abroad to seek optimum solutions which will enable the companies prevent the damaging effects of global climate change.

Vision

Interview

5

DERIPASKA_0515