**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                  )
**OLEG DERIPASKA,**                               )
                                                  )
  **Plaintiff,**                        )
                                                  )
    v.                        )  **Case No. 19-cv-00727 (APM)**
                                                  )
**JANET L. YELLEN[1] et al.,**                    )
                                                  )
  **Defendants.**                        )
_____)

<u>**MEMORANDUM OPINION**</u>

## I.  INTRODUCTION

In response to Russia's annexation of the Crimean Peninsula from Ukraine in 2014, President Barack Obama declared a series of escalating national emergencies and authorized the Department of the Treasury to sanction Russian individuals and entities that met specified criteria. Plaintiff Oleg Deripaska, a Russian businessman with ties to the Kremlin, was among those sanctioned. Deripaska now challenges those designations as arbitrary and capricious and violative of his Fifth Amendment rights. Defendants have moved to dismiss or, in the alternative, for summary judgment, and Deripaska has cross-moved for summary judgment. For the reasons that follow, the court grants Defendants' motion and denies Deripaska's cross-motion.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes the current Secretary of the Treasury as a defendant in this case.

## II.   BACKGROUND

### A.   Statutory Background

#### 1.   International Emergency Economic Powers Act

Pursuant to the International Emergency Economic Powers Act ("IEEPA"), the President possesses the authority to impose sanctions to "deal with an unusual and extraordinary threat with respect to which a national emergency has been declared."  50 U.S.C. § 1701(b).  Upon declaring a national emergency, the President can block "any right, power, or privilege" in "any property in which any foreign country or a national thereof has any interest by any person."  *Id.* § 1702(a)(1)(B).

In Executive Order 13660, issued in 2014, President Obama declared a national emergency in response to Russia's assertion of "governmental authority in the Crimean region without the authorization of the Government of Ukraine."  Exec. Order No. 13660, Blocking Property of Certain Persons Contributing to the Situation in Ukraine, 79 Fed. Reg. 13,493, 13,493 (Mar. 6, 2014).  Executive Order 13660 authorized sanctions against, among others, persons "responsible for or complicit in" the Russian annexation of Crimea.  *Id.*

The President quickly followed that declaration with two additional executive orders that permitted sanctions against an even broader swath of individuals.  First, he issued Executive Order 13661 ("E.O. 13661"), which "expand[ed] the scope of the national emergency declared in Executive Order 13660" in response to "the actions and policies of the Government of the Russian Federation with respect to Ukraine, including the recent deployment of Russian Federation military forces in the Crimea region of Ukraine."  Exec. Order No. 13661, Blocking Property of Additional Persons Contributing to the Situation in Ukraine, 79 Fed. Reg. 15,535, 15,535 (Mar. 16, 2014).  As relevant to this case, E.O. 13661 authorizes the Department of the Treasury to block the

property and interests of "persons determined by the Secretary of the Treasury, in consultation with the Secretary of State[,] . . . to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly[,] . . . a senior official of the Government of the Russian Federation." *Id.* at 15,535, § 1(a)(ii)(C)(1). The term "person" was defined to mean "an individual or entity." *Id.* at 15,536, § 6(a).

Four days later, President Obama again "expand[ed] the scope of the national emergency declared in Executive Order 13660" in response to Russia's "purported annexation of Crimea and its use of force in Ukraine." Exec. Order No. 13662, Blocking Property of Additional Persons Contributing to the Situation in Ukraine, 79 Fed. Reg. 16,169, 16,169 (Mar. 20, 2014). As relevant here, Executive Order 13662 ("E.O. 13662") permitted the blocking of property and interests of "any person determined by the Secretary of the Treasury, in consultation with the Secretary of State[,] . . . to operate in such sectors of the Russian Federation economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State, such as financial services, energy, metals and mining, engineering, and defense and related materiel." *Id.* at 16,169, § 1(a)(i). The Secretary of the Treasury later determined that E.O. 13662 should "apply to the financial services and energy sectors of the Russian Federation economy." A.R. at 21.[2]

2.      *Countering America's Adversaries Through Sanctions Act*

This case also implicates a different act of Congress:  the Countering America's Adversaries Through Sanctions Act ("CAATSA"), which, among other things, imposed new sanctions on Iran, Russia, and North Korea. *See* Pub. L. No. 115-44, 131 Stat. 886 (Aug. 2, 2017). As pertinent here, Section 241 of CAATSA requires "the Secretary of the Treasury, in consultation with the Director of National Intelligence and the Secretary of State," to submit "a detailed report"

---

[2] Citations to the unclassified Administrative Record ("A.R.") can be found in the Joint Appendix, ECF No. 43.

to congressional committees on "[s]enior foreign political figures and oligarchs in the Russian Federation" ("Section 241 Report"). *Id.* § 241(a)(1). Such report shall identify "the most significant senior foreign political figures and oligarchs in the Russian Federation, as determined by their closeness to the Russian regime and their net worth." *Id.* § 241(a)(1)(A).

**B.     Factual Background**

     *1.     CAATSA*

On January 29, 2018, the Secretary of the Treasury produced the Section 241 Report. *See* Dep't of Treasury, Report to Congress Pursuant to Section 241 of the Countering America's Adversaries Through Sanctions Act of 2017 Regarding Senior Foreign Political Figures and Oligarchs in the Russian Federation and Russian Parastatal Entities (Jan. 29, 2018), http://prod-upp-image-read.ft.com/40911a30-057c-11e8-9650-9c0ad2d7c5b5 [hereinafter Section 241 Report]. The Section 241 Report listed senior foreign political figures and oligarchs in the Russian Federation "based on objective criteria related to individuals' official position[s] in the case of senior political figures, or a net worth of $1 billion or more for oligarchs." *Id.* at 1. The Secretary further stated that the Section 241 Report was "not a sanctions list, and the inclusion of individuals or entities in th[e] report . . . does not and in no way should be interpreted to impose sanctions on those individuals or entities." *Id.* at 2. An individual's inclusion in the Report likewise did not mean that the individual met "the criteria for designation under any sanctions program," nor did it "give rise to, or create any other restrictions, prohibitions, or limitations on dealings with such persons by either U.S. or foreign persons." *Id.* Instead, the list was "prepared and provided exclusively in response to Section 241 of CAATSA." *Id.* Plaintiff Oleg Deripaska appeared on the list of oligarchs. *Id.* at 7.

2.      *Deripaska's Listing Under E.O. 13661 and E.O. 13662*

a.      <u>The initial listing</u>

Months later, on April 6, 2018, the Office of Foreign Assets Control ("OFAC") announced that Deripaska would be sanctioned because he met "one or more of the criteria for designation set forth in" E.O. 13661 and E.O. 13662.  A.R. at 1.  Additionally, several Deripaska-related entities, including En+ Group PLC ("En+"), Gaz Group ("Gaz"), JSC Eurosibenergo ("ESE"), and United Company Rusal PLC ("Rusal"), simultaneously were blocked because of their affiliation with Deripaska.  *Id.* at 2–3.

OFAC prepared an Evidentiary Memorandum, dated April 5, 2018, explaining the bases for sanctioning Deripaska under E.O. 13661 and E.O. 13662.  *Id.* at 6–11.  The Evidentiary Memorandum explained that OFAC had blocked Deripaska under E.O. 13661 because he had "acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation"—namely, Russian President Vladimir Putin.  *See id.* at 8. Most of the bases for designating Deripaska due to his actions on behalf of Putin contain classified information and therefore are not disclosed to Deripaska or the public.[3]  A redacted, unclassified version of the Memorandum, however, mentions public reports that Deripaska bought an aluminum plant in Montenegro in 2005 at Putin's behest so that the Kremlin could develop "an area of influence in the Mediterranean."  *Id.* (internal quotation marks omitted).

Because of the heavy redactions to the Evidentiary Memorandum, OFAC provided Deripaska with an unclassified summary of the bases for his designation.  *See* Second Am. Compl., ECF No. 26 [hereinafter SAC], Ex. C, ECF No. 26-3 [hereinafter Unclassified Summary], at 3. The unclassified summary identified six bases for Deripaska's designation.  These bases included

---

[3] The court has reviewed *in camera* a classified administrative record submitted by Defendants.

that (1) Putin "reportedly compelled" Deripaska to make an $800 million investment in the 2014
Sochi Olympics, and that, (2) as of late January 2018, Deripaska financed projects upon the request
of Putin and senior Russian officials.  *Id.*  Additionally, (3) Deripaska "reportedly once cancelled
an IPO of his company, Gaz, to hide Russian President Vladimir Putin's money laundering through
the company, as recently as September 2017," and (4) "[i]n December 2016, Deripaska was
reportedly identified as one of the individuals holding assets and laundering funds on behalf of
Russian President Vladimir Putin."  *Id.*  Moreover, (5) "Deripaska's business activity was
reportedly used, on at least one occasion, as a cover to facilitate the transfer of funds for the
personal use of then Russian Prime Minister Vladimir Putin" in July 2011.  *Id.*  And, finally,
(6) "Deripaska reportedly acted on verbal instructions from President Vladimir Putin in a high-
level bilateral meeting between Russian and Kyrgyz representatives."  *Id.*

      With respect to Deripaska's designation under E.O. 13662, the Evidentiary Memorandum
explains that Deripaska was sanctioned for operating in the energy sector of the Russian Federation
economy.  A.R. at 9.  That designation stemmed primarily from two sources:  Deripaska's work
with the World Economic Forum and his ownership of private power companies.  *See id.* at 9–10.
OFAC explained that Deripaska's website touted his role in World Economic Forum energy-
related projects, including projects titled "New Energy Architecture" and "Interaction between the
Power Industry and Society."  *Id.* at 9.  He also served as a representative on the Asia-Pacific
Economic Cooperation Business Advisory Council, "focus[ing] on multiple issues including
energy efficiency and energy security."[4]  *Id.* at 10.  OFAC further pointed to Deripaska's

---

[4] The Asia-Pacific Economic Cooperation ("APEC") Business Advisory Council "advise[s]" the heads of state for
Asia-Pacific countries "on issues of interest to business," "presents recommendations," and identifies "business-sector
priorities and concerns."  Asia-Pac. Econ. Coop., APEC Business Advisory Council (last updated Jan. 2021),
https://www.apec.org/Groups/Other-Groups/APEC-Business-Advisory-Council.  Members of the Council "are
appointed by their respective economic leaders and represent a range of business sectors."  *Id.*

ownership interests in En+ and ESE as evidence of his operation in Russia's energy sector. *Id.* The Evidentiary Memorandum described En+, of which Deripaska was the majority shareholder, as "a leading international vertically integrated aluminum and power producer with core assets located in Russia." *Id.* at 10 & n. 12 (internal quotation marks omitted). En+ in turn owns 100% of ESE, "the largest private power company in Russia, [which] produces around 9 percent of Russia's total electricity generation." *Id.* ESE and En+ were both blocked as a result of Deripaska's designation. *See id.* at 3.

In December 2018, Deripaska and OFAC agreed to a Terms of Removal Agreement that resulted in the delisting of En+, ESE, and another En+-affiliated entity, Rusal. *See id.* at 212. The agreement, among other things, required Deripaska to reduce his majority ownership in En+ to no more than 45% of shares, "prohibited [him] from voting more than 35% of En+ shares," and limited him to nominating four of En+'s twelve directors. *Id.* at 213–14. The Removal Agreement also imposed various other restrictions that limited Deripaska's direct ownership and control of ESE and Rusal. *See id.* at 216–18. These conditions are to "remain in place for as long as Deripaska remains on the [Specially Designated Nationals and Blocked Persons] List." *Id.* at 218.

b.   Deripaska's delisting request

Deripaska later submitted a petition to OFAC seeking delisting under E.O. 13662. He asserted that his original designation "was both factually and legally insufficient" and that his reduced ownership in En+ constituted "a change in circumstances." *Id.* at 160. Deripaska argued that his initial designation was without basis because his work for the World Economic Forum did not relate to *Russia's* energy sector and that the "energy sector," for purposes of E.O. 13662, does not include power generation activities. *See id.* at 160–61. OFAC rejected both of these arguments in March 2020.

7

First, it explained that Deripaska's work for the World Economic Forum constituted operation in Russia's energy sector because (1) Deripaska "participated in these projects as part of his work in the En+ Group," which operates in the Russian economy, and (2) he participated in other projects "as the appointee of the Russian Federation government and to represent a business sector of the Russian Federation economy." *Id.* at 161.  OFAC further stated that the term "energy sector" was undefined in E.O. 13662 and that the narrower definitions Deripaska proffered for "energy sector" were inapplicable to the Ukraine sanctions program.  *Id.* at 162.  Finally, OFAC rejected Deripaska's argument that his divestment of his ownership stake in En+ required his delisting.  OFAC concluded that Deripaska's "continued ownership in En+ and ESE," although reduced, nonetheless constituted "evidence of [his] continued operation in the energy sector of the Russian Federation economy."  *Id.* at 163–64.  OFAC therefore denied Deripaska's delisting petition.  *Id.* at 158.

### C.    Procedural Background

On March 15, 2019, Deripaska filed the Complaint in this matter, challenging his designations under E.O. 13661 and E.O. 13662, as well as his identification in the Section 241 Report.  *See* Compl., ECF No. 1.  Thereafter, Deripaska sought administrative reconsideration of his E.O. 13662 designation and amended his Complaint to drop his challenges relating to E.O. 13662.  *See* Am. Compl., ECF No. 7, ¶ 6.  After OFAC denied his reconsideration request, A.R. at 158, Deripaska filed the operative Second Amended Complaint, in which he once again challenges his designation under E.O. 13661 and E.O. 13662.  *See* SAC.  He also launches new challenges to OFAC's refusal to delist him under E.O. 13662 and his inclusion in the Section 241 Report.  *See id*.  Defendants have moved to dismiss or, in the alternative, for summary judgment, Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J., ECF No. 27 [hereinafter Defs.' Mot.],

and Deripaska has cross-moved for summary judgment, Pl.'s Cross-Mot. for Summ. J., ECF No. 31 [hereinafter Pl.'s Mot.].

After briefing on the parties' cross-motions was complete, Deripaska moved to supplement the administrative record. *See* Pl.'s Mot. to Suppl. the Administrative R., ECF No. 36. The court denied that motion on December 29, 2020. *See Deripaska v. Mnuchin*, No. 19-cv-727 (APM), 2020 WL 7828783 (D.D.C. Dec. 29, 2020).

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 344–45 (D.C. Cir. 2018) (alteration omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"[S]ummary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the [Administrative Procedure Act ('APA')] standard of review." *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016). In reviewing an agency action under the APA, "the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted). The court's analysis must be confined to the administrative record and should involve "neither more nor less information than" was before "the agency when it made its decision." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal quotation marks omitted). The district court's "review is 'narrow' and [it] will 'not substitute [its] judgment for that of the agency.'" *U.S. Sugar Corp.*

9

*v. EPA*, 830 F.3d 579, 605 (D.C. Cir. 2016) (alterations omitted) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.* (*State Farm*), 463 U.S. 29, 43 (1983)).

## III.   DISCUSSION

Deripaska asserts numerous claims challenging (1) his designation under E.O. 13661 and E.O. 13662, (2) the denial of his delisting petition under E.O. 13662, and (3) his inclusion in the Section 241 Report.  The court turns first to Deripaska's arguments regarding his designations and delisting request and then takes up his arguments regarding his inclusion in the Section 241 Report.

### A.   Designations in Excess of Statutory Authority

Deripaska argues that OFAC exceeded its statutory authority when it designated him for sanctions under both Executive Orders.  *See* Pl.'s Mot., Mem. of P. & A. in Supp. of Pl.'s Cross-Mot. for Summ. J. & in Opp'n to Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J., ECF No. 31-1 [hereinafter Pl.'s Br.], at 18–23.  Central to his argument is the Treasury Department's press release announcing his listing.  A.R. at 413 (announcing sanctions against "seven Russian oligarchs and 12 companies they own or control, 17 senior Russian government officials, and a state-owned Russian weapons trading company and its subsidiary, a Russian bank").  According to Deripaska, the press release reveals that he was not sanctioned on the grounds specified in E.O. 13661 or E.O. 13662, but instead was improperly penalized "in response to an undeclared national emergency—i.e., Russia's worldwide malign activities."  Pl.'s Br. at 19 (internal quotation marks omitted).

The record substantiates that OFAC sanctioned Deripaska pursuant to the authority granted in E.O. 13661 and E.O. 13662, and not for some improper purpose.  "[O]nce the President has declared a national emergency, the IEEPA authorizes the blocking of property to protect against that threat."  *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007); *see also*

*Regan v. Wald*, 468 U.S. 222, 228 (1984).  President Obama issued E.O. 13661 and E.O. 13662 after "declar[ing] a national emergency to deal" with the "unusual and extraordinary threat to the national security and foreign policy of the United States" caused by Russia's invasion of Crimea. *See* 79 Fed. Reg. at 13,493; 79 Fed. Reg. at 15,535 (issued to deal with and expand the "national emergency declared in Executive Order 13660"); 79 Fed. Reg. at 16,169 (same).  E.O. 13661 authorized the sanctioning of "persons [determined] . . to have acted or purported to act for or on behalf of, directly or indirectly[,] . . . a senior official of the Government of the Russian Federation."  79 Fed. Reg. at 15,535, § 1(a)(ii)(C)(1).  And E.O. 13662 permitted the blocking of property and interests of persons in certain sectors of the Russian economy, which the Secretary later defined to include the "energy sector[]."  A.R. at 21.  OFAC has since produced Evidentiary Memoranda substantiating its sanctioning of Deripaska pursuant to both Executive Orders.  *See id*. at 6–11 (Evidentiary Memorandum designating under E.O. 13661 and E.O. 13662); *id.* at 158–66 (Evidentiary Memorandum denying delisting petition under E.O. 13662).  Specifically, those Memoranda explain that OFAC sanctioned Deripaska because it had "reason to believe" that he both "has acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation, and operates in the energy sector of the Russian Federation economy."  *Id.* at 7 (citation omitted).  The Evidentiary Memoranda nowhere generically offer Russia's "malign activities" as grounds for Deripaska's designation.  Thus, the record reflects that the President declared a national emergency and identified criteria pursuant to which individuals may be sanctioned, and OFAC determined Deripaska met those criteria for sanctions.  OFAC therefore acted within its authority in sanctioning Deripaska.

The press release on which Deripaska relies does not change that conclusion for two reasons.  First, on its own terms, the press release establishes that OFAC acted within the scope of

the Executive Orders. It expressly announces that "[t]oday's actions are pursuant to authority provided under Executive Order (E.O.) 13661 and E.O. 13662." A.R. at 413. To be sure, the press release quotes the Secretary as saying that "[t]he Russian government engages in a range of malign activity around the globe," but the Secretary never purported to identify "malign activit[ies]" as either the source of sanctioning authority or a catch-all reason for imposing sanctions. *See id.* (internal quotation marks omitted). In any event, the Secretary identified Russia's "continuing to occupy Crimea and instigate violence in eastern Ukraine" as among the "malign activit[ies]" that justified sanctions. *Id*. (internal quotation marks omitted). It is for those very activities that E.O. 13661 and E.O. 13662 authorized the Secretary to designate Deripaska.

Second, Deripaska cites no authority for the proposition that statements in a press release can supplant OFAC's officially stated reasons for sanctioning him, which are set forth in the Evidentiary Memoranda. As discussed, the Evidentiary Memoranda clearly identify the sanctions criteria and explain why Deripaska satisfies them. The court must presume that OFAC prepared the Evidentiary Memoranda in good faith, absent contrary evidence. *See Friedman v. FAA*, 841 F.3d 537, 541 n.1 (D.C. Cir. 2016). Deripaska presents no such evidence here.

### B.    Arbitrary and Capricious Review

Deripaska next argues that his designations violate the APA because Defendants acted arbitrarily and capriciously when they sanctioned him under E.O. 13661 and rejected his delisting petition under E.O. 13662. Pl.'s Br. at 23–32. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision is arbitrary and capricious if the agency relies "on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for

its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. This review is deferential, and it is not for the court to "reweigh the conflicting evidence or otherwise to substitute [its] judgment for that of the [agency]." *Ind. Mun. Power Agency v. F.E.R.C.*, 56 F.3d 247, 254 (D.C. Cir. 1995). The court's review is particularly deferential in this case because the issues at hand implicate national security, foreign policy, and administrative law. *See Islamic Am. Relief Agency*, 477 F.3d at 734 ("[W]e reiterate that our review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential."); *see also Rakhimov v. Gacki*, No. 19-cv-2554 (JEB), 2020 WL 1911561, at *6 (D.D.C. Apr. 20, 2020) ("The D.C. Circuit . . . has urged courts to be particularly deferential to executive blocking orders, decisions 'at the intersection of national security, foreign policy, and administrative law.'" (quoting *Islamic Am. Relief Agency*, 477 F.3d at 734)).

       *1.    E.O. 13661*

       Deripaska first argues that Defendants' decision to designate him pursuant to E.O. 13661 was arbitrary and capricious because OFAC was required to identify a principal-agent relationship between Deripaska and a senior official of the Russian government before it could sanction him. Pl.'s Br. at 24–26. According to Deripaska, E.O. 13661's reference to persons who are "owned or controlled by" or who "act[] or purport[] to act for or on behalf of, directly or indirectly" a senior Russian official, 79 Fed. Reg. at 15,535, § 1(a)(ii)(C)(1), mirrors the definition of an "agent" in the Foreign Terrorist Organization Sanctions Regulations, 31 C.F.R. § 597.301. Pl.'s Br. at 24. Those regulations define an "agent" to include: "(1) Any person owned or controlled by a foreign terrorist organization; or (2) Any person to the extent that such person is, or has been, . . . acting

13

or purporting to act directly or indirectly on behalf of a foreign terrorist organization." 31 C.F.R.
§ 597.301.  The court rejects Deripaska's argument for two reasons.

First, E.O. 13661 on its face does not anywhere use the term "agent" or cross-reference
any existing definition of "agent," let alone the definition found in 31 C.F.R. § 597.301.  Had the
President wanted to incorporate agency principles into E.O. 13661, he would not have done so
silently.  What's more, as Defendants point out, the definitional terms used in the Foreign Terrorist
Organization Sanctions Regulations are applicable solely to that sanctions regime.  Those
regulations specifically state that "[d]iffering statutory authority and foreign policy and national
security contexts may result in differing interpretations of similar language among" the other
sanctions regimes that OFAC enforces, *id.* § 597.101(a).  Defs.' Consolidated Reply in Supp. of
Mot. to Dismiss, or in the Alternative, for Summ. J. & Opp'n to Pl.'s Cross-Mot. for Summ. J.,
ECF No. 32 [hereinafter Defs.' Reply], at 3–4.  The Terrorist Organization Sanctions Regulations'
definitions are thus expressly limited to that sanctions regime.

Second, even if E.O. 13661 requires Deripaska to have entered a formal "agency"
relationship with a senior Russian official, the unclassified summary provided to Deripaska
unquestionably establishes that he acted in such capacity.  Specifically, the unclassified summary
states that Deripaska "was reported to have financed projects *upon request of* Vladimir Putin and
senior Russian officials"; that he was "identified as one of the individuals holding assets and
laundering funds *on behalf of* Russian President Vladimir Putin"; that his "business activity was
reportedly used . . . as a cover to facilitate the transfer of funds for the *personal use* of then Russian
Prime Minister Vladimir Putin"; and that he "acted on *verbal instructions* from President Vladimir
Putin in a high-level bilateral meeting between Russian and Kyrgyz representatives."  Unclassified
Summary at 3 (emphasis added).  The classified administrative record also contains evidence

14

supporting these factual findings and OFAC's determination.  *See* 50 U.S.C. § 1702(c) (permitting the court to consider the classified administrative record *ex parte* and *in camera*).  These findings suggest that Deripaska's relationship with Putin exceeded the provision of mere material support and instead establish that Putin was directing Deripaska to take actions on his behalf and Deripaska complied.  Thus, even if OFAC was required to find that Deripaska acted as Putin's agent as a legal matter, it did so and supported that finding with adequate evidence.

Deripaska appears to concede that OFAC's unclassified description of his conduct qualified him as an agent of Putin.  *See* Pl.'s Br. at 25–26 (acknowledging that allegations of money laundering are acts "undertaken for Putin himself" or "for Putin's personal use").  To avoid this conclusion, he points to a heading in the Evidentiary Memorandum that states "DERIPASKA Has Acted in Support of Russian President Vladimir Putin's *Projects*."  *Id.* at 24 (emphasis added) (citing A.R. at 8).  Deripaska fixates on the term "Putin's Projects" and contends that OFAC concluded that Deripaska acted on behalf of only "Putin's Projects," and not Putin himself, as E.O. 13661 requires.  *See id.* at 24–25 ("OFAC determined that Deripaska acts for or on behalf of a senior Russian official following its conclusion that Deripaska acted in support [of] Putin's projects, not that Deripaska engaged in conduct for or [on] behalf of Putin himself.").  But Deripaska's parsing of the Evidentiary Memorandum is not at all convincing.  For one, the Memorandum's classified portions make plain that OFAC determined that Deripaska acted on behalf of Putin personally, not just to advance various "[p]rojects."  A.R. at 9 (classified header and supporting evidence).  Moreover, by emphasizing the term "Projects," Deripaska makes a distinction that E.O. 13661 itself does not make.  The Executive Order qualifies a person for sanctions if he "acted or purported to act for or on behalf of" a senior Russian government official.

That text easily reaches someone, like Deripaska, who furthers projects, like the Sochi Olympic Games, advocated by Putin.

Deripaska next argues that his designation under E.O. 13661 was arbitrary and capricious because it depended upon "conduct that purportedly occurred and . . . ceased prior to the issuance of E.O. 13661." Pl.'s Br. at 26. He argues that his past actions cannot form the basis for sanctions because those actions "were not sanctionable at the time which they purportedly occurred." *Id*. Not so. E.O. 13661 permits OFAC to sanction any individual it finds to "*have acted* or purported to act for or on behalf of, directly or indirectly[,] . . . a senior official of the Government of the Russian Federation." 79 Fed. Reg. at 15,535, § 1(a)(ii)(C)(1) (emphasis added). Courts in this District have previously interpreted similar language to permit OFAC to consider past conduct when issuing sanctions. For example, in *Olenga v. Gacki*, the court held that an executive order permitting OFAC to sanction certain individuals involved in the conflict in the Democratic Republic of the Congo permitted OFAC to designate someone "based on his past conduct." No. 19-cv-1135 (RDM), 2020 WL 7024206, at *15 (D.D.C. Nov. 30, 2020). The executive order at issue in *Olenga* empowered OFAC to designate "individuals deemed 'to be responsible for or complicit in, or to *have engaged in*, directly or indirectly . . . actions or policies that undermine democratic processes or institutions in the Democratic Republic of the Congo.'" *Id.* (alteration in original) (quoting E.O. 13671, 79 Fed. Reg. 39,949 (July 8, 2014)). Recognizing that the President has "broad authority under IEEPA" to "reasonably conclude that the deterrence of international bad actors, at least at times, requires the imposition of sanctions on those who have retired or moved on to other pursuits," the court reasoned that "[s]omeone can be found 'to have engaged in, directly or indirectly' an action they took in the past" and thus a designation can be "based on . . . past conduct." *Id*.; *see also Pejcic v. Gacki*, No. 19-cv-2437 (APM), 2021 WL 1209299, at *7

(D.D.C. Mar. 30, 2021) (finding similar language "permit[ted] OFAC to base a designation or a refusal to delist on past conduct"). E.O. 13661's application to individuals who "have acted" on behalf of a senior official likewise permits OFAC to consider an individual's past conduct in issuing sanctions. Defendants' decision to sanction Deripaska under E.O. 13661 for past conduct therefore did not violate the APA.

2.    *E.O. 13662*

Deripaska also contends that Defendants' decision to deny his petition for delisting under E.O. 13662 was arbitrary and capricious for three reasons. Pl.'s Br. at 28–31. None is persuasive.

First, he argues that Defendants erroneously relied on his involvement in World Economic Forum projects without establishing that such involvement constituted participation in *Russia*'s energy sector. *Id.* at 28–29. But the evidence on which Defendants relied connects Deripaska's work for the World Economic Forum to Russia's energy sector. Specifically, the Evidentiary Memorandum cites to a page from Deripaska's website that discusses his work for the World Economic Forum to substantiate its findings. A.R. at 429; *id.* at 433. That website, which is attached as an exhibit to the Evidentiary Memorandum, features a quote from Deripaska stating, "Without a significant change of thinking and better understanding of the opportunities that integration with Asia *can bring to Russia*, development will be limited." *Id.* at 511 (emphasis added). Thus, by emphasizing what Asian economies "can bring to Russia," Deripaska himself described his work with the World Economic Forum as intended to support Russia. That conclusion is bolstered by the website's description of Deripaska's work for the World Economic Forum. It highlights the role that Deripaska-related entities Rusal and En+ Group have played in the Forum's Mining and Metals Group and the Energy, Utilities, and Technology Group, as well as Deripaska's involvement in those Groups. *See id.* OFAC reasonably concluded from such

evidence that Deripaska participated in World Economic Forum "projects as part of his work in the En+ Group," which again is a power-producing company with core assets in Russia. *Id*. at 161. OFAC therefore rooted its conclusion that Deripaska's participation in the World Economic Forum was related to Russia's energy sector in record facts, and its conclusion is supported by substantial evidence.

Second, Deripaska argues that OFAC acted arbitrarily and capriciously by defining Russia's "energy sector" to include the "production of electricity." Pl.'s Br. at 29–30. According to Deripaska, OFAC has not traditionally defined the energy sector to include electricity production, and its decision to do so for purposes of the Ukraine sanctions program constitutes arbitrary, ad hoc decisionmaking. *Id.* Before the agency, Deripaska specifically noted that sanctions targeting the energy industry in the Ukraine Freedom Support Act of 2014 and in the sanctions regime against Iran exclusively applied to oil, petroleum, natural gas, and nuclear development. *See* A.R. at 199. OFAC rejected these arguments. It explained that its interpretations of terms like "energy sector" in different sanctions regimes were driven by the unique foreign policy and national security circumstances at play in each sanctions regime and therefore "an interpretation in one program is not determinative of an interpretation in other programs." *Id*. at 162. Further, OFAC explained that it had never "defined the term 'energy sector' to exclude power generation or electricity production," and it had "designated at least one other individual" for operating in power generation in Russia. *Id.* Finally, OFAC responded that neither Congress nor OFAC has defined "energy sector" as it applies in this context. *Id.* at 162–63.

Deripaska asks this court to second guess OFAC where its expertise, and thus its authority, is at its zenith. The court declines to do so. Again, the court emphasizes that its review in this "area at the intersection of national security, foreign policy, and administrative law[] is extremely

deferential." *Islamic Am. Relief Agency*, 477 F.3d at 734.  Here, the President expressly delegated to the Secretary of the Treasury, in consultation with the Secretary of State, the decision of which economic sectors should be subject to sanctions.  E.O. 13661, 79 Fed. Reg. at 16,169, § 1(a)(i) (authorizing sanctions against individuals who "operate in such sectors of the Russian Federation economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State").  It is therefore firmly within the agency's purview to apply its expertise in determining which sectors are subject to sanction and the scope of those sectors.  Where, as here, the definition of such a sector is otherwise undefined, so long as that definition is reasonable, the court will not disturb the agency's decision.  *See Humanitarian L. Project v. Reno*, 205 F.3d 1130, 1137 (9th Cir. 2000) (explaining in the context of sanctions for terrorist activities that "the Secretary must have reasonable grounds to believe that an organization has engaged in terrorist acts" but that, "because the regulation involves the conduct of foreign affairs, we owe the executive branch even more latitude than in the domestic context"); *see also Islamic Am. Relief Agency*, 477 F.3d at 734 (citing *Humanitarian Law Project* for a similar proposition).

And it appears to the court eminently reasonable to define the "energy" sector to include power generation.  Defendants have offered what appears to be a common sense proposition—that the production of electricity and power is a part of the energy sector.  *See* Energy, Merriam-Webster, https://www.merriam-webster.com/dictionary/energy (last visited June 13, 2021) (defining "energy" to mean, among other things, "usable power (such as heat or electricity)").  Indeed, none of Deripaska's arguments suggest that it is unreasonable as a general matter for the energy sector to include power generation activities; instead he merely argues that *OFAC* has not typically considered power generation activities as part of the energy sector and thus it made an "*ad hoc*" decision as to Deripaska.  *See* Pl.'s Br. at 30.  But the court is not persuaded that OFAC

19

has engaged in "*ad hoc*" decisionmaking.  The Ukraine sanctions program explicitly warns that "[d]iffering foreign policy and national security circumstances may result in differing interpretations of similar language among the parts of this chapter," which includes other sanctions programs.  31 C.F.R. § 589.101.  Thus, OFAC's interpretation of the scope of the energy sector in other sanctions programs does not necessarily correlate to its interpretation of the scope of the energy sector with respect to the Ukraine sanctions program.  And within the Ukraine sanctions program, there is evidence that OFAC has at least once before applied the term "energy sector" to include power generation.  *See* A.R. at 162 & n.2 (noting OFAC designated Viktor Vekselberg "for operating in the energy sector of the Russian Federation economy pursuant to E.O. 13662").  Deripaska thus has not identified any inconsistencies in OFAC's designations.

Third and finally, Deripaska argues that it was arbitrary and capricious for OFAC to continue to designate him for operating in the energy sector on the basis of his now minority shareholdings in En+ and ESE.  Pl.'s Br. at 30–32.  He points out that OFAC recently delisted En+ and ESE after he divested his control in the entities and argues that designation "solely by virtue of his remaining interests in En+" is "counter to the evidence before the agency."  *Id.* at 31–32.

Deripaska's argument overlooks important distinctions between the sanctions that led to the listing of En+ and ESE and the sanctions that led to his individual listing.  En+ and ESE were originally blocked because Deripaska "own[ed], directly or indirectly, a 50 percent or greater interest" in the entities.  31 C.F.R. § 589.406; *see* Pl.'s Br. at 7.  By contrast, the regulation under which Deripaska was designated does not turn on an individual's *ownership* of entities that operate in the Russian energy sector.  Rather, it applies to all persons who "operate in" the energy sector. *See* 79 Fed. Reg. at 16,169, § 1(a)(i); A.R. at 21.  Ownership and operation are two distinct concepts, with the latter conveying a far broader scope of conduct.

To that end, OFAC considered Deripaska's argument that his divestiture of his majority interests in En+ and ESE meant he no longer "operated" in the energy sector and offered a reasonable rejection of that argument. OFAC explained that despite his reduced ownership stake, Deripaska "maintains a 44.95 percent ownership interest in En+, which in turn, maintains a 100 percent ownership interest in ESE." A.R. at 163. In addition, Deripaska votes 35% of En+'s shares and appoints four of twelve members to the En+ board. *Id.* OFAC concluded that this "continued ownership interest . . . [is] evidence of his continued operation in the energy sector of the Russian Federation economy." *Id.* OFAC thus has again cited specific evidence demonstrating Deripaska's continued operation in the energy sector, and its conclusion that Deripaska operates in the energy sector is reasonable.

### C.     Due Process

Deripaska next argues that Defendants violated his Fifth Amendment due process rights by relying on undisclosed classified information and failing to provide him with adequately detailed unclassified summaries of that information. *See* Pl.'s Br. at 32–37. Defendants counter that Deripaska is not entitled to due process protections because he is a non-resident alien who lacks sufficient contact with the United States. Defs.' Mot., Mem. in Supp. of Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J., ECF No. 27-1 [hereinafter Defs.' Br.], at 27–29. Defendants alternatively contend that, even if Deripaska enjoys the Fifth Amendment's protection, he received all the process he was due. *See id.* at 16.

The court first considers Defendants' threshold argument that Deripaska lacks standing to bring a due process challenge. "The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections." *Jifry v. F.A.A.*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *People's Mojahedin Org. of Iran v. U.S.*

21

*Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) ("A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise."). "Exceptions," however, "may arise where aliens have come within the territory of the United States and established 'substantial connections' with this country or 'accepted some societal obligations.'" *Jifry*, 370 F.3d at 1182–83 (citation omitted) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271, 273 (1990)).

"The D.C. Circuit has not explicitly addressed what criteria this Court should apply in considering whether a foreign national residing outside the United States can satisfy the 'substantial connection' test to raise rights under the U.S. Constitution related to the blocking or freezing of his assets." *Kadi v. Geithner*, 42 F. Supp. 3d 1, 25 (D.D.C. 2012); *see also Rakhimov*, 2020 WL 1911561, at *5. The Circuit has, however, decided several cases regarding the due process rights of organizations designated as terrorist organizations that shed light on the inquiry. In *National Council of Resistance of Iran v. Department of State*, the D.C. Circuit found that the National Council of Resistance of Iran had substantial connections with the United States and therefore was entitled to due process protections where the organization "ha[d] an overt presence within the National Press Building in Washington, D.C.," and "claim[ed] an interest in a small bank account."[5] 251 F.3d 192, 201–02 (D.C. Cir. 2001). In contrast, in *32 County Sovereignty Committee v. Department of State*, the Circuit found that due process protections did not apply where two organizations could "demonstrate only that some of their American 'members' personally rented post office boxes and utilized a bank account to transmit funds and information" to the organizations. 292 F.3d 797, 799 (D.C. Cir. 2002). The court held that the plaintiffs did

---

[5] The court noted that it was also relying on "classified material" in finding that the organization had "come within the territory of the United States and developed substantial connections with th[e] country." *Nat'l Council of Resistance of Iran*, 251 F.3d at 202.

"not aver that either organization possessed any controlling interest in property located within the United States," nor did they "demonstrate any other form of presence here." *Id.* Accordingly, no "particular process" was due before the organizations were designated. *Id.*

Here, Deripaska alleges that "[a]t the time of his designations," he held "an ownership interest in Basic Element, Inc.," a Delaware corporation, and held "a beneficial ownership interest in RUSAL America Corp., which had offices in 660 Madison Ave., New York, NY." SAC ¶¶ 111–112. He also alleges that, prior to his designations, he was "regularly invited to speak at D.C.-based think tanks." *Id.* ¶ 105.

Deripaska, however, is not permitted to rest on the allegations in the Second Amended Complaint to establish his entitlement to due process. Each element of a plaintiff's standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598, 602 (D.C. Cir. 2019) ("[O]n summary judgment, the plaintiffs must prove injury in fact with specific facts in the record." (internal quotation marks omitted)). At summary judgment, "the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts, which for the purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561. (cleaned up). Even in cases in which an administrative record exists, if the record is insufficient to establish standing, the plaintiff "must supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review." *Sierra Club v. E.P.A.*, 292 F.3d 895, 900 (D.C. Cir. 2002).

Deripaska points to no evidence substantiating his property interests in the United States and instead invites the court to provide an additional "opportunity for the parties to address the facts in dispute" concerning his U.S. property interests. Pl.'s Reply Mem. in Supp. of Cross-Mot.

for Summ. J., ECF No. 34 [hereinafter Pl.'s Reply], at 17.  The D.C. Circuit, however, has made

clear that Deripaska was obligated to "establish [his] standing by the submission of [his] arguments

and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review

proceeding."  *Sierra Club*, 292 F.3d at 900.  Deripaska's belated request for a do-over in his reply

brief simply comes too late.  *See id.*  Accordingly, the court concludes that, on this record,

Deripaska lacks standing to pursue his due process challenge to his designations.

Even if the court were to consider Deripaska's due process claim on the merits, it would

reject it.  Deripaska has primarily argued that Defendants violated his due process rights by

redacting classified information and providing him with insufficiently detailed summaries of some

of the classified information that they relied on.  *See* Pl.'s Br. at 34–37.  The IEEPA, however,

expressly contemplates that OFAC may rely on classified information and provides that it may

submit that information "to the reviewing court ex parte and in camera."  50 U.S.C. § 1702(c).  In

light of the competing national security interests at play with classified information, the

D.C. Circuit has squarely held that "due process require[s] the disclosure of *only* the unclassified

portions of the administrative record."[6]  *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d

156, 164 (D.C. Cir. 2003) (internal quotation marks omitted).  Because Defendants provided

Deripaska with the unclassified record *and* a summary of the classified record, due process would

not have required OFAC to disclose any further information to Deripaska.  *See Olenga*, 2020 WL

7024206, at *11 ("OFAC has disclosed the unclassified portions of the administrative record and

---

[6] Deripaska reads the Ninth Circuit's decision in *Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*, 686 F.3d 965, 986 (9th Cir. 2012), to require OFAC to fully disclose each of the reasons for his designation. Consistent with the D.C. Circuit, however, the Ninth Circuit has "recognize[d] that disclosure may not always be possible" and that, "in some cases, the subject matter itself may be classified and cannot be revealed without implicating national security."  *Id.* at 983; *People's Mojahedin Org. of Iran*, 327 F.3d at 1242 ("[D]ue process require[s] the disclosure of *only* the unclassified portions of the administrative record.").

unclassified summaries of the classified information, while submitting the classified portions for the Court's *ex parte* and *in camera* review. . . . Under *Holy Land*, that is all—and, indeed, more than—IEEPA and the Constitution require.").

> ### D.   Notice Under the APA

Deripaska similarly claims that Defendants' redaction of portions of the Evidentiary Memorandum violates the APA's notice requirements.  Pl.'s Br. at 41–42.  The APA requires that an agency provide "a brief statement of the grounds" for its decision.  5 U.S.C. § 555(e).  As the D.C. Circuit has explained, "nothing more than a 'brief statement' is necessary," and "the core requirement is that the agency explain why it chose to do what it did."  *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (internal quotation marks omitted).  "The requirement of § 555(e) is modest," *Roelofs v. Sec'y of Air Force*, 628 F.2d 594, 601 (D.C. Cir. 1980), but a statement of reasoning "is indispensable to sound judicial review," *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

The court has little difficulty finding that Defendants have satisfied their minimal burden of providing Deripaska with a brief statement of the grounds for their decision to block his assets and deny his delisting petition.  With respect to Deripaska's designation under E.O. 13661, OFAC issued on April 6, 2018, the Special Designation and Blocking Memorandum, which identified Deripaska as an individual who met "one or more of the criteria for designation set forth in" E.O. 13661 and E.O. 13662.  A.R. at 1.  Defendants then produced an Evidentiary Memorandum supporting Deripaska's designation, which set forth OFAC's conclusions and identified evidence justifying the determination that Deripaska "has acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation, and operates in the energy sector of the Russian Federation economy."  *Id.* at 7 (citations omitted).  While

25

classified portions of that Evidentiary Memorandum are redacted, Defendants also provided Deripaska with an unclassified summary of those findings. *See* Unclassified Summary. Plainly, Defendants have communicated the reasons for their decision to Deripaska in numerous ways.

Deripaska objects that OFAC must disclose the unclassified portions of the Evidentiary Memorandum, but it is telling that he has not marshalled a single case in support of this argument. As the court explained with respect to Deripaska's due process challenge, OFAC may rely on classified information and may submit that information "to the reviewing court ex parte and in camera." 50 U.S.C. § 1702(c). "The statute does not require OFAC to provide [Deripaska] the classified or law enforcement-privileged information supporting" its conclusion. *Sulemane v. Mnuchin*, No. 16-cv-1822 (TJK), 2019 WL 77428, at *7 (D.D.C. Jan. 2, 2019).

With respect to Deripaska's delisting petition, Defendants provided Deripaska with an eleven-page Evidentiary Memorandum that explained the bases for its conclusion that he continued to meet the standard for designation. *See* A.R. at 158–69. The Evidentiary Memorandum responded to arguments Deripaska made in support of his delisting petition and explained why OFAC nonetheless considered designation to be appropriate. *See id.* The court is satisfied that Defendants have sufficiently explained their decision to Deripaska to meet the APA's notice requirement.

### E.     Section 241 Report

Finally, Deripaska challenges his inclusion in a list of oligarchs in the Section 241 Report. In the Section 241 Report, the Secretary of the Treasury identified individuals as oligarchs if, "according to reliable public sources," they had "an estimated net worth of $1 billion or more." Section 241 Report at 1. The Secretary concluded that Deripaska satisfied that criterion. While Deripaska appeared in the Section 241 Report and was subsequently designated under E.O. 13661

26

and E.O. 13662, the Report explicitly states that it is "not a sanctions list, and the inclusion of individuals or entities in th[e] report . . . does not and in no way should be interpreted to impose sanctions on those individuals or entities." *Id.* at 2.  Moreover, the Section 241 Report was expressly not a determination that the listed individuals met the criteria for sanctions, nor did it "imply, give rise to, or create any other restrictions, prohibitions, or limitations on dealings with such persons by either U.S. or foreign persons." *Id.*

Deripaska raises three challenges to his inclusion in the Section 241 Report.[7]  First, he argues that the Secretary acted arbitrarily and capriciously by erroneously defining the term "oligarch" to focus solely on an individual's net worth as opposed to the individual's net worth *and* political ties to the Kremlin.  Pl.'s Br. at 42–46.  Second, he argues that Defendants violated the APA by failing to provide him with adequate notice of their decision to include him in the Section 241 Report.  *Id.*  at 53–55.  Third and finally, Deripaska contends that the Section 241 Report violates his Fifth Amendment due process rights because he was not provided adequate notice of the reasons for his inclusion in the Section 241 Report or an opportunity to challenge his inclusion.  *Id*. at 50–53.

### 1.   *Arbitrary and Capricious Challenge*

#### a.   Standing

Turning first to Deripaska's challenge that his inclusion in the Section 241 Report was arbitrary and capricious, the court must determine whether Deripaska has standing to bring such a claim.  Defendants argue that Deripaska lacks standing to assert such a challenge because the Report did not cause his alleged injury.  *See* Defs.' Reply at 30–33.  The court agrees.

---

[7] In addition, the parties dispute whether Deripaska's objections to the Section 241 Report are justiciable because, according to Defendants, the Report is a nonreviewable congressional report.  *See* Defs.' Reply at 28–30.  Because the court concludes that Deripaska's challenges fail for other reasons, it does not reach this argument.

Deripaska alleges that he has been injured because "foreign financial institutions terminated accounts held on behalf of Deripaska and his companies" due to his inclusion in the Section 241 Report and the banks' concomitant concern that he subsequently would be sanctioned. *See* Pl.'s Reply at 21–22.  This injury "depend[s] on the conduct of a third party not before the court." *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 381 (D.C. Cir. 2020).  While "standing is not precluded" where a party's injury depends on the conduct of a third party, "it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (internal quotation marks omitted).  "The party invoking [the court's] jurisdiction must show that the third party will act in such manner as to produce causation and permit redressability of injury." *Competitive Enter. Inst.*, 970 F.3d at 381 (internal quotation marks omitted).  Such a "theory of standing . . . '[can]not rest on mere speculation about the decisions of third parties"; it must "rel[y] instead on the predictable effect of Government action on the decisions of third parties.'" *Id.* (quoting *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019)); *see also Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007) ("[S]tanding has been found where the record presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." (internal quotation marks omitted)).

Deripaska cannot satisfy this standard because he has failed to produce any evidence that the third-party banks' decisions to terminate his accounts were a "predictable effect," *Competitive Enter. Inst.*, 970 F.3d at 381 (internal quotation marks omitted), of his inclusion in the Section 241 Report.  The Section 241 Report repeatedly disclaims that "[i]nclusion in this report . . . does not constitute the determination by any agency that any of those individuals or entities meet the criteria for designation under any sanctions program" and clarifies that mere designation as an oligarch

does not "indicate that the U.S. Government has information about the individual's involvement in malign activities."  Section 241 Report at 2.  It further states that it should not be read to "imply, give rise to, or create any other restrictions, prohibitions, or limitations on dealings with such persons by either U.S. or foreign persons."  *Id.*  In light of such conspicuous disclaimers that inclusion in the Section 241 Report did not portend sanctions against an individual, Deripaska must come forth with evidence that it was predictable that financial institutions would nonetheless presume that individuals listed in the Section 241 Report would be sanctioned forthwith.  But Deripaska has not done so.   In fact, he has presented no evidence at all to support such a causal connection.  The court is therefore left to speculate as to how financial institutions can be expected to respond to an individual's appearance on the Section 241 Report.  This is insufficient to establish standing.

What's more, Deripaska has given the court no basis on which to conclude that his injury is redressable—that is, that the financial institutions would re-open his accounts if his name were removed from the Section 241 Report.  *See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 939 (D.C. Cir. 2004) (finding plaintiffs lacked standing where they "offer[ed] nothing to substantiate their assertion that a decision from the court vacating" agency action would alter the behavior of third parties), *abrogated on other grounds by Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006).  In fact, there is every reason to believe that the financial institutions would not re-open Deripaska's bank accounts:  regardless of whether he is expunged from the Section 241 Report, Deripaska's assets have been blocked pursuant to E.O. 13661 and E.O. 13662.

Because Deripaska's claimed injury resulted from third parties as to whom he has provided no evidence to support causation or redressability, he lacks standing to challenge his inclusion in the Section 241 Report.

b.      Final agency action

Defendants also argue that even if Deripaska did have standing to challenge his inclusion in the Section 241 Report, the court could not review his challenge because the Section 241 Report does not constitute final agency action.  Defs.' Br. at 38–39.  The court agrees.

"An agency action is deemed final if it is definitive and has a direct and immediate effect on the day-to-day business of the party challenging the agency action."  *Reliable Auto. Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (cleaned up).  Final agency "action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted).

Deripaska has failed to show that the Section 241 Report determined any rights or obligations or had any legal consequences.  He argues that the Section 241 Report had legal consequences because it identified him as an oligarch and ultimately led to his designation under E.O. 13661.  Pl.'s Br. at 48–51.  Yet the Section 241 Report disclaims any such effects.  First, appearing on the list itself had no legal consequences:  the Section 241 Report states, "[T]he inclusion of individuals or entities in this report, its appendices, or its classified annexes does not, in and of itself, imply, give rise to, or create any other restrictions, prohibitions, or limitations on dealings with such persons by either U.S. or foreign persons."  Section 241 Report at 2.  Second, the Section 241 Report was patently "not a sanctions list," and an individual's inclusion in the Report did "not and in no way should be interpreted to impose sanctions" on that individual.  *Id.*

Deripaska urges the court to blur the line between the Section 241 Report and sanctions pursuant to E.O. 13661, arguing that the Section 241 Report effectively was a sanctions list because both Congress and the Secretary viewed the Section 241 Report as a precursor to formal sanctions

30

and the Secretary expressly referred to the Report when announcing sanctions under the executive orders. *See* Pl.'s Br. at 50. But Deripaska's effort to muddle these different regimes cannot overcome the fact that the Section 241 Report explicitly stated that it was not a determination that any individual met "the criteria for designation under any sanctions program." Section 241 Report at 2. Indeed, Defendants represent that of the more than 100 individuals and entities appearing on the Section 241 Report, only a "small number of other individuals" were subsequently designated pursuant to E.O. 13661 and E.O. 13662. Defs.' Reply at 32. This suggests that there was not a one-to-one relationship between an individual appearing on the Section 241 Report and being designated for sanctions. Accordingly, the court concludes that the Section 241 Report did not constitute final agency action, and thus is not reviewable. *See Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (finding census report was not final agency action because it "carrie[d] no direct consequences" and "serve[d] more like a tentative recommendation than a final and binding determination").

### 2.    APA Notice Requirements

Deripaska also challenges his listing in the Section 241 Report under the APA on the procedural ground that he was not provided adequate notice of the reasons for his inclusion or an opportunity to challenge it. Pl.'s Br. at 51–53. Once again, however, Deripaska lacks standing to bring such a challenge.

Deripaska asserts a procedural injury, as to which the "imminence and redressability requirements" are "relax[ed]." *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005). Nonetheless, a "procedural-rights plaintiff must still satisfy the general requirements of the constitutional standards of particularized injury and causation." *Id.* The plaintiff must then demonstrate that the "challenged act is substantially probable to cause the demonstrated

particularized injury." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 666 (D.C. Cir. 1996); *see also WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) ("A procedural injury claim therefore must be tethered to some concrete interest adversely affected by the procedural deprivation.").

Assuming for argument's sake that Deripaska has a procedural right that has been violated, he has not adequately proven that Defendants' violation of his procedural rights caused his particularized injury. Recall that Deripaska asserts as his concrete injury the closure of his bank accounts by third-party financial institutions. Deripaska asks this court to presume that, even though the Section 241 Report expressly does not have any bearing on an individual's qualification for sanctions, third-party financial institutions would understand the Section 241 Report to constitute evidence that the individual will be imminently sanctioned and thus would necessarily terminate the individual's bank accounts. The problem with that causal chain is that Deripaska has not offered *any* facts or evidence to "bridge the uncertain ground found in [this] causal path," which "rests on the independent acts of third parties," *Fla. Audubon Soc'y*, 94 F.3d at 670. Particularly at the summary judgment stage, this is fatal to Deripaska's showing of standing.

### 3.   *Due Process Challenge*

Finally, Deripaska argues that his inclusion in the Section 241 Report violates his due process rights because he was not provided notice and an opportunity to challenge his inclusion in the Report. Pl.'s Br. at 51–53. Deripaska claims that this resulted in not only harm to his reputation, but also "immediate harm to his economic interests, as banks closed his or his companies' accounts in direct response to his identification in the Section 241 Report." *Id.* at 53.

As the court has already held, Deripaska has not established sufficient contacts with the United States to invoke the protections of the Due Process Clause. *See supra* section III.C. But

even if Deripaska did have due process rights, his claim would fail because the reputational harms and closure of his bank accounts purportedly caused by his inclusion in the Section 241 Report are not the type of deprivations that fall within the Clause's coverage.

Deripaska has asserted a "consequential" injury—that is, his injury does not result from Defendants "extinguishing or modifying a right recognized by state law," but instead arises from a claim that Defendants' actions have so stigmatized him as to deprive him of a property interest. *See Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 119–20 (D.C. Cir. 2010) (cleaned up). As a rule, harm to "reputation alone, apart from some more tangible interests," is not "by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976). In addition to establishing that he faces a stigma from the Section 241 Report, Deripaska must prove that either "(1) the government has deprived [him] of some benefit to which [he has] a legal right . . . or (2) the government-imposed stigma is so severe that it broadly precludes" him from pursuing his chosen business. *Gen. Elec. Co.*, 610 F.3d at 121. Put differently, Deripaska must establish that the government-imposed stigma "involve[d] some tangible change of status vis-à-vis the government." *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1108–09 (D.C. Cir. 1985).

He fails to do so. Deripaska has not shown that he had a protected right to maintain the bank accounts he alleges were closed or that he is precluded from pursuing his chosen business or banking relationships as a result of his Section 241 Report listing. *See Gen. Elec. Co.*, 610 F.3d at 121. Deripaska thus has not identified a sufficient tangible interest protected by the Due Process Clause. His due process claim therefore fails.

V.      **CONCLUSION**

For the foregoing reasons, the court grants Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 27, and denies Deripaska's Cross-Motion for Summary Judgment, ECF No. 31.

A separate, final appealable Order accompanies this Memorandum Opinion.

Dated:  June 13, 2021

_____
                    Amit P. Mehta
United States District Court Judge